No. 22-_____

# In the United States Court of Appeals for the Fifth Circuit

IN RE PAXTON,

*Petitioner.*

## INDEX OF EXHIBITS

Exhibit

Plaintiffs' Original Class Action Complaint for Declaratory and Injunctive Relief[*] ...................................................................................................1

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum of Law in Support ...................................................2

Response to Plaintiffs' Motion for Preliminary Injunction and Motion to Dismiss Plaintiffs' Complaint ...................................................................3

Paxton's Motion to Quash Subpoena ......................................................................4

Plaintiffs' Reply in Support of Their Motion for Preliminary Injunction.................5

September 27 Text Order Granting Motion to Quash Subpoena............................6

Response to Defendant's Motion to Quash, Motion to Reconsider Ruling on Same, and Emergency Motion to Exclude (with exhibits) ................................7

Response to Plaintiffs' Motion for Reconsideration and Motion to Exclude ...........8

Order Granting Motion to Reconsider and Denying Motion to Quash ....................9

Attorney General Paxton's Motion to Stay .........................................................10

---

[*] For purposes of streamlining the appendix, Petitioner has not included the exhibits attached to any of the filings other than those regarding the motions to quash and stay.

Plaintiffs' Response to Defendant Attorney General Paxton's
Motion to Stay ................................................................................ 11

Attorney General Paxton's Notice of Appeal ....................................... 12

**Exhibit 1:** Plaintiffs' Original Class Action Complaint for Declaratory and Injunctive Relief

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazaleh Moayedi, DO, MPH, FACOG,**<br><br>      **Plaintiffs,**<br>**v.**<br><br>**KEN PAXTON, in his Official Capacity of Attorney General; Susan R. Deski, in her Official Capacity of County Attorney of Burleson County, Texas, and on behalf of a class of all Texas County Attorneys similarly situated; and Julie Renken, in her Official Capacity of District Attorney for Washington County, Texas, Wiley B. "Sonny" McAfee, in his Official Capacity of District Attorney for Blanco, Burnet, Llano, and San Saba Counties, Texas, Jose Garza in his Official Capacity of District Attorney for Travis County, Texas, and Fred H. Weber, in his Official Capacity of District Attorney for Caldwell County, and on behalf of a class of all Texas District Attorneys similarly situated,**<br><br>      **Defendants.** | **Civil Case No. 1:22-cv-859** |

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF[1]

---

[1] Plaintiffs assert claims against the named defendants and against two defendant classes in this lawsuit, which are collectively referred to as the "Defendant Classes").

Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, CASN, and Dr. Ghazaleh Moayed, DO, MPH, FACOG, bring this complaint against the above-named Defendants, and under Federal Rule of Civil Procedure 23, two Defendant classes of all Texas District Attorneys and all Texas County Attorneys similarly situated (collectively, the "Defendant Classes"), under the United States Constitution, the laws of the United States and the State of Texas, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202, to challenge any criminal prosecution of Plaintiffs under Texas anti-abortion statutes for lawful exercise of their constitutional rights. In support thereof, Plaintiffs allege the following:

## I.      INTRODUCTION

1.      On June 24, 2022, the Supreme Court of the United State issued its opinion in *Dobbs v. Jackson Women's Health Organization*, No. 19-1392, 2022 WL 2276808 (U.S. June 24, 2022), reversing its prior holdings in *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), as well as decades of precedent upholding the constitutional right to abortion.

2.      Leading up to and immediately following the *Dobbs* decision, reproductive justice organizations, including Plaintiffs, were threatened by those who oppose a pregnant person's[2] right to self-determination and reproductive healthcare.  Agents of the State of Texas contend that

---

[2] Any person with a womb is capable of becoming pregnant.  This group includes not only women, but also non-binary and trans persons who do not identify as women, as well as children. To include all of these groups, this Complaint refers to "pregnant people" or "pregnant Texans" throughout.  Although women are obviously targeted and marginalized by laws limiting their personal autonomy, these laws also impact other marginalized individuals as well.

App.3

virtually every activity of those who assist pregnant Texans to understand their rights and medical options is now subject to criminal prosecution. The threats have been repeated and far-ranging, and the intimidation has chilled helping professionals from providing counseling, financial, logistical, and even informational assistance to pregnant Texans who may need to access abortion care outside of the state.

3.     The Texas Attorney General ("AG Paxton") and his associates have undertaken a concerted and coordinated effort to deprive *all* Texans (and non-Texans, too) of many of their constitutional rights when those individuals and entities have any involvement with abortion, or with helping a person to understand or access legal care. AG Paxton immediately declared that pre-*Roe* statutes that criminalized abortion in Texas were in full force and effect, and activist legislators and their associates have declared that reproductive justice groups were going to be held liable for years of being complicit in murder, including for activities that were undertaken in compliance with all federal and state law requirements at the time.

4.     These efforts have not been limited to abortion itself; they have targeted those who help pregnant Texans access legal healthcare by providing financial assistance, travel arrangements, non-abortion healthcare, logistical support, and even information about accessing legal care available in other places.

5.     For instance, after sending myriad threats in the form of cease-and-desist letters, social media posts, "tweets," and other forms of communication, a group of Texas legislators that comprise the "Texas Freedom Caucus" sent threatening letters to corporations and law firms who

have promised to assist their staff in accessing legal care outside of Texas. One portion of a July

7, 2022 letter to the Sidley Austin law firm states:[3]

>It has come to our attention that Sidley Austin has decided to reimburse
>the travel costs of employees who leave Texas to murder their unborn
>children. It also appears that Sidley has been complicit in illegal
>abortions that were performed in Texas before and after the Supreme
>Court's ruling in *Dobbs v. Jackson Women's Health Organization*, No.
>19-1392. We are writing to inform you of the consequences that you
>and your colleagues will face for these actions.
>
>Abortion is a felony criminal offense in Texas unless the mother's life is in
>danger. *See* West's Texas Civil Statutes, article 4512.1 (1974) (attached).
>The law of Texas also imposes felony criminal liability on any person
>who "furnishes the means for procuring an abortion knowing the
>purpose intended." West's Texas Civil Statutes, article 4512.2 (1974).
>This has been the law of Texas since 1925, and Texas did not repeal
>these criminal prohibitions in response to *Roe v. Wade*, 410 U.S. 113
>(1973). These criminal prohibitions extend to drug-induced abortions if
>any part of the drug regimen is ingested in Texas, even if the drugs were
>dispensed by an out-of-state abortionist. To the extent that Sidley is
>facilitating abortions performed in violation of article 4512.1, it is
>exposing itself and each of its partners to felony criminal prosecution and
>disbarment.

6.      The letter goes on for four pages, and ultimately concludes with:

---

[3] A copy of the July 7, 2022 letter to Sidley Austin is attached as **Exhibit A** to this Complaint
and is fully incorporated by reference. The letter was released publicly by the Texas Freedom
Caucus and is available at
https://www.freedomfortexas.com/uploads/blog/3b118c262155759454e423f6600e2196709787a
8.pdf.

PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          4

It also appears that Sidley may have aided or abetted drug-induced abortions in violation of the Texas Heartbeat Act, by paying for abortions (or abortion-related travel) in which the patient ingested the second drug in Texas after receiving the drugs from an out-of-state provider. Litigation is already underway to uncover the identity of those who aided or abetted these and other illegal abortions. In light of this pending litigation, as well as any anticipated litigation that might ensue, you and your colleagues at Sidley must preserve and retain all documents, data, and electronically stored information relating in any way to: (1) Any abortions performed or induced in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if tested), including any such abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021; (2) Any abortions performed or induced in Texas on or after June 24, 2022, including abortions performed while Judge Weems's TRO was in effect from June 28, 2022, through July 1, 2022; (3) Any abortion that occurred on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas, even if the drugs were dispensed by a provider outside the state of Texas; and (4) The identity of any person or entity who has aided or abetted the abortions described in (1) – (3), including anyone at your firm, and anyone who paid for or in any way reimbursed the costs of those abortions.

7.      The "litigation" referred to in the letter to Sidley Austin is a series of Rule 202 Petitions filed in Texas state courts, two targeting Plaintiffs here (Lilith Fund and TEA Fund), one targeting executives at Whole Women's Health and Alamo Women's Reproductive Services, another targeting a researcher at the University of Texas who studied self-managed abortions after SB8, and one targeting Yvette Ostolaza, managing partner of Sidley Austin.  These Rule 202 actions seek deposition testimony related to abortions the petitioners—all represented by Jonathan Mitchell and Senator Bryan Hughes—apparently believe ran afoul of Texas's Senate Bill 8 ("SB8") and pre-*Roe* statutes.  Messrs. Mitchell and Hughes previously drafted and Senator Hughes sponsored SB8, which was famously separated from state enforcement in order to prevent pre-enforcement judicial review by the federal courts. *Whole Woman's Health v. Jackson*, __ U.S. __, 142 S. Ct. 522, 211 L.Ed.2d 316 (2021).

8.     The 202 Petitions and the July 7 letter from the Texas Freedom Caucus mirror one another in parts word-for-word, evidencing a partnership and/or coordinated effort between private and state actors to intimidate Plaintiffs and others based on their willingness to help clients, employees—or anyone else—access legal healthcare in another state.[4]

9.     Plaintiffs in this action are Texas-based non-profit abortion funds and practical support networks (organized under Internal Revenue Code § 501(c)(3)), and an individual doctor who also serves as a board member on one of the non-profits, who seek a declaratory judgment and injunction to declare null and void the application of Texas anti-abortion laws (Texas REV. CIV. STATS. ANN. ART. 4512.1, 4512.2, 4512.3, 4512.4, 4512.6[5] (("Pre-*Roe* Statutes")) and TEXAS HEALTH & SAFETY CODE § 170A.001, *et seq.* "Trigger Ban") to Plaintiffs based upon Plaintiffs' exercise of their First Amendment Constitutional rights and/or their well-established right to travel interstate.

10.    Texas currently has an intricate, contradictory, and complicated set of laws regulating and outright banning abortion (and the Trigger Ban will soon add to that complexity). In addition to the criminal prohibitions, Texas enacted SB8 in 2021, in which the state authorized private individuals to police their neighbors by bringing civil lawsuits against anyone who "aided or assisted" with abortions in Texas.

11.    Just before *Dobbs* was decided, in anticipation of the decision and out of an abundance of caution (largely due to the previous threats made against them), Plaintiffs paused all

---

[4] In jurisdictions in which District Attorneys have publicly promised not to prosecute abortion-related crimes, SB8 works as a backstop to ensure providers and others are still chilled from providing abortion-related assistance by possible liability in a civil suit under SB8.
[5] Previously codified at Tex. Pen. Code art. 1191, 1192, 1193, 1194, and 1196, respectively.

PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          6

activities assisting access to abortion care, including for care provided out of state. The non-profit Plaintiffs have not provided direct abortion services (they never have), nor have they paid or reimbursed any provider or other individual or entity for the provision of abortion services within or outside of Texas.  Dr. Moayedi also ceased providing all abortion care, both in Texas and in other states where it remain legal an din which she is also licensed to practice medicine.

12.     Plaintiffs wish to resume the following activities: (a) funding legal, out-of-state abortions for pregnant Texans (i.e. including directly paying and/or reimbursing out-of-state licensed providers of abortion services and providing financial aid to pregnant Texans for that purpose); (b) providing informational materials and planning assistance (such as organizing and funding transportation and lodging) to pregnant Texans for obtaining legal, out-of-state abortions; and (c) transporting pregnant Texans to out-of-state licensed providers of safe, legal abortion.  Dr. Moayedi also wishes to resume her travel to other states to provide care to patients and she wishes to provide care to patients in other states via telehealth practices from her location in Texas.

13.     Despite Plaintiffs' cessation of activities directly related to abortion, Texas state actors have asserted that Plaintiffs engaged in criminal activity both before and after the issuance of *Dobbs*.  Specifically, Texas Legislators have threatened that abortion funds and their donors will be prosecuted for murder. They have asserted retroactive application of the Pre-*Roe* statutes against providers (not parties to this action) and abortion funds.

14.     Texas state actors threaten criminal prosecution of Plaintiffs, their staff, volunteers, and donors under both the Trigger Ban and the Pre-*Roe* statutes. If these statutes are construed as expansively as asserted by Texas state actors (including the Attorney General) both sets of laws violate the constitutional rights of Plaintiffs, their staff, volunteers, and donors. Further, the differing statutory constructs conflict significantly and thus fail to provide fair notice to Plaintiffs,

App.8

their staff, volunteers, and donors of the contours of criminal liability for activities Plaintiffs have historically performed (prior to the *Dobbs* opinion) and wish to resume performing.

15.     Plaintiffs seek to enjoin Defendants from applying Texas's anti-abortion laws to Plaintiffs for the legal exercise of their rights. Plaintiffs also seek a declaratory judgment declaring unconstitutional, null and void the retroactive application of the Pre-*Roe* Statutes and to enjoin Defendants from applying them against Plaintiffs, their staff, volunteers, and/or donors for conduct that preceded the *Dobbs* decision.

## II.     JURISDICTION AND VENUE

16.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This is an action to enforce civil and constitutional rights arising under 42 U.S.C. § 1983 and the United States Constitution.

17.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201-2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of the Court, including the Court's inherent authority to enforce the supremacy of federal law as against contrary state law.

18.     Venue is appropriate in this district under 28 U.S.C. § 1391(b)(1) and (b)(2) because one or more of the Defendants resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

19.     This case is appropriately filed in the Austin Division because all Defendants maintains offices in this division.  Assignment to the Austin Division is also proper because several

Plaintiffs maintain their headquarters in the Austin Division and serve Texans who reside in the Austin Division.[6]

### III.     PARTIES

#### A.     Plaintiffs

20.     Plaintiffs are non-profit entities that provide emotional, financial, logistical, practical, and informational assistance to those who may become pregnant and need or choose to consider abortion as an option, and an individual medical provider.  Plaintiffs support reproductive justice, which recognizes and supports the human right to maintain personal bodily autonomy, have children, not have children, and parent children in safe and sustainable communities.

21.     Reproductive justice is not just about abortion. Abortion access is critical, and people of color, children, and other marginalized people also often have difficulty accessing contraception, comprehensive sex education, STI prevention and care, alternative birth options, adequate prenatal and pregnancy care, domestic violence assistance, adequate wages to support our families, safe homes, and much more.  Plaintiffs are reproductive justice-focused organizations and individuals who have all altered their behavior following the *Dobbs* decision and the associated threat of criminal prosecution under Texas law.  They all want to resume their prior activities as permitted by the United States Constitution and seek intervention from this Court to allow them do so safely.

---

[6] Several other cases pending in the Western District of Texas are related to this case.  *Wendy Davis et al., v. Mistie Sharp, et al*., Cause No. 1:22-cv-00373-RP, *Whole Women's Health et al. v. Jackson et al*., Cause No. 1:21-cv-00616-RP, and *United States of America v. Texas*, Cause No. 1:21-cv-00796-RP, are all pending in front of the Honorable Robert Pitman, and also challenge Texas statutes regulating and/or prohibiting abortion, including Senate Bill 8.

22.     Plaintiff Fund Texas Choice's ("FTC's") mission is to help Texans equitably access abortion through safe, confidential, and comprehensive practical support. FTC is a nonprofit organization incorporated in Texas that provides practical, logistical, and emotional support to pregnant Texans seeking medical care, including legal health care within Texas and legal abortions outside of Texas. FTC was founded in response to HB2, a 2013 Texas statute that shuttered over half of the state's abortion clinics, imposing long wait times on patients and forcing them to travel long distances for care. In the past, FTC booked and directly paid for the transportation and lodging of companions for minor clients or clients who have a fetal anomaly. FTC does not—and never did—fund abortions directly.

23.     The mission of Plaintiff The North Texas Equal Access Fund ("TEA Fund") is to foster reproductive justice. It historically provided financial, emotional, and logistical support for abortion patients in North Texas. TEA Fund also provides education, information, advocacy and activism on behalf of pregnant Texans in need of abortion care. Since the *Dobbs* decision, TEA Fund has paused its funding of abortions as it tries to comply with Texas law, but it would like to resume its constitutional activity. TEA Fund is a nonprofit organization incorporated in Texas and based in North Texas.

24.     Plaintiff The Lilith Fund for Reproductive Equity's ("Lilith Fund's") mission is to foster reproductive justice. Lilith Fund historically provided financial, emotional, and logistical support for abortion patients in Central Texas. Its core values are compassion, intersectionality, anti-racism, client-centeredness, inclusivity and collaboration. In addition to its historical funding activities, Lilith Fund conducts educational and informational efforts, and provides advocacy and activism in support of reproductive justice principles. Since the *Dobbs* decision, Lilith Fund has paused its funding of abortions for Texans as it tries to comply with Texas law, but it would like

to resume it constitutional activity.  Lilith Fund is a nonprofit organization incorporated in Texas and based in Central Texas.

25.     Plaintiff Frontera Fund's mission is also to foster reproductive justice.   It historically provided financial, emotional, and logistical support for low-income abortion patients in the Rio Grande Valley.  In addition to its historical funding activities, Frontera Fund conducts educational and informational efforts and provides advocacy and activism in support of reproductive justice principles.  Since the *Dobbs* decision, Frontera Fund has paused its funding of abortions for Texans as it tries to comply with Texas law, but it would like to resume its constitutional activity.  Frontera Fund is a nonprofit organization incorporated in Texas and based in South Texas.

26.     Plaintiff The Afiya Center is a nonprofit organization incorporated in Texas and based in Dallas. Its mission is to serve Black women and girls by transforming their relationship with their sexual and reproductive health by addressing the consequences of reproductive oppression. Since the *Dobbs* decision, The Afiya Center has also paused its funding of abortions for Texans as it tries to comply with Texas law and because of the threat of potential prosection since *Dobbs* was decided, but it would like to resume conducting its constitutionally protected activities.

27.     Plaintiff West Fund is a non-profit, grass-roots organization based in El Paso, Texas.  It was founded in November of 2013 after a variety of restrictions on abortion clinics were imposed by the Texas Legislature.  Its mission historically was to provide direct and/or supportive funding to assist pregnant people seeking abortion services in El Paso, Texas; Ciudad Juarez, Chihuahua, Mexico; and throughout southern and eastern New Mexico.  It operates a Spanish and English hotline through which it provides information to callers and does client intake, though it

presently only does so in Mexico and New Mexico, where abortion remains legal. West Fund has also collaborated with other Texas reproductive justice organizations to advance advocacy for abortion access and engages in other political activities, with reproductive justice as its central focus. It also provides comprehensive sexual education programs to high schoolers. West Fund has previously funded and would like to resume funding reproductive healthcare, abortions, and people who seek abortions. West Fund also openly communicates with the public regarding abortion, voicing its support for abortion rights, advocating for reproductive freedom and reproductive justice, and seeking the support of others who share the same values.

28.     The mission of Plaintiff Jane's Due Process ("JDP") is to help ensure that young people in Texas have full reproductive freedom and autonomy over their healthcare decisions. Most young people involve a parent or guardian in their abortion decision if it is safe for them to do so. JDP serves those who cannot—young people who have parents or guardians who are deceased, incarcerated, or abusive; who are inclined to kick them out upon learning of their pregnancy or plans for an abortion; or who would try to coerce them to carry to term. JDP is a nonprofit organization incorporated in Texas, and it historically provided logistical, financial, and emotional support to pregnant Texans seeking medical care, including legal health care within Texas and legal abortions outside of Texas. JDP also used to provide funds to abortion providers in Texas on behalf of young patients in the state to subsidize the cost of their care. Occasionally, JDP also referred young people to abortion providers and secured the abortion appointments for them. JDP has not conducted any of these activities since the decision in *Dobbs* was issued. JDP would like to resume these activities in accordance with their constitutional rights, but are chilled by the threats of potential criminal prosecution.

29.     Plaintiffs FTC, TEA Fund, Lilith Fund, Frontera Fund, The Afiya Center, West Fund, and JDP are collectively referred to as the "Fund Plaintiffs" in this Complaint.

30.     Plaintiff Clinic Access Support Network ("CASN") is a predominantly volunteer, consensus-based, non-hierarchical practical support network that has provided transportation, meal stipends, accommodations, childcare and dependent care assistance, and support and compassionate care to people seeking abortion services in Greater Houston Area and the Southeast Texas region.  CASN generates no revenue, charges no fees for its services, and exists purely out of the generosity and commitment of its volunteers and staff to be of service to people in need. CASN has previously provided, and wishes to continue to provide assistance to people in need of an abortion, including pregnant Texans who need to access care outside of the state.  It cannot safely do so until the threat of criminal prosecution for those activities is removed.

31.     Plaintiff Dr. Ghazaleh Moayedi, DO, MPH, FACOG, is a board-certified OB/GYN and complex family planning specialist who resides in Texas.  She holds active licenses from the relevant medical licensing authorities in 20 states, including Texas, and she is authorized to practice medicine in all of those states.  Historically, as part of her practice, Dr. Moayedi provided abortions to Texans within the state in compliance with all applicable laws.  She also provided abortions to patients in other states in which she is licensed in accordance with all applicable laws in those other states.  Dr. Moayedi also wishes to provide abortion care via telemedicine to patients in states where it is legal, from her location in Texas.  The abortions she performed in other states historically included patients from Texas, particularly when she provided abortions in states other than Texas after Texas Senate Bill 8 became effective on September 1, 2021.  Since the decision in *Dobbs*, Dr. Moayedi stopped  traveling to other states in which abortions remain legal because she fears that performing any abortion on a Texas resident as a licensed Texas physician could

subject her to criminal prosecution and/or threaten her license to practice medicine in Texas. Dr. Moayedi is also a member of the Board of Directors for Plaintiff TEA Fund, and has historically provided funding to assist Texans to obtain abortions. She has also paused that activity since the *Dobbs* decision, but would like to resume all of her constitutionally protected activity.

32.    All Plaintiffs openly communicate with the public regarding abortion, voicing support for abortion rights and reproductive healthcare, advocating for reproductive freedom and reproductive justice, and seeking the support of others who share the same values.

33.    Each of the Fund Plaintiffs and CASN assert claims on behalf of itself, its staff, volunteers, and donors. Each Fund Plaintiff and CASN have suffered a direct injury because (a) they are being required to divert organizational resources to counteract the State of Texas' threats of criminal liability against it and its staff, volunteers, and donors; (b) their donors are chilled from making financial donations—the source of their funding as a nonprofit organization—because of threats of criminal prosecution against the donors; and, (c) each organization's mission is being frustrated. Each Fund Plaintiff and CASN are also suffering the imminent threat of additional direct injury because, according to public representations by State actors, they are threatened with criminal prosecution and civil and criminal penalties. Each Fund Plaintiff and CASN also have representational standing based on injuries to their staff, volunteers, and donors, because at least one of their staff, at least one of their volunteers, and at least one of their donors has standing; the interests at stake are germane to their purpose; and, neither the claims nor the relief requested requires participation of the organization's individual staff, volunteers, or donors. As set forth below, state actors' public threats regarding enforcement show that, in addition to each Fund Plaintiff and CASN themselves, their staff, volunteers, and donors are all likely targets of criminal prosecution.

**B.      Defendants**

34.      Defendant Ken Paxton is the Attorney General of the State of Texas and may be served at the Office of the Attorney General, 300 West 15th Street, Austin, Texas 78701. Defendant Paxton is sued in his official capacity as Attorney General, and in that capacity, he has authority to assist local prosecutors with criminal prosecutions upon request, TEX. GOV'T CODE 574.004, and he is authorized under the Trigger Ban to pursue a civil penalty of not less than $100,000 for any violation of that law.  TEX. HEALTH & SAFETY CODE 170A.005.

35.      Defendant Julie Renken is an individual sued in her official capacity as the District Attorney of Washington County, Texas.  She may be served at Courthouse Annex, 110 S. Park Street, Brenham, TX 77833.

36.      Defendant Susan R. Deski is an individual sued in her official capacity as the County Attorney of Burleson County, Texas and may be served at 100 West Buck Street, Suite 402, Caldwell, Texas 77836.

37.      Defendant Wiley B. "Sonny" McAfee is an individual sued in his official capacity as the District Attorney of Blanco County, Texas; the District Attorney of Burnet County, Texas; the District Attorney of Llano County, Texas; and the District Attorney of San Saba County, Texas. He may be served at 1701 E. Polk, Suite 24, Burnet, Texas 78611.

38.      Defendant José Garza is an individual sued in his official capacity as the District Attorney of Travis County, Texas and may be served at Ronald Earle Building, 416 West 11th St., Austin, Texas 78701.

39.      Defendant Fred H. Weber is an individual sued in his official capacity as the District Attorney of Caldwell County, Texas and may be served at 1703 S. Colorado Street, Lockhart, Texas 78644.

40. In their official capacities as District Attorneys, each DA Defendant is required to "represent the State in all criminal cases in the district courts of his district." TEX. CODE CRIM. PROC. art. 2.01. Therefore, each DA Defendant has the sole authority of the State of Texas within his or her respective districts to file and pursue criminal cases, including any cases charging a violation of the Trigger Ban and/or Pre-*Roe* abortion statutes.

41. Burleson County, Texas does not have an elected DA position. As such, under Texas statute, the County Attorney fulfills the duties traditionally required of a DA. TEX. CODE CRIM. PROC. art. 2.02. In her official capacity as County Attorney for Burleson County, Texas, County Attorney Deski therefore has the sole authority of the State of Texas within Burleson County to file and pursue criminal cases, including any cases charging a violation of the Trigger Ban and/or pre-*Roe* abortion statutes.

## IV. FACTUAL ALLEGATIONS

### A. Relevant Texas Laws

#### TEXAS'S PRE-*ROE* CRIMINAL ABORTION BAN

42. Prior to the Supreme Court's opinion in *Roe v. Wade*, 410 U.S. 113 (1973), the Texas Penal Code contained Articles 1191, 1192, 1193, 1194, and 1196[7] (collectively "Pre-*Roe* Statutes"), under which abortion was criminalized.

43. Art. 1191 of the Texas Penal Code stated:

> If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine, or shall use towards her any violence or means whatever

---

[7] Now codified at Tex. Rev. Stats. Ann. arts. 4512.1, 4512.2, 4512.3, 4512.4, and 4512.6 respectively.

externally or internally applied, and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled. By 'abortion' is meant that the life of the fetus or embryo shall be destroyed in the woman's womb or that a premature birth thereof be caused.

44.     Art. 1192 stated, "Whoever furnished the means for procuring an abortion knowing the purpose intended is guilty as an accomplice."  This accomplice liability is punishable by two to five years in state penitentiary.  Texas Penal Code art. 1192 (West 1961).

45.     Texas courts interpreted "furnish[ing] the means for procuring an abortion" to apply to providing drugs, medicine, or instruments that could produce an abortion, or committing violence upon the pregnant person to bring about an abortion.  *See Fondren v. State*, 169 S.W. 411, 414-16 (1914).

46.     In *Roe v. Wade*, 410 U.S. 113, 164 (1973), the U.S. Supreme Court affirmed a declaratory judgment that the Pre-*Roe* Statutes were unconstitutional.  It held that no further relief was necessary because the Court "assume[d] the Texas prosecutorial authorities will give full credence to this decision that the present criminal abortion statutes of that State are unconstitutional." *Roe*, 410 U.S. at 166.

47.     Despite the *Roe* holding, which remained binding law until June 24, 2022, in the Spring of 2021, the Texas Legislature included a legislative finding in Section 2 of Senate Bill 8, 87th Leg., Reg. Sess., popularly called the "Texas Heartbeat Act" ("SB 8") that Texas "never repealed, either expressly or by implication, the state statutes enacted before the ruling in *Roe v. Wade*, 410 U.S. 113 (1973), that prohibit and criminalize abortion unless the mother's life is in danger." S.B. 8 § 2 (Tex. 2021).

48.     Before and after the *Dobbs* opinion, Texas state actors have asserted that overruling *Roe* would immediately resurrect these Pre-*Roe* Statutes. Specifically, Texas state actors have continuously asserted that the Pre-*Roe* Statutes criminalize abortion funds, including Plaintiffs, for all activities related to abortion, regardless of whether abortions take place in a jurisdiction outside of Texas in which abortion is legal. Some state actors have gone so far as to contend that the Pre-*Roe* Statutes should be enforced retroactively, based on the theory that courts do not have the power to invalidate laws. Their tortured theory of constitutional law and federalism asserts that the Pre-*Roe* Statutes were always in effect, but just lacked DAs with the executive will to enforce them. Thus, these state actors and their associates contend that those who supported pregnant Texans in obtaining abortions over the past 50 years can be prosecuted as long as the statute of limitations has not expired under the Pre-*Roe* Statutes.

### TEXAS TRIGGER BAN

49.     In July 2021, Texas also enacted an abortion ban that would go into effect on the 30th day after (1) the issuance of a Supreme Court opinion overruling *Roe v. Wade*, 410 U.S. 113 (1973) either wholly or in part; (2) the issuance of any other Supreme Court opinion "that recognizes . . . the authority of the states to prohibit abortion;" or, (3) adoption of a constitutional amendment that "restores to the states the authority to prohibit abortion." 2021 Tex. Sess. Law Serv. Ch. 800 (H.B. 1280), Sec. 3 (West); TEXAS HEALTH & SAFETY CODE § 170A.001, *et seq.*

50.     The Trigger Ban prohibits any abortion except those performed by a licensed physician to prevent the death or serious risk of substantial impairment of a major bodily function of the pregnant person. TEXAS HEALTH & SAFETY CODE § 170A.002.

51.     Violations of the Trigger Ban are felony crimes. TEXAS HEALTH & SAFETY CODE § 170A.004.

52. The Trigger Ban also imposes a civil penalty of "not less than $100,000 for each violation." TEXAS HEALTH & SAFETY CODE § 170A.005. AG Paxton is authorized to pursue these civil penalties on behalf of the State and has indicated his intent to do so.

53. As in SB 8, the Trigger Ban also includes a legislative finding that "the State of Texas never repealed, either expressly or by implication, the state statutes enacted before the ruling in *Roe v. Wade*, 410 U.S. 113 (1973), that prohibit and criminalize abortion unless the mother's life is in danger." 2021 Tex. Sess. Law Serv. Ch. 800 (H.B. 1280), Sec. 4 (West).

54. The Trigger Ban addresses its effect on laws already in effect, stating "that conduct is subject to a civil or criminal penalty under this chapter does not abolish or impair any remedy for the conduct that is available in a civil suit." TEXAS HEALTH & SAFETY CODE § 170A.006.

55. The Trigger Ban becomes effective on August 25, 2022.

**TEXAS PENAL CODE – CRIMINAL RESPONSIBILITY FOR THE CONDUCT OF ANOTHER**

56. Texas defines criminal responsibility for the conduct of another in Section 7.02 of the Penal Code. A person is criminally responsible for an offense committed by the conduct of another if:

(1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or

(3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

TEX. PENAL CODE ANN. § 7.02(a).

## TEXAS CRIMINAL JURISDICTION STATUTE

57.     Texas also defines its state criminal jurisdiction by statute. Section 1.04(a) of the Texas Penal Code provides the State with "jurisdiction over an offense that a person commits . . ." if:

>   (1)     either the conduct or a result that is an element of the offense occurs inside this state;
>
>   (2)     the conduct outside this state constitutes an attempt to commit an offense inside this state;
>
>   (3)     the conduct outside this state constitutes a conspiracy to commit an offense inside this state, and an act in furtherance of the conspiracy occurs inside this state; or
>
>   (4)     the conduct inside this state constitutes an attempt, solicitation, or conspiracy to commit, or establishes criminal responsibility for the commission of, an offense in another jurisdiction that is also an offense under the laws of this state.

TEX. PENAL CODE ANN. § 1.04(a).

## TEXAS SENATE BILL 8

58.     SB8, which went into effect on September 1, 2021, authorizes private citizens to bring a civil action in strict liability tort against any person who performs or "aids or assists" certain abortions in Texas.

59.     The civil liability provisions of SB8, which are contained in Section 171.208 of the Texas Health & Safety Code, provide that a suit may be brought against a person who "performs or induces an abortion in violation of this subchapter" or any person who "knowingly engages in conduct that aids or abets the performance or inducement of an abortion…if the abortion is performed or induced in violation of this subchapter…" TEXAS HEALTH & SAFETY CODE § 171.208(a)(1), (2).

60.     Section 171.201 provides the definitions that apply to certain terms within Subchapter H of Chapter 171 of the Texas Health & Safety Code (the subchapter created by SB8). It defines "physician" as "an individual licensed to practice medicine in this state…" TEXAS HEALTH & SAFETY CODE § 171.201(4).  Thus, when Section 171.204 prohibits "a physician" from knowingly performing or inducing an abortion unless the test is done and no heartbeat is found, that prohibition applies only to "individual[s] licensed to practice medicine in this state[.]"  *Id*.

61.     SB8's civil liability provisions provide a means for private citizens to sue physicians in Texas for performing post-cardiac activity abortions, and to sue any person who may have "aided or assisted" such an abortion.

62.     SB8 has been declared unconstitutional by a Texas MDL Court.  The Defendants in the MDL have taken an interlocutory appeal, which is pending before the Third Court of Appeals in Austin.

63.     SB8 was purposely drafted to avoid prospective judicial review by the federal courts, which it has so far succeeded in doing.[8]  One of the bill's authors, former Texas Solicitor General, Jonathan F. Mitchell, was quoted in a recent news article:

> "We didn't want bounty hunters filing lawsuits under SB 8," Mitchell said in an email. "A bounty-hunter lawsuit would have provided an opportunity for a court to declare the statute unconstitutional."
>
> "The entire point of SB 8," he added, "was to prevent the judiciary from ruling on the constitutionality of the statute." In other words, the loophole isn't effective because it leads to lawsuits but because it creates the threat of them. "No one wanted to take the risk."…

---

[8] *See* Paulsen, Stephen, *The Legal Loophole that Helped End Abortion Rights,* July 30, 2022, *accessible at* https://www.courthousenews.com/the-legal-loophole-that-helped-end-abortion-rights, attached as **Exhibit B**.

"The Supreme Court is subject to checks and balances, just like the other institutions of our government," he said in an email. "There is nothing wrong with a state enacting a law to evade judicial review."[9]

### B. The U.S. Constitution Guarantees and Protects Plaintiffs' Right to Travel Freely Among and Across State Borders.

64. The right to travel is a fundamental constitutional right of all citizens of the United States. As the Supreme Court stated in *Saenz v. Roe*, 526 U.S. 489, 500 (1999):

> The "right to travel" discussed in our cases embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

65. Article IV, § 2 of the United States Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

66. The Fourteenth Amendment guarantees that:

> [a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

U.S. CONST. AMEND. XIV.

67. The Constitution also provides that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States . . . ." U.S. CONST. ART. I, § 8, CL.

---

[9] *See id.*

3. The positive grant of authority to Congress necessarily implies that states may not regulate commerce "among the several States."

68. Recognition of the right to travel dates back to the earliest period of self-government in the United States, under the Articles of Confederation, Article IV, which guaranteed the right of "free ingress and regress to and from" neighboring States.

69. The right to travel guarantees a citizen's ability to journey into other states and return to the citizen's state of residence.

70. The right to travel also includes a newly-arrived or traveling citizen's right to be treated equally to the destination state's residents and to receive the same services without discrimination or classification.

71. Thus, under the United States Constitution, no state can enforce its criminal laws to prevent citizens from traveling to or from another state without violating: (a) the Commerce Clause; (b) the Privileges and Immunities clauses of both Article IV and the Fourteenth Amendment; (c) the Due Process clauses of the Fifth and Fourteenth Amendments; and, (d) the First Amendment. A state may not enforce its own criminal laws to prohibit conduct that occurs in another state, where the conduct is legal. Moreover, as a matter of Texas law, application of the Trigger Ban and the Pre-*Roe* abortion statutes to Texans' travel out-of-state is barred by Texas' own expression of the limits of its criminal jurisdiction.

**C.      The U.S. Constitution Protects Plaintiffs' Right to Freely Associate, Speak, and Fund Others' Travel Across State Borders.**

72. Plaintiffs and their staff, volunteers, and donors have First Amendment rights to associate freely with each other and with pregnant Texans and to engage in expressive conduct,

including providing funding for pregnant Texans to access out-of-state services that are legal where rendered, including abortion.

73.     Pregnant Texans, including those who seek Plaintiffs' assistance, have constitutional rights to travel to states where full reproductive care—including abortions—is legal.

74.     Plaintiffs' use of funds in furtherance of their missions is considered speech and is protected by the First Amendment.

75.     Charitable donations are a protected form of freedom of speech and association under the First Amendment.  Organizations and their donors have a strong privacy interest in their affiliation—including the funding relationship—which is grounded in the First Amendment.

76.     A law that subjects donors or volunteers to prosecution or civil liability on the basis of their exercise of First Amendment rights (such as donating funds and/or time to a charitable organization) violates the First Amendment, even if the organization itself were accused of illegal activity.  *Elfbrandt v. Russell*, 384 U.S. 11, 17 (1966).

**D.     Irreparable Harm to Plaintiffs**

77.     On June 24, 2022, only hours after the *Dobbs* opinion was announced, AG Paxton issued an advisory regarding the Trigger Ban and asserting that the Pre-*Roe* Statutes could be enforced by DAs and County Attorneys immediately:

> … some prosecutors may choose to immediately pursue criminal prosecutions based on violations of Texas abortion prohibitions predating *Roe* that were never repealed by the Texas Legislature.[FN omitted]. … Under these pre-Roe statutes, abortion

providers could be criminally liable for providing abortions starting today.[10]

78.     On June 28, 2022, AG Paxton confirmed this via tweet: "[b]ut w/ SCOTUS's Dobbs decision, these laws are 100% in effect & constitutional."[11]

79.     After release of Paxton's Advisory, the Pre-*Roe* Statutes were added back into Vernon's Texas Civil Statutes, available on the Texas Legislature's website, which also notes that they were "held to have been impliedly repealed in *McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004)."[12]

80.     Although AG Paxton is the chief law enforcement authority in Texas (apart from Governor Abbott), and although AG Paxton has the authority to bring civil actions under the Trigger Ban, it is the District and County Attorney Defendants who have the sole power under the Texas Constitution to bring criminal charges. *State v. Stephens*, No. PD-1032-20, ___ S.W.3d ___, 2021 WL 5917198, at *6-11 (Tex. Crim. App. Dec. 15, 2021) (finding statute granting criminal enforcement power to the Attorney General to be unconstitutional and noting that these powers are granted to County and District Attorneys). The Attorney General's office nevertheless offers opinions construing laws and advising Texas governmental officials regarding the effect of certain laws, including criminal laws, and AG Paxton has done so here. Consequently, given the

---

[10] *Ken Paxton, Advisory on Texas Law Upon Reversal of* Roe v. Wade (June 24, 2022), https://www.texasattorneygeneral.gov/sites/default/files/images/executive-management/Post-Roe%20Advisory.pdf. (Attached as **Exhibit C**).

[11]   This Tweet is still viewable as of the time of this filing on Attorney General Ken Paxton's Twitter timeline at https://twitter.com/KenPaxtonTX/status/1541877550653313024. (Attached as **Exhibit D**).

[12] VERNON'S TEX. CIV. STATS. Ch. 6-1/2 (June 24, 2022), available at https://statutes.capitol .texas.gov/Docs/SDocs/VERNON'SCIVILSTATUTES.pdf.

PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          25

State of Texas's chief law enforcement officer's position that the Pre-*Roe* Statutes are enforceable, the threat of potential prosecution by the DA and County Attorney Defendants—none of whom has disavowed the Attorney General's position on the Pre-*Roe* Statutes—is presently chilling.

81.     In fact, many Texas DAs have publicly indicated that they intend to enforce the Pre-*Roe* Statutes and the Trigger Ban, and consider charges on a case-by-case basis as they do other crimes.[13]

82.     Members of the Texas Legislature have also confirmed their intention that the Pre-*Roe* Statutes and Trigger Ban apply beyond the borders of Texas.  The July 7, 2022 letter from the Texas Freedom Caucus to Sidley Austin discussed in paragraphs 5-8, above, is just one example. Prior to the issuance of the *Dobbs* opinion, Texas Representative Briscoe Rowell Cain III ("Cain") also asserted in cease-and-desist letters to Texas abortion funds (including Fund Plaintiffs) that Texas abortion funds, their donors, employees, and volunteers are subject to prosecution under the Pre-*Roe* Statutes.  Specifically, in a letter to Plaintiff Lilith Fund, Representative Cain stated that the Pre-*Roe* Statutes "continue[] to exist as the law of Texas," that Lilith Fund was "committing criminal acts," and that these alleged criminal acts exposed everyone involved in Lilith Fund, "including your employees, volunteers, and donors" to criminal prosecution and imprisonment.[14]

---

[13] J. David Goodman and Jack Healy, *In States Banning Abortion, a Growing Rift Over Enforcement*, The New York Times (nytimes.com), June 29, 2022, https://www.nytimes.com/2022/06/29/us/abortion-enforcement-prosecutors.html; Lauren Rangel, *Some Texoma District Attorneys Say they will Prosecute Abortion Cases*, KXII (kxii.com), June 30, 2022, https://www.kxii.com/2022/06/30/some-texoma-district-attorneys-say-they-will-prosecute-abortion-cases/; Oscar Saravia, *Smith County District Attorney will Prosecute Abortion-related Crimes Like any Other Case*, Tyler Morning Telegraph (tylerpaper.com), July 2, 2022, https://tylerpaper.com/news/smith-county-district-attorney-will-prosecute-abortion-related-crimes-like-any-other-case/article_6990012c-f71b-11ec-9ea4-a30dfafdd919.html.
[14] The Cain letter is attached as **Exhibit E**.

PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          26

83.     Post-*Dobbs*, Representative Cain has continued to assert that abortion funds and their donors will be prosecuted for murder. On June 28, Cain tweeted, in part, "[a]nyone performing or aiding an abortion in TX (including abortion funds & donors) could face murder charges."[15] On June 29, Cain retweeted a Texas Tribune tweet, adding "…they're already facing jail time for their criminal acts. #ProsecuteTexasAbortionFunds."[16] The same day, Representative Cain retweeted a tweet about donating to abortion funds with an image of the pre-*Roe* statutes recodified and wrote "[d]onating to a Texas abortion is a crime, punishable by 2-5 years imprisonment. *See* article 4512.2, revised civil statutes. #ProsecuteTexasAbortionFunds."[17] Representative Cain also has asserted that there is no right to pay for another person to travel to another state. On June 24, he tweeted a link to a Fortune Magazine article, noting "[h]ere's @FortuneMagazine confusing the right to interstate travel with the nonexistent right to pay for another person to travel to another state."[18]

---

[15] This Tweet was still viewable at the time of this filing at Briscoe Cain's Twitter timeline at https://twitter.com/BriscoeCain/status/1541977303219150848 and is attached as **Exhibit F**.

[16] This Tweet was still viewable at the time of this filing at Briscoe Cain's Twitter timeline at https://twitter.com/BriscoeCain/status/1542290615488204800 and is attached as **Exhibit G**.

[17] This Tweet was still viewable at the time of this filing at Briscoe Cain's Twitter timeline at https://twitter.com/BriscoeCain/status/1542232983142367240 and is attached as **Exhibit H**.

[18] This Tweet was still viewable at the time of this filing at Briscoe Cain's Twitter timeline at https://twitter.com/BriscoeCain/status/1540528410514046980 and is attached as **Exhibit I**. The partially obscured Fortune Magazine link in the Tweet is https://fortune.com/2022/06/24/justice-brett-kavanaugh-interstate-travel-abortions-constitutional-roe-v-wade-overturned/amp/. In other litigation pending before this Court, Cain and his co-defendants in that matter also asserted that the Pre-*Roe* Furnishing Statute is still operable that "there is no constitutional obstacle to enforcing article 4512.2 against abortion funds and their donors…" [*Wendy Davis, et al. v. Mistie Sharp, et al.*, Case No. 1:22-cv-00373-RP pending in the Western District of Texas (hereafter "Davis litigation") Dkt. 39 pp. 8-9].

PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          27

84.     Based on these and other public statements, Plaintiffs reasonably fear that any assistance provided to a pregnant Texan who obtains an abortion that violates the terms of the Pre-*Roe* Statutes or the Trigger Ban, even if the abortion occurs outside of the State of Texas, will subject them to criminal prosecution.  The public statements quoted and discussed above confirm that multiple state actors in Texas believe that providing assistance to a Texan who elects to have a medication abortion in another state violates Texas criminal law, if any part of the medication regimen is ingested in Texas.  *See*, *e.g.* paragraphs 80, 83-5.

85.     Other public statements have created confusion and fear about whether direct funding of surgical abortion procedures in other states would subject Plaintiffs to criminal prosecution.  And the language of the Pre-*Roe* Statues and the Trigger Ban applies directly to Dr. Moayedi as a licensed medical provider in the State of Texas.  What is now unclear given the confusion created by Defendant Paxton and other state officials is whether Dr. Moayedi may treat pregnant Texans in another state and provide elective surgical or medication abortions to those patients in conformity with that state's laws without being prosecuted in Texas for those actions.  Likewise, it is unclear if she may perform legal telemedicine abortion care services to other states from her location in Texas.

86.     Plaintiffs also reasonably fear that they will be criminally prosecuted for behaviors that they undertook prior to June 24, 2022, when the *Dobbs* decision was issued.  Until that date, *Roe v. Wade* remained the law of the land and Plaintiffs conformed their behavior accordingly.  State actors in Texas, however, have publicly asserted that they believe the Pre-*Roe* Statutes, which had been specifically declared to be unconstitutional in *Roe*, were capable of imposing criminal liability for conduct undertaken before June 24, 2022.  Indeed, several Plaintiffs have been specifically targeted by Representative Cain and private citizens for conduct they engaged in prior

to June 24, 2022 and the Texas Freedom Caucus has targeted Sidley Austin for providing travel and other financial assistance to employees who traveled to obtain medication abortions in 2021. *See*, *e.g.* paragraphs 5-6, 83-5.

87. Pursuant to this Court's equitable powers and Federal Rule of Civil Procedure 65, Plaintiffs are entitled to injunctive relief against AG Paxton in his official capacity and the DA and County Defendants in their official capacity because the threat of impending criminal prosecution and civil liability posed by the laws of Texas and the Defendants' enforcement authority is causing irreparable harm to Plaintiffs. That harm began immediately on June 24, 2022 when the *Dobbs* decision was issued and AG Paxton declared that the Pre-*Roe* statutes were immediately effective. Plaintiffs immediately ceased certain operations in fear that following the decision in *Dobbs*, they could be criminally prosecuted under the Pre-*Roe* Statutes for behavior that was legal under the prior laws of Texas and constitutionally protected, and if convicted receive a criminal sentence of 2-5 years.

88. The harm and threats to Plaintiffs will only grow in significance when the Trigger Ban is added to the statutory web on August 25, 2022. On that date, they will face potential criminal prosecution from the DA and County Attorney Defendants, and civil enforcement actions from AG Paxton under yet another state law, this time for first degree felonies that carry with them potential life sentences and minimum civil penalties of $100,000. Despite their strong desires and commitment to assisting their fellow Texans, Plaintiffs will be unable to safely return to their prior operations until it is made clear that Defendants have no authority to prosecute Plaintiffs or seek civil penalties from them for their constitutionally protected behavior. The intrusion of Plaintiffs' own constitutional rights is immediate and ongoing and the deprivation of constitutional rights for

any period of time constitutes irreparable harm. *De Leon v. Perry,* 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott,* 791 F.3d 619 (5th Cir. 2015).

89.     Plaintiffs would suffer immediate and irreparable harm if AG Paxton and the DA and County Attorneys Defendants, in their official capacities, are not enjoined from prosecuting or encouraging prosecution of Plaintiffs. As set forth previously, the legal threat Defendants pose is imminent.  Given the State of Texas' stated intent (through state actors, including AG Paxton) to prosecute abortion funds and their staff, volunteers, and donors, the chilling effect on Plaintiffs, their staff, volunteers, and donors (and the subsequent effect on their organizational funding) is substantial.  Plaintiffs will be irreparably harmed if Defendants are not enjoined before prosecution against Plaintiffs (or their staff, volunteers, and/or donors) begins.

90.     Plaintiffs are likely to prevail on the merits of this case and receive the requested declaratory judgment, as well as equitable relief, attorneys' fees, and costs of court.  Plaintiffs' case is purely legal, and the enforcement of the laws as to Plaintiffs is clearly unconstitutional.

91.     Plaintiffs have no adequate remedy at law for Defendants' threatened actions. Specifically, money damages are insufficient to undo the threatened injury to Plaintiffs.  Plaintiffs' First Amendment rights and fundamental due process rights and rights to travel are at stake and they cannot safely resume the exercise of their own constitutional rights until the threat of criminal prosecution for doing so is eliminated.

92.     The threatened injury to Plaintiffs outweighs any possible damages to Defendants. Indeed, Defendants are not harmed by Plaintiffs' conduct in any sense, nor by their exercise of their fundamental, constitutional rights in conducting activities in support of their lawful organizational missions. Defendants lose absolutely nothing by the issuance of an injunction.

### E. Class Allegations

93. Plaintiffs bring this action against each of the named Defendants and as a class action against certain of the named Defendants individually and as representatives of two subclasses of persons (collectively, the "Defendant Classes"):

    a. All elected District Attorneys in the State of Texas who have the authority within their jurisdictions to enforce through criminal prosecutions the Pre-*Roe* Statutes and the Trigger Ban (the "District Attorney Class"); and

    b. All County Attorneys in counties that do not have an elected District Attorney, and who have the authority within that jurisdiction to enforce the criminal laws of Texas, which includes the Pre-*Roe* Statutes and the Trigger Ban (the "County Attorney Class").

94. This lawsuit is properly maintained as an action against the two Defendant Classes under Federal Rule of Civil Procedure 23 (a) and 23(b)(1)(A).

95. Any separate actions commenced against individual District Attorneys or County Attorneys for the purpose of challenging their enforcement of the Pre-*Roe* Statutes or the Trigger Ban would create a risk of inconsistent or varying adjudications by the courts presiding over those actions, which would affect individual class members and establish incompatible standards of conduct for Plaintiffs.

96. Separate actions would also create a risk of putting Plaintiffs in the untenable position of not knowing which of multiple, incompatible interpretations and rulings they must comply with to avoid violating the law and risking criminal penalties and statutory damages.

97. Each of the 254 counties in the State of Texas has a position for a duly elected District Attorney or a County Attorney who has the same criminal jurisdiction, and each of those

individuals has exclusive jurisdiction to enforce the criminal laws of Texas within his or her district. The members of the proposed District Attorney Class and County Attorney Class are located in each of Texas's 254 counties. Given the size of the class and this geographic dispersal, it is impracticable to join all Texas District Attorneys and County Attorneys with power to enforce the Pre-*Roe* Statutes and the Trigger Ban in order to provide protection to all potential defendants in those actions.

98.     Resolution of any one of the legal issues raised in this case will affect similarly each member of the proposed District Attorney Class and County Attorney Class, by determining whether, and to what extent, they may enforce the Pre-*Roe* Statutes and the Trigger Ban under the U.S. Constitution and federal law. Moreover, the relief sought in this case does not turn on circumstances specific to members of the proposed defendant classes. Accordingly, there are questions of law common to the classes.

99.     Defendant DAs Renken, McAfee, Garza, and Weber (collectively, the "District Attorney Class Representatives") are adequate class representatives for the District Attorney Class because they each have exclusive authority within their jurisdictions to file criminal charges under the pre-*Roe* Statutes and the Trigger Ban. Plaintiffs seek a declaratory judgment that the pre-*Roe* Statutes and the Trigger Ban cannot be enforced by any Defendant, including the District Attorney Class Representatives, in a manner that violates Plaintiffs' rights to freely travel, freely associate, freely speak, and freely support members of their communities through financial assistance, as guaranteed by the United States Constitution and federal law.

100.     Plaintiffs' claims against each of the District Attorney Class Representatives and the members of the proposed District Attorney Class are the dame. The defenses that the District Attorney Class Representatives will raise will be typical of all members of the proposed District

Attorney Class. The claims against which the District Attorney Class Representatives must defend challenge the constitutionality of the Pre-*Roe* Statutes and the Trigger Ban and are asserted against all members of the proposed District Attorney Class. Further the District Attorney Class Representatives and the other class members hold a common position with respect to Plaintiffs, a position that is defined by statutory obligations and not by personal relationships. Therefore, any defenses the District Attorney Class Representatives assert—and the legal theories on which they are based—will be available to the other class members.

101. The District Attorney Class Representatives' positions are aligned with that of the other class members because all are authorized to enforce the Pre-*Roe* Statutes and the Trigger Ban through criminal prosecutions. For purposes of this suit, the District Attorney Class Representatives have no interests antagonistic to or in conflict with the interests of other members of the proposed class. Because the authority of all District Attorneys with respect to the Pre-*Roe* Statutes and the Trigger Ban are substantially the same, the District Attorney Class Representatives will be able to fairly and adequately represent the interests of all Texas District Attorneys.

102. Defendant Deski is an adequate class representatives for the County Attorney Class because she has exclusive authority within her jurisdictions to file criminal charges under the Pre-*Roe* Statutes and the Trigger Ban. Plaintiffs seek a declaratory judgment that the Pre-*Roe* Statutes and the Trigger Ban cannot be enforced by any Defendant, including Defendant Deski, in a manner that violates Plaintiffs' rights to freely travel, freely associate, freely speak, and freely support members of their communities through financial assistance, as guaranteed by the United States Constitution and federal law.

103. Plaintiffs' claims Defendant Reski and the members of the proposed County Attorney Class are the same. The defenses that Defendant Reski will raise will be typical of all

App.34

members of the proposed County Attorney Class. The claims against which Defendant Reski must defend challenge the constitutionality of the Pre-*Roe* Statutes and the Trigger Ban and are asserted against all members of the proposed County Attorney Class. Further, Defendant Reski and the other class members hold a common position with respect to Plaintiffs, a position that is defined by statutory obligations and not by personal relationships. Therefore, any defenses Defendant Reski asserts—and the legal theories on which they are based—will be available to the other class members.

104. Defendant Reski's positions are aligned with that of the other members of the County Attorney Class because all are authorized to enforce the Pre-*Roe* Statutes and the Trigger Ban through criminal prosecutions. For purposes of this suit, Defendant Reski has no interests antagonistic to or in conflict with the interests of other members of the proposed class. Because the authority of all County Attorneys with respect to the Pre-*Roe* Statutes and the Trigger Ban are substantially the same, Defendant Reski will be able to fairly and adequately represent the interests of all Texas County Attorneys who have authority to enforce the Pre-*Roe* Statutes and the Trigger Ban through criminal prosecutions.

## V.   CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF
## UNDER 42 USC § 1983 AND DECLARATORY JUDGMENT ACT[19]

**Count I:       The Trigger Ban and Pre-*Roe* Statutes Violate Dr. Moayedi's and CASN's Staff's and Volunteers' Rights to Travel**

105.    Plaintiffs Dr. Moyaedi and CASN bring this claim against all Defendants.

106.    The right to travel is guaranteed to all United States citizens as one of the "Privileges and Immunities of Citizens in the several States." U.S. Const., Article IV, § 2.

107.    States are prohibited from making or enforcing any law that "abridge[s] the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

108.    Under the Constitution, states are also prohibited from regulating interstate commerce, or from preventing or otherwise harming interstate commerce.

109.    Prior to the decision in *Dobbs*, Dr. Moayedi routinely traveled to and from other states in order to perform abortion procedures for patients in those states (and in compliance with all applicable laws in those states).  On many occasions, the patients to whom she provided care in states other than Texas were pregnant Texans.  Since *Dobbs* was decided and in anticipation of the Trigger Ban becoming effective, Dr. Moayedi has stopped traveling to other states to provide abortion procedures to pregnant Texans.  Because of the threat of criminal prosecution under the

---

[19] The Declaratory Judgment Act has, since its inception, provided a mechanism for relief in situations where a litigant might otherwise have to subject themselves to coercive action or looming litigation in order to secure constitutional or legal rights before irreparable harm occurs. *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 243 (1937) (finding federal courts had jurisdiction over insurer's declaratory judgment cause of action where, had the insured sued in contract, it was clear that the controversy would have been justiciable).

Pre-*Roe* Statutes and the criminal liability that will be imposed by the Trigger Ban on her as a medical provider licensed by the State of Texas, she is afraid that performing any abortion procedure on any Texan outside of the State of Texas will subject her to criminal prosecution by a member of the DA or County Attorney Classes and to civil penalties pursued by AG Paxton.

110.    Dr. Moayedi wishes to immediately resume her travel to and from other states to assist her patients—including pregnant Texans—but she cannot safely do so without relief from this Court.  She is chilled by these threats from doing what the Constitution guarantees any citizen may do: travel to another state and engage in lawful commerce and activities while she is there, protected by the privileges and immunities of the state she is visiting.

111.    Staff and volunteers for CASN also regularly traveled both within Texas and from Texas to other states to assist pregnant Texans seeking abortion care, but have stopped doing so following the decision in *Dobbs*.  Those staff and volunteers wish to resume such direct travel assistance.

112.    Although CASN believes that they have standing based upon the standing of their boards, staffs, and volunteers, since these are constituents of the CASN organization, CASN also has associational standing, because (1) at least one of its staff, volunteers, or members did—or at least used to—travel with or provide transportation assistance to people seeking abortions and/or would presently be doing so but for the threats created by the current law; (2) the interest of its staff, volunteers, or members in assisting pregnant Texans in obtaining legal abortions in other states is directly tied to CASN's purpose as described above in Section III.A.; and (3) there is no obvious reason why, apart from providing testimony, it would be necessary for individual staff, volunteers, or members to be made parties to this lawsuit.

113. Texas state actors' statements interpreting the scope of potential enforcement of the Trigger Ban and the Pre-*Roe* Statutes show an intent to enforce the Trigger Ban and/or Pre-*Roe* Statutes against CASN's staff, volunteers, and persons similarly situated, who travel between Texas and another state to assist pregnant Texans seeking abortions in other states where they continue to be legal, or who assist pregnant Texans with travel in order to seek legal abortion care.

114. Based on the activities and statements made by Defendants and other representatives of the State, CASN's staff and volunteers have a reasonable fear of being prosecuted under the Trigger Ban statutes and/or Pre-*Roe* Statutes if they assist pregnant Texans in traveling to another state to obtain a legal abortion.

115. Enforcement of the Trigger Ban and Pre-*Roe* Statutes against CASN's staff and volunteers, citizens who travel between Texas and another state in interstate commerce, violates CASN's staff and volunteers' right to travel and/or infringes upon their rights to assist others with interstate travel.

116. Interpreting the Pre-*Roe* Statutes and Trigger Ban to criminalize CASN's staff and volunteers' travel for the purpose of assisting a pregnant Texans seeking abortion care violates Plaintiff's staff and volunteers' right to travel and to exercise the "Privileges and Immunities" of citizenship under the Fourth Amendment.

117. Interpreting the Pre-*Roe* Statutes and Trigger Ban to criminalize CASN's staff and volunteers' travel for the purpose of assisting pregnant Texans seeking abortion care constitutes a State attempting to "enforce a law abridg[ing] the privileges or immunities of citizens of the United States." Texas is also classifying citizens, CASN's staff and volunteers, based on the purpose of their travel, therefore denying the equal protection of the laws to persons within its jurisdiction, in violation of the Fourteenth Amendment.

118.   Interpreting the Pre-*Roe* Statutes and Trigger Ban to criminalize CASN's staff and volunteers' travel for the purpose of assisting pregnant Texans seeking abortion care constitutes an attempt by Texas to regulate commerce "among the several States," which authority the Constitution grants only to Congress.  Likewise, interpreting those statutes to prohibit citizens from assisting Texans' travel generally also constitutes an unconstitutional attempt by Texas to regulate interstate commerce.

119.   The right to travel is implicated for both Dr. Moayedi and CASN's staff and volunteers personally, and is also impacted for their patients and clients in need of assistance.  To the extent the right of the pregnant Texan seeking help is implicated, Dr. Moayedi and CASN also have a First Amendment right to assist with that constitutionally-protected activity.

120.   The Pre-*Roe* Statutes and Trigger Ban are both facially invalid and void as applied to Plaintiffs Moayedi and CASN.

**Count II:   Criminalization of Financial Assistance for Pregnant Texans' Travel Out of State to Obtain Legal Abortion Violates Plaintiffs' First Amendment Rights.**

121.   All Plaintiffs bring this claim against all Defendants.

122.   Criminalization of the type of assistance provided by Plaintiffs—financial assistance, transportation, accommodations, and emotional support—to pregnant Texans seeking an abortion violates Plaintiffs' fundamental First Amendment rights.

123.   Plaintiffs' activity in funding travel for pregnant Texans to obtain healthcare that is legal where it is sought is protected First Amendment conduct, and Defendants' attempt to use Texas criminal law to chill that activity is unconstitutional.

124.    Likewise, Defendants' attempt to use Texas criminal law to chill Plaintiffs' relationships with their donors, employees, and volunteers, violates the freedom of expressive association protected by the First Amendment.

125.    Where a state statute infringes upon a fundamental right, such as the right to speech—which includes financial assistance to pregnant Texans—the state must show the statute is narrowly tailored to serve a compelling state interest.

126.    The State of Texas does not have a compelling state interest in criminalizing or preventing Plaintiffs' provision of transportation and emotional support (or financial assistance for transportation or other material aid) for pregnant Texans seeking abortion care.

127.    Neither the Trigger Ban nor the Pre-*Roe* Statutes are narrowly tailored to serve a compelling state interest and they are unconstitutional violations of Plaintiffs' rights.

128.    The Trigger Ban and the Pre-*Roe* Statutes should therefore be enjoined because financial assistance, travel assistance, practical, logistical and emotional support, as well as information sharing and advocacy are all protected conduct under the First Amendment.

129.    The Trigger Ban and Pre-*Roe* Statutes are unconstitutional both facially and as applied to the assistance provided by Plaintiffs to those seeking legal abortion care.

**Count III:    Texas's Threatened Enforcement of the Pre-*Roe* Furnishing Statute Violates Plaintiffs' First Amendment Free Speech Rights.**

130.    All Plaintiffs bring this claim against all Defendants.

131.    The First Amendment to the United States Constitution guarantees its citizens the right to free speech, assembly, association, and petition. U.S. Const. amend. I.

132.    The State has threatened enforcement of the Pre-*Roe* Furnishing Statute (for "furnishing the means" for procuring an abortion) against Plaintiffs for providing information and

funds to its clients for lawful out-of-state activities. Such targeted enforcement against Plaintiffs and their staff, volunteers, and donors on the basis of the content of their speech and conduct and the nature of their association violates their rights of association and free speech.

133. There is no bar to speaking and providing information just because the underlying conduct is illegal in one state, but not in another, and one can demonstrate and petition to change the law. These are fundamental tenets of the First Amendment.

134. Because Plaintiffs' use of funds is considered speech, banning this use of funds on the basis of their intended purpose is a violation of Plaintiffs' free speech rights.

135. Plaintiffs have representational standing to assert the rights of their employees, volunteers, and donors.

136. Plaintiffs' desired activity in funding abortion where it is legal is protected First Amendment activity.

137. Plaintiffs' activity in supporting Texans seeking legal abortion care in other financial, logistical, and practical ways is also protected First Amendment activity.

138. Likewise, Defendants' attempt to use Texas criminal law to threaten to chill Plaintiffs' relationships with their donors, employees, and volunteers, violates the freedom of expressive association protected by the First Amendment.

139. The State's threatened enforcement of the Pre-*Roe* Furnishing Statute against Plaintiffs, their staff, volunteers, and donors chills exercise of their protected First Amendment associational rights.

140. The State's threatened enforcement of the Pre-*Roe* Furnishing Statute against Plaintiffs' donors for funding Plaintiffs' activities through charitable donations chills the donors' First Amendment rights of speech and association.

141.     Any enforcement of the Pre-*Roe* Furnishing Statute that forces disclosure of Plaintiffs' donors would also violate their First Amendment rights of association.

142.     Enforcement of the Pre-*Roe* Furnishing Statute against Plaintiffs, their employees, volunteers or donors is targeted precisely at the speech acts that they have undertaken, including providing funding and other assistance to pregnant Texans.

143.     Therefore, the Pre-*Roe* Furnishing Statute is facially unconstitutional, contains content-based restrictions that are subject to strict scrutiny, and is retaliatory in that it provides for civil and criminal penalties for engaging in speech in which the State disagrees.

144.     The Pre-*Roe* Furnishing Statute is unconstitutional because the First Amendment protects:

a.       The right to speak out, petition, demonstrate, advocate, and provide information about abortion and the state of abortion laws;

b.       The right to offer aid (monetary and otherwise);

c.       The right to political donation;

d.       The right to discuss and associate;

e.       The right to contribute;

f.       The right to free expression; and

g.       Freedom of the press and publication of materials by Plaintiffs.

145.     Plaintiffs are entitled to a declaratory judgment as to each of these subparts and protections of the First Amendment for the infringement of the Furnishing Statute on their constitutional rights, as well as to injunctive relief.

146.     The Pre-*Roe* Statutes are unconstitutional both facially and as applied to Plaintiffs' protected First Amendment activities.

**PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **41**

**Claim IV:     Texas's Threatened Enforcement of the Trigger Ban Violates Plaintiffs' First Amendment Free Speech Rights.**

147.    All Plaintiffs bring this claim against all Defendants.

148.    The State has threatened enforcement of the Trigger Ban (via TEXAS PENAL CODE § 7.02(a)) against Plaintiffs for providing information and funds to their clients for out-of-state activities that are lawful where conducted.  This targeted enforcement against Plaintiffs and their staff, volunteers, and donors on the basis of the content of their speech and conduct and the nature of their association violates their right of association and free speech.

149.    Because Plaintiffs' use of funds is considered speech, banning the use of funds on the basis of their intended purpose is a violation of Plaintiffs' free speech rights.

150.    Plaintiffs' activity in funding abortions that occur lawfully out of state is protected by the First Amendment.

151.    Plaintiffs' activity in providing truthful information to pregnant Texans is protected by the First Amendment.

152.    Plaintiffs' activity in providing other financial, logistical, practical and emotional assistance to Texans in obtaining legal abortion care is also protected by the First Amendment.

153.    Likewise, Defendants' attempt to use Texas criminal law to threaten to chill Plaintiffs' relationships with their donors, employees, and volunteers, violates the freedom of expressive association protected by the First Amendment.

154.    Plaintiffs have representational standing to assert the rights of their employees, volunteers, and donors.

155.    The State's threatened enforcement of the Trigger Ban against Plaintiffs, their employees, volunteers, and donors chills association between them.

156. The State's threatened enforcement of the Trigger Ban against Plaintiffs' volunteers and donors for funding Plaintiffs' activities through charitable donations chills the donors' First Amendment rights of speech and association.

157. Any enforcement of the Trigger Ban that forces disclosure of Plaintiffs' donors would also violate their First Amendment associational rights.

158. Enforcement of the Trigger Ban against Plaintiffs, their staff, volunteers and/or donors is for precisely the speech acts that they have undertaken, including providing funding and other assistance to pregnant Texans.

159. Therefore, the Trigger Ban, if enforced against Plaintiffs for "criminally responsible conduct of another," is facially unconstitutional contains content-based restrictions that are subject to strict scrutiny, and is retaliatory in that it provides for civil and criminal penalties for engaging in speech with which the State disagrees.

160. The court should enjoin the Trigger Ban to the extent that it seeks to criminalize the First Amendment conduct of the Plaintiffs.

161. The Trigger Ban is unconstitutional because the First Amendment protects:

    a. The right to speak out, petition, demonstrate, advocate, and provide information about abortion and the state of abortion laws;

    b. The right to offer aid (monetary and otherwise);

    c. The right to political donation;

    d. The right to discuss and associate;

    e. The right to contribute;

    f. The right to free expression; and

    g. Freedom of the press and publication of materials by Plaintiffs.

162.    Plaintiffs are entitled to a declaratory judgment as to each of these subparts and protections of the First Amendment for the infringement of the Trigger Ban on their constitutional rights, as well as to injunctive relief.

163.    The Trigger Ban is unconstitutional both facially and as applied to Plaintiffs' protected First Amendment activities.

**Count V:    Retroactive Application of the Pre-*Roe* Statutes is Unconstitutional.**

164.    All Plaintiffs bring this claim against all Defendants.

165.    The Pre-*Roe* Statutes were struck down and rendered void by the *Roe v. Wade* decision in 1973.

166.    Any construction of the Pre-*Roe* Statutes that allows their retroactive application to conduct that was expressly lawful under *Roe v. Wade* until its overruling by *Dobbs* would create an Ex Post Facto criminal law.

167.    Retroactive enforcement of Pre-*Roe* Statutes violates the Constitution's Ex Post Facto Clause and Due Process Clause.

168.    "[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, s 10, of the Constitution forbids." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964).  State legislatures are barred by the Ex Post Facto Clause of the Constitution from passing such laws, and similarly the Courts are barred by the Due Process Clause from achieving the same result by judicial construction.

169.    "The fundamental principle that 'the required criminal law must have existed when the conduct in issue occurred,' Hall, General Principles of Criminal Law (2d ed. 1960), at 58-59, must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures." *Id*. at 354.

**Count VI:     The Texas Pre-*Roe* Furnishing Statute and Trigger Ban are Void for Vagueness.**

170.    All Plaintiffs bring this claim against all Defendants.

171.    The Texas Pre-*Roe* Furnishing Statute and Trigger Ban are also void for vagueness.

172.    The Texas Pre-*Roe* Furnishing Statute and Trigger Ban are too vague for the average citizen to determine what persons are regulated, what conduct is prohibited, and what penalties may be imposed.

173.    The Texas Pre-*Roe* Furnishing Statute and Trigger Ban are also void for vagueness because they impose on Plaintiffs' rights under the First Amendment.

174.    Because the Texas Pre-*Roe* Furnishing Statute and Trigger Ban violate Plaintiffs' constitutional rights, they cannot be enforced.  The statutes burden Plaintiffs by depriving them of their constitutional rights to be apprised of laws that they may be held liable for and by impairing their ability to redress and assert their rights in defense.

**Count VII:    The Texas Pre-*Roe* Statutes, SB8, and the Trigger Ban Cannot and Do Not Apply to Abortion Care Obtained Outside of Texas.**

175.    All Plaintiffs bring this claim against all Defendants.

176.    The Pre-*Roe* Statutes and the Trigger Ban do not provide for any extraterritorial application of those laws.

177.    The language of SB8 confirms that only Texas-licensed physicians can be principally liable, yet its fee-shifting provision codified in the Texas Civil Practice and Remedies Code omits that specificity.

178.    Thus, the scope of abortion prohibited by Texas law applies only to abortions performed or obtained in Texas, and in the case of SB8, which are performed by a Texas-licensed physician.

179. Texas Penal Code Section 7.02 provides that a person can only be liable if a principal first commits an offense. The abortion offense under the Trigger Ban (TEX. HEALTH & SAFETY CODE ANN., § 170A.002) applies to a person "knowingly perform[ing], induc[ing], or attempt[ing] an abortion," and the general criminal territorial jurisdiction statute in Texas Penal Code Section 1.04 does not extend to conduct undertaken outside of Texas.

180. Likewise, the Pre-*Roe* Furnishing Statute is an accomplice statute, and no one can be charged as an accomplice unless there is a guilty principal, as the Texas Court of Criminal Appeals has determined. *See*, *e.g.*, *Moore v. State*, 40 S.W. 287, 290 (Tex. Crim. App. 1897) (analyzing the "furnishing" statute and noting "[w]e cannot have an offense that could be committed by an accomplice without a principal.").

181. SB8 likewise only applies to abortions performed by a physician in Texas. Section 171.201 of the Texas Health & Safety Code provides the definitions that apply to certain terms within Subchapter H of Chapter 171 (the subchapter created by SB8). It defines "physician" as "an individual licensed to practice medicine in this state…" *Id.* at § 171.201(4). Thus, when Section 171.204 prohibits "a physician" from knowingly performing or inducing an abortion unless the test is done and no heartbeat is found, that prohibition applies only to "individuals licensed to practice medicine in this state[.]"

182. The Fee-Shifting Provision of SB8 is therefore also subject to this limitation in scope.

**Count VIII: Texas's Abortion Statutes Cannot Reach Medical Care Provided to Patients Outside of Texas.**

183. Plaintiff Dr. Moayedi brings this claim against all Defendants.

184. Dr. Moayedi is licensed in 20 states, including Texas.

185.     Telemedicine care is "provided" in the jurisdiction in which the patient resides, according to the billing requirements of the Center for Medicare Services and the Health & Human Services Department.  Specifically, Place of Service (POS) is equal to what it would have been had the service been furnished in person.

186.     The jurisdictional reach of the Texas Pre-*Roe* Statute and Trigger Ban does not contemplate abortions occurring outside of Texas.  Indeed, the Pre-*Roe* Statute was passed more than a century before telemedicine became possible.  Likewise, the general criminal jurisdictional statute does not extend to abortions occurring beyond Texas's borders.

187.     Construction of the Texas Abortion Bans to reach abortions obtained by patients in other states violates the constitutional prohibitions against regulation of interstate commerce.

188.     Construction of the Texas Abortion Bans to reach the practice of medicine provided pursuant to the licensure and laws governing another state, regardless of the location of the provider at the time, is also prohibited by the Interstate Commerce Clause of the United States Constitution, and otherwise preempted by federal law.

189.     The Texas Abortion Bans are unconstitutionally vague because they fail to apprise physicians of what conduct is prohibited and to provide notice comporting with due process.

190.     Physicians providing care cannot constitutionally be subjected to the criminal laws of one state for care provided in another state or for a patient located in another state, regardless of the physical location of the physician, pursuant to the Due Process Clause of the U.S. Constitution.

191.     Plaintiff Dr. Moayedi is thus entitled to a declaratory judgment that she cannot be subjected to Texas Abortion Bans for care she provides outside of Texas, or to patients receiving abortion care via telemedicine outside of Texas, regardless of where Moayedi may be located at

that time to the extent Defendants threaten criminal or civil sanctions, and to injunctive relief providing the same.

**Count IX:      SB8's Fee-Shifting Provision is Preempted.**

192.    All Plaintiffs bring this claim against all Defendants.

193.    Section 4 of Texas's SB8 creates a one-way fee-shifting provision applicable to any person—including a party's lawyers—who seeks declaratory and/or injunctive relief to prevent enforcement of any "law that regulates or restricts abortion" or any law excluding those who "perform or promote" abortion from participating in public funding programs. TEX. CIV. PRAC. & REM. CODE 30.022(a).

194.     Civil rights plaintiffs—including Plaintiffs in this action—could be forced to pay defense attorneys' fees unless they prevail on all claims.  If a court dismisses claims brought by the civil-rights plaintiff, regardless of reason for dismissal, or enters judgment for the opposing party, the party defending the abortion restriction is deemed to prevail.  *Id*. at § 30.022(b)(1)-(2).

195.    Section 4 of SB8 does not explicitly limit fees to what is reasonable, unlike other fee-shifting statutes such as 42 U.S.C. § 1988. It also purportedly applies in both state and federal courts and to both state and federal claims, including Section 1983 claims brought to vindicate federal constitutional rights. But there is already a comprehensive fee-shifting statute for such claims: 42 U.S.C. § 1988.

196.    For claims brought under 42 U.S.C. § 1983, the fee-shifting scheme set forth in Section 4 of SB8 is preempted by 42 U.S.C. § 1988.

197.    Because the fee-shifting scheme set forth in SB8 is preempted by 42 U.S.C. § 1988, it is null and inapplicable to this proceeding.

198.    Plaintiffs specifically request the recovery of costs and reasonable attorney fees under 42 U.S.C. § 1988 when they prevail in this case.

**Count XI:     SB8's Fee-Shifting Provision is Unconstitutional.**

199.    All Plaintiffs bring this claim against all Defendants.

200.    SB8's fee-shifting provision also violates the First Amendment's guarantee of the right to petition the government for redress of grievances and makes the courts inaccessible to potential plaintiffs who must choose between challenging an unconstitutional law, living under an existential threat to their operations, conduct, and freedom, or possible bankruptcy.

201.    Section 30.022's imposition of joint and several liability for attorneys' fees on litigants and attorneys/firm that take on challenges to abortion laws, including retroactively, restrict Plaintiffs' rights (and the rights of other citizens) to access the courts.

202.    Section 30.022 imposes all financial risks and burdens of seeking any kind of legal redress onto one set of litigants (which includes Plaintiffs)—namely those seeking to challenge the provisions of any Texas law or regulation affecting abortion.

203.    These provisions create an automatic conflict between a litigant and her attorney. Any attorney who agrees to present a constitutional defense or mount a proactive challenge to the constitutionality of SB8 subjects herself and her firm to joint and several liability for the attorneys' fees incurred by the opposing party in the case.  These provisions force an attorney to choose between the best interests of her client and liability under SB8 or to refuse to represent a client at all.  These provisions further prevent a litigant from redressing constitutional deprivations of rights by significantly burdening her ability to obtain counsel.

204.    The fee-shifting provisions of SB8 violate the Frist Amendment protections in the United States Constitution.

App.50

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.    That this Court determine this lawsuit may be maintained as a defendant class action under Federal Rule of Civil Procedure 23 and that this Court certify the District Attorney Class and the County Attorney Class and designate certain named Defendants as the representative of the District Attorney Class and the County Attorney Class;

2.    Preliminary and permanent injunctions:

    a.    Restraining, enjoining, and prohibiting the named Defendants and members of the Defendant Classes all persons acting on behalf of or in concert with the named Defendants and members of the Defendant Classes from prosecuting Plaintiffs, or any of their staff, volunteers, or donors, under the Pre-*Roe* Statutes and/or the Trigger Ban for any behavior undertaken by Plaintiffs in connection with any abortion that occurs outside the State of Texas; and

    b.    As otherwise necessary to accomplish the results Plaintiffs seeks herein; and

3.    Declaratory judgment relief:

    a.    That enforcement of the Pre-*Roe* Statutes against Plaintiffs or any of their staff or volunteers for traveling is unconstitutional because it violates Plaintiffs,' their staffs,' and their volunteers' right to travel;

    b.    That enforcement of the Trigger Ban via the Texas Penal Code provision on Criminal Responsibility for Conduct of Another against Plaintiffs or any of

their staff or volunteers for traveling is unconstitutional because it violates Plaintiffs,' their staffs,' and their volunteers' right to travel;

c.    That enforcement of the Pre-*Roe* Statutes against Plaintiffs or any of their staff, volunteers, or donors is unconstitutional because it violates Plaintiffs' right to free speech (including the rights to assemble, associate, and petition) under the United States Constitution by infringing upon:

   i.    The right to speak out, petition, demonstrate, advocate, and provide information about abortion and the state of abortion laws;

   ii.    The right to offer aid (monetary and otherwise);

   iii.    The right to political donation;

   iv.    The right to discuss and associate;

   v.    The right to contribute;

   vi.    The right to free expression; and

   vii.    Freedom of the press and publication of materials by Plaintiffs;

d.    That enforcement of the Trigger Ban via the Texas Penal Code provision on Criminal Responsibility for Conduct of Another against Plaintiffs or any of their staff, volunteers, or donors is unconstitutional because it violates Plaintiffs' right to free speech under the United States Constitution by infringing:

         i.      The right to speak out, petition, demonstrate, advocate, and provide information about abortion and the state of abortion laws;

         ii.     The right to offer aid (monetary and otherwise);

         iii.    The right to political donation;

         iv.    The right to discuss and associate;

         v.     The right to contribute;

         vi.    The right to free expression; and

         vii.   Freedom of the press and publication of materials by Plaintiffs;

e.     That enforcement of the Pre-*Roe* Statutes and Trigger Ban against Plaintiffs or any of their staff, volunteers or donors for their practical and financial assistance to pregnant Texans is unconstitutional because the statutes are void for vagueness as to the conduct and operations of Plaintiffs;

f.     That none of the Texas abortion statutes applies to abortions obtained or performed outside of Texas;

g.     That none of the Texas abortion statutes reaches abortion care provided by a physician licensed in another state, performing care that is lawful in that state, regardless of the physical location of the physician providing telemedicine care;

h.     That Section 30.022 of the Texas Civil Practice and Remedies Code is unconstitutional because it violates the First Amendment of the U.S. Constitution;

  i.  That Section 30.022 of the Texas Civil Practice and Remedies Code is preempted under the Supremacy Clause by 42 U.S.C. § 1988;

4.  The recovery of costs and reasonable attorney fees under 42 U.S.C. § 1988; and,

5.  Such other and further relief in law or in equity as the Court deems just and proper, including but not limited to, an award to Plaintiffs of costs and attorneys' fees incurred in bringing this action.

Dated: August 23, 2022　　　　　　Respectfully submitted,

By: */s/ Jennifer R. Ecklund*
　　Jennifer R. Ecklund
　　Texas Bar No. 24045626
　　jecklund@thompsoncoburn.com

　　Elizabeth G. Myers
　　Texas Bar No. 24047767
　　emyers@thompsoncoburn.com

　　Allyn Jaqua Lowell
　　Texas Bar No. 24064143
　　alowell@thompsoncoburn.com

　　John Atkins
　　Texas Bar No. 24097326
　　jatkins@thompsoncoburn.com

　　Elizabeth Rocha
　　Texas Bar No. 24127242
　　erocha@thompsoncoburn.com

　　**THOMPSON COBURN LLP**
　　2100 Ross Avenue, Suite 3200
　　Dallas, Texas 75201
　　Telephone: 972/629-7100
　　Facsimile: 972/629-7171


　　Alexandra Wilson Albright
　　Texas Bar No. 21723500
　　aalbright@adjtlaw.com

　　Marcy Hogan Greer
　　Texas Bar No. 08417560
　　mgreer@adjtlaw.com

　　515 Congress Ave., Suite 2350
　　Austin, TX 78701-3562
　　Telephone: 512/482-9300
　　Facsimile: 512/482-9303

Kevin Dubose
Texas Bar No. 06150500
kdubose@adjtlaw.com
1844 Harvard Street
Houston, TX 77008
Telephone: 713/523-2358
Facsimile: 713/522-4553

Kirsten M. Castañeda
Texas Bar No. 00792401
kcastaneda@adjtlaw.com
8144 Walnut Hill Lane, Suite 1000
Dallas, TX 75231-4388
Telephone: 214/369-2358
Facsimile: 214/369-2359

**ALEXANDER DUBOSE &
JEFFERSON, LLP**

**ATTORNEYS FOR PLAINTIFFS**

**Exhibit 2:** Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum of Law in Support

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazaleh Moayedi, DO, MPH, FACOG,** | |
| **Plaintiffs,** | **Civil Case No. 1:22-cv-859** |
| **v.** | |
| **KEN PAXTON, et al.,** | |
| **Defendants.** | |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

Following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, No. 19-1392, 2022 WL 2276808 (U.S. June 24, 2022), which reversed the Court's prior holdings in *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), Texans will soon be subject to a new abortion law, which bans all abortions in Texas, except when "the pregnant female . . . has a life-threatening physical condition . . . that places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed or induced." TEX. HEALTH & SAFETY CODE 170A.002. This new law, known as the "Trigger Ban" takes effect on August 25, 2022 and makes conduct that results in a successful abortion a first degree felony. *Id.* 170A.004(b).[1]

---

[1] A copy of the Trigger Ban is included as Exhibit A in Plaintiffs' Appendix for the Court's convenience. The Trigger Ban is codified in Texas Health and Safety Code in Chapter 170A. A

In addition to the Trigger Ban, which takes effect in two days, Texas Attorney General Ken Paxton ("AG Paxton") and certain Texas legislators have also taken the position that Texas's statutes that criminalized abortion prior to the decision in *Roe v. Wade* are also in effect following the *Dobbs* decision. These "Pre-*Roe* Statutes" were originally codified in Texas Penal Code statutes 1191, 1192, 1193, 1194, and 1196 and were specifically declared to be unconstitutional in *Roe v. Wade*. They were later transferred – in identical form – to West's Texas Civil Statutes 4512.1. 4512.2, 4512.3, 4512.4, and 4512.6.[2] AG Paxton and the Texas legislators have also asserted that one section of the Pre-*Roe* Statutes – 4512.2, which criminalizes anyone who "furnishes the means for procuring an abortion knowing the purpose intended" – specifically applies to individuals or groups that assist Texans who obtain abortion care out of state, where the abortion care remains legal. The criminal penalty imposed under the Pre-*Roe* Statutes is two to five years imprisonment.[3] Tex. Civ. Stat. 4512.1.

Plaintiffs filed this case under 42 U.S.C. §1983 and the Declaratory Judgment Act, seeking (among other things) equitable relief against Defendants in their official capacity. Should the Trigger Ban take effect on August 25, 2022 as planned, Plaintiffs would immediately suffer irreparable harm in the deprivation of their constitutional rights. Preliminary injunctive relief clarifying how the Trigger Ban and Pre-*Roe* Furnishing Statute may be applied to their constitutionally protected conduct is urgently needed to (1) ensure that Plaintiffs and their staffs, volunteers, and donors are not subject to criminal prosecution for assisting Texans who seek reproductive healthcare outside of the state, where such care remains legal; and (2) protect

---

violation of the Trigger Ban that does not result in a successful abortion is a second degree felony. Tex. Health & Safety Code 170A.004(b).

[2] A copy of the Pre-*Roe* Statutes is included as Exhibit B in Plaintiffs' Appendix for the Court's convenience.

[3] If the abortion performed is without the consent of the pregnant person, the penalty is doubled.

Plaintiffs' ability to operate and conduct business as nonprofits in the State of Texas, and in the case of Dr. Moayedi as a licensed medical provider in the State of Texas, without criminal threat and donor intimidation.

<div align="center">

## I.     PARTIES

</div>

**A.     Plaintiffs**

Plaintiffs in this action are Texas-based non-profit abortion funds and practical support networks (organized under Internal Revenue Code § 501(c)(3)) (the "Fund and Support Plaintiffs"), and Dr. Ghazaleh Moayedi, an OB-GYN and abortion provider who resides in Texas. Just before *Dobbs* was decided, in anticipation of the decision and out of an abundance of caution (largely due to the threats made directly against them), the Fund and Support Plaintiffs paused all direct assistance activities for Texans seeking abortion services. *See* Exhibits C-J (declarations of officers from each Plaintiff organization). They have not provided direct abortion services (they never have), nor have they paid or reimbursed any provider or other individual or entity for the provision of abortion services within or outside of Texas since June 24, 2022. *Id.* Dr. Moayedi, who is also licensed in 19 other states and had historically provided abortion services to patients in other states by physically traveling to those states or providing care via telehealth practices in those states, also stopped providing all such care. Ex. K, Moayedi Dec., ¶¶ 3, 5-6, 10-11.

All Plaintiffs wish to resume the following activities: (a) funding legal, out-of-state abortions for pregnant Texans (i.e. including directly paying and/or reimbursing out-of-state licensed providers of abortion services and providing financial aid to pregnant Texans for that purpose); (b) providing informational materials and planning assistance (such as organizing and funding transportation and lodging) to pregnant Texans for obtaining legal, out-of-state abortions; and (c) transporting pregnant Texans to out-of-state licensed providers of safe, legal abortion. Dr.

Moayedi also wishes to immediately return to her practice of traveling to states where abortion remains legal to provide services to patients – including Texans – in those states and to immediately begin providing telehealth care in states where such care is permitted.

## B. Defendants

The named Defendants in this case are the Texas Attorney General, Ken Paxton; four District Attorneys of the State of Texas (DA Julie Renken, DA Wiley B. "Sonny" McAfee, DA Jose Garza, and DA Fred H. Weber, collectively the "DA Defendants"); and  Burleson County Attorney Susan Deski.  Each of the DA Defendants in their official capacities is required to "represent the State in all criminal cases in the district courts of his district."  TEX. CODE CRIM PROC. art. 2.01. Therefore, each of the DA Defendants has the sole authority of the State of Texas within his or her respective districts to file and pursue criminal cases, including any cases charging a violation of the Trigger Ban and/or Pre-*Roe* abortion statutes.  Where there is no elected District Attorney in a county, the County Attorney possesses that power.  TEX. CODE CRIM PROC. art. 2.02. AG Paxton likewise has authority to pursue perceived violators of the Trigger Ban for significant civil penalties related to its criminal prohibitions.

There are 254 distinct counties in Texas and each has either a DA or County Attorney authorized to enforce the felony criminal laws of the State.  The DA Defendants and County Attorney Deski are, therefore, all sued in their official capacities and as representatives of two defendants classes, respectively: (1) the District Attorney Class and (2) the County Attorney Class.

## II.    TABLE OF EXHIBITS[4]

| Exhibit A | Trigger Ban Statutory Text |
|---|---|
| Exhibit B | Pre-*Roe* Statutes |
| Exhibit C | Declaration of Anna Rupani |
| Exhibit D | Declaration of Kamyon Conner |
| Exhibit E | Declaration of Neesha Davé |
| Exhibit F | Declaration of Zaena Zamora |
| Exhibit G | Declaration of Marsha Jones |
| Exhibit H | Declaration of Rachel Cheek |
| Exhibit I | Declaration of Rosann Mariappuram |
| Exhibit J | Declaration of Bridget Schilling |
| Exhibit K | Declaration of Ghazaleh Moayedi |
| Exhibit L | Paxton Post-*Roe* Advisory Letter |
| Exhibit M | AG Paxton's 6.28.2022 Tweet |
| Exhibit N | Representative Cain's 3.18.2022 Letter to Lilith Fund |
| Exhibit O | Representative Cain's 6.28.2022 Tweet |
| Exhibit P | Representative Cain's First 6.29.2022 Tweet |
| Exhibit Q | Representative Cain's Second 6.29.2022 Tweet |
| Exhibit R | Representative Cain's 6.24.2022 Tweet |
| Exhibit S | Freedom Caucus Letter to Sidley Austin |

---

[4] Plaintiffs are filing a separate Appendix of Exhibits as required by the Local Rules, but are also including this Table of Exhibits in the Motion for the Court's convenience.

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION – Page 5**

| Exhibit T | Representative Cain's Press Release and Letter to Citigroup |
| Exhibit U | Rule 202 Petitions Seeking SB8 Discovery |
| Exhibit V | Sections 1.04 and 7.02 of the Texas Penal Code |
| Exhibit W | SB8 Enacted Text |
| Exhibit X | Declaration of Elizabeth Myers |

### III.   STATEMENT OF FACTS

**A.   Defendants' Threats against Plaintiffs**

On June 24, 2022, the Supreme Court of the United States issued its opinion in *Dobbs v. Jackson Women's Health Organization*, reversing its prior decisions in *Roe* and. *Casey*, as well as decades of precedent upholding the constitutional right to abortion.  *Dobbs v. Jackson Women's Health Org.*, --- U.S. ---, 142 S. Ct. 2228, 2284-85 (2022). Almost immediately after the *Dobbs* opinion was announced, AG Paxton issued an advisory regarding the Trigger Ban and asserting that the Pre-*Roe* statutes could be enforced by District Attorneys (including Defendants) immediately:

> … some prosecutors may choose to immediately pursue criminal prosecutions based on violations of Texas abortion prohibitions predating Roe that were never repealed by the Texas Legislature.[FN omitted]. … Under these pre-Roe statutes, abortion providers could be criminally liable for providing abortions starting today.

Ex. L.  On June 28, 2022, AG Paxton confirmed this via tweet, saying "[b]ut w/ SCOTUS's Dobbs decision, these laws are 100% in effect & constitutional."  Ex. M.  After the release of AG's Paxton's Advisory, the Pre-*Roe* Statutes were added back into Vernon's Texas Civil Statutes, available on the Texas Legislature's website, which also notes that the Statutes were "held to have

been impliedly repealed in *McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004)."[5]  Several District Attorneys have also publicly confirmed that they intend to enforce the Texas abortion laws, including the Pre-*Roe* Statutes.[6]

Other state actors have gone even further than AG Paxton, asserting that the Pre-*Roe* Statutes were always effective and capable of imposing criminal liability to conduct, even before the overturning of *Roe* and *Casey*.  For instance, prior to the issuance of the *Dobbs* opinion, Texas Representative Briscoe Rowell Cain III ("Cain") asserted in cease-and-desist letters to Texas abortion funds (including Plaintiffs here) that Texas abortion funds, their donors, employees, and volunteers are subject to prosecution under the Pre-*Roe* Statutes.  Specifically, in a letter to Plaintiff Lilith Fund, Cain stated that the Pre-*Roe* statutes "continue[] to exist as the law of Texas," that Lilith Fund was "committing criminal acts," and that these alleged criminal acts exposed everyone involved at Lilith Fund, "including your employees, volunteers, and donors" to criminal prosecution and imprisonment.  Ex. N.

Following the *Dobbs* decision, Cain also continued to assert that abortion funds and their donors will be prosecuted for murder.  On June 28, Cain tweeted, in part, "[a]nyone performing or

---

[5] A group of over seventy Texas Legislators also recently filed an amicus brief at the Texas Supreme Court, in which they assert that the Pre-*Roe* Statutes were never repealed and were therefore fully effective on June 24, 2022.  *See* Amicus Curiae Letter Brief of Numerous State Senators and State Representatives, *In re Ken Paxton*, No. 22-0527 (now pending in the Supreme Court of Texas), filed July 18, 2022, *available at* https://search.txcourts.gov/Case.aspx?cn=22-0527&coa=cossup

[6] *See* J. David Goodman & Jack Healy, *In States Banning Abortion, a Growing Rift Over Enforcement*, www.NYTIMES.com, Jun. 29, 2022, *available at* https://www.nytimes.com/2022/06/29/us/abortion-enforcement-prosecutors.html; Lauren Rangel, *Some Texoma district attorneys say they will prosecute abortion cases*, www.kxii.com, June 30, 2022, *available at* https://www.kxii.com/2022/06/30/some-texoma-district-attorneys-say-they-will-prosecute-abortion-cases/; Oscar Saravia, *Smith County district attorney will prosecute abortion-related crimes like any other case*, tylerpaper.com, Jul. 2, 2022, available at https://tylerpaper.com/news/smith-county-district-attorney-will-prosecute-abortion-related-crimes-like-any-other-case/article_6990012c-f71b-11ec-9ea4-a30dfafdd919.html.

aiding an abortion in TX (including abortion funds & donors) could face murder charges." Ex. O.

On June 29, Cain retweeted a Texas Tribune tweet, adding "…they're already facing jail time for

their criminal acts. #ProsecuteTexasAbortionFunds." Ex. P. The same day, Cain retweeted a

Planned Parenthood tweet about donating to abortion funds with an image of the Pre-*Roe* statutes

recodified and wrote "[d]onating to a Texas abortion is a crime, punishable by 2-5 years

imprisonment. See article 4512.2, revised civil statutes. #ProsecuteTexasAbortionFunds." Ex. Q.

Cain also has asserted (wrongly, of course) that there is no right to pay for another person to travel

to another state. On June 24, he tweeted a link to a Fortune Magazine article, saying "[h]ere's

@FortuneMagazine confusing the right to interstate travel with the nonexistent right to pay for

another person to travel to another state." Ex. R.[7]

Likewise, a group of 11 Texas Legislators that comprise the "Texas Freedom Caucus" sent

a threatening letter to the law firm Sidley Austin on July 7, 2022. One portion of that letter states:

---

[7] In other litigation pending before this Court, Cain and his co-defendants in that matter have
asserted that the Pre-*Roe* Furnishing Statute is still operable as it was never repealed, and that
"there is no constitutional obstacle to enforcing article 4512.2 against abortion funds and their
donors…" *Wendy Davis, et al. v. Mistie Sharp, et al.,* Case No. 1:22-cv-00373-RP pending in the
Western District of Texas Dkt. 39 pp. 8-9.

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION – Page 8**

It has come to our attention that Sidley Austin has decided to reimburse the travel costs of employees who leave Texas to murder their unborn children. It also appears that Sidley has been complicit in illegal abortions that were performed in Texas before and after the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, No. 19-1392. We are writing to inform you of the consequences that you and your colleagues will face for these actions.

Abortion is a felony criminal offense in Texas unless the mother's life is in danger. *See* West's Texas Civil Statutes, article 4512.1 (1974) (attached). The law of Texas also imposes felony criminal liability on any person who "furnishes the means for procuring an abortion knowing the purpose intended." West's Texas Civil Statutes, article 4512.2 (1974). This has been the law of Texas since 1925, and Texas did not repeal these criminal prohibitions in response to *Roe v. Wade*, 410 U.S. 113 (1973). These criminal prohibitions extend to drug-induced abortions if any part of the drug regimen is ingested in Texas, even if the drugs were dispensed by an out-of-state abortionist. To the extent that Sidley is facilitating abortions performed in violation of article 4512.1, it is exposing itself and each of its partners to felony criminal prosecution and disbarment.

Ex. S.[8] The letter goes on for four pages, and ultimately continues:

It also appears that Sidley may have aided or abetted drug-induced abortions in violation of the Texas Heartbeat Act, by paying for abortions (or abortion-related travel) in which the patient ingested the second drug in Texas after receiving the drugs from an out-of-state provider. Litigation is already underway to uncover the identity of those who aided or abetted these and other illegal abortions. In light of this pending litigation, as well as any anticipated litigation that might ensue, you and your colleagues at Sidley must preserve and retain all documents, data, and electronically stored information relating in any way to: (1) Any abortions performed or induced in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if tested), including any such abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021; (2) Any abortions performed or induced in Texas on or after June 24, 2022, including abortions performed while Judge Weems's TRO was in effect from June 28, 2022, through July 1, 2022; (3) Any abortion that occurred on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas, even if the drugs were dispensed by a provider outside the state of Texas; and (4) The identity of any person or entity who has aided or abetted the abortions described in (1) – (3), including anyone at your firm, and anyone who paid for or in any way reimbursed the costs of those abortions.

---

[8] Representative Cain has sent at least one other, similar letter to another business organization, CitiGroup. *See* Ex. T.

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION – Page 9**

The "litigation" referred to by the Texas Freedom Caucus is a series of Rule 202 Petitions filed in Texas state courts: two against staff of two named Plaintiffs in this lawsuit (Lilith Fund and TEA Fund); one against executives at Whole Women's Health and Alamo Women's Reproductive Services; one against Yvette Ostolaza, managing partner of Sidley Austin; and one against a professor at the University of Texas at Austin, who conducted research about the use of medication abortion pills by Texans after SB8 became effective.  Ex. U. These Rule 202 Petitions seek deposition testimony related to abortions the petitioners—all represented by Jonathan Mitchell and Texas State Senator Bryan Hughes (in his individual capacity)—apparently believe ran afoul of Texas's SB8 and pre-*Roe* statutes.[9]  The Rule 202 Petitions also seek broad categories of documents, including lists of staff, volunteers, and donors.[10]  Mr. Mitchell and Senator Hughes previously drafted and Hughes sponsored SB8, which was famously supposed to be separated from state enforcement in order to prevent pre-enforcement judicial review by the federal courts.  *Whole Woman's Health v. Jackson*, __ U.S. __, 142 S. Ct. 522, 211 L.Ed.2d 316 (2021).[11]  The 202 Petitions and the  letters from the Texas Freedom Caucus mirror one another in parts word-for-word,[12] evidencing a partnership and/or coordinated effort between private and state actors to

---

[9] The Rule 202 Petition seeking information from TEA Fund has been abated, pending appeal of a related case in Denton County, Texas.  And the Rule 202 Petition seeking information from Lilith Fund was denied by the Honorable Brock Smith on August 9, 2022.  As of the filing of this Motion, the remaining Rule 202 Petitions appear to be pending in Smith County, Eastland County and Howard County, respectively but they have not yet been set for hearing.

[10] *See, e.g.*, Ex. U, pdf page 27 ("Any and all non-privileged documents describing or identifying any officer, employee, volunteer, board member, or donor of the Lilith Fund")  .

[11] The actions of private individuals are relevant to this case and analysis because SB8 was intended to provide a "backstop" to District Attorneys who may not prosecute under the abortion statutes to the satisfaction of the Attorney General or interested Legislators.  *See* Michael McCardel, *Republican Lawmakers in Texas Already Discussing Legislation to Further Punish Abortion Crimes*, WFAA (wfaa.com), available at
 https://www.wfaa.com/article/news/politics/inside-politics/texas-republican-lawmakers-discussing-further-punish-abortion-crimes/287-9525265f-87b3-405e-b254-9ebb7d69a6fb.

[12] *E.g.*, *Compare* Ex. S, p. 1 (second full paragraph) *with* Ex. U, pdf page 62, ¶¶ 10-13.

---

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION – Page 10**

intimidate Plaintiffs and others based on their willingness to help clients, employees—or anyone else—access legal healthcare in another state.

Based on these threats and the current and looming state of Texas criminal law, Plaintiffs immediately and drastically adjusted their behavior on June 24, 2022. Each of the Support Plaintiffs immediately stopped providing all direct assistance to Texans seeking abortion care, even those seeking care outside of the state. Dr. Moayedi likewise stopped providing abortion care altogether, stopped traveling to other states where providing such care is legal, and has delayed the start of her telehealth practice in other states. This cessation of activity that is protected by the U.S. Constitution has harmed, and will continue immediately and indefinitely to harm Plaintiffs, their staff, and donors. The threat of imminent enforcement violates Plaintiffs' civil and constitutional rights, and they are entitled to declaratory and injunctive relief prohibiting any prosecution of them under the Texas Trigger Ban and/or the Pre-*Roe* abortion statutes for assisting Pregnant Texans seeking abortion care in states where such care remains legal.

**B.**   **Relevant Texas Laws**

Texas has an intricate, contradictory, and complicated set of laws regulating and outright banning abortion, and the Trigger Ban will soon add to that complexity.

**1.**   **The Pre-*Roe* Statutes**

Prior to the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), the Texas Penal Code contained Articles 1191, 1192, 1193, 1194, and 1196 (now at Revised Civil Statutes 4512.1-6) under which abortion was criminalized. Ex. B.

Art. 1191 of the Texas Penal Code stated:

> If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine, or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion, he

shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled. By 'abortion' is meant that the life of the fetus or embryo shall be destroyed in the woman's womb or that a premature birth thereof be caused.

Art. 1192 stated:

"Whoever furnished the means for procuring an abortion knowing the purpose intended is guilty as an accomplice."

Like the principal offense, this accomplice liability is punishable by two to five years in the state penitentiary. Texas courts historically interpreted "furnish[ing] the means for procuring an abortion" to apply to providing drugs, medicine, or instruments that could produce an abortion, or committing violence upon the pregnant person to bring about an abortion. *See Fondren v. State*, 169 S.W. 411, 414-16 (1914).

In *Roe*, the U.S. Supreme Court affirmed a declaratory judgment that Articles 1191, 1192, 1193, 1194, and 1196 were unconstitutional and "as a unit, must fall." *Roe v. Wade*, 410 U.S. 113, 164. The *Roe* Court held that no further relief was necessary because the Court "assume[ed] the Texas prosecutorial authorities will give full credence to this decision that the present criminal abortion statutes of that State are unconstitutional." *Id.* at 166. The following year, Texas transferred the language of Articles 1191, 1192, 1193, 1194, and 1196 into the Texas Civil Statutes 4512.1. 4512.2, 4512.3, 4512.4, and 4512.6.

### 2. Texas Trigger Ban

In July 2021, Texas enacted a nearly total ban on abortion that goes into effect on the 30th day after (1) the issuance of a Supreme Court decision overruling *Roe v. Wade*, 410 U.S. 113 (1973) either wholly or in part; (2) the issuance of any other Supreme Court decision "that recognizes . . . the authority of the states to prohibit abortion;" or, (3) adoption of a constitutional amendment that "restores to the states the authority to prohibit abortion." 2021 Tex. Sess. Law

Serv. Ch. 800 (H.B. 1280), Sec. 3 (West); Tᴇx. Hᴇᴀʟᴛʜ & Sᴀғᴇᴛʏ Cᴏᴅᴇ § 170A.001, *et seq.* (the "Trigger Ban").

The Trigger Ban prohibits all abortions in Texas except when performed by a licensed physician to prevent the death or serious risk of substantial impairment of a major bodily function of the pregnant person. Violations of the Trigger Ban are felony level crimes. Tᴇx. Hᴇᴀʟᴛʜ & Sᴀғᴇᴛʏ Cᴏᴅᴇ § 170A.004. The Trigger Ban also creates a civil penalty of "not less than $100,000 for each violation," which is enforceable in a suit filed by the Texas Attorney General. *Id.* § 170A.005. The Trigger Ban expressly addresses its effect on laws already in effect, stating "that conduct is subject to a civil or criminal penalty under this chapter does not abolish or impair any remedy for the conduct that is available in a civil suit." *Id.* § 170A.006. The Trigger Ban goes into effect on August 25, 2022.

### 3.   Texas Penal Code Provisions

Texas defines general criminal responsibility for the conduct of another in Section 7.02 of the Penal Code:

> A person is criminally responsible for an offense committed by the conduct of another if:
>
> (1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;
>
> (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or
>
> (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

TEXAS PENAL CODE § 7.02(a).[13]

Texas also defines its purported criminal jurisdiction in the Penal Code. Section 1.04(a) provides the State with "jurisdiction over an offense that a person commits . . ." if:

(1) either the conduct or a result that is an element of the offense occurs inside this state;
(2) the conduct outside this state constitutes an attempt to commit an offense inside this state;
(3) the conduct outside this state constitutes a conspiracy to commit an offense inside this state, and an act in furtherance of the conspiracy occurs inside this state; or
(4) the conduct inside this state constitutes an attempt, solicitation, or conspiracy to commit, or establishes criminal responsibility for the commission of, an offense in another jurisdiction that is also an offense under the laws of this state.

TEXAS PENAL CODE § 1.04(a).[14]

### 4.    Senate Bill 8

In addition to its criminal laws prohibiting abortion, Texas enacted Senate Bill 8 ("SB8") in 2021, in which the state prohibited all abortions if the presence of cardiac activity was detected – which is usually at approximately the sixth week of pregnancy.[15]  SB8 was famously (or infamously) drafted to avoid judicial review in federal courts by authorizing private enforcement of its provisions until *Roe* was overturned.  Although it has been declared unconstitutional under both the Texas and U.S. Constitution for flaws that have nothing to do with the abortion ban itself,[16] it remains a threat to all Texans who seek to help others obtain reproductive healthcare, even outside of the state.   The effect of the combined civil and criminal statutes is a "belt and

---

[13] To be considered an "offense" under the Texas Penal Code, conduct must be "defined as an offense by statute, municipal ordinance, order of a county commissioners court, or rule authorized by and lawfully adopted under a statute."  TEX. PENAL CODE § 1.03(a).

[14] A copy of Section 1.04 and 7.02 of the Texas Penal Code are included as Exhibit V in Plaintiffs' Appendix for the Court's convenience.

[15] A copy of SB8 is included as Exhibit W in Plaintiffs' Appendix for the Court's convenience.

[16] *Van Stean v. Texas Right to Life*, No. D-1-GN-21-004179 (98th Dist. Travis County, Texas Dec. 9, 2021).

suspenders" attempt to ensure that anyone who wants to help a Texan access abortion, even in another state, cannot do so.

In addition to creating a one-sided bounty-hunting scheme that allows anyone in the world to sue a Texan who helps someone obtain an abortion without the claimant having any actual injury, SB8 also imposes a draconian fee shifting regime on anyone who affirmatively challenges a Texas abortion statute or regulation. Codified as Section 30.022 of the Texas Civil Practice and Remedies Code, it states:

> [A]ny person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief to prevent this state, a political subdivision, any governmental entity or public official in this state, or any person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts abortion . . . in any state or federal court, or that represents any litigant seeking such relief in any state or federal court, is jointly and severally liable to pay the costs and attorney's fees of the prevailing party.

TEX. CIV. PRAC. & REM. CODE 30.022 (a). Although couched in "prevailing party" language, the only people that can ever be jointly and severally liable are those "who seek[] declaratory or injunctive relief to prevent . . . enforce[ment of] any statute, ordinance, rule, regulation, or any other types of law that regulates or restricts abortion" and the lawyers who represent them.

This joint and several liability attaches if the party defending the abortion statute or regulation prevails on any single claim, regardless of whether there are others on which they fail. *Id.* 30.022(b). And the party defending the abortion statute or regulation need not even seek fees in the actual case challenging the law; he may file a separate civil action in a different court for up to three years afterward. *Id.* 30.022(c). Section 30.022 also purports to eliminate res judicata by stating that it is not a defense to an action to recover costs and fees that the court in the original lawsuit declined to recognize or enforce Section 30.022 or the original court held that any provision

of Section 30.022 was "invalid, unconstitutional, or preempted by federal law." *Id.* 30.022(d).

Section 30.022 is indeed invalid, unconstitutional, and preempted by federal law for multiple

reasons discussed in Section IV.B.8, *infra*.

The Texas Legislature also included a "legislative finding" in Section 2 of SB8 that Texas

"never repealed, either expressly or by implication, the state statutes enacted before the ruling in

*Roe v. Wade*, 410 U.S. 113 (1973), that prohibit and criminalize abortion unless the mother's life

is in danger." S.B. 8 § 2 (Tex. 2021)."[17]

## C.   Relevant Provisions of the United States Constitution

### 1.   The Right to Travel

The right to travel is a fundamental constitutional right of all citizens of the United States.

As stated by the Supreme Court in *Saenz v. Roe*, 526 U.S. 489, 500 (1999):

> The "right to travel" discussed in our cases embraces at least three
> different components. It protects the right of a citizen of one State
> to enter and to leave another State, the right to be treated as a
> welcome visitor rather than an unfriendly alien when temporarily
> present in the second State, and, for those travelers who elect to
> become permanent residents, the right to be treated like other
> citizens of that State.

Recognition of the right to travel dates back to the earliest period of self-government in the United

States, under the Articles of Confederation, Article IV, which guaranteed the right of "free ingress

and regress to and from" neighboring States. The right to travel guarantees a citizen's ability to

make journeys into other states and return to the citizen's state of residence. The right to travel

also includes a newly-arrived or traveling citizen's right to be treated equally to the destination

---

[17] The Trigger Ban also includes a "legislative finding" that "the State of Texas never repealed, either expressly or by implication, the state statutes enacted before the ruling in *Roe v. Wade*, 410 U.S. 113 (1973), that prohibit and criminalize abortion unless the mother's life is in danger."

state's residents and to receive the same services without discrimination or classification.  The right is grounded in multiple provisions of the U.S. Constitution, including:

- Article IV, § 2, which states "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

- The Fourteenth Amendment guarantees that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

- The Commerce Clause, which states "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const. art. I, § 8, cl. 3.

**2.      The Rights to Freely Associate, Speak, and Donate Money.**

All Texans have First Amendment rights to associate freely with each other and with pregnant Texans and to engage in expressive conduct, including providing funding for pregnant Texans to access out-of-state services that are legal where rendered, including abortion.  Pregnant Texans, including those who seek Plaintiffs' assistance, have constitutional rights to travel to states where full reproductive care – including abortions – is legal.  Plaintiffs' use of funds in furtherance of their missions is considered both speech and an integral part of the right to associate, and it is protected by the First Amendment to the U.S. Constitution, which states:

> Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Indeed, "the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or

even hurtful." *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 574 (1995). "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama*, 310 U.S. 88, 101–102, (1940); *see also First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 776 (1978). Citizens must be free to speak, associate, publish information, and to express themselves without fear of criminal prosecution in accordance with this protection, regardless of how State actors view the issue in question.

This is true especially when the subject of the speech is controversial:

> "[S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.'" *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758–759, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (opinion of Powell, J.) (*quoting First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (internal quotation marks omitted).

*Snyder v. Phelps,* 562 U.S. 443, 451-52 (2011).

The issue of abortion rights has undoubtedly been contentious in society over the last half-century, and following the *Dobbs* decision, the controversy has been front and center. Part of the result of *Dobbs* is a "restoration" of the issue to the states, and the varying approaches among the

states ranged from protections for reproductive healthcare and right to, as here, vast criminal prohibitions impacting wide subsections of the community and helping professions. The breadth of Texas's prohibitions is not sustainable under the First Amendment, however. As the Supreme Court has held:

> The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. 14 *Cf. Marcus v. Search Warrant*, 367 U.S. 717, 733, 81 S.Ct. 1708, 1717, 6 L.Ed.2d 1127. These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. *Cf. Smith v. California, supra,* 361 U.S. at 151—154, 80 S.Ct. at 217—219; *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity. *Cantwell v. Connecticut,* 310 U.S. 296, 311, 60 S.Ct. 900, 906, 84 L.Ed. 1213.

*National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 432-33 (1963). Where as here, criminal prosecutions are threatened, the scope and safety of First Amendment protections are paramount in order to protect citizens from sweeping government overreach—which in this case may impact their freedom altogether.

## IV. ARGUMENT & AUTHORITIES

### A. Legal Standards.

Preliminary injunctions are appropriate when (1) the movant is likely to succeed on the merits of their claims; (2) the movant is likely to suffer irreparable harm absent an injunction; (3) the balance of equities favor the movant; and (4) a preliminary injunction would serve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). District courts have "wide discretion"

in granting preliminary injunctions. *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987). "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and on evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Courts are not required to hold an evidentiary hearing before issuing a preliminary injunction, particularly where the "defendants do not point to any convincing factual disputes." *Dixon*, 835 F.2d at 558.

The same legal standards apply to temporary restraining orders ("TROs"). *DeFranceschi v. Seterus, Inc.*, No. 4:15-CV-870-O, 2016 WL 6496323, at *1 (N.D. Tex. Aug. 2, 2016) ("A temporary restraining order ('TRO') is 'simply a highly accelerated and temporary form of preliminary injunctive relief,' which requires that party seeking such relief to establish the same four elements for obtaining a preliminary injunction" (quoting *Hassani v. Napolitano*, No. 3:09-cv-1201-D, 2009 WL 2044596, at *1 (N.D. Tex. 2009))). Generally, a TRO may last up to 14 days. FED. R. CIV. P. 65(b)(2). The Court may extend it for another 14 days (for a total of 28 days) if it finds "good cause" or the party to be enjoined consents. *Pizza Hut LLC v. Pandya*, No. 4:19-CV-00726-RWS, 2019 WL 8331437, at *3 (E.D. Tex. Nov. 26, 2019). If (and only if) the Court extends a TRO beyond the time permissible under Federal Rule of Civil Procedure 65(b)(2) without consent of the enjoined party, it becomes an enforceable preliminary injunction that can be appealed. *See Sampson v. Murray*, 415 U.S. 61, 86 (1974); *see also Insight Direct USA, Inc. v. Kelleher*, No. 1:17-CV-252-RP, 2017 WL 1371252, at *2 (W.D. Tex. Apr. 10, 2017) (holding that a TRO that does not extend beyond the time permitted under FRCP 65(b)(2) is not appealable as a preliminary injunction).

B.    **Plaintiffs are likely to succeed on the merits of their constitutional challenges.**

The Texas Pre-*Roe* Statutes and Trigger Ban cannot criminalize Plaintiffs' conduct that assists pregnant Texans obtain abortion care outside of the state for many independent reasons. And Section 30.002 of the Texas Civil Practice & Remedies Code is also fatally flawed under the U.S. Constitution, is preempted by federal law, and therefore void.

1.    **The Pre-Roe Statutes and the Trigger Ban Violate the Right to Travel under the U.S. Constitution.**

The "freedom to travel throughout the United States has long been recognized as a basic right under the Constitution" and "fundamental to the concept of our Federal Union." *United States v. Guest*, 383 U.S. 745, 757–58 (1966); *Saenz v. Roe*, 526 U.S. 489, 498 (1999) ("[T]he constitutional right to travel from one State to another is firmly embedded in [federal] jurisprudence," and is "a virtually unconditional personal right, guaranteed by the Constitution to us all.") (internal quotation marks and citations omitted). Because it is fundamental, laws which infringe the right to travel, as Texas's laws do, are subject to strict scrutiny. *Chavez v. Martinez*, 538 U.S. 760, 775 (2003); *Dunn v. Blumstein*, 405 U.S. 330, 338–39 (1972). Such laws are unconstitutional unless they are shown to be narrowly tailored to accomplish a compelling state interest. *Id.* Where a law fails this test in a Right to Travel case, a finding that the law is facially invalid is appropriate. *Aptheker v. Sec'y of State*, 378 U.S. 500, 516-17 (1964).

A blanket restriction on all interstate travel or assistance related to abortion outside of the State of Texas, where there are reasonable alternatives that could further the State's alleged interest, is not narrowly tailored. *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972) ("And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'") (internal citation omitted). Such alternatives include disseminating information

about the activity, *i.e.*, abortion, to advocate the State's position for individuals to consider in their decision related to the medical services sought through interstate travel. *Bigelow v. Virginia*, 421 U.S. 809, 824, 95 S. Ct. 2222, 2234 (1975) (noting that an alternative for states seeking to regulate out of state conduct, which it has no authority to regulate, may instead "seek to disseminate information so as to enable its citizens to make better informed decisions when they leave.") Here, Defendants' assertion that  the Trigger Ban and Pre-*Roe* Statutes apply to interstate travel demonstrates their failure to choose a less drastic means to achieve the goal of restricting abortion within the State.  Because there are alternative means available to further the State's alleged interest in restricting abortion in the State of Texas, the Trigger Ban and Pre-*Roe* Statutes are not narrowly tailored.

Additionally, criminalizing interstate travel is not a compelling state interest.  Specifically, criminalizing a citizens' exercise of their constitutional right to interstate travel to engage in lawful conduct in another state does not bear any relationship to any State interest that could be alleged by Defendants.  While "[c]ompelling interests rarely 'reduce to precise definition' . . . [t]he Supreme Court has sometimes described compelling interests with synonyms such as 'interests of the highest order' and 'vital state interest[s].'" *Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1131 (5th Cir. 2022).  Whether a Texan engages in a lawful activity in another state is not vital to the State's criminalization and/or regulation of abortion within the State.  *See Bigelow*, 421 U.S. at 824 (noting available alternatives for the state to achieve its goal).  Because there is no compelling interest in the criminalization of interstate travel related to abortion, Defendants cannot criminalize and/or prosecute lawful constitutionally protected conduct.  *See Aptheker v. Sec'y of State*, 378 U.S. 500, 501 (1964) (finding that despite the Federal Government's asserted interest

of national security the law at issue, which made it a felony for a member of a Communist organization to apply for, use or attempt to use a passport, was unconstitutional on its face).

Neither the Trigger Ban nor the Pre-*Roe* Statutes can prohibit a person's right to travel or to assist someone in interstate travel.[18]   *Bigelow*, 421 U.S. at 822-24 ("Neither could Virginia prevent its residents from traveling to New York to obtain those services or, as the State conceded, prosecute them for going there").   A person is permitted to leave their home state to engage in an activity that is lawful in the destination state.   *Id.*  at 824 ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State."); *see also United States v. Texas*, 566 F. Supp. 3d 605, 683 (W.D. Tex. 2021) *cert. granted before judgment* 142 S.Ct. 14, 211 L.Ed.2d 225 (2021) (noting that under the Texas Heartbeat Act, pregnant Texans were bound by the state law, if constitutional, and "[s]tate lines only provide a refuge so long as different laws exist across them.").

Moreover, the Privileges and Immunities Clause of Article IV and the Fourteenth Amendment protects a non-resident's "right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in [another] State." *Saenz*, 526 U.S. at 500.   When a challenged restriction deprives nonresidents of a privilege or immunity protected by this Clause, it is invalid unless "(i) there is a substantial reason for the difference in treatment; and (ii) the

---

[18] In the *United States v. Texas*, Defendant Paxton seemingly conceded that the state regulation prohibiting conduct, i.e., abortion after cardiac activity is detected, within the state does not apply to Texans across state lines.   566 F. Supp. 3d 605, 674 (W.D. Tex.), *cert. granted before judgment*, 142 S. Ct. 14, 211 L. Ed. 2d 225 (2021) ("The State further asserts that Texas residents can still travel to other states to access abortion care, which nullifies the likely unconstitutionality of the ban.").   Additionally, the court noted that "[s]tate lines only provide a refuge so long as different laws exist across them." *United States v. Texas*, 566 F. Supp. 3d at 683.

discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Barnard v. Thorstenn*. 489 U.S. 546, 552-53 (1989).

Here, Defendants threaten Plaintiffs, their volunteers, and their donors with prosecution under the Texas's criminal abortions statutes for travel, intended travel, or assisting one in traveling across state lines.  The attempted restraint on Plaintiffs, their volunteers, and their donors to prevent their movement or assistance in movement of a pregnant Texan into a destination state where they may legally undertake or obtain reproductive health care services, such as an abortion while they are in the destination state, denies that person's entitlement to the privileges and immunities of the destination state. *Bigelow*, 421 U.S. at 822-24 ("Neither could Virginia prevent its residents from traveling to New York to obtain those services or, as the State conceded, prosecute them for going there") (citations omitted).  It is a violation of both the pregnant person's rights as well as the helper's constitutional rights to burden the fundamental right to travel in this way. *See*, *e.g.*, *Edwards v. People of State of California*, 314 U.S. 160 (1941) (finding that California statute applied against person helping another person exercise right to travel was unconstitutional).

These restrictions are also invalid because there is no "substantial reason for the difference in treatment," and "the discrimination practiced against nonresidents" bears no "relationship to the State's objective." *Barnard*, 489 U.S. at 552 (quoting *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 284 (1985)).  Threatened prosecution for exercising or assisting with the constitutional right to travel bears no relationship to the State's goal of criminalizing abortion *in the state of Texas*.  "A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State." *Bigelow*, 421 U.S. at 824.

State laws that seek to and/or prevent citizens from traveling to or from another state also violate the Due Process Clauses of the Fifth and Fourteenth Amendment. "The right to travel is part of the liberty of which the citizen cannot be deprived without the due process of law." *United States v. Laub*, 385 U.S. 475, 481 (1967) (quoting *Kent v. Dulles*, 357 U.S. 116, 125 (1958)); *accord Hernandez v. Cremer*, 913 F.2d 230, 237 (5th Cir. 1990); *Califano v. Gautier Torres*, 435 U.S. 1, 5, n. 6 (1978) ("The constitutional right of interstate travel is virtually unqualified. By contrast the 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment") (internal citations omitted). A law "implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Soto–Lopez*, 476 U.S. at 903 (internal quotation marks and citations omitted).

Here, Defendants' actions invade the right to travel in at least two ways. First, with respect to Dr. Moayedi, who wishes to resume her travel among the states to provide abortion services where legal, and the Support Plaintiffs, who wish to travel with pregnant Texans across state lines to help them obtain legal abortions out of state, the Trigger Ban and the Pre-*Roe* States directly impede their own personal rights to travel freely among the states. Second, the criminal laws implicate the right to travel because their threatened prosecutions resulted in Plaintiffs ceasing all abortion assistance activities in support of that right. *See Soto–Lopez*, 476 U.S. at 903. Indeed, Plaintiffs ceased all activities related to obtaining an abortion out of state because of the threat of prosecution and the significant criminal penalties that could follow.

2.      **The Pre-*Roe* Statutes and the Trigger Ban Violate the Commerce Clause of the U.S. Constitution.**

A business is in interstate commerce when it "directly engage[s] in the production, distribution, or acquisition of goods or services in interstate commerce." *United States v. American Building Maintenance Industries*, 422 U.S. 271, 283 (1975).  Interpreting the Pre-*Roe* Statutes and Trigger Ban to criminalize Plaintiffs', their volunteers', and their clients' travel for the purpose of assisting pregnant Texans seeking abortion care in other states constitutes an attempt by Texas to regulate commerce "among the several States," which authority the Constitution grants only to Congress.  *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015); *Dennis v. Higgins*, 498 U.S. 439 (1991); *Dickerson v. Bailey*, 336 F.3d 388, 397 (5th Cir. 2003).  Likewise, interpreting those statutes to prohibit citizens from assisting Texans' travel generally also constitutes an unconstitutional attempt by Texas to regulate interstate commerce.

Plaintiffs are nonprofit organizations that, prior to *Dobbs*, provided information and funds to its clients for lawful out-of-state activities.  Due to the numerous threats of prosecution under various Texas statutes for assisting and/or supporting Texans in obtaining an abortion in other states where abortions remain legal, Plaintiffs ceased all abortion funding activities, even for abortions that occur in another state.  But use of Pre-*Roe* Statutes and/or the Trigger Ban to threaten prosecution for assisting and/or supporting a pregnant Texan access care in another state hinders the flow of commerce in a manner that implicates federal concerns.  *See United States v. Texas*, 566 F. Supp. 3d at 641 ("By extending liability to persons anywhere in the country, [the Texas Heartbeat Act's] structure all but ensures that it will implicate commerce across state lines—whether through insurance companies reimbursing Texas abortions, banks processing payments, medical device suppliers outfitting providers, or persons transporting patients to their

appointments."). This interference with out-of-state access has a substantial effect on the availability of abortion-related services in the national market.

Both Congress and the courts have found that abortion regulation implicates interstate commerce. *See* 18 U.S.C. § 1531(a) (restricting the provision of "partial birth abortion" procedures "in or affecting interstate or foreign commerce"); *United States v. Bird*, 124 F.3d 667, 678 (5th Cir. 1997) (finding that a federal statute that criminalized certain threats and intimidation directed at providers of abortion services was a legitimate regulation of intrastate activity having a substantial effect on interstate commerce including commercial market for abortion and proportionate increase in out of state cost of abortion services); *see also United States v. Bird*, 401 F.3d 633, 634 (5th Cir. 2005) (reaffirming that the federal criminal statute was "a valid exercise of Congress's authority under the Commerce Clause").

Here, Defendants threaten to civilly and criminally prosecute all Texans and non-Texas to prevent access entirely to an abortion out of state. In effect, Defendants seek to remove all Texans from the national abortion market. This complete ban exceeds the State's authority and undoubtably implicates the national abortion market in interstate commerce. *See United States v. Bird*, 124 F.3d at 673 ("Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.").

### 3. The Pre-*Roe* Statutes and the Trigger Ban Violate Plaintiffs' First Amendment Rights.

In addition to violating the right to travel, the Pre-*Roe* Statutes and the Trigger Ban also violate Plaintiffs' rights to freely associate, freely speak, and freely donate money to charitable endeavors. And because the Pre-*Roe* and Trigger Ban's application to Plaintiffs' conduct are content-based regulations (that apply only to those seeking to assist pregnant Texans seeking

abortions) they are presumptively invalid. *R.A.V. v. City of St. Paul*, Minn., 505 U.S. 377, 382 (1992). "The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Bonta*, 141 S. Ct. at 2389 (citation omitted). Here, the chilling has already occurred, and it will continue to occur absent court intervention.

Plaintiffs are involved in "expressive activity" under the First Amendment because they advocate for reproductive justice. Dkt. 1, ¶¶ 20-33. An association need not associate for the purpose of disseminating a certain message for First Amendment protection, but "must merely engage in expressive activity that could be impaired." *Boy Scouts of America v. Dale*, 530 U.S. 640, 655 (2000). One central, common goal of all these Plaintiffs is to disseminate truthful information about reproductive rights and options, including legal abortion services outside of Texas. Defendants are clearly hostile to this message. But, the government (through its interpretation of law) may not "interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one…" *Id.* at 661 (quoting *Hurley*, 515 U.S. at 579). Just as the government may not interfere with Plaintiffs' truthful speech (disseminating information) and expressive speech (advocacy for reproductive justice), it may not interfere with Plaintiffs' association with their volunteers, donors, and clients.

> **a.    The rights to freely associate and freely speak under the First Amendment include assisting others exercising their own constitutional rights.**

Defendants' attempts to foreclose all assistance to pregnant Texans seeking abortion care, even in other states where such care is legal, directly violate the First Amendment.

> **i.    Free speech**

Plaintiffs are being subjected to threats of criminal prosecution due to their speech and advocacy activities. Part of that speech is in facilitating and providing truthful, factual information

as to how pregnant Texans may seek legal healthcare outside the state. As the Seventh Circuit Court of Appeals recognized more than 40 years ago:

> It is quite common for persons to travel to other jurisdictions in order to avoid restrictive laws in their home state or to take advantage of more lenient laws in another state, **and it is perfectly lawful for one to advise another to do so**. People travel to Nevada to gamble or to gain a quick marriage or divorce; they travel across state lines in order to purchase liquor cheaper or at a younger age.

*Robak v. United States*, 658 F.2d 471, 476–77 (7th Cir. 1981) (emphasis added). Attempts, and even as here, threats, to prosecute individuals under the State's criminal abortion statutes implicate the First Amendment right to assist with travel because "impeding travel is its primary objective." *Soto–Lopez*, 476 U.S. at 903.

Free speech requires individuals (and associations of individuals) be able to assist others with informational materials without being criminalized or prosecuted as an "aider or abetter." *See In re Aimster Copyright Litig,,* 334 F.3d 643, 651 (7th Cir. 2003) (internal citations omitted). Here, Plaintiffs are not providing informational assistance to obtain illegal Texas abortions; they are speaking to provide assistance to those seeking *legal* care elsewhere. When speech in the first instance is protected by the First Amendment, it cannot possibly be subject to criminalization in the second. *See generally Simon & Schuster v. Members of the New York State Crime Board,* 502 U.S. 105 (1991).

Free speech requires that Plaintiffs be able to speak on matters that may be repugnant to some. *Texas v. Johnson*, 491 U.S. at 414 ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *see also FCC v. Pacifica Foundation*, 438 U.S> 726, 745-46 (1978) ("The fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence

is a reason for according it constitutional protection.").  It likewise demands that Plaintiffs be able to advocate and speak out about the state of abortion laws in Texas, and about how laws function differently elsewhere.  *Snyder*, 562 U.S. at 452.  To construe the provision of truthful information and advocacy as criminal runs afoul of the most basic constitutional requirements.  *Button*, 371 U.S. at 433.

Plaintiffs are targeted in part due to assistance they provide in the form of informational materials, which may include newsletters, social media posts, and other public communications. Freedom of the press likewise prohibits Texas's Abortion Bans from criminalizing the dissemination of truthful information, and is a bedrock principle of our constitutional jurisprudence.  *Mills v. State of Ala.*, 384 U.S. 214, 219 (1966) ("Suppression of the right of the press … to clamor and contend for or against change … muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free.");  *Thornhill,* 310 U.S. at 101–102; *Lovell v. City of Griffin, Georgia*, 303 U.S. 444, 452 (1938) ("The liberty of the press is not confined to newspapers and periodicals.. . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.").  The Texas Pre-*Roe* Statutes and Trigger Ban facially violate this fundamental tenet by encompassing the public dissemination of information.

### ii.       *Free association*

Similarly, Defendants' threatened prosecutions of Plaintiffs and their donors for financial contributions also improperly infringe on the right to freely associate. *Dale*, 530 U.S. at 653 ("As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression.").  State actors have already coordinated with private actors under SB8 to "investigate" the identities of all who

may have violated the Pre-*Roe* Statutes in order to use to criminal statutes for intimidation.  The Supreme Court has noted that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom.  *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Ex parte Lowe*, 887 S.W.2d 1, 2 (Tex. 1994) ("The rights to form, discuss, and express unpopular views are protected fundamental rights.  Where the organization advocates views which might subject members to ridicule and denunciation from the mere fact of membership, First Amendment associational rights are the basis for a qualified privilege against disclosure of membership lists."). Further, the Court has recognized the vital relationship between freedom to associate and privacy in one's associations.  *Id.*  "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."  *Id*. at 449.

Challenges to compelled disclosure are reviewed under "exacting scrutiny." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021).  Under that standard, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id*. (citing *Doe v. Reed*, 561 U.S. 186, 196 (2010)).  "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id*.  Here, Plaintiffs advocate views which might subject members to ridicule and denunciation from the mere fact of membership.  In particular, disclosure may subject Plaintiffs' volunteers and donors to further threats of criminal prosecution or threats of ruinous civil lawsuits for the exercise of constitutionally protected conduct.  *Bonta*, 141 S. Ct. at 2388 (noting the gravity of the privacy concerns where petitioners' supporters were subjected to bomb threats, protests, stalking, and finding that the deterrent effect feared by the organizations was real and pervasive).  Therefore, the need for privacy is crucial for the preservation of Plaintiffs'

volunteers' and donors' freedom of association. *Id.*, at 2388 (2021) ("[D]isclosure requirements can chill association "[e]ven if there [is] no disclosure to the general public."). In fact, Defendants' threatened prosecution has already chilled, and continues to chill, Plaintiffs' volunteers and donors from engaging in their right to associate for fear of prosecution. [*See* ¶ 12 of Decl. of Anna Rupani (Exh.C); ¶ 10 of Decl. of Neesha Dave (Exh.E); ¶ 9 of Decl. of Rachel Cheek (Exh.H)].

The sole avenue for Plaintiffs to ensure avoidance of prosecution by Defendants under Texas's criminal abortion statutes is to cease any free speech or association that Defendants believe to be violative of those statutes, including – according to public statements made by AG Paxton and other state actors – assisting travel to other states for abortion procedures.[19] Essentially, Plaintiffs, their volunteers, and their donors have been given a choice: relinquish your right to associate in any way with an organization and its activities furthering reproductive health services or face prosecution for leaving, intending to leave, or assisting someone from leaving the state. A restriction of an individual's constitutional right to travel that can only be recaptured by relinquishing another fundamental right such as freedom of association, is unconstitutional. *Aptheker*, 378 U.S. at 507 ("The restrictive effect of the legislation cannot be gainsaid by emphasizing, . . . that a member of a registering organization could recapture his freedom to travel by simply in good faith abandoning his membership in the organization. Since freedom of association is itself guaranteed in the First Amendment, restrictions imposed upon the right to travel cannot be dismissed by asserting that the right to travel could be fully exercised if the individual would first yield up his membership in a given association.").

---

[19] As discussed more fully at § IV.B.5, neither Pre-*Roe* nor Trigger Ban explicitly states that the statute applies to travel or financial contributions/donations and this attempted breadth violates due process under both the Fifth and Fourteenth Amendment. Additionally, Defendants' interpretation of the statutes evidences the statutes' unconstitutional vagueness.

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION – Page 32**

### iii.    *Free expression*

Plaintiffs, as well as their volunteers and donors, also have a First Amendment right to make financial contributions to and/or advocate for the Plaintiffs' activities in furtherance of their organizational mission.  *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) (noting that the right to participate in democracy through political contributions is protected by the First Amendment); *see Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349 (2010) ("If the First Amendment has any force, it prohibits [the government] from fining or jailing citizens, or associations of citizens, for simply engaging in political speech.").  This fundamental freedom is not limited to political contributions, but extends to issues important to our time. *See Thornhill* 310 U.S. at 102) ("Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.").   Here, Plaintiffs – as well as their volunteers and donors – are already being forced to adjust their constitutionally protected behavior, including the giving of money, because they fear enforcement by the State.  Ex. C, ¶¶ 8-12, Ex. D, ¶¶ 6-10; Ex. E, ¶¶ 6-10; Ex. F, ¶¶ 7-10; Ex. G, ¶¶ 7-10;  Ex. H, ¶¶ 5-8; Ex. I, ¶¶ 7-10; Ex. J, ¶¶ 7-10; Ex. K, ¶¶ 5-9.

### b.    *Texas's Abortion Bans are not narrowly tailored to serve compelling state interests.*

The Texas criminal law provisions are presumptively invalid as applied to Plaintiffs' speech and "may be justified only if the government proves" that the restriction is "narrowly tailored" and necessary "to serve compelling state interests."  *Reed*, 576 U.S. at 163; *see also United States v. Alvarez*, 567 U.S. 709, 715-17 (2012); *R.A.V.*, 505 U.S. at 382 ("The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed.") (citations omitted).  Defendants cannot show that

the Pre-*Roe* Statutes or Trigger Ban's application to donations and/or financial contributions survives strict scrutiny because the State lacks a compelling interest in suppressing speech that promotes and supports legal abortion access in other states.  It also cannot constitutionally suppress speech that supports changing the law of *this* state. Therefore, Defendants' threatened prosecution of Plaintiffs' financial contributions (and sources thereof, i.e. donors) and receipt of donations related to abortion, travel, support of their clients, and their reproductive justice missions violates the right to freedom of speech, expression, and association.

### 4.    The Pre-*Roe* Statutes and Trigger Ban are unconstitutionally vague.

Under the Fourteenth Amendment's guarantee of due process, a law can be void for vagueness "for either of two independent reasons.  First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement."  *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality).  "This test demands that statutes affecting speech explain precisely what conduct they are proscribing." *Nat'l Press Photographers Assoc. v. McCraw*, __ F.Supp. 3d ___ , 2022 WL 939517, at *12 (W.D. Tex. Mar. 3, 2022).  As a result, "the government may regulate conduct that affects speech only with narrow specificity.")  *Id.* (citations and quotations omitted).

"Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly . . . ." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265 (1994).  A penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  Where the legislature fails to provide such minimal guidelines, a criminal statute may

permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974). "[A] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *State of Ala. ex rel. Patterson*, 377 U.S. at 307 (emphasis added).

The Pre-*Roe* Furnishing Statute prohibits "furnishes the means for procuring an abortion knowing the purpose intended is guilty as an accomplice." TEX. REV. STATS. ANN. Art. 4512.2 (1974). But the statute nowhere defines the phrase "furnishing the means." Nor is it defined in the Texas Penal Code. And it has no uniform definition under Texas law. Further, the Pre-*Roe* statutes use the words "means" and "procure" in a special (and consistent) way: "means" is consistently used to refer to the drug, medicine, or physical act that causes the abortion, and "procure" is used to refer to the actual causation of the abortion. Former Texas Penal Code Article 1191 reads: "…any drug or medicine, or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion" (emphasis added). *See*, *e.g.*, *Moore v. State*, 40 S.W. 287, 290 (Tex. Crim. App. 1897) (drugs); *Wandell v. State*, 25 S.W. 27, 28 (Tex. Crim. App. 1894) (catheter); *Willingham v. State*, 25 S.W. 424, 424 (1894) (drugs).

Under the "presumption of consistent usage,"[20] the same words, used later in the same statutory scheme, would have the same meaning as they do in former Article 1191. Thus, if "means" refers to the drug or instrument and "procure" means "induce or cause" in former Article 1191, then those words mean the same things in former Article 1192. Liability for "furnishing" under former Article 1192 should only be possible if Plaintiffs actually provide to the doctor or the patient the "drug or medicine…violence or means…externally or internally applied…[to]

---

[20] *See United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J. concurring).

procure [the] abortion[.]"  This is not the interpretation Defendant Paxton or the State of Texas has taken to date; thus, the statute is at the very least too vague to permit an ordinary citizen to understand what is prohibited.

Moreover, and in a vast expansion of that previous understanding, according the threats of State officials, the Furnishing Statute imposes liability regardless of whether a person knew that a critical element of the offense was present, specifically when the second portion of a medication abortion obtained lawfully outside of Texas is consumed inside the state.  This is fatal to the law's constitutionality.  *See Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) (abortion regulation "is unconstitutionally vague on its face because it impermissibly subjects physicians to sanctions based not on their own objective behavior, but on the subjective viewpoints of others"). This forced guessing game about what "furnishing the means" includes is the opposite of "fair warning" with "explicit standards."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Plaintiffs are subject to the "hazard of being prosecuted for knowing but guiltless behavior."  *Baggett v. Bullitt*, 377 U.S. 360, 373 (1964).  Due process does not allow for this uncertainty.  *Grayned*, 408 U.S. at 109 (citations and internal quotation marks omitted).

Similarly, the Trigger Ban is unconstitutionally vague because it fails to fairly apprise Plaintiffs of what conduct may be prohibited by the terms "induce" and "attempt."  The threats from State actors have targeted out-of-state medication abortions in which a pregnant Texan consumes part of the medication regime within the state.[21]  As with the Furnishing Statute, the Trigger Ban is thus impermissibly vague because anyone who provides assistance to a person seeking a lawful abortion outside of Texas cannot know or control the patient's timing or location in taking legal, prescribed medication.  Thus, the Trigger Ban is unconstitutionally vague because

it subjects people helping Texans to sanctions not based on their own objective behavior, but on the subjective decisions of others.  *See Bell*, 248 F.3d at 422.

Likewise, threats from State actors have targeted conduct ranging from charitable donations to informational assistance, from funding travel to physical accompaniment.  It is not at all clear that these activities constitute "inducement."  Once again, Plaintiffs are subject to the "hazard of being prosecuted for knowing but guiltless behavior," which due process does not permit. *Baggett,* 377 U.S. at 373; *Grayned*, 408 U.S. at 109.

### 5.    The Pre-*Roe* Statutes and Trigger Ban cannot criminalize abortion care provided for out-of-state patients pursuant to that state's laws.

Texas's jurisdictional penal statute does not contemplate extension to care provided beyond the boundaries of Texas in accordance with the law of the state where it is provided.  TEX. PENAL CODE ANN. § 1.04(a).  Because both patients and physicians have a fundamental constitutional right to travel, as laid out previously in this motion, Texas cannot burden the ability of abortion-seekers or providers for care provided out of state.  This is violative of not only the right to travel, but also the Constitution's prohibition against state regulation of interstate commerce.  *See United States v. Texas*, 566 F. Supp. 3d at 641.

The threats by state actors and their associated private emissaries (through SB8's civil enforcement mechanism) have thus far extended to abortion care provided in a state where it is lawful if medications necessary to complete the abortion are ultimately consumed in Texas.  This threat also demonstrates the vagueness of the Texas Abortion Bans, which do not clearly establish that care provided in another state may be subject to Texas criminal liability.  *Landgraf*, 511 U.S. at 265. Likewise, these threats further demonstrate that the Texas Abortion Bans are vague because they may subject an unknowing target to liability without intent or guilt.  *Bell*, 248 F.3d at 422.

Additionally, the federal government has assumed the role of regulating medical billing through CMS and the Department of Health and Human Services.  In that role, care is deemed provided where it is received, as "Place of Service" reflects the location of the patient rather than the provider in circumstances involving telehealth.[22]  Federal law preempts any state law suggestion or mandate to the contrary, in accordance with the Supremacy Clause of the U.S. Constitution.  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617-18 (2011).

Abortion care services provided via telehealth to patients in states where abortion is legal therefore cannot be subject to the Texas Abortion Bans. Medical care is regulated for the benefit of the patient, not for the interest of the State apart from patient safety.  *Bigelow*, 421 U.S. at 827. A physician must be licensed in a particular state to provide care in that state; where that is true and the care is provided via telehealth, such care is subject to the laws of the state in which the patient resides.  Texas cannot infringe upon those laws by applying its own statutes in that circumstance without also running afoul of the prohibitions against regulation of interstate commerce.  *Dennis v. Higgins*, 498 U.S. 439 (1991) (state statute taxing only out-of-state registered vehicles violated Commerce Clause, and Section 1983 suit was properly brought for redress).  Telehealth services provided to patients located outside of Texas by medical professionals located in Texas therefore cannot be the basis criminal or civil penalty under Texas law, and Defendants should be restrained enforcing its laws in that manner.

---

[22] "Include Place of Service (POS) equal to what it would have been had the service been furnished in person."  Billing and coding Medicare Fee-for-Service claims | Telehealth.HHS.gov; https://telehealth.hhs.gov/providers/billing-and-reimbursement/billing-and-coding-medicare-fee-for-service-claims/#coding-claims-during-covid-19, last accessed on August 23, 2022.

6.    **The Pre-*Roe* statutes cannot criminalize any conduct because they were already repealed by implication.**

In addition to being unconstitutional, the Pre-*Roe* Statutes are wholly unenforceable because they were repealed by implication. "[R]epeals by implication are not favored, . . . and will not be found unless an intent to repeal is clear and manifest." *Rodriguez v. United States*, 480 U.S. 522, 524 (1987).  A clear and manifest intent, however, may be inferred from the existence of an irreconcilable conflict.  *Id*.  An irreconcilable conflict exists between two statutes when there is a "positive repugnancy between them or. . .they cannot mutually coexist." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976).

Similarly, in Texas "a statute may be repealed expressly or by implication."  *Gordon v. Lake*, 356 S.W.2d 138, 139 (Tex. 1962).  "Where a later enactment is intended to embrace all the law upon the subject with which it deals, it repeals all former laws relating to the same subject." *Id*.  When "a subsequent statute, revising the subject matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must operate to repeal the former, to the extent to which its provisions are revised and supplied." *Bryan v. Sundburg*, 5 Tex. 418 at 423 (1849).  Therefore, "laws relating to the same subject should be considered as though incorporated in the same act." *Gordon*, 356 S.W.2d at 139..

In *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004), the Fifth Circuit Court of Appeals examined the issue and found that "[t]he Texas statutes that criminalized abortion (former Penal Code Articles 1191, 1192, 1193, 1194 and 1196) and were at issue in *Roe* have, at least, ***been repealed by implication***." (emphasis added).  After *Roe*, the Texas legislature passed numerous abortion regulations including its comprehensive set of civil regulations governing the availability of abortions for minors and practices and procedures of abortion clinics.  *Id*.  Since the regulatory provisions could not be "harmonized with provisions that purport to criminalize abortion," the

court found that the legislature had repealed its Pre-*Roe* ban by implication.  *Id*.  Because the Texas legislature repealed its statutes that criminalized abortion by implication, the Pre-*Roe* Statutes are unenforceable.

Defendant Paxton and other state actors assert that because there was no explicit repeal of the Pre-*Roe* Statutes, they are operative following *Dobbs*.  *See* Exs. L-U.  But this is inconsistent with a court's power to find that a statute has been repealed by implication.  Defendants cannot merely revive a repealed statute by expressing their, or the legislature's intent, to revive the statute. *Fleming Foods of Texas*, *Inc. v. Rylander*, 6 S.W.3d 278, 286 (Tex. 1999) ("General statements of the Legislature's intent cannot revive repealed statutes or override the clear meaning of a new, more specific statute.").  Therefore, the Pre-*Roe* statutes have been repealed by implication and cannot impose any criminal penalties on Plaintiffs at all.

**7.    The Pre-*Roe* Statutes and the Trigger Ban irreconcilably conflict.**

Even if the Pre-*Roe* Statutes have not been impliedly repealed by the State's 50 years of abortion-regulating laws, the Pre-*Roe* Statutes and the Trigger Ban are clearly inconsistent and attempt to regulate/criminalize the same subject and conduct.  For example, Article 4512.1 of the Pre-Roe Statutes provides:

> If any person shall designedly administer to a pregnant woman or knowingly produce to be administered with her consent any drug or medicine, or shall use towards her any violate or means whatever externally or internally applied, and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years; . . . .

TEX. REV. STATS. ANN. ART. 4512.1 (1974).  And Section 170A.004(a) of the Trigger Ban broadly states: "A person may not knowingly perform, induce, or attempt an abortion."  TEX. HEALTH. & SAFETY CODE §170A.004(a).

Both the Pre-*Roe* Statutes and Trigger Ban criminalize the intent to attempt, perform, and induce or procure an abortion, yet proscribe conflicting criminal penalties. For example, the Pre-*Roe* Statutes distinguish between an abortion with consent from the pregnant person and one without. An abortion performed, or attempted, with the consent of the pregnant person is penalized by incarceration of 2 to 5 years, but doubles when the act was performed without consent. TEX. REV. STATS. ANN. ART 4512.1 (1974). The Trigger Ban criminalizes the same conduct of performing an abortion, but makes no such distinction regarding consent. Instead, it provides that an attempted but failed abortion is a second-degree felony, which under the Texas Penal Code is punishable for up to 20 years in prison, and that a successful abortion is a first-degree felony, punishable by up to life in prison. *See* TEX. PENAL CODE § 12.33 (2009).

The Trigger Ban criminalizes the same subject/conduct and does not attempt to bridge any gaps or clarify any provision of the Pre-*Roe* Statutes. The Trigger Ban itself therefore supersedes the Pre-*Roe* Statutes. *Gordon*, 356 S.W.2d at 139. Bald statements mandating explicit repeal of the Pre-*Roe* Statutes in later legislation are insufficient to prevent the earlier of two clearly conflicting statutes from being repealed. Any argument that explicit repeal is required fails and is inconsistent with both state and federal law examining the issue. *Weeks v. Connick*, 733 F. Supp. 1036, 1039 (E.D. La. 1990) ("Neither party has cited nor has this court found any cases to support the state's argument that a bald statement of a contrary legislative intent can prevent the earlier of two clearly conflicting statutes from being repealed."); *Rylander*, 6 S.W.3d at 286 ("General statements of the Legislature's intent cannot revive repealed statutes or override the clear meaning of a new, more specific statute.").

8.    **Section 4 of SB8 is unenforceable because it is preempted by 42 U.S.C. § 1988 and is also unconstitutional.**

      *a.*      *SB8's Fee-Shifting Provision is Preempted by Federal Law*

Under the Supremacy Clause, when "state and federal law directly conflict, state law must give way." *PLIVA, Inc.*, 564 U.S. at 617-18 (citation and internal quotation marks omitted).  A conflict exists "when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.'" *United States v. Locke*, 529 U.S. 89, 109 (2000) (*quoting California v. ARC America Corp.*, 490 U.S. 93, 100-01 (1989); *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011); *see also United States v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016).

Section 1988 governs attorney's fees awards in federal civil rights actions, regardless of whether those claims are raised in state or federal court.  It provides that in "any action" to enforce Section 1983 and other covered civil rights statutes, the court "may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988(b).  As the Supreme Court has held, this provision grants a right to a prevailing plaintiff to "ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983); *see also Lefemine v. Wideman*, 568 U.S. 1, 5 (2012) (per curiam); *Grisham v. City of Fort Worth*, 837 F.3d 564, 568 (5th Cir. 2016).  But a prevailing defendant in a Section 1983 case may recover attorney's fees from the plaintiff  "only if the district court finds that the plaintiffs action was frivolous, unreasonable, or without foundation." *Hughes v. Rowe*, 449 U.S. 5, 14 (1980) (per curiam).  This specific limitation ensures that a non-prevailing plaintiff has a right to bring their civil rights claims without fear of incurring the other side's fees and costs.

Section 4 of SB8 directly conflicts with Section 1988. Specifically, Section 4 – which is codified as Section 30.022 of the Texas Civil Practice and Remedies Code – allows a defendant who loses an abortion-related Section 1983 case and is permanently enjoined from enforcing a challenged statute to still recover fees from a civil rights plaintiff. TEX. CIV. PRAC. & REM. CODE § 30.022(b). This availability of attorneys' fees for a defendant cannot be reconciled with Section 1988, which limits a defendant's recovery to reasonable attorney's fees only where the defendant truly prevails, and where such fees are "incurred because of," and "only because of, a frivolous claim" by the civil rights plaintiff. *Fox v. Vice*, 563 U.S. 826, 836 (2011).

SB8's broad definition of a "prevailing party" also directly conflicts with federal law. Essentially, anything less than a complete victory on all claims for the plaintiff challenging an abortion statute or regulation renders the defendant the prevailing party. TEX. CIV. PRAC. & REM. CODE § 30.022(b). This directly conflicts with the federal law where "parties are ordinarily required to bear their own attorney's fees—the prevailing party is not entitled to collect from the loser." *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Hum. Res*., 532 U.S. 598, 602 (2001) (citation omitted). It further conflicts with federal law noting that "prevailing party" is a "term of art" and requires at least some "alteration in the legal relationship of the parties." *Id*. at 603-05. Therefore, compliance with both SB8's definition and federal law is impossible.

Section 4 of SB8 also conflicts with Section 1988's fee regime. Under Section 1988 a request for attorney's fees must be made in the "action or proceeding to enforce" a federal civil rights statute, including Section 1983, and that the fees, where assessed, are allowed only "as part of the costs." 42 U.S.C. § 1988(b). A motion for fees and costs must be filed within 14 days of the judgment, or it is waived. *Romaguera v. Gegenheimer*, 162 F.3d 893, 895 (5th Cir. 1998),

*decision clarified on denial of reh'g*, 169 F.3d 223 (5th Cir. 1999); *United Indus., Inc. v. Simon-Hartley, Ltd.*, 91 F.3d 762, 766 (5th Cir. 1996). In contrast, SB8's cause of action for fees and costs may be brought in an entirely new proceeding before a different judge *within three years* of any substantive claim resolution. TEX. CIV. PRAC. & REM. CODE § 30.022(c). Again, compliance with both SB8 and Section 1988's fee regime is impossible.

Courts considering state laws governing imposition of attorney's' fees and costs in favor of prevailing defendants have likewise held that those laws were preempted by Section 1988 or analogous federal fee-shifting provisions. *See, e.g.*, *State v. Golden's Concrete Co.*, 962 P.2d 919, 926 (Colo. 1998) (en banc) (finding that because the state statute "mandates the award of attorney fees to a prevailing defendant, while 42 U.S.C. § 1988 permits an award of attorney fees to a prevailing defendant in limited circumstances, the Colorado statute conflicts with federal law . . . [t]hus, we hold that 42 U.S.C. § 1988 preempts the operation of [the state statute] as to the section 1983 claim in this case."); *Hubbard v. SoBreck*, LLC, 554 F.3d 742, 746-47 (9th Cir. 2009) (holding that a mandatory award of fees to prevailing defendants under the California Disabled Persons Act was inconsistent with, and therefore preempted by, the fee-shifting standard applicable to the Americans with Disabilities Act). Accordingly, Plaintiffs are likely to succeed on the merits of their claims finding that Section 4 of SB8 is preempted by Section 1988.

> **b.** **SB8's Joint and Several Fee Provision is also Unconstitutional**

SB8's fee-shifting deterrence scheme also violates Plaintiffs' First Amendment rights to freedom of speech and to petition the courts.

> **i.** **Section 30.022 Violates Plaintiffs' Freedom of Speech**

Section 30.022 also violates Plaintiffs' freedom of speech and is subject to strict scrutiny because it is a viewpoint and content-based restriction. *Barr v. Am. Ass'n of Pol. Consultants, Inc*,

140 S. Ct. 2335, 2346 (2020); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015); . *see also Simon & Schuster*, 502 U.S. at 115 ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."). SB8 specifically punishes litigants for challenges to the enforcement of laws that "regulate[] or restrict[] abortion" or laws that provide funding to entities who "perform or promote" abortion because of the content of their advocacy. *See* TEX. CIV. PRAC. & REM. CODE § 30.022. In contrast, SB8 does not impose any penalty on litigants whose goal is to uphold laws or to restrict access to abortion. *Cf. Compl., Davenport v. City of Fort Worth*, No. 4:20-cv-00379 (N.D. Tex. Apr. 23, 2020), ECF No. 1 (seeking declaratory and injunctive relief against abortion providers and the municipality to prevent abortion during the Covid-19 pandemic); *Scheideman v. City of Fort Worth*, No. 017-316515-20 (*Tarrant Cnty. Dist. Ct*. filed Apr. 17, 2020) (same). Because SB8 seeks to suppress Plaintiffs' pro-choice views in direct opposition to the Defendants' and the Texas Legislature's self-proclaimed anti-choice stance on abortion, it is a viewpoint and content-based restriction subject to strict scrutiny

Section 30.022 fails under strict scrutiny review. Texas has no valid interest in insulating its unconstitutional laws from judicial review. *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). Nor does the State have a legitimate or compelling, interest in punishing advocates with whom it disagrees. *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). Additionally, the broad fee-shifting provision that almost certainly guarantees attorneys' fees for a party opposing a pro-choice plaintiff or defendant is antithetical to narrow tailoring. *See United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 813 (2000) (where a "less restrictive alternative would serve the Government's purpose" in adopting a content-based restriction on speech, "the legislature must use that alternative").

### ii. *Section 30.022 Violates the Right to Petition*

The First Amendment guarantees the right to petition the courts for redress of grievances. "Petitions to the government assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 395 (2011). Accordingly, a state may not restrict the right to petition based on the content or viewpoint of a petitioner or to insulate an unconstitutional act from review. *See City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196 (2003); *Velazquez*, 531 U.S. at 548; *S. Christian Leadership Conf. v. Sup. Ct. of La.*, 252 F.3d 781, 792 (5th Cir. 2001).

Here, Section 30.022 is designed to insulate all Texas abortion restrictions from judicial challenge by deterring even meritorious lawsuits. Under Section 30.022, if someone challenges a Texas abortion restriction and does not prevail on any one of their claims, their opponent is deemed the "prevailing" party entitled to have their attorneys' fees paid. TEX. CIV. PRAC. & REM. CODE § 30.022(a)-(c). This means that successful challengers could still be forced to pay fees even when they obtain full relief against an unconstitutional restriction, simply because one claim was dismissed. *Id.* § 30.022(b)(1). It imposes an unnecessarily high standard for no other purpose than to deter any challenge to the constitutionality of Texas's abortion statutes and regulations. The Constitution, however, does not permit a state to constrain non-frivolous legal theories and claims available to civil rights litigants. *Velazquez,* 531 U.S. at 548.

### C. Without injunctive relief, Plaintiffs are likely to suffer irreparable harm.

The threatened violation of constitutional rights constitutes irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (threatened violation of First Amendment rights); *Opulent Life Church v. City of Holly Springs, Miss.,* 697 F.3d 279, 295 (5th Cir. 2012); *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott,* 791 F.3d 619 (5th Cir.

2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."); 11A Charles Alan Wright, et al., Federal Practice & Procedure § 2948.1 (3d ed. 2013) ("When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary."). Thus, in demonstrating a likelihood of success on the merits of their constitutional claims, Plaintiffs have also demonstrated that, in the absence of an injunction, they and their staff are likely to suffer irreparable harm as their constitutionally-protected speech and conduct will be chilled.

Harm is irreparable if traditional legal money damages are inadequate relief. *Six Kingdoms Enterprises, LLC v. City of El Paso, Tex.,* No. EP-10-CV-485-KC, 2011 WL 65864, at *9 (W.D. Tex. Jan. 10, 2011). The direct threats being posed by State actors against Plaintiffs are stifling Plaintiffs' ability to engage in their mission, and dramatically burdening their ability to freely exercise their constitutional rights. Plaintiffs are an individual medical provider and small nonprofit organizations with limited resources, whose very existence would be jeopardized by having to defend against unconstitutional laws. "[A]n injury that threatens to terminate a franchise or otherwise threatens a party's ability to continue in business can constitute an irreparable injury." *Id.* at *9 (citing cases).

Each Plaintiff has put a declaration into the record establishing the irreparable harm to its organization or herself. Plaintiffs' ability to accomplish their professional missions is compromised by the chilling effect of enforcement threats that exceed the constitutional guardrails guaranteed to Plaintiffs (and all others). The enforcement and threats of enforcement of the Pre-*Roe* Statutes and Trigger Ban, even if prosecutions are ultimately unsuccessful, irreparably harm Plaintiffs by damaging their abilities to serve Texans in need, damaging relationships with their donors, employees and volunteers, and even by chilling their ability to speak freely in a public

forum without threats of government harassment or targeting. *See Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.").

**D.     The remaining factors – the balance of equities and public interest – weigh in favor of injunctive relief.**

The "public interest" prong tests whether an injunction serves or disserves the public interest, but the Supreme Court generally considers this factor together with the balance of equities fcactor when deciding in which direction (for or against injunction) the balance tips. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (deciding that the balance of equities and public interest together weighed in favor of Navy and against injunction where public interest of national defense in accurate anti-submarine training was balanced against difficult-to-calculate environmental harms). Where constitutional rights are concerned, "enforcement of an unconstitutional law is always contrary to the public interest[.]" *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Vote.org v. Callanen,* No. SA-21-CV-00649-JKP, 2022 WL 2181867, at *17 (W.D. Tex. June 16, 2022) ("Injunctions protecting constitutional freedoms are always in the public interest.") (*citing Texans for Free Enter. v. Tex. Ethics Comm'n,* 732 F.3d 535, 539 (5th Cir. 2013)).

The public interest cannot be served by permitting an extremist interpretation of old and new statutes to intimidate and coerce the public to forego their constitutional rights.  The Pre-*Roe* Statutes were largely passed before women and racial minorities even had the right to vote, and have not been enforced in fifty years.  The Trigger Ban has never yet been in effect, and its halting as to the constitutional conduct of Texans cannot harm the public interest.  In the dawning of an

entirely new era of jurisprudence, the public interest is best served by a careful and constitutionally sound enforcement of the law. *Austin Div. Dep't of Texas v. Texas Lottery Comm'n*, No. A-10-CA-465-SS, 2010 WL 11597747, at *3 (W.D. Tex. Dec. 14, 2010) ("Further, '[a] government's constituents have a vested interest in their government enacting [and enforcing] constitutionally sound laws.'") (citation omitted).

The balance of equities also tips in Plaintiffs' favor because the injuries that Plaintiffs are suffering – the ongoing deprivation of their constitutional rights while this case is pending – far outweigh any injury to Defendants from having to delay enforcement of the challenged laws. *See De Leon*, 975 F. Supp. 2d at 664 (holding that threatened injuries to individual constitutional rights outweighed any harm to state officials from enjoining enforcement of legislation). Unlike Plaintiffs who are already suffering irreparable harm, Defendants will not be injured by the requested injunction.

First, Defendants have no right to prosecute or seek civil penalties from Plaintiffs under unconstitutional state statutes and enjoining them from doing something they has no right to do is not an injury. Second, even if this Court ultimately determines that Plaintiffs are wrong and that the statutes at issue do not violate that U.S. Constitution and federal law, temporarily enjoining Defendants from bringing criminal charges or other cases related to or arising under the Pre-*Roe* Statutes and Trigger Ban does not injure the State's ability to later file such claims. By contrast, the injury to Plaintiffs is and will be profound if the State's threats come to fruition in the form of criminal prosecutions or civil penalty cases. The Plaintiffs' very existence and the freedom of their employees and volunteers are at stake.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiffs request a temporary restraining order preventing

Defendants from pursuing any criminal prosecutions against Plaintiffs for any conduct related to an abortion that is obtained outside of the State of Texas, and request that the Court set a hearing on their motion for preliminary injunction at its earliest convenience. Plaintiffs further request any other relief to which they may be entitled.

Dated: August 23, 2022

Respectfully submitted,

By: */s/ Jennifer R. Ecklund*
 Jennifer R. Ecklund
 Texas Bar No. 24045626
 jecklund@thompsoncoburn.com

 Elizabeth G. Myers
 Texas Bar No. 24047767
 emyers@thompsoncoburn.com

 Allyn Jaqua Lowell
 Texas Bar No. 24064143
 alowell@thompsoncoburn.com

 John Atkins
 Texas Bar No. 24097326
 jatkins@thompsoncoburn.com

 Elizabeth Rocha
 Texas Bar No. 24127242
 erocha@thompsoncoburn.com

 **THOMPSON COBURN LLP**
 2100 Ross Avenue, Suite 3200
 Dallas, Texas 75201
 Telephone: 972/629-7100
 Facsimile: 972/629-7171


 Alexandra Wilson Albright
 Texas Bar No. 21723500
 aalbright@adjtlaw.com

 Marcy Hogan Greer
 Texas Bar No. 08417560
 mgreer@adjtlaw.com

 515 Congress Ave., Suite 2350
 Austin, TX 78701-3562
 Telephone: 512/482-9300
 Facsimile: 512/482-9303


 Kevin Dubose
 Texas Bar No. 06150500

kdubose@adjtlaw.com
1844 Harvard Street
Houston, TX 77008
Telephone: 713/523-2358
Facsimile: 713/522-4553

Kirsten M. Castañeda
Texas Bar No. 00792401
kcastaneda@adjtlaw.com
8144 Walnut Hill Lane, Suite 1000
Dallas, TX 75231-4388
Telephone: 214/369-2358
Facsimile: 214/369-2359

**ALEXANDER DUBOSE &
JEFFERSON, LLP**

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document was filed electronically on August 23, 2022, with the clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.

/s/ *Jennifer R. Ecklund*
Jennifer R. Ecklund

**Exhibit 3:** Response to Plaintiffs' Motion for
Preliminary Injunction and Motion to Dismiss
Plaintiffs' Complaint

<div align="center">

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

</div>

| | | |
|---|---|---|
| **FUND TEXAS CHOICE**, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **No. 1-22-CV-859-RP** |
| | § | |
| **KEN PAXTON**, in his official capacity | § | |
| of Attorney General, *et al.* | § | |
| | § | |
| *Defendants.* | § | |

<div align="center">

**RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
**AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

</div>

Plaintiffs seek to enjoin the Attorney General from enforcing the pre-*Roe* statutes, Senate Bill 8, and the Human Life Protection Act (HLPA) against Plaintiffs for any action they take in connection with any abortion that occurs outside the State of Texas. Dkt. #1 at 50. Plaintiffs' pre-enforcement challenges to Texas's abortion laws are based on sheerly speculative assumptions of future injury and unsubstantiated legal conclusions. Plaintiffs are a collection of non-profit organizations who assist women in procuring an abortion (Dkt. #1 at ¶ 20) and an obstetrician who has performed abortions in Texas and other states (*id.* at ¶ 31).

Plaintiffs' contention that they face an imminent threat of enforcement for helping women procure out-of-state abortions is not based on any statement or action taken by the Attorney General, and their manufactured threats of injury are insufficient to confer them with Article III standing. Moreover, Plaintiffs' claims are barred by sovereign immunity, and Plaintiffs are unlikely to succeed on the merits of their claims. For these reasons alone, Plaintiffs' claims must be dismissed and the Court should deny their Motion for Preliminary Injunction.

<center>**STANDARD OF REVIEW**</center>

## I. PRELIMINARY INJUNCTION

An award of preliminary injunctive relief is "an extraordinary remedy that should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely v. Fed. Emerg. Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008). "[T]he enormity of the relief is difficult to overstate." *Trinity USA Oper'g, LLC v. Barker*, 844 F. Supp. 2d 781, 785 (S.D. Miss. 2011) (citing Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2948 (courts describe such requests as "drastic," "extraordinary," and the requesting party must make a "clear showing")). Plaintiffs have not met their burden of demonstrating an entitlement to this "extraordinary remedy."

## II. MOTION TO DISMISS

### A. Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Accordingly, "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) motion before addressing any motion as to the merits. *Ramming*, 281 F.3d at 161. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P 12(h)(3).

### B. Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

Although a court accepts all well-pleaded facts as true, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A plaintiff's obligation to demonstrate his entitlement to relief requires more than mere conclusory statements. *Twombly*, 550 U.S. at 555. Rather, a plaintiff must plead facts with enough specificity "to raise a right to relief above the speculative level." *Id.* A plaintiff must allege more than "'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief." *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 975 (N.D. Tex. 2011).

<div align="center">

### ARGUMENT

</div>

## I. THE COURT LACKS SUBJECT MATTER JURISDICTION

Plaintiffs' claims against the Attorney General are jurisdictionally barred, and, accordingly, the Court cannot grant them preliminary injunctive relief. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979

F.3d 319, 329 (5th Cir. 2020) ("A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue."); *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 964 (5th Cir. 2014) (reversing grant of preliminary injunction when the State defendants were immune and *Ex parte Young* did not apply). Plaintiffs' claims are all barred by lack of standing, sovereign immunity, and the ripeness requirement. The Court should dismiss this case for lack of jurisdiction without opining on any other issues raised by Plaintiffs. *See Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc).

### A. Plaintiffs Lack Standing

Standing requires a plaintiff to "prove that he has suffered a concrete and particularized [injury in fact] that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). A plaintiff must clearly allege facts demonstrating each element of Article III standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("[P]laintiffs bear the burden of *pleading and proving concrete facts* showing that the defendant's actual action has caused the substantial risk of harm." (emphasis added)); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements."); *Warth v. Seldin*, 42 U.S. 490, 518 (1975) ("It is the responsibility of the complainant *clearly to allege facts demonstrating that* he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." (emphasis added)). An association or organization can demonstrate that it has incurred an injury-in-fact under either associational or organizational standing. *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237–38 (5th Cir. 2010).

Plaintiffs fail to allege facts that "clearly and specifically" demonstrate they satisfy each element of Article III standing. *Whitmore*, 495 U.S. at 155. That alone requires dismissal of Plaintiffs' claims. Finally, this Court's analysis under *Ex parte Young* also bears on the standing

analysis, and that issue is addressed below in Argument § C. *See City of Austin v. Paxton*, 943 F.3d 993, 1003 (5th Cir. 2019) (noting the doctrinal overlap).

### 1. Plaintiffs' speculative injuries are not fairly traceable to any action by the Attorney General

Plaintiffs have made no allegations—and have introduced no evidence—that a single enforcement action has been taken or will be taken against them by the Attorney General. Plaintiffs allege that the *existence* of the challenged abortion statutes has exerted a chilling effect on their activities, but this too fails to constitute an injury in-fact. Plaintiffs do not have standing against *statutes*. To survive a motion to dismiss, Plaintiffs must allege facts sufficient that a reasonable person could infer that the *Attorney General* is violating their constitutional rights such that they would be entitled to relief under Section 1983 or the Declaratory Judgment Act. For prospective relief, Plaintiffs' injury "must be certainly impending to constitute injury in fact"—"[a]llegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted).

Plaintiffs' entire theory of standing with respect to the Attorney General is based on two things: (1) an advisory from the Attorney General that says he is authorized to enforce civil penalties under the HLPA and the pre-*Roe* statutes are enforceable by district and county attorneys, and (2) a tweet by the Attorney General stating that the pre-*Roe* statutes are in effect. Dkt. #1 at ¶¶ 77–78; Dkt. #1-3; Dkt. #1-4. Plaintiffs do not contest these points. *See generally* Dkt. #1. And these innocuous statements hardly support Plaintiffs' standing with respect to the Attorney General, because neither of these statements represent a threat that he will interpret the pre-*Roe* statutes to "criminalize abortion funds, including Plaintiffs, for all activities related to abortion, regardless of whether abortions take place in a jurisdiction outside of Texas in which abortion is legal." Dkt. #1 at ¶48. Indeed, Plaintiffs concede that it is not the Attorney General— or even any named defendant— who has made this threat. Rather, as Plaintiffs say, such statements have been made by Texas legislators. Dkt. #1 at ¶ 13. Plaintiffs allege no facts supporting the reasonable inference that the Attorney General is involved in any "partnership and/or coordinated effort between private and state actors to intimidate Plaintiffs" through Rule 202 petitions. Dkt.

#1 at ¶ 8. Plaintiffs' allegations relate only to legislators in the Texas Freedom Caucus and Senator Bryan Hughes, who Plaintiffs acknowledge is acting in his *individual* capacity. *Id.* at ¶¶ 7–8; Dkt. #6 at 10. While Plaintiffs point to a letter sent by the Texas Freedom Caucus and statements made by Representative Briscoe Cain, they allege no facts tying that threat of enforcement or that interpretation of the law to the Attorney General. *See, e.g.*, Dkt. #1 at 3, 27. The Attorney General cannot enforce S.B.8. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 539 (2021); *Whole Woman's Health v. Jackson*, 642 S.W.3d 569 (Tex. 2022). Plaintiffs acknowledge that the Attorney General lacks criminal enforcement action. Dkt. #1 at ¶ 80. And Plaintiffs do not allege any imminent risk that the Attorney General will pursue civil enforcement against them under the HLPA. *See generally* Dkt. #1. Nor do Plaintiffs allege any facts sufficient to support the reasonable inference that the Attorney General will prosecute them for abortions they performed or assisted before *Roe v. Wade* was overturned. In sum, the Court may not "hold unconstitutional 'a statute that is . . . constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.'" *Netchoice, LLC v. Paxton*, No. 21-51178 slip op. at *68 (5th Cir. Sept. 16, 2022) (quoting *United States v. O'Brien*, 391 U.S. 367, 384 (1968)).

    In their sworn declarations, Plaintiffs contend that "Texas public officials" and *private litigants* have "claim[ed] that various Texas law [*sic*] now not only criminalize and civilly penalize abortion *in Texas*, but also criminalize and civilly penalize providing abortion services to Texans in other states where those abortions are legal" and "helping pregnant Texans get legal abortions elsewhere." Dkt. #4-11 at ¶6 (emphasis in original); Dkt. #4-7 at ¶ 8; *see also* Dkt. #4-10 at ¶ 8 (same); Dkt. #4-9 at ¶ 8 (same); Dkt. #4-8 at ¶ 6 (same); Dkt. #4-6 at ¶ 7 (same); Dkt. #4-5 at ¶ 7 (same); Dkt. #4-4 at ¶ 7 (same); Dkt. #4-3 at ¶ 9 (same). These general allegations are inadequate to clearly and specifically plead facts sufficient for the Court to draw the reasonable inference that the *Attorney General* aims to prosecute Plaintiffs for these actions. *Cf. Whitmore*, 495 U.S. at 155 ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."). Plaintiffs' claims against the Attorney General should be dismissed for lack of standing.

### 2. Plaintiffs lack a concrete and particularized injury

Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. As long as Plaintiffs bear no probable, imminent risk of the Attorney General enforcing the HLPA against them or their members in the way Plaintiffs hypothesize, their reactions deriving from "subjective fear" do "not give rise to standing." *Id.* at 418. Plaintiffs' speculation about *how* the Attorney General may enforce the law does not confer them with standing. Federal courts' jurisdiction is limited to actual controversies; this prevents them "from anticipat[ing] a question of constitutional law in advance of the necessity of deciding it." *Netchoice*, slip op. at *10 (5th Cir. Sept. 16, 2022) (internal quotation marks omitted). Similarly, Plaintiffs seek relief to protect them from reotractive application of the pre-*Roe* statutes. Dkt. #1 at ¶¶ 164–69. But Plaintiffs identify no threat of retroactive enforcement from the Attorney General or any named Defendant. *See generally* Dkt. #1.

Plaintiffs' declarations do not cure this fatal pleading deficiency. In total, Plaintiffs submitted nine declarations in support of their purported harm, none of which include any evidence the Attorney General has threatened to pursue civil or criminal action against them. And they do not point to any statement, advisory, or opinion from the Attorney General that says anything other than that he will enforce Texas's laws. *See* Dkt. 4-12. Plaintiffs do not allege that they have been warned to stop or threatened with prosecution by anyone with prosecutorial authority. *Cf. Steffel v. Thompson*, 415 U.S. 452 (1974). Nor do they identify any threat that they will be prosecuted for any abortions they performed or assisted with before *Roe v. Wade* was overruled.

Indeed, Plaintiffs' claims of a chilling effect are belied by the testimony of the Executive Director of the North Texas Equal Access Fund (TEA Fund). In her declaration, she testifies that the organization "*continues* to openly communicate with the public regarding abortion, voicing its support for abortion rights, advocating for reproductive freedom and reproductive justice, and seeking the support of others who share the same values." Dkt. #4-4 at ¶ 5 (emphasis added).

App.118

While she claims TEA Fund's volunteers and staff are chilled from "traveling with Texans seeking abortions in states where abortion is legal," there is no testimony that they ever did so in the past or plan to do so in the future. *See generally* Dkt. #4-4.

Similarly, the Co-Founder and Executive Director of the Afiya Center testified that the organization "*continues* to advocate for abortion access where is [*sic*] legal," demonstrating there is no chilling effect on their First Amendment rights. Dkt. #4-7 at ¶4 (emphasis added). And while she asserts that Afiya's volunteers and staff are "chilled" from "traveling with Texans seeking abortions in states where abortion is legal," there is no evidence that they ever traveled with them in the past or have plans to do so in the future.

In another declaration, the Executive Director of Fund Texas Choice (FTC) testified that FTC's free speech and right to travel are being chilled. Dkt. #4-3 at ¶ 12. But she provides no testimony that FTC's volunteers, board, or staff ever travelled out-of-state with women seeking abortions before or have any plans to do so in the future. *See generally* Dkt. #4-3.

The Deputy Director for the Lilith Fund testified that the organization's volunteers and staff "are chilled from associating with or traveling with people seeking abortions in states where abortion is legal." Dkt. #4-5 at ¶ 10. Again, there is no testimony that the Lilith Fund ever traveled with out-of-state with women seeking abortions in the past or have plans to do so in the future. *See generally id.*

Similarly, the Executive Director of the Frontera Fund testifies that their "rights are being violated" and they are chilled from speaking and "traveling with people seeking abortions in states where abortion is legal." Dkt. #4-6 at ¶ 11. But again, there is no testimony that the Frontera Fund ever traveled out-of-state with these women in the past or has plans to do so in the future.

Likewise, neither the President of the West Fund nor the Executive Director of Jane's Due Process provide any testimony that the any of their volunteers, staff, or board members ever traveled with women seeking abortions in the past—or even have plans to in the future. *See generally* Dkt. #4-8; Dkt. #4-9.

**B. Plaintiffs' speculative injuries are not fairly traceable to the Attorney General**

Plaintiffs do not satisfy Article III's requirements by complaining about injuries that arise from the mere *existence* of Texas's abortion laws, rather than any threatened action by the Attorney General. Plaintiffs contend that the pre-*Roe* statutes and the HLPA "chill" their First Amendment rights. *See, e.g.*, Dkt. #1 at ¶¶ 138–40; Dkt. #6 at 28–29. But this purported "chilling effect" cannot support their standing unless it is "fairly traceable" to the conduct of the Attorney General. *See California v. Texas*, 141 S. Ct. 2104, 2113 (2021) ("A plaintiff has standing only if he can 'allege personal injury *fairly traceable to the defendant's allegedly unlawful conduct* and likely to be redressed by the requested relief.'" (emphasis added) (citation omitted)). Here, the purported "chilling effect" is not traceable to the Attorney General, because he has not threatened Plaintiffs with prosecution—and Plaintiffs cite nothing to support that he has. *See generally* Dkt. #1. Failing to allege that they face an imminent threat of prosecution, any purported "chilling effect" imposed on Defendants is traceable to the *legislature*, not the defendants. *Cf. Collins v. Yellen*, 141 S. Ct. 1761, 1779 ("[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." (internal quotation marks omitted)). Moreover, as Plaintiffs acknowledge, the Attorney General lacks criminal enforcement authority under both the pre-*Roe* statutes and the HLPA. Dkt. #1 at ¶ 80.

### 3. Plaintiffs do not have associational standing

In addition to bringing claims on behalf of themselves, the Fund Groups and CASN purport to bring claims on behalf of "their staff, volunteers, and donors." *E.g.*, Dkt. #1 at ¶¶ 33, 138, 154. An association has standing to bring claims on behalf of its members when "(1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022). But Plaintiffs fail to plead facts sufficient to support the reasonable inference that they have associational standing with respect to their donors, volunteers, and staff. Plaintiffs do not even

allege that their donors, volunteers, or staff are *members* of their organizations. *See generally* Dkt. #1.

While Plaintiffs could try to demonstrate standing on behalf of their donors, volunteers, and staff by showing that they satisfy the indicia-of-membership test, they fail to do that too. Under the indicia-of-membership test, the Fifth Circuit considers "whether an organization's purported 'members' (1) elect the organization's leaders, (2) serve in the organization's leadership, (3) finance the organization's activities, (4) associate voluntarily with the organization, and (5) provide sworn testimony of membership." *Id.* at 1084 n.7. Plaintiffs do not plead any facts demonstrating that any of the of the Fund Plaintiffs' or CASN's donors, volunteers, or staff satisfy these requirements. *See e.g.*, Dkt. #1 at ¶¶ 22–30, 33.

Nor do Plaintiffs plead facts sufficient to demonstrate that they have a "close relationship" with these third-parties and "there is a hindrance to the [third-parties'] ability to protect [their] own interests." *Vote.Org v. Callanen*, 39 F.4th 297, 303–04 (5th Cir. 2022). Because Plaintiffs fail to allege the necessary elements of representational standing, all claims they assert on behalf of their donors, volunteers, and staff should be dismissed.

### 4. Plaintiffs lack standing to assert claims challenging the application of Senate Bill 8 outside of Texas (Count VII)

In Count VII of their Complaint, Plaintiffs contend that S.B.8 should only apply in Texas. Dkt. #1 at 45. Assuming that Plaintiffs even have a federal right enforceable under Section 1983 for this count, the Court cannot redress any purported injury resulting from the application of S.B.8 outside of Texas by enjoining the Attorney General because any injury caused by the enforcement of S.B.8 is not traceable to the Attorney General. S.B.8 allows *private litigants* to sue a person who aids or abets a post-heartbeat abortion, or who intends to engage in such conduct. *See* Tex. Health & Safety Code § 171.208(a); *see also Whole Woman's Health*, 642 S.W.3d at 583 (holding that no state official has authority to enforce S.B.8). The statute specifically prohibits a State officer or employee from bringing suit. *Id.* An injunction that merely reiterates the statutory prohibition on Defendants filing suit under S.B.8 does not redress any injury that Plaintiffs might purportedly

App.121

suffer on account of that statute. Moreover, injunctive relief is improper because Plaintiffs necessarily have an adequate remedy at law. No fees can be awarded unless court-ordered, which gives them the opportunity to raise any constitutional defenses in the course of that litigation.

### 5. Plaintiffs lack standing to sue the Attorney General over SB8's fee-shifting provision (Count XI)

Plaintiffs' claims regarding S.B.8's fee-shifting provision are likewise barred by lack of standing and ripeness. Plaintiffs lack standing to sue the Attorney General over S.B.8's fee-shifting provision because they do not allege the Attorney General has sought (or will imminently seek) attorneys' fees under S.B.8. Plaintiffs do not allege that any of the defendants will acquire "prevailing party" status in this litigation, as any such prediction would amount to a confession that their claims should lose.  Any possibility that the Attorney General might someday sue them for fees under S.B.8 is "conjectural" and "hypothetical," which is insufficient to confer Article III standing. *See Lujan*, 504 U.S. at 560 (holding that an injury in fact must be "actual or imminent, not conjectural or hypothetical" (citation and internal quotation marks omitted)); *O'Shea v. Littleton*, 424 U.S. 488, 494 (1974) ("It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct. The injury or threat of injury must be both real and immediate, not conjectural or hypothetical." (citations and internal quotation marks omitted)).

### C. The Attorney General is Entitled to Sovereign Immunity

Absent a waiver of immunity, sovereign immunity bars suit against states in federal court, regardless of the nature of the remedy sought. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State") (internal citations omitted)). "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). "Suits against state

officials in their official capacity [] should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Section 1983 does not abrogate sovereign immunity. *Will*, 491 U.S. at 67. Nor has Texas voluntarily waived sovereign immunity for claims brought under Section 1983. *See Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 839 (Tex. 2007). The Declaratory Judgment Act does not waive sovereign immunity either. *E.g. Acosta v. Univ. of Tex. at El Paso*, No. EP-06-CA-408-H, 2007 WL 9701442, at *2 (W.D. Tex. 2007) ("A litigant cannot circumvent [sovereign immunity] by pleading a claim under the Declaratory Judgment Act."). Therefore, as a preliminary matter, any Section 1983 claim or request for declaratory relief against the Attorney General in his official capacity is barred by sovereign immunity unless an exception applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted).

Under the *Ex parte Young* exception, sovereign immunity is no bar when the suit "seeks prospective, injunctive relief from a state actor, in [his] official capacity, based on an alleged ongoing violation of the federal constitution" or other federal law. *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013); *McCarthy*, 381 F.3d at 413–14. But the state official being sued "must have some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *City of Austin*, 943 F.3d at 997–98 (cleaned up); *see also Air Evac EMS Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). A court's initial step is determining whether the plaintiff has sued the right defendant. *City of Austin*, 943 F.3d at 997. "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, [the court's] *Young* analysis ends." *City of Austin*, 943 F.3d at 998. An official's "general duty to see that the laws of the state are implemented" is insufficient to establish the requisite connection to enforcement. *Morris*, 739 F.3d at 746. Rather, the official sued must bear "the particular duty to enforce the [provision] in question," alongside a demonstrated willingness to enforce it. *Id.*

App.123

As mentioned above, the Attorney General does not have independent statutory authority to enforce the criminal provisions of the pre-*Roe* statutes or the HLPA. *See* Tex. Gov't Code § 402.028. As the Attorney General does not enforce those statutes, the *Ex parte Young* exception does not apply, and sovereign immunity bars Plaintiffs' claims. *Mi Familia Vota v. Abbott*, 977 F.3d 461, 477 (5th Cir. 2020); *see also Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021); *cf. Whole Woman's Health*, 141 S. Ct. at 2495. The Attorney General's to assist in certain criminal cases is not sufficient to establish that he has enforcement authority for the *Ex parte Young* analysis. *Starr v. Cnty. of El Paso, Tex.*, No. EP-09-CV-353, 2010 WL 3122797, at *5 (W.D. Tex. Aug. 5, 2010).

Even if the Attorney General had enforcement authority, the *Ex parte Young* exception does not apply to Plaintiffs' claims, because the Attorney General has not "demonstrated a willingness to enforce" the statutes in the way Plaintiffs hypothesize. *See Morris*, 739 F.3d at 746. To substantiate their threat of future harm, Plaintiffs rely only on the Attorney General's statements that the pre-*Roe* statutes are in effect and that he will enforce the civil provisions of the HLPA. *See* Dkt. #1-3 at 3; Dkt. #1-4. Even still, Plaintiffs do not allege any facts supporting their allegation that the Attorney General will interpret the law to apply to "any behavior undertaken by Plaintiffs in connection with any abortion that occurs outside the State of Texas." Dkt. #1 at 50. Because Plaintiffs fail to allege facts sufficient to draw the reasonable inference that the Attorney General will enforce the law in the way Plaintiffs fear, their claims remain barred by sovereign immunity. *See Starr*, 2010 WL 3122797, at *5 (*Ex parte Young* exception to sovereign immunity did not apply when the Attorney General "had not taken any action to enforce the challenged statute").

Plaintiffs also challenge S.B.8's attorneys' fees provision, arguing it violates their First Amendment rights and is "preempted" by 28 U.S.C. § 1988. Dkt. #1 at 48–49. Plaintiffs theorize that the very existence of this fee-shifting provision requires them to "liv[e] under an existential threat to their operations, conduct, and freedom." *Id.* at ¶ 200. But "the proposition that the [F]irst [A]mendment, or any other part of the Constitution, prohibits or even has anything to say about fee-shifting statutes in litigation seems too farfetched to require extended analysis." *Premier*

App.124

*Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 373 (7th Cir. 1987) (footnote omitted).

The Attorney General does not "enforce" the fee-shifting provision merely because it allows him the opportunity to recover attorneys' fees if he defends certain Texas laws. In the *Ex parte Young* context, an "enforcer" is one who exercises powers of "compulsion or constraint." *City of Austin*, 943 F.3d at 1000. A litigant who seeks attorneys' fees does not compel or constrain in this sense. The existence of a fee-shifting statute does not prohibit plaintiffs from filing lawsuits, it just makes them liable for attorneys' fees if their opponents prevail. If the Attorney General were to seek attorneys' fees under S.B.8 section 4, it would be in the posture of a litigant, not as a government official "enforcing" the law within the meaning of *Ex parte Young*. Like other litigants invoking fee-shifting statutes, the Attorney General would have to seek an award of attorneys' fees from the court. *See* Tex. Civ. Prac. & Rem. Code § 30.022(a), (c). Without a court order, he cannot compel anyone to pay attorneys' fees.

Finally, Plaintiffs have not shown that the Attorney General has a "demonstrated willingness" to seek attorney's fees under S.B.8. *City of Austin*, 943 F.3d at 1000. It is not enough that a defendant official "*might*" someday request attorneys' fees, *id.*, but "might" is the very most plaintiffs can allege.

## II.  Plaintiffs are Not Likely to Succeed on the Merits

### A.  The Declaratory Judgment Act Does Not Provide a Cause of Action

The Declaratory Judgment Act is not a cause of action. It is "not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res. Ltd.*, 99 F.3d 746, 752 n.3 (5th Cir. 1996). A request for a declaratory judgment is not a substantive claim. Accordingly, to the extent Plaintiffs purport to bring standalone claims under the Declaratory Judgment Act, they should be dismissed for failure to state a claim.

App.125

**B. Plaintiffs Fail to State Cognizable Claims under Section 1983**

"Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989). "Section 1983 speaks in terms of 'rights, privileges, and or immunities,' not violations of federal law" *Id.* at 106. "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

**1.    Plaintiffs cannot assert third-parties' rights under Section 1983**

CASN brings third-party claims on behalf of its volunteers and staff, contending that the pre-*Roe* statutes and HLPA violate these third parties' right to travel. Dkt. #1 at ¶ 116. The Fund Groups and CASN bring third-party claims on behalf of their donors, staff, volunteers, and donors, contending that the pre-*Roe* statutes and HLPA violate their First Amendment rights. Dkt. #1 at ¶¶ 138, 154. Plaintiffs' Complaint invokes both Section 1983 and the Declaratory Judgment Act, but neither of those statutes provides a cause of action that allows plaintiffs to assert the rights of non-litigant third parties. Both Section 1983 and the DJA provide limited relief that extend only to litigants who assert their *own* rights. *See* 42 U.S.C. § 1983 (every "person" who acts under color of state law and deprives another person of his constitutional or federal rights "shall be liable *to the party injured*") (emphasis added); 28 U.S.C. § 2201(a) (authorizing federal courts to "declare the rights and other legal relations of *any interested party seeking such declaration* . . .") (emphasis added).

As a general rule, a plaintiff "must assert his own legal rights and interests, not those of third parties." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988). Section 1983 is no exception: it provides a cause of action only when the plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the

violation of a third-party's rights. *Cf. Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275 (2022) ("The Court's abortion cases have … ignored the Court's third-party standing doctrine.").

The Declaratory Judgment Act imposes similar obstacles to the third-party claims in this case. A request for a declaratory judgment is not a cause of action. *Id.* Nevertheless, assuming Plaintiffs have a valid cause of action, like Section 1983, the federal Declaratory Judgment Act provides limited relief, one that allows litigants to seek a declaration only of their *own* rights and legal relations. *See* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations *of any interested party seeking such declaration*.") (emphasis added). The Declaratory Judgment Act necessarily excludes actions brought to declare the rights or legal relations of non-parties—or anyone other than the party "seeking such declaration" under the Act. It provides no authority for a federal court to declare the rights of those who are not "seeking" a declaration under the statute.

Failing to establish associational or representational standing, Plaintiffs' third-party claims brought on behalf of their donors, volunteers, and staff cannot proceed, and these claims must be dismissed for failing to state a claim on which relief can be granted.

### 2.   As to Counts VI–VIII, Plaintiffs fail to assert any federal right enforceable under Section 1983

In Counts VI–VIII of their Complaint, Plaintiffs contend that Texas's abortion laws do not apply to abortions or medical care occurring outside of Texas, but Plaintiffs fail to identify any violation of a federal right in these counts. *Ex parte Young* does not extend to determining the meaning of state laws. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Because a violation of a federal right is a necessary element of a cognizable Section 1983 claim, these claims must be dismissed. *See James*, 535 F.3d at 373.

### 3.   "Preemption" is not a right secured by Section 1983

In Count IX, Plaintiffs assert that S.B.8's fee-shifting provision is preempted by § 1988. But Section 1988 does not confer any substantive right. Nor can Plaintiffs bring this claim under

Section 1983, because Section 1983 itself does not confer any substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion) (cleaned up) ("Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights."); *Chapa v. City of Alvin*, No. 3:20-CV-00362, 2021 WL 3077671, at *2 (S.D. Tex. July 21, 2021) ("Section 1988 does not provide a substantive right or cause of action.") Similarly, "the Supremacy Clause is not the source of any federal rights." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (internal quotations and citations omitted) (citing *Golden State Corp.*, 493 U.S. at 107); *see also Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017). Rather, it "creates a rule of decision." *Armstrong*, 575 U.S. at 324. As the Supreme Court has explained, the Supremacy Clause instructs courts to "not give effect to state laws that conflict with federal laws." *Id.* In other words, the Supremacy Clause does not create a right to preemption a litigant can preemptively assert; instead, it "instructs courts what to do when state and federal law clash." *Id.* at 325–26. Accordingly, preemption is not a "right[] secured by the Constitution or laws of the United States" and cannot be asserted under Section 1983. *Armstrong*, 575 U.S. at 324.

In sum, while Plaintiffs contend that "SB8's Fee-Shifting Provision is Preempted," they fail to identify any "right secured by the Constitution or laws of the United States" of which S.B.8 deprives them. *James*, 535 F.3d at 373. Accordingly, this claim should be dismissed.

### C. Plaintiffs Fail to State a Claim for Facial Relief (Counts I–IV)

Plaintiffs bring both facial and as-applied First Amendment and right-to-travel challenges to the pre-*Roe* statutes and HLPA. *See* Dkt. #1 at ¶¶ 129, 146. Plaintiffs fail to meet their high burden to obtain such relief. *See Justice v. Hosemann*, 771 F.3d 285, 296 (5th Cir. 2014).

Pre-enforcement facial challenges to legislation are "disfavored for several reasons"—"to put it mildly." *Netchoice,*, slip op. at *8–9 (internal quotation omitted). "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*

*v. Wash. State Rep. Party*, 552 U.S. 442, 451 (2008). States and their duly enacted legislation are entitled to deference when a court is considering a facial challenge to the constitutionality of that legislation. *See Netchoice*, slip op. at *10.

"[F]acial and as-applied challenges have different substantive requirements." *Catholic Leadership Coal. of Texas v. Reisman*, 764 F.3d 409, 425–26 (5th Cir.2014) (citing *Doe v. Reed*, 561 U.S. 186, 130 S. Ct. 2811, 2817 (2010)). A facial challenge fails unless "no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). This is an "extraordinarily high" standard, *Netchoice*, slip op. at *10, and courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449. And it applies in "cases concerning abortion" just as it applies in "any other context." *SisterSong Women of Color Reprod. Justice Collective v. Governor of Georgia*, 40 F.4th 1320, 1328 (11th Cir. 2022). The overbreadth doctrine eases this burden slightly in the First Amendment context, permitting a plaintiff to succeed "if a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Netchoice*, slip op. at *11 (quotation omitted). But this overbreadth doctrine is "a last resort," not a saving grace, and it "attenuates as the regulated expression moves from pure speech toward conduct." *Id.* at *12 (quotation omitted).

The Plaintiffs do not even attempt to hoist the heavy burden required for a facial challenge. Indeed, they repeatedly disavow any challenge to the statutes' application within Texas. *E.g.*, Dkt. #1 at ¶¶ 84–85. As Plaintiffs' facial challenges can succeed only if there is "no set of circumstances . . . under which [the laws] would be valid," *Justice*, 771 F.3d at 298 (quoting *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014)), Plaintiffs' disavowal is fatal.

More, nothing on the face of Texas's abortion laws purports to burden speech, burden the freedom of association, or impose a burden on the right to travel. Certainly Plaintiffs point to no such burden; their Motion offers nothing but hypotheticals, identifying no particular task Plaintiffs wish to undertake and no imminent risk of being penalized by the Defendants for doing so. *See* Dkt. #6 at 36. Their "whataboutisms . . . exemplify why it's inappropriate to hold the law facially

unconstitutional in a pre-enforcement posture." *Netchoice*, slip op. at *14. A talented talespinner can weave a saga of woe, but facial challenges are not dramaturgy—Plaintiffs must come forward with evidence of imminent danger of punishment. Mights and coulds and maybes do not build such a case, and mights and coulds and maybes are all the Plaintiffs can identify. *See Netchoice*, slip op. at *15–16 (courts should avoid determining the constitutionality of State statutes "in hypothetical situations where it is not even clear the State itself would consider its law applicable" (quotation omitted)); *see also Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) ("[t]he fact that a court can hypothesize situations in which the statute will impact protected speech is not alone sufficient" to support a facial challenge).

Because the statutes are not facially unconstitutional, any constitutional challenge must be as-applied. "Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.'" *Wash. State Grange*, 552 U.S. at 450 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

### D. Plaintiffs are Not Likely to Succeed on Their First Amendment Challenge

#### 1.   Plaintiffs do not have a First Amendment right to fund illegal conduct.

The thrust of Plaintiffs' claims is their desire to fund abortions or to pay to transport a mother to her abortion appointment, *see, e.g.*, Dkt. #1 at ¶¶ 22–30, and, for Moayedi, to actually *perform* or *prescribe* medications for the abortion. Dkt. #4-11 at ¶¶ 6, 10. That is conduct, not speech, and courts have long dawn the line between the two. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018). States may make certain conduct illegal, and "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 62 (2006).

App.130

Plaintiffs' declarations make it plain their challenges are about conduct. Fund Texas Choice's mission is "practical support" for abortion, including "paying vendors for bus tickets, ride shares, providing food assistance, and lodging." Dkt. #4-3 at ¶¶ 4–5. TEA Fund's mission is "to foster reproductive justice" by providing "financial . . . and logistical support" for abortion services. Dkt. #4-4 at ¶ 4. The Lilith Fund, Frontera Fund, and Afiya seek to "provide practical and/or financial support to Texans seeking abortions." Dkt. #4-5 at ¶11; *see also* Dkt. #4-6 at ¶ 4; Dkt. #4-7 at ¶ 5. Likewise, the West Fund aims "to provide . . . funding" for abortions, and JDP "historically provided funds to abortion providers." Dkt. #4-8 at ¶ 3; Dkt. #4-9 at ¶ 6. CASN notes that the "majority of [its] activities involved providing transportation, accommodations, and direct payments" for abortion services. Dkt. #4-10 at ¶ 4. Each of these is conduct, not speech. Indeed, the organizational plaintiffs all provided testimony that they have ceased their "assistive activities." In other words, they have ceased their assistive *conduct*, which is not protected by the First Amendment. Dkt. #4-3 at ¶ 9; Dkt. #4-4 at ¶ 7; Dkt. #4-5 at ¶ 7; Dkt. #4-6 at ¶ 8; Dkt. #4-7 at ¶8; Dkt. #4-8 at ¶ 6; Dkt. #4-9 at ¶ 8; Dkt. #4-10 at ¶8.

Even if their conduct is carried out through speech by talking to a client, that does not transform the conduct into a protected speech issue. *See Rumsfeld*, 547 U.S. at 62; *see also NIFLA*, 138 S. Ct. at 2373 ("The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." (internal quotation marks omitted)). It does not violate the First Amendment to "regulat[e] the *conduct* of an entity," and invoking the First Amendment does not shroud conduct with constitutional protection. *See Netchoice*, slip op. at *21, *35 (emphasis added).

Moreover, Plaintiffs' conduct is not inherently expressive. *See Rumsfeld*, 547 U.S. at 66. Making appointments, performing abortions, funding abortions, and paying for incidental expenses are no more inherently expressive conduct than paying for a tank of gas is inherently expressing disagreement with support for alternative energy. Supreme Court precedent supports this. A person does not cloak unlawful conduct in the First Amendment by first "announc[ing] that he intends to express his disapproval of the Internal Revenue Serviced by refusing to pay his income

App.131

taxes." *Id.* So too here. "If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* There is no constitutional right to an abortion, there is no constitutional right to pay for an abortion, there is no constitutional right to help someone get an abortion, and the First Amendment does not protect those things just because Plaintiffs want to perform those illegal deeds at the same time they talk about performing them. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

### 2. Even if Texas's abortion statutes implicated the First Amendment, they survive constitutional scrutiny.

Even if the pre-*Roe* statutes and HLPA burdened Plaintiffs' First Amendment rights, they do so in a content-neutral way. "[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny under the First Amendment." *Netchoice*, slip op. at *64 (internal quotation marks omitted). Whether one supports the legality of abortion or not, a person may not "knowingly perform, induce, or attempt an abortion" under the HLPA or "furnish[] the means for procuring an abortion" under the pre-*Roe* statutes. Texas Penal Code art. 1191 (West 1961). The statutes apply equally regardless of one's opinion on abortion, and the statutes' requirements in no way depend on the speaker's viewpoint or motives. *See Netchoice*, slip op. at *65. To survive intermediate scrutiny, the State need only show that its "statutory classification is substantially related to an important governmental objective. . . . It need not be perfect, or even the least restrictive alternative that can be used to achieve Texas's goal." *Netchoice*, slip op. at *72 n.35. Both preservation of unborn life and preservation of the integrity of the medical profession are legitimate and important State interests and well within the State's police powers. *See Dobbs*, 142 S. Ct. at 2284. Accordingly, Texas's abortion statutes satisfy intermediate scrutiny.

Yet even if Plaintiffs were correct and sliding a stack of bills across the counter to an abortionist's waiting palm were a restriction on pure speech, Texas's abortion statutes would still survive. Under the strict scrutiny that would apply in that counterfactual, Texas's laws would both serve a compelling state interest and be narrowly drawn to achieve that end. *See Burson v. Freeman*,

504 U.S. 552 (2011). The preservation of life is a compelling state interest, including the lives of unborn children. *See Dobbs*, 142 S. Ct. at 2284. Indeed, Plaintiffs do not question the existence of such an interest. *See generally* Dkt. #1; Dkt. #6. And the Texas statutes are narrowly drawn to protect that interest: They prohibit third parties from helping to end that life in the same way that statutes prohibit third parties from helping achieve any other criminal end. *Compare* Tex. Penal Code § 7.02(a)(2) (criminalizing aiding another person in committing an offense) *with* Tex. Rev. Civ. Stat. art. 4512.2 (criminalizing furnishing the means for procuring an abortion); *see also State v. Sandoval*, 842 S.W.2d 782, 787–88 (Tex. App. – Corpus Christi 1992, pet. ref'd) ("We find that the word 'procure' is neither vague nor indefinite. It has been used in various statutes over the years. . . . We find that a person of normal intellect would be able to determine what the term 'procure' means as used in the barratry statute.").

### E.  Texas's Laws Do Not Infringe on Plaintiffs' Right to Travel (Count I)

As with the purported burden on Plaintiffs' First Amendment rights, the purported burden on their right to interstate travel is vaporous. The Plaintiffs mischaracterize their and Texas's interests, take citations out of context, and misrepresent how Texas's statutes work and what they target. Their right-to-travel claim fails on every basis.

The right to travel is not mentioned in the Constitution; determining whether that liberty, as the Plaintiffs interpret it, is one protected by the Constitution requires us to "guard against the natural human tendency to confuse what [the Constitution] protects with our own ardent views about the liberty Americans should enjoy." *Dobbs*, 142 S. Ct. at 2247. Courts must "'exercise the utmost care whenever [they] are asked to break new ground in'" evaluating the existence of an unenumerated liberty "'lest the liberty protected . . . be subtly transformed into the policy preferences of the'" judiciary, "usurp[ing] authority that the Constitution entrusts to the people's elected representatives." *Dobbs*, 142 S. Ct. at 2247–48 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), and citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–26 (1985)). The process must begin "with a careful description of the asserted right[,] for the more general is the

right's description, *i.e.*, the free movement of people, the easier is the extension of substantive due process." *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 538 (D.C. Cir. 1999) (en banc) (opn. of Silberman, J.) (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993), and *Michael H. v. Gerald D.*, 491 U.S. 110, 127 n.6 (1989) (opn. of Scalia, J., joined by Rehnquist, C.J.)). Respect for "basic notions of ordered liberty" demands that these rights be "'deeply rooted in [our] history and tradition,'" not "lightly extended" as if slipshod. *Id.* (quoting *Glucksberg*, 521 U.S. at 721). "For that reason, we must ask not whether Americans enjoy a general right of free movement, but rather whatever are the scope and dimensions of such a right . . . ?" *Id.*

And on this first step, the Plaintiffs already fail. They describe the right at stake as "interstate travel to engage in lawful conduct in another state." Dkt. #6 at 22. But that is not a "'careful description' of the asserted fundamental liberty interest," *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. at 302); it essentially asks "whether Americans enjoy a general right of free movement[.]" *Hutchins*, 188 F.3d at 538. Similarly, the Plaintiffs mischaracterize Texas's interests as an "alleged interest in restricting abortion in the State of Texas." Dkt. #6 at 22. The Court need not rely on the Plaintiffs' characterization, however; Texas has explicitly codified its interest by statute so there can be no mistake about it—it has "compelling interests from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child[.]" Tex. Health & Safety Code § 171.202(3). And a perusal of the Plaintiffs' Complaint and Motion shows the right to travel they actually claim: A right to "travel with pregnant Texans across state lines to help them obtain legal abortions our of state[.]" Dkt. #6 at 25.

No such right is protected by the Constitution. There is no constitutional right to have an abortion paid for, to pay for someone's abortion, or to assist in performing or procuring an abortion. *See Harris v. McRae*, 448 U.S. 297, 325 (1980); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 912 (6th Cir. 2019) (en banc). But more, the Texas statutes do not criminalize what the Plaintiffs claim. Texas does not "criminalize interstate travel," Dkt. #6 at 22; the Plaintiffs are free to come and go from the State as they please, and they are neither taxed when doing so, *see Crandall*

*v. Nevada*, 73 U.S. (6 Wall.) 35 (1867), nor prohibited from returning with impoverished friends whose goal is to settle in Texas themselves, *see Edwards v. California*, 314 U.S. 60 (1941). Nor, contra the Plaintiffs' suggestion, is Texas interested in criminalizing abortion for its own sake. Dkt. #6 at 22, 24. Rather, criminalization is a means to an end—the protection of human life, including the life of the unborn. That interest continues whether the Texan mother seeks an abortion in Denver or Dallas, in Las Cruces or Lamesa. When that procurement takes the form of a bus ticket for the pregnant Texan to an abortion clinic, or the paying from Texas of the cost of a pregnant Texan's hotel room adjacent to that clinic, it does not matter if the travel and hotel are in Albuquerque or Austin—the procurement in Texas of the means of an abortion has intruded upon the State's interest in the protection of human life.

Texas's statutes do not result in Texans' being treated in other states as "an unfriendly alien" rather than a "welcome visitor[.]" *Cf. Saenz v. Roe*, 526 U.S. 489, 500 (1999). They do not regulate the sending of advertisements into the State promoting services that are legal in other jurisdictions. *Cf. Bigelow v. Virginia*, 421 U.S. 809, 824 (1975). They do not discriminate between Texans and visitors. *Cf. Barnard v. Thorstenn*, 489 U.S. 546, 552–53 (1989). They regulate conduct in Texas that has an effect in Texas upon the lives of persons in Texas. They do not target travel; whatever impact they have on travel is incidental to the goal of preserving the lives of unborn children and ensuring the health of their mothers.

Nor do Texas's statutes improperly interfere with interstate commerce. The Court need not actually reach that issue, for the Plaintiffs don't actually identify the proper test; they skip from *ipse* directly to *dixit* without telling the Court that it's supposed to use the balancing test announced in *Pike v. Bruce Church, Inc.*, to determine whether the Texas statutes improperly burden interstate commerce. *See* 397 U.S. 137, 142 (1970); *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 221–22 (5th Cir. 2019). Having not properly joined the issue, their discussion of it is forfeit. *See Mission Toxicology LLC v. UnitedHealthcare Ins. Co.*, 499 F. Supp. 3d 350, 359 (W.D. Tex. 2020) (citing *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). But at any rate, the Texas statutes satisfy the *Pike* test: They do not directly discriminate against interstate commerce; there

App.135

are clear local benefits (*i.e.*, the preservation of lives that are not aborted thanks to the restrictions on procuring the means of an abortion for a third party); and there is no clearly excessive burden on interstate commerce—indeed, the existence of a burden is entirely theoretical as the Plaintiffs have introduced no evidence about the number of interstate abortion trips they would take or the impact they would have on the national economy.

### F. Texas's Abortion Laws are Not Unconstitutionally Vague (Count VI)

A law is not void for vagueness unless it "is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 497. A law need not "'delineate the exact actions a [person] would have to take to avoid liability.'" *Doe I*, 909 F.3d at 118 (quoting *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008)). As the Supreme Court has put it, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (alteration in original) (quoting *Ward*, 491 U.S. at 794). That perfection, however, is exactly what Plaintiffs demand. Plaintiffs argue that any one of their activities could constitute "inducement" under the HLPA. Dkt. #6 at 37. But Plaintiffs point to nothing other than statements by a handful of legislators in making this assertion, and Plaintiffs do not dispute that those legislators have no enforcement authority. *See* Dkt. #1 at ¶¶ 5–6, 83. "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)); *see also SisterSong*, 40 F.4th at 1328 ("To be sure, there might be vague applications of that definition in other provisions of the Georgia Code, but challenges to those applications—like the arguments . . . about potential applications to constitutionally protected conduct—are properly brought in an as-applied manner.").

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001)

(alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). Belying their contention that the Pre-*Roe* statutes are impermissibly vague, Plaintiffs spill much ink explaining what exactly they understand the Pre-*Roe* statutes to prohibit. Dkt. 6 at 35–37. "'[O]nly a reasonable degree of certainty is required'" for a statute to survive a vagueness challenge. *Roark & Hardee*, 522 F.3d 552–53 (quoting *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993)) (emphasis and internal quotation marks omitted). The pre-*Roe* statutes and HLPA give that reasonable degree of certainty, so Plaintiffs' vagueness challenge fails.

### G.   Section 1988 Does Not Preempt the Fee Shifting Provision of SB8

"There are three types of federal preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption." *Aldridge v. Mississippi Dep't of Corr.*, 990 F.3d 868, 874 (5th Cir. 2021). Courts "start with the basic presumption that Congress did not intend to displace state law." *Id.* at 875. As an initial matter, there is no express preemption in Section 1988. *See* 42 U.S.C. § 1988. Plaintiffs appear to argue that § 1988 constitutes field preemption because it is "a comprehensive fee-shifting statute" for § 1983 claims. Dkt. #6 at 48. "Field preemption exists when (1) 'the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation,' or (2) 'where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Aldridge*, 990 F.3d at 874 (quoting *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). However, § 1988 cannot be a "comprehensive" fee statue because Congress left room for supplementary state regulation. Specifically, the award of fees under § 1988 is discretionary. *See* 42 U.S.C. § 1988(b). Therefore, § 1988 leaves room for the States to regulate, namely where the court declines to award fees to a prevailing party. S.B.8 fills that void. Tex. Civ. Prac. & Rem. Code § 30.022(a). For the same reason the fee-shifting provision of S.B.8 is not conflict preempted. "Conflict preemption, which is not 'rigidly distinct' from field preemption, is present when (1) 'compliance with both state and federal law is impossible,' or (2) state law 'stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress.'" *Aldridge*, 990 F.3d at 875. S.B.8's fee shifting provision does not directly conflict with § 1988 in all circumstances and does not render compliance with federal law impossible or stand as an obstacle to the purposes of § 1988. Therefore, S.B.8 is not conflict preempted. Because none of the three types of preemption apply to the fee shifting provision of SB 8, Plaintiffs have failed to state a claim for preemption (if such a claim existed).

### H. CMS Billing Requirements Do Not Preempt Texas's Regulation of the Practice of Medicine

In Count VII, Plaintiffs claim that the pre-*Roe* statues and HLPA cannot apply to abortions provided out-of-State via telemedicine because a CMS billing requirement preempts State law. Dkt. #1 at 45; Dkt. #6 at 38. Plaintiffs' contention that a CMS billing requirement preempts any State law concerning the practice of medicine must be dismissed. The requirement Plaintiffs cite relates to fee-for-services delivered during the COVID-19 public health emergency. Dkt. #6 at 38; *id.* at 38 n.22. This billing requirement says *nothing* about preempting State laws regulating the practice of medicine. And, moreover, President Biden has declared that the "pandemic is over."[1]

The State of Texas regulates the practice of telemedicine, and its authority to do so is traditional and well-established. Tex. Occ. Code § 111.004; *see also* Tex. Occ. Code § 111.001(4) (defining "telemedicine medical service" as "a health care service delivered by a physician licensed in his state . . . and acting within the scope of the physician's . . . license to a patient at a different physical location than the physician or health professional using telecommunications or information technology"). Plaintiffs' assertion that a CMS billing requirement issued pursuant to a public health emergency preempts "any state law" related to telemedicine strains credulity. CMS regulations relate to reimbursement, not what is permissible as a matter of practice. It does not purport to govern what procedures are or are not lawful. Whether the federal government has

---

[1] Dan Diamond, *Biden's claim that 'pandemic is over' complicates efforts to secure funding*, THE WASHINGTON POST (Sept. 18, 2022), https://www.washingtonpost.com/health/2022/09/18/biden-covid-pandemic-over/ (last visited Sept. 19, 2022).

authority to regulate telemedicine *nationwide* is a question of deep economic and political significance, and Plaintiffs cite nothing supporting the proposition that Congress intended CMS or the Department of Health and Human Services to exercise such broad authority. *See Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (holding that Congress must "speak clearly if it wishes to assign . . . decisions of vast economic and political significance.").

## I.  Pre-Roe Statutes were Never Repealed

In their Motion, Plaintiffs contend that the pre-*Roe* statutes "cannot criminalize any conduct because they were already repealed by implication." Dkt. #6 at 39. That is incorrect. While *Roe* effectively prevented enforcement of Texas's criminal prohibitions for nearly five decades, federal courts have no ability to "strike down" or revoke a statute. *See Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (per curiam). "When a court declares a law unconstitutional, the law remains in place unless and until the body that enacted it repeals it, even though the government may no longer constitutionally enforce it." *Pidgeon v. Turner*, 538 S.W.3d 73, 88 n.21 (Tex. 2017).

"Repeals by implication are never favored." *Cole v. State*, 170 S.W. 1036, 1037 (Tex. 1914). There must be "total repugnance" between the new statute and the old; "the antagonism must be absolute—so pronounced that both [statutes] cannot stand." *Id.*; *see also J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001) (there must be "an irreconcilable conflict"). That stringent standard is not met here.

"A legislative enactment covering a subject dealt with by an older law, but not repealing that law, should be harmonized whenever possible with its predecessor in such a manner as to give effect to both." *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990); *see also Diruzzo v. State*, 581 S.W.3d 788, 799 n.13 (Tex. Crim. App. 2019). Plaintiffs point to *McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2005), in which the Fifth Circuit guessed that Texas's preexisting criminal prohibitions had been repealed. *See id.* at 849. The Court noted "regulatory provisions" governing abortion and concluded "[t]hese regulatory provisions cannot be harmonized with provisions that

purport to criminalize abortion." *Id.* But federal courts' *Erie* guesses are not definitive statements of Texas law; "*Erie* guesses are just that—guesses. Hopefully we get them right, but sometimes we get them wrong." *Priester v. JP Morgan Chase Bank, N.A.*, 927 F.3d 912 (5th Cir. 2019). This Court should not now follow *McCorvey*'s *Erie* guess because the Legislature has enacted provisions designed specifically to reject it. *E.g.* Tex. Gov't Code § 311.036(a) ("A statute that regulates or prohibits abortions may not be construed to repeal any other statute that regulates or prohibits abortion, either wholly or partly, unless the repealing statute explicitly states that it is repealing the other statute."). Even if *McCorvey* had been correct—it was not—today, it is contrary to Texas law to treat subsequent abortion regulations as impliedly repealing the preexisting criminal prohibitions.

And *McCorvey*'s *Erie* guess is unpersuasive in any event. The Fifth Circuit did not recognize, much less address, Texas's strong presumption against implied repeal. Enforcement was impossible for many years; the Texas Legislature cannot be said to have "repealed" its criminal law by enacting additional regulations that *could* be enforced under the *Roe v. Wade* regime. Doing so is hardly an expression of intent to repeal the then-unenforceable criminal statutes. Moreover, there is no repeal by implications so long as the "later statute reasonably admits of a construction which will allow effect to the older law and still leave an ample field for its own operation." *Cole*, 170 S.W. at 1037. That is the case here. When necessary to save the life of the mother, abortion is not criminal, Tex. Civ. Stat. art. 4512.6, so Texas's other regulations of abortion have effect even though most abortions are criminal. Because both the preexising criminal prohibitions and the later-enacted regulations have some effect, "total repugnance" is lacking. *Cole*, 170 S.W. at 1037.

"The bright-line rule" is that "[a] statute is *not* repealed by nonuse or desuetude." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 336 (2012) (emphasis added). Instead, "a statute has effect until it is repealed" by the body that enacted it. *Id.* That body was the Texas Legislature, and, far from repealing the preexisting criminal prohibitions on abortion, the Legislature has twice stated that these prohibitions have *not* been repealed. *See*

H.B. 1280, § 4; S.B. 8, § 2. The criminal prohibitions on abortion that the Supreme Court held unconstitutional in *Roe v. Wade* remain in force.

### J.   The pre-*Roe* Statutes and the HLPA Do Not Irreconcilably Conflict

Finally, contrary to Plaintiffs' assertions otherwise, the pre-*Roe* laws and HLPA do not conflict. Both laws prohibit abortion so there is no question as to what conduct is prohibited. *Compare* Tex. Civ. Stat. art. 4512.1, *with* Tex. Health & Safety Code § 170A.002. The only conflict Plaintiffs raise is the length of criminal punishment, Dkt. #6 at 41, and that is a matter to be taken up at sentencing if a prosecution under either statute occurs. Given that the Legislature found that the pre-*Roe* laws had never been repealed in the same bill that enacted the HLPA (H.B. 1280), the Court must presume that the Legislature intended both sets of laws to apply and to give prosecutors a choice once the HLPA became effective.

### III.   *Pullman* Abstention Counsels Against Finding Texas's Abortion Laws Unconstitutional

When a federal court is considering a facial challenge to legislation, any purported vagueness claim "can be ameliorated by a state court's authoritative interpretations." *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (internal quotation marks omitted). That exercise of comity, in which "the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and the smooth working of the federal judiciary," is known as *Pullman* abstention. *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) (internal quotation marks omitted). "The paradigm of the 'special circumstances' that make abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 306 (1979). This is so because federal courts are loath to deprive "state courts of the opportunity to construe a law to avoid constitutional infirmities." *NetChoice,* slip op. at *10 (cleaned up). *Pullman* abstention serves values of federalism, comity, and judicial administration because, "no matter how seasoned the judgment" of a federal court may be on an

App.141

issue of state law, "it cannot escape being a forecast rather than a determination," as "the last word" on state law always rests with the state's courts. *Pullman*, 312 U.S. at 499-500.

"Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations." *Harman v. Forssenius*, 380 U.S. 528, 534 (1965). As Plaintiffs reiterate throughout their pleadings, their various federal constitutional theories are dependent upon, and may be materially altered by, determinations regarding uncertain issues of Texas law. *See e.g.*, Dkt. #1 at ¶ 14 ("If these statutes are construed as expansively as asserted by Texas state actors[, they] violate the constitutional rights of Plaintiffs. . . ."); Dkt. #6 at 35 ("But the statute nowhere defines the phrase 'furnishing the means.' Nor is it defined in the Texas Penal Code. And it has no uniform definition under Texas law."); *id.*, pp. 39–40 (discussing implied repeal under Texas law and whether "Pre-*Roe* statutes" have been impliedly repealed); *id.* pp. 40–41 (alleging that pre-*Roe* statutes and "Trigger Ban" irreconcilably conflict); *id.* p. 43 (discussing the proper construction of Tex. Civ. Prac. & Rem. Code § 30.022 and alleging that it conflicts with 42 U.S.C. § 1988). In short, Plaintiffs allege that "Texas has an intricate, contradictory, and complicated set of laws" at issue in this case. Dkt. #1 at ¶ 10. To further the values of federalism, comity, and judicial administration, this Court should decline Plaintiffs' invitation to make the provisional pronouncements on these unsettled issues of Texas law that are necessary to adjudicate Plaintiffs' novel constitutional theories.

While it has been said that federal courts "have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment," *City of Houston v. Hill*, 482 U.S. 451, 467 (1987), in such cases, "the pivotal question" remains "whether the statute is 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.'" *Id.* at 468 (quoting *Harman*, 380 U.S. at 534–35). In *Babbitt*, the Court concluded that the district court should have abstained from adjudicating the plaintiffs' First Amendment overbreadth challenge to a criminal penalty provision because "the statute [was]

App.142

reasonably susceptible of constructions that might undercut or modify [the] vagueness attack." 442 U.S. at 307.

Abstention would be particularly appropriate here, where Plaintiffs seek a pre-enforcement facial challenge to a state's legislative acts. *See e.g.*, *NetChoice*, slip op. at *8–9. Pre-enforcement facial challenges are uniquely troubling because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at *10 (further noting that "[t]he respect owed to a sovereign State" requires restraint when a plaintiff asks "unelected federal judges to countermand the State's democratically accountable policymakers."). In abstaining from adjudication before the Texas courts can determine these unsettled questions of state law, this Court would be following the principled course of eschewing premature federal intervention as the states experiment with different approaches to this sensitive political issue. *See Bellotti v. Baird*, 428 U.S. 132, 134 (1976) (Blackmun, J., maj. op.) (district court should have abstained from adjudicating constitutionality of Massachusetts statute enacted in response to *Roe v. Wade* and requiring parental consent for abortions performed on minors); *id.* at 136 (noting that plaintiffs filed their action one day before the Massachusetts statute's effective date); *cf. Younger v. Harris*, 401 U.S. 37, 52 (1971) (even when pre-enforcement facial challenges present a case or controversy, "the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary.").

## IV. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO OBTAIN A PRELIMINARY INJUNCTION

Plaintiffs' claims of irreparable harm fail for at least two reasons. First, Plaintiffs' substantial and unjustifiable delay in bringing their Motion demonstrate that preliminary relief is unwarranted. Second, Plaintiffs' only evidence to prove their injuries are their self-serving, conclusory, unsupported declarations that do not sustain their heavy burden. Accordingly, Plaintiffs cannot establish that they face a substantial threat of irreparable injury.

App.143

### A. Plaintiffs' delay in bringing their motion dooms their allegations of irreparable harm

The equities weigh against a preliminary injunction. As this Court recognized when it denied Plaintiffs' requests for a TRO, "Plaintiffs have been aware of the threat of enforcement since *Dobbs* but requested an ex parte TRO the day before the Trigger Ban took effect." Dkt. #13 at 3. Plaintiffs substantially and unjustifiably delayed filing their motion for two months since the date *Dobbs* was issued on June 24, thereby demonstrating that there is no emergency at all. *See Dobbs*, 142 S. Ct. 2228. Rather than immediately file their motion, Plaintiffs waited to file until the eve of the effective date of the HLPA and twice requested an *ex parte* temporary restraining order, which the Court denied. Dkt. #6; Dkt. #8; Dkt. #9; Dkt. #13.

It is long established that "[d]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *GoNannies, Inc v. GoAuPair, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006); *see also High Tech Med. Instmt'n, Inc. v. New Image Indus.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."). Unjustified delay on its own is sufficient to "preclude the granting of preliminary relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbounds Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (citations and internal quotation marks omitted); *see also Kensington Partners v. Cordillera Ranch, Ltd.*, No. 98-121, 1998 WL 1782540, at *11 (W.D. Tex. June 16, 1998) ("Delay in bringing suit may preclude a finding of irreparable injury, which would then preclude the granting of preliminary injunctive relief.").

Courts have found that comparable periods of delay have undone the urgency that is required to justify granting preliminary injunctive relief. *See, e.g.*, *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming denial to movant who "waited three months before petitioning the district court for temporary relief"); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322,

333 (S.D.N.Y. 2011) ("The Second Circuit has found delays of 'as little as ten weeks' sufficient to defeat the presumption of irreparable harm.") (quoting *Weight Watchers Int'l v. Lugino's, Inc.*, 423 F.3d 137, 145 (2d Cir. 2005)). A movant's "delay in seeking injunctive relief . . . weighs heavily against a finding of irreparable injury." *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 438 (S.D. Tex. 2008).

Here, Plaintiffs cannot justify their delay. They concede they "paused all activities assisting access to abortion care, including for care provided out of state" before the Supreme Court even issued its opinion in *Dobbs*. Dkt. #1 at ¶ 11. The declarations they submit in support of their motion repeatedly emphasize that they were tracking the "expected date" of the issuance of the *Dobbs* opinion and "ceased [their] assistive activities" before the opinion was even published. Dkt. #4-3 at ¶¶ 8–9; Dkt. #4-4 at ¶ 7 (same); Dkt. #4-6 at ¶ 8 (same); Dkt. #4-7 at ¶ 8 (same); Dkt. 4-8 at ¶ 6 (same); *see also see also* Dkt. #4-5 at ¶ 7; Dkt. #4-9 at ¶ 8; Dkt. #4-10 at ¶ 8. Likewise, Moayedi testified that she "stopped provid[ing] any abortion services in Texas and also stopped traveling and providing abortion care to Texans in any other states" *before Dobbs* was even issued." Dkt. #4-11 at ¶ 6.

Plaintiffs' delay bringing their motion for preliminary injunction precludes a finding of irreparable injury. Plaintiffs offer no justification for waiting two months before initiating this litigation. Plaintiffs' inexcusable delay alone is sufficient to justify denying their motion.

### B. Plaintiffs' claim of injury rests on speculation and conjecture

Plaintiffs have not provided sufficient evidence to demonstrate they are entitled to the relief they seek. Their argument for irreparable harm rest on speculation and conjecture about how the Attorney General may enforce the provisions of the HLPA. Plaintiffs' claims that they will be immediately and irreparably injured are unfounded.

The requisite showing of immediate irreparable injury requires more than demonstrating a merely serious or substantial harm. *ECRI v. McGraw-Hill*, 809 F.2d 223, 226 (3d Cir. 1987). An injunction is not issued "simply to prevent the possibility of some remote future injury." *Texas v.*

*United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex. 2015) (internal quotation marks omitted). "'[E]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.'" *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (quoting *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948)).

As discussed throughout this brief, Plaintiffs' threat of future injury depends entirely on whether the Attorney General will eventually enforce Texas's abortion laws to prohibit all conduct in support of out-of-state abortions, and Plaintiffs point to no evidence supporting this hypothetical harm. Instead, Plaintiffs rely entirely on statements made by Texas Legislators that have no connection to the Attorney General. *See, e.g.*, Dkt. #1 at ¶¶ 5–6.

While Plaintiffs' note that the Attorney General is authorized to assist local prosecutors in the prosecution of a criminal case at the request of the district or county attorney, several prerequisites would need to occur before that authority alone could threaten harm to Plaintiffs: (1) Plaintiffs would have to undertake proscribed activity, (2) the local prosecutor would have to decide to prosecute, (3) the local prosecutor would need to request assistance from the Attorney General, and finally (4) the Attorney General must agree to assist. "Such speculation built upon further speculation does not amount to a reasonably certain threat of imminent harm and does not warrant injunctive relief." *City of Austin v. Kinder Morgan Tex. Pipeline, LLC*, 447 F. Supp. 3d 558, 571 (W.D. Tex. 2020) (internal quotation marks omitted).

Plaintiffs' allegations and declarations show only that their alleged injuries are merely possible, which is not enough for this Court to issue preliminary relief. Accordingly, the Court should deny Plaintiffs' Motion.

## C. Preliminary injunctive relief disserves the public interest and would encroach upon Texas's sovereignty

The remaining two factors—the public interest and potential harm to Defendants—both weigh against granting Plaintiffs' Motion. Though the first two factors are often the most salient, a preliminary injunction should not issue if the applicant fails to carry its burden on "any one of the four prerequisites." *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d

464, 472 (5th Cir. 1985). "The public interest standard is a hurdle which must be overcome before employing the drastic remedy of interim injunctive relief, not a clarion call for action before reaching final judgment." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 633 (5th Cir. 1985). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008).

Exercising caution is especially important where the defendant is itself a state actor because of the federalism concerns that are attendant to a federal court intervening to grant preliminary injunctive relief against, in this case, a democratically elected public official. *Machete Prods.*, 809 F.3d at 288 ("'[E]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.'") (quoting *Eccles*, 333 U.S. at 431)). The equities and public interest weigh strongly against enjoining the Attorney General's enforcement of the State's laws, particularly when the statutes at issue are entitled to a "strong presumption of validity." *Dobbs*, 142 S. Ct. at 2284.

## Conclusion

For the foregoing reasons, the Court should deny the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, and grant Defendants' Motion to Dismiss.

Dated September 19, 2022.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**CHRISTOPHER D. HILTON**
Chief, General Litigation Division

**BRENT WEBSTER**
First Assistant Attorney General

*/s/Amy S. Hilton*
**AMY SNOW HILTON**
Assistant Attorney General
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN E. COWLES**
Deputy Attorney General for Civil Litigation

**LEIF OLSON**
Special Counsel
Texas Bar No. 24032801
Leif.Olson@oag.texas.gov

**WILLIAM D. WASSDORF**
Assistant Attorney General
Texas Bar No. 24103022
Will.Wassdorf@oag.texas.gov

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**Counsel for Attorney General
Ken Paxton**

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2022, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/Amy S. Hilton*

App.148

**Exhibit 4:** Paxton's Motion to Quash Subpoena

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| FUND TEXAS CHOICE, et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 1-22-CV-859-RP |
| | § | |
| KEN PAXTON, in his official capacity | § | |
| of Attorney General, et al. | § | |
| | § | |
| *Defendants*. | § | |

---

## PAXTON'S MOTION TO QUASH SUBPOENAS

---

The Plaintiffs demand that the sitting Attorney General of Texas appear at a hearing to testify at their behest. None of the requisites for making, let alone enforcing, such a demand have been satisfied. Their subpoenas should be quashed.

### ARGUMENT

The Plaintiffs have issued subpoenas to Ken Paxton in both his individual capacity and his official capacity as Attorney General. Neither subpoena has been effectively served,[1] but more importantly, neither subpoena is proper. Both should be quashed.

## I. AS A HIGH-RANKING GOVERNMENT OFFICIAL, PAXTON IS NOT SUBJECT TO THE PLAINTIFFS' SUBPOENA.

Top executive officials should not be called to testify absent extraordinary circumstances. *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995). The "'practice of calling high officials as witnesses should be discouraged,'" *id.* (quoting *In re United States*, 985 F.2d 510, 512 (11th Cir.)), or else litigation would swallow the time available for the official to perform the duties he was actually

---

[1] Plaintiffs purport to have served Ken Paxton. ECF No. 41 at 2 n.1. They have thus far offered no evidence that they have done so. Defendant does not concede that service has been effectuated, and reserves the right to supplement or amend this motion in light of new evidence from Plaintiffs.

elected to perform. *See League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-259, 2022 WL 2866673, at *2 (W.D. Tex. July 6, 2022).

The Plaintiffs are not entitled to demand Paxton's testimony unless he "has first-hand knowledge of the claims being litigated and other persons cannot provide the necessary information." *LULAC*, 2022 WL 2866673, at *1 (quoting *Freedom From Religion Found. v. Abbott*, No. 1:16-cv-233, 2017 WL 4582804, at *11 (W.D. Tex. Oct. 13, 2017)). Determining whether that is so requires looking at (1) the witness's high-ranking status, (2) the potential burden the testimony would impose on the witness, and (3) the substantive reasons for the testimony. *In re Bryant*, 745 Fed. Appx. 215, 220 (5th Cir. 2018).

### A.    Paxton is a high-ranking government official.

Paxton is the Attorney General of Texas. The entire reason he is named as a defendant in his official capacity is that he is a high-ranking government official. The Plaintiffs cannot reasonably dispute this factor.

### B.    Furnishing testimony would be burdensome.

The only ground upon which the Plaintiffs have attempted to justify calling Paxton as a witness is that he is the policymaker for the Office of the Attorney General. But that is the case any time a government agency is sued. Paxton's status as a policymaker, that is, is not an *exceptional* circumstance, but the *ordinary* circumstance. Requiring his testimony in the ordinary course of a case challenging the enforcement of Texas laws would transform him from a policymaker into an evidence-giver—"his time would be monopolized by preparing and giving testimony in such cases." *In re United States*, 985 F.2d at 512. Preventing this swallowing of his official duties is the very reason that the "exceptional circumstances" exists. *See Bryant*, 745 F. App'x at 220–21. Accordingly, regardless of whether Paxton is a policymaker, the burden of imposing upon the Attorney General the singular duty of justifying a state policy at a litigant's whim cannot be overstated.

**C.   The substantive reasons for the testimony do not justify the burden.**

The Plaintiffs have given no reason to believe that this case presents a "a special need or situation compelling [high-ranking official] testimony." *In re United States*, 985 F.2d at 512. They have given no explanation of efforts they have taken to obtain purportedly relevant information from elsewhere. They have given no explanation of why the information they seek is available only from the Attorney General. They have given no explanation of why the Attorney General possesses unique and superior information the equivalent of which could not be obtained elsewhere. That "the head of an agency would be involved in agency decision-making . . . is unexceptional." *Ctr. for Juvenile Mgmt. v. Williams*, No. 5:15-cv-640, 2016 WL 8904968, at *5 (W.D. Tex. Sep. 22, 2016).

"'[I]t will be the rarest of cases" in which suitable testimony is not available from an alternate witness," *Ctr. for Juvenile Mgmt.*, 2016 WL 8904968 at *6 (quoting *In re FDIC*, 58 F.3d at 1062), and there is no suggestion that this case qualifies. Indeed, every indication is that the Plaintiffs seek Paxton's testimony solely for the newsworthiness of Paxton's being placed on the stand to testify. But if "the purpose of the" exceptional-circumstances rule "is to avoid '[interrogating] high-level government officials in a plethora of cases in order to probe their decision-making processes,'" *id.* (quoting *In re FDIC*, 58 F.3d at 1061), how much more so where the purpose of the interrogation is not to obtain information, but to trumpet the interrogation itself?

## II. The Plaintiffs are not entitled to an eleventh-hour renovation of their demand.

Paxton has already explained why the Plaintiffs' delay defeats their claim of irreparable harm and thus their claim to injunctive relief. Dkt. 33 at 33–34. Their similar delay in attempting to garner evidence to support the existence of that harm defeats any request that the Court ignore their actual subpoena and instead construe it as a request for agency-representative testimony.

The Plaintiffs' painting themselves into a corner here resembles the same predicament by the plaintiff in *Texas Entertainment Association v. Hegar*, No. 1:17-cv-594, 2019 WL 13080576 (W.D. Tex. Oct. 18, 2019). The plaintiff there issued on October 9 a subpoena demanding that

App.152

Texas Comptroller Glenn Hegar appear to testify at an October 22 bench trial. *Id.* at *1. Magistrate Judge Lane quashed that subpoena as unjustified by exceptional circumstances, *id.* at *2, and further rejected the request to recharacterize the subpoena as requiring the Comptroller "to produce a corporate representative with authority to testify on behalf of his office at trial." *Id.* The plaintiff, as Judge Lane recognized, "did not seek to identify a corporate representative at any point," "served no discovery device seeking to identify a corporate representative, nor sought to depose any corporate representative under Rule 30(b)(6)." *Id.* The plaintiff might have made those decision "for a tactical purpose," but in doing so, "it missed its lengthy opportunity to search and identify a corporate representative[.]" *Id.* Judge Lane therefore refused to order the "Comptroller to designate a representative for the first time on the eve of trial." *Id.*

*Texas Entertainment Association* is dispositive. The law has not changed from the time the Plaintiffs contemplated this suit until now; they have always been required to show exceptional circumstances justifying the Attorney General's attendance at a preliminary-injunction hearing, and they sat on their hands rather than attempt to build a case for doing so—or even secure some alternative. Unlike the metaphorical "eve of trial" that Judge Lane faced in *Texas Entertainment*, it is now the *literal* eve of trial—and the Plaintiffs did not even bother trying to obtain testimony until mere days ago. "Adopting Texas Entertainment's modification of the subpoena proposed three days before trial" in that case would have "'fail[ed] to allow . . . reasonable time to comply'" and subjected the "Comptroller 'to undue burden.'" *Tex. Entmt.*, 2019 WL 13080576, at *2 (quoting Fed. R. Civ. P. 45(d)). So too here, where the Court will consider the merits in less than 24 hours.

## III. Paxton in his individual capacity has no relevant testimony.

The Plaintiffs have sued Paxton in his official capacity as Attorney General to attempt to prohibit the enforcement of Texas statutes. Paxton, as an individual, has no connection to that dispute. It is only through his authority as Attorney General of Texas that Paxton is connected to the enforcement (or defense) of Texas law. In his individual capacity, Paxton has no information

relevant to this dispute—no information that makes it more or less likely that any material fact is likely to be true. *See* Fed. R. Evid. 401–402. Forcing him to testify, then, is a pure imposition of cost with no countervailing benefit to the case—a purely undue burden. *See* Fed. R. Civ. P. 45(a)(3)(A)(iv). The subpoena to Paxton in his individual capacity should be quashed.

## Conclusion

For the foregoing reasons, and without conceding that Plaintiffs have effected service, Ken Paxton respectfully requests that the Court quash the subpoenas directed to him.

Dated September 26, 2022.

**Ken Paxton**
Attorney General of Texas

**Brent Webster**
First Assistant Attorney General

**Grant Dorfman**
Deputy First Assistant Attorney General

**Shawn E. Cowles**
Deputy Attorney General for Civil Litigation

Respectfully submitted,

**Christopher D. Hilton**
Chief, General Litigation Division

*/s/Amy S. Hilton*
**Amy Snow Hilton**
Assistant Attorney General
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

**Leif Olson**
Special Counsel
Texas Bar No. 24032801
Leif.Olson@oag.texas.gov

**William D. Wassdorf**
Assistant Attorney General
Texas Bar No. 24103022
Will.Wassdorf@oag.texas.gov

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**Counsel for Attorney General**
**Ken Paxton**

**Certificate of Service**

I certify that on September 26, 2022, this motion to quash was served via the Court's ECF system to all counsel of record.

*/s/Amy S. Hilton*

**Exhibit 5:** Plaintiffs' Reply in Support of Their Motion for Preliminary Injunction

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazaleh Moayedi, DO, MPH, FACOG,** | |
| **Plaintiffs,** | **Civil Case No. 1:22-cv-859-RP** |
| **v.** | |
| **KEN PAXTON, et al.,** | |
| **Defendants.** | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION**

In response to Plaintiffs' Motion for Preliminary Injunction (ECF 6) ("**Motion**"), Defendant Ken Paxton, Attorney General of Texas, filed both a response to the Motion and a motion to dismiss under Rule 12(b)(1) and 12(b)(6) in the same document. (ECF 33) (Def. Paxton's "**Response**," ECF 33). As explained in detail below, the Response offers no meaningful rejoinder to Plaintiffs' requests for preliminary relief in the Motion[1] and is based on a fundamental misunderstanding of Plaintiffs' claims and the law that applies to them. Plaintiffs' Motion should be granted.

---

[1] Pursuant to the agreed briefing schedule this Court entered, Plaintiffs' reply in support of their Motion is due September 26, 2022. ECF 23. No briefing schedule has been entered on the motions to dismiss, and pursuant to Local Rule CV-7(d)(2), Plaintiffs' response is not due until October 3, 2022. This reply brief therefore focuses on the critical issues before the Court related to Plaintiffs' Motion for Preliminary Injunction. While a discussion of likelihood of success on the merits of certain critical arguments necessarily overlaps with certain of the motion to dismiss arguments, this Reply is not intended to be a full response to General Paxton's Motion to Dismiss, which Plaintiffs will file on or before October 3, 2022, or such other time as the Court directs.

App.157

# I.    <u>ARGUMENT</u>

**A.    This Court's jurisdiction is secure.**

General Paxton challenges Plaintiffs' standing, Resp. at 1, 4-11, and asserts that he enjoys immunity from suit, Resp. at 1, 11-14. Although Plaintiffs' response to General Paxton's motion to dismiss under Rule 12(b) is not due until at least October 3. 2022, Plaintiffs' factual allegations and the evidence already before the Court more than satisfy Plaintiffs' minimal burden on standing, and establishes that the *Ex Parte Young* exception to sovereign immunity applies to Plaintiffs' claims.

### 1.    Plaintiffs have standing to sue General Paxton.

General Paxton makes three arguments regarding standing. He asserts: (1) Plaintiffs have not suffered a personal injury; (2) that any injury suffered by Plaintiffs is not fairly traceable to his conduct (or that of his office); and (3) that Plaintiffs do not have associational standing to assert the rights of their donors, volunteers, and staff.[2] General Paxton is wrong on all fronts.

#### a.    The chilling of Plaintiffs' activities and speech is a concrete injury.

Showing "injury in fact" requires a plaintiff to allege "an invasion of a legally protected interest which is (a) concrete and particularized," and (b) "'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). In a pre-enforcement challenge to a criminal law, a plaintiff meets these requirements by showing "threatened injury" that is "certainly impending." *Whitmore*, 495 U.S. at 158). In turn, this is shown by establishing that the plaintiff "(1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended

---

[2] In a motion for preliminary injunction, "the plaintiff must make a 'clear showing' that she has standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION – Page 2**

future conduct is arguably . . . proscribed by the policy in question, and (3) the threat of future enforcement of the [challenged policies] is substantial." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), *as revised* (Oct. 30, 2020). "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)).

Here, Plaintiffs' desire and intent to engage in conduct is clear. Every single Plaintiff has provided a sworn declaration describing the conduct they would like to engage in—paying for out of state abortions, providing funding and practical support for Texans to travel outside of the state to obtain abortions in states where that care is legal, traveling themselves in order to provide abortion care in states where it is legal or to accompany a pregnant Texan as they travel to access care. *See* Exs.16-23.[3] General Paxton does not address these facts or the descriptions of Plaintiffs' desired conduct, or the fact that Plaintiffs are not currently able to do so under threat of criminal and civil enforcement by government actors (including his office). Such injuries are "more than an identifiable trifle." *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017).

The First Amendment overbreadth doctrine protects parties who cannot afford the social or financial costs to "undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation[.]" *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). This "expansive remedy" is provided by the Court "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Id.*; *see also Gooding v. Wilson*, 405 U.S. 518, 521

---

[3] Some or all Plaintiffs may testify at the Preliminary Injunction hearing on these points as well.

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION – Page 3**

App.159

(1972) (finding the doctrine "necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression.").[4] The risks inherent in an overly broad statute are even greater when the statute has criminal penalties. *See Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) ("A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms."). In such cases, the "assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded." *Id.* After all, the "threat of sanctions may deter their exercise almost as potently as the actual application of sanctions[.]" *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Plaintiffs have all also sworn that they are currently not engaging in their desired conduct because it is arguably proscribed by the Pre-*Roe* Statutes and the Texas Trigger Ban. Exs. 16-23. That chilling effect would be undermined if General Paxton took the position that the Trigger Ban and the Pre-*Roe* Statutes cannot reach abortions performed in states where abortion is legal. General Paxton's Response does not assert that the challenged statutes do not apply to Plaintiffs' desired conduct. Instead, it **confirms** that General Paxton's position on these statutes is exactly what Plaintiffs alleged—namely, that General Paxton, as the top state law enforcement official, believes that the state of Texas has, in fact, criminalized conduct that merely assists legal abortions that occur in another state. The Response states:

---

[4] *See also Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) ("[A] litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court."); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 380 (1977) ("An overbroad statute might serve to chill protected speech …. a person who contemplates protected activity might be discouraged by the in terrorem effect of the statute.").

> That interest continues whether the Texan mother seeks an abortion in Denver or Dallas[.] ... When that procurement [of an abortion] takes the form of a bus ticket for the pregnant Texan to an abortion clinic, or paying from Texas of the cost of a pregnant Texans' hotel room adjacent to that clinic, **it does not matter if the travel and hotels are in Albuquerque or Austin**—the procurement in Texas of the means of an abortion has intruded upon the State's interest in the protection of human life.

*Id.* (emphasis added). Assisting pregnant Texans by helping them procure abortion care in other states where that care is legal is precisely the conduct in which all of the Plaintiffs want to engage.[5] This intended future conduct is proscribed by General Paxton's position, and the threat of future enforcement is substantial. *See Fenves*, 979 F.3d at 330; *see also* Section A.2.a, *infra*.

      **b.**      **Plaintiffs' injuries are directly traceable to General Paxton.**

General Paxton also claims that the injuries already being suffered by Plaintiffs are not traceable to him because he has not directly threatened to enforce the challenged statutes against Plaintiffs. Resp. at 5-6. This argument misstates the facts and misapplies the law. To meet both the requirements of standing and those of the *Ex Parte Young* exception[6], plaintiffs "must demonstrate that the state officer has 'some connection' with the enforcement of the disputed act." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact". *Ex Parte Young*, 209 U.S. 123, 157 (1908).

With respect to the law, "federal courts have consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to

---

[5] General Paxton also makes clear his position that the laws of Texas can "regulate conduct in Texas that has an effect in Texas upon the lives of persons in Texas," again confirming that the laws challenged by Plaintiffs in this case "arguably" apply to their desired conduct. Resp. at 24.

[6] As discussed further in Section I.A.2.a, *infra*, the "connection" component of its *Ex Parte Young* analysis overlaps with the traceability requirement Article III standing. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). For the purposes of this section, Plaintiffs address them interchangeably.

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION – Page 5**

enforcement." *Sullo & Bobbitt, PLLC v. Abbott*, No. 3:11-CV-1926-D, 2012 WL 2796794, at *5 (N.D. Tex. July 10, 2012), *aff'd in part sub nom.*, 536 Fed. App'x. 473 (5th Cir. 2013). This is because, when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing simply requires the named defendants to possess authority to enforce the complained-of provision. *See*, *e.g.*, *Socialist Workers Party v. Leahy,* 145 F.3d 1240, 1248 (11th Cir. 1998) ("In a suit such as this one, where the plaintiff seeks a declaration of the unconstitutionality of a state statute and an injunction against its enforcement, a state officer, in order to be an appropriate defendant, must, at a minimum, have some connection with enforcement of the provision at issue.").[7] As explained in Section I.A.2.a, *infra*, General Paxton has direct enforcement authority for the Texas Trigger Ban and also has secondary enforcement authority for the Pre-*Roe* Statutes.

General Paxton cites to *Okpalobi v. Foster*, as support for his request that this case be dismissed for lack of standing. Resp. at 4. But the plaintiffs in *Okpalobi* lacked standing because they sued state officials who had no power to enforce the challenged statute. *See Okpalobi v. Foster*, 244 F.3d 405, 424-27 (5th Cir. 2001). Therefore, the defendants could not have caused the alleged injury, nor would any injunction against those officials redress the plaintiffs' grievances; the defendants had "**no power** to redress the asserted injuries," and "no state official has any duty or ability to do **anything**" related to the enforcement of the law at issue. *Id.* at 427 (emphasis added

---

[7] *See also Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979) (noting that "an officer of a state is an appropriate defendant if he has some connection with the enforcement of the act"); 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.5, at 1072–73 (Supp. 2007) (commenting on cases that view the identification of the proper governmental defendant as a standing issue and "at times focus[ ] explicitly on the causal nexus between the official's role and the claimed injury")."

to "no power"). Unlike the *Okpalobi* defendants, General Paxton is specifically authorized to enforce the Trigger Ban and he has made clear his intention to do so.

General Paxton clearly believes that the challenged statutes apply to the conduct Plaintiffs wish to resume. For example,

- In his Response he states that the challenged Texas laws apply to activities that help pregnant Texans procure out-of-state abortions. Resp. at 24.

- Immediately after the *Dobbs* opinion issued, General Paxton, without any apparent request or prompting, put out an alert on the state of Texas law that confirmed his civil enforcement authority under the Trigger Ban and his intention to embrace that authority in full. Exs. 3, 27, 34. That same alert also confirmed his position that the Pre-*Roe* Statutes were currently effective, and confirmed his willingness to assist in any criminal prosecution initiated under those statutes. Exs. 3 at 2; 27 at 2.

- On June 28, 2022, General Paxton tweeted that the "Harris County judge froze pre-Roe laws criminalizing abortion in TX. But w/SCOTUS's Dobbs decision, these laws are 100% in effect & constitutional." Exs. 4, 42.

- On June 30, 2022, General Paxton filed an emergency motion with the Texas Supreme Court asserting that the Pre-Roe Statutes were and are fully enforceable. Ex. 32.

- Also on July 1, 2022 General Paxton tweeted, "Texas's pre-Roe statutes criminalizing abortion is 100% good law, and I'll ensure they're enforceable." Ex. 42.

- Following the Texas Supreme Court's decision granting in part General Paxton's emergency motion for temporary relief, General Paxton tweeted "Our state's pre-Roe statutes banning abortion in Texas are 100% good law." Ex. 41.

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION – Page 7**

Moreover, in an interview with Leland Vittert on June 21, 2022, General Paxton stated that he can, and that his Office will, enforce civil penalties under the Trigger Ban. Ex. 63. He further stated that **he believed the laws reached corporations that offer abortion travel assistance for employees**. Ex. 63; 63-B (asked whether Texas would go after companies who offered to pay for their employees to go out of state to have an abortion, Paxton responded: "We're going to look whether the language covers at least the civil side, and that's obviously at least what we can deal with. These penalties can be, even for corporations, over $100,000 per violation, so we'll see…were looking at that literally as we speak."). General Paxton says he will enforce the Trigger Ban and he says he can enforce it in precisely the context in which Plaintiffs wish to act and express their First Amendment rights. This statement by General Paxton—on its own—exceeds the requirements of standing for challenging a "non-moribund" statute. *Fenves*, 979 F.3d at 330, 335.

c.       **Plaintiffs are asserting their own injuries.**

General Paxton also claims that Plaintiffs lack standing because they are asserting the rights of others—namely their donors, staff, and volunteers—but have not satisfied the standard for associational standing. Resp. at 15-16. First, this argument is irrelevant to whether the case should be dismissed or the preliminary injunction granted; it pertains only to the scope of the case going forward, since Plaintiffs do assert their own rights, and one Plaintiff, Dr. Moayedi, is a natural person to whom associational standing does not apply. Second, General Paxton ignores the facts establishing associational standing.  However, for purposes of Plaintiffs' Motion for Preliminary Injunction, Plaintiffs' focus on their own rights.[8]  In this regard, General Paxton misunderstands

---

[8] Plaintiffs do not waive any argument regarding their associational standing and will respond more fully in the response to General Paxton's Motion to Dismiss.

the rights and injuries underlying Plaintiffs' claims.

Plaintiffs assert that their own constitutional rights have been violated. For the Fund Plaintiffs, each organization has rights to donate money to help pregnant Texans procure legal care in another state under each of the constitutional claims alleged.[9] For the Practical Support Plaintiffs, each organization has the right to provide funding for practical support—like travel funds and funds for childcare—to assist pregnant Texans to procure legal healthcare in another state, as well as the right to freely travel with those pregnant Texans to help them procure that care. And Dr. Moayedi has constitutionally protected rights to freely travel among the states to actually provide care to pregnant Texans in other states where abortion care is legal, to donate money to fund travel and abortion services for pregnant Texans through her service on the TEA Fund Board, and as a donor in her own personal capacity to other similar organizations (including some of the other Plaintiffs in this case).

### 2. *Ex Parte Young* applies to Plaintiffs' claims against General Paxton.

General Paxton also claims sovereign immunity precludes Plaintiffs claims. But Plaintiffs' claims against General Paxton fall squarely within the *Ex Parte Young* exception to sovereign immunity. In *Ex Parte Young*, the Supreme Court found an exception to sovereign immunity based on the principle that no state can act unconstitutionally. 209 U.S. 123, 159 (1908). Thus, when a government official attempts to enforce an unconstitutional law, he is stripped of his immunity and becomes subject to suit. *Id.* at 160. *Ex Parte Young* applies to "[s]uits for injunctive or declaratory relief" filed "against a state official" who is connected to the enforcement of "an allegedly

---

[9] Organizations—even for-profit corporations—have constitutional rights of their own. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010) ("[T]he Government may not suppress political speech on the basis of the speaker's corporate identity.").

unconstitutional law." *Tex. Democratic Party v. Abbott* (*Abbott II*), 978 F.3d 168, 179 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021)

> **a.      General Paxton is an enforcer of the Texas Trigger Ban, and has demonstrated a willingness to enforce it.**

General Paxton suggests that he does not enforce the Texas Trigger Ban because (he argues) he does not have criminal enforcement power over it.[10] Resp. at 13. Yet General Paxton has the **exclusive** power to file suits for ruinous civil penalties under the Texas Trigger Ban:

> A person who violates Section 170A.002 is subject to a civil penalty of not less than $100,000 for each violation. **The attorney general shall file an action** to recover a civil penalty assessed under this section and may recover attorney's fees and costs incurred in bringing the action.

TEX. HEALTH & SAFETY CODE ANN. § 170A.005 (emphasis added). General Paxton is the correct defendant with respect to the Trigger Ban, a fact that is not altered by the existence of other correct defendants (who have different enforcement authority). *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 3052489, at *5-21 (W.D. Tex. Aug. 2, 2022) (both the Attorney General and the Secretary of State were sufficiently connected to the enforcement of certain election laws to be proper *Ex Parte Young* defendants). In the same interview in which he said his Office would enforce the challenged statutes, and that they could be applied to corporations providing travel funding for Texans seeking abortions, General Paxton also made clear that the statutory penalties only **begin** at $100,000 per violation, but are actually **unlimited**. *See* Ex. 63. General Paxton therefore has the actual authority to ruin each and every Plaintiff, and has professed publicly that the Trigger Ban can reach the conduct in which they wish to engage.

---

[10] For the reasons given in Section I.A.2.b. *infra*, even this claim is dubious, since General Paxton can join criminal prosecutions, and has been very public about (1) his desire to make sure these anti-abortion laws are criminally enforced, and (2) his desire to ensure that these laws are enforced even in counties where the district or county attorney elects not to pursue criminal prosecutions.

His numerous public statements belie General Paxton's litigation position that he has not shown a willingness to enforce the Texas Trigger Ban. Regardless, *Ex Parte Young* does not require that the defendant show a willingness to enforce in a precise context. Instead, it simply requires a willingness to enforce the challenged provision. *City of Austin*, 943 F.3d at 1002 (finding that 5th Circuit caselaw "requires some scintilla of 'enforcement' by the relevant state official with respect to the challenged law."). Here, that provision is the prohibition on pregnant Texans obtaining an abortion (and attendant "law of parties" liability for conduct that assists). General Paxton's Response confirms that he believes Texas's abortion bans (1) may be violated through assistive rather than direct conduct, and (2) may be violated even when the assistive conduct is undertaken in connection with an abortion that occurs outside the state. Resp. at 20, 24.

The "connection" component of the *Ex Parte Young* analysis overlaps with Article III standing analysis. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). ("In fact, it may be the case that an official's connection to enforcement is satisfied when standing has been established.") (cleaned up).[11] As explained in Section I.A.1 *supra*, the threat of enforcement is more than sufficient to satisfy the concreteness and traceability requirements of Article III standing with respect to General Paxton. This conclusion either decides the question under *Ex Parte Young*, or, at a minimum "bolsters" the conclusion that General Paxton has a sufficient connection to the

---

[11] The Sixth Circuit has explicitly so ruled. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("It would be a perverse reading of *Young* to say that, although Russell might have an Article III injury before the Attorney General directly communicates his intent to prosecute him, the Eleventh Amendment would nonetheless simultaneously bar us from enjoining the Attorney General's initiating a prosecution. Rather, at the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of *Ex Parte Young*.").

enforcement of the Texas Trigger Ban to be subject to suit under *Ex Parte Young*. *City of Austin*, 943 F.3d at 1002.

As explained above, the Trigger Ban is a new law that arguably proscribes the conduct at issue in this case, and the Pre-*Roe* Statutes arguably have been unearthed from their graves as a result of *Dobbs,* according to General Paxton. *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228 (2022). Therefore, Plaintiffs are entitled to a presumption of a credible threat of enforcement absent compelling evidence to the contrary. For example, if General Paxton testified under oath before this Court that the challenged statutes do not reach the conduct Plaintiffs seek to engage in, and that Plaintiffs cannot be prosecuted or subjected to civil enforcement proceedings by General Paxton under these statutes for their desired conduct, that could provide compelling evidence to help General Paxton rebut the presumption. But he has not done so. In fact, his Response indicates that he **cannot truthfully do so** because he believes the State's interest under the challenged statutes is the same whether the abortion occurs inside or outside of Texas. Resp. at 20, 24.

General Paxton has also made multiple statements indicating his desire to enforce Texas's abortion-restraining laws. Asked specifically what will happen in the event a District Attorney declines to prosecute, General Paxton explained in an interview, "I have the opportunity to impose some of the civil penalties, so the minimum penalty is 100,000, and it can go up to an unlimited amount. **So we will be pursuing the civil side of this**." Ex. 63-A (transcribed from audio by drafter, emphasis added). As the Fifth Circuit has explained, "A scintilla of enforcement by the relevant state official with respect to the challenged law will do." *Abbott II*, 978 F.3d at 179 (quoting *City of Austin*, 943 F.3d at 1002). The record here contains far more than a "scintilla."

As abortion funds, practical support networks, and providers, Plaintiffs are a part of a very small (and shrinking) universe of Texas targets for the enforcement General Paxton has threatened.

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION – Page 12**

Moreover, while not necessary to establish a right to preliminary relief in this case, they are targets who have been specifically called out by General Paxton's political allies for enforcement. Ex. 1-2, 5-10, 61. Far from disavowing his ability or intention to pursue enforcement of the Trigger Ban against funding and assistive conduct, General Paxton has expressed an interest in doing precisely that.  to the contrary he has expressed an interest in precisely that. Ex. 63-B. If Plaintiffs violate General Paxton's unconstitutional and textually incorrect construction of the Trigger Ban, they face an imminent threat that they will be sued for civil penalties by his Office, and/or that General Paxton will encourage and assist in criminal prosecutions against them.

> **b.  General Paxton would be an enforcer of the pre-*Roe* statutes if they were still extant, and he has shown a willingness to attempt to enforce them.**

Plaintiffs' position is that the Pre-*Roe* statutes are not effective because they were impliedly repealed. *See* § I.B.3. *infra*. General Paxton's position is that these laws **are** effective, and that prosecutions for violating them could be brought immediately after the *Dobbs* decision issued. *E.g.* Ex. 27. As already noted, General Paxton has made numerous clear and express statements that he intends to enforce all of Texas's abortion-restraining laws to the maximum degree possible. Exs. 3-4, 27, 32, 34, 42, 60, 62-63. General Paxton has the authority by Texas law to assist any district attorney who brings an action under the criminal provisions of the Trigger Ban or under the pre-*Roe* statutes. Exs. 3, 25, 27.

With regard to the threatened criminal prosecution (as opposed to the threatened civil penalties), it is true that the Fifth Circuit has held that an attorney general's authority to assist with a criminal prosecution, coupled with a few statements indicating that a particular order "would be enforced," were not alone sufficient to establish the attorney general as a proper defendant. *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *judgment vacated sub nom. Planned Parenthood Ctr.*

*for Choice v. Abbott*, 141 S. Ct. 1261 (2021). But here, the only inference to be drawn from General Paxton's near-exclusivity among Texas law enforcement officials in advocating full enforcement of the pre-*Roe* statutes is that he intends to directly assist to the maximum degree he can. In fact, General Paxton's conduct—more than that of any other law enforcement official in Texas—is what has caused the chilling of Plaintiffs' constitutional rights.[12]

*In re Abbott* is also inapposite because of the high profile threats being made by other state officials regarding the legal status of the actions that Plaintiffs want to take, and the fact that, post-*Dobbs*, abortion funds, practical support networks, and providers are the natural targets of these brand new and allegedly recently restored, politically high-profile laws. Unlike in *In re Abbott* the organizations in this lawsuit are already known to Defendants because of their public litigation against Senate Bill 8, and the drumbeat of public threats that continues around them. Therefore, the enforcement General Paxton has threatened is almost certain to target one or more of the entities presently before the Court. *See NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (finding *Ex Parte Young* applied where threatening letter to business, which attorney general refused to explain, continued to chill commercial conduct). Plaintiffs are among the only persons against whom General Paxton's conduct and threats are likely to be carried out.  His

---

[12] As the Court knows, Plaintiffs also sued several District Attorneys and one County Attorney, who all have authority to criminally enforce both the Texas Trigger Ban and the Pre-*Roe* Statutes (to the extent they have not been impliedly repealed). Each of those prosecutor defendants remains a party to this case, and each has (1) stipulated that they have the authority to bring criminal prosecutions under the challenged laws and they are therefore proper defendants in this case; (2) agreed not to bring any such prosecutions until a final, unappealable order is issued in this case; and (3) each has stipulated that there is significant confusion and controversy about the constitutionality of the challenged laws. Exs. 46-47. Thus, even if General Paxton were not a proper defendant with respect to Plaintiffs' claims challenging the Pre-*Roe* Statutes, the prosecuting defendants are properly before the Court as well. The prosecuting defendants did not file a response or opposition to Plaintiffs' Motion and they have all agreed they and their offices will be bound by any order of the Court. *Id.*

conduct and threats are presently chilling conduct protected by the U.S. Constitution. Coupled with General Paxton's statutory authority to make good on these threats, this is enough to satisfy *Ex Parte Young*.[13]

**B.    Plaintiffs are likely to succeed on the merits because they have plausibly alleged that the challenged laws violate federal law and the United States Constitution.**

General Paxton also argues that a preliminary injunction is not proper because Plaintiffs are not likely to succeed on the merits of their claims. This argument fails because of the clear constitutionally-protected conduct impacted by Texas's abortion bans.

**1.    Plaintiffs' First Amendment challenges—facial and as-applied—are plausibly alleged and likely to succeed.**

**a.    Plaintiffs have a First Amendment right to fund legal conduct.**

Plaintiffs themselves have First Amendment rights to associate freely with each other and with pregnant Texans, and to engage in expressive conduct. Mot. at 17. General Paxton does not dispute this; instead, he argues that funding abortions in other states—though such care is legal there—is illegal in Texas because the State's purported interest is the same no matter where an abortion occurs. Resp. pp. 21-22. This argument is meritless.

Donations and funding are inherently protected speech. "[T]he solicitation of charitable contributions is protected speech." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 789 (1988); *see also Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 967 (1984) (finding unconstitutional a law that limited the ability of charitable organizations to raise contributions because the law was therefore "a direct restriction on protected First

---

[13] General Paxton's position that the laws **can** be enforced against assistive and aiding conduct associated with out-of-state abortions involving Texans, strenuously argued for in his Response, further establishes the necessary "actual controversy" for Plaintiffs' claim under the Declaratory Judgment Act. *See Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 294 (5th Cir. 2019) (setting out the standard).

Amendment activity."). Defendant himself is the beneficiary of such expressive speech because he receives political campaign donations.[14] *See Ted Cruz for Senate v. Fed. Election Comm'n*, 542 F. Supp. 3d 1, 4 (D.D.C. 2021), *aff'd sub nom.*, *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638 (2022) ("Protections for political speech extend to campaign financing because effective speech requires spending money.").[15]

Since he vehemently disagrees with Plaintiffs' missions, however, General Paxton differentiates their funding by calling it "illegal": "the First Amendment does not protect [paying for an abortion, helping someone get an abortion] just because Plaintiffs want to perform those illegal deeds at the same time they talk about performing them." Resp. at 21. But Plaintiffs have not asked to fund or perform any illegal deeds; they have not claimed that funding abortions **in Texas** is protected speech. Plaintiffs' assert only that they may fund legal conduct, whether it be

---

[14] Following Defendant's own theory of the law, contributors to his campaign may be subject to criminal sanctions if any of Defendant's actions in office are criminal.

[15] *See also Citizens United*, 558 U.S. at 339 ("prohibition on corporate independent expenditures is thus a ban on speech."); *Schaumburg*, 444 U.S. at 632 (charitable solicitations "involve a variety of speech interests ... that are within the protection of the First Amendment"); *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 430 (5th Cir. 2014) (applying strict scrutiny to the Texas Bingo Enabling Act, which allowed charitable organizations to raise money by holding bingo games on the condition that the money is used only for the organizations' charitable purpose, and finding that the statute restricted organizations speech, and was therefore invalid under the First Amendment.); *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[Texans for Free Enterprise's] ability to speak is undoubtedly limited when it cannot raise money to pay for speech. Consistent with our precedents, then, [Texans for Free Enterprise] has established irreparable harm."); *Texas Mun. Police Assoc. v. Texas Ethics Comm'n*, No. A-08-CA-741-SS, 2010 WL 11506913, at *7-8 (W.D. Tex. Oct. 29, 2010) (finding that Texas statute that prohibited a corporation or labor organization from making political contribution or political expenditure conflicted with *Citizens United*, and holding that Texas may not restrict political speech based on the speaker's corporate identity); *Free Mkt. Found. v. Reisman*, 573 F. Supp. 2d 952, 954 (W.D. Tex. 2008) ("Contribution limits imposed on groups can be especially problematic when they 'severely inhibit collective political activity by preventing [a group] from using contributions by small donors to provide meaningful assistance to any individual candidate.'" (quoting *Randall v. Sorrell*, 548 U.S. 230 (2006) (Breyer, J., plurality)).

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION – Page 16**

advocacy for reproductive justice in Texas, or legal abortions performed outside of Texas. Deeds are not rendered illegal in New Mexico, Kansas, or elsewhere simply because Texas has decreed them illegal within its own borders. Thus, funding abortion-related activity—where actual abortions are performed where legal—is not funding illegal activity. Rather, it is protected speech. *See Riley*, 487 U.S. at 789; *Joseph H. Munson Co.*, 467 U.S. at 967.

### b. A restraint on funding or assistance regarding out-of-state legal abortions cannot pass even rational basis scrutiny, much less strict scrutiny.

General Paxton also asserts that the Pre-*Roe* statutes and Trigger Ban are content-neutral because they "apply equally regardless of one's opinion on abortion, and the statutes' requirements in no way depend on the speaker's viewpoint or motives." [Dkt. 33, p. 21]. But this is a fundamental misunderstanding of content-based discrimination. A regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter. *Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015). Earlier this month, the Fifth Circuit affirmed that, under *Reed*, "the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *NetChoice, L.L.C. v. Paxton*, No. 21-51178, 2022 WL 4285917, at *30 (5th Cir. Sept. 16, 2022) (quoting *Reed*, 576 U.S. at 163). "Whether laws define regulated speech by particular subject matter or by its function or purpose, they are subject to strict scrutiny." *Reed*, 576 U.S. at 156. "This stringent standard reflects the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (cleaned up).

The only speech targeted by the Pre-*Roe* Statutes and the Trigger Ban is speech (including funding) that supports Texans seeking safe and legal abortion. Only those Texans (natural and

organizational, such as Plaintiffs) who believe that pregnant Texans should be allowed to obtain safe abortions where those abortions are legal are impacted by these laws if/when they assist pregnant people in obtaining legal, out-of-state abortions. *See Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) (holding government cannot selectively exclude speakers from the public sphere based on the content of their message).

General Paxton argues that Texas has an interest in its citizens' health and medical care, regardless of where it is obtained. But the U.S. Supreme Court rejected similar arguments in *Bigelow v. Virginia*, 421 U.S. 809 (1975). In that case, a Virginia law prohibited speech about out-of-state abortion, and the plaintiffs challenged the statute as being overbroad in violation of the First Amendment. *Bigelow*, 421 U.S. at 815. The U.S. Supreme Court agreed, holding that whatever interests Virginia had in overseeing medical care within its borders did not pertain to regulating its residents' understanding of, and even procurement of, out-of-state medical care in the form of abortions. *Bigelow*, 421 U.S. at 824-25. Texas's statutes are even broader, however, and conceivably could arguably Plaintiffs' conduct even when the person traveling from Texas isn't even a resident or citizen of the state. Texas has no legitimate or protectible interest in regulating the conduct that is the subject of Plaintiffs' request for preliminary relief.

**2.      Plaintiffs are likely to succeed on their right-to-travel claims.**

General Paxton argues that the travel right asserted by Plaintiffs in their Motion—that is, the right to interstate travel to engage in lawful conduct in another state—is (1) too broadly defined, and (2) when properly narrowed, is not historically protected. Resp. at 23-4. Both arguments fail.

Taking the second argument first, a broad right to travel has been recognized since before the country's founding. Justice Bushrod Washington, nephew of George Washington, recognized

precisely the right asserted by Plaintiffs in this case within a generation of Constitutional ratification:

> The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise … may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental…

*Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823).[16] To contend that the untrammeled right to travel to conduct legal business in another state is not "deeply rooted" in American history or tradition is frivolous; the is "virtually unqualified," and has been recognized and affirmed by the Supreme Court for more than a century. *Califano v. Gautier Torres*, 435 U.S. 1, 5 n.1 (1978).

Turning to the breadth argument, General Paxton asserts that construing a right to "interstate travel to engage in lawful conduct in another state," is too broad, contending that it is too similar to a "general right of free movement" that the D.C. Circuit has suggested is too broad to be administrable. Resp. at 23 (citing *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 538 (D.C. Cir. 1999)). Plaintiffs construction of the right, however is limited to travel between states and to conduct legal in the destination state; it does not cover international travel, which is meaningfully constitutionally different, *Califano*, 435 U.S. at 5 n.6, nor do Plaintiffs claims assert a right to travel in order to violate the laws or other regulations of the destination state. Plaintiffs are

---

[16] A broad right to travel in peacetime is also present in Blackstone's commentaries. Blacktone, COMMENTARIES ON THE LAWS OF ENGLAND, Book 1: The Rights of Persons, Chapter 1 – Of the Absolute Rights of Individuals, II ("Next to personal security, the law of England regards, asserts, and preserves the personal liberty of individuals. This personal liberty consists in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law.") It is also explicit in the Articles of Confederation, U.S.C.A. § ARTICLES OF CONFEDERATION, Art. IV, ¶ 1. (1777), and enshrined in Magna Carta, Leonard B. Boudin, The Constitutional Right to Travel, 56 COLUM. L. REV. 47 (1956) (citing Magna Carta, Ch. 42, as giving to every free man the right to leave the realm at his pleasure in time of peace).

asserting a right to travel to a destination state to engage in conduct that is legal and protected in that state, which is nearly identical to the Supreme Court's holding shortly after the ratification of the 14th Amendment that the right to travel "plainly and unmistakably" embraces the right to cross state lines to engage in "lawful commerce, trade, or business." *Ward v. State*, 79 U.S. 418, 430 (1870).

General Paxton's position—that the Right to Travel for a specific **type** of legal commerce must be shown to be deeply rooted in American history and tradition—is absent from any authority he cites.[17] Moreover, binding Supreme Court precedent makes clear that the Right to Travel specifically includes the right to do so "to procure medical services." *Saenz v. Roe*, 526 U.S. 489, 502 (1999). Construing it even more narrowly, the Right to Travel specifically prohibits restraints on travel to procure abortion services, and restraints on in-state advertising and advocacy for people to travel across state lines to obtain abortions where those abortions are legal. *Bigelow*, 421 U.S. at 822–24. Both the Trigger Ban and the Pre-*Roe* statutes run roughshod over the Right to Travel if construed to extend to prohibitions of abortions in states where abortion is legal.

General Paxton also argues that Texas could nevertheless pass the strict scrutiny test because it has a compelling interest in "protecting … the life of [an] unborn child." Resp. at 23. Whether that is true is irrelevant. The question is whether that State interest continues beyond Texas's border, and the Supreme Court has already made clear that it does not. "A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State." *Bigelow,* 421 U.S.

---

[17] It is also borders on the absurd. Visiting Disneyland is not deeply rooted in the history and tradition of the United States of America—it didn't exist before 1955. County fairs, by contrast, likely did exist at the time of constitutional ratification. Under General Paxton's argument, traveling to Orange County for a county fair would be protected by the Right to Travel, while Texas may punish any travel to Orange County for theme-park-related purposes.

at 824. Indeed, in a case specifically involving a situation in which the State of Virginia attempted to prosecute local advertisements for abortion placement services available in New York (at a time when abortion was illegal in Virginia, but legal in New York) the Court opined:

> The Virginia Legislature could not have regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State. Neither could Virginia prevent its residents from traveling to New York to obtain those services or, as the State conceded prosecute them for going there.

*Id.* at 822–24. This holding is not a one-off decision. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003) ("A State cannot punish a defendant for conduct that may have been lawful where it occurred.") (separately citing and quoting *Bigelow* with approval); *New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("… it would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State and in the State of New York and there destroy freedom of contract without throwing down the constitutional barriers…upon the preservation of which the Government under the Constitution depends."); *Huntington v. Attrill*, 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the state which enacts them, and can have extraterritorial effect only by the comity of other states."); *Bonaparte v. Appeal Tax Court of Baltimore*, 104 U.S. 592, 594 (1881) ("No State can legislate except with reference to its own jurisdiction."). Texas may or may not have a compelling state interest to protect "unborn life," but any such interest ceases at the interstate border.[18]

---

[18] It may be that Texas retains more of its original interests in situations involving international travel or travel on the high seas. *See Califano*, 435 U.S. at 5 n.6 (1978) (noting international travel less protected than interstate travel, the right to which is "virtually unqualified"); *Skiriotes v. State of Florida*, 313 U.S. 69, 77 (1941) (jurisdiction on the high seas). The issue in this case is travel between and among sister states, and the precedent on that issue could not be clearer. *Nielsen v. State of Oregon*, 212 U.S. 315, 321 (1909) ("It is enough to decide, as we do, that, for an act done within the territorial limits of the state of Washington, under authority and license from that state, one cannot be prosecuted and punished by the state of Oregon.").

The alternative to the correct application of existing standards is a world in which State power disrespects state borders, follows its citizens in their interstate movement against their will, and dictates what conduct is illegal within the others' state borders. It is a world in which five visitors to the same state may have five different sets of legal rights, rather than what the Constitution says they are entitled to: "the Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2. It is perhaps for this reason that, addressing the dissent's concerns in *Dobbs* regarding confusion over the effect of abortion laws on interstate travel, Justice Kavanaugh in his concurrence expressed the view that (1) states do not have the power to prevent travel to obtain an abortion, and (2) the questions was "not especially difficult as a constitutional matter." *Dobbs*, 142 S. Ct. at 2309 (U.S. 2022) (Kavanaugh, J., concurring).

### 3. The Pre-*Roe* Statutes were impliedly repealed and enforcing them would violate Due Process.

The Pre-*Roe* Statues were repealed by implication and cannot be revived by general statements of the Texas Legislature. General Paxton, however, incorrectly contends that the repealed Pre-Roe Statutes are enforceable. This threatened application of a repealed statute, is "a deprivation of the right of fair warning [that] can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964).

As conceded by General Paxton, the Fifth Circuit held that Texas's regulatory scheme on abortion after *Roe v. Wade* "cannot be harmonized with provisions that purport to criminalize abortion. There is no way to enforce both sets of laws; the current regulations are intended to form a comprehensive scheme—not an addendum to the criminal statutes struck down in *Roe*." *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004). General Paxton's disagreement with the Fifth Circuit's holding in *McCorvey* does not undo this Court's obligation to follow it. *See F.D.I.C. v.*

*Abraham*, 137 F.3d 264, 269 (5th Cir. 1998) ("[W]hen our Erie analysis of controlling state law is conducted for the purpose of deciding whether to follow or depart from prior precedent of this circuit. . . we should not disregard our own prior precedent on the basis of subsequent intermediate state appellate court precedent unless such precedent comprises unanimous or near-unanimous holdings from several—preferably a majority—of the intermediate appellate courts of the state in question."); *see also Poindexter v. R.J. Reynolds Tobacco Co.*, No. CIV.A.3:99-CV-262-X, 2000 WL 358473, at *1 (N.D. Tex. Apr. 7, 2000), *aff'd*, 237 F.3d 630 (5th Cir. 2000) ("*Erie* predictions made by the Fifth Circuit are controlling authority unless and until state court decisions or statutory amendments overrule the prior decision."). The Supreme Court of Texas has not disagreed with *McCorvey*, nor has any Texas Court of Appeals disapproved it.

The Texas Legislature's attempts to retroactively construe the Pre-*Roe* Statutes as not having been repealed also fail, because a later legislature cannot speak for the intention of an earlier legislature. *Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 454 (Tex. 2008) ("That another session of the Legislature decided to incorporate into the Bail Bond Act broader statewide restrictions on bail bond solicitation does not mean that the Board lacked the power to regulate solicitation under the Legislature's prior broad grant.").[19] The Legislature had the power to simply re-enact the Pre-*Roe* Statutes if it wished. It did not. It cannot do so by retroactive construction simply by claiming that courts have no power. Its attempt to do so invokes the possibility of retroactive enforcement of a law that was struck down by a U.S. Supreme Court decision and

---

[19] *Fed. Crude Oil Co. v. Yount-Lee Oil Co.*, 52 S.W.2d 56, 63 (1932) ("[T]he expression of an opinion by one Legislature in construing the act of a former Legislature is not conclusive upon the courts as it is their province to arrive at the intention of the particular legislature which enacted each of these laws."); *see also Rowan Oil Co. v. Texas Employment Commission*, 263 S.W.2d 140, 144 (Tex. 1953) ("[T]he Act cannot release any contributions which accrued … before its passage and neither does one session of the Legislature have the power to construe the Acts or declare the intent of a past session.").

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION – Page 23**

impliedly repealed by later legislative acts. Such a threat violates the due process rights of any targets of such enforcement, including Plaintiffs.

## C. Plaintiffs have established, and will further establish at the upcoming hearing, the required elements for preliminary injunctive relief.

General Paxton also argues that Plaintiffs cannot establish irreparable injury or that a preliminary injunction is in the public interest. But the deprivation of constitutional rights is always an irreparable injury, and never in the public interest and Plaintiffs did not delay in seeking relief from the Court.

First, Plaintiffs did not unduly delay the filing of their lawsuit or their motion for preliminary injunctive relief. They filed their claims as soon as practicable after securing necessary funding to prevent a full divestiture of their organization funds (and potentially the personal assets of their officers and board members) should this lawsuit not succeed. The Texas legislature's unique fee-shifting provision that attaches to all affirmative abortion-related constitutional challenges, *see* TEX. CIV. PRAC. & REM. CODE ANN., § 30.022, is so chilling that few organizations can afford to test the scope of the laws for fear of the financial ruin they may suffer in the case of any loss in court. And few organizations will be able to find counsel willing to risk the severe financial injury attendant to cases such as this, since Section 30.022 imposes joint and several liability on any counsel who assist in the challenge of an abortion statute. *Id.*

Between the time the *Dobbs* decision was announced and the effective date of the Trigger Ban—an extremely short time frame—Plaintiffs secured funding to ensure their continued financial viability if the draconian and one-sided fee shifting regime in Section 30.022 were applied to the claims in this lawsuit, and then filed suit. The purported "delay" lasted only two months, during which all of those who work in the reproductive health and justice communities were thrown into complete operational upheaval just to comply with new laws and possibly

effective "zombie" laws, while attempting to protect their associates from possible criminal prosecutions and ruinous civil penalties. Plaintiffs are prepared to introduce evidence and testimony at the upcoming hearing on September 27, 2022, about the reason for the amount of time it took to file their lawsuit. To characterize this time period as "delay" and deny a preliminary injunction on that basis would be counter to the principles of equity that govern injunctive relief. It would also reward the State of Texas for a legislative strategy transparently designed to obstruct access to justice and deter constitutional challenges (as the fee-shifting provisions of SB8 have done to date, while they await judicial review).

Second, as this Court previously recognized, Plaintiffs have alleged "serious constitutional injuries." *See* ECF 13, p. 3. Enforcement of an unconstitutional law always violates the public interest, and enjoining such enforcement serves the public interest. *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) ("The School Prayer Statute is unconstitutional so the public interest was not disserved by an injunction preventing its implementation.")[20]

## II.    <u>CONCLUSION</u>

For all of these reasons, Plaintiffs respectfully request the Court issue the preliminary injunction requested in their Motion.

---

[20] *See also De Leon v. Perry*, 975 F. Supp. 2d 632, 665 (W.D. Tex. 2014), *aff'd sub nom.*, *De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Therefore, a preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest."); *Texas Med. Providers Performing Abortion Servs. v. Lakey*, No. A-11-CA-486-SS, 2011 WL 13137818, at *1 (W.D. Tex. Oct. 12, 2011) ("Accordingly, the Court concludes: . . . the public interest does not favor enforcement of an unconstitutional act.").

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION – Page 25**

Dated: September 26, 2022  Respectfully submitted,

By: */s/ Jennifer R. Ecklund*
Jennifer R. Ecklund
Texas Bar No. 24045626
jecklund@thompsoncoburn.com

Elizabeth G. Myers
Texas Bar No. 24047767
emyers@thompsoncoburn.com

Allyn Jaqua Lowell
Texas Bar No. 24064143
alowell@thompsoncoburn.com

John Atkins
Texas Bar No. 24097326
jatkins@thompsoncoburn.com

Elizabeth Rocha
Texas Bar No. 24127242
erocha@thompsoncoburn.com

**THOMPSON COBURN LLP**
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201
Telephone: 972/629-7100
Facsimile: 972/629-7171


Alexandra Wilson Albright
Texas Bar No. 21723500
aalbright@adjtlaw.com

Marcy Hogan Greer
Texas Bar No. 08417560
mgreer@adjtlaw.com

515 Congress Ave., Suite 2350
Austin, TX 78701-3562
Telephone: 512/482-9300
Facsimile: 512/482-9303
Kevin Dubose
Texas Bar No. 06150500
kdubose@adjtlaw.com
1844 Harvard Street

Houston, TX 77008
Telephone: 713/523-2358
Facsimile: 713/522-4553

Kirsten M. Castañeda
Texas Bar No. 00792401
kcastaneda@adjtlaw.com
8144 Walnut Hill Lane, Suite 1000
Dallas, TX 75231-4388
Telephone: 214/369-2358
Facsimile: 214/369-2359

**ALEXANDER DUBOSE &
JEFFERSON, LLP**

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document was filed electronically on September 26, 2022, with the clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.

/s/ *Jennifer R. Ecklund*
Jennifer R. Ecklund

**Exhibit 6:** September 27 Text Order Granting
Motion to Quash Subpoena

| | |
|---|---|
| **From:** | TXW_USDC_Notice@txwd.uscourts.gov |
| **To:** | cmecf_notices@txwd.uscourts.gov |
| **Subject:** | Activity in Case 1:22-cv-00859-RP Fund Texas Choice et al v. Paxton et al Order on Motion for Miscellaneous Relief |
| **Date:** | Tuesday, September 27, 2022 8:08:47 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court [LIVE]

### Western District of Texas

## Notice of Electronic Filing

The following transaction was entered on 9/27/2022 at 8:07 AM CDT and filed on 9/27/2022
**Case Name:**       Fund Texas Choice et al v. Paxton et al
**Case Number:**     1:22-cv-00859-RP
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Text Order GRANTING [44] Motion entered by Judge Robert Pitman. IT IS ORDERED that Defendant Paxton's motion to quash subpoena is GRANTED. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sh)**

**1:22-cv-00859-RP Notice has been electronically mailed to:**

Alexandra Wilson Albright     aalbright@adjtlaw.com

Allyn J. Lowell     alowell@thompsoncoburn.com, ldebardeleben@thompsoncoburn.com

Amy Snow Hilton     amy.hilton@oag.texas.gov, ana.aranda@oag.texas.gov

Christopher D. Hilton     christopher.hilton@oag.texas.gov, laura.kiick@oag.texas.gov

Elizabeth B. Rocha     erocha@thompsoncoburn.com

Elizabeth G. Myers     emyers@thompsoncoburn.com, dwhitaker@thompsoncoburn.com, gcasey@thompsoncoburn.com, lcarranza@thompsoncoburn.com, ldebardeleben@thompsoncoburn.com

Gayle Rosenstein Klein     gayle.klein@srz.com, courtfilings@srz.com,
evan.melluzzo@srz.com

Jason Eric Magee     e.magee@allison-bass.com, allison.bass@allison-bass.com,
j.mcvey@allison-bass.com

Jennifer Rudenick Ecklund     jecklund@thompsoncoburn.com,
gcasey@thompsoncoburn.com, lcarranza@thompsoncoburn.com,
ldebardeleben@thompsoncoburn.com

John P. Atkins     jatkins@thompsoncoburn.com, fcdebate@hotmail.com,
lcarranza@thompsoncoburn.com, ldebardeleben@thompsoncoburn.com

Kevin H. Dubose     kdubose@adjtlaw.com, gholland@adjtlaw.com

Kirsten M. Castaneda     kcastaneda@adjtlaw.com, dallasadmin@adjtlaw.com

Leif A. Olson     leif.olson@oag.texas.gov, tamera.martinez@oag.texas.gov

Leslie W. Dippel     leslie.dippel@traviscountytx.gov, amy.pollock@traviscountytx.gov,
sylvia.mcnicholas@traviscountytx.gov

Marcy Hogan Greer     mgreer@adjtlaw.com, ggrimm@adjtlaw.com,
gverlander@adjtlaw.com, sjett@adjtlaw.com

William D. Wassdorf     Will.Wassdorf@oag.texas.gov, michelle.elliott@oag.texas.gov,
tamera.martinez@oag.texas.gov

**1:22-cv-00859-RP Notice has been delivered by other means to:**

Anna Rich
Office of the Attorney General
California Department of Justice
1515 Clay St.
Oakland, CA 94612

**Exhibit 7:** Response to Defendant's Motion to Quash, Motion to Reconsider Ruling on Same, and Emergency Motion to Exclude (with exhibits)

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazaleh Moayedi, DO, MPH, FACOG, | § § § § § § § | |
| Plaintiffs, | § | |
| vs. | § | **CIVIL CAUSE NO. 1:22-cv-859-RP** |
| | § | |
| KEN PAXTON, in his Official Capacity as Attorney General; et al., | § § | |
| Defendants. | § § | |

---

**RESPONSE TO DEFENDANT'S MOTION TO QUASH, MOTION TO
RECONSIDER RULING ON SAME, AND EMERGENCY MOTION TO EXCLUDE**

---

Plaintiffs hereby file this Response to Defendant's Motion to Quash (ECF 44), Motion to

Reconsider Ruling (9/27/22 Docket Entry) on Same, and Emergency Motion to Exclude.  The

Court should reconsider its ruling granting Defendant's Motion to Quash because General Paxton

has made his own conduct of which he has exclusive, first-hand knowledge relevant to today's

injunction hearing.  Alternatively, if General Paxton is not compelled to appear and testify, the

Court should prohibit him-- exclude under the applicable principles of equity and the Court's

authority over hearing subpoenas—from contesting at the hearing the meaning of his statements,

the evidence Plaintiffs offer about those statements, and that he has threatened enforcement of civil

and criminal penalties for helping women procure out-of-state abortions.  *See, e.g.*, *Healthpoint,*

*Ltd. v. Stratus Pharms., Inc.*, 273 F. Supp. 2d 769, 794-95 (W.D. Tex. 2001) (equitable principles

apply to preliminary injunctions); *see also* FED. R. CIV. P. 45.

App.188

In his Response to Plaintiffs' Motion for Preliminary Injunction and Motion to Dismiss Plaintiffs' Complaint (ECF 33) filed September 19, 2022, General Paxton chose to anchor his defense to the primary argument that he has not made any statement creating an imminent threat of enforcement for helping women procure out-of-state abortions and that Plaintiffs have manufactured the threatened injury. PI Response at 1. This argument contradicts numerous extra-litigation statements that General Paxton himself has made as Attorney General. This argument also contradicts statements General Paxton makes later in his PI Response.

By threatening enforcement of civil and criminal laws against those who help Texans obtain abortions in other states where abortion is legal, and by defending against the preliminary injunction by arguing that those threats do not mean what he said, General Paxton has made conduct about which he has exclusive, first-hand knowledge relevant to the issues to be determined at the injunction hearing. *See Freedom From Religion Foundation, Inc. v. Abbott*, No. A-16-CA-00233-SS, 2017 WL 4582804, at *11 (W.D. Tex. Oct. 13, 2017). When a witness has personal knowledge of relevant facts, even the highest-level official is subject to examination. *See id.*; *see also, e.g.*, *Rolscreen Co. v. Pella Prods. of St. Louis, Inc.*, 145 F.R.D. 92, 98 (S.D. Ia. 1992); *Digital Equip. Corp. v. Sys. Indus., Inc.*, 108 F.R.D. 742, 744 (D. Mass 1986); *CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y. 1984).

In moving to quash subpoenas compelling General Paxton in his official and individual capacities to attend the preliminary injunction hearing and give testimony, General Paxton invokes the *Morgan* doctrine, discussed in *In re F.D.I.C.*, 58 F.3d 1055 (5th Cir. 1995). *See* Paxton's Motion to Quash Subpoenas (ECF 44) at 1-2. But this doctrine offers him no refuge. The doctrine provides, "'[T]op executive department officials should not, **absent extraordinary circumstances**, be called to testify regarding **their reasons for** taking official actions.'" *F.D.I.C.*,

58 F.3d at 1060 (emphasis added). The doctrine applies in cases where "'it [i]s not the function of the court to probe the mental processes of" the [policymaker]," but rather to determine whether the policy comports with the law. *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999 (1941); *Morgan v. United States*, 304 U.S. 1, 18, 58 S. Ct. 773 (1938). Here, General Paxton is not being called to testify about the reasons or mental processes leading to his choice to make the statements/threats he has made. He is being called to testify because he now argues that his public statements do not mean what he said, such that Plaintiffs have "manufactured [the] threats of injury" that support injunctive relief. PI Response at 1.

Even if the *Morgan* doctrine applied, this case involves extraordinary circumstances. The Attorney General has himself (not through representatives) made repeated statements about enforcement of civil and criminal penalties (as he misinterprets them) against those who assist women in obtaining or attempting to obtain abortions outside Texas borders in states where abortion is legal. Plaintiffs are entitled to examine General Paxton.

When General Paxton first attempted last week in his September 19 PI Response to create a fact dispute regarding his own statements/threats, Plaintiffs were unaware of any need to subpoena him to attend a hearing this Court already had ordered him and his counsel (along with all other parties and counsel) to attend. *See* Order Setting Preliminary Injunction Hearing (ECF 24). General Paxton's choices drove the events that unfolded thereafter:

- On September 22-23, 2022, when General Paxton's counsel refused to confirm he would attend the hearing as ordered or to accept service of a hearing subpoena, Plaintiffs (with advance notice to General Paxton's counsel) served a subpoena on him through the procedure established at his office. *See* Exhibit A (Declaration of John Atkins) at Exs. A-1-A-4.

- When on September 25, 2022, General Paxton's counsel challenged the sufficiency of that service and of the capacity to which the subpoena was directed, Plaintiffs (again with advance notice) on September 26, 2022, served subpoenas in his official and individual capacities in person. *See id.* at ¶¶5-7 & Exs. A-4-A-5.

- 3 -

- When General Paxton's counsel challenged that service on the basis that Plaintiffs offered no evidence that service had been effectuated, Plaintiffs filed certificates of service evidencing service of the various subpoenas, including the service location. *See* Motion to Quash at 1 n.1; Certificates of Service (ECF 59-62).

- When General Paxton's counsel objected to two Certificates as including the location at which Plaintiffs served General Paxton (*i.e.*, his wife's home address), Plaintiffs filed redacted Certificates even though no rule requires redaction of the address. *See* Ex. A at Ex. A-5; Redacted Certificates of Service (ECF 63-64).

The necessity, nature, timing, and location of Plaintiffs' service of the subpoenas are the product of General Paxton's choices. The law does not protect him—a person who has placed his own, exclusive, first-hand knowledge at issue in these extraordinary circumstances— from testifying as any other witness with personal knowledge of relevant facts. The ruling on his motion to quash should be reconsidered and the motion denied. Alternatively, he should be prohibited from contesting at the hearing the meaning and evidence of his statements or that he has threatened enforcement of civil and criminal penalties for helping women procure out-of-state abortions.

**A.      General Paxton has made conduct of which he has exclusive, first-hand knowledge relevant to the preliminary-injunction issues.**

General Paxton has stated—in an Advisory issued in his official capacity as Attorney General and signed by him as "Attorney General of Texas—that he "**will assist** any local prosecutor who pursues criminal charges." Exhibit B (PX3) at 2 (emphasis added). He did not state that he is authorized to assist local prosecutors, willing to assist local prosecutors, or will assist any local prosecutors who may ask for his assistance. Instead, just as he stated that he "**will** strictly enforce this law" to "pursue and recover those civil penalties," he stated in the very next sentence that he "**will** assist any local prosecutor who pursues criminal charges." Ex. B (PX3) at 2 (emphasis added). In case anyone was inclined to take the "will assist" statement about criminal charges at less than face value in comparison with the "will strictly enforce" statement about civil penalties, General Paxton concluded his Advisory by stating that he "will do **everything in my**

**power** to protect the unborn and uphold **the state laws** duly enacted by the Texas Legislature." *Id.* (emphasis added). Although General Paxton later updated his advisory to say he "**stand[s] ready** to assist any local prosecutor who pursues criminal charges," he did not condition his readiness on any request for assistance. Exhibit C (PX 27) at 2 (emphasis added). And he reasserted that he "will do everything in my power . . . to uphold the state laws duly enacted by the Texas Legislature," without distinguishing between civil and criminal laws or limiting his efforts to situations where he is invited by a local authority to participate. *Id.*

General Paxton's refusal to limit his enforcement threats to only civil, not criminal, statutes extends to other statements, as well. *See, e.g.*, PX4 (Attorney General Ken Paxton tweeting "I'll ensure we have **all the legal tools** to keep TX pro-life!" (emphasis added)); Exhibit D (PX28) at 2 (Attorney General Ken Paxton stating "I will fight back to defend **our pro-life laws** and Texas mothers and children." (emphasis added)); Exhibit E (PX34) at 2 (Attorney General Ken Paxton stating that "abortion is illegal here. I look forward to defending **the pro-life laws of Texas** and the lives of all unborn children moving forward." (emphasis added)).[1] Indeed, General Paxton has confirmed that his enforcement efforts will (not may) extend to criminal laws. After the updated Advisory, General Paxton stated, in the face of a Harris County District Court temporary restraining order blocking enforcement of Pre-*Roe* Statutes—"Let there be no mistake: the lower court's unlawful order does not immunize **criminal conduct, which can be punished at a later date** once the temporary restraining order is lifted. My office **will not hesitate to act** in defense of unborn Texans put in jeopardy by plaintiffs' wrongful actions and the trial court's erroneous order." Exhibit G (PX32) at 2 (emphasis added).

---

[1] *See also* Exhibit F (PX31) (State of Texas Original Complaint against Biden Administration) (stating that "[t]he sovereign right to enforce its criminal laws is the epitome of Texas's police power" and discussing the criminal statutes providing that "an individual may not act as an accomplice to abortion or an attempted abortion.").

In his PI Response, General Paxton made his testimony relevant to the preliminary injunction issues by contending that these statements do not mean what they say. He asserts that no statement or action of his constitutes an "imminent threat of enforcement for helping women procure out-of-state abortions…." PI Response at 1. He contends that he has not "demonstrated a willingness to enforce the statutes in the way Plaintiffs hypothesize . . . ." *Id.* at 13.

General Paxton also argues in his Response that the statements in his Advisory and tweet do not "represent a threat that he will interpret the pre-*Roe* statutes to 'criminalize abortion funds, including Plaintiffs, for all activities related to abortion, regardless of whether abortions take place in a jurisdiction outside of Texas in which abortion is legal.'" *Id.* at 5. He posits that the facts do not support the allegation "that the Attorney General will interpret the law to apply to 'any behavior undertaken by Plaintiffs in connection with any abortion that occurs outside the State of Texas." *Id.* at 13. Yet General Paxton does not address the inconsistency of this position with: (1) his own public statements about the illegality of abortions under Pre-*Roe* Statutes [*e.g.*, Ex. E (PX34) at 2]; (2) his position in his lawsuit against the Biden administration that Pre-*Roe* criminal statutes provide "an individual may not act as an accomplice to abortion or an attempted abortion" [Ex. F (PX 31)]; or (3) his position in the PI Response itself that funding and assisting Texans to obtain abortions in other states where abortion is legal is "illegal," violates "legitimate and important State interests," and is "well within the State's police powers" [PI Response at 21, 24].

As General Paxton makes clear in his PI Response, his interpretation of Texas law is that "there is no constitutional right to **pay for an abortion**, there is no constitutional right to **help someone get an abortion**, and the First Amendment does not protect those things just because Plaintiffs want to perform **those illegal deeds** at the same time they talk about performing them." PI Response at 21 (emphasis added). According to General Paxton, Texas's criminalization of

- 6 -

abortion applies "whether the Texan mother seeks an abortion in Denver or Dallas, in Las Cruces or Lamesa" and extends to "procurement [in] the form of a bus ticket for the pregnant Texan to an abortion clinic, or the paying from Texas of the cost of a pregnant Texan's hotel room adjacent to that clinic, it does not matter if the travel and hotel are in Albuquerque or Austin . . . ." *Id.* at 24. Although it would be reasonable to do so, Plaintiffs do not need "to draw [a] reasonable inference that the Attorney General will enforce the law in the way Plaintiffs fear . . . ." *Id.* at 13. General Paxton's statements on pages 21 and 24 of the PI Response confirm what he has repeatedly threatened: He interprets the pre-*Roe* statutes to criminalize abortion funds, including Plaintiffs, for all activities related to abortion, regardless of whether abortions take place in a jurisdiction outside of Texas in which abortion is legal. *See id.* at 21, 24. And his public statements confirm that he will enforce all laws of this State, not just those authorizing civil penalties, to defend against these activities he has misinterpreted as illegal. *See* Exs. B, C, G (PX 3, 27, 32).

Nevertheless, General Paxton argues that the preliminary injunction should be denied because his public statements do not mean what he said. *See* PI Response at 5-9, 13. To the extent that these conclusory arguments create a fact dispute, General Paxton has made conduct of which he has exclusive, first-hand knowledge relevant to the issues at the preliminary injunction hearing. His own responsive arguments turn heavily on the meaning of words spoken by General Paxton himself and whether he meant something different than he said (*e.g.*, only civil laws, rather than all Texas laws), which are matters about which *only he* can testify.

Contrary to his arguments, Plaintiffs do not merely assert that General Paxton was merely involved in the regular course of agency decisionmaking. *See F.D.I.C.*, 58 F.3d at 1061-62 (no extraordinary circumstances presented by mere involvement in decisionmaking); *Ctr. for Juvenile Mgmt. v. Williams*, No. 5:15-cv-640, 2016 WL 8904968, at *5 (W.D. Tex. Sept. 22, 2016) (same).

On the contrary, all of the statements/threats that General Paxton attempts to place at issue were made by General Paxton himself.  They were not made by or through deputies or other representatives.  Thus, General Paxton "has first-hand knowledge related to the [issues] being litigated and other persons cannot provide the necessary information."  *See FFRF*, 2017 WL 4582804, at *11.  This exclusive, first-hand knowledge "present[s] extraordinary circumstances" and "a special need for [the official's] testimony," either one of which would defeat the *Morgan* doctrine.  *See In re United States*, 985 F.2d 510, 512-13 (11th Cir. 1993) (quoted language; Commissioner was not the commissioner at the time of relevant investigation and other agency officials with knowledge of investigation had already testified in the case).  Even if the *Morgan* doctrine applies, Plaintiffs are entitled to examine General Paxton.

Furthermore, the substantive reason that General Paxton's exclusive, first-hand knowledge of his own statements is relevant to the preliminary injunction is his own choice to defend against the injunction by arguing that he did not mean what he said.  When a senior agency decisionmaker puts his conduct at issue, he subjects himself to examination.  *See F.D.I.C.*, 58 F.3d at 1062 (holding that, when senior agency decisionmakers engage in conduct that makes testimony explaining their actions relevant, they subject themselves to deposition).  For this reason, as well, even if the *Morgan* doctrine applies, General Paxton's decision to deny that his statements constitute threats of enforcement subjects him to Plaintiffs' hearing subpoena.  *See id.*

Additional extraordinary circumstances support Plaintiffs' right to examine General Paxton.  The statements/threats he has made himself (not through representatives), then attempted to recharacterize as the basis for defeating injunctive relief, concern the enforcement of civil and criminal penalties (as he misinterprets them) against those who assist women in obtaining or attempting to obtain abortions outside Texas borders in states where abortion is legal.  And the

examination he seeks to avoid is not at a deposition or at a trial after full discovery has been completed, but at a preliminary-injunction hearing held before Plaintiffs are allowed to conduct any discovery.  *See F.D.I.C.*, 58 F.3d at 1057 (addressing motion to quash depositions during discovery); *League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2022 WL 2866673, at *1 (W.D. Tex. July 6, 2022) (addressing motion to quash depositions during discovery); *Texas Entertainment Association v. Hegar*, No. 1:17-cv-594, 2019 WL 13080576, at *2 (W.D. Tex. Oct. 18, 2019) (addressing untimely trial subpoena after plaintiff failed to seek identification of corporate representative during discovery); *FFRF*, 2017 WL 4582804, at *10-11 (addressing motion to quash deposition during discovery); *Williams*, 2016 WL 8904968, at *5 (addressing motion for leave to depose official).

Far from being dispositive (Motion to Quash at 3-4), the *Texas Entertainment* case lacked any extraordinary circumstances, with the plaintiff conceding they did not exist.  2019 WL 13080576, at *2.  Similarly, the magistrate judge in *F.D.I.C.* had made no effort to find extraordinary circumstances, which were not created by mere involvement in the regular course of agency decisionmaking.  58 F.3d at 1061-62; *see also Williams*, 2016 WL 8904968, at *5.  The extraordinary circumstances in this case justify the requested testimony under *Morgan*.

But General Paxton has not even established that the *Morgan* doctrine applies here.  The doctrine constitutes a "general bar against **probing mental processes**" and examining high-ranking officials' "**reasons** for taking official actions" when those processes and reasons are not relevant.  *See In re Office of Inspector Gen'l*, 933 F.2d 276, 278 (5th Cir. 1991) (emphasis added); *Kent Corp. v. N.L.R.B.*, 530 F.2d 612, 620-21 (5th Cir. 1976) (emphasis added).  But General Paxton is not being called to testify about the mental processes or reasons that led him to make the statements and threats he has made.  Instead, he is being called to testify about the

- 9 -

statements/threats themselves because, in his PI Response, he denies they mean what he said.

**B.     General Paxton has made his testimony as an individual relevant to the preliminary injunction issues.**

In pre-hearing discussions about evidence Plaintiffs will offer at the preliminary-injunction hearing, General Paxton has conclusorily asserted that the Twitter account he operates as Attorney General of Texas is a personal account and that his tweeted statements/threats are unauthenticated. *Cf.* Ex. A at Ex. A-5, p.7 (9/26 9:54 a.m. e-mail). Once again, General Paxton's litigation position has necessitated the subpoena directed to him individually. Either he can appear and testify on the issues he has made relevant by objecting to evidence of his own tweets, or he can withdraw the objections that made the individual subpoena necessary.

**C.     Plaintiffs did not delay in serving General Paxton with the hearing subpoenas.**

General Paxton's mischaracterization of Plaintiffs' subpoenas as served at the "eleventh hour" is both inaccurate and disingenuous. *See* Bullet List at 3-4, *supra*. The only delay and impropriety in connection with the subpoenas has been on General Paxton's part. There has been no delay and no impropriety on Plaintiffs' part. The timing of the subpoenas does not support quashing them under Rule 45 or the *Morgan* doctrine.

**CONCLUSION**

The Court should reconsider its ruling and deny General Paxton's motion to quash. Alternatively, under applicable principles of equity and the Court's authority over hearing subpoenas, he should be prohibited from contesting at the hearing the meaning of his statements, the evidence Plaintiffs offer about those statements, and that he has threatened enforcement of civil and criminal penalties for helping women procure out-of-state abortions. *See, e.g.*, *Healthpoint*, 273 F. Supp. 2d at 794-95 (equitable principles apply to preliminary injunctions).

Dated: September 27, 2022

Respectfully submitted,

*s/ Kirsten M. Castañeda*
Kirsten M. Castañeda
Texas Bar No. 00792401
kcastaneda@adjtlaw.com
8144 Walnut Hill Lane, Suite 1000
Dallas, TX 75231-4388
Telephone: 214/369-2358
Facsimile: 214/369-2359

**ALEXANDER DUBOSE & JEFFERSON LLP**

**Jennifer R. Ecklund**
Texas Bar No. 24045626
**Elizabeth G. Myers**
Texas Bar No. 24047767
**Allyn Jaqua Lowell**
Texas Bar No. 24064143
**John Atkins**
Texas Bar No. 24097326
**Elizabeth Rocha**
Texas Bar No. 24127242

**THOMPSON COBURN, LLP**
2100 Ross Avenue, Suite 3200
Dallas, TX 75201
(972) 629-7100
(972) 629-7171 (facsimile)
jecklund@thompsoncoburn.com
emyers@thompsoncoburn.com
alowell@thompsoncoburn.com
jatkins@thompsoncoburn.com
erocha@thompsoncoburn.com

Alexandra Wilson Albright
Texas Bar No. 21723500
aalbright@adjtlaw.com
Marcy Hogan Greer
Texas Bar No. 08417560
mgreer@adjtlaw.com

App.198

515 Congress Ave., Suite 2350
Austin, TX 78701-3562
Telephone: 512/482-9300
Facsimile: 512/482-9303

Kevin Dubose
Texas Bar No. 06150500
kdubose@adjtlaw.com
1844 Harvard Street
Houston, TX 77008
Telephone: 713/523-2358
Facsimile: 713/522-4553

**ALEXANDER DUBOSE &
JEFFERSON LLP**

***Counsel for Plaintiffs***


## CERTIFICATE OF SERVICE

I hereby certify that on this September 27, 2022, a copy of the foregoing, with attachments, was filed electronically with the Clerk of Court using the CM/ECF system, which provides service to all counsel of record for the parties.

*s/ Kirsten M. Castañeda*
Kirsten M. Castañeda

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazaleh Moayedi, DO, MPH, FACOG,** | |
| **Plaintiffs,** | **Civil Case No. 1:22-cv-859-RP** |
| **v.** | |
| **KEN PAXTON, in his Official Capacity as Attorney General; et al.,** | |
| **Defendants.** | |

## DECLARATION OF JOHN ATKINS

STATE OF TEXAS          §

TRAVIS COUNTY          §

1.      My name is John Atkins.  I am over the age of 18, and suffer from no legal or mental disabilities.  I have personal knowledge of, and full capacity to testify about, the facts stated in this Declaration, which is provided as Exhibit A to Plaintiffs' Response to Defendant Ken Paxton's Motion to Quash Subpoenas (ECF 44).

2.      I am Counsel at Thompson Coburn LLP.  I represent Plaintiffs in the above-captioned matter.  As part of my duties, I participated in the email correspondence attached to this declaration, and was cced on all emails.  I also participated in a phone call on Sunday, September 25, 2022, in which Elizabeth Myers (also counsel for Plaintiffs) and I conferred with opposing counsel Amy Hilton and Will Wassdorf, both of the Office of the Attorney General, regarding, among other things, our attempts to secure General Paxton's attendance and testimony at the preliminary injunction hearing set for September 27, 2022.

3.      Exhibits A-1 through A-5 are true and correct copies of various chains of emails (some of which include some overlap) detailing the communications between counsel regarding (1) our expectation based on this Court's September 12, 2022 Order that General Paxton was, like all parties *and* their counsel, attending the preliminary injunction hearing; (2) our attempts to further secure General Paxton's attendance through a Rule 45 Subpoena by serving him through his office or his counsel; (3) our desire to avoid having to attempt to personally serve him with the Rule 45 Subpoena; (4) our repeated communications that we would serve him personally if necessary, followed by communications indicating that we *were* in fact serving him personally, but would be happy to abort that service if General Paxton agreed to accept service; and (5) the filing of affidavits of service when they were received.

4.      I was copied on all of these emails and received them in the course of my representation of Plaintiffs in this matter.  The copies attached as Exhibits A-1 through A-5 are true and correct copies of the emails as-sent, except with several pages of irrelevant emails prior to the relevant emails omitted.

5.      I was also a participant in a telephone conversation on September 25, 2022 between counsel for Plaintiffs and counsel for General Paxton. Prior to that conversation, General Paxton's attorneys had never given an answer as to whether they would accept service of the Rule 45 Subpoena for him, nor clearly indicated that he would not be attending the hearing.

6.      During that call, counsel for General Paxton claimed that the original service of the Rule 45 Subpoena on Friday September, 23, 2022 was invalid because it was served on General Paxton in his individual capacity, but was served through his Office, and that this was improper. Plaintiffs' counsel disagreed, but asked if another subpoena specifically designating him in his official capacity would be accepted through service on counsel. General Paxton's counsel indicated that they believed that, in his official capacity, he could appear at the upcoming hearing through his attorneys alone, and declined to clearly indicate whether they would accept a revised subpoena.

7.    Elizabeth Myers then indicated that this meant General Paxton needed to be served personally, and Ms. Myers asked if General Paxton's counsel knew where General Paxton was so that he could be located and served. General Paxton's counsel indicated that they did not and likely would not be able to provide that information.  General Paxton's counsel then indicated that she would endeavor to provide an answer regarding whether General Paxton could be served through counsel by noon on September 25, 2022.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 26, 2022.**

_____

John P. Atkins

EXHIBIT A-1

## Myers, Elizabeth G.

| | |
|---|---|
| **From:** | Myers, Elizabeth G. |
| **Sent:** | Friday, September 23, 2022 12:20 PM |
| **To:** | Amy Hilton |
| **Cc:** | Will Wassdorf; Ecklund, Jennifer R.; Leslie.Dippel@traviscountytx.gov; Christopher Hilton; aalbright@adjtlaw.com; Lowell, Allyn J.; Hillier, Sadie; Atkins, John P.; Eric Magee; Leif Olson |
| **Subject:** | Re: FTC v. Paxton - conference on motion for leave to appear remotely at PI hearing |

Hi, Amy.  Of course.  I'm tied up in a meeting until about 1 but will ask someone in our team to send it over to you.

Sent from my iPhone

> On Sep 23, 2022, at 11:13 AM, Amy Hilton <Amy.Hilton@oag.texas.gov> wrote:

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

Hi Elizabeth,

Could you please send me a copy of the subpoena so I can see if we are authorized to accept it?

Thanks,
Amy

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Friday, September 23, 2022 9:03 AM
**To:** Amy Hilton <Amy.Hilton@oag.texas.gov>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>
**Cc:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Leslie.Dippel@traviscountytx.gov; Christopher Hilton <Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Eric Magee <e.magee@allison-bass.com>; Leif Olson <Leif.Olson@oag.texas.gov>
**Subject:** RE: FTC v. Paxton - conference on motion for leave to appear remotely at PI hearing
**Importance:** High

Hi, Amy –

Conferring at 9 am Sunday works for us.  With respect to General Paxton, I can't tell from your response below whether he is actually going to be at the hearing in person.  We read Judge Pitman's order to require all parties to attend, but in an abundance of caution, we're going to issue a subpoena for General Paxton.  I assume you'd like for us to serve that through you, but will you please confirm by noon today that you will accept service.  Otherwise, we'll start the personal service process.  I'd really prefer not to have to do that, of course.

1

App.205

Thanks for the quick response and the courtesy on the page limits.  We'll get that motion for leave filed later today.

And 2 pm Saturday to confer works well for us.  Could we do the exchange of witness and exhibits lists at 9 am on Saturday instead?  Our entire team is on the road tomorrow traveling back from our annual firm meeting so a deadline tomorrow is very difficult.

Finally, you'll see this on our witness list as well, of course, but we intend to call General Paxton on Tuesday.  Given Judge Pitman's order that all parties appear for the hearing on Tuesday, I'm assuming I don't need to send you a subpoena, but could you please confirm that General Paxton will be at the hearing in person?  I can confirm for you that all of our clients other than Dr. Moayedi and Anna Rupani will appear in person on Tuesday as well.  Dr. Moayedi and Ms. Rupani will be available remotely, pursuant to Judge Pitman's order on our motion for leave to allow them to appear virtually.

Thanks,

Elizabeth


**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Amy Hilton <Amy.Hilton@oag.texas.gov>
**Sent:** Thursday, September 22, 2022 1:05 PM
**To:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>
**Cc:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Leslie.Dippel@traviscountytx.gov; Christopher Hilton <Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Eric Magee <e.magee@allison-bass.com>
**Subject:** RE: FTC v. Paxton - conference on motion for leave to appear remotely at PI hearing


**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**


Hi Elizabeth,

The Attorney General is unopposed to Plaintiffs' page extension.

As far as exhibit and witness lists, how about the Parties agree to exchange exhibit and witness lists by 8pm tomorrow in advance of a call at 2pm on Saturday to confer?

Best,
Amy

EXHIBIT A-2

**Myers, Elizabeth G.**

| | |
|---|---|
| **From:** | Myers, Elizabeth G. |
| **Sent:** | Friday, September 23, 2022 3:19 PM |
| **To:** | 'Myers, Elizabeth G.'; Amy Hilton; Will Wassdorf; Christopher Hilton; Ecklund, Jennifer R.; Alexandra Albright; Atkins, John P.; Kirsten Castaneda |
| **Subject:** | RE: Subpoena |
| | |
| **Importance:** | High |

Hi, Amy –

Since we haven't heard back and it is past 3 pm, we are starting the process of personal service of the subpoena. Please let General Paxton know that we now need to serve him personally and that we are happy to arrange a meeting with the process server if he'd prefer to do that.

Thanks,

Elizabeth

**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Friday, September 23, 2022 1:00 PM
**To:** Amy Hilton <Amy.Hilton@oag.texas.gov>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Christopher Hilton <christopher.hilton@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Alexandra Albright <aalbright@adjtlaw.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** Subpoena

Amy -

I'm not back in front of my computer so I can't confirm that I've copied your full team on this but wanted to get this to you asap. This is the version of the subpoena that we would serve through you. And we'd tender the required witness fee through you as well or in whatever other process you'd like. I haven't included a copy of the money itself, but we'll tender, of course, to comply with the rules. If we need to serve General Paxton personally, the process server will tender the fee directly to him instead and the reference to service to you would be taken out of the subpoena.

I'm also happy to chat by phone when I free up this afternoon of that would be helpful.

Can you please let me know whether you will accept service by 3 pm central so we know whether we need to proceed with personal service this afternoon and weekend?

I'm also adding in two members of our appellate team at ADJ.

1

Thanks,

Elizabeth


Sent from my iPhone

EXHIBIT A-3

## Myers, Elizabeth G.

| | |
|---|---|
| **From:** | Myers, Elizabeth G. |
| **Sent:** | Friday, September 23, 2022 4:35 PM |
| **To:** | 'Myers, Elizabeth G.'; Amy Hilton; Will Wassdorf; Christopher Hilton; Ecklund, Jennifer R.; Alexandra Albright; Atkins, John P.; Kirsten Castaneda |
| **Subject:** | RE: Subpoena - Courtesy copy of as-served subpoena |

Hi, Amy –

Our process server has informed us that General Paxton was served at his office this afternoon, through the designated process established for service there. We'll file the affidavit of service as soon as we have it, but I wanted to send you a courtesy copy of the as-served subpoena as well.

I'm about to be on a plane for several hours, but will be back online tonight if we need to discuss anything. And we'll be prepared to exchange witness and exhibits lists at 9 am tomorrow.

Best,

Elizabeth

**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Friday, September 23, 2022 1:00 PM
**To:** Amy Hilton <Amy.Hilton@oag.texas.gov>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Christopher Hilton <christopher.hilton@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Alexandra Albright <aalbright@adjtlaw.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** Subpoena

Amy -

I'm not back in front of my computer so I can't confirm that I've copied your full team on this but wanted to get this to you asap. This is the version of the subpoena that we would serve through you. And we'd tender the required witness fee through you as well or in whatever other process you'd like. I haven't included a copy of the money itself, but we'll tender, of course, to comply with the rules. If we need to serve General Paxton personally, the process server will tender the fee directly to him instead and the reference to service to you would be taken out of the subpoena.

I'm also happy to chat by phone when I free up this afternoon of that would be helpful.

Can you please let me know whether you will accept service by 3 pm central so we know whether we need to proceed with personal service this afternoon and weekend?

App.211

I'm also adding in two members of our appellate team at ADJ.

Thanks,

Elizabeth


Sent from my iPhone

EXHIBIT A-4

## Myers, Elizabeth G.

| | |
|---|---|
| **From:** | Myers, Elizabeth G. |
| **Sent:** | Sunday, September 25, 2022 6:50 PM |
| **To:** | 'Amy Hilton' |
| **Cc:** | Will Wassdorf; Ecklund, Jennifer R.; Christopher Hilton; aalbright@adjtlaw.com; Lowell, Allyn J.; Hillier, Sadie; Atkins, John P.; Leif Olson; Kirsten Castaneda |
| **Subject:** | RE: FTC v. Paxton -- follow up on inquiry regarding service of subpoena (please read and respond at your earliest convenience) |

Thanks, Amy. Please let me know asap if you are authorized to accept service so I can adjust our process server instructions.

With respect to the documents referenced in my declaration, I understand that you are not asserting any authenticity objections, but could you clarify whether you have any other objections to those documents? I don't have the list in front of me right now, but I believe we discussed some additional objections to those documents and I just want to be clear whether we've resolved those other issues. I'm also happy to confer again by phone tonight or tomorrow morning if it's easier to just walk back through the exhibit list again.

**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Amy Hilton <Amy.Hilton@oag.texas.gov>
**Sent:** Sunday, September 25, 2022 6:10 PM
**To:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Christopher Hilton <Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- follow up on inquiry regarding service of subpoena (please read and respond at your earliest convenience)

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

Hi Elizabeth,

Thanks for the call this morning & thanks for your follow-up. I don't have an answer yet on my authority to accept the revised subpoena. In the meantime, I've attached revised exhibits that are hopefully more readable. For DEX 27 and DEX 30, we've tried our best but the nature of Instagram makes it difficult to capture the posts. Following up on some of our objections to Plaintiffs' exhibits: we will withdraw our objections to the declarations of any witness who Plaintiffs agree

App.214

not to call. We maintain our objections to your declaration (PEX 24), but since we're not challenging the authenticity of the exhibits cited therein, that should resolve the issue entirely.

Hope y'all arrived safely,

Amy

---

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Sunday, September 25, 2022 5:17 PM
**To:** Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Christopher Hilton <Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** FTC v. Paxton -- follow up on inquiry regarding service of subpoena (please read and respond at your earliest convenience)

Amy -

Just following up on whether you can accept service of a subpoena that is directed specifically to General Paxton in his official capacity?  As I said on the phone this morning, I don't believe the prior subpoena we served on Friday was defective or that service was insufficient.  But in order to resolve any and all doubts, I have another subpoena that specifically identifies General Paxton in his official capacity as the recipient.  Since you represent him in that capacity in this lawsuit, can you accept service via email?  Or do I need to go through the formal process of service at the OAG's office again?

Could you please let me know asap on this?  I know you were trying to get an answer by noon today.

Thanks,

Elizabeth

Sent from my iPhone

> On Sep 25, 2022, at 11:58 AM, Myers, Elizabeth G. <EMYERS@thompsoncoburn.com> wrote:
>
> Amy and Will –
>
> Thanks for the productive call this morning.  I'm writing to confirm that we have no objections to the documents identified on your Exhibit List (Defendants' Exhibits 1- 56).  As we discussed, there are a few that appear to have some issues caused by the pdf or screen shot processes, so could we get better copies of Exhibits 4, 6, 8, 12, 27, and 30?  Some of those seem to not be complete copies or have the top or bottom cutoff.
>
> We're also ready to serve another subpoena specifically directed at General Paxton in his official capacity.  Could you please let me know whether you are authorized to accept service?  If not, we'll get it served through the process as the OAG tomorrow morning, but I'd like to avoid that if we could.
>
> Finally, Jenny and I will be on the road to Austin for the next few hours, but we're happy to confer again later today to see if we can reach any further agreements about Plaintiffs' Exhibits.

2

App.215

EXHIBIT A-5

## Myers, Elizabeth G.

| | |
|---|---|
| **From:** | Ecklund, Jennifer R. |
| **Sent:** | Monday, September 26, 2022 8:53 PM |
| **To:** | Christopher Hilton; Myers, Elizabeth G.; Amy Hilton |
| **Cc:** | Will Wassdorf; aalbright@adjtlaw.com; Lowell, Allyn J.; Hillier, Sadie; Atkins, John P.; Leif Olson; Kirsten Castaneda |
| **Subject:** | RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning |

Chris—

We did in fact advise that we would be attempting personal service if you all couldn't accept service, after Amy advised that your office believed service on Friday was insufficient. We even asked if you could tell us where to serve him. We repeatedly tried to *avoid* having to serve your client personally, which I agree would have been preferable. Your staff and client necessitated this, and we even advised that he was evading service before it was ultimately completed, to avoid a result embarrassing to you and your client.

Also, you complained in your Motion to Quash that we had not effectively served your client, requiring us to submit proof of service to the Court.

I am not sure why you believe we have endangered your client when the information was publicly available simply by googling. Nonetheless, we will file a redacted version of the proof of service and contact the clerk's office when they open to withdraw the original filing, which is the only available option to us to address your concerns.

I realize it is late in the day, but I would appreciate if you would cease the accusatory tone—we made repeated efforts on multiple days to avoid any of these issues, and were rebuffed each time. We will proceed as indicated in order to alleviate your concerns.

Jenny

**Jenny Ecklund**
jecklund@thompsoncoburn.com
P: 972 629 7112
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>
**Sent:** Monday, September 26, 2022 8:42 PM
**To:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** Re: FTC v. Paxton -- General Paxton is refusing and evading service this morning

App.217

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

You never advised us that you would be attempting personal service on the attorney general at his home, and you've now endangered his and his family's personal safety. I had thought you were simply careless but it seems you did so deliberately. I would think common sense is all that's needed, not a local rule.

We'll mark you as opposed to our filing, unless I am misunderstanding your position.

Get Outlook for iOS

**From:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>
**Sent:** Monday, September 26, 2022 8:33 PM
**To:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>; Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; aalbright@adjtlaw.com <aalbright@adjtlaw.com>; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning

Chris—

We are certainly willing to file a redacted version, my reading of the rules suggests we had no basis (or obligation) to seal anything.  I've not found any local or filing rule at issue that was violated after checking again.  Since you refused to accept service, as did your client, we had no choice but to file the affidavit of service in order to establish the efforts made and service effected.

I am happy to see if the process server can be available by zoom tomorrow, but obviously we haven't changed our position on the motion to quash since you all have objected to all of the exhibits and statements by your client coming in (and he has been ordered to appear).

Jenny


**Jenny Ecklund**
jecklund@thompsoncoburn.com
P: 972 629 7112
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>
**Sent:** Monday, September 26, 2022 8:19 PM
**To:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** Re: FTC v. Paxton -- General Paxton is refusing and evading service this morning

App.218

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

You should have done that in the first place. And it's too late to get the filing stricken tonight because the court is closed. We have no choice but to move to seal this filing until you correct this mistake.

Will you have your process server available to testify if we determine that is necessary?

And can we just agree to forego this whole issue in light of the issues we raised in our motion to quash?

Get Outlook for iOS

---

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Monday, September 26, 2022 7:57 PM
**To:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; aalbright@adjtlaw.com <aalbright@adjtlaw.com>; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning

Chris –

We're happy to redact out the address and refile, assuming you don't oppose that.  We also don't oppose a motion by you to redact that specific information but we do oppose a motion to place the entire filing under seal because there is no basis to seal the entire thing.

Elizabeth

**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>
**Sent:** Monday, September 26, 2022 7:53 PM
**To:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** Re: FTC v. Paxton -- General Paxton is refusing and evading service this morning

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

App.219

As soon as possible, we will be filing a motion to seal your filings that contain the Attorney General's personal address. I hope that this was an unfortunate oversight on your part and that you are unopposed. Please confirm.

Get Outlook for iOS

**From:** Christopher Hilton
**Sent:** Monday, September 26, 2022 12:38:51 PM
**To:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; aalbright@adjtlaw.com <aalbright@adjtlaw.com>; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning

We do not agree to a preliminary injunction. I look forward to reviewing the evidence of your purported service.

---

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Monday, September 26, 2022 12:37 PM
**To:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning

One more update on service.  We received confirmation from our process server that both the personal subpoena and the official capacity subpoena, along with two sets of the required witness fees, were served on General Paxton in Collin County this morning, despite his multiple attempts to evade service.  We'll file the affidavits of service as soon as we receive them.

Also, to the extent your client is interested in entering into an agreed preliminary injunction to avoid the necessity of tomorrow's hearing, we are open to that resolution as well.  I realized that we did not discuss that possibility in my prior conversations with Will and Amy and I didn't want to not explore that option if it is viable.

Thanks,

Elizabeth


**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

4

App.220

**From:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>
**Sent:** Monday, September 26, 2022 12:29 PM
**To:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>;
Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J.
<ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P.
<JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda
<kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning

<div style="background:yellow">**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**</div>

We will be complying with Judge Pitman's order. We are not modifying the position you have quoted and we disagree
with your characterization of it. And we are not withdrawing any objections to exhibits.

Thanks,
Chris

*Christopher D. Hilton*
Chief, General Litigation Division
Office of the Attorney General of Texas
(512) 475-4120

**From:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>
**Sent:** Monday, September 26, 2022 11:59 AM
**To:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>; Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>;
Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J.
<ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P.
<JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda
<kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning

Thanks, Chris.

I appreciate you articulating your views—this is why we inquired last week, to avoid any last-minute motion
practice.  But certainly we oppose any attempt by your office to avoid Judge Pitman's order that all parties and counsel
appear in-person tomorrow, especially since it was made two weeks ago and all other parties have made efforts to
comply.

However, based on your email, do I understand that the AG is modifying its position below?  If that is the case, will you
be filing an amended response?  Because your response specifically puts jurisdictional facts into dispute:

App.221

Plaintiffs' contention that they face an imminent threat of enforcement for helping women procure out-of-state abortions is not based on any statement or action taken by the Attorney General, and their manufactured threats of injury are insufficient to confer them with Article III standing. Moreover, Plaintiffs' claims are barred by sovereign immunity, and Plaintiffs are unlikely to succeed on the merits of their claims. For these reasons alone, Plaintiffs' claims must be dismissed and the Court should deny their Motion for Preliminary Injunction.

Also, please confirm (given your representation that no material facts are in dispute) that your office is withdrawing/foregoing any objections to the exhibits showing statements by Mr. Paxton.

Thanks very much, look forward to seeing you tomorrow.

Jenny

**Jenny Ecklund**
jecklund@thompsoncoburn.com
P: 972 629 7112
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>
**Sent:** Monday, September 26, 2022 11:32 AM
**To:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>;
aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie
<SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson
<Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

Elizabeth,

Your position is meritless. The Attorney General is not obligated to appear personally at any hearing where he is sued in his official capacity, much less to testify. And you cannot establish that his testimony is necessary or appropriate at the hearing tomorrow, even if you were to serve him. There is not a single disputed fact in this matter which requires his testimony.

Unless you are willing to reconsider, we'll simply take it up with the Court. If we file any motions related to these issues, we'll mark you as opposed.

Thanks,

App.222

Chris

**Christopher D. Hilton**
Chief, General Litigation Division
Office of the Attorney General of Texas
(512) 475-4120

---

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Monday, September 26, 2022 9:54 AM
**To:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>;
aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie
<SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson
<Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning
**Importance:** High

Chris –

To be clear there is one subpoena directed to General Paxton in his official capacity, which is the capacity in which he is
named in this case. And another subpoena directed to him in his personal capacity given the position Amy and Will
conveyed to us yesterday. We are attempting to serve both on him personally now and he is actively evading service. If
you want to challenge the subpoenas, that's fine, but General Paxton can't just refuse to be served.

In addition to our subpoenas, General Paxton in his official capacity is also the party and has been ordered to appear by
Judge Pitman. Our position is that General Paxton was already obligated to attend the hearing. We have been serving
the subpoenas in an abundance of caution to ensure that General Paxton would be present.

Finally, we have made clear our intention to call General Paxton in his official capacity because he is the policymaker for
the Office.

If you think it would be meaningful to confer further, I'll give you a call. Otherwise, we'll file the affidavits of service and
attempted services and you can raise the issues with Judge Pitman tomorrow.

Best,

Elizabeth

**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

---

**From:** Christopher Hilton <Christopher.Hilton@oag.texas.gov>
**Sent:** Monday, September 26, 2022 9:45 AM
**To:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>;
aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie
<SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson

App.223

<Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** RE: FTC v. Paxton -- General Paxton is refusing and evading service this morning

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

Elizabeth,

As you know, none of us represent Ken Paxton in his individual capacity with respect to this matter, and we are not authorized to accept a subpoena on his behalf.

I would be happy to discuss this matter and any ways that we could seek an amicable resolution of these issues. But under no circumstances will we agree to have the sitting Attorney General testify in court.

If you are interested in a discussion, feel free to call me. Otherwise we can just litigate these issues.

Thanks,
Chris

*Christopher D. Hilton*
Chief, General Litigation Division
Office of the Attorney General of Texas
(512) 475-4120

---

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Monday, September 26, 2022 9:13 AM
**To:** Amy Hilton <Amy.Hilton@oag.texas.gov>
**Cc:** Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Christopher Hilton <Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Leif Olson <Leif.Olson@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>
**Subject:** FTC v. Paxton -- General Paxton is refusing and evading service this morning
**Importance:** High

Hi, Amy –

Our process server has located General Paxton at his wife's residence and has attempted to serve him there, but he is refusing to come to the door. I have instructed the process server to remain and continue to attempt service, but at this point General Paxton is actively refusing or evading service. I wanted to let you know of this development and that we'll need to report that to the Court.

We remain happy to serve General Paxton through you, as counsel, of course. I'm also happy to discuss this development by phone as well. Please just let me know a good time to call you.

Thanks,

Elizabeth

**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111

App.224

F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

App.225

Exhibit B



# KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

## ADVISORY ON TEXAS LAW UPON REVERSAL OF *ROE V. WADE*

For nearly half a century, Americans have lived under a legally incorrect and morally bankrupt court decision that created, out of thin air, a constitutional "right" to abortion. *Roe v. Wade* was an act of raw, partisan political will of unelected judges, and it had no basis in the text of the U.S. Constitution then or now. Today we celebrate *Roe*'s reversal, mindful that nothing can bring back the millions of lives lost since the Supreme Court federalized abortion policy and prohibited States from fully protecting their most vulnerable citizens. Thankfully, the current Court has finally acted to overturn this egregious act of unconstitutional judicial activism.

Texans want to know what to expect now that *Roe* is overturned. The answer is that without further action by the Texas Legislature, abortion will soon be clearly illegal in Texas. In 2021, the Texas Legislature passed the Human Life Protection Act of 2021 ("the Act"), which prohibits abortions in most circumstances and takes effect on the 30th day after "issuance of a United States Supreme Court judgment in a decision overruling, wholly or partly, *Roe v. Wade*, 410 U.S. 113 (1973), as modified by *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), thereby allowing the states of the United States to prohibit abortion."[1]

Today, the Court issued its *opinion* reversing *Roe*, but it has yet to issue its *judgment*. A judgment is a legal document distinct from the Court's opinion. The Court will issue its judgment only after the window for the litigants to file a motion for rehearing has closed. A judgment can issue in about a month, or longer if the Court considers a motion for rehearing. So while it is clear that the Act *will* take effect, we cannot calculate exactly *when* until the Court issues its judgment. My office will publicly announce an effective date for the Act as soon as possible—and we look forward to doing so.

Upon taking effect, the Act provides that a person "may not knowingly perform, induce, or attempt an abortion" except under limited circumstances, such as a life-threatening condition to the mother caused by the pregnancy.[2] A person who violates the Act commits a first-degree felony if an unborn child dies as a result[3] and incurs

---

[1] H.B. 1280, 87th Reg. Session (2021).
[2] Tex. Health & Safety Code § 170A.002(a), (b).
[3] *Id.* § 170A.004.

Plaintiffs'
Exhibit

3

civil penalties of not less than $100,000 for each violation.[4] My office is specifically authorized to pursue and recover those civil penalties, and I will strictly enforce this law. Further, we will assist any local prosecutor who pursues criminal charges.[5] Additionally, state licensing authorities are required to revoke any applicable license or permit of a health care professional who performs or attempts to perform an abortion in violation of the Act.[6]

What's more, some prosecutors may choose to immediately pursue criminal prosecutions based on violations of Texas abortion prohibitions predating *Roe* that were never repealed by the Texas Legislature.[7] Although these statutes were unenforceable while *Roe* was on the books, they are still Texas law. Under these pre-*Roe* statutes, abortion providers could be criminally liable for providing abortions starting today.

Texas law in a post-*Roe* world has already been written. Now that the Supreme Court has finally overturned *Roe*, I will do everything in my power to protect the unborn and uphold the state laws duly enacted by the Texas Legislature.

**KEN PAXTON**
Attorney General of Texas

---

[4] *Id.* § 170A.005. A pregnant woman, however, cannot be held criminally or civilly liable under the Act. *Id.* § 170A.003.

[5] Tex. Gov't Code § 402.028.

[6] Tex. Health & Safety Code § 170A.007.

[7] *See* Tex. Rev. Civ. Stats. Ann. Art. 4512.1 ("Abortion"), previously codified at Tex. Pen. Code art. 1191 (1925) ("If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine, or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled. By 'abortion' is meant that the life of the fetus or embryo shall be destroyed in the woman's womb or that a premature birth thereof be caused."); Tex. Rev. Civ. Stats. Ann. Art. 4512.2. ("Furnishing the means"), previously codified at Tex. Pen. Code art. 1192 (1925) ("Whoever furnishes the means for procuring an abortion knowing the purpose intended is guilty as an accomplice."); Tex. Rev. Civ. Stats. Ann. Art. 4512.3 ("Attempt at abortion"), previously codified at Tex. Pen. Code art. 1193 (1925) ("If the means used shall fail to produce an abortion, the offender is nevertheless guilty of an attempt to produce abortion, provided it be shown that such means were calculated to produce that result, and shall be fined not less than one hundred nor more than one thousand dollars."); Tex. Rev. Civ. Stats. Ann. Art. 4512.4 ("Murder in producing abortion"), previously codified at Tex. Pen. Code art. 1194 (1925) ("If the death of the mother is occasioned by an abortion so produced or by an attempt to effect the same it is murder."); Tex. Rev. Civ. Stats. Ann. Art. 4512.6 ("By medical advice"), previously codified at Tex. Pen. Code art. 1196 (1925) ("Nothing in this chapter applies to an abortion procured or attempted by medical advice for the purpose of saving the life of the mother.").





# KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

## UPDATED ADVISORY ON TEXAS LAW UPON REVERSAL OF *ROE V. WADE*

Yesterday—July 26, 2022—the United States Supreme Court issued its final judgment in *Dobbs v. Jackson Women's Health Organization*. As previously stated in our June 24th Advisory, Texas's Human Life Protection Act ("the Act") takes effect on the 30th day after issuance of a judgment in a case overturning *Roe v. Wade*. *See* H.B. 1280, 87th Reg. Session 2021. Accordingly, we now know with certainty that the Act takes effect on August 25, 2022.

The Act provides that a "person may not knowingly perform, induce, or attempt an abortion" unless the mother has "a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that places [her] at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed or induced." Tex. Health & Safety Code § 170A.002(a)–(b).

"Abortion" is defined in section 245.002(1) of the Health and Safety Code as "the act of using or prescribing an instrument, a drug, a medicine, or any other substance, device, or means with the intent to cause the death of an unborn child of a woman known to be pregnant. The term does not include birth control devices or oral contraceptives." The term "abortion" in Texas law does not apply when these acts are done to "(A) save the life or preserve the health of an unborn child; (B) remove a dead, unborn child whose death was caused by spontaneous abortion; or (C) remove an ectopic pregnancy." Tex. Health & Safety Code § 245.002(1)(A)–(C).

A person who violates the Act commits a first-degree felony if an unborn child dies as a result, a second-degree felony if the child lives, incurs civil penalties of no less than $100,000 for each violation, and may lose his or her professional license. *Id.* § 170A.004–.007. The pregnant woman upon whom the abortion is performed cannot be penalized, *id.* § 170A.003, and the law protects women facing life-threatening physical conditions resulting from pregnancy complications, *id.* § 170A.002(b)(2).

Plaintiffs'
Exhibit

27

My office is specifically authorized to pursue and recover civil penalties for violations of the Act, *id.* § 170A.005, and I will do my duty to enforce this law. Further, we stand ready to assist any local prosecutor who pursues criminal charges. Tex. Gov't Code § 402.028. Additionally, state licensing authorities "shall revoke the license, permit, registration, certificate, or other authority of a physician or other health care professional who performs, induces, or attempts an abortion in violation of" the Act. Tex. Health & Safety Code § 170A.007.

At the same time, local prosecutors may choose to immediately pursue criminal prosecutions based on violations of Texas abortion prohibitions predating *Roe* that were never repealed by the Texas Legislature.[1] Although these statutes were unenforceable while *Roe* was on the books, they are still Texas law. Now that *Roe* has been overturned, those statutes are in full effect.[2]

Texas law in a post-*Roe* world has already been written. Now that the Supreme Court has finally overturned *Roe*, I will do everything in my power to protect mothers, families, and unborn children, and to uphold the state laws duly enacted by the Texas Legislature.

KEN PAXTON
Attorney General of Texas

---

[1] *See* Tex. Rev. Civ. Stat. art. 4512.1 ("Abortion"), previously codified at Tex. Pen. Code art. 1191 (1925) ("If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine, or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled. By 'abortion' is meant that the life of the fetus or embryo shall be destroyed in the woman's womb or that a premature birth thereof be caused."); Tex. Rev. Civ. Stat. art. 4512.2. ("Furnishing the means"), previously codified at Tex. Pen. Code art. 1192 (1925) ("Whoever furnishes the means for procuring an abortion knowing the purpose intended is guilty as an accomplice."); Tex. Rev. Civ. Stat. art. 4512.3 ("Attempt at abortion"), previously codified at Tex. Pen. Code art. 1193 (1925) ("If the means used shall fail to produce an abortion, the offender is nevertheless guilty of an attempt to produce abortion, provided it be shown that such means were calculated to produce that result, and shall be fined not less than one hundred nor more than one thousand dollars."); Tex. Rev. Civ. Stat. art. 4512.4 ("Murder in producing abortion"), previously codified at Tex. Pen. Code art. 1194 (1925) ("If the death of the mother is occasioned by an abortion so produced or by an attempt to effect the same it is murder."); Tex. Rev. Civ. Stat. art. 4512.6 ("By medical advice"), previously codified at Tex. Pen. Code art. 1196 (1925) ("Nothing in this chapter applies to an abortion procured or attempted by medical advice for the purpose of saving the life of the mother.").
[2] With one exception: Only the Dallas County District Attorney is currently enjoined from enforcing these statutes.

App.229

Exhibit D



(/)

Español (/es/news/releases/paxton-asegura-
victoria-contra-la-administracion-biden-
impide-que-hhs-obligue-los-proveedores-de)

About (/about-office)   News (/news)

Opinions (/attorney-general-opinions)

Careers (/join-our-team)

Contact Us (/contact-us)



Menu

HOME (/)   >   NEWS (/NEWS)   >   NEWS RELEASES (/NEWS/RELEASES)   >   
PAXTON SECURES VICTORY AGAINST BIDEN ADMINISTRATION, BLOCKS HHS FROM FORCING
HEALTHCARE PROVIDERS TO PERFORM ABORTIONS IN TEXAS

**August 24, 2022 | Press Release | Protect Life/Unborn (/news/categories/protect-
lifeunborn)**

# Paxton Secures Victory Against Biden Administration, Blocks HHS from Forcing Healthcare Providers to Perform Abortions in Texas

**SHARE THIS:**

2

Plaintiffs'
Exhibit

28

App.230

Attorney General Paxton released the following statement after a federal judge sided with the Texas Attorney General and issued an injunction to stop the Biden Administration from using the Emergency Medical Treatment and Active Labor Act (EMTALA) to force Texas hospitals and doctors to perform abortions:

"The court's decision to side with Texas is a crucial step in preventing Joe Biden and his radical pro-abortion Administration from breaking the law and threatening our entire healthcare industry by withholding federal funds. We're not going to allow left-wing bureaucrats in Washington to transform our hospitals and emergency rooms into walk-in abortion clinics, and the decision last night proves what we knew all along: the law is on our side. No matter how many backdoors Joe Biden attempts to go through to illegally force abortions in Texas, I will fight back to defend our pro-life laws and Texas mothers and children."

The judge's decision's comes after Paxton filed the initial lawsuit (https://www.texasattorneygeneral.gov/news/releases/paxton-sues-biden-admin-over-its-efforts-force-abortions-texas) against the U.S. Department of Health and Humans Services in mid-July and moved for an injunction (https://www.texasattorneygeneral.gov/news/releases/ag-paxton-files-injunction-stop-biden-administration-forcing-healthcare-providers-use-state-funding) in early August.

"The Court concludes that the Guidance extends beyond EMTALA's authorizing text in three ways: it discards the requirement to consider the welfare of unborn children when determining how to stabilize a pregnant woman; it claims to preempt state laws notwithstanding explicit provisions to the contrary; and it impermissibly interferes with the practice of medicine in violation of the Medicare Act," the court stated in its decision.

To read the full court decision, click here. (https://texasattorneygeneral.gov/sites/default/files/images/executive-management/Order%20granting%20PI%20in%20EMTALA%20case.pdf)

App.231

*Receive email updates from the OAG Press Office:*  | Your | **Submit**

## Related News

### AG Paxton Files for Injunction to Stop Biden Administration from Forcing Healthcare Providers to Use State Funding for Abortions (/news/releases/ag-paxton-files-injunction-stop-biden-administration-forcing-healthcare-providers-use-state-funding)

Yesterday Attorney General Paxton filed a motion to enjoin the Biden Administration from using a provision of the Emergency Medical Treatment and Active Labor Act (EMTALA) to require Texas hospitals and doctors to perform abortions as a condition of receiving Medicare and Medicaid funding.

**August 04, 2022 | Press Release**

### AG Paxton Publishes New Guidance Upon Issuance of SCOTUS's Dobbs Judgment (/news/releases/ag-paxton-publishes-new-guidance-upon-issuance-scotuss-dobbs-judgment)

Today Attorney General Paxton released a guidance letter following the U.S. Supreme Court's issuance of a judgment in the Dobbs decision overturning Roe v Wade.

**July 27, 2022 | Press Release**

### AG Paxton Sends Letter to Google Urging Fair Access to Crisis Pregnancy Centers (/news/releases/ag-paxton-sends-letter-google-urging-fair-access-crisis-pregnancy-centers)

Attorney General Paxton sent a Virginia-led multistate letter to the CEO of Alphabet Inc.—the multinational Big Tech conglomerate of which Google is a part—urging the company not

App.232

to discriminate against crisis pregnancy centers in search results and online advertising.

**July 26, 2022 | Press Release**

See all News (/news)

Back to Top

Child Support (/child-support)

Crime Victims (/crime-victims)

Consumer Protection (/consumer-protection)

Open Government (/open-government)

All Divisions (/node/976)

Opinions (/attorney-general-opinions)

Initiatives (/initiatives)

Human Resources (/join-our-team)

Where the Money Goes (https://comptroller.texas.gov/tran

ADA Compliance (/ada-compliance)

Compact With Texans (/about-office/compact-texans)

Cost Efficiency Saving Ideas (/about-office/cost-efficiency-saving-ideas)

Reporting Fraud (/about-office/reporting-fraud-state-government)

State Agency Charters (https://oagtx.force

TRAILS Search (https://www.tsl.sta

Texas Homeland Security (https://gov.texas.g

Texas Veterans Portal (https://veterans.po

Texas.gov (http://www.texas.g

Accessibility & Site Policies (/site-policies)

🐦 (https://twitter.com/TXAG)

f (https://www.facebook.com/TexasAttorneyGeneral)

(/)

PO Box 12548
Austin, TX 78711-2548

Exhibit E



Español (/es/news/releases/paxton-celebra-el-fin-de-roe-v-wade-anuncia-que-el-aborto-ahora-es-ilegal-en-texas)

About (/about-office)   News (/news)

Opinions (/attorney-general-opinions)

Careers (/join-our-team)

Contact Us (/contact-us)



Menu

HOME (/)   >   NEWS (/NEWS)   >   NEWS RELEASES (/NEWS/RELEASES)   >

AG PAXTON CELEBRATES END OF ROE V. WADE; ANNOUNCES ABORTION NOW ILLEGAL IN TEXAS

June 24, 2022 | Press Release | **Protect Life/Unborn (/news/categories/protect-lifeunborn)**

# AG Paxton Celebrates End of Roe v. Wade; Announces Abortion Now Illegal in Texas

**SHARE THIS:**                                    **78**

Today the United States Supreme Court overturned Roe v. Wade, 410 U.S. 113 (1973), and Planned Parenthood v. Casey, 505 U.S. 833 (1992), thus bringing an end to a half century of the unconstitutional and unconscionable national "right" to

Plaintiffs' Exhibit

34

Exhibit F

## F.   Texas Abortion Statutes

### 1.  Human Life Protection Act

36.     The Human Life Protection Act states that "[a] person may not knowingly perform, induce, or attempt an abortion." Act of May 25, 2021, 87th Leg., R.S., ch. 800, 2021 Tex. Sess. Law Serv. 1887 (H.B. 1280) (to be codified at Tex. Health & Safety Code Ch. 170A). That prohibition does not apply if the woman on whom the abortion is performed "has a life-threatening physical condition" arising from a pregnancy that places her "at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed." H.B. 1280 at § 2 (to be codified at Tex. Health & Safety Code § 170A.002(b)(2)). The potential criminal penalty for violating this law is anywhere from two years to life in prison and a civil penalty not less than $100,000. *Id.* (to be codified at Tex. Health & Safety Code §§170A.004–.005); Tex. Penal Code §§ 12.32–.33.

37.     The Human Life Protection Act is effective on the thirtieth-day after the issuance of a United States Supreme Court judgment in a decision overruling *Roe v. Wade*. H.B. 1280 at § 3(1). No further action by the Texas Legislature or any state official is required—it is certain that these provisions will become effective.

### 2.  Pre-*Roe* Criminal Statutes

38.     In addition to the Human Life Protection Act, Texas has several statues predating *Roe* that address the subject of abortion. *See* Tex. Rev. Civ. Stat. arts. 4512.1–.4, .6. (2010) (former Tex. Penal Code arts. 1191–1194, 1196 (1925)). Under those statutes, any person who causes an abortion is guilty of an offense and shall be confined in a penitentiary. *Id.* at 4512.1. Moreover, an individual may not act as an accomplice to abortion or an attempted abortion. *Id.* at 4512.2–.3.

Plaintiffs'
Exhibit
31

App.235

However, it is not on offense if the abortion is performed under "medical advice for the purpose of saving the life of the mother." *Id.* at 4512.6.

39.     These laws have never been repealed, and this criminal prohibition on abortion is currently the law in Texas. As the Texas Supreme Court has explained, "[w]hen a court declares a law unconstitutional, the law remains in place unless and until the body that enacted it repeals it, even though the government may no longer constitutionally enforce it." *Pidgeon v. Turner*, 538 S.W.3d 73, 88 n.21 (Tex. 2017). And the Legislature never repealed Articles 4512.1–.4 and .6. Instead, they were merely moved from the Texas Penal Code to the Texas Revised Civil Statutes. *See* Act of May 25, 1973, 63rd Leg., R.S., ch. 399, § 5(a), 1973 Tex. Gen. Laws 883, 995 ("provid[ing] for the transfer of articles of the Penal Code of Texas, 1925, which are not repealed by this Act to the civil statutes or other appropriate places within the framework of Texas statute law, without reenactment and without altering the meaning or effect of the unrepealed articles.").

### G.     The Effects of the Abortion Mandate in Texas

40.     Texas is injured because the Abortion Mandate purports to preempt its laws. This violates Texas's "sovereign interest in the power to create and enforce a legal code." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (quotation omitted). The sovereign right to enforce its criminal laws is the epitome of Texas's police power.

41.     Furthermore, the State of Texas operates hospitals that participate in Medicare. The EMTALA Guidance explicitly threatens the Medicare provider agreements for any healthcare providers that refuse to abide by the Abortion Mandate.[12] These hospitals are now threatened with

---

[12] Exh. 1 at 5 ("HHS OIG may also exclude physicians from participation in Medicare and State health care programs. CMS may also penalize a hospital by terminating its provider agreement.").

App.236

abortion. Attorney General Paxton also released an official advisory (https://www.texasattorneygeneral.gov/sites/default/files/images/executive-management/Post-Roe%20Advisory.pdf) setting forth Texas law in light of the Supreme Court's decision. Additionally, he announced the statewide closure of his agency's offices today in honor of the nearly 70 million unborn babies killed in the womb since 1973. June 24th will be an annual Office of the Attorney General holiday in recognition of this momentous decision—and the many lives lost before it.

"Roe v. Wade and its successor case Planned Parenthood v. Casey have absolutely no basis in the U.S. Constitution," said Attorney General Paxton. "Nevertheless, for half a century, Americans have had to live under these illegitimate, illegal, and unconstitutional dictates of a partisan, willful Supreme Court. No more. Today, the question of abortion returns to the states. And in Texas, that question has already been answered: abortion is illegal here. I look forward to defending the pro-life laws of Texas and the lives of all unborn children moving forward."

"Further," added Attorney General Paxton, "we cannot forget the extraordinary violence that Roe and Casey unleashed on our nation. Because of those decisions, almost 70 million babies have been killed in the womb. And so, today at noon, I am closing all my offices as a memorial to these babies. Our hearts and prayers go out to all of them. Never again should something like this happen in America."

---

*Receive email updates from the OAG Press Office:*   Your |   **Submit**

## Related News

### Paxton Secures Victory Against Biden Administration, Blocks HHS from Forcing Healthcare Providers to Perform Abortions in Texas (/news/releases/paxton-secures-victory-against-biden-administration-blocks-hhs-forcing-healthcare-providers-perform)

Attorney General Paxton released the following statement after a federal judge sided with the Texas Attorney General and issued an injunction to stop the Biden Administration from using the Emergency Medical Treatment and Active Labor Act (EMTALA) to force Texas hospitals and doctors to perform abortions:

**August 24, 2022 | Press Release**

### AG Paxton Files for Injunction to Stop Biden Administration from Forcing Healthcare Providers to Use State Funding for Abortions (/news/releases/ag-paxton-files-injunction-stop-biden-administration-forcing-healthcare-providers-use-state-funding)

Yesterday Attorney General Paxton filed a motion to enjoin the Biden Administration from using a provision of the Emergency Medical Treatment and Active Labor Act (EMTALA) to require Texas hospitals and doctors to perform abortions as a condition of receiving Medicare and Medicaid funding.

**August 04, 2022 | Press Release**

### AG Paxton Publishes New Guidance Upon Issuance of SCOTUS's Dobbs Judgment (/news/releases/ag-paxton-publishes-new-guidance-upon-issuance-scotuss-dobbs-judgment)

Today Attorney General Paxton released a guidance letter following the U.S. Supreme Court's issuance of a judgment in the Dobbs decision overturning Roe v Wade.

**July 27, 2022 | Press Release**

See all News (/news)

App.238

🐦 (https://twitter.com/TXAG)

f (https://www.facebook.com/TexasAttorneyGeneral)

(/)

PO Box 12548
Austin, TX 78711-2548

Child Support (/child-support)

Crime Victims (/crime-victims)

Consumer Protection (/consumer-protection)

Open Government (/open-government)

All Divisions (/node/976)

Opinions (/attorney-general-opinions)

Initiatives (/initiatives)

Human Resources (/join-our-team)

Where the Money Goes (https://comptroller.texas.gov/transparency)

ADA Compliance (/ada-compliance)

Compact With Texans (/about-office/compact-texans)

Cost Efficiency Saving Ideas (/about-office/cost-efficiency-saving-ideas)

Reporting Fraud (/about-office/reporting-fraud-state-government)

State Agency Charters (https://oagtx.force)

TRAILS Search (https://www.tsl.sta)

Texas Homeland Security (https://gov.texas.g)

Texas Veterans Portal (https://veterans.po)

Texas.gov (http://www.texas.g)

Accessibility & Site Policies (/site-policies)

Exhibit G



Español (/es/news/releases/procurador-
general-paxton-presenta-una-mocion-de-
emergencia-ante-la-corte-suprema-de-texas-
en-apoyo)



Menu

About (/about-office)    News (/news)

Opinions (/attorney-general-opinions)

Careers (/join-our-team)

Contact Us (/contact-us)

HOME (/)    >    NEWS (/NEWS)    >    NEWS RELEASES (/NEWS/RELEASES)    >
AG PAXTON FILES EMERGENCY MOTION WITH TEXAS SUPREME COURT IN SUPPORT OF PRE-ROE
STATUTES BARRING ABORTIONS

June 30, 2022 | Press Release | **Protect Life/Unborn (/news/categories/protect-
lifeunborn)**

# AG Paxton Files Emergency Motion with Texas Supreme Court in Support of Pre-Roe Statutes Barring Abortions

**SHARE THIS:**

**5**

Plaintiffs'
Exhibit

32

This week Attorney General Paxton asked the Supreme Court of Texas to vacate a temporary restraining order blocking enforcement Texas's pre-*Roe* criminal prohibitions on elective abortion. A Harris County district court previously issued the restraining order at the request of a group of abortion clinics that wish to immediately violate these criminal prohibitions by performing criminal abortions up until the Human Life Protection Act of 2021 takes effect a few weeks from now.

The Texas Legislature has never repealed the State's longstanding criminal laws that prohibit abortion, unless necessary to save the life of the mother. The United States Supreme Court's erroneous decision in *Roe v. Wade* prevented Texas from enforcing these laws for many decades. But lack of enforcement does not remove the provisions from Texas law. Now that the Supreme Court has overruled *Roe v. Wade* in *Dobbs v. Jackson Women's Health*, Texas law against abortion can be enforced. Because the plaintiff abortion clinics intend to immediately begin performing criminal abortions under cover of the temporary restraining order—and some may have already done so—the Attorney General sought emergency relief from the Texas Supreme Court.

---

"The trial court was wrong to enjoin enforcement of Texas's longstanding prohibitions on elective abortion," said Attorney General Paxton, "Let there be no mistake: the lower court's unlawful order does not immunize criminal conduct, which can be punished at a later date once the temporary restraining order is lifted. My office will not hesitate to act in defense of unborn Texans put in jeopardy by plaintiffs' wrongful actions and the trial court's erroneous order."

---

Texas requested an immediate stay of the temporary restraining order. Evidently undeterred by future criminal punishment and civil liability, the plaintiff abortion clinics say that they intend to violate Texas law under cover of the temporary restraining order. Once an abortion occurs, nothing can restore the unborn child's

App.241

life, prosecuting the abortionist later is no substitute." That irreparable loss necessitates th[e] Court's immediate action," the petition explains.

To read SCOTEX Mandamus click here. (https://texasattorneygeneral.gov/sites/default/files/images/executive-management/SCOTEX%20Mandamus%20FINAL%202__FM.pdf)

To read SCOTEX Motion to Stay click here. (https://texasattorneygeneral.gov/sites/default/files/images/executive-management/MotionStay_Final__FM.pdf)

*Receive email updates from the OAG Press Office:*   Your   **Submit**

## Related News

### Paxton Secures Victory Against Biden Administration, Blocks HHS from Forcing Healthcare Providers to Perform Abortions in Texas (/news/releases/paxton-secures-victory-against-biden-administration-blocks-hhs-forcing-healthcare-providers-perform)

Attorney General Paxton released the following statement after a federal judge sided with the Texas Attorney General and issued an injunction to stop the Biden Administration from using the Emergency Medical Treatment and Active Labor Act (EMTALA) to force Texas hospitals and doctors to perform abortions:
**August 24, 2022 | Press Release**

### AG Paxton Files for Injunction to Stop Biden Administration from Forcing Healthcare Providers to Use State Funding for Abortions (/news/releases/ag-paxton-files-injunction-stop-biden-administration-forcing-healthcare-providers-use-state-funding)

Yesterday Attorney General Paxton filed a motion to enjoin the Biden Administration from using a provision of the Emergency Medical Treatment and Active Labor Act (EMTALA) to require Texas hospitals and doctors to perform abortions as a condition of receiving Medicare and Medicaid funding.

**August 04, 2022 | Press Release**

### AG Paxton Publishes New Guidance Upon Issuance of SCOTUS's Dobbs Judgment (/news/releases/ag-paxton-publishes-new-guidance-upon-issuance-scotuss-dobbs-judgment)

Today Attorney General Paxton released a guidance letter following the U.S. Supreme Court's issuance of a judgment in the Dobbs decision overturning Roe v Wade.

**July 27, 2022 | Press Release**

See all News (/news)

Back to Top

Child Support (/child-support)

Crime Victims (/crime-victims)

Consumer Protection (/consumer-protection)

Open Government (/open-government)

All Divisions (/node/976)

Opinions (/attorney-general-opinions)

Initiatives (/initiatives)

Human Resources (/join-our-team)

Where the Money Goes (https://comptroller.texas.gov/tra

ADA Compliance (/ada-compliance)

Compact With Texans (/about-office/compact-texans)

Cost Efficiency Saving Ideas (/about-office/cost-efficiency-

saving-ideas)

Reporting Fraud (/about-office/reporting-fraud-state-government)

State Agency Contracts (https://oagtx.force

TRAILS Search (https://www.tsl.st

Texas Homeland

PO Box 12548
Austin, TX 78711-2548

(/) 

(https://twitter.com/TXAG)

(https://www.facebook.com/TexasAttorneyGeneral)

App.243

Texas.gov
(https://gov.texas.gov/organization)

Texas
Veterans
Portal
(https://veterans.portal.texas.gov/)

Accessibility
& Site
Policies
(/site-policies)

**Exhibit 8:** Response to Plaintiffs' Motion for Reconsideration and Motion to Exclude

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **FUND TEXAS CHOICE,** *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **No. 1-22-CV-859-RP** |
| | § | |
| **KEN PAXTON, in his official capacity** | § | |
| **of Attorney General,** *et al.* | § | |
| | § | |
| *Defendants.* | § | |

## RESPONSE TO PLAINTIFFS' MOTION FOR RECONSIDERATION AND MOTION TO EXCLUDE

Plaintiffs should not be allowed to continue with their political stunt. Nothing about this lawsuit requires Ken Paxton's personal testimony. But rather than focus on litigating their meritless claims, Plaintiffs have instead abused the subpoena power to harass and endanger the sitting Attorney General of Texas.

Nothing the Attorney General could say would make one iota of difference to the merits of Plaintiffs' claims. And Plaintiffs have not attempted any other means of finding out more about the Office of the Attorney General's policies and practices. Instead, Plaintiffs have insisted exclusively on the personal testimony of Ken Paxton, failed to warn him or his office that they intended to accost him at his personal residence, and then publicized his personal address with callous disregard for the security threats that the Attorney General faces on a daily basis because of his work on behalf of Texans.

Plaintiffs have failed to explain why they ever believed it proper to serve an official capacity defendant—*i.e.*, the State of Texas—at someone's personal residence, and their gamesmanship and carelessness threatened the safety of the Attorney General and his family. Instead, Plaintiffs'

motion for reconsideration is a last-ditch effort to overcome their own pleading deficiencies, and it illustrates just how slender is the reed on which their claims rest. But the facts and law make clear that Plaintiffs have not and cannot demonstrate that they are entitled to the extraordinary demand that they have made.

The Court's decision on Defendant's motion to quash was correct, and Plaintiffs' motion for reconsideration should be denied.

## Background

The Plaintiffs' complaint failed to plead any threat of imminent prosecution or enforcement actions by the Office of Attorney General. Defendant's Motion to Dismiss and Response to Plaintiffs' Motion for Preliminary Injunction (ECF No. 33) highlights this abject pleading failure and demonstrates that Plaintiffs' purported threat of irreparable harm is wholly unfounded. But this fatal blow to Plaintiffs' Motion—and, in fact, their entire lawsuit—does not entitle them to testimony from the Attorney General himself. Plaintiffs' deficient claims are theirs to own, and it not incumbent on the Attorney General to appear personally before this Court to give them an opportunity to score political points and social media cachet.

Plaintiffs named the Attorney General in his official capacity as the defendant in this lawsuit. They apparently believed that entitled them to the testimony of the Attorney General as an individual. That is clearly not the law. A suit against a state official is a suit against the State—not against the individual.

Plaintiffs were never entitled to the Attorney General's *individual* testimony. Beyond that, counsel for Defendant—*i.e.*, the State of Texas—do not represent the Attorney General here in his individual capacity and are not authorized to accept service of any pleading or subpoena on behalf of the Attorney General in his individual capacity. When counsel made Plaintiffs aware of this fact, Plaintiffs' counsel said they would reissue the subpoena to the Attorney General in his *official* capacity, as the named party to this lawsuit. Plaintiffs' counsel confirmed this in writing: "We're also ready to serve another subpoena specifically directed to General Paxton *in his official*

*capacity.* . . . [W]e'll get it served *through the process as the OAG.*" ECF No. 67-1 at 16 (emphasis added). Plaintiffs' counsel did not inform Defendant's counsel that they intended to serve the subpoena to the Attorney General in his *official* capacity at his *personal* residence hundreds of miles away from where the Office of Attorney General is located.

Undersigned counsel first became aware of Plaintiffs' attempted service at 9:13 AM on Monday, September 26—roughly 24 hours before the hearing on Plaintiffs' Motion for Preliminary Injunction, and 45 minutes *after* the unidentified process server had been dispatched to the Attorney General's house. Even if that information could have been communicated to the Attorney General in real time—which it could not have been, as Ken Paxton was occupied with personal and campaign-related matters—nothing about Plaintiffs' case justifies this unwarranted intrusion at his home, the needless and dangerous publicization of his personal address, or the personal testimony of a statewide officer elected by the people of Texas.

## ARGUMENT

## I. PLAINTIFFS ARE NOT ENTITLED TO THE ATTORNEY GENERAL'S TESTIMONY

Plaintiffs tendered at the preliminary-injunction hearing hours of testimony from multiple witnesses from across the State. Not one of them could support the allegations that they are threatened with imminent enforcement action by the Office of Attorney General. That failure is Plaintiffs' own; it is not an extraordinary circumstance warranting the testimony of the Attorney General.

"[T]op executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions." *In re Off. of Inspector Gen., R.R. Ret. Bd.*, 933 F.2d 276, 278 (5th Cir. 1991) (quoting *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985)). To "protect officials from the constant distraction of testifying in lawsuits, courts have required that [plaintiffs] show a special need or situation compelling such testimony." *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993). The Fifth Circuit has cautioned district courts to "remain mindful of the fact that exceptional circumstances must exist before the

involuntary depositions of high agency officials are permitted." *Off. of Inspector Gen.*, 933 F.2d at 278. "[I]t is normally inappropriate to 'probe the mental processes and motives of the individual decision-maker, rather than to question the objective legal validity of the institutional decision. *Id.* (quoting *Kent Corp. v. NLRB*, 530 F.2d 612, 620 (5th Cir. 1976)).

The questions before the Court in a preliminary-injunction proceeding are whether Plaintiffs are likely to succeed on the merits of their claims and whether they are suffering irreparable injury. Here, Plaintiffs' claims are barred by lack of standing, and Plaintiffs cannot overcome sovereign immunity. *See* ECF No. 33. Plaintiff's failure to demonstrate that the Office of Attorney General has taken affirmative steps to enforce the law against them in the way they theorize is enough to deny the injunction they request, just as their failure to plead that such steps were taken warrants granting Defendant's motion to dismiss. But even if Plaintiffs were entitled to probe the Office of Attorney General's policies and practices, that information is not solely in the Attorney General's possession; it is available from the Office.

To be entitled to the testimony of the Attorney General himself, Plaintiffs are required to establish, among other things, that he "has firsthand knowledge of the claims being litigated and other persons cannot provide the necessary information." *League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-259, 2022 WL 2866673, at *1 (W.D. Tex. July 6, 2022). They have not met this burden. How the Office of Attorney General enforces the law is not solely within the knowledge of the Attorney General himself. To the extent Plaintiffs want to know whether their interpretation of Tweets of less than 250 characters accurately represents the enforcement policies of the Office of Attorney General, they can get that information through the Office of Attorney General. ECF No. 37 at 4–5. That is the capacity in which Plaintiffs sued the Attorney General, and that is the only capacity in which any statement by anyone has any bearing on the issues in this case. Likewise, to the extent that the Attorney General's own public statements have any bearing on the issues in this litigation, his subjective intent and state of mind when he made them are wholly irrelevant. The Attorney General's explanation of his statements is utterly irrelevant to Plaintiffs' theory of injury (namely, whether *they* were subjectively chilled by those statements and whether

that chill was *objectively* reasonable), and the connection between the Attorney General's statements and the official policy of his Office is readily explained by his Assistant Attorneys General.

Plaintiffs have had ample opportunity to obtain the information they seek, either through questions directed at counsel in Court or through the testimony of a representative. But that is not what they wanted, which is why they never even attempted to get it; Plaintiffs never asked Defendant for discovery or to provide an appropriate representative to testify at the hearing. As they demonstrated with their needless invasion of Ken Paxton's personal residence, what they want is a spectacle—the publicity generated by the political stunt of putting the sitting Attorney General of Texas on the witness stand. Their attempts to engineer that show are the only explanation for their eight-person trial team's deliberate disregard of decades of clear law requiring an extraordinary showing of need to obtain the testimony they now pretend to have thought was theirs as of right. The order quashing the subpoenas correctly rejected Plaintiffs' attempt to transform the Court from adjudicator into circus ringmaster. Plaintiffs' request to reconsider that ruling should be denied.

## II. Plaintiffs are not entitled to exclude Defendants' evidence or argument

Plaintiffs' failure to request appropriate discovery to support their preliminary injunction request should not bar the consideration of the Office of Attorney General's statements and arguments in its pleadings and to the Court. *See* ECF No. 67 at 1. It is Plaintiffs' missteps, not Defendants' refusal to help remedy those missteps, that have affected their case. Whatever prejudice Plaintiffs may have suffered by failing to obtain evidence from the Office of the Attorney General is their own doing, not a reason to prevent Defendant from defending itself. Plaintiffs' alternative motion to exclude is meritless and should be denied.

## Conclusion

For these reasons, Plaintiffs' Motion for Reconsideration and Motion to Exclude should be denied.

Dated September 28, 2022.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

*/s/ Christopher D. Hilton*
**CHRISTOPHER D. HILTON**
Chief, General Litigation Division
Texas Bar No. 24087727
Christopher.Hilton@oag.texas.gov

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**AMY SNOW HILTON**
Assistant Attorney General
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

**SHAWN E. COWLES**
Deputy Attorney General for Civil Litigation

**LEIF OLSON**
Special Counsel
Texas Bar No. 24032801
Leif.Olson@oag.texas.gov

**WILLIAM D. WASSDORF**
Assistant Attorney General
Texas Bar No. 24103022
Will.Wassdorf@oag.texas.gov

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**Counsel for Attorney General
Ken Paxton**

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2022, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Christopher D. Hilton*

App.251

**Exhibit 9:** Order Granting Motion to Reconsider and Denying Motion to Quash

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FUND TEXAS CHOICE, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:22-CV-859-RP |
| | § | |
| KEN PAXTON, *in his official capacity of* | § | |
| *Attorney General*, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is a motion for reconsideration brought by Plaintiffs Fund Texas Choice, et al. ("Plaintiffs"). (Mot. Reconsider, Dkt. 67). The motion requests that the Court reconsider its order granting Defendant Ken Paxton's ("Paxton") motion to quash subpoenas that order Paxton to testify at a hearing on Plaintiffs' motion for a preliminary injunction. (Certificate of Service, Dkt. 62). For the reasons discussed below, the Court will grant Plaintiffs' motion for reconsideration.

## I. BACKGROUND

This case concerns several non-profit Texas abortion funds and one OB-GYN who are suing Attorney General Ken Paxton and local district attorneys (collectively, "Defendants"), in their official capacity, for alleged violations of their constitutional rights. Plaintiffs contend that statements made by Paxton chill their First Amendment rights to speak about and fund abortion care. (Mot. Prelim. Inj., Dkt. 6, at 32). They further allege that Paxton's statements restrict their ability to facilitate out-of-state abortions, which is protected by the right to interstate travel. (*Id.* at 23). In addition, Dr. Moayedi argues that Paxton's actions have restricted her ability to travel across state lines and provide abortion services where they remain legal. (*Id.* at 25). The Plaintiffs request an injunction which, among other things, would enjoin Defendants from punishing organizations for facilitating abortion care outside Texas. (*Id.* at 50–51).

1

App.253

Plaintiffs filed their complaint and a motion for a temporary restraining order and preliminary injunction on August 23, 2022. (Compl., Dkt. 1; Mot. Prelim. Inj., Dkt. 6). The Court denied Plaintiffs' ex parte motion for a temporary restraining order to give the Defendants time to respond and to allow the Court to decide the preliminary injunction with complete briefing from both parties. (Order, Dkt. 8). After the parties submitted a joint briefing schedule on September 8, the Court set a hearing for the preliminary injunction for September 27, 2022. (Order, Dkts. 24). The Court ordered, "All parties and counsel must appear at this hearing." (*Id.*)

On September 19, Defendant Ken Paxton responded to Plaintiffs' motion for a preliminary injunction and moved to dismiss Plaintiffs' complaint.[1] (Resp., Dkt. 33). Paxton anchored his response on the argument that Plaintiffs lack standing because the Attorney General's office has no authority to bring criminal prosecutions, and that Paxton has not clarified the scope of his civil enforcement powers. (*Id.* at 3–13). He argued that Plaintiffs have manufactured the injury at question and there is no imminent threat of enforcement for out-of-state abortions or speech protected by the First Amendment. (*Id.*). At the same time, Paxton's response showed that the Attorney General's office viewed abortions as illegal whether the Texan has one in "Denver or Dallas, in Las Cruces or Lamesa." (*Id.* at 24).

According to Plaintiffs' motion for reconsideration, Paxton's argument that Plaintiffs lacked standing called into doubt whether Paxton meant what he had said in his Tweets, statements, and interviews—namely, whether he does in fact interpret the Human Life Protection Act ("Trigger Ban") to penalize Texans who seek out-of-state abortions. (Mot. Reconsider, Dkt. 67, at 2). Plaintiffs felt that this response contradicted his earlier statements, and accordingly decided they would need to call him as a witness at the upcoming hearing for a preliminary injunction. (*Id.*) According to the

---

[1] Originally, Mr. Paxton's responsive pleading was due on September 15, but the Court granted Mr. Paxton's unopposed motion to extend the pleading deadline to September 19. (Dkt. 27).

App.254

sworn declaration of Plaintiffs' counsel John Atkins, Plaintiffs emailed Defendants on the morning of September 22 asking them to confirm that Paxton would appear at the hearing, pursuant to our order that all parties make an appearance. (Mot. Reconsider, Dkt. 67-1, at 6–7). Over the following days, counsel for Plaintiff repeatedly emailed the counsel for Paxton, asking whether they could accept service of a subpoena on behalf of Paxton. Up until September 26, the Plaintiffs continued to inquire as to how to serve Mr. Paxton with subpoenas. (*Id.* at 6–26).

Around 12:30 pm on September 26, the day before the hearing, both parties submitted their proposed witness list. (Dkts. 36, 41). Plaintiffs' list included Paxton, in both his official and personal capacity. (Dkt. 41). Later that afternoon, Paxton filed a motion to quash the subpoenas. (Mot. Quash, Dkt. 44). In his motion, Paxton argued that, as a high-ranking government official, he could not be compelled to testify in a hearing. (*Id.*). Paxton represented that the Court should deny the motion because Plaintiffs raised the prospect of his testimony at the last minute. (*Id.* at 4). Specifically, Mr. Paxton characterized the timing of the request as being made at the "eleventh-hour." (*Id.* at 3). He argued that the Court should quash the subpoena because "the Court will consider the merits in less than 24 hours" and because "it is now the *literal* eve of trial." (*Id.* at 4 (emphasis in original)). Paxton noted that Plaintiffs "did not even bother trying to obtain testimony until mere days ago" but made no reference to when Plaintiffs had first notified Defendant's counsel of Paxton's expected appearance. (*Id.*)

In addition, Paxton called into question whether he had been properly served. In a footnote, Paxton stated that Plaintiffs "have thus far offered no evidence that they have [served Paxton]." (*Id.* at 1, n.1). He stated explicitly that "[n]either subpoena has been effectively served." (*Id.* at 1). Paxton made no mention of Plaintiffs' repeated emails attempting to serve Paxton and inquiring how best to accomplish service.

App.255

Relying on these representations made by Paxton and his counsel, the Court granted his motion to quash the subpoena the following morning around 8:00 am. (Dkt. 66). An hour later, Plaintiffs filed the motion to reconsider, which is now pending before the Court. (Mot. Reconsider, Dkt. 67). Plaintiffs argued that they had informed Paxton well before serving him that he would be expected at the hearing. (Mot. Reconsider, Dkt. 67, at 3, 10). The motion contends that any delay on Plaintiffs' part is because Paxton's response, filed on September 19, created a factual dispute about his policy positions, and thus the need to clarify his stance on out-of-state abortions. (*Id.* at 3–5). Plaintiffs also argue that they properly served Mr. Paxton and attach exhibits showing attempts to serve him. (*Id.* at 3–4). Finally, Plaintiffs contend that Mr. Paxton has exclusive and first-hand knowledge of the central facts at issue in the hearing, and accordingly should be compelled to testify. (*Id.* at 1–11).

At the hearing for a preliminary injunction, Plaintiffs pointed to several press releases from the Attorney General's office where Paxton states that he will pursue civil penalties and assist in criminal prosecutions against anyone performs, incudes, or attempts an abortion. (Press releases, Dkt. 42, Exhs. 27–29). They also include several posts from Paxton's official Twitter account stating that he intends to ensure that pre-*Roe* laws are "100% in effect" and that he'll make "Texas fully pro-life!" (Tweets, Dkt. 42, Exhs. 4, 41, 42). Finally, Plaintiffs point to media interviews given by Paxton, where he promises to "use the full force of [the Trigger Ban] to make people pay if they're going to do abortions." (Interviews, Dkt. 42, Exhs. 62, 63, 64). Several witnesses stated that they understood these statements to cover out-of-state abortion care but could not be sure because the statements were unclear. (Hearing, Dkt. 74).

The Court briefly discussed the pending motion for reconsideration but deferred a decision on the matter so that Paxton could respond. (*Id.*). On September 28, 2022, Paxton filed a response, focusing largely on the alleged impropriety of Plaintiffs' service. (Resp., Dkt. 77). The response also

App.256

encouraged the Court to deny the motion on the merits, arguing that nothing in the hearing required Paxton's testimony. (*Id.*)

## II. DISCUSSION

Plaintiffs ask the Court to reconsider its motion to quash the subpoenas served on Mr. Paxton. (Mot. Reconsider, Dkt. 67).[2] The Court will first address whether it should reconsider its earlier order to quash. It will then turn to whether Paxton should be compelled to testify.

### A. Motion to Reconsider

"[T]he Federal Rules of Civil Procedure do not recognize a general motion for reconsideration." *St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997). Instead, Plaintiff asserts its motion under Rule 54(b). "[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). "Rule 54(b) allows parties to seek reconsideration of interlocutory orders and authorizes the district court to revise at any time any order or other decision that does not end the action." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (cleaned up) (citing Fed. R. Civ. P. 54(b)). "Under Rule 54(b), 'the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.'" *Id.* (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990)). "Rule 54(b)'s approach to the interlocutory presentation of new arguments as the case evolves can be more flexible, reflecting the 'inherent power of the rendering

---

[2] Plaintiffs served—or attempted to serve—Paxton is both his official and personal capacity. The Court need not address whether the attempted service on Paxton in his personal capacity was legally sufficient. The exhibits presented by the Plaintiffs show that he was served in his official capacity on September 23, 2022. (Certificate of Service, Dkt. 62); Fed. R. Civ. P. 5(b). Defendants represented that Paxton was not properly served, but they have offered no evidence to suggest that this particular service was improper.

App.257

district court to afford such relief from interlocutory judgments as justice requires.'" *Id.* at 337 (quoting *Cobell v. Jewell*, 802 F.3d 12, 25–26 (D.C. Cir. 2015)).

Under the Rule 54(b) standard, the Court finds sufficient grounds to grant Plaintiffs' motion for reconsideration. First, the Court has now had more time to review Paxton's motion to quash and consider the full record. Because Paxton filed its motion to quash late in the day before the hearing—and the motion impacted whether Paxton would be required to attend the hearing the next morning—the Court issued a text order granting the motion before the hearing, eliminating the need for Paxton to attend that morning. Less than two hours later, Plaintiffs filed their motion for reconsideration. The critical issues raised by both Plaintiffs and Paxton warrant time to consider their motions in full.

In addition, when the Court granted Paxton's motion to quash, it did so on the assumption that counsel for Paxton had made candid representations to the Court about when Paxton had been served and when Paxton was notified that he was expected to attend the hearing. The Court took Paxton's factual statements—that the notification occurred "at the eleventh hour" and "on the *literal* eve of trial*"—as accurate, candid representations of counsel, and those statements influenced the Court's decision on Paxton's motion to quash. (Mot. Quash, Dkt. 44, at 4) (emphasis in original). The Court also assumed Paxton provided full, accurate factual statements, only to learn later that Paxton failed to disclose Plaintiffs' repeated emails attempting to inquire as to whether Paxton could testify. The motion mentioned that Plaintiffs began to try and obtain testimony "mere days ago," but did not convey that Paxton had been served or that Plaintiffs had been trying to engage on ongoing conversations to coordinate witnesses for the hearing. Yet, Plaintiffs' attempt to obtain "mere days ago" was presented as the only notification that Paxton received in advance of the hearing about his expected testimony. (*Id.*) Paxton stated that "the Court will consider the merits in less than 24 hours." (*Id.*) Finally, Paxton had already been served days before and could have filed his motion to

6

quash then, giving Plaintiffs a meaningful chance to respond and the Court time to consider. Instead, the Court only learned that Paxton's counsel had been notified several days before the hearing during the hearing itself.[3]

Because the Court was forced to decide Paxton's motion to quash on a very limited timeframe, without the benefit of Plaintiffs' response, and because the Court relied on Defendant's representations as accurate depictions of when Paxton had been served and notified of his expected testimony,[4] the Court issued its ruling on incomplete facts. Accordingly, the Court grants Plaintiffs' motion to reconsider. (Dkt. 67).

### B. Motion to Quash Subpoena under Rule 45(d)(3)(A)

Having granted the motion for reconsideration, the Court next turns to whether it should grant or deny Paxton's motion to quash. (Dkt. 44). Rule 45(d)(3)(A) provides that, "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena that: (i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). Paxton moves to quash the subpoenas on the fourth basis. (Mot. Quash, Dkt. 44, at 5).

Paxton centers his request to quash the subpoena on a legal principle called the "*Morgan* doctrine." *See United States v. Morgan*, 313 U.S. 409 (1941). Under the doctrine, a party may not involuntarily compel testimony from a high-ranking official without exceptional circumstances. *Id.* at

---

[3] Because Paxton delayed filing his motion to quash, Plaintiffs responded by filing their certificates of service late in the evening. One of these certificates showed that Mr. Paxton had been served through his executive assistant. (Certificate of Service, Dkt. 62). While this appeared to meet the federal requirements for service of a subpoena, it did not show that Mr. Paxton or his counsel had been notified of the subpoena or his expected testimony. It was not until Plaintiffs submitted their motion for reconsideration that the Court learned that Paxton's counsel was notified of the expected testimony even earlier than the certificate of service showed.
[4] *See Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*, 23 F.4th 529, 543 (5th Cir. 2022) (explaining that the duty of candor extends both to intentional misrepresentations as well as omissions).

App.259

413; *In Re Bryant*, 745 F. App'x 215 (5th Cir. 2018), *as revised* (Nov. 30, 2018) (unpublished); *In re F.D.I.C.,* 58 F.3d 1055, 1062 (5th Cir. 1995). Courts in the Fifth Circuit have employed a three-factor test, examining (1) whether the witness is a high-ranking official, (2) the substantive reasons for taking the testimony, and (3) the potential burden that involuntary testimony would impose on the official. *In Re Bryant*, 745 F. App'x at 220; *Freedom from Religion Found., Inc. v. Abbott*, No. A-16-CA-00233-SS, 2017 WL 4582804, at *9 (W.D. Tex. Oct. 13, 2017).

### 1. Substantive Reasons for the Testimony

The parties do not contest that the Attorney General qualifies as a "high-ranking official." The burden then shifts to Plaintiffs to demonstrate exceptional circumstances. *Freedom from Religion Found., Inc,* 2017 WL 4582804, at *9. When considering the substantive reasons for the deposition, courts ask whether the official has first-hand knowledge related to the claims being litigated and other persons cannot provide the necessary information. *Id.* at *11 (citing *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007)); *Hernandez v. Tex. Dept. of Aging & Disability Servs.*, No. A–11–CV–856 LY, 2011 WL 6300852, at *2 (W.D. Tex. Dec. 16, 2011); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1048 (E.D. Cal. 2010)).

Plaintiffs argue that only Paxton can provide the necessary information needed to clarify his statements, press releases, and media appearances. (Mot. Reconsider, Dkt. 67, at 2). Because the statements came directly and voluntarily from Paxton, only he is capable of clarifying the scope of what he means when he claims he will pursue civil penalties to "use the full force of [the Trigger Ban] to make people pay." (*Id.*; Interview, Dkt. 42, Exh. 64). In addition, Plaintiffs point out that Paxton's position has changed over the course of the lawsuit and even within the same document filed with the Court. (Mot. Reconsider, Dkt. 67, at 2). For example, Paxton's response claims that Plaintiffs lack any concrete injury for the purposes of standing, while simultaneously suggesting that the Trigger Ban requires the Attorney General bring civil enforcement actions against Texans who

App.260

facilitate out-of-state abortion care. (*Id.*; Resp., Dkt. 33). The Plaintiffs argue that only the Attorney General himself can clarify the scope of these statements and whether he intends to pursue civil or criminal sanctions for facilitating out-of-state abortion care.

Paxton responds that Plaintiffs have failed to demonstrate a "special need or situation compelling" testimony. (Mot. Quash, Dkt. 44, at 3). He states that compelling high-ranking officials to testify would risk constant distraction and render him unable to perform his public duties. (Resp., Dkt. 77, at 3–4). Finally, Paxton argues that Plaintiffs have failed to show he has firsthand knowledge of the claims being litigated because the information is readily available from the Attorney General's office more broadly. (*Id.*)

The Court finds that exceptional circumstances exist, and Paxton should testify. First, this case does not involve an official being called to testify about his decision making in previous actions. In *Morgan*, the Supreme Court considered whether the Secretary of Agriculture should have been called to explain the reasons behind his recent policies. *Morgan*, 313 U.S. at 413. The Supreme Court counseled that "it [i]s not the function of the court to probe the mental processes of the [policymaker]," but to determine whether the policy in question comports with the law. *Id.* at 422. In the instant case, Paxton is not being called to testify to explain a past policy. Instead, Plaintiffs call Paxton to seek clarification as to what his policy *is*. Plaintiffs allege that the current ambiguity of Paxton's statements has created a chilling effect. Indeed, his counsel conceded that "whatever is happening in state law perhaps that is chilling their conduct." (Hearing, Dkt. 74). To determine whether the "policy in question comports with the law," the Court must first determine what the Attorney General means by his repeated statements threatening to enforce the law. *Morgan*, 313 U.S. at 413.

Paxton also possesses unique, first-hand knowledge of the issues at hand and about how he will enforce the Trigger Ban. Courts have repeatedly found that even the highest-ranking officials

App.261

should testify when they have personal knowledge of relevant facts. *See, e.g.*, *Rolscreen Co. v. Pella Prods. of St. Louis, Inc.*, 145 F.R.D. 92, 98 (S.D. Ia. 1992); *Digital Equip. Corp. v. Sys. Indus., Inc.*, 108 F.R.D. 742, 744 (D. Mass 1986); *CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y. 1984). Indeed, in 2017, this Court ordered Governor Greg Abbott to testify because he alone had personal knowledge of the central question at issue. *Freedom From Religion Foundation, Inc.*, 2017 WL 4582804, at *11. In short, parties have repeatedly overcome the *Morgan* doctrine by making a genuine showing of unique, firsthand knowledge.

Paxton's motion to quash does not dispute in earnest whether he has firsthand knowledge of the issues in this case. Instead, he argues that his knowledge is not unique to him, and that any representative of the Attorney General's office can testify as to the office's policies. The Court does not dispute the plain fact that lawyers at the Attorney General's Office may articulate the Office's policies. In this case, Paxton has inserted himself into this dispute by repeatedly tweeting and giving interviews about the Trigger Ban. Having added his voice many times—not just in a press release or official statement but in intentional ways designed to reach Texans from within his role as Attorney General—Paxton alone is capable of explaining his thoughts and statements.

Paxton's own briefing suggests that he does consider out-of-state abortions illegal under Texas law and is required to pursue such civil penalties. (Resp., Dkt. 33, at 24); *see also* Tex. Health & Safety Code § 170A.005 ("The attorney general shall file an action to recover a civil penalty[.]"). If Paxton believes that out-of-state abortion care violates the Trigger Ban, then the statutory language suggests he must pursue civil sanctions against the alleged offenders. This position, however, goes against Paxton's contention that there is no imminent threat of enforcement. Given this contradiction, Paxton alone can testify as to which represents his position on out-of-state abortion care and his views as to whether such conduct is covered by the statute is directly related to whether Plaintiffs' conduct has been chilled.

10

App.262

During the preliminary injunction hearing, witnesses for the Plaintiffs frequently expressed confusion and fear about Paxton's stance on out-of-state abortions. (Hearing, Dkt. 74). For example, Neesha Dave, Deputy Director of the Lillith Fund, stated that a press release from the Attorney General's Office, among other public statements, forced the organization to stop giving direct abortion funding because it was unclear about the scope of the new abortion laws. (*Id.*). Dr. Ghazaleh Moayedi, a licensed OB-GYN in 20 states, expressed her concern that the lack of clarity on Texas's abortion laws renders her unable to provide complete care to her patients. (*Id.*). Likewise, Rosann Mariappuram, Executive Director of Jane's Due Process, remarked how confusing the scope of the law was without clarification from Paxton. (*Id.*).

The repeated testimony from the witnesses shows that Paxton's statements have rendered Plaintiffs feeling unable to fulfill their organizational purpose or facilitate out-of-state abortion care in states where it remains legal. Paxton's contention that these fears are objectively unreasonable is precisely why Paxton's testimony is needed. If their fears are unwarranted, then that will become clear during the course of his testimony. But the Court will not sanction a scheme where Paxton repeatedly labels his threats of prosecution as real for the purposes of deterrence and as hypothetical for the purposes of judicial review.

## 2. Burden on Witness

Paxton also contends that having to testify would create a significant burden, given his role as Attorney General and the short timing in question. In general, federal courts should recognize the fact that high-ranking officials have significant constraints on their time. *In re F.D.I.C.*, 58 F.3d at 1062. Yet the idea that Paxton would be unduly burdened by testimony in court is belied by his many public statements and interviews in which he threatens civil prosecutions of Texans. (Interviews, Dkt. 65-62, 63, 64). It is challenging to square the idea that Paxton has time to give interviews threatening prosecutions but would be unduly burdened by explaining what he means to

11

App.263

the very parties affected by his statements. To the extent Paxton is burdened by his testimony, it is because both he and his office have declined to take a clear stance on the legality of out-of-state abortions while issuing statements suggesting they are illegal. The burden faced by Plaintiffs—the effective cessation of many core operations—outweighs the burden of testimony faced by Paxton.

In addition, Paxton argues that the timing of the subpoena would create an undue burden. Paxton relies on a 2019 case from this Court to bolster his position. (Mot. Quash, Dkt. 44, at 3–4); *Texas Entertainment Association v. Hegar*, No. 1:17-cv-594, 2019 WL 13080576, at *2 (W.D. Tex. Oct. 18, 2019). In that case, the United States Magistrate Judge considered a motion to quash the subpoena on Glenn Hegar, the public comptroller for the state. *Id.* The court granted the motion, holding that enforcing the plaintiff's subpoena would violate the *Morgan* doctrine. *Id.* The plaintiff had argued that the comptroller should be able to designate a corporate representative on his behalf, but the court held that having to do so a mere thirteen days before trial would constitute an undue burden. *Id.* Paxton contends that because Plaintiffs provided only a few days' notice to Paxton, his testimony would likewise create an unreasonable burden.

However, the facts of *Texas Entertainment* are easily distinguished from the instant case. In *Texas Entertainment*, the plaintiff delayed over two years before serving a subpoena on the high-ranking official. *Id.* In this case, by contrast, Plaintiffs waited only a few days before attempting to serve Paxton with a subpoena. More importantly, the plaintiff in *Texas Entertainment* conceded that no exceptional circumstances existed. *Id.* The court's holding was directed at whether the public official should nonetheless be compelled to appoint a corporate representative in his stead. It did not address whether the plaintiff could meet the *Morgan* exception, since that issue was not in contention.

Weighing all factors, the Court concludes that Plaintiffs have carried their burden of demonstrating exceptional circumstances exist that merit the opportunity to question Paxton.

App.264

## III. CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that Plaintiffs' motion for reconsideration, (Dkt. 67), is **GRANTED**.

**IT IS FURTHER ORDERED** that the Court's Text Order on September 27, 2022 granting Defendant's motion to quash is **VACATED**.

**IT IS FURTHER ORDERED** that Paxton's motion to quash, (Dkt. 44), is **DENIED**.

**IT IS FURTHER ORDERED** that the parties meaningfully confer **on or before October 11, 2022** to agree on the particulars of Paxton's testimony, whether by deposition or evidentiary hearing.

**IT IS FINALLY ORDERED** that the parties' agreed motion for entry of scheduling order, (Dkt. 79), is **MOOTED**. The parties' deadline to file post-hearing briefing and Plaintiffs' deadline to respond to Defendant's motion to dismiss, (Dkt. 33), shall be stayed pending Paxton's testimony.

**SIGNED** on October 4, 2022.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

App.265

**Exhibit 10:** Attorney General Paxton's Motion to Stay

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **FUND TEXAS CHOICE**, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | **No. 1-22-CV-859-RP** |
| **KEN PAXTON, in his official capacity** | § | |
| **of Attorney General**, *et al.* | § | |
| | § | |
| *Defendants.* | § | |

---

## ATTORNEY GENERAL PAXTON'S MOTION TO STAY

---

Defendant Ken Paxton in his official capacity as Attorney General respectfully requests that the Court stay its Order requiring testimony from the Attorney General pending the Attorney General's request for relief from the Fifth Circuit. In support of this motion, the Attorney General shows as follows:

1. On October 4, 2022, this Court issued an Order granting Plaintiffs' Motion for Reconsideration and denying the Attorney General's Motion to Quash. Dkt. #83. The Court vacated its previous order granting the Attorney General's Motion to Quash and ordered the Attorney General to provide testimony by deposition or evidentiary hearing so that the Court may determine whether Plaintiffs are entitled to the relief they seek. *Id.* at 8–9, 13.

2. The Attorney General intends to seek relief from that Order from the Fifth Circuit by no later than Friday, October 7, 2022.

3.   "The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997). The purpose of such a stay is to ensure "economy of time and effort for [the court], for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 255 (1936). Accordingly, the Attorney General requests that the Court stay the order pending resolution of his request for relief from the Fifth Circuit.

4.   In addition, the Court should stay the Order because it may have been based on Plaintiffs' incomplete recitation of events in their Motion for Reconsideration. Less than 90 minutes after Plaintiffs first raised the issue of the Attorney General's testifying at the Preliminary Injunction hearing, Defendant's counsel responded, "[W]e don't believe there's been a showing that entitles plaintiffs to apex testimony." Ex. A at 3–4. From the beginning, Plaintiffs were aware of Defendant's position on this issue, but this correspondence was not included in the Motion for Reconsideration. *Compare* Dkt. #67-1 at 6–7, *with* Ex. A at 3–4.

## Conclusion

The Attorney General respectfully requests that the Court stay its Order (Dkt. #83) until disposition of his request for relief from the Fifth Circuit.

Dated October 5, 2022.                    Respectfully submitted,

**KEN PAXTON**                             **CHRISTOPHER D. HILTON**
Attorney General of Texas                  Chief, General Litigation Division

**BRENT WEBSTER**                          */s/ Amy S. Hilton*
First Assistant Attorney General           **AMY SNOW HILTON**
                                           Assistant Attorney General
**GRANT DORFMAN**                          Texas Bar No. 24097834
Deputy First Assistant Attorney General    Amy.Hilton@oag.texas.gov

**SHAWN E. COWLES**                        **LEIF OLSON**
Deputy Attorney General for Civil Litigation  Special Counsel
                                           Texas Bar No. 24032801
                                           Leif.Olson@oag.texas.gov

                                           **WILLIAM D. WASSDORF**
                                           Assistant Attorney General
                                           Texas Bar No. 24103022
                                           Will.Wassdorf@oag.texas.gov

                                           Office of the Attorney General of Texas
                                           General Litigation Division
                                           P.O. Box 12548, Capitol Station
                                           Austin, Texas 78711-2548

                                           **Counsel for Attorney General
                                           Ken Paxton**

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2022, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/Amy S. Hilton*

App.269

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| FUND TEXAS CHOICE, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | No. 1-22-CV-859-RP |
| | § | |
| KEN PAXTON, in his official capacity | § | |
| of Attorney General, *et al.* | § | |
| | § | |
| *Defendants.* | § | |

---

## EXHIBIT A

---

| From: | Myers, Elizabeth G. |
|---|---|
| To: | Amy Hilton |
| Cc: | Will Wassdorf; Ecklund, Jennifer R.; Leslie.Dippel@traviscountytx.gov; Christopher Hilton; aalbright@adjtlaw.com; Lowell, Allyn J.; Hillier, Sadie; Atkins, John P.; Eric Magee; Leif Olson |
| Subject: | Re: FTC v. Paxton - conference on motion for leave to appear remotely at PI hearing |
| Date: | Friday, September 23, 2022 12:20:01 PM |

Hi, Amy.  Of course.  I'm tied up in a meeting until about 1 but will ask someone in our team to send it over to you.

Sent from my iPhone

> On Sep 23, 2022, at 11:13 AM, Amy Hilton <Amy.Hilton@oag.texas.gov> wrote:

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

Hi Elizabeth,

Could you please send me a copy of the subpoena so I can see if we are authorized to accept it?

Thanks,
Amy

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Friday, September 23, 2022 9:03 AM
**To:** Amy Hilton <Amy.Hilton@oag.texas.gov>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>
**Cc:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Leslie.Dippel@traviscountytx.gov; Christopher Hilton <Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Eric Magee <e.magee@allison-bass.com>; Leif Olson <Leif.Olson@oag.texas.gov>
**Subject:** RE: FTC v. Paxton - conference on motion for leave to appear remotely at PI hearing
**Importance:** High

Hi, Amy –

Conferring at 9 am Sunday works for us.  With respect to General Paxton, I can't tell from your response below whether he is actually going to be at the hearing in person.

App.271

We read Judge Pitman's order to require all parties to attend, but in an abundance of caution, we're going to issue a subpoena for General Paxton. I assume you'd like for us to serve that through you, but will you please confirm by noon today that you will accept service. Otherwise, we'll start the personal service process. I'd really prefer not to have to do that, of course.

And we don't believe the apex doctrine applies to this case, especially given the unique role General Paxton's own words play in threats to our clients.

Best,

Elizabeth

**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Amy Hilton <Amy.Hilton@oag.texas.gov>
**Sent:** Thursday, September 22, 2022 2:54 PM
**To:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>
**Cc:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Leslie.Dippel@traviscountytx.gov; Christopher Hilton <Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Eric Magee <e.magee@allison-bass.com>; Leif Olson <Leif.Olson@oag.texas.gov>
**Subject:** RE: FTC v. Paxton - conference on motion for leave to appear remotely at PI hearing

---

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

---

Hi Elizabeth,

Saturday at 9am works for us. The rest of our team has conflicts on Saturday, so can we plan to confer on Sunday at 9am?

As to the Attorney General, we don't believe there's been a showing that entitles plaintiffs to apex testimony.

Thanks,
Amy

---

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Thursday, September 22, 2022 1:39 PM
**To:** Amy Hilton <Amy.Hilton@oag.texas.gov>; Will Wassdorf
<Will.Wassdorf@oag.texas.gov>
**Cc:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>;
Leslie.Dippel@traviscountytx.gov; Christopher Hilton
<Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J.
<ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>;
Atkins, John P. <JAtkins@thompsoncoburn.com>; Eric Magee <e.magee@allison-
bass.com>
**Subject:** RE: FTC v. Paxton - conference on motion for leave to appear remotely at PI
hearing

Amy –

Thanks for the quick response and the courtesy on the page limits.  We'll get that
motion for leave filed later today.

And 2 pm Saturday to confer works well for us.  Could we do the exchange of witness
and exhibits lists at 9 am on Saturday instead?  Our entire team is on the road
tomorrow traveling back from our annual firm meeting so a deadline tomorrow is very
difficult.

Finally, you'll see this on our witness list as well, of course, but we intend to call
General Paxton on Tuesday.  Given Judge Pitman's order that all parties appear for the
hearing on Tuesday, I'm assuming I don't need to send you a subpoena, but could you
please confirm that General Paxton will be at the hearing in person?  I can confirm for
you that all of our clients other than Dr. Moayedi and Anna Rupani will appear in
person on Tuesday as well.  Dr. Moayedi and Ms. Rupani will be available remotely,
pursuant to Judge Pitman's order on our motion for leave to allow them to appear
virtually.

Thanks,

Elizabeth

**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

App.273

**Exhibit 11:** Plaintiffs' Response to Defendant Attorney General Paxton's Motion to Stay

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazaleh Moayedi, DO, MPH, FACOG, | § § § § § § § | |
| Plaintiffs, | § | |
| vs. | § § | **CIVIL CAUSE NO. 1:22-cv-859-RP** |
| KEN PAXTON, in his Official Capacity as Attorney General; et al., | § § § | |
| Defendants. | § § | |

---

**PLAINTIFFS' RESPONSE TO**
**DEFENDANT ATTORNEY GENERAL PAXTON'S MOTION TO STAY**

---

In his Motion to Stay (ECF 84), Defendant Attorney General Paxton does not meet the standard for this Court to exercise its discretionary, non-statutory, inherent power to stay proceedings as a docket-control measure. Among other things, the standard imposes a heavy burden to show "something close to necessity" for a stay. *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.*, 761 F.2d 198, 203 n.6 (5th Cir. 1985). General Paxton does not provide argument or evidence to support a finding that such a necessity exists. ECF 84 (Stay Motion) at 1-2.

General Paxton also asserts that the Court did not have before it the substance or timing of his "apex doctrine" assertion when considering Plaintiffs' motion to reconsider. *Id.* at 2 ¶4. On the contrary, Plaintiffs discussed both the substance and timing of General Paxton's "apex" assertion—as well as the e-mail containing that assertion—at the preliminary-injunction hearing. **Exhibit A** at 31-32. General Paxton has not provided this Court with a record that would support the requested stay. The Stay Motion should be denied.

- 1 -

App.275

**A.** **General Paxton has not met the requirements for issuing a stay.**

Although General Paxton mentions the standard applicable to a stay pursuant to the Court's inherent power, he offers only a single sentence in support of his request for a stay, stating his intent to seek appellate review of the Court's order granting reconsideration, vacating its order quashing Plaintiffs' subpoena, and denying General Paxton's motion to quash (the "Order"). ECF 84 (Stay Motion) at 1-2 ¶¶2-3. There are no grounds presented in the Stay Motion—nor any evidence attached—to suggest any harm, prejudice, burden, or other detriment to General Paxton in the absence of a stay. *Id.* at 1-2. There are no grounds or evidence presented in the Stay Motion to suggest any exigency that would make a stay necessary. *Id.* Instead, General Paxton argues that the purpose of the stay he seeks is "to ensure 'economy of time and effort for [the court], for counsel, and for litigants.'"[1] *Id.* at 2 ¶3 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)).

Plaintiffs agree that a district court has the inherent authority to manage its docket, including the power to stay proceedings. *Landis*, 299 U.S. at 254; *Taylor Lohmeyer Law Firm PLLC v. United States*, No. SA-18-CV-1161-XR, 2019 WL 5694116, at *1 (W.D. Tex. Oct. 3, 2019). However, generally in seeking such a stay, "the moving party bears a heavy burden to show why a stay should be granted absent statutory authorization…." *Coastal*, 761 F.2d at 203 n.6; *see also Taylor*, 2019 WL 5694116, at *1 (quoting *Coastal*). Even when a movant makes this showing, the district "court should tailor its stay so as not to prejudice other litigants unduly." *Coastal*, 761 F.2d at 203 n.6.

General Paxton represents to the Court in the Stay Motion that he intends to seek relief from the Fifth Circuit "by no later than Friday, October 7, 2022." ECF 84 (Stay Motion) at 1 ¶2.

---

[1] Any attempt to raise new grounds or arguments for the first time in a reply would be untimely. *See Perez v. Stephens*, No. A–14–CA–880–SS, 2015 WL 5159394, at *2 n.1 (W.D. Tex. Sept. 2, 2015); *Staton Holdings, Inc. v. First Data Corp.*, No. Civ.A. 304CV2321P, 2005 WL 2219249, at *4 n.1 (N.D. Tex. Sept. 9, 2005).

There is no motion pending before the Court in which Plaintiffs seek to compel immediate compliance with the Order. On the contrary, as part of the e-mail string in which counsel conferred on the Stay Motion, Plaintiffs' counsel suggested that the testimony required by the Order "is most efficiently obtained in an evidentiary hearing" and offered to contact the Court for available dates. **Exhibit B** (counsel's e-mail string conferring on Stay Motion) at 4 (e-mail from Ms. Ecklund to General Paxton's counsel on October 5, 2022 at 12:43 p.m.). Alternatively, Plaintiffs' counsel offered two sets of dates if General Paxton preferred to testify by deposition: October 17-21 and October 27-28. *Id.*

"Where a discretionary stay is proposed, something close to genuine necessity should be the mother of its invocation." *Coastal*, 761 F.2d at 203 n.6. General Paxton has not provided the Court with any argument or evidence to support a conclusion that any exigency exists to support a stay at this time. *See* ECF 84 (Stay Motion) at 1-2. The facts that he did not disclose—showing that Plaintiffs suggested setting a hearing date or deposition dates later in October—confirm that there is no such exigency. **Ex. B** at 4. The dates provided by Plaintiffs' counsel afford General Paxton time to seek further review from the Fifth Circuit without the necessity for a stay. *See Coastal*, 761 F.2d at 203 n.6.

Furthermore, the testimony at the preliminary-injunction hearing supports a conclusion that the requested stay would unduly prejudice Plaintiffs. Each Plaintiff, directly or through a representative, testified about the harm they already are experiencing as a result of the conduct sought to be enjoined. *See, e.g.*, **Ex. A** at 11-16, 42-44, 47 (Ms. Rupani); *id.* at 54-58, 60-63, 71 (Ms. Davé); *id.* at 84-87, 114-18, 120-21, 126-30 (Ms. Mariappuram); *id.* at 153-54, 164-65, 168-69 (Ms. Schilling); *id.* at 189-94, 197, 199-208, 210-12 (Dr. Moayedi). That harm remains ongoing because, as the Court concluded, General "Paxton alone can testify" about issues "directly

App.277

related to whether Plaintiffs' conduct has been chilled" so as to support injunctive relief. *See* ECF 83 (Order) at 10. On this record, issuing a stay of the order compelling General Paxton's testimony without a showing of necessity would unduly prejudice Plaintiffs. *See Coastal*, 761 F.2d at 203 n.6.

General Paxton has not met the standard to obtain a stay of the Order. The Court should deny the Stay Motion.

**B. Plaintiffs discussed the timing and substance of General Paxton's assertion of the "apex doctrine" at the preliminary-injunction hearing.**

General Paxton also asserts that the Court should grant a stay based on "Plaintiffs' incomplete recitation of events in their Motion for Reconsideration." ECF 84 (Stay Motion) at 2 ¶4. He contends that Plaintiffs did not disclose to the Court that, on September 22, 2022, General Paxton took the position that Plaintiffs were required to show entitlement to his "apex testimony." *Id.* But at the preliminary-injunction hearing, Plaintiffs disclosed these facts to the Court.

During argument on the Motion for Reconsideration, Plaintiffs' counsel discussed "whether the timing of the subpoena would support the quashing" General Paxton requested. **Ex. A** at 30. Plaintiffs' counsel opened this discussion by stating:

> We've provided in our response and motions an Exhibit A, which provides communications by e-mail and information about communications that happen by phone to show that plaintiffs very promptly sought to subpoena General Paxton when he put this matter at issue and made it relevant.

*Id.* at 31.

After discussing General Paxton's preliminary-injunction response filed September 19, and Plaintiffs' counsel's belief on September 19-21 that General Paxton was required by court order to attend the preliminary-injunction hearing, Plaintiffs' counsel discussed General Paxton's assertion of the "apex doctrine" in the September 22, 2022, e-mail included in Reconsideration

App.278

Exhibit A:

> *On September 22nd*, as is illuminated in the declaration *and supporting e-mails in Exhibit A*, we became aware that at the very least, there was some ambiguity about whether General Paxton would appear. Counsel would not confirm or deny whether he would appear, *but they did raise a slightly different doctrine, not the Morgan doctrine, but the Texas state <u>apex doctrine</u> indicating their position that we did not have the basis to compel General Paxton to testify here.*

*Id.* at 31-32 (emphasis added).

Thus, the Court's Order is not based on an incomplete recitation of events. Plaintiffs disclosed both the substance and the timing of General Paxton's assertion of the "apex doctrine" for the Court to consider in deciding the Reconsideration Motion. *See id.* Indeed, Plaintiffs were the only parties discussing General Paxton's assertion of the apex doctrine and other events leading to the service of subpoenas on him, since General Paxton had omitted these facts from his motion to quash. *See* ECF 44 (Motion to Quash) at 1-5. Moreover, General Paxton made no mention of his September 22 "apex" assertion (or Plaintiffs' September 23 rejection of it) in his counsel's argument at the preliminary-injunction hearing or in his Response to the Motion for Reconsideration filed the day after the hearing. *See* **Ex. A** at 38-41; ECF 77 (Reconsideration Response) at 1-5. But because Plaintiffs had discussed the "apex" assertion with the Court for its consideration in determining the Reconsideration Motion, General Paxton's assertion does not provide support for a stay.

Nevertheless, General Paxton is correct that, unbeknownst to Plaintiffs' counsel, the page of the September 22-23, 2022 e-mail chain documenting his assertion of the apex doctrine was inadvertently omitted from Reconsideration Exhibit A-1. This page also contained Plaintiffs' response, promptly putting General Paxton on notice that Plaintiffs disputed his position that the apex doctrine applied. **Exhibit C** to this Response contains the omitted page. *Compare* ECF 67-

1 (Reconsideration Ex. A-1) at 6-7 (e-mail pages 1 and 3) *with* **Ex. C** (e-mail page 2).

This filing mistake first came to Plaintiffs' counsel's attention last night (October 5, 2022) at approximately 7:32 p.m., during the e-mail conference on General Paxton's Stay Motion.  *See* **Ex. B** at 3.  Plaintiffs' counsel promptly reviewed the filed Reconsideration Exhibits and discovered that page 2 of Reconsideration Exhibit A-1 had been inadvertently omitted when assembling the various e-mail chains as exhibits.[2]  *See* ECF 67-1 at 6-7 (jumping from page 1 to page 3).  At approximately 8:47 p.m. last night, Plaintiffs' counsel alerted General Paxton's counsel to the mistake, informed them that Plaintiffs' counsel did not object to the Court's consideration of the page, and offered to confer on next steps.  **Ex. B** at 2.  General Paxton's counsel responded that this information "doesn't change the basis of our motion so we're going to go ahead and file."  *Id.*  The Stay Motion was filed at approximately 10:02 p.m.  ECF 84.

While these details of counsel's pre-filing conference normally would not be pertinent, General Paxton's attempt in the Stay Motion to characterize Plaintiffs' counsel's inadvertent omission as an "incomplete recitation of events" (*id.* at 2 ¶4) necessitates their discussion.  Before last night, Plaintiffs' counsel believed the missing page had been included in their filing.  *See* **Ex.**

---

[2] Plaintiffs' counsel prepared and filed the Reconsideration Exhibits under the significant time pressure created by General Paxton's Monday afternoon (September 26, 2022) filing of his motion to quash, less than 24 hours before the preliminary-injunction hearing. As Plaintiffs' counsel discussed at the hearing (**Ex. A** at 31-32), and as General Paxton's counsel confirms in the Stay Motion (ECF 84 (Stay Motion) at 2 ¶4; ECF 84-1 (Stay Motion Ex. A) at 2-3), General Paxton's counsel was aware as of 9:03 a.m. on Friday, September 23, 2022, that:  (1) they intended to assert an "apex" defense to the subpoena; *and* (2) Plaintiffs did not believe the apex doctrine applied. **Ex. C**; *see also* ECF 84-1 (Stay Motion Ex. A) at 2-3.  The first subpoena was served on General Paxton on Friday afternoon through the procedure he established at his office. ECF 67-1 (Reconsideration Ex. A-3) at 12.  As General Paxton's counsel acknowledged at the preliminary-injunction hearing, "It was incumbent on all of us to move fast….." **Ex. A** at 38.  Had General Paxton filed the motion to quash upon service of the first subpoena on Friday, September 23 (or even over the weekend), the additional time to respond might have averted the severe time constraints that produced the inadvertent omission.

**B** at 2. This belief is reflected in Plaintiffs' counsel's discussion at the preliminary-injunction hearing of the e-mail in Reconsideration Exhibit A as documenting General Paxton's assertion of the apex doctrine. **Ex. A** at 31-32. When the filing mistake was brought to Plaintiffs' counsel's attention last night, Plaintiffs' counsel promptly offered to correct the mistake. **Ex. B** at 2. General Paxton's counsel were within their rights to reject this offer and proceed with filing the Stay Motion. But in submitting the Stay Motion, General Paxton's counsel disclosed only the part of the facts that favored General Paxton's position. *See* ECF 84 (Stay Motion) at 2 ¶4.[3]

The Court's inherent power to control its docket, on which General Paxton grounds his request for a stay, is a power in equity. *In the Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1146 n.3 (5th Cir. 1987) (discussing the inherent power of courts under their general equity powers and in the efficient management of their dockets to grant a stay); *Castleberry v. A.T.F.*, 530 F.2d 672, 677 (5th Cir. 1976) (discussing the equitable powers of the district court necessarily inherent in the court's supervision of its own docket). He who seeks equity must do equity. *See Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) (discussing principle that a party's inequitable conduct can make equitable relief, such as a stay, inappropriate); *Winston v. Brown,* 247 F. 948, 949 (5th Cir. 1918) (setting forth equitable maxim). Plaintiffs respectfully submit that General Paxton's violation of this maxim by, *inter alia*, omitting facts from the Stay Motion that are material to the requested relief would preclude an award of equitable relief, even if Plaintiffs had not already made the Court aware of the "apex" issue at the preliminary-injunction hearing.

---

[3] In addition to the Stay Motion, General Paxton had the opportunity to disclose the material facts in the Certificate of Conference he filed separately. ECF 85. Instead, the Certificate references only Ms. Myers' e-mail "indicat[ing] Plaintiffs are opposed to the Attorney General's Motion to Stay" and omits any reference to Ms. Ecklund's e-mail regarding the inadvertent mistake and offer to correct it. *Id.* at 1; **Ex. B** at 2 (portion of conference e-mail string setting forth Ms. Ecklund's e-mail and Mr. Hilton's response).

## CONCLUSION

The Court should deny Attorney General Paxton's Motion to Stay.

Dated: October 6, 2022

Respectfully submitted,

*s/ Kirsten M. Castañeda*
Kirsten M. Castañeda
Texas Bar No. 00792401
kcastaneda@adjtlaw.com
**ALEXANDER DUBOSE & JEFFERSON LLP**
8144 Walnut Hill Lane, Suite 1000
Dallas, TX 75231-4388
Telephone: 214/369-2358
Facsimile: 214/369-2359

Jennifer R. Ecklund
Texas Bar No. 24045626
Elizabeth G. Myers
Texas Bar No. 24047767
Allyn Jaqua Lowell
Texas Bar No. 24064143
John Atkins
Texas Bar No. 24097326
Elizabeth Rocha
Texas Bar No. 24127242
**THOMPSON COBURN, LLP**
2100 Ross Avenue, Suite 3200
Dallas, TX 75201
(972) 629-7100
(972) 629-7171 (facsimile)
jecklund@thompsoncoburn.com
emyers@thompsoncoburn.com
alowell@thompsoncoburn.com
jatkins@thompsoncoburn.com
erocha@thompsoncoburn.com

Alexandra Wilson Albright
Texas Bar No. 21723500
aalbright@adjtlaw.com
Marcy Hogan Greer
Texas Bar No. 08417560
mgreer@adjtlaw.com

App.282

**ALEXANDER DUBOSE & JEFFERSON LLP**
515 Congress Ave., Suite 2350
Austin, TX 78701-3562
Telephone: 512/482-9300
Facsimile: 512/482-9303

Kevin Dubose
Texas Bar No. 06150500
kdubose@adjtlaw.com
**ALEXANDER DUBOSE & JEFFERSON LLP**
1844 Harvard Street
Houston, TX 77008
Telephone: 713/523-2358
Facsimile: 713/522-4553

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2022, a true and correct copy of the foregoing document, with any and all attachments, was filed electronically with the Clerk of Court using the CM/ECF system, which provided service to all parties through their counsel of record.

*s/ Kirsten M. Castañeda*
Kirsten M. Castañeda

# Exhibit A

Case 22-50882 Document 3 Page: 287 Date Filed 10/07/2022
Case 1:22-cv-00859-RP Document 87 Filed 10/04/2022 Page 1 of 231

1

```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   FUND TEXAS CHOICE, ET AL ) Docket No. A 22-CA-859 RP
     vs.                      ) Austin, Texas
 4   KEN PAXTON, IN HIS       )
     OFFICIAL CAPACITY OF     )
 5   ATTORNEY GENERAL, ET AL  ) September 27, 2022

 6         TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
              BEFORE THE HONORABLE ROBERT L. PITMAN
 7
     APPEARANCES:
 8
     For the Plaintiff:       Mr. John P. Atkins
 9                            Ms. Jennifer R. Ecklund
                              Ms. Allyn J. Lowell
10                            Ms. Elizabeth G. Myers
                              Ms. Elizabeth B. Rocha
11                            Thompson Coburn, LLP
                              2100 Ross Avenue, Suite 3200
12                            Dallas, Texas 75201

13                            Ms. Kirsten M. Castaneda
                              Alexander, Dubose
14                            & Jefferson, LLP
                              8144 Walnut Hill Lane, Suite 1000
15                            Dallas, Texas 75231

16                            Ms. Marcy Hogan Greer
                              Alexander, Dubose
17                            & Jefferson, LLP
                              515 Congress Avenue, Suite 2350
18                            Austin, Texas 78701

19   For the Defendant:       Ms. Amy Snow Hilton
                              Mr. Christopher D. Hilton
20                            Mr. Leif A. Olson
                              Mr. William D. Wassdorf
21                            Texas Attorney General's Office
                              P.O. Box 12548
22                            Austin, Texas 78711-2548

23   Court Reporter:          Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
24                            Austin, Texas 78701

25   Proceedings reported by computerized stenography,
     transcript produced by computer-aided transcription.
```

```
              I N D E X

                   Direct    Cross     Redirect  Recross
Witnesses:

Anna Rupani        7         20

Neesha Dave        53        64

Rosann Mariappuram 77        119       143       150

Bridget Schilling  152       165       175       180

Ghazaleh Moayedi   184       213       244
```

```
 1                  E X H I B I T S

 2                                    Offered    Admitted
     Plaintiffs'
 3

 4   #1                                 88          89

 5   #3                                 80          80

 6   #4                                158         159

 7   #5                                 92          92

 8   #6                                 97          97

 9   #8                                100         100

10   #9                                101         101

11   #12 through 15                    182         182

12   #17 through 20                    182         182

13   #26                               102         103

14   #27                                87          87

15   #28                               103         104

16   #29                               105         105

17   #32                               107         107

18   #33                               182         182

19   #34                               108         108

20   #41                               110         110

21   #42                               111         111

22   #43 through 46                    182         183

23   #47                               183         183

24   #50                                95          95

25   #62                               183         183
```

```
 1                    E X H I B I T S   (Continued)

 2                                       Offered   Admitted

 3   Plaintiffs'

 4   #63                                  111       111

 5

 6   Defendants'

 7   #1 through 48                        22        22

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:30:06 | 1  | THE CLERK:  A 22-CV-859, <u>Fund Texas Choice, and</u>       |
| 10:30:10 | 2  | <u>others vs. Ken Paxton</u>, for preliminary injunction hearing. |
| 10:30:13 | 3  | THE COURT:  For the plaintiff.                               |
| 10:30:19 | 4  | MS. ECKLUND:  Your Honor, Jennifer Ecklund along            |
| 10:30:21 | 5  | with Elizabeth Myers, Allyn Lowell, John Atkins and        |
| 10:30:24 | 6  | Elizabeth Rocha from Thompson Coburn for the plaintiff,    |
| 10:30:26 | 7  | along with Marcy Greer and Kirsten Castaneda from          |
| 10:30:30 | 8  | Alexander, Dubose & Jefferson.                             |
| 10:30:32 | 9  | THE COURT:  Good morning.                                  |
| 10:30:33 | 10 | And for the state.                                          |
| 10:30:34 | 11 | MS. HILTON:  Good morning, your Honor.                     |
| 10:30:35 | 12 | Amy Hilton for the Attorney General along with            |
| 10:30:38 | 13 | Will Wassdorf, Leif Olson and Chris Hilton.               |
| 10:30:42 | 14 | THE COURT:  Good morning.                                  |
| 10:30:43 | 15 | MS. HILTON:  Good morning.                                 |
| 10:30:44 | 16 | THE COURT:  We're here for a hearing on                   |
| 10:30:45 | 17 | plaintiffs' motion for a preliminary injunction.  What I   |
| 10:30:48 | 18 | would propose we do is to allow the parties to put into    |
| 10:30:54 | 19 | the record anything that you're going to be relying on in |
| 10:30:56 | 20 | support of your motion on -- it looks like that there's -- |
| 10:31:03 | 21 | the witness lists are substantially the same.  Is that --  |
| 10:31:06 | 22 | okay.  And I understand that there is an issue that we     |
| 10:31:09 | 23 | need to take up with regard to the subpoena or attempted   |
| 10:31:13 | 24 | subpoena of the Attorney General.  And so, why don't we    |
| 10:31:17 | 25 | take that up later.  Let's go ahead and go through your    |

| | | |
|---|---|---|
| 10:31:20 | 1 | witnesses, get everything into the record, and then, I'll |
| 10:31:24 | 2 | obviously give you an opportunity, once the record is |
| 10:31:26 | 3 | complete, to make any arguments that you would like to |
| 10:31:29 | 4 | make as I take this under consideration.  So with that, |
| 10:31:32 | 5 | your first witness. |
| 10:31:36 | 6 | MS. MYERS:  Your Honor, may I address one quick |
| 10:31:38 | 7 | housekeeping? |
| 10:31:38 | 8 | THE COURT:  Absolutely.  If you could just make |
| 10:31:40 | 9 | sure that the microphone is close to you. |
| 10:31:43 | 10 | MS. MYERS:  Elizabeth Myers on behalf of the |
| 10:31:44 | 11 | plaintiffs, your Honor. |
| 10:31:46 | 12 | As you know, you've granted leave for two of our |
| 10:31:48 | 13 | witnesses to appear via Zoom.  Dr. Moayedi actually has a |
| 10:31:51 | 14 | scheduling conflict between 11:00 and 12:30.  We're |
| 10:31:55 | 15 | planning to call her last.  And I just wanted to request |
| 10:31:58 | 16 | permission for her to deal with her scheduling conflict |
| 10:32:02 | 17 | and then, reappear when it's time for her to. |
| 10:32:04 | 18 | THE COURT:  Sure.  That's fine as long as -- I |
| 10:32:07 | 19 | mean we're not going to recess her or change our schedule |
| 10:32:11 | 20 | at all.  But if ou think that's going to be difficult, you |
| 10:32:13 | 21 | can call her now.  Or if you think you're going to -- |
| 10:32:17 | 22 | we'll pick this up after lunch and if she'll be available, |
| 10:32:20 | 23 | that's fine, too. |
| 10:32:21 | 24 | MS. MYERS:  I expect our evidence will take long |
| 10:32:23 | 25 | enough that we'll call her after lunch. |

| 10:32:25 | 1 | THE COURT: Great. That's fine. |
| 10:32:27 | 2 | MS. MYERS: Thank you, your Honor. |
| 10:32:27 | 3 | THE COURT: Thank you. |
| 10:32:35 | 4 | MS. LOWELL: We'd like to call Anna Rupani. And |
| 10:32:36 | 5 | Ms. Rupani is appearing via Zoom so I'm not sure. |
| 10:32:39 | 6 | THE COURT: You know, it's just not ideal. I |
| 10:32:40 | 7 | think that if -- it might be best if you question from the |
| 10:32:43 | 8 | podium if that's okay, and I think that she'll be able to |
| 10:32:49 | 9 | see you there. But let's test our sound first. |
| 10:33:11 | 10 | MS. MYERS: Your Honor, one other housekeeping. |
| 10:33:13 | 11 | We have a courtesy copy of our exhibits and binders. If |
| 10:33:15 | 12 | the Court would like them, I'm happy to bring them to you. |
| 10:33:20 | 13 | THE COURT: That would be great. If you could |
| 10:33:22 | 14 | pass them to the clerk. |
| 10:34:23 | 15 | Ms. Rupani, can you hear me? |
| 10:34:27 | 16 | THE WITNESS: I can hear you now. Thank you. |
| 10:34:29 | 17 | THE COURT: Great. And we can hear you, as well. |
| 10:34:31 | 18 | You may proceed. |
| 10:34:31 | 19 | DIRECT EXAMINATION |
| 10:34:33 | 20 | BY MS. LOWELL: |
| 10:34:33 | 21 | Q. Ms. Rupani, would you state your name for the record, |
| 10:34:35 | 22 | please? |
| 10:34:35 | 23 | A. Anna Rupani. |
| 10:34:38 | 24 | Q. And where are you employed? |
| 10:34:39 | 25 | A. At Fund Texas Choice. |

| | | |
|---|---|---|
| 10:34:41 | 1 | Q.   And what kind of an organization is Fund Texas |
| 10:34:44 | 2 | Choice? |
| 10:34:44 | 3 | A.   It's a practical support organization which basically |
| 10:34:47 | 4 | means that we help pregnant Texans travel to their |
| 10:34:51 | 5 | abortion appointment and to help them with lodging and |
| 10:34:55 | 6 | other support like gas assistance, food assistance, |
| 10:34:58 | 7 | childcare stipends, and other miscellaneous costs. |
| 10:35:00 | 8 | Q.   Okay.  And how would you summarize the mission of |
| 10:35:05 | 9 | Texas Fund Choice? |
| 10:35:05 | 10 | A.   It's to equitably -- it's to provide Texans equitable |
| 10:35:08 | 11 | access to safe, comprehensive and confidential practical |
| 10:35:13 | 12 | support. |
| 10:35:13 | 13 |        THE COURT:  Excuse me, if I could interrupt.  My |
| 10:35:15 | 14 | fault.  This is the thing about doing things remotely.  We |
| 10:35:20 | 15 | failed to swear the witness in. |
| 10:35:22 | 16 |        So, Ms. Rupani, you could you please raise your |
| 10:35:24 | 17 | right hand to be sworn. |
| 10:35:45 | 18 |        THE CLERK:  You do solemnly swear or affirm that |
| | 19 | the testimony which you may give in the case now before |
| | 20 | the Court shall be the truth, the whole truth, and nothing |
| | 21 | but the truth? |
| | 22 |        THE WITNESS:  Yes. |
| | 23 | ANNA RUPANI, called by the Plaintiffs via videoconference, |
| 10:35:47 | 24 | duly sworn. |
| 10:35:47 | 25 | Q.   (BY MS. LOWELL) Ms. Rupani, now that you're under |

| | | |
|---|---|---|
| 10:35:47 | 1 | oath, let's just recap your name on the record, please. |
| 10:35:49 | 2 | A.   Anna Rupani. |
| 10:35:50 | 3 | Q.   And where are you employed? |
| 10:35:53 | 4 | A.   Texas Fund Choice. |
| 10:35:54 | 5 | Q.   And how long have you been employed there? |
| 10:35:57 | 6 | A.   Since November 2020. |
| 10:36:00 | 7 | Q.   What's your role at Texas Fund Choice? |
| 10:36:02 | 8 | A.   I'm the executive director. |
| 10:36:05 | 9 | Q.   What kind of an organization is Texas Fund Choice? |
| 10:36:09 | 10 | A.   Texas Fund Choice is a practical support |
| 10:36:11 | 11 | organization.  And so, what we do is provide practical |
| 10:36:15 | 12 | support and travel support logistics to pregnant Texans |
| 10:36:18 | 13 | who need to get to abortion care, which could include gas |
| 10:36:22 | 14 | assistance, flights, lodging, childcare, food assistance |
| 10:36:26 | 15 | and other -- any other kind of miscellaneous costs that |
| 10:36:29 | 16 | might be incurred during travel. |
| 10:36:32 | 17 | Q.   And once more, how would you summarize the mission of |
| 10:36:36 | 18 | Texas Fund Choice? |
| 10:36:38 | 19 | A.   Sure.  It's to help Texans equitably access |
| 10:36:41 | 20 | comprehensive and confidential, practical travel and |
| 10:36:46 | 21 | practical support services. |
| 10:36:48 | 22 | Q.   Historically, what kinds of activities did FTC or |
| 10:36:53 | 23 | Texas Fund Choice engage in in furtherance of its mission? |
| 10:36:56 | 24 | A.   Yeah.  We recognize that Texans would need travel |
| 10:36:59 | 25 | support, so we were providing travel support and logistics |

10:37:03  1  to get pregnant Texans to their abortion care appointment.

10:37:06  2  And so, that could be in Texas before S.B. 8.  That would

10:37:11  3  be out of Texas if they needed support.  But we would buy

10:37:14  4  their flights.  We would book their hotels.  We would give

10:37:16  5  them gas assistance.  If they needed ride shares, we

10:37:21  6  provide them ride shares.  If they needed food assistance,

10:37:23  7  we'd provide them food stipends.  Anything and everything

10:37:26  8  from booking the appointment to traveling to the

10:37:28  9  appointment and then, getting back home.  Any of the costs

10:37:31  10  that might have been associated to that, we try to support

10:37:33  11  that.

10:37:33  12  Q.   And you mentioned S.B. 8.  Was there a change in the

10:37:39  13  activities that FTC undertook -- or, I'm sorry, Texas Fund

10:37:42  14  Choice undertook after S.B. 8?

10:37:44  15  A.   Yeah.  There was significant change.  Prior to S.B.

10:37:48  16  8, we saw around 40 to 50 callers at FTC a month.  And

10:37:53  17  then, post S.B. 8, we started receiving two to 300 calls a

10:37:57  18  month.  And then, 30 to 35 percent of our callers prior to

10:38:01  19  S.B. 8 left Texas to access case.  But post S.B. 8, 99.5

10:38:06  20  percent of our callers had to leave the state to access

10:38:08  21  care because they were unable to receive that care in the

10:38:11  22  state of Texas due to the six-week limit.

10:38:15  23  Q.   And so, how did this shift in the kinds of care that

10:38:20  24  people were seeking affect the activities that Texas Fund

10:38:23  25  Choice was conducting?

| | | |
|---|---|---|
| 10:38:25 | 1 | A.   Yeah.   Prior to S.B. 8, we were able to kind of help |
| 10:38:30 | 2 | everybody that called our hotline or almost everyone that |
| 10:38:32 | 3 | called our hotline, like around 90 percent or so; but |
| 10:38:35 | 4 | then, when S.B. 8 happened, we couldn't help as many |
| 10:38:40 | 5 | people.  We did double our staff size, but we were still |
| 10:38:42 | 6 | only able to help 30 to 40 percent of the callers that |
| 10:38:46 | 7 | called.  So we weren't able to offer support to everyone |
| 10:38:50 | 8 | that called, which we used to be able to do.  And it |
| 10:38:53 | 9 | required higher costs for us per caller because everyone |
| 10:38:57 | 10 | was leaving the state, so we had to find lodging for most |
| 10:39:00 | 11 | people.  It wasn't a quick ride share, a quick gas |
| 10:39:04 | 12 | assistance.  Almost everyone needed food assistance.  So |
| 10:39:08 | 13 | we just saw increase in costs for us, as well. |
| 10:39:10 | 14 | Q.   But did any of the core activities that Texas Fund |
| 10:39:13 | 15 | Choice had historically undertaken, did any of those |
| 10:39:17 | 16 | actually change after S.B. 8? |
| 10:39:18 | 17 | A.   They did not because we were able to continue |
| 10:39:21 | 18 | providing practical support to Texans getting care out of |
| 10:39:24 | 19 | state because abortions were legal out of state. |
| 10:39:29 | 20 | Q.   Okay.  And what are your operations like today? |
| 10:39:34 | 21 | A.   Currently, we don't offer practical support to our |
| 10:39:37 | 22 | callers.  We're predominantly doing advocacy and |
| 10:39:41 | 23 | educational activities and providing resources to callers, |
| 10:39:44 | 24 | letting them know that Texas -- Texas Fund Choice can't |
| 10:39:47 | 25 | help them, but there are other organizations in the nation |

| 10:39:50 | 1 | that can support them.  And just referring them to online |
| 10:39:54 | 2 | websites, and so forth, where they can look up that |
| 10:39:56 | 3 | information. |
| 10:39:57 | 4 | Q.   And when did that change occur in what Texas Fund |
| 10:40:02 | 5 | Choice was doing? |
| 10:40:03 | 6 | A.   As soon as the Dobbs decision came down. |
| 10:40:06 | 7 | Q.   Okay.  And why? |
| 10:40:07 | 8 | A.   We stopped providing -- oh, sorry. |
| 10:40:09 | 9 | Q.   Why did everything -- why did your operations change |
| 10:40:13 | 10 | upon the issuance of the Dobbs opinion? |
| 10:40:16 | 11 | A.   We feared civil and criminal prosecution. |
| 10:40:24 | 12 | Q.   Okay.  Why did you fear civil and criminal |
| 10:40:26 | 13 | prosecution? |
| 10:40:28 | 14 | A.   Yeah.  I think -- I believe that immediately after |
| 10:40:31 | 15 | the Dobbs decision came down, Attorney General Paxton's |
| 10:40:35 | 16 | office issued a statement that explicitly stated that the |
| 10:40:39 | 17 | full force of the law and the full force of his office |
| 10:40:42 | 18 | would be used in criminal prosecutions and civil |
| 10:40:46 | 19 | litigation and recovering civil penalties against anyone |
| 10:40:50 | 20 | that would violate the pre-Roe ban.  So the law that -- my |
| 10:40:56 | 21 | understanding, the law that existed before Roe was |
| 10:40:58 | 22 | decided.  And then, we also received a letter from |
| 10:41:01 | 23 | Representative Briscoe Cain that was on his official |
| 10:41:06 | 24 | letterhead that referred to us engaging in criminal |
| 10:41:09 | 25 | activity under the pre-Roe ban. |

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
| 10:41:11 | 1  | So with that combined, it kind of felt very                 |
| 10:41:15 | 2  | imminent.  And then, there was a hash tag that not only     |
| 10:41:18 | 3  | Representative Briscoe Cain but other representatives in     |
| 10:41:20 | 4  | the House at the Texas legislature were trending with,       |
| 10:41:26 | 5  | which was basically prosecute Texas abortion funds.  And    |
| 10:41:29 | 6  | so, we knew that we were going to be targeted.              |
| 10:41:34 | 7  | Q.   And how soon after the Dobbs opinion was released did  |
| 10:41:38 | 8  | Texas Fund Choice stop offering any practical support?      |
| 10:41:40 | 9  | A.   Immediately.                                            |
| 10:41:45 | 10 | Q.   Are there any other reasons that Texas Fund Choice     |
| 10:41:47 | 11 | stopped engaging in those activities?                       |
| 10:41:52 | 12 | A.   Yeah.  We also received like a spoliation letter from  |
| 10:41:56 | 13 | Jonathan Mitchell, who I believe is the ex-solicitor         |
| 10:41:59 | 14 | general of the state of Texas, stating that we likely       |
| 10:42:04 | 15 | engaged in criminal activity and so, we had to -- it was    |
| 10:42:08 | 16 | kind of like a litigation hold letter that we had to keep   |
| 10:42:14 | 17 | everything on file.  And then, we also know and have heard  |
| 10:42:21 | 18 | of the 202 depositions that our partner funds have been     |
| 10:42:27 | 19 | having to deal with.  And so, that felt also like a         |
| 10:42:30 | 20 | fishing expedition and feels like they're out to kind of   |
| 10:42:33 | 21 | attack abortion funds, including ones like ours.            |
| 10:42:38 | 22 | Q.   Okay.  Aside from the threat of prosecution or civil   |
| 10:42:44 | 23 | penalties or criminal prosecution, were there any other     |
| 10:42:47 | 24 | reasons that Texas Fund Choice stopped those activities     |
| 10:42:50 | 25 | that are historically done?                                 |

10:42:56  1   A.   I think we believe we'd be prosecuted, to be frank,

10:43:00  2   just because of the things that I said earlier.  Attorney

10:43:05  3   General Paxton's advisory was like a big part of it, too,

10:43:07  4   and then, being called criminals.  And the law that itself

10:43:10  5   kind of stated that there could be criminal prosecutions.

10:43:21  6   Q.   What impact has the change in -- well, the change in

10:43:24  7   activities that Texas Fund Choice undertakes, what impact

10:43:27  8   has that had on the donors?

10:43:31  9   A.   Yeah.  We've received several communications from our

10:43:35  10   donors explicitly saying that they aren't sure they can

10:43:40  11   donate to us because of criminal and civil liabilities.

10:43:43  12   There was this fear of being sued as someone who's

10:43:49  13   potentially aiding and abetting.  And we've also had

10:43:51  14   several communications with donors who are sustaining and

10:43:54  15   recurrent donors who have been giving us monthly donations

10:43:57  16   that are discontinuing their support while we're paused

10:43:59  17   with operations.  So -- and when you lose a sustaining

10:44:04  18   donor, it's often hard to get them back.  And so, you

10:44:06  19   know, we've seen a decrease -- we've seen our -- sorry.

10:44:12  20   We've seen our sustaining -- some of our sustaining donors

10:44:15  21   drop off because of that and we've had to spend, I guess,

10:44:18  22   a pretty extensive time trying to talk to our donors and

10:44:22  23   let them know what's happening on the ground, which has

10:44:24  24   taken away from other work we could be doing.

10:44:28  25   Q.   Has there been any impact on Texas Fund Choice's

| | | |
|--|--|--|
| 10:44:31 | 1 | staff since the Dobbs opinion? |
| 10:44:34 | 2 | A.   Yeah.   Staff has been very fearful of the lawsuit and |
| 10:44:38 | 3 | just fearful of losing their jobs so much so that we even |
| 10:44:42 | 4 | lost a staff member recently due to having to pause |
| 10:44:45 | 5 | practical support.   They were -- we are unable to fulfill |
| 10:44:49 | 6 | our full mission right now.   We're unable to provide |
| 10:44:52 | 7 | practical support.   And, you know, the reason we get staff |
| 10:44:54 | 8 | to come to Fund Texas Choice is because they're very |
| 10:44:58 | 9 | excited about this work, and so, to not be able to do this |
| 10:45:01 | 10 | work was taking a mental toll on -- is taking a mental |
| 10:45:06 | 11 | toll on our staff.   And so, we did end up losing a staff |
| 10:45:09 | 12 | member just in relation to not being able to help Texans |
| 10:45:12 | 13 | the way that we want to.   And they do fear that the risk |
| 10:45:14 | 14 | of these laws will make the work really impossible to do |
| 10:45:19 | 15 | going forward. |
| 10:45:27 | 16 | Q.   So what does Texas Fund Choice want to resume doing? |
| 10:45:32 | 17 | A.   We want to go back to providing practical support for |
| 10:45:35 | 18 | Texans to seek care out of state, which we were before the |
| 10:45:39 | 19 | Dobbs decision came out. |
| 10:45:40 | 20 | Q.   And when would you all feel comfortable doing that? |
| 10:45:45 | 21 | A.   Once the Court says that we can. |
| 10:45:49 | 22 | Q.   Do you have any knowledge about the timing of this |
| 10:45:53 | 23 | particular lawsuit, the complaint in this case? |
| 10:45:57 | 24 | A.   Yeah.   My understanding was that S.B. 8 can require |
| 10:46:05 | 25 | parties not only to pay for their attorneys' fees but |

| | |
|---|---|
| 10:46:07 | 1 |
| 10:46:10 | 2 |
| 10:46:13 | 3 |
| 10:46:16 | 4 |
| 10:46:20 | 5 |
| 10:46:26 | 6 |
| 10:46:37 | 7 |
| 10:46:39 | 8 |
| 10:46:43 | 9 |
| 10:46:46 | 10 |

potentially the other side's attorneys' fees if we lost in
any way.  And so, we had to protect the financial
wherewithal of the agency and raise money for the
organization to be able to participate in a suit like
this.  A lawsuit like this could really harm us
financially if we didn't have the money ready to go.
Q.   Okay.  Are there any other harms that you can tell
the Court about that have affected Texas Fund Choice since
the Dobbs opinion was issued?
A.   I think the three areas of the base harm, leave of
staff, staff fear, staff retention, having to kind of redo
our policy and not be able to practice our mission and
then, also, to donors.  And also, board members that also
felt this -- the fear of criminal liability.  The
directors of the organization whose names are kind of out
there and who have fiduciary duty to the organization.  So
we've seen fear on all levels of the organization and
discomfort in the words that we've all heard as well as
seeing in action with staff leaving and losing recurrent
donors.
Q.   Okay.  And has the -- has any of this impacted your
relationships with the public or with other entities?
A.   I'm sorry.  Would you mind repeating that?
Q.   Yeah.  Has any of this affected Texas Fund Choice's
relationship with public or with other entities?

| | | |
|---|---|---|
| 10:47:52 | 1 | A.   I think that it's difficult to say in its entirety. |
| 10:47:58 | 2 | I know that other folks have looked at us and said, we're |
| 10:48:01 | 3 | not funding anymore.  And so, kind of steer people clear |
| 10:48:07 | 4 | of our way in many ways.  We haven't been able to |
| 10:48:09 | 5 | communicate with clinics or partners that we normally |
| 10:48:12 | 6 | communicate with to let them know what's happening on the |
| 10:48:15 | 7 | ground because we're fearful those communications can be |
| 10:48:19 | 8 | used as a way to say we're providing practical support. |
| 10:48:23 | 9 | And so, we've kind of had to change the way we talk to our |
| 10:48:27 | 10 | partners.  And so, I would say that our relationship with |
| 10:48:31 | 11 | our partners have changed because there's risk of criminal |
| 10:48:37 | 12 | liability. |
| 10:48:37 | 13 | Q.   Okay.  And I'm asking you to sort of hypothesize |
| 10:48:44 | 14 | here, but what would be the effect if you're not able to |
| 10:48:47 | 15 | resume the activities that historically Texas Fund Choice |
| 10:48:50 | 16 | had engaged in? |
| 10:48:53 | 17 | A.   I'm sorry.  Would you mind repeating that?  I'm |
| 10:48:55 | 18 | having a hard time hearing. |
| 10:48:56 | 19 | Q.   Sure.  What will be the effect on Fund Texas Choice |
| 10:49:00 | 20 | if it's unable to resume those historical activities that |
| 10:49:05 | 21 | it had undertaken in furtherance of its mission? |
| 10:49:08 | 22 | MR. WASSDORF:  Objection.  Calls for speculation. |
| 10:49:10 | 23 | THE COURT:  I'll allow the question -- |
| 10:49:14 | 24 | A.   It's kind of hard to quantify, I think.  In my |
| 10:49:14 | 25 | opinion, it would be catastrophic just because our staff |

| | | |
|---|---|---|
| 10:49:16 | 1 | is here to do practical support and support that mission |
| 10:49:20 | 2 | of the organization in whatever level of work they're |
| 10:49:23 | 3 | doing.  And so, to not be able to fulfill its mission |
| 10:49:27 | 4 | would potentially be catastrophic for us.  It's so |
| 10:49:34 | 5 | unknown, but it does feel that, you know, we fear that we |
| 10:49:38 | 6 | might have to shut down and not be able to support |
| 10:49:41 | 7 | pregnant Texans if we're unable to get a court order that |
| 10:49:45 | 8 | says we can. |
| 10:49:46 | 9 | Q.   (BY MS. LOWELL) Specifically, what activities do you |
| 10:49:49 | 10 | want the Court to allow you to resume doing? |
| 10:49:54 | 11 | A.   Yeah.  So the travel logistics, being able to book |
| 10:49:58 | 12 | travel for Texans to leave the state to access care in |
| 10:50:00 | 13 | legal states.  Be able to book hotels in those same |
| 10:50:03 | 14 | states, provide Texans gas assistance to get to their |
| 10:50:06 | 15 | appointments out of state where abortion is still legal. |
| 10:50:10 | 16 | Be able to provide them childcare stipends so they have |
| 10:50:14 | 17 | care in Texas because 62 percent of our clients are |
| 10:50:17 | 18 | already parenting so they can actually leave home and be |
| 10:50:20 | 19 | able to not have to worry about that.  Be able to provide |
| 10:50:24 | 20 | ride shares for them to get to their appointment.  Any of |
| 10:50:27 | 21 | the miscellaneous costs so any and all of that that we've |
| 10:50:30 | 22 | already been doing prior to Dobbs. |
| 10:50:33 | 23 | Q.   And it's your current understanding that any of those |
| 10:50:36 | 24 | activities could subject you or the organization to |
| 10:50:38 | 25 | prosecution? |

| 10:50:39 | 1 | A.    Yes. |

A.    Yes.

Q.    That's all I have.  Thank you, Ms. Rupani.

            MR. WASSDORF:  Your Honor, a brief question.
With respect to the Zoom witnesses and exhibits, how is
that going to work?

            THE COURT:  So do they have a copy of whatever
you would be showing the witness?

            MR. WASSDORF:  Yes, your Honor.

            THE COURT:  Does your witness have copies with
her of what's been provided?

            THE WITNESS:  I'm sorry.  I'm having a real
difficult time hearing opposing counsel.

            THE COURT:  Yeah, we're having a little sidebar
conversation here.  We're figuring out some logistics.

            THE WITNESS:  Sorry about that.  Thank you.

            THE COURT:  No.

            MS. LOWELL:  Which exhibits?

            MR. WASSDORF:  Looks like we'll be using
Defendant's Exhibit 32, 33 and 34.

            MS. LOWELL:  I don't know that she has an actual
copy of them.  I think we can.  We can get them e-mailed
to her, if that's how you want to do it, instead of
sharing through Zoom or whatever.  Is that 32 through 34?

            MR. WASSDORF:  Yeah, that works for me.

            THE COURT:  You don't have the ability to Zoom

| 10:52:02 | 1 | share.  This is one of the things we wanted y'all to take |
| 10:52:04 | 2 | care of before now.  Do you have the ability to receive |
| 10:52:11 | 3 | e-mails where you are? |
| 10:52:14 | 4 | THE WITNESS:  Is that a question for me?  I |
| 10:52:15 | 5 | apologize. |
| 10:52:17 | 6 | THE COURT:  I'm sorry.  Ms. Rupani, yes, that's a |
| 10:52:19 | 7 | question for you.  Do you have the ability to receive |
| 10:52:21 | 8 | e-mails where you are? |
| 10:52:22 | 9 | THE WITNESS:  Yes. |
| 10:52:23 | 10 | THE COURT:  Okay.  Your counsel is going to be |
| 10:52:27 | 11 | e-mailing you certain exhibits that will be referred to |
| 10:52:34 | 12 | during the opposing counsel's questioning of you.  So |
| 10:52:38 | 13 | we'll give that a couple of minutes to go through. |
| 10:52:43 | 14 | THE WITNESS:  Okay.  Thank you. |
| 10:52:45 | 15 | THE COURT:  Do you have some preliminary |
| 10:52:46 | 16 | questioning? |
| 10:52:47 | 17 | MR. WASSDORF:  I do.  I'll just -- for the |
| 10:52:52 | 18 | Court's benefit, I'll pull the exhibits up on here, as |
| 10:52:55 | 19 | well. |
| 10:52:55 | 20 | THE COURT:  Thank you. |
| 10:53:09 | 21 | CROSS-EXAMINATION |
| 10:53:10 | 22 | BY MR. WASSDORF: |
| 10:53:10 | 23 | Q.  So, Ms. Rupani, I believe we've already established |
| 10:53:12 | 24 | that you're the executive director of Texas Fund Choice; |
| 10:53:14 | 25 | is that correct? |

| 10:53:16 | 1 | A.   Yes. |
| 10:53:17 | 2 | Q.   And Texas Fund Choice helps Texans access abortion |
| 10:53:23 | 3 | through travel services and other practical support; is |
| 10:53:29 | 4 | that correct? |
| 10:53:29 | 5 | A.   Yes. |
| 10:53:33 | 6 | Q.   And this includes planning and supporting travel for |
| 10:53:36 | 7 | individuals to abortion appointments? |
| 10:53:43 | 8 | A.   If the abortion appointment is in a state where the |
| 10:53:46 | 9 | abortion is legal, yes. |
| 10:53:48 | 10 | Q.   And you also book and pay for bus tickets and ride |
| 10:53:54 | 11 | shares, airfare, food and lodging to assist people in |
| 10:54:01 | 12 | their travel to these abortion appointments? |
| 10:54:04 | 13 | A.   In the state where the abortion is legal, yes. |
| 10:54:09 | 14 | Q.   And Texas Fund Choice has at this point ceased all |
| 10:54:13 | 15 | these practical activities? |
| 10:54:15 | 16 | A.   Yes. |
| 10:54:16 | 17 | Q.   And you also contend that your speech has been |
| 10:54:22 | 18 | chilled. |
| 10:54:25 | 19 | A.   Yes. |
| 10:54:27 | 20 | Q.   But you do continue to speak about abortion, don't |
| 10:54:31 | 21 | you? |
| 10:54:32 | 22 | A.   Yes, but using -- being able to have to think about |
| 10:54:38 | 23 | how we talk about abortion, the way we talk about |
| 10:54:41 | 24 | abortion, the way our callers can access care does, in |
| 10:54:47 | 25 | fact, mean that I am unable to speak freely to them. |

| 10:54:54 | 1 | Q.   Have you received the e-mail with the exhibits that |
| 10:54:57 | 2 | I'm going to be using? |
| 10:54:58 | 3 | A.   I will check right now.  Thank you.  I do not see the |
| 10:55:06 | 4 | e-mail yet. |
| 10:55:16 | 5 | MR. WASSDORF:  While we're waiting for her to |
| 10:55:17 | 6 | receive that, your Honor, I will go ahead and say that I |
| 10:55:21 | 7 | believe that we have an agreement as to all of Defendants' |
| 10:55:25 | 8 | Exhibits.  So I would go ahead and move to admit Exhibits |
| 10:55:28 | 9 | 32, 33 and 34. |
| 10:55:30 | 10 | THE COURT:  Any objection? |
| 10:55:32 | 11 | MS. MYERS:  Your Honor, we've agreed that all the |
| 10:55:34 | 12 | exhibits on their exhibit list can be readily entered now, |
| 10:55:37 | 13 | in fact.  So. |
| 10:55:37 | 14 | THE COURT:  If you'd like to go ahead and just |
| 10:55:39 | 15 | pre-admit all of them?  Okay.  What exhibits would the |
| 10:55:41 | 16 | range be? |
| 10:55:42 | 17 | MR. WASSDORF:  It will be Exhibits 1 through 48. |
| 10:55:50 | 18 | THE COURT:  One through 48 without objection, so |
| 10:55:53 | 19 | admitted. |
| 10:56:02 | 20 | THE WITNESS:  I have refreshed my e-mail a couple |
| 10:56:04 | 21 | of times.  I have not seen the exhibits come in quiet. |
| 10:56:08 | 22 | MS. MYERS:  Your Honor, we're trying.  It's a zip |
| 10:56:11 | 23 | file, so it may be taking additional time. |
| 10:56:14 | 24 | THE COURT:  Okay.  It's a zip file, so it may be |
| 10:56:16 | 25 | taking a little longer to get to you. |

| 10:56:18 | 1 | MS. MYERS: And it should be coming from Ms. |
| 10:56:20 | 2 | Ecklund. |
| 10:56:20 | 3 | THE COURT: And it will be coming from Ms. |
| 10:56:23 | 4 | Ecklund's account if that's what you're looking for. |
| 10:56:24 | 5 | THE WITNESS: Okay. Thank you. |
| 10:56:32 | 6 | THE COURT: And just while we're on the subject, |
| 10:56:35 | 7 | are there any additional exhibits that needs to be sent to |
| 10:56:43 | 8 | Dr. Moayedi? |
| 10:56:45 | 9 | MS. MYERS: We're doing that right now as we |
| 10:56:46 | 10 | speak, your Honor. |
| 10:56:47 | 11 | THE COURT: Great. Thank you. |
| 10:56:48 | 12 | MS. MYERS: We've also just provided -- since we |
| 10:56:50 | 13 | have no objection to the Defendants' Exhibits, we're just |
| 10:56:52 | 14 | providing entire sets. |
| 10:56:53 | 15 | THE COURT: Okay. Great. Thank you. |
| 10:57:02 | 16 | Ms. Rupani, just let us know when you've received |
| 10:57:04 | 17 | those. |
| 10:57:05 | 18 | THE WITNESS: I will. It might just be taking a |
| 10:58:22 | 19 | while. I have refreshed a few times. I have to log back |
| 10:58:26 | 20 | in and log back out just to make sure. |
| 10:58:28 | 21 | THE COURT: Okay. Thank you. |
| 10:58:31 | 22 | THE WITNESS: It has not come in quite yet. I'm |
| 10:58:34 | 23 | just letting you know. |
| 10:58:35 | 24 | THE COURT: I guess with this down time, why |
| 10:58:38 | 25 | don't we take this as an opportunity to talk about the |

10:58:43  1    Paxton subpoena and let's -- so we're going to take a

10:58:48  2    minute and deal with another matter, Ms. Rupani and we'll

10:58:51  3    get back to you in just a few minutes.

10:58:53  4              THE WITNESS:  Okay.  Thank you.

10:58:58  5              MS. CASTANEDA:  Your Honor, we have a paper copy

10:58:59  6    of the response and motion to reconsider and emergency

10:59:01  7    motion to exclude that we filed this morning.  We've

10:59:04  8    provided a copy to opposing counsel.  May I approach?

10:59:06  9              THE COURT:  Yes.  I've actually seen it.  Thank

10:59:11  10   you.

10:59:11  11             MS. CASTANEDA:  Perfect.  Your Honor, we have

10:59:12  12   filed a motion to reconsider the Court's ruling this

10:59:16  13   morning granting the motion to quash and, also, an

10:59:19  14   emergency motion to exclude that provides a request for

10:59:23  15   alternative relief if the ruling stands.  I'm not going to

10:59:29  16   belabor all of the detail that's provided in the response

10:59:32  17   or the motion to reconsider.  I will go ahead and say for

10:59:37  18   the record because discussions before the hearing

10:59:40  19   indicated that there may be an objection to the motion to

10:59:43  20   reconsider as inappropriate or unsupported.

10:59:49  21             This is an interlocutory order, and motions to

10:59:51  22   reconsider interlocutory orders are not strictly governed

10:59:55  23   by any rule.  But many times, this district and courts in

10:59:59  24   the circuit have looked to Rule 59(e) to rule on motions

11:00:06  25   to reconsider.  Rule 54 generally provides that

| 11:00:12 | 1 | interlocutory orders, of course, may be revised at any |
| 11:00:15 | 2 | time before final judgment, which we don't have in this |
| 11:00:18 | 3 | case.  And a motion to reconsider an interlocutory order |
| 11:00:24 | 4 | generally can call into question the correctness of that |
| 11:00:28 | 5 | order and that's what our motion to reconsider does. |
| 11:00:32 | 6 | Some of the grounds that will support |
| 11:00:34 | 7 | reconsideration are whether the motion is necessary to |
| 11:00:37 | 8 | correct a manifest error of law or fact. |
| 11:00:40 | 9 | THE COURT:  I'm not worried about my ability to |
| 11:00:43 | 10 | reconsider. |
| 11:00:43 | 11 | MS. CASTANEDA:  Okay.  Thank you, your Honor. |
| 11:00:44 | 12 | THE COURT:  That's fine.  I guess what would be |
| 11:00:46 | 13 | most helpful to me would be if you could articulate, |
| 11:00:48 | 14 | perhaps proffer for the record what information you |
| 11:00:51 | 15 | believe is necessary from this witness because as they |
| 11:00:56 | 16 | have pointed out in their motion to quash, it's an |
| 11:00:59 | 17 | exceptional circumstance that would -- in which a state |
| 11:01:03 | 18 | official would be compelled to testify personally.  And |
| 11:01:05 | 19 | so, if you could kind of proffer what that would be that |
| 11:01:07 | 20 | is uniquely sort of within the ability of this witness to |
| 11:01:13 | 21 | testify and then -- and there seems to be an issue with |
| 11:01:16 | 22 | regard to how long they've been on notice that you |
| 11:01:20 | 23 | intended to or wished to call Mr. Paxton as a witness. |
| 11:01:25 | 24 | And so, if you could address those matters, that |
| 11:01:26 | 25 | would be helpful to me. |

11:01:28   1          MS. CASTANEDA:  I would be glad to, your Honor.

11:01:29   2   Thank you.

11:01:29   3          With regard to the evidence that this witness

11:01:34   4   would put on, assuming for the moment of this argument on

11:01:39   5   this point that the Morgan doctrine does apply and that we

11:01:43   6   are required to enumerate extraordinary circumstances to

11:01:49   7   show that he should be compelled to testify.  The

11:01:52   8   extraordinary circumstances in this case are twofold.

11:01:54   9   First of all, this is not a case which is the regular case

11:01:59   10   where we are simply arguing that General Paxton was

11:02:04   11   involved in policymaking or decisionmaking, that he was

11:02:07   12   involved in the process in the regular course of business.

11:02:11   13          General Paxton has chosen to make public

11:02:15   14   statements as Attorney General not only in tweets, not

11:02:21   15   only in legal filings in this case but, also, in public

11:02:25   16   statements that do two things.  First of all, they say he

11:02:28   17   will enforce the laws of Texas with regard to the exact

11:02:32   18   conduct that's at issue here at this preliminary

11:02:34   19   injunction hearing, which includes funding or otherwise

11:02:38   20   assisting Texans to obtain abortions in other

11:02:42   21   jurisdictions where abortion is legal.  And that he will

11:02:47   22   enforce Texas laws without limiting those statements,

11:02:52   23   those threats of enforcement to civil penalties.  That he

11:02:56   24   will enforce all the laws of Texas that he will assist in

11:02:59   25   criminal prosecutions.

| | | |
|---|---|---|
| 11:03:01 | 1 | Not that he will wait to see if anyone asks for |
| 11:03:03 | 2 | his assistance or not that he will assist if invited, but |
| 11:03:11 | 3 | that he will do this.  In addition to that, those |
| 11:03:15 | 4 | statements have come from General Paxton, I mean.  He has |
| 11:03:19 | 5 | not made those statements through deputies, or through a |
| 11:03:22 | 6 | press secretary, or through other people who could come |
| 11:03:27 | 7 | and testify as to whether those statements and threats |
| 11:03:31 | 8 | actually mean what they say. |
| 11:03:34 | 9 | The second extraordinary circumstance there -- |
| 11:03:37 | 10 | and this is an extraordinary circumstance recognized by |
| 11:03:41 | 11 | the case law that we cite in our response and our motion |
| 11:03:44 | 12 | to reconsider -- is that General Paxton has chosen to make |
| 11:03:50 | 13 | that question a relevant issue here at this preliminary |
| 11:03:54 | 14 | injunction hearing.  The question being do the statements |
| 11:03:57 | 15 | and threats that he has made actually mean what they say? |
| 11:04:01 | 16 | We've reproduced exact language, quoted language |
| 11:04:04 | 17 | showing that the statements are not equivocal, they're |
| 11:04:10 | 18 | from his own mouth, and they do not limit his intent to |
| 11:04:14 | 19 | enforce pre-Roe statutes to simply civil penalties.  They |
| 11:04:20 | 20 | include criminal enforcement.  We also have included |
| 11:04:23 | 21 | information including statements in the preliminary |
| 11:04:25 | 22 | injunction response. |
| 11:04:28 | 23 | I would draw the Court's attention to pages 21 |
| 11:04:30 | 24 | and 24, in particular, where General Paxton has confirmed |
| 11:04:34 | 25 | his misinterpretation of Texas law to criminalize the |

11:04:41  1  conduct at issue here and has confirmed that he interprets

11:04:48  2  the pre-Roe statutes to criminalize abortion funds,

11:04:52  3  including the plaintiffs here for all activities related

11:04:55  4  to abortion, regardless of whether abortions take place in

11:04:59  5  a jurisdiction outside of Texas in which abortion is

11:05:02  6  legal.  He says there's no constitutional right to pay for

11:05:06  7  an abortion.  There is no constitutional right to help

11:05:09  8  someone get an abortion.  And the First Amendment does not

11:05:11  9  protect those things just because plaintiffs want to

11:05:14  10  perform those illegal deeds at the same time they talk

11:05:18  11  about performing them.

11:05:20  12          He also makes clear that the pre-Roe statutes

11:05:25  13  criminalizing abortion apply, quote, whether the Texan

11:05:28  14  mother seeks an abortion in Denver or Dallas, in Las

11:05:33  15  Cruces or Lamesa, end quote, and extends to, quote,

11:05:37  16  procurement in the form of a bus ticket for the pregnant

11:05:41  17  Texan to an abortion clinic or the paying the Texan --

11:05:45  18  from Texas of the cost of the pregnant Texan's hotel room

11:05:49  19  adjacent to that clinic.  It does not matter if the travel

11:05:51  20  and hotel are in Albuquerque or in Austin, end quote.  So

11:05:55  21  that's another extraordinary circumstances we have here.

11:05:58  22          The third extraordinary circumstance we have here

11:06:02  23  is that we have subpoenaed General Paxton to testify at a

11:06:04  24  time in this case where we have not been allowed to

11:06:06  25  conduct discovery.  We have not been allowed to conduct

| | |
|---|---|
| 11:06:10 | 1 |
| 11:06:16 | 2 |
| 11:06:20 | 3 |
| 11:06:24 | 4 |

depositions, to establish what the record already shows, which is General Paxton has exclusive firsthand knowledge of what he said and whether he meant what he said when he said it.

I think as we go further in the hearing, our position will be communicated that regardless of what he meant when he said these things, they say what they say. But General Paxton has placed what he meant at issue because his defense -- if you look at page 1 of his preliminary injunction response and then, follow throughout, his defense is the statements that I made don't mean what I said. The statements that I made don't actually threaten enforcement of criminal laws, even though I made no distinction between civil or criminal laws and I've said this conduct is criminal and I've said I will assist in the criminal prosecutions of people, I didn't really mean that. He's the only one who can testify on that particular issue.

So to the extent that he has chosen to make it the center point of his defense here, he has created one of the extraordinary circumstances that justify his testimony here. If you look at the cases that are cited in the motion to quash, they involve situations where a subpoena has been directed to a high-ranking official for a deposition during the course of discovery or after a

| 11:07:52 | 1 | period for discovery has elapsed, whether at a summary |
| 11:07:57 | 2 | judgment stage or at trial where the plaintiff seeking to |
| 11:08:00 | 3 | compel the attendance and testimony either didn't make the |
| 11:08:04 | 4 | effort to generate the information that would show that |
| 11:08:09 | 5 | the official did more than simply participate in the |
| 11:08:12 | 6 | process and has exclusive firsthand knowledge or the |
| 11:08:18 | 7 | depositions and the discovery that happened actually show |
| 11:08:21 | 8 | and confirm that there are other people who can testify. |
| 11:08:25 | 9 | We're here on a preliminary injunction hearing |
| 11:08:29 | 10 | where we haven't had the opportunity to conduct discovery |
| 11:08:31 | 11 | where the witness that we have subpoenaed has himself |
| 11:08:36 | 12 | chosen to make this relevant, and yet, we are being faced |
| 11:08:40 | 13 | with an argument in the motion to quash that he should not |
| 11:08:47 | 14 | be compelled to testify absent extraordinary circumstances |
| 11:08:51 | 15 | and that these circumstances are not extraordinary.  In |
| 11:08:54 | 16 | light of the case law, these circumstances are |
| 11:08:56 | 17 | extraordinary.  They're rare.  In fact, there is not one |
| 11:08:59 | 18 | single case cited in the motion to quash that addresses |
| 11:09:02 | 19 | the situation before this court. |
| 11:09:06 | 20 | The relevance issue, your Honor, if I may lead to |
| 11:09:09 | 21 | the second point that you asked me to address, which is |
| 11:09:13 | 22 | whether the timing of the subpoena would support the |
| 11:09:18 | 23 | quashing.  And we have provided evidence in addition to |
| 11:09:24 | 24 | the evidence, which I believe is Exhibits B through G or |
| 11:09:30 | 25 | H, which support the arguments that I was making with |

| 11:09:34 | 1 | regard to the extraordinary circumstances. |
| 11:09:35 | 2 | We've provided in our response and motions an |
| 11:09:40 | 3 | Exhibit A, which provides communications by e-mail and |
| 11:09:44 | 4 | information about communications that happen by phone to |
| 11:09:47 | 5 | show that plaintiffs very promptly sought to subpoena |
| 11:09:53 | 6 | General Paxton when he put this matter at issue and made |
| 11:09:58 | 7 | it relevant. |
| 11:10:00 | 8 | Before the filing of his response to the |
| 11:10:02 | 9 | preliminary injunction on September 19th, we had no way to |
| 11:10:06 | 10 | know that he would be taking the position that his |
| 11:10:10 | 11 | statements and threats didn't mean what he said.  Once we |
| 11:10:14 | 12 | learned that, which was a week ago yesterday, September |
| 11:10:17 | 13 | 19th, we still did not see a need to subpoena General |
| 11:10:23 | 14 | Paxton to appear and testify here because the Court had |
| 11:10:26 | 15 | ordered all parties and counsel to attend this hearing. |
| 11:10:30 | 16 | And we were unaware that unlike our clients, unlike the |
| 11:10:37 | 17 | actual individual district attorneys who actually sought |
| 11:10:43 | 18 | clarity on whether they needed to be here since they're |
| 11:10:45 | 19 | not participating, General Paxton did not indicate in any |
| 11:10:51 | 20 | way in the preliminary injunction response, or otherwise, |
| 11:10:55 | 21 | on September 19th, or 20th, or 21st that he did not intend |
| 11:11:00 | 22 | to honor the Court's order as written and appear. |
| 11:11:04 | 23 | On September 22nd, as is illuminated in the |
| 11:11:11 | 24 | declaration and the supporting e-mails in Exhibit A, we |
| 11:11:15 | 25 | became aware that at the very least, there was some |

11:11:19   1   ambiguity about whether General Paxton would appear.

11:11:22   2   Counsel would not confirm or deny whether he would appear,

11:11:25   3   but they did raise a slightly different doctrine, not the

11:11:29   4   Morgan doctrine, but the Texas state apex doctrine

11:11:33   5   indicating their position that we did not have the basis

11:11:39   6   to compel General Paxton to testify here.

11:11:43   7           So we made attempts to get -- to have counsel

11:11:51   8   accept service of a subpoena on General Paxton's behalf.

11:11:53   9   When they refused the next day, September 23rd, which was

11:11:57   10  Friday, we went ahead and served a subpoena on General

11:12:01   11  Paxton through the procedure established at his office.

11:12:02   12  We believe that was sufficient.  Over the weekend, we had

11:12:08   13  discussions with General Paxton's counsel about exhibits

11:12:11   14  and other logistics for this hearing, and during those

11:12:15   15  discussions, they communicated to us that they did not

11:12:17   16  believe the subpoena was sufficient either from a

11:12:20   17  technical or a substantive standpoint.  So we advised them

11:12:24   18  that we would serve General Paxton in person where he

11:12:28   19  could be found.  And we, in abundance of caution, also

11:12:34   20  drafted subpoenas for his official and individual

11:12:38   21  capacity.

11:12:38   22          The official capacity subpoena deals with these

11:12:42   23  issues that I've outlined already.  The individual

11:12:44   24  capacity subpoena addressed the objections that General

11:12:49   25  Paxton's counsel indicated they would lodge against, in

11:12:55 1  particular, a tweet from General Paxton's Twitter account

11:12:59 2  that is labeled in three different ways, attorney general,

11:13:05 3  Ken Paxton.  They indicated an intent to object that that

11:13:08 4  is his personal account and that the tweet would be

11:13:14 5  unauthenticated.

11:13:15 6        So again, their having put that at issue, we went

11:13:20 7  ahead and, in abundance of caution, did two subpoenas:

11:13:24 8  One official, one individual.  We then on Monday, after

11:13:27 9  having again asked if they would accept service of the

11:13:31 10  subpoena, which request was refused, we went ahead and

11:13:38 11  made more attempts to serve General Paxton in person where

11:13:42 12  he could be found.  When General Paxton refused to accept

11:13:49 13  service at that location, we alerted his counsel by e-mail

11:13:56 14  what was going on and asked again if they would accept

11:13:59 15  service of the subpoenas.  They refused.  We were left

11:14:01 16  with no choice but to serve him in person at that

11:14:04 17  location.

11:14:06 18        We then received, yesterday afternoon, the motion

11:14:09 19  to quash.  In footnote one of the motion to quash, General

11:14:15 20  Paxton's counsel challenged the fact that we had not

11:14:18 21  presented any evidence that service had actually been

11:14:21 22  accomplished.  Therefore, we filed certificates of service

11:14:24 23  promptly showing that we had served him, including a

11:14:29 24  location of where we had served him, which is not required

11:14:32 25  to be redacted by any rule and was necessary to respond to

11:14:37    1   their footnote.

11:14:38    2          When opposing counsel then objected to the fact

11:14:43    3   that we included the address where he was served in our

11:14:45    4   certificates, we offered to voluntarily redact that even

11:14:49    5   though no rule required it.  So I realize the timeline was

11:14:54    6   very detailed, but I think in light of the challenges to

11:15:00    7   the timing of the subpoena and also the accusations of

11:15:04    8   impropriety, it's important for the Court to know -- and

11:15:07    9   we have provided this in our response and also in Exhibit

11:15:11   10   A to that response -- that there has been no delay and no

11:15:17   11   impropriety by the plaintiffs.  To the extent that there's

11:15:19   12   been any delay or impropriety, it's been on the part of

11:15:23   13   General Paxton.  That is not necessary for the Court to

11:15:27   14   find.

11:15:29   15          The last thing that I would say is, in the

11:15:32   16   alternative that the Court does not reconsider the motion

11:15:35   17   to quash ruling and General Paxton is not compelled to

11:15:41   18   appear and testify as part of this hearing, we would ask

11:15:45   19   that the Court exclude any evidence from General Paxton

11:15:53   20   and any arguments of counsel which wouldn't be evidence

11:16:00   21   with regard to what his statements that he's made and that

11:16:03   22   we're going to be providing evidence about, what these

11:16:07   23   statements and threats meant, whether they can be recast

11:16:10   24   or re-characterized contrary to what the language says.

11:16:15   25   They say what they say and the Court can consider that as

| 11:16:18 | 1 | it is. |

11:16:21  2      That they not be allowed to contest the evidence

11:16:26  3  that we offer, including the tweet from General Paxton's

11:16:31  4  account.  I don't believe that there's any evidence that

11:16:34  5  would establish it's not his official account or that he

11:16:38  6  isn't posting tweets as Attorney General in that capacity.

11:16:42  7  But to the extent that even there's an argument to be made

11:16:44  8  about that by asking to have the individual subpoena

11:16:50  9  quashed, they can't basically use that as a sword and a

11:16:55  10  shield here.  If they don't want him to appear, they

11:17:00  11  shouldn't be able to contest the evidence.

11:17:01  12      And finally, that they not be allowed to contest

11:17:06  13  that Governor Paxton has threatened enforcement of civil

11:17:12  14  and criminal penalties for helping women procure

11:17:14  15  out-of-state abortions as part of their defense.  We have

11:17:20  16  cited some case law in our response, in our motion to

11:17:25  17  reconsider and exclude regarding the impropriety of using

11:17:32  18  equity as both a sword and a shield.  You see it in

11:17:37  19  judicial estoppel where a party takes an independent

11:17:42  20  position and obtains relief as a result of it and then, is

11:17:45  21  not allowed to come in and stand inconsistent to that.

11:17:49  22      You see it in equitable estoppel, which is

11:17:53  23  applied in a variety of situations that precludes a party

11:17:57  24  from having its cake and eating it, too, or eating the

11:18:01  25  cake and having it, too.  I never know exactly which way

| | | |
|---|---|---|
| 11:18:03 | 1 | that goes.  Here, the things that we're asking the Court |
| 11:18:08 | 2 | to exclude, or disallow, or prohibit General Paxton from |
| 11:18:11 | 3 | doing at the hearing are necessary to prevent him from |
| 11:18:16 | 4 | using equity as a shield to protect him from testifying |
| 11:18:20 | 5 | here, but then, using it as a sword to keep us from either |
| 11:18:27 | 6 | providing the Court with evidence and material or to come |
| 11:18:31 | 7 | in and contest our right to a preliminary injunction. |
| 11:18:35 | 8 | THE COURT:  Let me ask you a question with regard |
| 11:18:37 | 9 | to the relevance piece of this. |
| 11:18:41 | 10 | MS. CASTANEDA:  Yes, your Honor. |
| 11:18:41 | 11 | THE COURT:  And that is -- and I think you're |
| 11:18:43 | 12 | exactly right.  We will know more at the end this hearing |
| 11:18:45 | 13 | what the state's position is in this regard.  But doesn't |
| 11:18:48 | 14 | the relevance of Mr. Paxton's testimony depend -- whatever |
| 11:18:53 | 15 | he believes about the illegality of any of the things that |
| 11:18:56 | 16 | are the subject of this lawsuit, doesn't the relevance of |
| 11:18:59 | 17 | that testimony depend on his ability in his official |
| 11:19:02 | 18 | capacity to enforce those beliefs or enforce those laws? |
| 11:19:07 | 19 | And to some extent, I believe it's going to be the state's |
| 11:19:10 | 20 | position that he doesn't have that ability, and if he |
| 11:19:13 | 21 | doesn't, then what does it matter what he believes if he's |
| 11:19:15 | 22 | not the state officials who going to be enforcing them? |
| 11:19:18 | 23 | MS. CASTANEDA:  I think that Ms. Ecklund may be |
| 11:19:21 | 24 | addressing in more detail the legal basis.  But for |
| 11:19:25 | 25 | purposes of this question and this context, what I would |

| | | |
|---|---|---|
| 11:19:27 | 1 | say is that we are not required to show that General |
| 11:19:34 | 2 | Paxton actually can, for example, initiate and pursue to |
| 11:19:44 | 3 | completion a criminal prosecution.  We are actually not |
| 11:19:47 | 4 | required to show even that he has made the threats that he |
| 11:19:53 | 5 | has made. |
| 11:19:55 | 6 | I know it's their position that we need to show |
| 11:19:57 | 7 | that, but under the law, we do not.  What we need to show |
| 11:20:01 | 8 | is that the threats, the statements that he's made and the |
| 11:20:04 | 9 | position that he's taken, and that position is stated very |
| 11:20:07 | 10 | clearly in the response, has had a chilling effect on the |
| 11:20:14 | 11 | First Amendment rights of plaintiffs and that plaintiffs |
| 11:20:19 | 12 | based on what governor -- General Paxton has said that |
| 11:20:23 | 13 | they are in fear of criminal penalties. |
| 11:20:28 | 14 | In addition to that, I would say that given |
| 11:20:34 | 15 | General Paxton's ability to assist in criminal |
| 11:20:40 | 16 | prosecutions, his authority to do that where he is |
| 11:20:47 | 17 | invited, given the fact that General Paxton wields the |
| 11:20:52 | 18 | influence that he wields, not only the authority but also |
| 11:20:55 | 19 | the influence, and given that General Paxton from his own |
| 11:20:59 | 20 | mouth to the exclusion of not only deputies and |
| 11:21:03 | 21 | representatives in his own office but to the exclusion of |
| 11:21:07 | 22 | many other law enforcement and government officials, has |
| 11:21:12 | 23 | decided to lead the charge and has pledged to use every |
| 11:21:16 | 24 | tool at his disposal to both -- to pursue both criminal -- |
| 11:21:22 | 25 | to pursue both civil penalties and criminal enforcement, I |

| | | |
|---|---|---|
| 11:21:27 | 1 | do not think that it is -- I think that that establishes |
| 11:21:33 | 2 | that even if he is not authorized to do something |
| 11:21:36 | 3 | completely on his own, his encouragement, his influence, |
| 11:21:39 | 4 | his pressure and his ability to assist would support that |
| 11:21:46 | 5 | sort of conclusion that he can to the extent that that is |
| 11:21:50 | 6 | what the state ends up arguing and to the extent that the |
| 11:21:53 | 7 | Court is looking at that issue from that standpoint. |
| 11:21:55 | 8 | THE COURT:  Thank you very much.  And what would |
| 11:21:58 | 9 | like -- Mr. Hilton? |
| 11:21:59 | 10 | MR. HILTON:  Thank you, your Honor.  Chris Hilton |
| 11:22:01 | 11 | for the state. |
| 11:22:01 | 12 | There was a lot there, a lot of it, I think, |
| 11:22:06 | 13 | overlap with the merits of the lawsuit.  I want to start |
| 11:22:08 | 14 | just with the motion for reconsideration and, of course, |
| 11:22:10 | 15 | address any of the Court's questions.  I don't have any |
| 11:22:14 | 16 | objection to the premise they can move the Court to |
| 11:22:17 | 17 | reconsider its ruling, but your Honor correctly decided |
| 11:22:20 | 18 | the motion to quash. |
| 11:22:22 | 19 | You know, as an initial matter, all of these |
| 11:22:26 | 20 | arguments could have been raised in a timely manner |
| 11:22:28 | 21 | yesterday or early this morning in a response to motion to |
| 11:22:32 | 22 | quash.  Not a motion to reconsider.  There's no reason, |
| 11:22:35 | 23 | you know, offer that they could not have responded in a |
| 11:22:37 | 24 | timely manner.  Obviously this was a fast-moving |
| 11:22:40 | 25 | situation.  It was incumbent on all of us to move fast and |

11:22:44  1  under the circumstances, there's no excuse for their

11:22:47  2  untimeliness.  That, in and of itself, warrants denying a

11:22:49  3  motion for reconsideration.

11:22:50  4       More importantly, I think they fundamentally

11:22:53  5  misunderstand what they would even theoretically be

11:22:57  6  getting from the Attorney General's personal testimony to

11:23:00  7  the extent that there's any relevance to his public

11:23:02  8  statements here at all.  And I think we would tend to

11:23:05  9  agree with your Honor, what's much more relevant is what

11:23:07  10  the law actually provides and that's, of course, something

11:23:10  11  that your Honor will determine.  To the extent we are

11:23:12  12  looking at the Attorney General's statements, it is, you

11:23:16  13  know, the statements themselves that are important not

11:23:19  14  whatever subjective he -- intent he might have had when he

11:23:22  15  said them.  To the extent that plaintiffs are relying on a

11:23:25  16  chilling injury, they could not have possibly been chilled

11:23:28  17  by unspoken subjective intent.  They only could have been

11:23:33  18  chilled by a public statement, otherwise, they wouldn't

11:23:36  19  have known about it.

11:23:37  20       Furthermore, to the extent that there's any

11:23:40  21  question about, you know, what the policy of the Attorney

11:23:43  22  General's Office is, you have four representatives from

11:23:47  23  the Attorney General's Office here, will answer the

11:23:50  24  Court's questions as we always do.  And I very much

11:23:55  25  bristle at the suggestion that we have somehow not abided

11:23:58   1   by the Court's order.  They've sued the Attorney General

11:24:00   2   in his official capacity.  So the office has four

11:24:03   3   representatives authorized to address the Court on any

11:24:06   4   matter that the Court has to raise.

11:24:09   5          Another fundamental misunderstanding we think is

11:24:13   6   that none of the exhibits and none of the text of these

11:24:17   7   supposed statements actually shows that, you know, he said

11:24:20   8   he would prosecute any of this conduct.  Quite frankly, I

11:24:24   9   think the entire case suffers from this issue of putting

11:24:26   10  the cart before the horse where we're trying to do a

11:24:29   11  pre-enforcement challenge on something that is necessarily

11:24:32   12  fact found and specific and must be addressed with, you

11:24:36   13  know, particular circumstances.

11:24:40   14         And so, you know, to the suggestion that we

11:24:42   15  shouldn't even be able to discuss the meaning of the

11:24:45   16  statements that they're attempting to introduce into

11:24:47   17  evidence, I think that will be wholly unjust and unfair to

11:24:51   18  our client.  It's for the Court to determine the meaning

11:24:52   19  of the words and their relevance to the case.  The

11:24:55   20  suggestion that the attorney should be precluded from

11:24:58   21  discussing that, I think, you know, has no basis for -- no

11:25:03   22  basis in law.

11:25:05   23         And your Honor, I'm happy to answer any other

11:25:08   24  questions, but I also just want to address the -- you

11:25:13   25  know, the issue with the Attorney General's personal

11:25:17  1  address being put into the record.  There is absolutely no

11:25:19  2  reason that should have ever been done and that presented

11:25:22  3  a grave security threat.  And it was, of course,

11:25:26  4  understandable that the Attorney General would not engage

11:25:28  5  with an unidentified man shouting his name outside his

11:25:30  6  house.

11:25:31  7       And so, I very much bristle at the suggestion

11:25:35  8  that anything improper happened here at all, except for

11:25:37  9  the fact that plaintiffs' counsel never advised us ahead

11:25:41  10 of time that they'd be spending someone to the Attorney

11:25:44  11 General's residence.  So there's a lot more I could

11:25:45  12 respond to, your Honor.  I'm happy to address any

11:25:47  13 questions.  But I think you have the thrust of the issue

11:25:50  14 on the motion for reconsideration.

11:25:50  15      THE COURT:  Thank you.  I think I'll be much

11:25:53  16 better informed at the conclusion of this hearing about

11:25:55  17 sort of the propriety or necessity of that witness'

11:26:00  18 testimony.  And so, I'm going to withhold ruling on that

11:26:03  19 and we can always keep the record open in the event that I

11:26:08  20 believe that that testimony is appropriate and necessary

11:26:11  21 to this hearing.  So thank you very much for.

11:26:14  22      MS. CASTANEDA:  Thank you, your Honor.

11:26:15  23      THE COURT:  And now, Ms. Rupani, are you still

11:26:17  24 with us?

11:26:21  25      THE WITNESS:  I am.  Sorry.

| | | |
|---|---|---|
| 11:26:24 | 1 | THE COURT: All right. Thank you. Have you |
| 11:26:26 | 2 | received the exhibits? |
| 11:26:27 | 3 | THE WITNESS: I did receive the exhibits. |
| 11:26:29 | 4 | THE COURT: Great. Thank you. I think we'll |
| 11:26:31 | 5 | resume, then, your cross-examination. And I believe that |
| 11:26:34 | 6 | if you're able to have access to those, he's going to be |
| 11:26:36 | 7 | asking you questions about certain of those exhibits. |
| 11:26:40 | 8 | THE WITNESS: Okay. |
| 11:26:40 | 9 | THE COURT: Thank you. |
| 11:26:44 | 10 | Q. (BY MR. WASSDORF) All right. Ms. Rupani, could you |
| 11:26:55 | 11 | pull up Defendants' Exhibit 32? |
| 11:27:03 | 12 | A. Yes. This is the one with a tweet and a picture, |
| 11:27:08 | 13 | correct? |
| 11:27:09 | 14 | Q. Yes, ma'am. |
| 11:27:13 | 15 | A. Okay. |
| 11:27:13 | 16 | Q. So you testified earlier that Texas Fund Choice has |
| 11:27:18 | 17 | ceased all practical activities; is that correct? |
| 11:27:19 | 18 | A. I said we ceased practical support, which is a |
| 11:27:22 | 19 | specific phrase referring to travel support and logistical |
| 11:27:25 | 20 | support when folks are seeking abortion care. |
| 11:27:30 | 21 | Q. And you also contend that your speech has been |
| 11:27:34 | 22 | chilled? |
| 11:27:35 | 23 | A. In specific instances, yes. |
| 11:27:37 | 24 | Q. But you do continue to speak about abortion, do you |
| 11:27:42 | 25 | not? |

11:27:43  1   A.   Yes, but if you remember what I said to my attorney,

11:27:47  2   I said that not be able to completely speak freely.  It is

11:27:52  3   having an effect on our speech.

11:27:56  4   Q.   Well, how is it that you are not able to speak in the

11:28:03  5   ways you wish to speak?

11:28:06  6   A.   We're not able to actually speak to callers and let

11:28:09  7   them know exactly where to go because then, we could be

11:28:12  8   seen as aiding and abetting that abortion.  We're not able

11:28:15  9   to explicitly say hey, seek these services, because that

11:28:19  10  could be deemed in violation of the pre-Roe ban until we

11:28:23  11  get further clarity from the Court.  So we're not able to

11:28:28  12  explicitly help callers the way we were able to even do so

11:28:32  13  before.  Not even being able to say yes, we'll support you

11:28:34  14  the way we wanted to is a chilled matter -- it has a

11:28:37  15  chilling effect on us.

11:28:38  16  Q.   Let's take a look at Exhibit 32 here.  Do you

11:28:42  17  recognize this document?

11:28:45  18  A.   The tweet, yes.

11:28:47  19  Q.   Yes, ma'am.  And it is a tweet from Texas Fund Choice

11:28:52  20  that was, I guess, published on September 15th, 2022?

11:29:00  21  A.   Yes.

11:29:02  22  Q.   And it reads, our resource lines are open.  Although

11:29:08  23  we are not able to provide travel support at this time due

11:29:12  24  to Texas law, we are here to share First

11:29:16  25  Amendment-protected info about clinics and abortion

11:29:20   1   support resources to Texans.  Did I read that correctly?

11:29:24   2   A.   You did.

11:29:27   3   Q.   So you are sharing First Amendment-protected

11:29:33   4   information; is that correct?

11:29:35   5   A.   We are sharing some First Amendment protected

11:29:39   6   information.  We're not sharing everything we can because

11:29:42   7   we're not sure if it would be used as something to be

11:29:44   8   aided or abetted or is in violation of these pre-Roe bans

11:29:47   9   until we get a clear court order saying that we can.

11:29:50   10  Q.   So what information that you contend is protected by

11:29:52   11  the First Amendment are you not sharing with your callers?

11:29:58   12  A.   So if you were to call me and say, I am a pregnant

11:30:02   13  Texan and I need to go to a clinic, what clinic is able to

11:30:05   14  help me and what organization explicitly able to support

11:30:09   15  me, I wouldn't be able to -- it is my understanding that

11:30:12   16  I'm not able to tell you exactly where to go and exactly

11:30:14   17  who to call and exactly where to receive those services in

11:30:18   18  detail because then I could be -- then it could be argued

11:30:23   19  that I would be potentially aiding and abetting, and I'm

11:30:27   20  not sure if that's the case until I'm waiting for the

11:30:29   21  Court to decide on that.

11:30:30   22         However, if you as a pregnant Texan is calling me

11:30:33   23  and asking where can I find resources, I do tell them

11:30:36   24  where they can find resources, say, on Google because it

11:30:38   25  is easily Google-able and findable online, and therefore,

| | | |
|---|---|---|
| 11:30:42 | 1 | it's not violating anything that they weren't able to |
| 11:30:45 | 2 | search in the first place. |
| 11:30:47 | 3 | Q.   Let's go ahead and pull up Defendants' Exhibits 33 |
| 11:30:52 | 4 | and 34. |
| 11:31:04 | 5 | A.   Thirty-three, that's another tweet, correct? |
| 11:31:06 | 6 | Q.   Yes, ma'am. |
| 11:31:09 | 7 | A.   Okay.  I have to have it in front of me. |
| 11:31:20 | 8 | Q.   Now, this is another tweet by Texas Fund Choice; is |
| 11:31:25 | 9 | that correct? |
| 11:31:25 | 10 | A.   Yes. |
| 11:31:28 | 11 | Q.   And it looks like -- I'm sorry, it appears to be a |
| 11:31:32 | 12 | poor copy, but it looks like that it was published on |
| 11:31:34 | 13 | August 24th, 2022.  Does that look correct? |
| 11:31:38 | 14 | A.   Yes. |
| 11:31:39 | 15 | Q.   And the top one there reads, we need your help to |
| 11:31:46 | 16 | fight these antiabortion extremists in the courtroom. |
| 11:31:50 | 17 | This lawsuit seeks to end their threats to charge us with |
| 11:31:56 | 18 | crime or criminal and civil penalties.  It will allow all |
| 11:31:59 | 19 | people in Texas to provide compassionate care and |
| 11:32:06 | 20 | assistance to pregnant Texans who need abortions.  Did I |
| 11:32:10 | 21 | read that correctly? |
| 11:32:12 | 22 | A.   Yes. |
| 11:32:13 | 23 | Q.   And so, in addition to being able to speak about |
| 11:32:19 | 24 | abortion, you are also continuing to fundraise for your |
| 11:32:25 | 25 | organization's efforts; is that correct? |

| | | |
|---|---|---|
| 11:32:30 | 1 | A.   Yes. |
| 11:32:32 | 2 | Q.   And in fact, you are fundraising off of the existence |
| 11:32:37 | 3 | of this very lawsuit that we're here today talking about. |
| 11:32:41 | 4 | A.   We would not have to do that if we didn't have to |
| 11:32:44 | 5 | deal with this lawsuit.  If we were able to know that we |
| 11:32:45 | 6 | could do what we needed to do, then we wouldn't be |
| 11:32:48 | 7 | fundraising for that.  We'd be fundraising for practical |
| 11:32:50 | 8 | support, which we are unable to do at the moment.  We have |
| 11:32:53 | 9 | seen donors fall out and say they won't support us right |
| 11:32:57 | 10 | now while we are not providing practical support. |
| 11:33:00 | 11 | Q.   So that would be a yes that you are fundraising off |
| 11:33:05 | 12 | of the existence of this lawsuit, correct? |
| 11:33:06 | 13 | A.   We're fundraising to support this lawsuit. |
| 11:33:10 | 14 | Q.   You just mentioned your donors.  You contended |
| 11:33:15 | 15 | earlier that your donors' free speech rights have also |
| 11:33:20 | 16 | been chilled; is that correct? |
| 11:33:24 | 17 | A.   Yes. |
| 11:33:25 | 18 | Q.   And you testified that regular donors have contacted |
| 11:33:29 | 19 | you indicating that they will no longer donate to your |
| 11:33:33 | 20 | organization. |
| 11:33:37 | 21 | A.   Did I hear you say that donors have contacted us and |
| 11:33:40 | 22 | saying they won't support the organization?  I'm sorry, |
| 11:33:43 | 23 | I'm having a little bit of hearing difficulty with that |
| 11:33:45 | 24 | question. |
| 11:33:46 | 25 | Q.   Yes, ma'am.  Your evaluation of the question was |

| | | |
|---|---|---|
| 11:33:49 | 1 | correct. |
| 11:33:51 | 2 | A.   We have had donors reach out to us and say while we |
| 11:33:54 | 3 | are paused, they will not support us or they're unsure |
| 11:33:56 | 4 | they can support us due to legal liabilities, either |
| 11:34:00 | 5 | criminal or civil. |
| 11:34:01 | 6 | Q.   So who has contacted you indicating that? |
| 11:34:04 | 7 | MS. LOWELL:  Objection.  Relevance. |
| 11:34:08 | 8 | MR. WASSDORF:  Goes to the truthfulness, your |
| 11:34:10 | 9 | Honor, if she can identify a specific individual. |
| 11:34:13 | 10 | THE COURT:  I'll allow the question. |
| 11:34:15 | 11 | Q.   (BY MR. WASSDORF) So who has contacted you indicating |
| 11:34:18 | 12 | that they can no longer donate to your organization? |
| 11:34:21 | 13 | A.   We've had several donors.  I don't have the list in |
| 11:34:24 | 14 | front of me.  I can get the information if my attorneys |
| 11:34:30 | 15 | tell me that that is required.  But I don't have the names |
| 11:34:34 | 16 | in front of me at the moment. |
| 11:34:37 | 17 | Q.   So as you sit here today, you cannot identify any |
| 11:34:42 | 18 | specific individual who has called to tell you that they |
| 11:34:47 | 19 | could no longer donate to your organization due to Texas' |
| 11:34:52 | 20 | abortion laws; is that correct? |
| 11:34:53 | 21 | A.   Yeah.  Unfortunately, we get several calls and |
| 11:34:56 | 22 | several e-mails daily, so it is hard for me to identify |
| 11:34:59 | 23 | which exact person sent those e-mails unless I am required |
| 11:35:03 | 24 | to do so by court, and that would require some time on my |
| 11:35:06 | 25 | end. |

| 11:35:07 | 1 | Q.   You've testified that you feel threatened by Texas |
| 11:35:14 | 2 | public officials; is that correct? |
| 11:35:16 | 3 | A.   Yes. |
| 11:35:18 | 4 | Q.   And one of the groups that you feel threatened by is |
| 11:35:22 | 5 | the Texas Freedom Caucus? |
| 11:35:29 | 6 | A.   Yes.  The Texas Freedom Caucus has explicitly talked |
| 11:35:33 | 7 | about travel support as a criminal activity and that is |
| 11:35:35 | 8 | what Texas Fund Choice does. |
| 11:35:36 | 9 | Q.   And I believe that you also identified representative |
| 11:35:40 | 10 | Briscoe Cain, specifically; is that correct? |
| 11:35:43 | 11 | A.   Yes.  He sent us a letter. |
| 11:35:45 | 12 | Q.   Now, do you understand that those individuals are |
| 11:35:50 | 13 | members of the legislature and can't prosecute you or |
| 11:35:55 | 14 | bring any civil enforcement actions against you? |
| 11:35:58 | 15 | A.   I do understand that they're members of the |
| 11:36:02 | 16 | legislature.  I also understand that they wield power in |
| 11:36:04 | 17 | the state as representatives of the state and of the |
| 11:36:06 | 18 | regions they are supposed to be representing.  So their |
| 11:36:11 | 19 | words do have an effect, regardless of whether or not they |
| 11:36:16 | 20 | themselves can do it.  They can, in fact, impact who does |
| 11:36:19 | 21 | bring those actions just like Ken Paxton's words do. |
| 11:36:23 | 22 | Q.   You also mentioned Jonathan Mitchell, I believe. |
| 11:36:28 | 23 | A.   Yes. |
| 11:36:29 | 24 | Q.   And you stated that he has -- what was it he sent |
| 11:36:35 | 25 | you?  A letter? |

| | | |
|---|---|---|
| 11:36:36 | 1 | A.   Yes. |
| 11:36:39 | 2 | Q.   Now, you understand that Jonathan Mitchell is a |
| 11:36:42 | 3 | private individual and does not speak for the state of |
| 11:36:44 | 4 | Texas in any manner, correct? |
| 11:36:48 | 5 | A.   I do know that he's an attorney that is not |
| 11:36:51 | 6 | affiliated with any position currently, but I do know that |
| 11:36:54 | 7 | he was the ex-solicitor general of Texas so he also wield |
| 11:36:58 | 8 | power. |
| 11:37:01 | 9 | Q.   Do you understand that any of these individuals or |
| 11:37:05 | 10 | organizations, whether it be the Texas Freedom Caucus or |
| 11:37:08 | 11 | Briscoe Cain or Jonathan Mitchell, that they don't speak |
| 11:37:12 | 12 | for the Office of the Attorney General? |
| 11:37:14 | 13 | A.   I do understand that, but the Office of the Attorney |
| 11:37:16 | 14 | General also explicitly said they would use the force of |
| 11:37:19 | 15 | the office against folks to file criminal and civil |
| 11:37:22 | 16 | prosecutions or help attorney generals in their counties |
| 11:37:25 | 17 | to do as such. |
| 11:37:26 | 18 | Q.   That wasn't my question, Ms. Rupani.  Do you |
| 11:37:28 | 19 | understand that the Texas Freedom Caucus, Briscoe Cain and |
| 11:37:32 | 20 | Jonathan Mitchell do not speak for the Office of the |
| 11:37:34 | 21 | Attorney General? |
| 11:37:37 | 22 | A.   I cannot say what conversations they have with each |
| 11:37:40 | 23 | other, but I can say that they are not the Attorney |
| 11:37:43 | 24 | General. |
| 11:37:43 | 25 | Q.   And do you understand that those individuals or |

11:37:47  1   organizations are also not a district attorney or county
11:37:52  2   attorney in the state of Texas?
11:37:54  3   A.   Again, I can't say what conversations they have with
11:37:57  4   other county district attorneys.  I can say that they're
11:37:59  5   not district attorneys.
11:37:59  6   Q.   Has anybody from the Office of the Attorney General
11:38:04  7   threatened to prosecute you for these activities that you
11:38:14  8   say you are unable to participate in?
11:38:20  9   A.   They've made statements that the pre-Roe bans are in
11:38:24  10  effect and support -- aiding an abortion is illegal.  And
11:38:30  11  they've also stated the activities that abortion funds
11:38:33  12  engage in can be deemed aiding or abetting in different
11:38:37  13  instances, I can't recall exactly when.  So they have --
11:38:40  14  the Attorney General and his office have made statements
11:38:43  15  as such, which is why we feel threatened.
11:38:46  16  Q.   So you can't identify any specific instance in which
11:38:49  17  the Office of the Attorney General or any of its
11:38:52  18  representatives have stated that the activities, the
11:38:55  19  specific activities that you engage in are subject to
11:39:01  20  criminal liability?
11:39:03  21  A.   I think there was a video of a speech Attorney
11:39:08  22  General Paxton made.  And then, also, I think when the
11:39:12  23  Harris County judge froze the pre-Roe ban -- pre-Roe laws,
11:39:17  24  I think that his office did tweet saying that the pre-Roe
11:39:22  25  laws criminalize abortion and that the decision was wrong,

11:39:26  1   and then, they did subsequently appeal that.  So I do

11:39:29  2   think that there has been enough tweets, enough

11:39:32  3   statements, and even the advisory of the -- of his office

11:39:38  4   that stated those things that these laws are in effect and

11:39:42  5   aiding an abortion is deemed criminal and there are civil

11:39:47  6   penalties attached to it that are very high.

11:39:53  7   Q.   Can you identify any --

11:39:55  8   A.   He's been saying these out loud.  They've been saying

11:39:59  9   them out loud and they have power and they use their

11:40:02  10  connections to make sure that attorneys will -- their DAs

11:40:05  11  in areas that we live in.

11:40:08  12  Q.   Thank you, Ms. Rupani.  Can you identify a -- any

11:40:12  13  specific instance in which any district or county attorney

11:40:15  14  has threatened to criminally prosecute you?

11:40:22  15  A.   I'm sorry, will you repeat that?

11:40:23  16  Q.   Can you identify any specific instance in which any

11:40:27  17  county or district attorney has threatened to criminally

11:40:31  18  prosecute you?

11:40:32  19  A.   None that I can recall at the moment.

11:40:40  20  Q.   And are you aware that only the county and district

11:40:42  21  attorneys have criminal prosecution authority?

11:40:47  22  A.   I'm sorry, will you repeat that?

11:40:49  23  Q.   Are you aware that only county and district attorneys

11:40:54  24  have criminal prosecution authority?

11:40:56  25  A.   Yes, but Ken Paxton did say that he will use the

| | | |
|---|---|---|
| 11:41:00 | 1 | force of his office to support these criminal prosecutions |
| 11:41:04 | 2 | and support of his office to make sure that they will |
| 11:41:07 | 3 | civilly prosecute us up to a hundred-thousand dollars, |
| 11:41:11 | 4 | which is a significant amount, as well, for our |
| 11:41:13 | 5 | organization. |
| 11:41:14 | 6 | Q.   All right.  Thank you, ma'am.  No further questions. |
| 11:41:17 | 7 | THE COURT:  Any redirect? |
| 11:41:20 | 8 | MS. LOWELL:  I have nothing more.  Thank you. |
| 11:41:23 | 9 | THE COURT:  Okay.  Thank you, ma'am.  May this |
| 11:41:25 | 10 | witness be released?  Yes. |
| 11:41:32 | 11 | MR. WASSDORF:  Yes. |
| 11:41:32 | 12 | THE COURT:  Okay.  Ms. Rupani, you're free to go. |
| 11:41:35 | 13 | Thank you very much.  Your next witness. |
| 11:41:38 | 14 | MS. LOWELL:  We'd like to call Neesha Dave. |
| 11:41:52 | 15 | MS. MYERS:  Your Honor, one final housekeeping. |
| 11:41:54 | 16 | We have set up for the witness binders if that would be |
| 11:41:58 | 17 | useful. |
| 11:41:58 | 18 | THE COURT:  That would be great. |
| 11:42:00 | 19 | MS. MYERS:  Can Mr. Atkins approach? |
| 11:42:03 | 20 | THE COURT:  Sure.  Ms. Dave, if you could come to |
| 11:42:06 | 21 | that corner of the courtroom and then, come to me. |
| 11:42:12 | 22 | MR. ATKINS:  Your Honor, I believe these also |
| 11:42:14 | 23 | include Defendants' Exhibits, although if they have their |
| 11:42:15 | 24 | own, I'd be happy to. |
| 11:42:16 | 25 | THE COURT:  Okay.  If you've got a copy there, |

| 11:42:18 | 1 | that's great. |
| 11:42:22 | 2 | Ms. Dave, before you're seated, if you could |
| 11:42:26 | 3 | raise your right hand to be sworn in. |
| 11:42:30 | 4 | THE CLERK:  You do solemnly swear or affirm that |
| 11:42:30 | 5 | the testimony which you may give in the case now before |
| 11:42:30 | 6 | the Court shall be the truth, the whole truth, and nothing |
| 11:42:31 | 7 | but the truth? |
| 11:42:31 | 8 | THE WITNESS:  Yes. |
| 11:42:32 | 9 | THE COURT:  Please be seated. |
| 11:42:39 | 10 | NEESHA DAVE, called by the Plaintiffs, duly sworn. |
| 11:42:39 | 11 | DIRECT EXAMINATION |
| 11:42:55 | 12 | BY MS. LOWELL: |
| 11:42:55 | 13 | Q.   Good morning, Ms. Dave. |
| 11:42:57 | 14 | A.   Hi.  Good morning. |
| 11:42:58 | 15 | Q.   Could you state you full name for the record, please? |
| 11:43:00 | 16 | A.   My name is Neesha Dave. |
| 11:43:02 | 17 | Q.   And what is your --who is your employer? |
| 11:43:04 | 18 | A.   I work at an organization called Lilith Fund. |
| 11:43:08 | 19 | Q.   What kind of organization is that? |
| 11:43:09 | 20 | A.   Lilith Fund is an abortion fund in Texas. |
| 11:43:12 | 21 | Q.   And what's its mission if you can summarize it? |
| 11:43:16 | 22 | A.   Yes.  Absolutely.  Lilith Fund has since the year |
| 11:43:19 | 23 | 2000 provided direct financial assistance to people |
| 11:43:23 | 24 | seeking abortion, to Texans seeking abortion care, has |
| 11:43:27 | 25 | also provided emotional support; and we also engage in |

| | | |
|---|---|---|
| 11:43:31 | 1 | organizing, advocacy and movement-building efforts to |
| 11:43:34 | 2 | expand access to abortion care in our state. |
| 11:43:37 | 3 | Q.   Historically, what other kinds of activities did |
| 11:43:41 | 4 | Lilith Fund engage in in furtherance of its mission? |
| 11:43:43 | 5 | A.   Yeah.  So since Lilith Fund's founding in 2001, our |
| 11:43:47 | 6 | organization has operated a direct assistance |
| 11:43:50 | 7 | abortion-funding hotline where people who are in need of |
| 11:43:55 | 8 | financial assistance to be able to access abortion care |
| 11:43:57 | 9 | can contact our organization and when we are -- when we |
| 11:44:02 | 10 | have the funds to do so, we're able to assist them with |
| 11:44:04 | 11 | direct funding for their abortion care.  And then, we also |
| 11:44:08 | 12 | provide emotional support, resource connection.  We also |
| 11:44:13 | 13 | engage in movement building and organizing and advocacy |
| 11:44:18 | 14 | activities to try to improve the abortion landscape in our |
| 11:44:21 | 15 | state. |
| 11:44:23 | 16 | Q.   And has at any point the scope of activities or kinds |
| 11:44:28 | 17 | of activities that Lilith Fund has engaged in, has that |
| 11:44:31 | 18 | changed? |
| 11:44:31 | 19 | A.   It has changed significantly and it feels like it has |
| 11:44:38 | 20 | been constantly changing in these last few years.  Last |
| 11:44:41 | 21 | fall when Senate Bill 8 took effect overnight, we saw that |
| 11:44:49 | 22 | the clients who were typically calling us now no longer |
| 11:44:51 | 23 | knew where they could access care, and the majority of |
| 11:44:54 | 24 | them were now having to travel out of state.  So the |
| 11:44:57 | 25 | majority of our clients then were facing huge additional |

| | |
|---|---|
| 11:45:00 | 1 |
| 11:45:04 | 2 |
| 11:45:07 | 3 |
| 11:45:09 | 4 |
| 11:45:12 | 5 |
| 11:45:15 | 6 |
| 11:45:20 | 7 |
| 11:45:21 | 8 |
| 11:45:24 | 9 |
| 11:45:28 | 10 |
| 11:45:31 | 11 |
| 11:45:34 | 12 |
| 11:45:37 | 13 |
| 11:45:41 | 14 |
| 11:45:44 | 15 |
| 11:45:49 | 16 |
| 11:45:54 | 17 |
| 11:45:56 | 18 |
| 11:46:00 | 19 |
| 11:46:04 | 20 |
| 11:46:10 | 21 |
| 11:46:12 | 22 |
| 11:46:15 | 23 |
| 11:46:18 | 24 |
| 11:46:22 | 25 |

1 costs in accessing abortion care.

2 So one thing that changed Lilith Fund is that a

3 majority of our clients are now traveling out of state,

4 and because they were facing so many additional costs,

5 Lilith Fund increased the amount of direct financial

6 assistance provided to each client to help close those

7 gaps.

8 Q.  And can you describe just generally the demographic

9 or the types of folks that Lilith Fund serves?

10 A.  Yeah.  Absolutely.  Our clients are majority people

11 of color.  They are majority parents, people who are

12 parenting children already.  They primarily live in the

13 southern half of the state of Texas, although we do serve

14 people across the state.  Primarily, our clients are in

15 the Houston, San Antonio and Austin areas.

16 Q.  So you've testified about what changed after Senate

17 Bill 8.  Have things changed more recently?

18 A.  Yes.  Absolutely.  When the Dobbs decision came down

19 in June of this year, Lilith Fund was forced to

20 immediately pause all direct abortion funding.  So that

21 day, the date the Dobbs decision came down was a Friday

22 and our hotline was open and we, for the first time in our

23 21-year history, had to call our clients back and tell

24 them that we would not be able to fund a single one of

25 their calls.  We would not able to assist any of them

11:46:26  1  because the decision had been handed down and because --

11:46:31  2  and the reason that we had to do that is because we feared

11:46:35  3  criminal prosecution for those activities that we had been

11:46:40  4  doing for a very long time.

11:46:41  5  Q.   And what made you fear criminal prosecution?

11:46:44  6  A.   So the day the Dobbs decision came down, I read an

11:46:50  7  advisory from the Office of the Attorney General in which

11:46:54  8  that stated -- and I will paraphrase and my recollection.

11:46:59  9  I believe it stated that the office of the Attorney

11:47:05  10  General believed that the pre-Roe abortion ban laws that

11:47:09  11  contain criminal penalties that those were in effect and

11:47:12  12  enforceable and that the office was encouraging and the

11:47:16  13  Attorney General was encouraging prosecutors across the

11:47:19  14  state to bring criminal charges under those laws.

11:47:23  15  Q.   And what made you believe that any activities that

11:47:28  16  Lilith Fund was engaging in would be subject to

11:47:31  17  prosecution if the pre-Roe statutes were enforced against

11:47:34  18  Lilith Fund?

11:47:35  19  A.   Yeah.  Over the course of the last year, we have seen

11:47:39  20  so many different public comments from state officials,

11:47:45  21  from public officials sharing their perspective that the

11:47:50  22  activities of abortion funds, directly providing direct

11:47:54  23  financial assistance for abortion care, that these are

11:47:56  24  criminalized under various antiabortion laws and also have

11:48:02  25  civil penalties associated with them under various

| | | |
|---|---|---|
| 11:48:06 | 1 | antiabortion laws. |
| 11:48:08 | 2 | Q.   So you testified that you ceased the funding |
| 11:48:11 | 3 | activities as of the day of Dobbs.  What does Lilith Fund |
| 11:48:14 | 4 | do today? |
| 11:48:16 | 5 | A.   So today, Lilith Fund still does not provide direct |
| 11:48:22 | 6 | abortion-funding assistance.  And we have been working |
| 11:48:28 | 7 | tirelessly since the Dobbs decision came down to figure |
| 11:48:33 | 8 | out other ways that we can meet the needs of our clients |
| 11:48:36 | 9 | because it is devastating to not be able to provide the |
| 11:48:42 | 10 | assistance that our clients need.  And so, we have been |
| 11:48:46 | 11 | working very hard to try to meet other needs that we know |
| 11:48:50 | 12 | that pregnant Texans have.  So we are now providing |
| 11:48:54 | 13 | funding for other kinds of reproductive healthcare but not |
| 11:48:58 | 14 | abortion care.  Of course, many of our clients, people |
| 11:49:00 | 15 | calling our hotline, they just need -- they need funding |
| 11:49:03 | 16 | for abortion care because they are seeking abortion care |
| 11:49:05 | 17 | in states where abortion is legal. |
| 11:49:09 | 18 | Q.   How are you assisting, if you're able to at all, |
| 11:49:12 | 19 | people who are looking for abortion care outside of Texas? |
| 11:49:15 | 20 | A.   If someone calls our hotline and asks for information |
| 11:49:19 | 21 | related to that, we are able to point them to publicly |
| 11:49:23 | 22 | available resources that are out there.  There's lots of |
| 11:49:27 | 23 | information that's already publicly available that we are |
| 11:49:30 | 24 | able to point them to. |
| 11:49:32 | 25 | Q.   Is there a reason that you don't more specifically |

| 11:49:35 | 1 | point them to, say, a specific clinic? |
| 11:49:38 | 2 | A.   We would like to be able to provide more direct |
| 11:49:42 | 3 | connection for our clients to make it easier for them to |
| 11:49:47 | 4 | be able to access the care that they are seeking, but we |
| 11:49:52 | 5 | have tried to stick with providing information that's |
| 11:49:56 | 6 | publicly available because we fear criminal prosecution. |
| 11:50:00 | 7 | Q.   And what specifically makes you fear criminal |
| 11:50:04 | 8 | prosecution for giving that kind of information? |
| 11:50:07 | 9 | A.   Because we have seen repeated statements from public |
| 11:50:11 | 10 | officials in Texas stating that -- I don't know what |
| 11:50:18 | 11 | exactly all the right terms are, but things like aiding |
| 11:50:22 | 12 | and abetting, being an accomplice, all of these different |
| 11:50:27 | 13 | phrases that we have seen that those apply, that public |
| 11:50:31 | 14 | officials believe that that applies to activities of |
| 11:50:33 | 15 | abortion funds like helping find -- helping people access |
| 11:50:37 | 16 | abortion care. |
| 11:50:38 | 17 | Q.   And what has Lilith Fund's engagement in the abortion |
| 11:50:45 | 18 | issue or abortion litigation been over the last year, if |
| 11:50:49 | 19 | any? |
| 11:50:49 | 20 | A.   We have been party in many different legal actions. |
| 11:50:55 | 21 | We were -- we are plaintiffs in a lawsuit related to |
| 11:51:02 | 22 | Senate Bill 8 that is in state court.  We are plaintiffs |
| 11:51:05 | 23 | in this lawsuit.  We have also been defendants in a |
| 11:51:11 | 24 | variety of matters. |
| 11:51:14 | 25 | Q.   And how about you in your personal capacity? |

| | | |
|---|---|---|
| 11:51:16 | 1 | A.   Yeah.  So I was personally targeted with a Rule 202 |
| 11:51:22 | 2 | petition this year.  I received service of it by a process |
| 11:51:29 | 3 | server directly at my home.  It is my understanding that |
| 11:51:33 | 4 | in that situation the opposing counsel did understand that |
| 11:51:37 | 5 | my counsel would accept service on my behalf, but they saw |
| 11:51:40 | 6 | fit to hire a process server to serve me at my home on a |
| 11:51:43 | 7 | Saturday morning, before 8:00 a.m. |
| 11:51:47 | 8 | Q.   What activities does Lilith Fund want to resume? |
| 11:51:51 | 9 | A.   Lilith Fund very much would like to be able to carry |
| 11:51:54 | 10 | out our full mission to be able to directly fund abortion |
| 11:51:59 | 11 | care for our clients, for Texans who are seeking abortion |
| 11:52:03 | 12 | care; and right now, that means seeking abortion care in |
| 11:52:06 | 13 | other states because there's not legal access to abortion |
| 11:52:09 | 14 | care in Texas. |
| 11:52:10 | 15 | Q.   Okay.  What has been the effect of this shift in your |
| 11:52:14 | 16 | operations on, say, donors? |
| 11:52:18 | 17 | A.   We have received many questions and, you know, |
| 11:52:23 | 18 | confusing sort of like that we have fielded a lot of |
| 11:52:27 | 19 | inquiries from donors that demonstrate they are very |
| 11:52:30 | 20 | confused about what is happening and they are very |
| 11:52:32 | 21 | concerned about what is happening.  We have at least one |
| 11:52:35 | 22 | donor who contacted us and paused or stopped -- not |
| 11:52:40 | 23 | paused, just stopped their sustaining, their ongoing |
| 11:52:42 | 24 | monthly contributions because we are not able to provide |
| 11:52:46 | 25 | direct financial assistance for abortion care at this |

| | | |
|---|---|---|
| 11:52:49 | 1 | time. |
| 11:52:49 | 2 | Q.   And has there been any effect in staffing or in the |
| 11:52:53 | 3 | organization aside from having to stop funding? |
| 11:52:56 | 4 | A.   Yeah.   Every member of our staff has been profoundly |
| 11:53:00 | 5 | affected by these laws.   Our staff that interacts with |
| 11:53:05 | 6 | donors has had to spend so much time responding to those |
| 11:53:09 | 7 | inquiries, had to spend so much time writing out, you |
| 11:53:15 | 8 | know, responses to frequently asked questions, really |
| 11:53:19 | 9 | assuring donors that we're doing everything that we can to |
| 11:53:22 | 10 | fight against these unjust laws and -- but that, you know, |
| 11:53:26 | 11 | we are constrained in this way because of the criminal |
| 11:53:31 | 12 | threats that we face.   And then, our program staff has |
| 11:53:37 | 13 | been working absolutely tirelessly, time they would have |
| 11:53:42 | 14 | spend doing other work but they could not because we have |
| 11:53:45 | 15 | been adopting our programs to these particular constraints |
| 11:53:49 | 16 | because we fear criminal prosecution. |
| 11:53:53 | 17 | Q.   If you no longer feared criminal prosecutions, how |
| 11:53:56 | 18 | quickly would you resume funding activities? |
| 11:53:59 | 19 | A.   We would act as quickly as we could.   We have been an |
| 11:54:04 | 20 | abortion fund since 2001.   We would like to carry out our |
| 11:54:07 | 21 | mission and we would like to be able to assist people with |
| 11:54:10 | 22 | direct financial assistance to access abortion care.   So |
| 11:54:14 | 23 | we would start working immediately to create arrangements |
| 11:54:20 | 24 | with the trusted partners that we work with to be able to |
| 11:54:24 | 25 | send funds for particular clients at their abortion |

11:54:30  1  providers and other states.

11:54:31  2  Q.  And so, is it fair to say that the fear of

11:54:33  3  prosecution is the only thing keeping Lilith Fund from

11:54:35  4  resuming its prior activities?

11:54:37  5  A.  Yes.

11:54:44  6  Q.  Do you have any knowledge about the timing of this

11:54:47  7  lawsuit?

11:54:48  8  A.  Yes.

11:54:50  9  Q.  And what is your knowledge about that?

11:54:52  10  A.  So we would -- we, frankly, wanted to file this

11:54:57  11  lawsuit much sooner than we did, but it took time to

11:55:04  12  secure the funding commitments that were needed -- to

11:55:08  13  secure funding commitments and to secure counsel so that

11:55:11  14  we could bring this suit forward.  Unfortunately, Senate

11:55:18  15  Bill 8 creates -- I'll say this the best I can in.  I

11:55:24  16  believe Senate Bill 8 creates liability for us as

11:55:26  17  plaintiffs but, also, our counsel that we are liable for

11:55:30  18  opposing counsel's -- for opposing partis' attorneys' fees

11:55:36  19  and costs when we challenge antiabortion laws should we

11:55:39  20  lose, and you know, those legal costs could be in the

11:55:45  21  hundreds of thousands or millions of dollars.  And that

11:55:50  22  would be absolutely financially devastating for our

11:55:53  23  organization.

11:55:55  24         And so, it took time to put together the funding

11:55:57  25  commitments that were necessary to have that assurance

| 11:56:01 | 1 | that our organization be able to continue operating should |
| 11:56:07 | 2 | that truly unfortunate circumstance come to pass. |
| 11:56:13 | 3 | Q.   If Lilith Fund is not able to resume its historical |
| 11:56:18 | 4 | activities long-term, what will the effect be on your |
| 11:56:22 | 5 | organization? |
| 11:56:23 | 6 | A.   The effect is devastating.  The effect would be |
| 11:56:27 | 7 | devastating.  It is already devastating, but for now, you |
| 11:56:34 | 8 | know, we are doing the best we can to put a Band-Aid on |
| 11:56:37 | 9 | this terrible situation where we're not able to carry out |
| 11:56:41 | 10 | our mission.  But we will only continue to lose longtime |
| 11:56:45 | 11 | supporters because, you know, the folks who are involved |
| 11:56:50 | 12 | in our work are involved in it because they want to assist |
| 11:56:55 | 13 | in providing direct financial assistance for people |
| 11:56:58 | 14 | seeking abortion care. |
| 11:56:59 | 15 | That is why people donate to abortion funds |
| 11:57:01 | 16 | because they want to help people access abortion care. |
| 11:57:03 | 17 | And if we are not able to carry out our full mission and |
| 11:57:07 | 18 | directly assist people financially with accessing abortion |
| 11:57:11 | 19 | care, then we will lose more donors and also we will lose |
| 11:57:18 | 20 | trust with clients who have -- you know, people seeking |
| 11:57:22 | 21 | abortion care for the last 21 years have come to know that |
| 11:57:27 | 22 | Lilith Fund is a place that they can call and where they |
| 11:57:29 | 23 | can receive accurate information, where they will be |
| 11:57:33 | 24 | respected and trusted, and where they can also receive |
| 11:57:36 | 25 | financial assistance, which is really what most people |

| | | |
|---|---|---|
| 11:57:39 | 1 | need.  That is the biggest barrier in accessing abortion |
| 11:57:43 | 2 | care in our states, and the reason for that is that |
| 11:57:45 | 3 | there's virtually no insurance coverage of abortion care |
| 11:57:47 | 4 | in our state because of state restrictions. |
| 11:57:50 | 5 | So almost everyone who seeks abortion care needs |
| 11:57:54 | 6 | financial assistance to be able to get the care that they |
| 11:57:56 | 7 | need.  And for 21 years, people have known that they can |
| 11:58:01 | 8 | contact Lilith Fund and other abortion funds in our state |
| 11:58:04 | 9 | for that financial assistance, and if we cannot provide |
| 11:58:07 | 10 | that assistance that is at the core of our mission, then |
| 11:58:11 | 11 | we will lose that trust that we have built with our |
| 11:58:14 | 12 | clients and the public. |
| 11:58:24 | 13 | Q.  I may have gone over this briefly, but I'll round it |
| 11:58:28 | 14 | up here.  So there's no other reason other than fear of |
| 11:58:30 | 15 | prosecution for continuing the activities? |
| 11:58:32 | 16 | A.  We also fear civil penalties associated with these |
| 11:58:38 | 17 | various laws. |
| 11:58:39 | 18 | Q.  Thank you, Ms. Dave.  That's all I have. |
| 11:58:42 | 19 | A.  Thank you. |
| 11:58:43 | 20 | Q.  Pass the witness. |
| 11:58:49 | 21 | MR. OLSON:  Thank you, your Honor.  I have a copy |
| 11:58:51 | 22 | of our exhibits for the witness.  May I approach to hand |
| 11:58:53 | 23 | them to her? |
| 11:58:53 | 24 | THE COURT:  Just I think -- does she already |
| 11:58:55 | 25 | have? |

Case 1:22-cv-00859-RP Document 86 Filed 10/21/22 Page 350 of 557
Case: 22-50882 Document: 35 Date Filed: 10/07/2023 Page: 351

64

| | | |
|---|---|---|
| 11:58:56 | 1 | MR. ATKINS:  I believe she has a copy.  I think |
| 11:58:57 | 2 | the smallest binder up there, the one that's underneath |
| 11:59:01 | 3 | the white binder, I believe that should be defendants'. |
| 11:59:06 | 4 | MS. LOWELL:  May I approach the witness? |
| 11:59:08 | 5 | THE COURT:  Sure.  If you'd check that. |
| 11:59:10 | 6 | MS. CASTANEDA:  If you can give me the numbers. |
| 11:59:13 | 7 | MR. OLSON:  We're going to have Defendants' 20, |
| 11:59:18 | 8 | 27 through 29 and 39 through 42. |
| 11:59:24 | 9 | THE WITNESS:  I've got numbered tabs here. |
| 11:59:27 | 10 | MR. OLSON:  Excellent. |
| 11:59:35 | 11 | THE COURT:  If you don't mind questioning from |
| 11:59:37 | 12 | the podium, that would be more efficient. |
| 11:59:39 | 13 | MR. OLSON:  Of course, your Honor.  I'm sorry. |
| 11:59:46 | 14 | CROSS-EXAMINATION |
| 11:59:50 | 15 | BY MR. OLSON: |
| 11:59:50 | 16 | Q.  Ms. Dave, what's the Hype Squad? |
| 12:00:06 | 17 | A.  Oh, Texas Abortion Hype Squad is a program that |
| 12:00:12 | 18 | Lilith Fund has created.  It's a way that people -- |
| 12:00:17 | 19 | everyday people can get involved with our organization and |
| 12:00:20 | 20 | help share accurate information about how people can |
| 12:00:23 | 21 | access abortion care that is publicly available. |
| 12:00:25 | 22 | Q.  And in fact, on your web page, you promote as helping |
| 12:00:30 | 23 | people find crucial resources and crucial information |
| 12:00:32 | 24 | about abortions, correct? |
| 12:00:33 | 25 | A.  Yes. |

| 12:00:34 | 1 | Q.   And you solicit volunteers to help you with that, |
| 12:00:37 | 2 | correct? |
| 12:00:37 | 3 | A.   Yes. |
| 12:00:38 | 4 | Q.   The entire time since the Dobbs decision came down, |
| 12:00:43 | 5 | Lilith Fund's hotlines have remained open to talk about |
| 12:00:47 | 6 | pregnancy options, correct? |
| 12:00:48 | 7 | A.   Yes.  That is correct. |
| 12:00:49 | 8 | Q.   And you advertise that to the public, correct? |
| 12:00:52 | 9 | A.   Yes.  It's very important to us that people know that |
| 12:00:56 | 10 | they can still call us. |
| 12:00:57 | 11 | Q.   And as a matter of fact, on your fundraising page, |
| 12:01:04 | 12 | there's a copy of it at Defendants' Exhibit 39. |
| 12:01:07 | 13 | A.   Oh, okay. |
| 12:01:08 | 14 | Q.   Lilith Fund states we continue to offer information |
| 12:01:11 | 15 | about pregnancy options, resources and referrals for all |
| 12:01:14 | 16 | Texans, correct? |
| 12:01:15 | 17 | A.   Uh-huh. |
| 12:01:16 | 18 | Q.   And you give a phone number for Texans to call. |
| 12:01:20 | 19 | A.   Yes.  That's our hotline. |
| 12:01:22 | 20 | Q.   And you state that you are going to build |
| 12:01:26 | 21 | reproductive justice programming with those donations, |
| 12:01:30 | 22 | correct? |
| 12:01:31 | 23 | A.   So Exhibit 39 is actually not -- you said this was a |
| 12:01:36 | 24 | donation page. |
| 12:01:37 | 25 | Q.   Yes. |

12:01:38  1    A.    It's actually not a donation page.  Exhibit 39 is --

12:01:43  2    I think it's a blog post called We're Here to Help, and

12:01:47  3    this is like an update about -- for our supporters that

12:01:53  4    our staff had to put together to share information about

12:01:57  5    what has been happening with our organization since the

12:01:59  6    Dobbs decision came down in June of 2022.

12:02:04  7    Q.    I apologize.  I was confusing this with a different

12:02:08  8    web page.

12:02:09  9    A.    Okay.

12:02:10  10   Q.    But since we were talking about that, let me direct

12:02:17  11   you to Defendants' Exhibit 28.

12:02:19  12   A.    Okay.

12:02:20  13   Q.    This is, in fact, an invitation to a fundraiser for

12:02:25  14   Lilith Fund, correct?

12:02:26  15   A.    It does read that it is a benefit for Lilith Fund.

12:02:30  16   This was organized by a third-party organization.

12:02:33  17   Q.    And did Lilith Fund receive a benefit from it?

12:02:38  18   A.    I would assume so, but I have no direct knowledge.

12:02:41  19   Q.    Who would have direct knowledge of that?

12:02:43  20   A.    No.  I would not have direct knowledge of that.

12:02:45  21   Q.    As the executive director, you would not have direct

12:02:48  22   knowledge as to whether you receive a benefit from this?

12:02:49  23   A.    I'm actually the deputy director of Lilith Fund and

12:02:52  24   so, I supervise our program staff and I assist in

12:02:57  25   fundraising, but I do not see every contribution that

12:02:59  1  comes in the door.  And so, I am not aware whether or not

12:03:04  2  an organization called Sky Candy, who I guess organized

12:03:09  3  this event, if that -- if the donations that they

12:03:13  4  solicited on behalf of Lilith Fund were sent to Lilith

12:03:17  5  Fund.  I am not aware of that.

12:03:18  6  Q.  I could tell you, Sky Candy is actually a venue.

12:03:21  7  A.  Oh, okay.  I did not attend this event.

12:03:26  8  Q.  And were you aware that someone was charging between

12:03:30  9  20 and $150 a ticket to attend the show, the proceeds

12:03:35  10  would go to Lilith Fund?

12:03:37  11  A.  I see that on this event pride page.  Sometimes the

12:03:41  12  higher levels are sponsorships or different kinds of, you

12:03:45  13  know, things.  So I don't actually know what the actual

12:03:50  14  ticket cost was because the tickets link is a button and

12:03:55  15  if we click on it, I don't know what happens because this

12:03:57  16  is paper.

12:04:00  17  Q.  You'd agree on the web page right above the ticket,

12:04:04  18  it says -- unfortunately, it doesn't show up right because

12:04:08  19  it's a box, but it says 20 to $150?

12:04:11  20  A.  Yes, but I don't know if that is how much the tickets

12:04:16  21  cost because I have no direct knowledge of this event.

12:04:17  22  Q.  And as of September 24th, ticket sales were going to

12:04:22  23  end soon because that fundraiser was that evening,

12:04:25  24  correct?

12:04:26  25  A.  Again, I did not attend this event nor was I part of

| | | |
|---|---|---|
| 12:04:30 | 1 | organizing it.  So I do not actually know what date the |
| 12:04:32 | 2 | event was held.  But this does say that the event was -- |
| 12:04:36 | 3 | is going to be held or was held on Saturday, September |
| 12:04:39 | 4 | 24th at 7:00 p.m., according to this Event Bright web page |
| 12:04:43 | 5 | that is printed here. |
| 12:04:45 | 6 | Q.   And then, if you'll look at Exhibit 41. |
| 12:04:49 | 7 | A.   Okay. |
| 12:04:51 | 8 | Q.   Meghan R. Ross on Twitter, I don't know who that is, |
| 12:04:56 | 9 | but she was delighted AF to be hosting Cherry Bomb Fest, a |
| 12:05:00 | 10 | night of comedies by she's, gays and they's this Friday, |
| 12:05:03 | 11 | which would have been August 12. |
| 12:05:06 | 12 | A.   Okay. |
| 12:05:07 | 13 | Q.   And you know proceeds are benefiting our besties at |
| 12:05:12 | 14 | Lilith Fund.  That's your fund, correct? |
| 12:05:15 | 15 | A.   Yes.  This references my organization Lilith Fund. |
| 12:05:18 | 16 | Q.   Fundraiser that was held on August 12? |
| 12:05:21 | 17 | A.   Yes.  I did know about this fundraiser, but I was not |
| 12:05:24 | 18 | able to attend.  I was disappointed. |
| 12:05:27 | 19 | Q.   Who was in charge of the Lilith Fund Twitter account? |
| 12:05:31 | 20 | A.   Who was -- various of our staff contribute to the |
| 12:05:35 | 21 | Lilith Fund Twitter account. |
| 12:05:36 | 22 | Q.   And so, someone from Lilith Fund was comfortable |
| 12:05:38 | 23 | enough with this advertisement to re-Tweet it to publicize |
| 12:05:41 | 24 | it to everyone who follows Lilith Fund on Twitter? |
| 12:05:43 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 12:05:45 | 1 | Q.   Exhibit 42, the Democratic Socialist of Austin held a |
| 12:05:52 | 2 | rally day showing the fight has only begun and they tag |
| 12:05:57 | 3 | you at Lilith Fund. |
| 12:05:58 | 4 | A.   Yes. |
| 12:05:59 | 5 | Q.   On January 31, 2022? |
| 12:06:04 | 6 | A.   It looks like it's July 31st. |
| 12:06:07 | 7 | Q.   I said January, didn't I? |
| 12:06:09 | 8 | A.   Yes. |
| 12:06:09 | 9 | Q.   I apologize.  That's a J-U-L, not a J-A-N.  That's |
| 12:06:12 | 10 | July 31st, 2022, correct? |
| 12:06:15 | 11 | A.   Yeah.  It looks like this tweet is, indeed, from July |
| 12:06:17 | 12 | 31st, 2022. |
| 12:06:19 | 13 | Q.   And again, someone from Lilith Fund re-Tweeted that |
| 12:06:22 | 14 | so everybody who follows Lilith Fund could know to show up |
| 12:06:25 | 15 | to? |
| 12:06:26 | 16 | A.   To this rally. |
| 12:06:28 | 17 | Q.   For workers to unite because abortion is healthcare, |
| 12:06:31 | 18 | healthcare is a human right, correct? |
| 12:06:32 | 19 | A.   Yes, there's a critical connection between issues of |
| 12:06:35 | 20 | economic justice and reproductive justice, so I think |
| 12:06:38 | 21 | that's what this rally was about. |
| 12:06:40 | 22 | Q.   This rally was held here at the federal courthouse? |
| 12:06:44 | 23 | A.   It says federal courthouse.  It looks like the |
| 12:06:48 | 24 | address here on 5th Street.  I did not attend this rally. |
| 12:06:51 | 25 | I actually was not -- I was not really very well aware of |

12:06:55  1  it ahead of time and I was not able to attend.

12:06:56  2  Q.   But Lilith Fund has continued to feel comfortable

12:06:58  3  with advocacy, correct?

12:07:03  4  A.   I believe so.

12:07:04  5  Q.   It has continued to raise funds for advocacy,

12:07:07  6  correct?

12:07:08  7  A.   Yes, we have continued to raise funds for advocacy.

12:07:11  8  Q.   It has continued to promote other people's

12:07:13  9  fundraisers to help it raise funds for advocacy, correct?

12:07:17  10  A.   When third-party people in organizations want to host

12:07:22  11  benefits for Lilith Fund, many times people do so without

12:07:26  12  even informing us.  And so, you know, we receive funds

12:07:29  13  later and find out that they had organized an event.

12:07:31  14  Sometimes we find out ahead of time and then, we're able

12:07:33  15  to, you know, re-Tweet, or publicize, or repost in some

12:07:38  16  way, you know, because we appreciate their support.

12:07:59  17  Q.   By direct funding for abortion care, do you mean

12:08:02  18  paying doctors who perform abortions for the procedure?

12:08:06  19  A.   So direct -- when we say direct financial assistance

12:08:09  20  for abortion care.

12:08:10  21  Q.   I mean, you specifically stated direct funding for

12:08:13  22  abortion care?

12:08:14  23  A.   Are you referring to an exhibit?

12:08:16  24  Q.   I am referring to your testimony.

12:08:18  25  A.   Oh, okay.  Yes.  I usually say either direct funding

| 12:08:21 | 1 | or direct financial assistance.  I think we use those |
| 12:08:24 | 2 | terms interchangeably but what they both mean if you -- |
| 12:08:27 | 3 | I'm happy to answer if you'd like. |
| 12:08:29 | 4 | Q.   One of the things that means is paying doctors to |
| 12:08:31 | 5 | perform the procedure, correct? |
| 12:08:33 | 6 | A.   So what that means specifically is sending funds to |
| 12:08:38 | 7 | clinics that perform -- that provide abortion care and |
| 12:08:44 | 8 | when our client has an appointment at a clinic, we send a |
| 12:08:48 | 9 | voucher to that clinic at the time of the appointment, the |
| 12:08:53 | 10 | client signs it, and then, we send funds later to that |
| 12:08:55 | 11 | clinic.  And we have signed agreements with these clinics |
| 12:09:00 | 12 | that sets out this relationship and this interaction. |
| 12:09:05 | 13 | Q.   Sets out the relationship that you pay for the |
| 12:09:07 | 14 | abortion. |
| 12:09:07 | 15 | A.   Yes, we do pay for abortion -- well, we have |
| 12:09:10 | 16 | historically paid for abortion care.  Unfortunately, we've |
| 12:09:12 | 17 | not been able to since the Dobbs decision came down. |
| 12:09:15 | 18 | Q.   By whom does Lilith Fund fear prosecution? |
| 12:09:28 | 19 | A.   Lilith Fund fears criminal prosecution from |
| 12:09:32 | 20 | prosecutors in our state.  And then, we fear civil |
| 12:09:38 | 21 | enforcement from a large variety of actors. |
| 12:09:43 | 22 | Q.   Which prosecutors in the state have threatened Lilith |
| 12:09:46 | 23 | Fund with prosecution? |
| 12:09:47 | 24 | A.   Attorney General Paxton's office have encouraged |
| 12:09:51 | 25 | prosecutors to take -- to bring criminal action against |

| | | |
|---|---|---|
| 12:09:53 | 1 | our organization like Lilith Fund. |
| 12:09:55 | 2 | Q. I understand that you want to point to Attorney |
| 12:10:02 | 3 | General Paxton's statements, but I'm asking who has |
| 12:10:04 | 4 | actually threatened Lilith Fund with prosecution? |
| 12:10:10 | 5 | A. Our organization has been on the receiving end of a |
| 12:10:14 | 6 | variety of threats over the course of many years. |
| 12:10:17 | 7 | Q. I'm asking specifically what threats of prosecution. |
| 12:10:20 | 8 | A. Threats. |
| 12:10:21 | 9 | Q. Threats of criminal prosecution. |
| 12:10:25 | 10 | A. We have received threats of criminal prosecution from |
| 12:10:28 | 11 | various elected officials in Texas. |
| 12:10:30 | 12 | Q. Which of those are prosecutors? |
| 12:10:32 | 13 | A. I am not able at this time to point to a specific |
| 12:10:35 | 14 | example from district or county official. |
| 12:10:42 | 15 | Q. If given time, could you? Do you recall one from a |
| 12:10:45 | 16 | district attorney or a county attorney? |
| 12:10:47 | 17 | A. I do not recall one from a district or county |
| 12:10:50 | 18 | attorney. |
| 12:10:50 | 19 | Q. Is that the sort of thing you think you would recall? |
| 12:10:52 | 20 | A. I am not sure. I cannot say what I might recall. |
| 12:10:55 | 21 | Q. Have you personally ever been threatened with |
| 12:10:57 | 22 | criminal prosecution? |
| 12:10:59 | 23 | A. I have not personally been threatened with criminal |
| 12:11:01 | 24 | prosecution as an individual. |
| 12:11:03 | 25 | Q. Do you think you would recall if you had been |

| | |
|---|---|
| 12:11:05 | 1 personally threatened with prosecution? |
| 12:11:08 | 2 A.  I can tell you that I do not recall at this time |
| 12:11:11 | 3 being threatened with criminal prosecution as an |
| 12:11:13 | 4 individual. |
| 12:11:13 | 5 Q.  Fair enough.  The state officials that you have |
| 12:11:22 | 6 identified as threatening you are Ken Paxton, Briscoe |
| 12:11:31 | 7 Cain, was there anyone else? |
| 12:11:35 | 8 A.  I cannot remember -- I talked about Briscoe Cain |
| 12:11:37 | 9 specifically, but Briscoe Cain did send our organization a |
| 12:11:41 | 10 cease and desist letter, start the hash tag prosecute |
| 12:11:44 | 11 Texas abortion funds and tweet a variety of times about |
| 12:11:49 | 12 how our activities are -- that he considers them to be |
| 12:11:52 | 13 criminal acts.  Other elected officials have, as well, |
| 12:11:56 | 14 sent letters to that effect. |
| 12:11:58 | 15 Q.  Sure.  Which -- |
| 12:11:59 | 16 A.  And tweet it. |
| 12:12:00 | 17 Q.  -- of those officials have prosecutorial power? |
| 12:12:03 | 18 A.  So the Attorney General's office has the ability to |
| 12:12:06 | 19 assist in prosecutions. |
| 12:12:07 | 20 Q.  Does the Attorney General's Office have the power to |
| 12:12:10 | 21 bring a prosecution? |
| 12:12:12 | 22 A.  Not that I'm aware of. |
| 12:12:14 | 23 Q.  Are you aware that the Attorney General's Office can |
| 12:12:16 | 24 assist with the prosecution only if invited to do so by a |
| 12:12:20 | 25 local prosecutor? |

| | | |
|---|---|---|
| 12:12:21 | 1 | A.   I do not have specific knowledge of those mechanisms. |
| 12:12:26 | 2 | Q.   Is the Attorney General the only person with any sort |
| 12:12:30 | 3 | of prosecuting authority who is a state official who has |
| 12:12:33 | 4 | threatened Lilith Fund with prosecution? |
| 12:12:38 | 5 | A.   I don't know that I could say with complete |
| 12:12:40 | 6 | certainty. |
| 12:12:41 | 7 | Q.   But you're not aware of anyone else. |
| 12:12:43 | 8 | A.   I am not aware at this time. |
| 12:12:45 | 9 | Q.   And as a matter of fact, right now, the defendant |
| 12:12:49 | 10 | prosecutors in this case have agreed that they are not |
| 12:12:51 | 11 | going to pursue any charges against Lilith Fund during the |
| 12:12:55 | 12 | pendency of this case, correct? |
| 12:12:58 | 13 | A.   I am not exactly sure.  I do not think I could speak |
| 12:13:01 | 14 | to that. |
| 12:13:03 | 15 | Q.   Are you aware that -- you are not aware that there |
| 12:13:07 | 16 | has been a stipulation filed in this case that those |
| 12:13:09 | 17 | prosecutors will not pursue Lilith Fund or any of the |
| 12:13:12 | 18 | other plaintiffs for violations of the pre-Roe statutes or |
| 12:13:17 | 19 | the Human Life Protection Act? |
| 12:13:20 | 20 | A.   As a non-lawyer, I do my best to try to understand |
| 12:13:25 | 21 | and keep up with all of the various back-and-forth and |
| 12:13:29 | 22 | mechanisms that happen in these lawsuits.  But I am not |
| 12:13:34 | 23 | able to have a complete ability to recollect and speak on |
| 12:13:38 | 24 | all of the different things. |
| 12:13:41 | 25 | Q.   If those lawyers have promised you -- those lawyers, |

| | | |
|---|---|---|
| 12:13:44 | 1 | those prosecutors had promised you they would not pursue |
| 12:13:46 | 2 | charges against you during the pendency of this case and |
| 12:13:49 | 3 | if they sign their name to that promise and filed it with |
| 12:13:52 | 4 | the Court, would you be comfortable that they weren't |
| 12:13:55 | 5 | going to prosecute you while this case was going on? |
| 12:13:59 | 6 | A.   I don't know that I could say because there are |
| 12:14:08 | 7 | certainly other prosecutors in the state. |
| 12:14:32 | 8 | Q.   Could you name one of the donors who stopped donating |
| 12:14:35 | 9 | because Lilith Fund could no longer pursue its -- could |
| 12:14:41 | 10 | not pursue the goals that -- let me phrase it this way and |
| 12:14:47 | 11 | start again. |
| 12:14:48 | 12 |        You stated that Lilith Fund is not pursuing a |
| 12:14:51 | 13 | full suite of its goals after the Dobbs decision came |
| 12:14:55 | 14 | down.  Could you name one of the donors who is no longer |
| 12:15:00 | 15 | donating because you are no longer doing so? |
| 12:15:04 | 16 |        MS. LOWELL:  Objection.  Relevance. |
| 12:15:07 | 17 |        THE COURT:  I'll allow the question. |
| 12:15:09 | 18 | A.   I cannot at this time provide the name of a donor |
| 12:15:14 | 19 | because I do not recollect individual names of donors. |
| 12:15:22 | 20 | But I could provide that information to my counsel at a |
| 12:15:24 | 21 | later date if they asked for that information. |
| 12:15:28 | 22 | Q.   (BY MR. OLSON) And that donor stopped donating |
| 12:15:34 | 23 | because you were not directly funding abortions, correct? |
| 12:15:39 | 24 | A.   Yes.  That is correct.  That is my recollection. |
| 12:15:46 | 25 | Q.   And that was the donor's choice, correct? |

| | |
|---|---|
| 12:15:51 | 1 |
| 12:15:54 | 2 |
| 12:15:57 | 3 |
| 12:16:00 | 4 |
| 12:16:01 | 5 |

1  A.   I could not speak to whether or not it was their

2  choice.  It's the communication we received from them.

3  Q.   Did anyone at Lilith Fund tell the donor to stop

4  donating?

5  A.   I can't imagine we would do that, so I assume no.

6  Q.   I don't have any further questions for Ms. Dave, your

7  Honor.  It is Ms. Dave, correct?

8  A.   Dave.

9        MR. OLSON:  I'm sorry.  As Leif Olson, I try to

10  be sensitive to that.

11        THE WITNESS:  Thank you.

12        THE COURT:  Any followup questions?

13        MS. LOWELL:  I have nothing further.

14        THE COURT:  Okay.  Thank you.  You may step down.

15        THE WITNESS:  Okay.  Thank you.

16        THE COURT:  Now's a good time for us to take our

17  lunch break, I believe.  So it's at 12:15, so let's take

18  an hour break and reconvene at 1:15 and we will pick up

19  our testimony at 1:15.

20        (Recess.)

21        THE COURT:  All right.  Your next witness.

22        MR. ATKINS:  Plaintiffs call Rosann Mariappuram.

23        THE COURT:  Ms. Mariappuran, if you could just go

24  to that corner of the courtroom and come back to me.

25  Before you take a seat, could you please raise your right

| 13:16:10 | 1 | hands to be sworn. |
| 13:16:11 | 2 | THE CLERK:  You do solemnly swear or affirm that |
| 13:16:11 | 3 | the testimony which you may give in the case now before |
| 13:16:11 | 4 | the Court shall be the truth, the whole truth, and nothing |
| 13:16:19 | 5 | but the truth? |
| 13:16:19 | 6 | THE WITNESS:  I do. |
| 13:16:21 | 7 | THE COURT:  Please be seated. |
| 13:16:23 | 8 | ROSANN MARIAPPURAM, called by the Plaintiffs, duly sworn. |
| 13:16:23 | 9 | DIRECT EXAMINATION |
| 13:16:31 | 10 | BY MR. ATKINS: |
| 13:16:31 | 11 | Q.   Good morning, Ms. Mariappuran -- or I'm sorry. |
| 13:16:36 | 12 | A.   Good afternoon. |
| 13:16:37 | 13 | Q.   Do you mind if I call you Rosann? |
| 13:16:41 | 14 | A.   That's fine. |
| 13:16:42 | 15 | Q.   I'm going to use some terms in asking you questions |
| 13:16:47 | 16 | and to shorthand, I want to make sure you know what I |
| 13:16:49 | 17 | mean.  If I say Senate Bill 8, do you know what I mean? |
| 13:16:52 | 18 | A.   Yes. |
| 13:16:52 | 19 | Q.   What is Senate Bill 8? |
| 13:16:54 | 20 | A.   Senate Bill 8 is one of the abortion bans in Texas |
| 13:16:58 | 21 | that currently, we're looking at limits with abortion care |
| 13:17:01 | 22 | to about six weeks. |
| 13:17:02 | 23 | Q.   Okay.  And how does that work? |
| 13:17:04 | 24 | A.   It works through civil enforcement so civil lawsuits |
| 13:17:08 | 25 | that are filed against those who are allegedly in |

| | | |
|---|---|---|
| 13:17:10 | 1 | violation of the law. |
| 13:17:11 | 2 | Q.   And if I say the pre-Roe ban, do you know what means? |
| 13:17:16 | 3 | A.   Yeah.  So that is the abortion restriction that was |
| 13:17:19 | 4 | in place before <u>Roe v. Wade</u> that had criminal penalties |
| 13:17:22 | 5 | along with others. |
| 13:17:23 | 6 | Q.   If I call something the Texas trigger ban, what would |
| 13:17:27 | 7 | that be? |
| 13:17:27 | 8 | A.   That was a piece of legislation passed last session |
| 13:17:31 | 9 | that also criminalizes or comes with penalties around |
| 13:17:33 | 10 | abortion care upon the overturning of <u>Roe v. Wade</u>, so it |
| 13:17:39 | 11 | is also now in effect. |
| 13:17:39 | 12 | Q.   Okay.  So, Rosann, what do you do for a living? |
| 13:17:44 | 13 | A.   I am the executive director at Jane's due process. |
| 13:17:50 | 14 | Q.   What does Jane's Due Process do? |
| 13:17:51 | 15 | A.   We're a nonprofit organization that helps anyone at |
| 13:17:55 | 16 | that time under 18 in Texas navigate parental involvement |
| 13:17:58 | 17 | laws to confidentially access birth control and abortion |
| 13:18:01 | 18 | care. |
| 13:18:01 | 19 | Q.   And what did you do before the enactment of Senate |
| 13:18:09 | 20 | Bill 8? |
| 13:18:09 | 21 | A.   Before Senate Bill 8, we were able to help anyone who |
| 13:18:12 | 22 | is under 18 access abortion care normally through the |
| 13:18:17 | 23 | judicial bypass process, which is for young people who |
| 13:18:20 | 24 | can't get a parent or guardian's consent to have an |
| 13:18:23 | 25 | abortion so then they have to go speak with a judge, get a |

13:18:26 1  court order, and then, they can consent to their abortion

13:18:28 2  care.  So we helped with judicial bypass.  And then, we

13:18:31 3  also helped with paying for abortion care and coordinating

13:18:34 4  practical support, including travel.

13:18:36 5  Q.   I skipped a question.  What is your specific position

13:18:40 6  at Jane's Due Process?

13:18:42 7  A.   I am the executive director.

13:18:44 8  Q.   And between -- so you just answered what you did

13:18:49 9  before Senate Bill 8.  Between Senate Bill 8 and the Dobbs

13:18:51 10 decision, what did Jane's Due Process do?

13:18:55 11 A.   So our operations did have to change significantly.

13:18:58 12 Most of the young people we worked with were -- would have

13:19:02 13 come to our service past the about six-week mark, which

13:19:05 14 meant that they could no longer obtain abortion care in

13:19:08 15 Texas.  So we had to transition to helping youth travel

13:19:11 16 outside of the state for care.

13:19:12 17         We also did do some judicial bypass work during

13:19:16 18 Senate 8 but before Dobbs.  It was very limited because

13:19:20 19 the judicial bypass process normally takes between two to

13:19:23 20 three weeks, and suddenly, youth were expected to do it in

13:19:26 21 a day or a handful of days.

13:19:27 22 Q.   Could you turn -- there should be four binders in

13:19:34 23 front of you.  Three of them should just say Exhibits 1

13:19:39 24 through 3, and then, the fourth should be a binder of

13:19:41 25 Defendants' Exhibits.

| | | |
|---|---|---|
| 13:19:41 | 1 | A.   Yes. |
| 13:19:42 | 2 | Q.   Could you turn to Exhibit 3 in the first set of three |
| 13:19:49 | 3 | binders, or tab 3. |
| 13:20:00 | 4 | MR. WASSDORF:  That's Plaintiff's Exhibit 3? |
| 13:20:04 | 5 | MR. ATKINS:  Yes, Plaintiff's Exhibit 3. |
| 13:20:06 | 6 | A.   I believe I'm there. |
| 13:20:08 | 7 | Q.   (BY MR. ATKINS) Have you seen plaintiffs' -- are you |
| 13:20:13 | 8 | ready? |
| 13:20:13 | 9 | A.   Yes. |
| 13:20:14 | 10 | Q.   Have you seen Plaintiffs' Exhibit 3 before? |
| 13:20:16 | 11 | A.   I have.  Yes. |
| 13:20:18 | 12 | Q.   And what is Plaintiffs' Exhibit 3? |
| 13:20:20 | 13 | A.   It is an advisory on Texas law upon reversal of Roe |
| 13:20:26 | 14 | v. Wade.  At the top, it says Attorney General of Texas |
| 13:20:29 | 15 | Ken Paxton and then, it says Attorney General of Texas |
| 13:20:31 | 16 | again. |
| 13:20:32 | 17 | Q.   I'd like to move to admit Plaintiffs' Exhibit 3 into |
| 13:20:36 | 18 | evidence. |
| 13:20:37 | 19 | MR. WASSDORF:  No objection, your Honor. |
| 13:20:38 | 20 | THE COURT:  Without objection, so admitted. |
| 13:20:40 | 21 | Q.   (BY MR. ATKINS) I'm going to publish it up on the |
| 13:20:44 | 22 | screen.  And do you have a sense of when this document, |
| 13:21:35 | 23 | Plaintiffs' Exhibit 3 was issued? |
| 13:21:36 | 24 | A.   I believe it was the day of the Dobbs decision. |
| 13:21:38 | 25 | Q.   And did you read it at that time? |

| 13:21:40 | 1 | A.   Yes.  It was sent to me that day. |
| 13:21:44 | 2 | Q.   And I want to take you down to the second to last |
| 13:21:52 | 3 | paragraph on the first page.  There is a paragraph that is |
| 13:22:01 | 4 | split between the first and second page. |
| 13:22:03 | 5 | A.   Yes. |
| 13:22:03 | 6 | Q.   Do you see that? |
| 13:22:04 | 7 | A.   Yes. |
| 13:22:04 | 8 | Q.   Okay.  And do you understand the -- this paragraph is |
| 13:22:11 | 9 | talking about the Texas trigger ban? |
| 13:22:15 | 10 | A.   Yes. |
| 13:22:16 | 11 | Q.   Okay.  Can you read the last sentence on the first |
| 13:22:23 | 12 | page and the first sentence on the next page of |
| 13:22:30 | 13 | Plaintiffs' Exhibit 3? |
| 13:22:32 | 14 | A.   So the sentence starting a person who violates the |
| 13:22:37 | 15 | act. |
| 13:22:37 | 16 | Q.   Yes. |
| 13:22:37 | 17 | A.   A person who violates the act commits a first degree |
| 13:22:41 | 18 | felony if an unborn child dies as a result, and incurs |
| 13:22:45 | 19 | civil penalties of no less than $100,000 for each |
| 13:22:48 | 20 | violation.  My office is specifically authorized to pursue |
| 13:22:52 | 21 | and recover those civil penalties and I will strictly |
| 13:22:55 | 22 | enforce this law. |
| 13:22:56 | 23 | Q.   And can you then read, I'm sorry, the next sentence, |
| 13:23:00 | 24 | as well? |
| 13:23:01 | 25 | A.   Further, we will assist any local prosecutor who |

| | |
|---|---|
| 13:23:04 | 1 |
| 13:23:07 | 2 |
| 13:23:12 | 3 |
| 13:23:13 | 4 |
| 13:23:16 | 5 |
| 13:23:20 | 6 |
| 13:23:24 | 7 |
| 13:23:27 | 8 |
| 13:23:31 | 9 |
| 13:23:37 | 10 |
| 13:23:38 | 11 |
| 13:23:43 | 12 |
| 13:23:53 | 13 |
| 13:23:55 | 14 |
| 13:23:57 | 15 |
| 13:24:03 | 16 |
| 13:24:08 | 17 |
| 13:24:11 | 18 |
| 13:24:17 | 19 |
| 13:24:20 | 20 |
| 13:24:23 | 21 |
| 13:24:26 | 22 |
| 13:24:29 | 23 |
| 13:24:29 | 24 |
| 13:24:38 | 25 |

pursues criminal charges.

Q.   And does this appear to be Attorney General Ken
Paxton's signature?

A.   Yes.

Q.   And when you read this, what did you take it to mean?

A.   I took it to mean that this was a notice by the
Attorney General of Texas to other prosecutors across the
state about the full scope of how they could enforce a
series of abortion bans and giving them clarity about just
how to do that.

Q.   And in fact, there is a paragraph that immediately
follows the paragraph you were just reading from.  What is
that paragraph about?  This is the second paragraph from
the end.

A.   So I believe that paragraph refers to the pre-Roe ban
because it refers to criminal prosecutions of abortions
predating Roe that were never appealed by the Texas
legislature.  So that was a particularly confusing moment
around Dobbs.  We thought that the pre-Roe abortion ban
had been repealed, and then, we began seeing statements
that no, it was actually immediately in effect.

Q.   And this was one of those statements?

A.   Yes.

Q.   I'm going to ask you to turn to tab 27, which
actually might not be in that binder.  If it is, then

| | | |
|---|---|---|
| 13:24:42 | 1 | great. |
| 13:25:03 | 2 | A.   I'm at Exhibit 27, Plaintiffs' Exhibit. |
| 13:25:07 | 3 | Q.   And what does Plaintiffs' Exhibit 27 appear to be? |
| 13:25:11 | 4 | A.   It appears to be another advisory.  It says at the |
| 13:25:17 | 5 | top, Attorney General Texas Ken Paxton, Attorney General |
| 13:25:21 | 6 | of Texas updated advisory on Texas law upon reversal of |
| 13:25:26 | 7 | Roe v. Wade. |
| 13:25:27 | 8 | Q.   And when does this appear to have been issued? |
| 13:25:33 | 9 | A.   It appears -- it says yesterday so July 26.  So i |
| 13:25:36 | 10 | assume this came out on the 27th. |
| 13:25:38 | 11 | Q.   Okay.  And you go down to the first paragraph of the |
| 13:25:46 | 12 | second page, what law do you read that paragraph to be |
| 13:25:57 | 13 | referring to? |
| 13:25:59 | 14 | A.   I believe it's referring to the trigger bill taking |
| 13:26:03 | 15 | effect. |
| 13:26:03 | 16 | Q.   And can you read for me the first two sentences of |
| 13:26:12 | 17 | that paragraph? |
| 13:26:13 | 18 | A.   My office is specifically authorized to pursue and |
| 13:26:16 | 19 | recover civil penalties for violations of the act, id, and |
| 13:26:23 | 20 | then, 170A.005, and I will do my duty to enforce this law. |
| 13:26:27 | 21 | Further, we stand ready to assist any local prosecutor who |
| 13:26:30 | 22 | pursues criminal charges and then, it refers to Texas |
| 13:26:34 | 23 | Government Code, Section 402.028. |
| 13:26:37 | 24 | Q.   Okay.  And so, how do you interpret that statement? |
| 13:26:43 | 25 | A.   So I assume this is, once again, clarification from |

13:26:48  1  Attorney General Ken Paxton to prosecutors across Texas
13:26:51  2  about how the trigger bill will take effect and also, once
13:26:54  3  again, referring to the pre-Roe ban because it refers to
13:26:58  4  criminal charges and how the Attorney General's Office
13:27:01  5  will be ready to assist any prosecutors across the state
13:27:05  6  who use criminal charges.
13:27:07  7  Q.    Does this statement indicate that the Attorney
13:27:12  8  General Paxton needs any assistance or permission from
13:27:14  9  anyone to recover civil penalties?
13:27:17 10  A.    No.
13:27:17 11          MR. WASSDORF:  Objection, your Honor.  Calls for
13:27:18 12  a legal conclusion.
13:27:19 13          THE COURT:  I'll allow the question.
13:27:20 14  A.    No.  I believe because it refers to the specific part
13:27:23 15  of the trigger bill where the Attorney General is named in
13:27:29 16  being part of the civil penalty enforcement.
13:27:41 17  Q.    (BY MR. ATKINS) So after Dobbs was issued, the Dobbs
13:27:44 18  decision was issued and after you read Exhibit 3, we
13:27:49 19  talked about what you did before, specifically.  We talked
13:27:52 20  about what you did between Senate Bill 8 and Dobbs.  What
13:27:54 21  did you do after Dobbs and Plaintiffs' Exhibit 3?
13:27:58 22  A.    So the day of the Dobbs decision, we immediately
13:28:03 23  ceased all abortion-related direct services.  That is
13:28:08 24  because of these types of statements we saw coming from
13:28:12 25  Attorney General Ken Paxton.  And also, other prosecutors

13:28:15  1   made statements around whether or not they would enforce
13:28:17  2   the law.  It was also because of the law itself.  And so,
13:28:21  3   we closed our hotline, which was awful.  It's a 24/7
13:28:26  4   hotline that normally teenagers can call or text, and we
13:28:29  5   had to assess was it safe to even have the hotline open.
13:28:33  6   Normally the hotline's run by volunteers.  I wasn't sure
13:28:36  7   if that was safe anymore.  I also wasn't sure what we
13:28:39  8   could say.  So we took time -- we did eventually reopen
13:28:42  9   the hotline, but it's no longer live.  It goes to a
13:28:44  10  voicemail and our staff members are calling folks back if
13:28:47  11  we think we can at least give information.
13:28:50  12  Q.  And you just talked about reopening the hotline.  In
13:28:56  13  addition to that, do you provide the same information that
13:29:00  14  you used to?
13:29:01  15  A.  No.  It took time to understand what we thought might
13:29:06  16  be protected information to share.  So prior to Dobbs and
13:29:12  17  S.B., if someone called us, we could help them actually
13:29:16  18  make their appointments at clinics.  We can no longer do
13:29:18  19  that.  We have a very limited set of publicly available
13:29:21  20  resources that we refer to, and that is why we have staff
13:29:23  21  doing it and not volunteers because we want to be very
13:29:26  22  careful what we say.  We're afraid of a lot of these
13:29:29  23  unclear provisions about what counts as aiding and
13:29:32  24  abetting and also counts under any of these criminal
13:29:35  25  prosecution charges.

13:29:35  1   Q.   And prior to the Dobbs decision, prior to Plaintiffs'

13:29:45  2   Exhibit 3, did you provide assistance to people who were

13:29:48  3   obtaining abortions outside the state of Texas?

13:29:50  4   A.   Yes.  So sometimes you had to travel out of state and

13:29:56  5   it didn't happen often before S.B. 8, but when it did

13:30:00  6   happen, you know, minors are uniquely, I think, kept from

13:30:04  7   traveling because they often don't have the financial

13:30:06  8   resources.  They also are young and they've never, you

13:30:09  9   know, maybe made a hotel booking or had to like get on an

13:30:12  10  airplane.  So we did extensive emotional support and also

13:30:15  11  logistical support if a teen did have to travel out of

13:30:18  12  state.

13:30:18  13  Q.   And are you doing that now?  Are you helping people

13:30:25  14  obtain abortion service outside the state of Texas?

13:30:29  15  A.   No.  Because of these laws, I don't know if it's safe

13:30:32  16  for us to do that.  So we completely stopped any travel,

13:30:37  17  practical support work and, also, any funding of abortion

13:30:40  18  care outside of Texas and in the states where abortion is

13:30:44  19  legal.

13:30:44  20  Q.   Would Jane's Due Process like to do that?

13:30:48  21  A.   Yes.  Deeply.

13:30:52  22  Q.   And presuming there's a favorable result in this case

13:30:57  23  and the entry of a final declaratory judgment and

13:31:00  24  permanent injunction, would Jane's Due Process begin doing

13:31:04  25  that work?

| | | |
|---|---|---|
| 13:31:04 | 1 | A.   Yes.  As soon as humanly possible. |
| 13:31:11 | 2 | Q.   I want to go through some statements that are |
| 13:31:17 | 3 | sprinkled throughout the binder.  So we may be moving |
| 13:31:19 | 4 | around in binders. |
| 13:31:21 | 5 | A.   Sure. |
| 13:31:22 | 6 | Q.   I'm sorry for that.  There's just quite a lot of |
| 13:31:26 | 7 | them. |
| 13:31:26 | 8 | A.   It's okay. |
| 13:31:27 | 9 | THE COURT:  Counsel, did you move to admit the |
| 13:31:29 | 10 | updated advisory? |
| 13:31:32 | 11 | MR. ATKINS:  No, your Honor, I don't believe I |
| 13:31:34 | 12 | did.  May I move to admit into evidence Plaintiffs' |
| 13:31:37 | 13 | Exhibit 27? |
| 13:31:38 | 14 | MR. WASSDORF:  No objection. |
| 13:31:39 | 15 | THE COURT:  So admitted. |
| 13:31:41 | 16 | MR. ATKINS:  Thank you, your Honor. |
| 13:31:53 | 17 | Q.   (BY MR. ATKINS) Can you flip to tab 1. |
| 13:31:59 | 18 | A.   Yes. |
| 13:32:09 | 19 | Q.   Can you take a moment to just quickly review tab 1, |
| 13:32:12 | 20 | see what's behind it.  Let me know when you have a sense |
| 13:32:18 | 21 | of what it is. |
| 13:32:19 | 22 | A.   Yes.  I'm familiar with this.  I've seen it before. |
| 13:32:21 | 23 | Q.   Okay.  And what is behind tab 1 there? |
| 13:32:28 | 24 | A.   So it is a letter from the Texas Freedom Caucus to |
| 13:32:33 | 25 | Sidley Austin, LP, which I believe is a law firm and it |

13:32:39  1  seems to -- I'm going to use the word I feel -- threaten

13:32:45  2  the law firm for their decision to reimburse the travel

13:32:48  3  costs of employees who have to leave Texas for abortion

13:32:51  4  care.  And then, it goes on extensively to cite the

13:32:56  5  variety of abortion bans in place.  It does -- I'm not

13:33:01  6  going to read some of the information unless you would

13:33:03  7  like me to.  But it seems to state that there're both

13:33:07  8  criminal prosecutions possible and civil penalties for

13:33:11  9  helping someone travel out of state for abortion care

13:33:13  10  where it is legal.

13:33:15  11  Q.   And when do you remember first seeing that document?

13:33:25  12  A.   I believe the day or day after it came out because we

13:33:30  13  are also a legal nonprofit and some of our legal network

13:33:34  14  sent it to me.

13:33:35  15  Q.   Who is the Texas Freedom Caucus?

13:33:37  16  A.   They are a group of House representatives of Texas

13:33:42  17  who have, I would say, extreme conservative views and, in

13:33:47  18  particular, vehemently antiabortion.

13:33:51  19  Q.   Plaintiffs move to admit Exhibit 1.  Plaintiffs'

13:33:57  20  Exhibit 1.

13:33:57  21       MR. WASSDORF:  We do have objections to this,

13:33:59  22  your Honor.  Relevance and hearsay.

13:34:03  23       MR. ATKINS:  Your Honor, on the relevance point,

13:34:05  24  this goes the public context in which all of Attorney

13:34:08  25  General Paxton's statements and silences have been

13:34:12  1   occurring.  These are state officials who presumably voted

13:34:16  2   for this law speaking about its meaning, and if Attorney

13:34:19  3   General Paxton is going to take the position that he

13:34:21  4   didn't mean the things that they meant and did not say

13:34:23  5   anything to make that position clear, we should at least

13:34:27  6   get to explain why that silence is additionally chilling.

13:34:31  7          THE COURT:  And the hearsay objection?

13:34:35  8          MR. ATKINS:  And the hearsay objection, this is a

13:34:38  9   preliminary injunction hearing where in a situation where

13:34:41  10  we're also not advocating that the representations in this

13:34:45  11  communication are true, instead, we're advocating that

13:34:48  12  they go to the state of mind.

13:34:50  13         THE COURT:  Overrule the objection.  So admitted.

13:34:54  14  Q.   (BY MR. ATKINS) I'm going to publish Exhibit 1 to the

13:34:59  15  screen.  So let's go down to the portion that you were

13:35:32  16  just talking about.  Do you see paragraph 2 on the screen

13:36:01  17  and also in front of you, the second full paragraph?

13:36:05  18  A.   Yes.

13:36:05  19  Q.   Okay.  And what law, specifically, is this referring

13:36:10  20  to?

13:36:11  21  A.   I believe the first is referring to the pre-Roe ban

13:36:19  22  because I see it referring to the Texas civil statutes,

13:36:22  23  but also, that's because it says procuring abortions,

13:36:26  24  which that language I specifically remember from the

13:36:28  25  pre-Roe ban.

| | | |
|---|---|---|
| 13:36:29 | 1 | Q.   And so, what is this paragraph saying?  What's the |
| 13:36:34 | 2 | sort of message of this paragraph? |
| 13:36:38 | 3 | A.   From my reading, it seems to say that abortion itself |
| 13:36:42 | 4 | is a felony in Texas but, also, that furnishing the means |
| 13:36:46 | 5 | for procuring an abortion is a felony and that, you know, |
| 13:36:55 | 6 | that language "procuring" is very vague.  So I think that |
| 13:36:59 | 7 | was confusing because why are you sending it to a law |
| 13:37:02 | 8 | firm?  They don't provide abortion care. |
| 13:37:04 | 9 | Q.   And does it have any implication one way or the other |
| 13:37:08 | 10 | about whether a pre-Roe statutes are in effect? |
| 13:37:11 | 11 | A.   It seems to firmly state that they are. |
| 13:37:14 | 12 | Q.   And in fact, that's what Attorney General Paxton said |
| 13:37:19 | 13 | in Exhibit 3, right? |
| 13:37:20 | 14 | A.   Yes.  That was what I took from the statement. |
| 13:37:24 | 15 | Q.   And when was this letter sent? |
| 13:37:27 | 16 | A.   This was sent on July 7, 2022. |
| 13:37:32 | 17 | Q.   Do you remember when we said Plaintiffs' Exhibit 3 |
| 13:37:35 | 18 | was sent? |
| 13:37:38 | 19 | A.   I believe if that was the day of the decision, yes. |
| 13:37:41 | 20 | So that was June 24th. |
| 13:37:45 | 21 | Q.   So this one, I guess, would be -- would have been |
| 13:37:49 | 22 | between. |
| 13:37:49 | 23 | A.   The first statement by the Attorney General's Office |
| 13:37:52 | 24 | advisory and the second advisory. |
| 13:38:04 | 25 | Q.   Can you move to exhibit -- or tab 5? |

| | | |
|---|---|---|
| 13:38:19 | 1 | A.   Yes.  I'm there. |
| 13:38:20 | 2 | Q.   Go ahead and take a look at it.  Let me know when |
| 13:38:23 | 3 | you've read it and you've seen that document before? |
| 13:38:26 | 4 | A.   Yes, I have seen this before. |
| 13:38:29 | 5 | Q.   I'm sorry.  I had just stopped my questions on |
| 13:38:35 | 6 | Exhibit 1.  I have more questions to ask on it.  Let me |
| 13:38:49 | 7 | not publish that quite yet because I haven't asked you on |
| 13:38:53 | 8 | it.  So do you have Exhibit 5 in front of you?  Have you |
| 13:38:57 | 9 | read it? |
| 13:38:57 | 10 | A.   Yes, I have read Exhibit 5. |
| 13:38:58 | 11 | Q.   Have you seen that before today? |
| 13:39:00 | 12 | A.   Yes.  I think -- I might have seen it the day it came |
| 13:39:05 | 13 | out because we are an abortion fund, and so, we work |
| 13:39:07 | 14 | closely with the Lilith Fund, whom it is directed at that. |
| 13:39:10 | 15 | Q.   What is behind tab 5? |
| 13:39:12 | 16 | A.   It is the letter from the Texas House of |
| 13:39:15 | 17 | Representatives, Representative Briscoe Cain in District |
| 13:39:19 | 18 | 127, and it's to the Lilith Fund For Reproductive Equity |
| 13:39:24 | 19 | specifically to their Executive Director Amanda Williams. |
| 13:39:26 | 20 | And it is, I believe, a cease-and-desist letter and it |
| 13:39:30 | 21 | goes on extensively to state that abortion has a felony |
| 13:39:37 | 22 | criminal liability and the Lilith Fund is violating the |
| 13:39:42 | 23 | criminal statutory laws around abortion by paying for |
| 13:39:44 | 24 | other people's abortion care. |
| 13:39:47 | 25 | Q.   Do you know if this letter received any publicity? |

| 13:39:50 | 1 | A.   Oh, I'm sorry.  Could you repeat? |
| 13:39:53 | 2 | Q.   Do you know if the letter received any publicity? |
| 13:39:55 | 3 | A.   Yes.  So most of -- |
| 13:39:57 | 4 | Q.   I'm sorry.  That question ended up with an ambiguous |
| 13:40:01 | 5 | answer because you said yes, but I don't know if you meant |
| 13:40:03 | 6 | yes that you know or yes that there was. |
| 13:40:05 | 7 | A.   Yes, there was publicity around it. |
| 13:40:07 | 8 | Q.   Okay.  Excellent.  Plaintiffs move to admit Exhibit |
| 13:40:17 | 9 | 5. |
| 13:40:18 | 10 | MR. WASSDORF:  Objection, your Honor.  Relevance |
| 13:40:19 | 11 | and hearsay. |
| 13:40:20 | 12 | THE COURT:  Overruled and admitted. |
| 13:40:25 | 13 | Q.   (BY MR. ATKINS) By any chance, do you happen to know |
| 13:40:28 | 14 | whether Representative Cain is a member of the Texas |
| 13:40:30 | 15 | Freedom Caucus? |
| 13:40:32 | 16 | A.   Yes, I do know that and yes, he is. |
| 13:40:36 | 17 | Q.   Do you see right there at the beginning of Exhibit 5, |
| 13:40:45 | 18 | what is this paragraph talking about? |
| 13:40:48 | 19 | A.   So I believe this paragraph is discussing that -- |
| 13:40:54 | 20 | it's making the claim that at the time abortion is illegal |
| 13:40:58 | 21 | completely in Texas, and then, it goes on to list the |
| 13:41:01 | 22 | penalties, including two to five years imprisonment for |
| 13:41:04 | 23 | each abortion that occurred.  It seems to claim that |
| 13:41:09 | 24 | Lilith Fund is actively violating this law and that |
| 13:41:15 | 25 | employees, volunteers, donors are all open to criminal |

13:41:18  1  prosecution and imprisonment.

13:41:21  2  Q.   And are the statutes listed here, to your knowledge,

13:41:25  3  are those the pre-Roe statutes?

13:41:26  4  A.   Yes, which is why I'm confused, especially since this

13:41:31  5  was sent on March 18, 2022.

13:41:33  6  Q.   And does Representative Cain make the argument

13:41:39  7  essentially that these statutes are effective?

13:41:41  8  A.   Yes.  All the language is present tense saying that

13:41:45  9  they're currently in effect.

13:41:56  10  Q.   If you could flip to tab 10.  Could you flip to tab

13:42:06  11  10.

13:42:09  12  A.   I'm there.

13:42:11  13  Q.   Take a second to just take a look at it.  Make sure

13:42:17  14  you know what it is.  Have you seen that document before?

13:42:21  15  A.   Yes.  So this is a tweet from Representative Briscoe

13:42:27  16  Cain.

13:42:27  17  Q.   And do you remember -- when do you remember seeing

13:42:32  18  that?

13:42:32  19  A.   I think it might have been around the publication

13:42:34  20  date because it was around June 24th.

13:42:41  21  Q.   So I'm going to move to admit Exhibit 10.

13:42:47  22        MR. WASSDORF:  Your Honor, I probably have an

13:42:49  23  objection to this, but I'm a little confused because

13:42:53  24  Exhibit 10 on my exhibit list indicates that it's a press

13:42:56  25  release and a letter and not a tweet.

13:43:13   1   A.   I believe 9, yeah.  This might have got --

13:43:17   2   Q.   (BY MR. ATKINS) What is in Exhibit 9?

13:43:19   3   A.   So Exhibit 9 seems to be the same tweet.  And then,

13:43:22   4   Exhibit 10, I believe, it's labeled press release, but the

13:43:27   5   copy I have is a tweet.

13:43:29   6   Q.   I see.  No matter -- we'll move on to a different

13:43:34   7   exhibit.  Can you pull up -- should be Exhibit 50.

13:44:10   8   A.   I'm at Plaintiffs' Exhibit 50.

13:44:13   9   Q.   What is Exhibit 50?

13:44:18   10   A.   So this is -- it says from Jonathan Mitchell,

13:44:23   11   Mitchell Law, PLLC, dated July 7, 2022.  I believe it's a

13:44:27   12   litigation hold letter and notice to preserve documents.

13:44:33   13   Q.   And have you seen that document before today?

13:44:38   14   A.   I have.

13:44:39   15   Q.   And did you receive a copy of that document?

13:44:42   16   A.   So I don't believe Jane's Due Process specifically

13:44:48   17   received a letter at like our offices or mailbox, but we

13:44:50   18   learned from our attorneys that we were a part of this

13:44:52   19   whole letter.

13:44:52   20   Q.   If you look in that letter, is Jane's Due Process

13:44:56   21   named?

13:45:01   22   A.   Yes, I believe so.  Actually, no.  I don't think

13:45:08   23   we're named in this one.

13:45:09   24   Q.   Okay.  Do you remember whether this letter received

13:45:14   25   any significant publication?

| 13:45:15 | 1 | A.   Yes, I do remember it receiving significant |
| 13:45:18 | 2 | publication. |
| 13:45:19 | 3 | Q.   And you read and heard about this letter. |
| 13:45:22 | 4 | A.   Yes, because I immediately assumed we were part of it |
| 13:45:26 | 5 | because we work closely with all the organizations listed |
| 13:45:28 | 6 | here. |
| 13:45:29 | 7 | Q.   Right.  Move to admit Plaintiffs' Exhibit 50. |
| 13:45:33 | 8 | MR. WASSDORF:  Objection.  Relevance and hearsay. |
| 13:45:35 | 9 | THE COURT:  Overruled.  Admitted. |
| 13:45:39 | 10 | Q.   (BY MR. ATKINS) Do you know who Ms. Albright is? |
| 13:45:46 | 11 | A.   Yes.  She was a professor at my law school and also |
| 13:45:50 | 12 | an advocate.  She used to also be part of Jane's Due |
| 13:45:54 | 13 | Process and as a lawyer. |
| 13:46:00 | 14 | Q.   And this is addressed to Ms. Albright? |
| 13:46:02 | 15 | A.   Yes.  It's addressed to Alex Wilson Albright. |
| 13:46:06 | 16 | Q.   Okay.  And what is the substance of this letter |
| 13:46:11 | 17 | essentially? |
| 13:46:12 | 18 | A.   So it seems to indicate that Jonathan Mitchell |
| 13:46:17 | 19 | intends to pursue a lawsuit against several folks that |
| 13:46:23 | 20 | names -- that they want to depose Amy Hagstrom Miller, |
| 13:46:28 | 21 | Marva Sadler, Dr. Alan Braid and Andrea Gallegos about |
| 13:46:31 | 22 | alleged violations of S.B. 8 and that the named |
| 13:46:40 | 23 | organizations need to hold on to any documentation that |
| 13:46:43 | 24 | might be relevant to that litigation. |
| 13:46:44 | 25 | Q.   In addition to mentioning Senate Bill 8, which I |

| 13:46:48 | 1 | think in this letter, it's called the Texas Heartbeat Act, |
| 13:46:52 | 2 | does this letter mention any potential criminal penalty? |
| 13:47:06 | 3 | A.   Yes.  I see it says illegal abortions. |
| 13:47:12 | 4 | Q.   Might be simpler if I direct your attention to the |
| 13:47:15 | 5 | first paragraph and the sentence. |
| 13:47:19 | 6 | A.   Crime fraud exceptions. |
| 13:47:21 | 7 | Q.   Actually, the first sentence.  What are the last |
| 13:47:24 | 8 | three words of the first sentence of this letter? |
| 13:47:27 | 9 | A.   The Texas murder statute. |
| 13:47:32 | 10 | Q.   So do you construe this letter as suggesting that at |
| 13:47:36 | 11 | the time it was sent, Mr. Mitchell intended to investigate |
| 13:47:41 | 12 | murder? |
| 13:47:44 | 13 | A.   I do believe in Mr. Mitchell's eyes, yes, that was |
| 13:47:48 | 14 | his intention. |
| 13:47:50 | 15 | Q.   And you said this was sent July 7, 2022? |
| 13:47:54 | 16 | A.   Yes. |
| 13:47:56 | 17 | Q.   And is that the date on the letter? |
| 13:47:58 | 18 | A.   It is dated July 7, 2022. |
| 13:48:01 | 19 | Q.   And is that -- is that the same date as |
| 13:48:06 | 20 | Representative Cain's letter to Lilith Fund? |
| 13:48:08 | 21 | A.   I believe so. |
| 13:48:12 | 22 | Q.   Which I believe was Exhibit 5; is that right? |
| 13:48:14 | 23 | A.   Yes. |
| 13:48:33 | 24 | Q.   Assuming none of the rest of these are out of order, |
| 13:48:38 | 25 | would you go to Exhibit 6. |

| 13:49:03 | 1 | A.   Yes, I'm in Exhibit 6. |
| 13:49:05 | 2 | Q.   I'm sorry.  I need to correct my previous question. |
| 13:49:08 | 3 | I think we both made the same mistake.  In fact, July 7, |
| 13:49:15 | 4 | 2022 is the date of -- |
| 13:49:18 | 5 | A.   Of the letter to the law firm, I believe. |
| 13:49:20 | 6 | Q.   The letter to Sidley Austin.  That's right.  So |
| 13:49:32 | 7 | Exhibit 6, do you have Exhibit 6 in front of you? |
| 13:49:35 | 8 | A.   I do. |
| 13:49:36 | 9 | Q.   What is Exhibit 6? |
| 13:49:38 | 10 | A.   It is a tweet from Representative Briscoe Cain, dated |
| 13:49:43 | 11 | June 28, 2022. |
| 13:49:44 | 12 | Q.   What does it say? |
| 13:49:45 | 13 | A.   It says abortion is still, in all capital, a crime in |
| 13:49:49 | 14 | Texas.  Murder statute defines homicide to include the |
| 13:49:52 | 15 | killing of an unborn child, Penal Code, Section 1.077 and |
| 13:49:56 | 16 | then, Section 1902(b)(1), anyone performing or aiding an |
| 13:50:01 | 17 | abortion in Texas, including abortion funds and donors, |
| 13:50:03 | 18 | could face murder the charges. |
| 13:50:04 | 19 | Q.   Okay.  Move to admit Plaintiffs' Exhibit 6. |
| 13:50:11 | 20 | MR. WASSDORF:  Objection.  Relevance and hearsay. |
| 13:50:12 | 21 | THE COURT:  Overruled.  Admitted. |
| 13:50:15 | 22 | MR. ATKINS:  Your Honor, it might be simpler from |
| 13:50:16 | 23 | an efficiency perspective, the next three are also from |
| 13:50:20 | 24 | Representative Cain or communications from Representative |
| 13:50:23 | 25 | Cain 7, 8 and 9.  Can I move to admit them and they can |

| 13:50:28 | 1 | preserve their objections with respect to those, as well? |
| 13:50:30 | 2 | THE COURT:  You want to really set a predicate by |
| 13:50:34 | 3 | asking her a few questions about those. |
| 13:50:35 | 4 | MR. ATKINS:  Understood.  Will do. |
| 13:50:38 | 5 | Q.  (BY MR. ATKINS) And when was this tweet sent? |
| 13:51:03 | 6 | A.  June 28, 2022.  So a few does after the Dobbs |
| 13:51:09 | 7 | decision. |
| 13:51:09 | 8 | Q.  This was sent -- do you recognize the format here as |
| 13:51:16 | 9 | being a Twitter -- |
| 13:51:17 | 10 | A.  Yes.  It looks like a tweet. |
| 13:51:20 | 11 | Q.  And Representative Cain has a blue check by his name. |
| 13:51:24 | 12 | Do you know what that means? |
| 13:51:25 | 13 | A.  I believe that means he's verified, which is |
| 13:51:28 | 14 | something we have not achieved. |
| 13:51:35 | 15 | Q.  Go ahead and go to tab 7.  Have you seen Exhibit 7 |
| 13:51:53 | 16 | before? |
| 13:51:54 | 17 | A.  I don't believe I've seen this specific tweet before. |
| 13:51:57 | 18 | But. |
| 13:51:58 | 19 | Q.  Can you review it? |
| 13:52:00 | 20 | A.  Yes. |
| 13:52:01 | 21 | Q.  What is Exhibit 7? |
| 13:52:03 | 22 | A.  It is a tweet from Representative Briscoe Cain, dated |
| 13:52:06 | 23 | June 29th. |
| 13:52:08 | 24 | Q.  What does that tweet say? |
| 13:52:10 | 25 | A.  It says good news.  Also they've already facing jail |

13:52:15    1    time for their criminal acts hash tag prosecute Texas

13:52:19    2    abortion funds.  And then, it seems to be, quote, tweeting

13:52:22    3    a tweet from the Texas Tribune, dated June 29th, that

13:52:27    4    talks about how abortion funds have been helping Texans

13:52:30    5    pay for care in Texas and outside of the state and that

13:52:34    6    all of our work had to pause after Dobbs.

13:52:36    7    Q.   And have you heard of the hash tag prosecute Texas

13:52:42    8    abortion funds before?

13:52:44    9    A.   I have because we are an abortion fund, too.

13:52:48    10   Q.   Plaintiffs move to admit Exhibit 7.

13:52:51    11            MR. WASSDORF:  Objection.  Relevance and hearsay.

13:52:54    12            THE COURT:  I think, in addition, I mean, I don't

13:52:56    13   think she's ever even seen it before today.  So I don't

13:52:58    14   know that it's been properly authenticated or -- so I'm

13:53:02    15   going to sustain the objection.

13:53:04    16            MR. ATKINS:  Understood.

13:53:11    17   Q.   (BY MR. ATKINS) Would you look at Exhibit 8, the very

13:53:16    18   next tab.

13:53:24    19   A.   I'm at 8.

13:53:25    20   Q.   Have you seen Exhibit 8 before?

13:53:27    21   A.   This one, yes.

13:53:29    22   Q.   Okay.  And what is Exhibit 8?

13:53:31    23   A.   It is a tweet from Representative Briscoe Cain and

13:53:38    24   it, once again, is a, quote, tweet so it shows an image

13:53:41    25   and then, has some language describing that donating to

| | | |
|---|---|---|
| 13:53:45 | 1 | abortion funds is a crime. |
| 13:53:47 | 2 | Q.   And plaintiffs move to admit Exhibit 8. |
| 13:53:54 | 3 |        MR. WASSDORF:  Objection.  Relevancy and hearsay. |
| 13:53:56 | 4 |        THE COURT:  Overruled and admitted. |
| 13:53:59 | 5 | Q.   (BY MR. ATKINS) And do you see -- is that the same |
| 13:54:11 | 6 | exhibit you've got in front of you? |
| 13:54:13 | 7 | A.   Yes, it is. |
| 13:54:13 | 8 | Q.   And does that -- what hash tag does that bear? |
| 13:54:17 | 9 | A.   That is paid with Prosecute Texas Abortion Funds. |
| 13:54:22 | 10 | Q.   And what is appended there under Representative |
| 13:54:29 | 11 | Cain's tweet? |
| 13:54:29 | 12 | A.   So it looks like a screen shot of the pre-Roe |
| 13:54:32 | 13 | abortion ban, specifically, one of the sections where it |
| 13:54:37 | 14 | says furnishing the means is highlighted with a big red |
| 13:54:40 | 15 | box.  This is that language around procuring an abortion |
| 13:54:45 | 16 | as being guilty as an accomplice. |
| 13:54:58 | 17 | Q.   Can you turn to Exhibit 9. |
| 13:55:10 | 18 | A.   I'm there. |
| 13:55:11 | 19 | Q.   And what is Exhibit 9? |
| 13:55:13 | 20 | A.   Exhibit 9 is a tweet from Representative Briscoe |
| 13:55:16 | 21 | Cain.  It's dated June 24th and it seems to be adding or |
| 13:55:23 | 22 | tagging someone on Twitter at Fortune magazine about |
| 13:55:27 | 23 | abortion funding and interstate travel. |
| 13:55:30 | 24 | Q.   Okay.  And have you seen Exhibit 9 before today? |
| 13:55:34 | 25 | A.   I have.  Yes. |

13:55:37  1    Q.   Plaintiffs move to admit Exhibit 9.

13:55:40  2         MR. WASSDORF:  Objection.  Relevance and hearsay.

13:55:42  3         THE COURT:  Overruled and admitted.

13:56:03  4    Q.   (BY MR. ATKINS) What do you interpret this tweet as

13:56:06  5    referring to?

13:56:07  6    A.   So I don't know the full article.  I know I clicked

13:56:12  7    it at the time.  Fortune magazine, I think, is trying to

13:56:14  8    explain what abortion funds are and why they exist to help

13:56:18  9    people travel and pay for abortion care, and it seems to

13:56:21  10   be that Representative Cain is saying there's no right to

13:56:26  11   help people who travel.  And I'm a little confused by

13:56:29  12   language there may be no right to interstate travel or

13:56:31  13   there is a right.  So I'm not sure what he's trying to

13:56:35  14   assert totally.

13:56:36  15   Q.   So in the context of these other tweets, does this

13:56:43  16   suggest to you what you think about the criminality or the

13:56:48  17   illegality of providing funds to someone to cross state

13:56:53  18   lines to obtain an abortion?

13:56:54  19   A.   From these tweets, my understanding is that he does

13:56:58  20   think it is illegal to help someone travel, specifically

13:57:01  21   to also fund their abortion if it's -- even if it's not

13:57:04  22   the state of Texas.  Even if it's somewhere where abortion

13:57:06  23   care is still legal.

13:57:09  24   Q.   In your view, is Representative Cain a pretty

13:57:15  25   prominent public figure?

| | | |
|---|---|---|
| 13:57:15 | 1 | A.   Yes.  He's high up in the Texas House of |
| 13:57:19 | 2 | Representatives.  I know when we've been there to testify, |
| 13:57:21 | 3 | I've testified before him about abortion bans. |
| 13:57:24 | 4 | Q.   And is Representative Cain a prolific Tweeter or is |
| 13:57:31 | 5 | this rare for him? |
| 13:57:32 | 6 | A.   A prolific Tweeter.  That's why I was surprised I |
| 13:57:35 | 7 | hadn't seen the other one.  He does seem to tweet, |
| 13:57:38 | 8 | especially around significant moments like on the Dobbs |
| 13:57:42 | 9 | decision day and since then around abortion bans. |
| 13:57:44 | 10 | Q.   And he certainly -- is he speaking in a public way? |
| 13:57:51 | 11 | Anyone can see these tweets, right? |
| 13:57:53 | 12 | A.   Yeah, I believe this is public, so anyone can see |
| 13:57:56 | 13 | them. |
| 13:57:56 | 14 | Q.   Can you turn to Exhibit 26? |
| 13:58:38 | 15 | A.   I'm at Exhibit 26. |
| 13:58:39 | 16 | Q.   And have you seen Exhibit 26 before? |
| 13:58:46 | 17 | A.   Yes. |
| 13:58:47 | 18 | Q.   And what is Exhibit 26? |
| 13:58:51 | 19 | A.   So this is a tweet from Attorney General Ken Paxton |
| 13:58:56 | 20 | and it is about whether or not the pre-Roe statutes were |
| 13:59:06 | 21 | in effect in this lawsuit.  It seems the date on this is |
| 13:59:11 | 22 | July 2nd, 2022. |
| 13:59:13 | 23 | Q.   Okay.  Plaintiffs move to admit Plaintiffs' Exhibit |
| 13:59:17 | 24 | 26. |
| 13:59:17 | 25 | MR. WASSDORF:  No objection, your Honor. |

| | | |
|---|---|---|
| 13:59:18 | 1 | THE COURT: So admitted. |
| 13:59:35 | 2 | Q. (BY MR. ATKINS) So can you read the -- I guess this |
| 13:59:46 | 3 | will be the third sentence of the tweet. |
| 13:59:50 | 4 | A. Sure. Our state's pre-Roe statutes banning abortion |
| 13:59:54 | 5 | in Texas are a hundred percent good law. |
| 13:59:57 | 6 | Q. Is that consistent with what we've earlier seen |
| 14:00:01 | 7 | Representative Cain saying? |
| 14:00:02 | 8 | A. Yes. This all seems in line. |
| 14:00:04 | 9 | Q. Is that consistent with what Jonathan Mitchell was |
| 14:00:08 | 10 | saying? |
| 14:00:08 | 11 | A. Yes, it seems consistent with what was in the law |
| 14:00:12 | 12 | firm. |
| 14:00:22 | 13 | Q. Turn to Exhibit 28. |
| 14:00:34 | 14 | A. I'm at 28. |
| 14:00:35 | 15 | Q. Have you seen Exhibit 28 before? |
| 14:00:37 | 16 | A. Yes. |
| 14:00:38 | 17 | Q. And what is Exhibit 28? |
| 14:00:41 | 18 | A. I believe it is a press release from Attorney General |
| 14:00:47 | 19 | Ken Paxton's office. It's like a web page version. |
| 14:00:52 | 20 | Q. Okay. Plaintiffs move to admit Exhibit 28. |
| 14:00:56 | 21 | MR. WASSDORF: I'm going to object to relevance |
| 14:00:58 | 22 | on this, your Honor. It deals with a lawsuit over some |
| 14:01:01 | 23 | federal guidance. None of the issues that are at issue in |
| 14:01:06 | 24 | this lawsuit. |
| 14:01:07 | 25 | MR. ATKINS: One of the issues that we have to |

14:01:08  1  demonstrate is a willingness to enforce and Attorney

14:01:13  2  General Paxton's views with respect to the protection, and

14:01:16  3  enforcement of antiabortion statutes are generally

14:01:18  4  relevant to the demonstration of a willingness to enforce.

14:01:20  5          THE COURT:  I'll overrule and admit it.

14:01:30  6  Q.   (BY MR. ATKINS) And what in general is this press

14:01:32  7  release about?

14:01:34  8  A.   So I believe this is about there was a lawsuit to

14:01:38  9  ensure that the emergency medical treatment and act --

14:01:44  10  labor act -- I always say this wrong -- EMTALA, that it

14:01:48  11  would allow healthcare providers, including doctors and

14:01:52  12  hospitals in states with abortion bans to at least provide

14:01:54  13  emergency care because there is a limited exception to the

14:01:58  14  trigger bill that some emergency situations would allow

14:02:02  15  someone to get abortion care in Texas.  And then, I

14:02:05  16  believe that was challenged and this lawsuit is stating

14:02:09  17  that there was a victory at some point in the litigation,

14:02:11  18  which I don't believe is fully complete.  That that

14:02:17  19  request to allow EMTALA to allow for some abortions was

14:02:24  20  blocked.

14:02:24  21  Q.   And does this press release suggest to you that

14:02:30  22  Attorney General Paxton wants to make certain that the

14:02:35  23  pre-Roe statutes, for instance, continue to have the force

14:02:38  24  that he has said they have?

14:02:40  25  A.   Yes.

14:02:41  1          MR. WASSDORF:  Objection.  Calls for speculation,
14:02:43  2  your Honor.
14:02:43  3          THE COURT:  I'll overrule.
14:02:45  4  A.   I was very surprised that this lawsuit even happened.
14:02:48  5  We had hoped that the medical exception was something that
14:02:51  6  would wouldn't be pursued and would be allowed.  We
14:02:54  7  actually also in judicial bypass submitted limited medical
14:02:58  8  exception, so we were watching this closely.  It worries
14:03:00  9  me that, you know, there's literally no exceptions and
14:03:04  10 particularly that, you know, the pre-Roe ban and the
14:03:08  11 trigger bill, there's going to be no availability for any
14:03:12  12 legal abortion care in Texas.
14:03:23  13 Q.   (BY MR. ATKINS) Can you look at Exhibit 29?
14:03:33  14 A.   Yes, I'm there.
14:03:34  15 Q.   And what is Exhibit 29?
14:03:36  16 A.   This is also a press release from the Attorney
14:03:40  17 General of Texas Office from Ken Paxton and this seems to
14:03:44  18 be about filing the injunction to stop EMTALA's -- I'm
14:03:52  19 sorry, it seems they were trying to prohibit the Biden
14:03:55  20 administration's request that EMTALA be honored in Texas.
14:03:59  21 Q.   Plaintiffs move to admit Exhibit 28.
14:04:02  22         MR. WASSDORF:  Same relevance objection.
14:04:04  23         THE COURT:  Overruled.  Admitted.  Twenty-eight;
14:04:12  24 is that right?
14:04:12  25         MR. ATKINS:  I'm sorry, 29.  Twenty-eight was the

| | |
|---|---|
| 14:04:15 | 1 last one. |
| 14:04:18 | 2 Q. (BY MR. ATKINS) And from this press release, would |
| 14:04:36 | 3 you derive the same inference that we just talked about |
| 14:04:38 | 4 that this would suggest that Attorney General Paxton wants |
| 14:04:42 | 5 these laws to remain as enforceable as possible? |
| 14:04:46 | 6 MR. WASSDORF: Objection. Leading, your Honor. |
| 14:04:47 | 7 THE COURT: Rephrase the question. |
| 14:04:48 | 8 Q. (BY MR. ATKINS) What inference would you draw from |
| 14:04:50 | 9 this press release about Attorney General Paxton's |
| 14:04:56 | 10 attitude towards abortion laws? |
| 14:04:57 | 11 A. Yes. I would say my understanding of challenging |
| 14:05:00 | 12 this was that even when someone's at risk of dying and |
| 14:05:03 | 13 continuing their pregnancy, that Attorney General Ken |
| 14:05:07 | 14 Paxton wants to force them to continue the pregnancy and |
| 14:05:10 | 15 risk their own life. |
| 14:05:18 | 16 Q. To your knowledge, has Attorney General Ken Paxton |
| 14:05:20 | 17 ever said -- ever given a list or made a statement with |
| 14:05:24 | 18 any context in which he would not enforce the pre-Roe |
| 14:05:27 | 19 statutes or the trigger ban? |
| 14:05:29 | 20 A. Not to my knowledge. |
| 14:05:47 | 21 Q. Can you go to Exhibit 31? I'm sorry, Exhibit 32. |
| 14:05:56 | 22 A. Yes, I'm in Exhibit 32. |
| 14:05:59 | 23 Q. And what is Exhibit 32? |
| 14:06:01 | 24 A. This is a press release from Attorney General Texas |
| 14:06:04 | 25 Ken Paxton's office on June 30th and it's about the filing |

14:06:09  1   of an emergency motion with the Texas Supreme Court to

14:06:13  2   support the pre-Roe statutes being in effect.

14:06:16  3   Q.   And have you seen that before today?

14:06:21  4   A.   I'll be honest, I can't recall this one.  I don't

14:06:23  5   think I've seen it before.

14:06:26  6   Q.   Your Honor, we move to admit Plaintiffs' Exhibit 32.

14:06:29  7        MR. WASSDORF:  No objection, your Honor.

14:06:31  8        THE COURT:  Without objection, so admitted.

14:06:35  9   Q.   (BY MR. ATKINS) And you briefly summarized what --

14:06:54  10  what this press release is about, but do you know what the

14:06:57  11  -- can you tell from the press release what the reason for

14:07:01  12  this emergency motion was?

14:07:03  13  A.   Yes.  I believe there was a window between when Roe

14:07:07  14  vs. Wade was overturned and before our trigger bill took

14:07:11  15  effect that some clinics were hoping to still be able to

14:07:14  16  provide abortion care under that very narrow space, and it

14:07:17  17  seems that this was around that challenge of whether or

14:07:21  18  not they could do that.  And the Attorney General press

14:07:25  19  release seems to state that the pre-Roe ban was never

14:07:29  20  repealed and is currently in effect.

14:07:31  21  Q.   And so, they were fighting in litigation about the

14:07:35  22  pre-Roe ban?

14:07:35  23  A.   Yes.

14:07:40  24  Q.   And on which side did Attorney General Paxton land in

14:07:44  25  terms of whether the pre-Roe ban should be in effect or

| 14:07:47 | 1 | not? |
| 14:07:47 | 2 | A.   It seems that he landed on that the pre-Roe ban was |
| 14:07:50 | 3 | in effect and so, people could be criminally prosecuted |
| 14:07:53 | 4 | for providing abortion care in Texas. |
| 14:07:57 | 5 | Q.   If you'd turn to 34. |
| 14:08:16 | 6 | A.   Yes, I'm at 34. |
| 14:08:21 | 7 | Q.   Have you seen Exhibit 34 before? |
| 14:08:24 | 8 | A.   Yes, I have. |
| 14:08:25 | 9 | Q.   And what is Exhibit 34? |
| 14:08:27 | 10 | A.   It is a press release from Attorney General of Texas |
| 14:08:31 | 11 | Ken Paxton on June 24th, the day of the Dobbs decision, |
| 14:08:34 | 12 | and it states in the title, AG Paxton celebrates end of |
| 14:08:38 | 13 | Roe v. Wade.  Announces abortion now illegal in Texas. |
| 14:08:42 | 14 | Q.   Move to admit Exhibit 34. |
| 14:08:48 | 15 |       MR. WASSDORF:  No objection, your Honor. |
| 14:08:51 | 16 |       THE COURT:  So admitted. |
| 14:08:53 | 17 | Q.   (BY MR. ATKINS) What is the full title of this press |
| 14:09:25 | 18 | release? |
| 14:09:27 | 19 | A.   The full title, AG Paxton celebrates end of Roe v. |
| 14:09:33 | 20 | Wade.  Announces abortion now illegal in Texas. |
| 14:09:46 | 21 | Q.   He says that abortion is now illegal in Texas.  What |
| 14:09:50 | 22 | do you take him to mean by that? |
| 14:09:53 | 23 | A.   I take that to mean that Attorney General Ken Paxton |
| 14:09:56 | 24 | believes that pre-Roe ban immediately is in effect as soon |
| 14:10:01 | 25 | as Roe v. Wade was overturned. |

14:10:03 1 Q.   To your knowledge, did the trigger ban have a delay

14:10:07 2 associated with it?

14:10:08 3 A.   Yes.  So although the opinion came out on June 24th,

14:10:12 4 the final order from the Court we knew would be later,

14:10:15 5 maybe a month, maybe longer.  So our understanding at the

14:10:20 6 time was that there was going to be a period of time

14:10:24 7 before the trigger bill took effect where some abortion

14:10:27 8 care would still be legal and we'd just be continuing to

14:10:29 9 live under S.B. 8.  But this kind of language made us

14:10:33 10 concerned that immediately, we could be prosecuted under

14:10:36 11 the pre-Roe ban.

14:10:37 12 Q.   Can you read the last sentence of the first paragraph

14:10:42 13 of this letter?

14:10:44 14 A.   June 24th will be an annual office of the Attorney

14:10:48 15 General holiday in recognition of this momentous decision

14:10:51 16 and the many lives lost before it.

14:10:54 17 Q.   So how do you interpret that statement?

14:10:59 18 A.   That the official stance of the Attorney General of

14:11:04 19 Texas and the entire office, so all those under him, all

14:11:10 20 agree with the statements of like that this is a

14:11:12 21 celebration, even though it meant the loss of human rights

14:11:15 22 for millions of Americans.

14:11:25 23 Q.   Move to Exhibit 41.

14:11:37 24 A.   I'm at 41.

14:11:39 25 Q.   Have you seen Exhibit 41 before?

14:11:43  1   A.   Yes.

14:11:44  2   Q.   What is Exhibit 41?

14:11:49  3   A.   So this is a tweet from Attorney General Ken Paxton

14:11:56  4   on July 2nd, 2022 and it's, once again, about that

14:12:02  5   litigation around whether or not the pre-Roe ban is in

14:12:07  6   effect and whether there's any legal abortion care in

14:12:11  7   Texas before the trigger bill took effect but after Dobbs.

14:12:14  8   Q.   Plaintiffs move to admit Exhibit 41.

14:12:17  9        MR. WASSDORF:   No objection, your Honor.

14:12:18  10       THE COURT:   So admitted.

14:12:20  11  Q.   (BY MR. ATKINS) And what do you understand this to be

14:12:44  12  referring to?

14:12:48  13  A.   So I believe as that petition was working its way

14:12:50  14  through the courts, this was one of the rulings that was

14:12:55  15  seeking emergency relief by the abortion clinics and

14:12:58  16  providers in Texas, but it was denied by the Texas Supreme

14:13:01  17  Court.  And so, Attorney General Ken Paxton says prolific

14:13:07  18  victory.  So I believe he was celebrating the ability to

14:13:09  19  show that the pre-Roe ban was still in effect.

14:13:13  20  Q.   And can you read for us the third sentence of that

14:13:18  21  tweet?

14:13:19  22  A.   Our state's pre-Roe statutes banning abortion in

14:13:22  23  Texas are a hundred percent good law.

14:13:30  24  Q.   Can you look at Exhibit 42.

14:13:44  25  A.   Yes, I'm there.

| | | |
|---|---|---|
| 14:13:45 | 1 | Q.   Have you seen Exhibit 42 before? |
| 14:13:49 | 2 | A.   I'm not sure if I've seen this exact tweet before. |
| 14:13:52 | 3 | Q.   Okay.  But what is Exhibit 42? |
| 14:13:55 | 4 | A.   It is a tweet by Attorney General Ken Paxton on July |
| 14:13:59 | 5 | 1st, 2022, and it's talking about an appeal to the Texas |
| 14:14:03 | 6 | Supreme Court about, I believe, this litigation around |
| 14:14:06 | 7 | whether or not the pre-Roe ban was in effect immediately |
| 14:14:09 | 8 | after Dobbs. |
| 14:14:12 | 9 | Q.   Plaintiffs move to admit Exhibit 42. |
| 14:14:16 | 10 | MR. WASSDORF:  No objection, your Honor. |
| 14:14:17 | 11 | THE COURT:  So admitted. |
| 14:14:19 | 12 | Q.   (BY MR. ATKINS) Does this statement repeat Attorney |
| 14:14:49 | 13 | General Paxton's statement that the pre-Roe statutes are |
| 14:14:51 | 14 | good law? |
| 14:14:51 | 15 | A.   Yes.  It seems to repeat from the previous tweet and |
| 14:14:54 | 16 | then, also, the press release. |
| 14:15:19 | 17 | Q.   I'm going to try if these facilities allow to play |
| 14:15:26 | 18 | for you a video -- I'm sorry.  Actually, it would be a -- |
| 14:15:32 | 19 | yeah, would be a video, about a five-minute video.  Before |
| 14:15:36 | 20 | I do that, I'm going to try to describe what it is because |
| 14:15:45 | 21 | often it's not in your binder.  This is Exhibit 63.  Do |
| 14:15:59 | 22 | you guys have objections?  Okay.  Plaintiffs move to admit |
| 14:16:03 | 23 | Exhibit 63. |
| 14:16:05 | 24 | MR. WASSDORF:  No objection. |
| 14:16:06 | 25 | THE COURT:  So admitted. |

14:16:09   1   Q.   (BY MR. ATKINS)  I'm going to play this video for you

14:16:11   2   and then, we're going to talk about it a little bit

14:16:14   3   assuming this works.

14:16:39   4               (Audio and video file played.)

14:18:11   5   Q.   (BY MR. ATKINS)  What do you understand him to mean

14:18:14   6   when he talks about his ability to enforce civil

14:18:17   7   penalties?

14:18:18   8   A.   I believe he's referring to the sections in S.B. 8

14:18:23   9   that says, you know, S.B. 8 was still in force, but then,

14:18:26   10  the pursual of that hundred K that he referred to has to

14:18:31   11  be through the Attorney General.

14:18:32   12  Q.   Is it -- did you understand him to be saying that he

14:18:38   13  needs anyone else's authority to bring civil penalties?

14:18:40   14  A.   No.  It doesn't -- specifically, since he's referring

14:18:45   15  to himself as the Attorney General in the interview that

14:18:48   16  it is entirely within his purview.

14:18:49   17  Q.   And he referred to separate criminal penalties,

14:18:55   18  right?

14:18:55   19  A.   Yes.  I assumed those were the pre-Roe ban criminal

14:18:59   20  penalties or perhaps, you know, other application of

14:19:02   21  criminal law.

14:19:05   22  Q.   And did you hear him say what the top limit of

14:19:10   23  potential damages, civil damages he could seek?

14:19:13   24  A.   There -- to my understanding there's no upper limit,

14:19:15   25  which is one of the concerns we've always had.  There's a

| | | |
|---|---|---|
| 14:19:18 | 1 | minimum but not a top. |
| 14:19:25 | 2 | (Audio and video file played.) |
| 14:20:34 | 3 | Q.   What do you understand that exchange to have been |
| 14:20:39 | 4 | about? |
| 14:20:39 | 5 | A.   That Attorney General Ken Paxton and his office, so |
| 14:20:42 | 6 | folks under him, were immediately looking into how they |
| 14:20:46 | 7 | could enforce abortion bans.  They seem to be referring |
| 14:20:48 | 8 | maybe to the civil penalties of S.B. 8, but I wasn't |
| 14:20:52 | 9 | clear.  It could be additional abortion bans like the |
| 14:20:55 | 10 | pre-Roe statute. |
| 14:20:56 | 11 | Q.   Could it have been the trigger ban? |
| 14:20:58 | 12 | A.   Yes. |
| 14:20:59 | 13 | Q.   And did you hear them discuss providing funds to |
| 14:21:06 | 14 | travel out of state to obtain a legal abortion? |
| 14:21:08 | 15 | A.   Yes.  So those kind of commitments that were made by |
| 14:21:11 | 16 | companies, I will admit those were things that brought us |
| 14:21:13 | 17 | hope at the time.  But then, immediately to hear that |
| 14:21:17 | 18 | those companies might be investigated, I mean, those |
| 14:21:19 | 19 | companies are much larger than us.  We're small nonprofits |
| 14:21:22 | 20 | and yet, they're willing to take on large corporations, |
| 14:21:26 | 21 | multinational corporations.  So I assume we would still be |
| 14:21:29 | 22 | targeted. |
| 14:21:29 | 23 | Q.   Was Sidley Austin one of those companies that made |
| 14:21:34 | 24 | such a promise? |
| 14:21:35 | 25 | A.   Yes, it was. |

14:21:35  1   Q.   And Sidley Austin was the law firm that received the

14:21:39  2   letter from --

14:21:40  3   A.   Yes, that's the letter that I reviewed.

14:21:44  4   Q.   And did you hear him clearly saying whether he

14:21:50  5   thought that he could reach out-of-state conduct or not?

14:21:55  6   A.   No.  I will admit even this interview reminded me of

14:22:00  7   in that immediate moment how confusing it all was and how

14:22:03  8   it's remained confusing.  There's no clarity from the

14:22:06  9   Attorney General on if when speaking about these types of

14:22:09  10  enforcement, it would be limited to abortion care

14:22:11  11  happening in Texas, does it extend out of state where

14:22:14  12  abortion is still legal, and it's caused a vast majority

14:22:18  13  of our fear.

14:22:19  14  Q.   Do you expect that we might be able to find out his

14:22:24  15  view on that if we were able to ask him?

14:22:26  16  A.   Yes.  And, you know, it's been confusing why there

14:22:31  17  hasn't been more clarity from that office.

14:22:34  18  Q.   In the context of all of the statements that we went

14:22:40  19  through, what does Attorney General Paxton's ambiguity

14:22:47  20  about looking into enforcing in the context of helping

14:22:51  21  people go out of state to obtain abortions, what does that

14:22:55  22  do to your desire or ability to do that work?

14:22:59  23  A.   You know, our desire has never wavered.  We've wanted

14:23:02  24  to help people -- continue to help people seek legal

14:23:06  25  abortion care and now we can't do that in Texas.  It has

14:23:11  1   been awful not knowing what's safe to do.  And

14:23:14  2   particularly I remember in those days around Dobbs and

14:23:18  3   statements like, this, we were watching closely everything

14:23:20  4   that came out of Attorney General Ken Paxton, any state

14:23:23  5   official.  And we also were -- you know, I'm not just

14:23:26  6   worried about myself.  I'm worried about my staff, my

14:23:29  7   volunteers my board of directors.  And I'm worried about

14:23:31  8   the young people we help.  So if there was clarity, I

14:23:35  9   would feel like we could resume services, but right now,

14:23:37  10  I'm afraid to put people at risk.

14:23:40  11  Q.   But is there any lack of clarity from Attorney

14:23:43  12  General Paxton about whether he will enforce civil

14:23:45  13  penalties against a violation?

14:23:48  14  A.   No.  That is probably the one area that has been very

14:23:51  15  repeatedly stated that civil penalties will be enforced.

14:23:54  16  Q.   It would be fair to say that he's clear he'll enforce

14:23:58  17  the law, but he's not clear on the scope?

14:24:00  18        MR. WASSDORF:  Objection, your Honor.

14:24:02  19        MR. ATKINS:  Withdrawn.

14:24:09  20  Q.   (BY MR. ATKINS) You mentioned your volunteers, staff

14:24:12  21  members, board members, donors, are they scared?

14:24:17  22  A.   Yes.  I'm sorry.  It's a little hard answering these

14:24:20  23  after going through all the documentation.  They are

14:24:23  24  terrified.  I've had to talk to staff about what to do if

14:24:26  25  they are arrested or if a warrant is put out for them.

| | |
|---|---|
| 14:24:31 | 1 |
| 14:24:35 | 2 |
| 14:24:37 | 3 |
| 14:24:41 | 4 |
| 14:24:44 | 5 |

1   I've had to think about that for myself.  I had a board

2   member step down the day of the Dobbs decision stating

3   that they were afraid of prosecution because of where they

4   live in the state.  I've had volunteers ask me what would

5   happen if they were prosecuted, who would help them.

6          MR. WASSDORF:  Objection.  Hearsay, your Honor.

7          MR. ATKINS:  Your Honor, one of the things that

8   is in issue is the question of whether we can meet

9   associational standing and that part of refers to the

10  germaneness of this to the donors, volunteer staff

11  members, potential complaints to the issues in this

12  litigation.  So I'm simply asking about the effect of

13  these precise things on the groups of people for whom that

14  would be a germane issue.

15          THE COURT:  I'll allow the question.

16  A.   So yeah, I think volunteers have specifically asked

17  if it's safe to continue volunteering with us.  We

18  volunteer not just in Texas but other states, and they're

19  worried that they could get prosecuted by the Texas law in

20  other states.  And then, we've had donors reach out asking

21  what our services are.  I remember there was a comment on

22  one of our -- I think our Facebook page like don't give to

23  them anymore because they're not helping people.  So it's

24  been a variety and kind of relentless concern for people's

25  safety and then, also, what our work can look like to

14:25:51  1  continue.

14:25:51  2  Q.   (BY MR. ATKINS)  And so, you're not helping people

14:25:53  3  now.

14:25:54  4  A.   Not with abortion care, no.

14:26:00  5  Q.   You said you reopened your hotline; is that correct?

14:26:03  6  A.   Partially, yes.

14:26:05  7  Q.   What do you mean by partially?

14:26:07  8  A.   So it used to be a live hotline which was particular

14:26:11  9  for young people, often it's helpful for them to hear a

14:26:14  10  human on the other side, and it was 24/7 so they could

14:26:17  11  call us any time.  But we as of Dobbs closed it for

14:26:22  12  several days, I think almost a full week.  And then, we

14:26:24  13  reopened it as a cold line so people call and leave a

14:26:28  14  voicemail.  We call them back.  We still get like dozens

14:26:31  15  of calls every week, but maybe a handful of people will

14:26:34  16  leave a voicemail and most are just hang-ups.  So I think

14:26:37  17  folks are too afraid to get a call back from us.

14:26:40  18  Q.   What are some of the ways that Jane's Due Process

14:26:45  19  communicates generally?

14:26:46  20  A.   We're active on social media.  We send e-mails to

14:26:50  21  supporters.  We, yeah, try to be very vocal about what our

14:26:54  22  services are so youth can find them.

14:26:55  23  Q.   Have you changed any of those vectors of

14:27:00  24  communication as a result of the Dobbs decision and

14:27:02  25  Plaintiffs' Exhibit 3 and 27?

14:27:04  1    A.   Yes.  So obviously our hotline changed.  We -- our

14:27:09  2    social media presence changed.  We used to be able to say

14:27:12  3    specifically like call us for this type of help.  I think

14:27:14  4    it took several weeks, almost a month to navigate what was

14:27:19  5    safe to share information-wise.  We also had to -- young

14:27:25  6    people often have nowhere to turn and so, we didn't want

14:27:27  7    to abandon them, but we also didn't know if it was safe to

14:27:30  8    say, here's a list of verified abortion clinics in states

14:27:33  9    where abortion care is still legal.  It took time and

14:27:36  10   support of legal counsel to know if we felt comfortable

14:27:39  11   doing that.

14:27:40  12   Q.   And are you sure even now?  Even sitting now, are you

14:27:44  13   completely sure that that is safe?

14:27:45  14   A.   No, I'm not, and I worry about it every day.

14:27:52  15   Q.   If plaintiffs were to prevail in this lawsuit and

14:28:00  16   obtain declaratory injunctive relief that plaintiffs seek,

14:28:03  17   would plaintiffs or would Jane's Due Process be able to

14:28:11  18   assist people in obtaining abortions in states where it's

14:28:13  19   legal?

14:28:13  20   A.   Yes, if we had resolution from the Court, we would.

14:28:16  21   Q.   Would you provide, Jane's Due Process provide

14:28:20  22   practical assistance?

14:28:21  23   A.   Yes, we'd resume with travel, lodging, meals

14:28:25  24   stipends.

14:28:28  25   Q.   That's all I have from this witness.

| | | |
|---|---|---|
| 14:28:33 | 1 | MR. WASSDORF:  Could we take a brief break, your |
| 14:28:35 | 2 | Honor? |
| 14:28:35 | 3 | THE COURT:  A break?  Yeah, for how long? |
| 14:28:39 | 4 | MR. WASSDORF:  Two or three minutes. |
| 14:28:41 | 5 | THE COURT:  Sure.  Let's take a three-minute |
| 14:28:42 | 6 | break. |
| 14:31:04 | 7 | (Recess.) |
| 14:33:22 | 8 | THE COURT:  Mr. Wassdorf. |
| 14:33:27 | 9 | CROSS-EXAMINATION |
| 14:33:55 | 10 | BY MR. WASSDORF: |
| 14:33:55 | 11 | Q.  So, Ms. Mariappuran? |
| 14:34:06 | 12 | A.  Mariappuran.  You can also call me Rosann if that |
| 14:34:10 | 13 | helps. |
| 14:34:11 | 14 | Q.  That's all right.  So you are the executive director |
| 14:34:14 | 15 | of Jane's Due Process. |
| 14:34:16 | 16 | A.  Yes. |
| 14:34:16 | 17 | Q.  And Jane's Due Process helps young people in |
| 14:34:22 | 18 | navigating parental consent laws and confidentially |
| 14:34:27 | 19 | obtaining abortions, correct? |
| 14:34:28 | 20 | A.  Yes. |
| 14:34:29 | 21 | Q.  And you operate a hotline that we've already |
| 14:34:36 | 22 | discussed. |
| 14:34:37 | 23 | A.  Yes. |
| 14:34:38 | 24 | Q.  And that hotline connects young people to attorneys, |
| 14:34:45 | 25 | to represent them in judicial bypass proceedings? |

14:34:48  1   A.   It does not anymore because judicial bypass is no

14:34:51  2   longer available in Texas, but it used to.

14:34:54  3   Q.   Judicial bypass is no longer?

14:34:58  4   A.   Well, because abortion care is not available.

14:35:01  5   There's no reason for a young person in Texas to seek a

14:35:04  6   judicial bypass, so people aren't pursuing them anymore.

14:35:07  7   Q.   There are circumstances in which an individual can

14:35:11  8   obtain a legal abortion in Texas, are there not?

14:35:13  9   A.   Yes.  We do believe the judicial bypass law is still

14:35:16  10  in effect and someone could seek a bypass and abortion

14:35:19  11  care.  To the best of my knowledge, no one has done that

14:35:23  12  since Dobbs.

14:35:24  13  Q.   Through that hotline, you also provide emotional

14:35:34  14  support to individuals?

14:35:35  15  A.   Yes, we do.

14:35:37  16  Q.   And you make referrals to housing, education,

14:35:42  17  childcare, and other social services?

14:35:44  18  A.   Yes.

14:35:47  19  Q.   And you are still able to provide emotional support

14:35:51  20  and those referrals, correct?

14:35:54  21  A.   We're able to provide the referrals.  We're more

14:35:57  22  limited in what kind of emotional support we're providing.

14:35:59  23  It is not especially around abortion care, so we also do

14:36:04  24  birth control access.  We provide a lot of emotional

14:36:06  25  support on birth control access.  But I would say we're

14:36:08  1  not really providing emotional support around abortion

14:36:13  2  access right now.

14:36:13  3  Q.    What emotional support for abortion are you not able

14:36:16  4  to provide?

14:36:17  5  A.    So we used to be able to help minors who were seeking

14:36:21  6  abortion care without parental support, and that often

14:36:24  7  meant that our case manager would kind of be the adult in

14:36:27  8  their life who was helping them make their appointments,

14:36:30  9  you know, travel for care and arrange that travel, but

14:36:33  10  that kind of work is not happening anymore.

14:36:35  11  Q.    So making appointments and arranging for travel care,

14:36:40  12  I mean, that's not emotional support, is it?

14:36:43  13  A.    For teenagers, it can be.  Many of them have never

14:36:47  14  ridden on an airplane or called a doctor's office, so it

14:36:51  15  actually is a lot of counseling.

14:36:56  16  Q.    And traditionally, you have also paid for abortions?

14:37:00  17  A.    Yes.

14:37:06  18  Q.    And Jane's Due Process at this point has stopped

14:37:10  19  paying for abortions, correct?

14:37:11  20  A.    Yes.  We do not feel it is safe to fund abortion care

14:37:15  21  in states where it is legal because of confusion of the

14:37:18  22  law.

14:37:20  23  Q.    Do you understand that after Dobbs, there is no

14:37:26  24  longer a constitutionally protected right to an abortion

14:37:29  25  in this country?

14:37:31  1    A.   I believe that Dobbs overturned Roe v. Wade and the

14:37:37  2    court held that there is not a constitutional right.  I

14:37:39  3    believe there's still paths to affirming a constitutional

14:37:42  4    right, but I agree that Roe v. Wade is overturned.

14:37:47  5    Q.   And you understand that the state of Texas has

14:37:49  6    outlawed and criminalized abortion?

14:37:51  7    A.   Under the right of abortion, yes, I believe that to

14:37:56  8    be true.

14:37:56  9    Q.   And do you understand that the state of Texas as a

14:38:01 10    sovereign entity is well within its authority to do so?

14:38:06 11            MR. ATKINS:  Objection.  Calls for a legal

14:38:08 12    conclusion.

14:38:09 13            THE COURT:  I'll allow the question.

14:38:12 14    A.   Honestly, I believe the state of Texas is ultimately

14:38:16 15    the people of Texas, so yes, I believe under the current

14:38:19 16    government, yes.  I'm not sure if Texas will always outlaw

14:38:23 17    abortion.  Under our current representative government,

14:38:26 18    yes, it's outlawed.

14:38:28 19    Q.   (BY MR. WASSDORF) And that government as it stands is

14:38:31 20    elected by the people, correct?

14:38:33 21    A.   Yes, with the -- my personal belief that it is very

14:38:38 22    challenging to vote in Texas, so I don't believe all

14:38:40 23    people who want to vote can vote.

14:38:42 24    Q.   But the fact is that the legislature and the governor

14:38:46 25    and the attorney general are all voted on by the

| | |
|---|---|
| 14:38:49 | 1 | electorate and voted into office.
| 14:38:52 | 2 | A.   Of the electorate who can, you know, obtain a photo
| 14:38:56 | 3 | ID and get to polling places and all the things you need
| 14:39:00 | 4 | to be able to vote.
| 14:39:01 | 5 | Q.   But this lawsuit isn't about the election laws, is
| 14:39:04 | 6 | it?
| 14:39:04 | 7 | A.   No.  I wasn't clear why you were asking about this.
| 14:39:06 | 8 | Q.   And do you understand that it's the state of Texas'
| 14:39:14 | 9 | view that unborn life is worthy of protection?
| 14:39:20 | 10 | A.   May I ask what do you mean by the state of Texas'
| 14:39:23 | 11 | view?
| 14:39:24 | 12 | Q.   The state of Texas as acting through the legislature
| 14:39:27 | 13 | and enacting the laws that we are here discussing today?
| 14:39:32 | 14 | A.   I guess I'm struggling with the state of Texas as a
| 14:39:34 | 15 | concept.  I believe certain elected officials have made it
| 14:39:37 | 16 | clear that that is their view.
| 14:39:38 | 17 | Q.   Let's say the majority of the legislature has made
| 14:39:42 | 18 | that their view.
| 14:39:44 | 19 | A.   I guess I wouldn't agree with that statement.  I
| 14:39:46 | 20 | would need to know how you mean how has the majority of
| 14:39:50 | 21 | the legislature.
| 14:39:51 | 22 | Q.   The majority of the legislature has passed Senate
| 14:39:56 | 23 | Bill 8, has passed the Human Life --
| 14:39:57 | 24 |          MR. ATKINS:  Objection.  Counsel is testifying.
| 14:39:59 | 25 |          THE COURT:  I'll allow predicate.

| | | |
|---|---|---|
| 14:40:01 | 1 | Q. (BY MR. WASSDORF) The majority of the legislature has |
| 14:40:04 | 2 | passed Senate Bill 8, correct? |
| 14:40:05 | 3 | A. Oh, I agree what you're saying. So yes, I believe |
| 14:40:10 | 4 | the legislature have passed Senate Bill 8. |
| 14:40:12 | 5 | Q. And they have passed the Human Life Protection Act? |
| 14:40:15 | 6 | A. If that is Senate Bill -- its full title, yes. |
| 14:40:17 | 7 | Q. I believe you referred to that as the trigger bill? |
| 14:40:19 | 8 | A. Oh, okay. I'm sorry. Yes. They did pass the |
| 14:40:23 | 9 | trigger bill. |
| 14:40:24 | 10 | Q. And they passed some time ago, the pre-Roe statutes. |
| 14:40:31 | 11 | A. A different legislature that was elected by different |
| 14:40:33 | 12 | people in Texas, yes. |
| 14:40:35 | 13 | Q. But the current legislature has not acted to revoke |
| 14:40:41 | 14 | those laws, have they? |
| 14:40:43 | 15 | A. Any of those bills? |
| 14:40:46 | 16 | Q. Correct. |
| 14:40:47 | 17 | A. None of those have been overturned by the Texas |
| 14:40:49 | 18 | legislature. |
| 14:40:52 | 19 | Q. Do you understand that your free speech rights are |
| 14:40:55 | 20 | not unlimited? |
| 14:40:59 | 21 | A. I believe, yes, I understand what you're saying. |
| 14:41:01 | 22 | There is limits on free speech. |
| 14:41:04 | 23 | Q. And are you aware that there are many crimes that |
| 14:41:10 | 24 | prohibit certain types of speech? |
| 14:41:13 | 25 | A. Many crimes that prohibit -- I'm sorry. I'm not |

| | | |
|---|---|---|
| 14:41:16 | 1 | sure. |
| 14:41:17 | 2 | Q.  For example, are you aware that you can't tell |
| 14:41:22 | 3 | someone how to commit a murder? |
| 14:41:25 | 4 | A.  Yes. |
| 14:41:28 | 5 | Q.  And you can't knowingly give someone information that |
| 14:41:32 | 6 | would aid them in committing murder. |
| 14:41:35 | 7 | A.  Yes, I do understand that would be a crime. |
| 14:41:37 | 8 | Q.  And you can't commit fraud by making false |
| 14:41:42 | 9 | statements. |
| 14:41:43 | 10 | A.  Yes, I do understand that is a crime. |
| 14:41:46 | 11 | Q.  And you can't do that even if -- so you can't inform |
| 14:41:59 | 12 | someone how to commit a murder even if that murder is |
| 14:42:04 | 13 | going to occur in another state? |
| 14:42:08 | 14 | MR. ATKINS:  Objection.  Calls for a legal |
| 14:42:10 | 15 | conclusion. |
| 14:42:12 | 16 | THE COURT:  You can ask if she knows. |
| 14:42:15 | 17 | Q.  (BY MR. WASSDORF) Are you aware? |
| 14:42:16 | 18 | A.  I'm so sorry.  Can you repeat that? |
| 14:42:18 | 19 | Q.  Yes.  Are you aware that you cannot provide |
| 14:42:23 | 20 | information to aid someone in a murder even if that murder |
| 14:42:26 | 21 | is going to occur in another state? |
| 14:42:28 | 22 | A.  Yes.  I would assume that violates one or both state |
| 14:42:31 | 23 | laws. |
| 14:42:34 | 24 | Q.  And you understand that the people who call your |
| 14:42:39 | 25 | organization on your hotline have no constitutionally |

14:42:43  1  protected right to violate the law?

14:42:46  2  A.   Which law?

14:42:49  3  Q.   Any law.

14:42:54  4  A.   I agree that our callers cannot commit crimes.  Yes.

14:42:59  5  Q.   And would you agree that they also cannot get help in

14:43:09  6  obtaining illegal abortion?

14:43:14  7  A.   So are you asking -- I don't believe anyone who calls

14:43:17  8  us can be assisted in obtaining abortion care in Texas

14:43:22  9  because abortion is illegal in Texas?

14:43:24  10  Q.   Correct.

14:43:25  11  A.   Yes.  I would say our understanding is that abortion

14:43:28  12  care -- assisting someone to have an abortion in Texas

14:43:31  13  right now, except in that limited exception of the medical

14:43:33  14  emergency, is illegal.

14:43:36  15  Q.   Now, you contend that your speech has been chilled,

14:43:42  16  correct?

14:43:42  17  A.   Correct.

14:43:43  18  Q.   But you do continue to speak about abortion

14:43:49  19  generally, right?

14:43:52  20  A.   We do share some information, but I would not say --

14:43:57  21  I think it's actually been deleted from what I can say

14:44:01  22  about abortion.

14:44:01  23  Q.   Can you pull up Defendants' Exhibit 22.

14:44:13  24  A.   I'm at 22.

14:44:14  25  Q.   Now, is this the -- I guess you would call it the top

14:44:25   1   of Jane's Due Process Twitter feed?

14:44:28   2   A.   Yes.

14:44:29   3   Q.   And that first pinned tweet there, does it say:  Our

14:44:39   4   hotlines are open.  Texas teens can call our phone hotline

14:44:44   5   and leave a voicemail.  We will return calls with

14:44:47   6   information about abortion care in other states?

14:44:51   7   A.   Yes, it says that.

14:44:52   8   Q.   And so, even today, your hotline is open, people can

14:45:07   9   call in and you will provide them information about

14:45:10  10   abortion care in other states?

14:45:13  11   A.   Our hotline is open to a degree, but it is not a live

14:45:17  12   hotline.  So where it refers to the voicemail, that means

14:45:20  13   it's not open fully.  And then, as the bottom of the tweet

14:45:25  14   says, unfortunately, JDP is still paused on all abortion

14:45:28  15   services while we wait for legal clarity from the courts.

14:45:30  16   So we can give them some information but not the

14:45:33  17   information we were giving before.

14:45:36  18   Q.   When it says JDP is still paused on all abortion

14:45:39  19   services, that means what?

14:45:42  20   A.   That means both funding abortion care in states where

14:45:45  21   it is still legal and, also, helping people travel to

14:45:47  22   states where abortion care is still legal.

14:45:50  23   Q.   But you still provide information about abortion care

14:45:53  24   in other states?

14:45:54  25   A.   We provide a limited set of resources that we, I

| | |
|---|---|
| 14:45:59 | 1 |
| 14:46:03 | 2 |
| 14:46:06 | 3 |
| 14:46:06 | 4 |
| 14:46:09 | 5 |
| 14:46:10 | 6 |
| 14:46:11 | 7 |
| 14:46:27 | 8 |
| 14:46:28 | 9 |
| 14:46:33 | 10 |
| 14:46:36 | 11 |
| 14:46:36 | 12 |
| 14:46:37 | 13 |
| 14:46:41 | 14 |
| 14:46:46 | 15 |
| 14:46:50 | 16 |
| 14:46:53 | 17 |
| 14:46:55 | 18 |
| 14:46:56 | 19 |
| 14:47:06 | 20 |
| 14:47:12 | 21 |
| 14:47:19 | 22 |
| 14:47:20 | 23 |
| 14:47:23 | 24 |
| 14:47:24 | 25 |

1  would say, feel okay-ish about providing it.  I don't feel

2  a hundred percent safe of the information we're giving

3  out.

4  Q.   So that is a yes, you do provide information about

5  abortion care in other states?

6  A.   Yes.

7  Q.   Could you pull up Defendants' Exhibit 23?

8  A.   Yes, I'm there.

9  Q.   This is just an isolated copy of that tweet and the

10  date down at the bottom is July 5th, 2022; is that

11  correct?

12  A.   Correct.

13  Q.   And that would be after the Dobbs decision, correct?

14  A.   Yes.  So there was a different pin tweet for the days

15  of Dobbs and the days immediately up until this that said

16  that our hotlines were closed.  And then, we put this up

17  once we decided it was reasonably safe to reopen

18  partially.

19  Q.   Can you pull up Defendants' Exhibit 24?

20  A.   Yes.  I'm there.

21  Q.   And this appears to be a re-Tweet of SisterSong on

22  tweet; is that correct?

23  A.   Yes.  They're a black-led reproductive justice

24  organization.

25  Q.   And this tweet that Jane's Due Process re-Tweeted

| 14:47:28 | 1 | states, need an abortion?  Find care at INeedAnA.com. |
| 14:47:33 | 2 | Visit AbortionFunds.org to find out more about practical |
| 14:47:37 | 3 | and funding support.  Legal support is @reprolegalfund and |
| 14:47:43 | 4 | reproaction has resources for self-managed abortions using |
| 14:47:48 | 5 | pills. |
| 14:47:51 | 6 | So you are still freely publishing information |
| 14:47:56 | 7 | about where people can obtain abortions, where they can |
| 14:48:00 | 8 | obtain funding, where they can obtain legal support, |
| 14:48:04 | 9 | correct? |
| 14:48:05 | 10 | A.   So yes, after time and consultation with attorneys |
| 14:48:09 | 11 | post-Dobbs we did begin to feel safe sharing some |
| 14:48:13 | 12 | information. |
| 14:48:14 | 13 | Q.   Then could you go to Defendants' Exhibit 48. |
| 14:48:27 | 14 | A.   Yes. |
| 14:48:29 | 15 | Q.   Now, this is one of your own tweets, correct? |
| 14:48:31 | 16 | A.   Yes, it is. |
| 14:48:33 | 17 | Q.   And it says, come visit the Jane's Due Process table |
| 14:48:36 | 18 | at AFL2022 today hash tag Texas family law.  What was this |
| 14:48:43 | 19 | event? |
| 14:48:44 | 20 | A.   It was a family law conference that I attended in my |
| 14:48:48 | 21 | role as executive director at Jane's Due Process.  We've |
| 14:48:51 | 22 | been going there for years.  We usually used to work with |
| 14:48:54 | 23 | family lawyers on the judicial bypass work we did. |
| 14:49:01 | 24 | Q.   And this image is a little blurry.  Your Honor, with |
| 14:49:08 | 25 | your permission and opposing counsel's, may I pull up the |

14:49:12  1   original tweets so we can read this a little bit more

14:49:14  2   closely?

14:49:15  3           THE COURT:  Yes.

14:49:16  4           MR. ATKINS:  No objection.

14:49:33  5   Q.   (BY MR. WASSDORF) This is a little handout that looks

14:49:36  6   like that discusses Jane's Due Process' work and the

14:49:40  7   abortion laws in Texas and then, the support that Jane's

14:49:45  8   Due Process can provide.

14:49:48  9   A.   Well, the resources you listed are those national

14:49:52  10  resources, which are a not all based in Texas.  And we did

14:49:55  11  include our contact information.  Specifically, that

14:49:59  12  conference is for family lawyers and we know that there's

14:50:01  13  a lot of confusion about what the state of the law is.  So

14:50:03  14  we made ourselves available to other attorneys.

14:50:05  15  Q.   And so, at this conference, you did share information

14:50:10  16  on where people can obtain abortions, where they can

14:50:13  17  obtain funding, and where they can obtain legal support, I

14:50:16  18  think are the three categories.

14:50:20  19  A.   Yes.  And these are all national resources, not based

14:50:22  20  in Texas.

14:50:24  21  Q.   And then, it looks like there's a little sign-in

14:50:28  22  sheet over there.  What do you use that sign-in sheet for?

14:50:30  23  A.   That is for our e-mail list.  So people who want to

14:50:33  24  support our work.  In particular, you know, we thought

14:50:36  25  some attorneys might want to follow the laws as it

| | | |
|---|---|---|
| 14:50:40 | 1 | progresses. |
| 14:50:40 | 2 | Q.   You said in case people want to support your work. |
| 14:50:44 | 3 | Does that mean you're still out there fundraising? |
| 14:50:46 | 4 | A.   So yes, Jane's Due Process does abortion access work |
| 14:50:50 | 5 | as well as family planning, sexual health education for |
| 14:50:53 | 6 | youth.  So we've seen a huge increase in requests for |
| 14:50:57 | 7 | other services because many people are terrified of |
| 14:50:59 | 8 | becoming pregnant and need access to birth control. |
| 14:51:05 | 9 | Q.   You and your co-plaintiffs in this lawsuit have |
| 14:51:08 | 10 | complained about losing supporters.  How many supporters |
| 14:51:13 | 11 | has Jane's Due Process lost since the Dobbs decision was |
| 14:51:16 | 12 | issued? |
| 14:51:18 | 13 | A.   I don't have an exact number.  I've received |
| 14:51:23 | 14 | inquiries from donors and from supporters about what our |
| 14:51:25 | 15 | work looks like, and I've had to be honest with them that |
| 14:51:28 | 16 | we have significantly reduced our work. |
| 14:51:31 | 17 | Q.   You have significantly reduced your work, but have |
| 14:51:37 | 18 | you lost any donors or have you gained donors? |
| 14:51:42 | 19 | A.   We always lose donors.  Folks for different reasons |
| 14:51:45 | 20 | have to stop giving money.  I do know some people have |
| 14:51:48 | 21 | chose not to give us to because they like to put their |
| 14:51:51 | 22 | resources in other funds that can fund abortion right now. |
| 14:51:55 | 23 | Q.   But overall, have you lost or gained donors since the |
| 14:52:01 | 24 | issuance of Dobbs? |
| 14:52:02 | 25 | A.   I would say there was a swell of support immediately |

| | | |
|---|---|---|
| 14:52:05 | 1 | after Dobbs because people want to help.  I think that |
| 14:52:09 | 2 | also happened after S.B. 8, and all these things temper |
| 14:52:12 | 3 | off. |
| 14:52:12 | 4 | Q.   So the number of donors went up after Dobbs? |
| 14:52:15 | 5 | A.   Yes. |
| 14:52:23 | 6 | Q.   Has the number of fundraising dollars that you had |
| 14:52:25 | 7 | received also gone up since Dobbs? |
| 14:52:28 | 8 | A.   Yes, along with the number of donors, because I think |
| 14:52:31 | 9 | people also are interested in helping however they can. |
| 14:52:34 | 10 | Q.   You have also contended that your donors' free speech |
| 14:52:37 | 11 | rights have been chilled; is that correct? |
| 14:52:39 | 12 | A.   Yes. |
| 14:52:41 | 13 | Q.   And have any donors contacted you indicating that due |
| 14:52:45 | 14 | to our alleged inability to provide the services you want |
| 14:52:51 | 15 | that they are no longer able to donate to your |
| 14:52:53 | 16 | organization? |
| 14:52:53 | 17 | A.   Yes.  I've had conversations with donors where |
| 14:52:57 | 18 | they've said they're going to wait and see what happens |
| 14:53:00 | 19 | with the law.  And then, I've had others who didn't make |
| 14:53:05 | 20 | their normal annual gift. |
| 14:53:08 | 21 | Q.   Can you identify any of those specific donors? |
| 14:53:11 | 22 | MR. ATKINS:  Your Honor, objection.  Relevance |
| 14:53:12 | 23 | and I'd like to briefly talk about this objection. |
| 14:53:16 | 24 | THE COURT:  Sure. |
| 14:53:17 | 25 | MR. ATKINS:  I understand the veracity basis for |

| | |
|---|---|
| 14:53:20 | 1 | the use of this evidence, but we'd like to protect the |
| 14:53:24 | 2 | identity of these people who, you know, the basis of the |
| 14:53:28 | 3 | question is that they are no longer donating because of |
| 14:53:33 | 4 | the specific risk and we'd like to figure out if there's a |
| 14:53:35 | 5 | way to -- |
| 14:53:36 | 6 | THE COURT: Here's what I would propose. I think |
| 14:53:38 | 7 | first ask whether or not those names are known today, not |
| 14:53:42 | 8 | that you could come up with them after the hearing today. |
| 14:53:44 | 9 | And if they are, then those can be submitted under seal |
| 14:53:49 | 10 | and -- but with the -- under oath with the representation |
| 14:53:56 | 11 | that those were known at the time of this hearing. |
| 14:53:59 | 12 | MR. ATKINS: Understood. Thank you, your Honor. |
| 14:54:01 | 13 | A. So I don't know specific names. That's often because |
| 14:54:05 | 14 | they send it to our general e-mail and I get that. So I |
| 14:54:09 | 15 | don't recall specific names, but I know I've responded |
| 14:54:11 | 16 | that we've had to reduce services and that we respect |
| 14:54:15 | 17 | folks might be investing in other places. |
| 14:54:19 | 18 | Q. (BY MR. WASSDORF) You talked with your counsel |
| 14:54:24 | 19 | earlier about how you felt threatened by Texas public |
| 14:54:29 | 20 | officials; is that correct? |
| 14:54:30 | 21 | A. Yes. |
| 14:54:30 | 22 | Q. One of the specific groups that you testified you |
| 14:54:34 | 23 | felt threatened by was the Texas Freedom Caucus? |
| 14:54:37 | 24 | A. Yes. |
| 14:54:37 | 25 | Q. And you are aware that the Freedom Caucus consists of |

| | | |
|--|--|--|
| 14:54:44 | 1 | members of the legislature. |
| 14:54:45 | 2 | A.   Yes. |
| 14:54:48 | 3 | Q.   And the letter that we all were discussing, which I |
| 14:54:55 | 4 | believe is Exhibit 1, that was a letter from the Freedom |
| 14:55:03 | 5 | Caucus to Sidley Austin, correct? |
| 14:55:07 | 6 | A.   Is it Defendants' Exhibit 1 or -- |
| 14:55:09 | 7 | Q.   Plaintiffs'. |
| 14:55:16 | 8 | A.   Yes.  This is the Freedom Caucus letter to Sidley |
| 14:55:19 | 9 | Austin. |
| 14:55:21 | 10 | Q.   Now, are you aware that the Freedom Caucus consisting |
| 14:55:26 | 11 | of members of the legislature is not the Attorney General |
| 14:55:29 | 12 | and does not speak on behalf of the Attorney General? |
| 14:55:33 | 13 | A.   I cannot speak to whether they have like |
| 14:55:36 | 14 | communications with the Attorney General, but I understand |
| 14:55:38 | 15 | that this is speaking as the Freedom Caucus. |
| 14:55:41 | 16 | Q.   And do you understand that the Freedom Caucus is not |
| 14:55:44 | 17 | a district or county attorney in Texas and does not speak |
| 14:55:47 | 18 | on behalf of the district on county attorneys? |
| 14:55:50 | 19 | A.   Once again, I'm not sure their communications with |
| 14:55:52 | 20 | prosecutors, but I understand that this letter, yes, is |
| 14:55:58 | 21 | the Freedom Caucus. |
| 14:55:59 | 22 | Q.   And are you aware that neither you nor Jane's Due |
| 14:56:03 | 23 | Process is Sidley Austin? |
| 14:56:06 | 24 | A.   Yes.  I agree we're not the law firm Sidley Austin. |
| 14:56:10 | 25 | Q.   So this letter was not directed to you. |

14:56:13  1   A.   It was not written to us, but I believe someone sent

14:56:17  2   it to us out of concern because so many of the things

14:56:21  3   alleged are activities that we engage in.

14:56:24  4   Q.   But the letter was not addressed to Jane's Due

14:56:26  5   Process.

14:56:27  6   A.   No.  It is addressed to Sidley Austin.

14:56:31  7   Q.   And the Freedom Caucus has no criminal enforcement

14:56:35  8   authority, correct?

14:56:37  9   A.   Well, they are lawmakers, so I do believe they could

14:56:41  10  pass laws that criminalize our activities.

14:56:43  11  Q.   They could pass laws, but they cannot enforce those

14:56:47  12  laws, correct?

14:56:48  13  A.   I agree.  Members of the legislature, although

14:56:52  14  they're also private citizens of Texas so they could file

14:56:56  15  S.B. 8 claims.

14:56:57  16  Q.   But when they would be doing that, they would be

14:57:00  17  filing those as private citizens of Texas and not

14:57:02  18  representatives of the state of Texas, correct?

14:57:04  19  A.   I don't know how to speculate on that because I think

14:57:06  20  it depends on how the lawsuits are filed and how they

14:57:08  21  represent themselves.

14:57:09  22  Q.   You also talked about Briscoe Cain, who is a specific

14:57:20  23  member of the Texas Freedom Caucus.  Now, like the Freedom

14:57:30  24  Caucus, you would agree that Representative Cain has no

14:57:39  25  enforcement authority?

14:57:39  1   A.   I believe he's a lawyer and I don't know his area of

14:57:42  2   practice, but I would say in his role as a House

14:57:44  3   representative, no, he would not be able to criminally

14:57:47  4   enforce the law.

14:57:54  5   Q.   It looks like Plaintiffs' Exhibit 5 is Representative

14:58:00  6   Cain's letter to Lilith Fund.  Now, Jane's Due Process is

14:58:06  7   not Lilith Fund, correct?

14:58:08  8   A.   No, we are not, but when this letter was sent out,

14:58:11  9   Representative Cain, I believe, did tweet at us that we

14:58:14  10  had been sent a letter.  And so, I looked for one, but I

14:58:16  11  never received a physical copy.  So I don't believe we

14:58:18  12  were sent this.

14:58:19  13  Q.   And so, this letter Exhibit 5, which is in evidence,

14:58:24  14  is addressed to Lilith Fund and not Jane's Due Process?

14:58:27  15  A.   That is correct.

14:58:44  16  Q.   You and your counsel also discussed an individual,

14:58:47  17  Jonathan Mitchell.

14:58:49  18  A.   Yes.

14:58:50  19  Q.   And you also stated that you were threatened with

14:58:55  20  enforcement by him.  How so?

14:58:57  21  A.   So Jonathan Mitchell had subpoenaed our organization

14:59:01  22  and specifically did send a process server to my house not

14:59:06  23  specifically under S.B. 8, but around a grant we received

14:59:09  24  to do practical support work.

14:59:11  25  Q.   And you understand that Jonathan Mitchell is a

14:59:14  1  private citizen and not any elected official in Texas

14:59:19  2  correct?

14:59:20  3  A.   I do understand that he has held roles in the Texas

14:59:25  4  government but not currently, is not currently an officer

14:59:28  5  of the state.

14:59:28  6  Q.   So he is not currently any sort of public official in

14:59:32  7  the state of Texas?

14:59:32  8  A.   To the best of my knowledge, no.

14:59:36  9  Q.   You understand that none of these individuals can

14:59:45  10  bring a criminal prosecution, correct?

14:59:48  11  A.   Which -- so Representative Briscoe Cain.

14:59:51  12  Q.   The Texas Freedom Caucus and Jonathan Mitchell.

14:59:54  13  A.   That they cannot bring criminal prosecution, I agree

14:59:57  14  that they cannot.

14:59:58  15  Q.   And you agree that they cannot bring civil

15:00:02  16  enforcement proceedings under the Human Rights Protection

15:00:04  17  Act?

15:00:04  18  A.   And that's referring to the trigger bill?

15:00:06  19  Q.   Correct.

15:00:07  20  A.   Actually don't know if I have that understanding.  I

15:00:13  21  agree that the trigger bill civil enforcement act goes

15:00:18  22  through the Attorney General's Office to my understanding.

15:00:21  23  So yes, in that way, I do agree.

15:00:26  24  Q.   And do you understand that only district and county

15:00:30  25  attorneys can initiate criminal prosecutions in the state

138

15:00:35  1  of Texas?

15:00:35  2  A.   Yes, and that they are under the supervision of

15:00:37  3  Attorney General Ken Paxton.

15:00:39  4  Q.   You believe that the county and district attorneys

15:00:42  5  are under the supervision of Attorney General Ken Paxton?

15:00:45  6  A.   Under like the broader authority as prosecutors, but

15:00:49  7  I agree they're under the authority of their

15:00:52  8  municipalities and counties that they're elected to.

15:00:54  9  Q.   And so, only county and district attorneys can

15:00:56  10  initiate criminal prosecutions in Texas.

15:00:58  11  A.   That is my understanding.

15:01:01  12  Q.   Have you been threatened by any county or district

15:01:04  13  attorney in Texas?

15:01:06  14  A.   So in the days and weeks following the Dobbs decision

15:01:09  15  and the reversal of Roe, I did see in the press that some

15:01:13  16  prosecutors said they would be enforcing the laws and that

15:01:16  17  did refer to, I believe, the criminal ban and potentially

15:01:19  18  the trigger bill when it took effect.  So I did see that

15:01:23  19  there was a desire to enforce.

15:01:25  20  Q.   Can you identify any of those district attorneys or

15:01:29  21  county attorneys?

15:01:30  22  A.   I do remember they were in north Texas because we're

15:01:32  23  a statewide organization so we were keeping an eye on the

15:01:35  24  entire state.  I can't remember the exact counties, but I

15:01:37  25  remember they were north of Dallas.

| | | |
|---|---|---|
| 15:01:42 | 1 | Q. And what specifically did they threaten to do? |
| 15:01:46 | 2 | A. To enforce the abortion bans. They were asked, I |
| 15:01:50 | 3 | think, by reporters whether or not they would. |
| 15:01:52 | 4 | Q. So they threatened to enforce the law, correct? |
| 15:01:58 | 5 | A. I think that was that period of time where it wasn't |
| 15:02:01 | 6 | clear if the pre-Roe abortion ban was in effect or if the |
| 15:02:05 | 7 | trigger bill was in effect. And so, I will be honest, |
| 15:02:08 | 8 | this confusion that I've talked about, I wasn't sure if |
| 15:02:11 | 9 | you could enforce those laws if they were in effect at the |
| 15:02:15 | 10 | time. Obviously, it's different now, but the pre-Roe ban |
| 15:02:17 | 11 | is still confusing in terms of its enforcement. |
| 15:02:20 | 12 | Q. But they threatened to enforce the law is what you're |
| 15:02:24 | 13 | saying? |
| 15:02:24 | 14 | A. They did. |
| 15:02:27 | 15 | Q. And do you believe that government officials should |
| 15:02:31 | 16 | not obey the law? |
| 15:02:34 | 17 | A. I think they should obey law just like citizens. |
| 15:02:42 | 18 | Q. Now, I think you stated earlier that you understand |
| 15:02:45 | 19 | that only the Attorney General can pursue the civil |
| 15:02:49 | 20 | penalties of the Human Life Protection Act; is that |
| 15:02:52 | 21 | correct? |
| 15:02:52 | 22 | A. It is my best understanding that that is true given |
| 15:02:55 | 23 | the way the language in S.B. 8 that specifically names |
| 15:02:58 | 24 | him. |
| 15:02:59 | 25 | Q. Now, why do you believe that you are subject to civil |

15:03:02 1 penalties under the Human Life Protection Act?

15:03:05 2 A.   So the aiding and abetting provision in S.B. 8 is

15:03:11 3 vague.  It's unclear what falls inside of that scope, so I

15:03:17 4 think that's one of our concerns.

15:03:19 5 Q.   We were talking about the Human Life Protection Act.

15:03:21 6 A.   Oh, apologies.  The trigger bill.  So with the

15:03:24 7 trigger bill, the civil penalties, you know, it's my

15:03:30 8 understanding that yeah, depending how the claim is

15:03:32 9 brought if someone alleges that we did violate the law, we

15:03:36 10 could be held for the civil penalties.

15:03:41 11 Q.   Now, the Human Life Protection Act has civil

15:03:46 12 penalties for performing, inducing, or attempting an

15:03:51 13 abortion, correct?

15:03:51 14 A.   Correct.

15:03:52 15 Q.   Does Jane's Due Process perform, induce, or attempt

15:03:56 16 abortions?

15:03:58 17 A.   No, we assist with practical support and funding.

15:04:00 18 And also, we, you know, have been accused by folks who do

15:04:05 19 not support abortion access of directly providing abortion

15:04:10 20 care.  Those types of comments have been made about us.

15:04:12 21 So I think I have a reasonable fear that someone might

15:04:15 22 allege we're providing abortion care in Texas.

15:04:17 23 Q.   But Jane's Due Process does not perform, induce, or

15:04:21 24 attempt abortions, correct?

15:04:22 25 A.   Correct.

15:04:23   1   Q.   And if that is the conduct that the Human Life

15:04:31   2   Protection Act prohibits, why are you fearful of

15:04:35   3   enforcement of those civil penalties against you?

15:04:38   4   A.   Because the risk is so high.  We're trying to avoid

15:04:44   5   any action that might fall under these laws.  The minimum

15:04:48   6   penalty is $100,000.  If multiple claims are brought, we

15:04:52   7   could be bankrupted from doing our work.  And depending on

15:04:56   8   which law they use, S.B. 8 also shifts all the attorneys'

15:05:00   9   fees and penalties to us if we had challenged.  I think

15:05:04  10   we're just really concerned that trying to fight lawsuits

15:05:08  11   under these abortion bans would upend our organization.

15:05:12  12   We wouldn't be able to fight all claims.

15:05:14  13   Q.   We keep flipping back and forth here between the

15:05:17  14   Human Life Protection Act and S.B. 8.  Let's talk about

15:05:20  15   the Human Life Protection Act for a second.  I believe

15:05:21  16   we've already established that you do not engage in

15:05:25  17   conduct that would be violative of the Human Life

15:05:29  18   Protection Act.

15:05:29  19   A.   I agree.  I don't believe that would prevent someone

15:05:31  20   from alleging that we do and bringing a claim.  I hope we

15:05:34  21   would prevail ultimately in a court, but we would still

15:05:37  22   have to go through that lawsuit and that litigation.

15:05:40  23   Q.   Even though you don't perform, induce, or attempt

15:05:43  24   abortions?

15:05:44  25   A.   Yes, I do think people would still potentially bring

| | | |
|---|---|---|
| 15:05:47 | 1 | those claims. |
| 15:05:48 | 2 | Q.   And now, with respect to S.B. 8, you understand that |
| 15:05:51 | 3 | the office of the Attorney General does not enforce the |
| 15:05:54 | 4 | provisions of S.B. 8, correct? |
| 15:05:55 | 5 | A.   It is civilly enforced.  That's correct. |
| 15:06:11 | 6 | Q.   Has anyone at the office of the Attorney General |
| 15:06:14 | 7 | threatened to enforce the civil penalties in the Human |
| 15:06:20 | 8 | Life Protection Act against you? |
| 15:06:21 | 9 | A.   They have threatened to, I believe, uphold or enforce |
| 15:06:24 | 10 | the trigger bill against Jane's Due Process. |
| 15:06:29 | 11 | Specifically, no.  And I think I have to name that our |
| 15:06:33 | 12 | fear is also in the text of the law.  So if the question |
| 15:06:35 | 13 | is about fear, that is both in the law and then, in the |
| 15:06:38 | 14 | statements that the Attorney General will enforce the law. |
| 15:06:41 | 15 | Q.   So again, with respect to the district attorneys you |
| 15:06:47 | 16 | mentioned earlier and the Attorney General, they have just |
| 15:06:52 | 17 | threatened to enforce the law generally, correct? |
| 15:06:57 | 18 | A.   They have said they want to enforce the right of |
| 15:07:01 | 19 | abortion bans that are in effect. |
| 15:07:03 | 20 | Q.   Have they threatened to enforce it against Jane's |
| 15:07:06 | 21 | Process, specifically? |
| 15:07:07 | 22 | A.   Not to the best of my knowledge.  I have not received |
| 15:07:10 | 23 | a direct threat, no. |
| 15:07:11 | 24 | Q.   And have they threatened to enforce it against any |
| 15:07:16 | 25 | activities that Jane's Due Process specifically engages |

| | | |
|---|---|---|
| 15:07:21 | 1 | in? |
| 15:07:23 | 2 | A.   I'm not trying to be difficult.  I just -- it's been |
| 15:07:26 | 3 | confusing when they say they're going to enforce the law. |
| 15:07:27 | 4 | I'm not sure if that applies to helping someone travel out |
| 15:07:30 | 5 | of state for abortion care and it's because the language |
| 15:07:32 | 6 | of the law is confusing and they can be applied -- I'm not |
| 15:07:36 | 7 | clear which laws they would enforce against us. |
| 15:07:38 | 8 | Q.   So let's use that as an example.  Providing what was |
| 15:07:44 | 9 | it?  Did you say travel assistance? |
| 15:07:47 | 10 | A.   And funding. |
| 15:07:48 | 11 | Q.   And funding.  So has the Attorney General of the |
| 15:07:52 | 12 | State of Texas threatened to bring civil penalties under |
| 15:07:56 | 13 | the Human Life Protection Act against you for providing |
| 15:07:59 | 14 | travel assistance and funding? |
| 15:08:02 | 15 | A.   We have not received that specifically; and also, we |
| 15:08:05 | 16 | have not been able to get clarity that that would not |
| 15:08:07 | 17 | happen. |
| 15:08:10 | 18 | Q.   Thank you.  No further questions, your Honor. |
| 15:08:13 | 19 | THE COURT:  Anything further? |
| 15:08:16 | 20 | MR. ATKINS:  Brief redirect, your Honor. |
| 15:08:17 | 21 | RE-DIRECT EXAMINATION |
| 15:08:17 | 22 | BY MR. ATKINS: |
| 15:08:48 | 23 | Q.   So you just talked a little bit about -- with |
| 15:08:52 | 24 | opposing counsel about the idea of providing someone |
| 15:08:57 | 25 | information about murdering somebody in another state and |

| | | |
|---|---|---|
| 15:09:02 | 1 | whether that would be illegal.  Do you remember that? |
| 15:09:04 | 2 | A.   I do recall that conversation. |
| 15:09:06 | 3 | Q.   To your knowledge, is murder legal in any state? |
| 15:09:09 | 4 | A.   No, it is not legal in any state. |
| 15:09:12 | 5 | Q.   Is -- but are there differences among state laws in |
| 15:09:18 | 6 | other areas? |
| 15:09:19 | 7 | A.   Yes.  I think abortion's a perfect example that |
| 15:09:22 | 8 | depending on where you live, abortion or is not legal. |
| 15:09:25 | 9 | Q.   And to your knowledge, from your knowledge of |
| 15:09:30 | 10 | criminal law, whatever that is, if you aid or abet any |
| 15:09:36 | 11 | kind of crime, is it possible to be liable for someone |
| 15:09:39 | 12 | else's crime? |
| 15:09:39 | 13 | A.   Yes, through accomplice liability or other ways of |
| 15:09:44 | 14 | tieing you to a criminal act, you can be involved in it. |
| 15:09:47 | 15 | Q.   But if you have a friend who wants to go to Colorado, |
| 15:09:50 | 16 | say, and he wants to, you know, smoke some pot in |
| 15:09:56 | 17 | Colorado.  If you drive him to the airport, do you think |
| 15:10:00 | 18 | you're likely to be held criminally liable for that in the |
| 15:10:02 | 19 | state of Texas? |
| 15:10:03 | 20 | A.   No.  I would assume that that action would be |
| 15:10:06 | 21 | entirely my friend's. |
| 15:10:08 | 22 | Q.   But marihuana is illegal in the state of Texas; is |
| 15:10:10 | 23 | that right? |
| 15:10:10 | 24 | A.   Yes, it is. |
| 15:10:12 | 25 | Q.   So you also were asked a few questions about the |

| | | |
|---|---|---|
| 15:10:23 | 1 | specific scope of the trigger ban and its provisions and |
| 15:10:27 | 2 | you were asked whether Jane's Due Process performs induces |
| 15:10:31 | 3 | or does abortions.  Do you remember that? |
| 15:10:34 | 4 | A.   I do. |
| 15:10:36 | 5 | Q.   Do you have a working knowledge of the statutes that |
| 15:10:47 | 6 | permit criminal offenses to be charged or criminal conduct |
| 15:10:53 | 7 | to be charged to other people?  Do you have a working |
| 15:10:57 | 8 | knowledge of how those statutes work? |
| 15:10:58 | 9 | A.   I do. |
| 15:10:58 | 10 | Q.   Okay.  And is it possible, then, for a statute that |
| 15:11:06 | 11 | prohibits certain conduct to by virtue of some other |
| 15:11:11 | 12 | statute cause you or cause a person who assists in that |
| 15:11:15 | 13 | direct conduct to be liable for it? |
| 15:11:18 | 14 | MR. WASSDORF:  Objection.  Calls for speculation, |
| 15:11:20 | 15 | legal conclusion. |
| 15:11:21 | 16 | THE COURT:  Rephrase the question. |
| 15:11:22 | 17 | Q.   (BY MR. ATKINS) Are you aware of a situation in |
| 15:11:27 | 18 | which, for instance -- well, let's actually use a concrete |
| 15:11:30 | 19 | example. |
| 15:11:32 | 20 | To your knowledge, does the Texas murder statute |
| 15:11:36 | 21 | itself specifically say that people who aid or abet or |
| 15:11:40 | 22 | provide resources for murder are also liable under that |
| 15:11:45 | 23 | statute? |
| 15:11:46 | 24 | MR. WASSDORF:  Objection.  Lack of foundation. |
| 15:11:48 | 25 | THE COURT:  I'll allow the question. |

| | | |
|---|---|---|
| 15:11:50 | 1 | A.   I am very rusty from criminal law and my professor |
| 15:11:55 | 2 | there knows it.  I do believe that, yes, there is the |
| 15:11:58 | 3 | ability to pull someone in if they helped facilitate or |
| 15:12:01 | 4 | allowed for the commission of a murder crime. |
| 15:12:05 | 5 | Q.   (BY MR. ATKINS) But would it surprise you if that |
| 15:12:08 | 6 | section is a different section of the law, that is, the |
| 15:12:10 | 7 | section that says you could be criminally liable for the |
| 15:12:13 | 8 | actions of another is a different part of law than the law |
| 15:12:16 | 9 | that bans the specific thing? |
| 15:12:18 | 10 | A.   Yes.  From my understanding and recollection, where |
| 15:12:20 | 11 | the crimes are listed is different from something like a |
| 15:12:24 | 12 | crime of being accomplice to a crime. |
| 15:12:25 | 13 | Q.   And do you understand that the Texas trigger ban |
| 15:12:28 | 14 | actually creates a felony? |
| 15:12:31 | 15 | A.   Yes. |
| 15:12:33 | 16 | Q.   And the felony is abortion. |
| 15:12:35 | 17 | A.   Yes. |
| 15:12:35 | 18 | Q.   Right?  And that one of the ways of enforcing the |
| 15:12:41 | 19 | penalties for violating that provision is the Attorney |
| 15:12:46 | 20 | General's civil enforcement power.  Is that what you |
| 15:12:48 | 21 | understand the law to be? |
| 15:12:49 | 22 | A.   That is my understanding. |
| 15:12:50 | 23 | MR. WASSDORF:  Objection.  Legal conclusion, |
| 15:12:53 | 24 | speculation. |
| 15:12:53 | 25 | THE COURT:  You can ask if that's her |

15:12:55   1   understanding.

15:12:55   2   Q.   (BY MR. ATKINS) Is that your understanding?

15:12:57   3   A.   That is my understanding of the law.

15:13:00   4   Q.   Okay.  And if the Texas trigger ban creates a felony,

15:13:08   5   would you expect that it's possible for people to be

15:13:11   6   liable for that felony even though they were not the ones

15:13:14   7   who directly did that felony, just like with murder?

15:13:18   8   A.   Yes.  That was what I was struggling.  My

15:13:21   9   understanding is that yes, perhaps Jane's Due Process

15:13:24   10   would not be charged with the initial felony, but we might

15:13:27   11   be pulled into a felony charge under this law because of

15:13:31   12   perhaps the allegation that we facilitated.

15:13:34   13   Q.   Someone could violate arguably -- or if that's the

15:13:39   14   correct interpretation, someone could violate the Texas

15:13:41   15   trigger ban?

15:13:43   16         MR. WASSDORF:  Objection.  Calls for speculation.

15:13:44   17         THE COURT:  I'll allow the question.

15:13:46   18   Q.   (BY MR. ATKINS) Without actually being the one to

15:13:49   19   perform the abortion.

15:13:50   20   A.   Yes.  That is my understanding.

15:13:53   21   Q.   And do you still have Exhibit 1?

15:13:59   22   A.   I do.

15:14:00   23   Q.   In front of you?  So in that circumstance, if it was

15:14:25   24   possible to be criminally liable for some -- for the

15:14:29   25   violation of -- for someone else's violation.

| | | |
|---|---|---|
| 15:14:31 | 1 | A. Violation. |
| 15:14:32 | 2 | Q. Of that section of the trigger ban, do you have any |
| 15:14:35 | 3 | reason to think that it wouldn't also be possible to be |
| 15:14:37 | 4 | civilly liable for that same conduct? |
| 15:14:41 | 5 | A. That is my understanding. |
| 15:14:44 | 6 | Q. So just to be clear, it's your understanding that you |
| 15:14:47 | 7 | would be civilly liable for the same conduct that someone |
| 15:14:50 | 8 | else might be held criminally liable for as a result of |
| 15:14:56 | 9 | how those provisions work together? |
| 15:14:58 | 10 | A. Yes. |
| 15:14:59 | 11 | MR. WASSDORF: Objection, your Honor. Calls for |
| 15:15:00 | 12 | speculation and legal conclusion. |
| 15:15:01 | 13 | THE COURT: I'll allow the question. |
| 15:15:03 | 14 | Q. (BY MR. ATKINS) Can you repeat your answer? |
| 15:15:05 | 15 | A. Yes. That is my understanding. |
| 15:15:07 | 16 | Q. Understood. I just want to briefly call your |
| 15:15:12 | 17 | attention to the letter from the Freedom Caucus. This is |
| 15:15:20 | 18 | Plaintiffs' Exhibit 1, which has already been admitted. |
| 15:15:23 | 19 | If we could go ahead and publish again. And we go down |
| 15:15:31 | 20 | here at the bottom. Do you see who has been copied on |
| 15:15:37 | 21 | this letter? |
| 15:15:37 | 22 | A. Yes. I see that it lists all of the attorneys at |
| 15:15:41 | 23 | Sidley Austin, LP, as well as Ken Paxton, the Attorney |
| 15:15:44 | 24 | General of Texas. |
| 15:15:50 | 25 | Q. If we wanted -- after repeatedly hearing that |

15:15:55   1   Attorney General Ken Paxton wants to enforce these laws

15:15:58   2   civilly and participate in helping that they be enforced

15:16:03   3   criminally, if we wanted to know whether Attorney General

15:16:09   4   Paxton agreed with the Texas Freedom Caucus that Sidley

15:16:14   5   Austin's conduct in this case helping people obtain

15:16:17   6   abortions is illegal under the pre-Roe ban, or if we

15:16:21   7   wanted to know if it was illegal under the trigger ban

15:16:23   8   based on his statements, what would we want to be able to

15:16:31   9   do to get that information?

15:16:32  10        MR. WASSDORF:  Objection.  Calls for speculation,

15:16:34  11   your Honor.

15:16:34  12        THE COURT:  I'll allow the question.

15:16:36  13   A.   Just so I understand, what would we want to know if

15:16:40  14   -- how would we want to know if Attorney General Ken

15:16:44  15   Paxton -- I mean, ideally, I would have wanted a statement

15:16:48  16   from Attorney General Ken Paxton about how these laws

15:16:51  17   would be enforced and if they are enforceable against

15:16:55  18   activities of my organization, including funding abortion

15:16:59  19   and travel support in states where abortion care is still

15:17:02  20   legal, but we have not received that.

15:17:03  21   Q.   Would you expect that the Texas Freedom Caucus

15:17:07  22   representatives on this letter voted for the trigger ban?

15:17:13  23   A.   I believe they all did, though I cannot recall

15:17:16  24   exactly, because I was there when they voted.

15:17:20  25   Q.   So these people who voted for this law construe -- at

15:17:24  1   least the pre-Roe statutes, they voted for the trigger

15:17:27  2   ban, construed the pre-Roe statutes at least as applying

15:17:31  3   in this context?

15:17:32  4          MR. WASSDORF:  Objection, your Honor.  She has no

15:17:33  5   knowledge --

15:17:33  6          THE COURT:  Getting a little far afield.

15:17:38  7          MR. ATKINS:  Okay.

15:17:39  8          THE COURT:  Sustain the objection.

15:17:42  9          MR. ATKINS:  Understood.

15:17:47  10  Q.   (BY MR. ATKINS) Based on the fact that Attorney

15:17:49  11  General Ken Paxton was CC-ed on this letter, do you expect

15:17:51  12  that Attorney General Ken Paxton at the time this letter

15:17:53  13  was issued knew that state officials were telling people

15:17:59  14  that assistive conduct would violate Texas criminal law?

15:18:05  15         MR. WASSDORF:  Objection, your Honor.  She has no

15:18:07  16  knowledge of what Ken Paxton knew.  Speculation.

15:18:13  17         THE COURT:  Do you really want to go there?

15:18:18  18  Okay.  I'll sustain the objection.

15:18:24  19         MR. ATKINS:  I have no further questions for this

15:18:26  20  witness.

15:18:29  21         MR. WASSDORF:  Quick re-cross, your Honor.

15:18:30  22         THE COURT:  Sure.

15:18:31  23                    RE-CROSS EXAMINATION

15:18:31  24  BY MR. WASSDORF:

15:18:43  25  Q.   Ms. Mariappuran, are you aware that the state of

| | | |
|---|---|---|
| 15:18:46 | 1 | Texas can criminalize certain conduct? |
| 15:18:49 | 2 | A.   Yes. |
| 15:18:50 | 3 | Q.   And are you aware that if people engage in conduct |
| 15:18:54 | 4 | that is criminalized, they are subject to criminal |
| 15:18:58 | 5 | liability? |
| 15:18:59 | 6 | A.   Yes. |
| 15:19:02 | 7 | Q.   No further questions, your Honor. |
| 15:19:03 | 8 | THE COURT:  Thank you.  All right. |
| 15:19:06 | 9 | Any further questions of this witness? |
| 15:19:09 | 10 | MR. ATKINS:  No, your Honor. |
| 15:19:10 | 11 | THE COURT:  Thank you.  You may step down. |
| 15:19:12 | 12 | Your next witness. |
| 15:19:20 | 13 | MS. MYERS:  Your Honor, may we have brief |
| 15:19:21 | 14 | sidebar.  I think given the objection that was just made |
| 15:19:23 | 15 | and sustained, we actually need to call General Paxton at |
| 15:19:28 | 16 | this point as one of our witnesses. |
| 15:19:28 | 17 | THE COURT:  Let's just continue to have the |
| 15:19:30 | 18 | witnesses who are here today. |
| 15:19:31 | 19 | MS. MYERS:  Okay. |
| 15:19:32 | 20 | THE COURT:  And in any event, given the hour, I |
| 15:19:34 | 21 | don't know that we'd be able to accommodate that request |
| 15:19:38 | 22 | anyway so we'll have an opportunity to re-urge that. |
| 15:19:40 | 23 | MS. MYERS:  Thank you, your Honor.  Before it got |
| 15:19:42 | 24 | very late in the day, I wanted to make sure we did. |
| 15:19:44 | 25 | THE COURT:  Sure.  No.  You've preserved that. |

| 15:19:46 | 1 | MS. MYERS: Preserved that. |
|---|---|---|
| 15:19:47 | 2 | THE COURT: Absolutely for sure. Thank you. |
| 15:19:48 | 3 | Your next witness. |
| 15:19:49 | 4 | MR. ATKINS: Plaintiffs called Bridget Schilling. |
| 15:20:19 | 5 | THE COURT: When you take a seat, could you raise |
| 15:20:23 | 6 | your right hand to be sworn. |
| 15:20:24 | 7 | THE CLERK: You do solemnly swear or affirm that |
| 15:20:24 | 8 | the testimony which you may give in the case now before |
| 15:20:24 | 9 | the Court shall be the truth, the whole truth, and nothing |
| 15:20:26 | 10 | but the truth? |
| 15:20:26 | 11 | THE WITNESS: I do. Yes. |
| 15:20:30 | 12 | BRIDGET SCHILLING, called by the Plaintiffs, duly sworn. |
| 15:20:30 | 13 | DIRECT EXAMINATION |
| 15:20:30 | 14 | BY MR. ATKINS: |
| 15:20:37 | 15 | Q. Good afternoon, Ms. Schilling. |
| 15:20:38 | 16 | A. Good afternoon. |
| 15:20:39 | 17 | Q. Will you state your name for the record? |
| 15:20:42 | 18 | A. My name is Bridget Schilling. |
| 15:20:43 | 19 | Q. And what do you do for a living? |
| 15:20:46 | 20 | A. I'm sorry? |
| 15:20:46 | 21 | Q. What do you do for a living? |
| 15:20:48 | 22 | A. I am not currently employed. I recently left my job. |
| 15:20:52 | 23 | But would you like to know about my employment or involved |
| 15:20:59 | 24 | with clinic access? |
| 15:20:59 | 25 | Q. What do you do in connection with clinic access |

15:21:03  1   support network?

15:21:04  2           THE COURT:  Let me ask if I can -- we've turned

15:21:06  3   the volume up as much as we can, but we are speaking very

15:21:10  4   softly.  So if both of you could please speak out a little

15:21:12  5   bit so we can -- little closer to the mic.

15:21:16  6           THE WITNESS:  Okay.  Sorry.

15:21:20  7   Q.   (BY MR. ATKINS) What do you do for Clinic Access

15:21:22  8   Support Network?

15:21:23  9   A.   I am a board member for Clinic Access Support

15:21:28  10  Network, or CASN.  CASN has a working board, though, so we

15:21:31  11  are entirely run by board members right now.  So for all

15:21:35  12  intents and purposes, I am equal parts every job at CASN

15:21:41  13  in terms of access to information and we share in the

15:21:45  14  labor of running the organization.

15:21:47  15  Q.   Okay.  And is there any specific division of

15:21:51  16  responsibilities among board members that would give you

15:21:53  17  some things and other board members others?

15:21:55  18  A.   Somewhat.  I primarily focus on grants, the data

15:22:01  19  collection and processing, and have recently come into the

15:22:07  20  treasury role.

15:22:09  21  Q.   Okay.  I'm sorry.  At the end, you said the treasury

15:22:12  22  role?

15:22:12  23  A.   Yes.

15:22:12  24  Q.   Okay.  And what does CASN do?

15:22:19  25  A.   CASN leverages volunteers to provide practical

| 15:22:23 | 1 | support, including travel assistance, food support, the |
| 15:22:28 | 2 | child care support, meals, accommodations, occasionally |
| 15:22:35 | 3 | wage replacement for time taken off of work for people |
| 15:22:39 | 4 | seeking abortions who are either traveling to the Houston |
| 15:22:42 | 5 | area, would be traveling to the Houston area, or are from |
| 15:22:44 | 6 | the Houston area. |
| 15:22:46 | 7 | Q.   And do you do all of that right now? |
| 15:22:52 | 8 | A.   No.  Since the Dobbs decision, we immediately paused |
| 15:22:56 | 9 | operations. |
| 15:22:58 | 10 | Q.   And what, if anything, is CASN doing right now? |
| 15:23:02 | 11 | A.   We're waiting for clarity on what this law and the |
| 15:23:06 | 12 | trigger law and the pre-Roe law is going to mean for us. |
| 15:23:12 | 13 | We're a small organization.  We don't have the capacity to |
| 15:23:16 | 14 | take on a high degree of risk right now.  And so, while we |
| 15:23:18 | 15 | don't believe that anything that we were doing before is |
| 15:23:21 | 16 | illegal now, we don't have the capacity to take on that |
| 15:23:25 | 17 | risk. |
| 15:23:27 | 18 | Q.   Can you look in the binders over there and find tab |
| 15:23:31 | 19 | 3. |
| 15:23:36 | 20 | A.   For witness four? |
| 15:23:38 | 21 | Q.   Find -- the binders should be labeled.  It should |
| 15:23:42 | 22 | have on the front the range of exhibits inside them.  So |
| 15:23:45 | 23 | you need the one that has Exhibit 3 in it. |
| 15:23:58 | 24 | A.   I think I'm looking at it. |
| 15:24:01 | 25 | Q.   Okay.  Let me go ahead and pull it up. |

| | | |
|---|---|---|
| 15:24:10 | 1 | A.   Is this the advisory? |
| 15:24:12 | 2 | Q.   Yes.  That's correct. |
| 15:24:13 | 3 | A.   Yes, I have it in front of me. |
| 15:24:15 | 4 | Q.   And have you seen Exhibit 3 before? |
| 15:24:27 | 5 | A.   I have.  Yes. |
| 15:24:29 | 6 | Q.   Okay.  What is Exhibit 3? |
| 15:24:31 | 7 | A.   I believe that this is the advisory that Attorney |
| 15:24:36 | 8 | General Paxton published on the day that the Dobbs |
| 15:24:40 | 9 | decision was released. |
| 15:24:42 | 10 | Q.   And you were in the courtroom when we talked with Ms. |
| 15:24:46 | 11 | Mariappuran about this document? |
| 15:24:47 | 12 | A.   Yes. |
| 15:24:49 | 13 | Q.   And so, what in your view, what does this document |
| 15:24:54 | 14 | say? |
| 15:24:58 | 15 | A.   Whenever -- this is the first time, the most striking |
| 15:25:01 | 16 | thing for me was that he was encouraging district |
| 15:25:04 | 17 | attorneys to start, I believe, charging under the pre-Roe |
| 15:25:12 | 18 | statutes.  So my interpretation of this was that General |
| 15:25:19 | 19 | Paxton believes that as soon as the decision came out that |
| 15:25:25 | 20 | the pre-Roe statutes became law in Texas again. |
| 15:25:31 | 21 | Q.   Okay.  And does Attorney General Paxton also talk at |
| 15:25:41 | 22 | all in this advisory about pursuing civil penalties? |
| 15:25:49 | 23 | A.   To my understanding, yes. |
| 15:25:51 | 24 | Q.   And what does he say about his office's willingness |
| 15:25:57 | 25 | to enforce this law through civil penalties? |

| | | |
|---|---|---|
| 15:26:00 | 1 | A.   He expresses that he is going to -- by my |
| 15:26:06 | 2 | understanding, it says I will strictly enforce this law |
| 15:26:08 | 3 | after saying that he is authorized to pursue and recover |
| 15:26:11 | 4 | these civil penalties of the dollar amount upward of |
| 15:26:15 | 5 | $100,000 each. |
| 15:26:17 | 6 | Q.   And is Attorney General Paxton in this advisory |
| 15:26:20 | 7 | equivocal about whether he will assist any local |
| 15:26:24 | 8 | prosecutor who asks him to help a criminal prosecution? |
| 15:26:27 | 9 | A.   I find the sentence "further we will assist any local |
| 15:26:31 | 10 | prosecutor who pursues criminal charges" to be fairly |
| 15:26:35 | 11 | unambiguous. |
| 15:26:38 | 12 | Q.   I think it's in the same binder.  Can you turn to |
| 15:26:45 | 13 | Exhibit 27. |
| 15:27:16 | 14 | A.   The updated advisory? |
| 15:27:19 | 15 | Q.   This should be -- yes.  That's correct. |
| 15:27:22 | 16 | A.   Yes, I have it. |
| 15:27:23 | 17 | Q.   Okay.  And what is -- what is the -- your general |
| 15:27:31 | 18 | understanding of what this document is? |
| 15:27:38 | 19 | A.   Sorry.  Can you repeat the question? |
| 15:27:40 | 20 | Q.   What do you understand this document to be? |
| 15:27:42 | 21 | A.   Clarification, I think, on the definition of an |
| 15:27:47 | 22 | abortion and an indication of what the new felony |
| 15:28:00 | 23 | provisions will be for the trigger law. |
| 15:28:09 | 24 | Q.   And do you see in this advisory further statements |
| 15:28:13 | 25 | regarding the Attorney General's willingness to enforce |

15:28:16  1  civil penalties?

15:28:21  2  A.  "I will do my duty to enforce this law" is the second

15:28:27  3  line here.  He's repeating the same thing from the first

15:28:32  4  advisory, from what I can see, that he is specifically

15:28:36  5  authorized to pursue and recover civil penalties and that

15:28:40  6  he is expressing intent to enforce that.

15:28:45  7  Q.  And does this advisory also indicate that Attorney

15:28:50  8  General Paxton takes the position on whether the pre-Roe

15:28:54  9  ban is in effect?

15:29:01  10  A.  I believe so, yes, based on the second paragraph that

15:29:05  11  I'm looking at the -- he says they were never repealed so

15:29:09  12  they were unenforceable while Roe was on the books that

15:29:12  13  they are still Texas law and that now they are in full

15:29:15  14  effect after the overturning of Roe per his

15:29:18  15  interpretation.

15:29:27  16  Q.  Did you read those communications as indicating that

15:29:36  17  some of CASN's conduct might be subjected to civil or

15:29:38  18  criminal penalties if it was continued after Dobbs was

15:29:41  19  decided?

15:29:47  20  A.  Yes.  I didn't think that they should be, but just

15:29:51  21  the -- like with S.B. 8's ambiguity when it comes to what

15:29:59  22  aiding and abetting means, a lot of the questions that

15:30:01  23  we'd asked ourselves as an organization, it's like okay,

15:30:04  24  how many degrees of separation from the actual abortion

15:30:07  25  does that mean?  Who is liable for this?  And that

| | | |
|---|---|---|
| 15:30:11 | 1 | determined a lot of our protective actions there. |
| 15:30:15 | 2 | Similarly, the pre-Roe statute uses the term, I believe, |
| 15:30:19 | 3 | furnishing the means that has no meaning to me like |
| 15:30:26 | 4 | specifically.  So for the sake of caution like that's |
| 15:30:30 | 5 | basically why we paused is that we do not have a specific |
| 15:30:34 | 6 | interpretation of what this law means for us as people who |
| 15:30:41 | 7 | are associated with an abortion but not the ones providing |
| 15:30:45 | 8 | it. |
| 15:30:46 | 9 | Q.   Okay.  And are you aware of -- let me just go through |
| 15:30:57 | 10 | some of the statements individually.  Can you look in your |
| 15:31:08 | 11 | binders, you should be able to find Exhibit 4. |
| 15:31:35 | 12 | A.   Yes.  I have it in front of me. |
| 15:31:37 | 13 | Q.   Have you seen Exhibit 4 before? |
| 15:31:41 | 14 | A.   Yes.  The tweet from June 28th. |
| 15:31:49 | 15 | Q.   Yes.  That's right.  What is Exhibit 4? |
| 15:31:55 | 16 | A.   It is a tweet from Attorney General Ken Paxton's |
| 15:32:02 | 17 | verified Twitter account that says, today a Harris County |
| 15:32:07 | 18 | judge froze pre-Roe laws criminalizing abortion in Texas |
| 15:32:10 | 19 | but with SCOTUS's Dobbs decision, these laws are a hundred |
| 15:32:13 | 20 | percent in effect and constitutional.  The judge's |
| 15:32:16 | 21 | decision is wrong.  I am immediately appealing.  I will |
| 15:32:19 | 22 | ensure we all have the legal tools to help keep -- for |
| 15:32:22 | 23 | keep Texas pro life, exclamation mark. |
| 15:32:26 | 24 | Q.   Plaintiffs would move to admit Plaintiffs' Exhibit 4. |
| 15:32:29 | 25 | MR. WASSDORF:  We object, your Honor.  It's |

| | | |
|---|---|---|
| 15:32:31 | 1 | relevance and hearsay grounds. |
| 15:32:32 | 2 | THE COURT:  Okay.  Overruled and admitted. |
| 15:32:39 | 3 | Q.  (BY MR. ATKINS) What does this suggest to you, if |
| 15:33:00 | 4 | anything, about how strongly Attorney General Paxton feels |
| 15:33:04 | 5 | about the present effect and enforceability of the pre-Roe |
| 15:33:08 | 6 | ban? |
| 15:33:16 | 7 | A.  He does not seem to think that the Harris County |
| 15:33:21 | 8 | judge's -- whatever the Harris County judge said freezing |
| 15:33:25 | 9 | the pre-Roe laws was valid. |
| 15:33:31 | 10 | Q.  Does he give a percentile estimate of how in effect |
| 15:33:36 | 11 | these laws are? |
| 15:33:38 | 12 | MR. WASSDORF:  Objection.  Leading. |
| 15:33:38 | 13 | THE COURT:  It's a yes or no question. |
| 15:33:41 | 14 | Overruled. |
| 15:33:42 | 15 | A.  Yes.  A hundred percent in effect. |
| 15:33:49 | 16 | Q.  (BY MR. ATKINS) Could you find Exhibit 26. |
| 15:34:11 | 17 | A.  Yes. |
| 15:34:13 | 18 | Q.  And have you seen Exhibit 26 before? |
| 15:34:19 | 19 | A.  Sorry.  Can you repeat that? |
| 15:34:20 | 20 | Q.  Have you seen Exhibit 26 before? |
| 15:34:22 | 21 | A.  I have, yes. |
| 15:34:23 | 22 | Q.  Okay.  And what is Exhibit 26? |
| 15:34:25 | 23 | A.  It is a tweet from Attorney General Ken Paxton |
| 15:34:32 | 24 | celebrating his appeal and the Supreme Court of Texas |
| 15:34:39 | 25 | saying, slapped down the abortion providers and the |

15:34:43  1  district court carrying their water.  Our state's pre-Roe

15:34:46  2  statutes banning abortion in Texas are a hundred percent

15:34:50  3  good law.  Litigation continues but I'll keep winning for

15:34:53  4  Texas' unborn babies.  And it has an attachment which is

15:35:01  5  the order for -- on the petition for writ of mandamus in

15:35:09  6  the Supreme Court of Texas, No. 22-0527.

15:35:14  7  Q.   And the Attorney General Paxton -- does Attorney

15:35:21  8  General Paxton in this tweet again say anything about how

15:35:26  9  much he thinks the pre-Roe statutes are good law?

15:35:29  10  A.   He says quote, 100 percent good law, period, end

15:35:35  11  quote.

15:35:36  12  Q.   The pre-Roe statutes are the ones that include that

15:35:38  13  furnishing provision you talked about earlier; is that

15:35:40  14  right?

15:35:40  15  A.   To my understanding, yes.

15:35:42  16  Q.   Okay.  Were you here, I talked with Ms. Mariappuran

15:35:51  17  about a variety of the statements that Mr. Cain,

15:35:54  18  Representative Cain made?

15:35:55  19  A.   Yes.

15:35:56  20  Q.   Were you aware of some or all of those statements

15:36:00  21  when they were made?

15:36:01  22  A.   I believe the majority of the ones discussed, yes.

15:36:05  23  Q.   And did those statements in part cause you to fear

15:36:13  24  that some of CASN's activities might be risky?

15:36:19  25  A.   Risky in that I felt like by pursuing those, we were

15:36:24  1  putting a target on our backs but not risky in I believed
15:36:27  2  that they would be breaking the law.
15:36:29  3  Q.   Because there's a distinction between whether you
15:36:32  4  think you're breaking the law and whether you think
15:36:34  5  someone else might enforce the law against you, right?
15:36:37  6  A.   Yes.  That's my understanding.  Yes.
15:36:40  7  Q.   So it's, in fact, possible to think that you're not
15:36:44  8  breaking the law but to be prosecuted, anyway?
15:36:46  9  A.   Yes.  Definitely.
15:36:48  10  Q.   And were you aware if the letter Exhibit 1, which
15:36:59  11  review if you'd like, but were you aware of the letter
15:37:01  12  that Jonathan Mitchell sent to Sidley Austin?
15:37:04  13  A.   Yes, I was.
15:37:05  14  Q.   Did that letter also sort of filter into your view of
15:37:12  15  how risky some of CASN's activities might be?
15:37:17  16  A.   Yes, because I believe that Sidley Austin was saying
15:37:22  17  that they would be supporting out-of-state abortions.  Not
15:37:28  18  that they would be conducting them themselves but that
15:37:30  19  they would be assisting people in getting them or in
15:37:33  20  getting there, which has overlaps with CASN activities.
15:37:40  21  Q.   And you have a copy.  Given the statements of these
15:37:53  22  public officials regarding the specific kind of conduct
15:37:58  23  CASN did and wants to do, does the Attorney General's
15:38:08  24  unequivocal statements of enforcement have any effect on
15:38:11  25  your willingness to go forward and provide services to

15:38:16  1  people seeking abortions out of state?

15:38:18  2  A.   Certainly.  He is aware of this letter.  It was -- he

15:38:25  3  was CC-ed on this and I think that presents an opportunity

15:38:30  4  for him to say that it wouldn't apply to us and it's --

15:38:35  5  I've not heard anything from the Attorney General saying

15:38:37  6  that help organizations would be protected.

15:38:42  7  Q.   And did you hear the interview that I played for Ms.

15:38:45  8  Mariappuran?

15:38:45  9  A.   I did, yes.

15:38:46  10 Q.   And what, if anything, did you get from that video

15:38:50  11 about whether Attorney General Paxton is looking into

15:38:54  12 filing this type of civil action against people seeking to

15:38:58  13 provide services in other states?

15:39:00  14 A.   That he was not only enthusiastic about enforcing the

15:39:06  15 law to his understanding but excited to find new ways to

15:39:10  16 prevent people from getting abortions.

15:39:11  17 Q.   And Attorney General Paxton has never, to your

15:39:15  18 knowledge, indicated that he would not enforce it in that

15:39:17  19 context, has he?

15:39:18  20 A.   Not to my knowledge, no.

15:39:20  21 Q.   And have you ever heard him describe a single context

15:39:25  22 in which he would not enforce this law?

15:39:29  23 A.   I have not.  Not to my knowledge.

15:39:34  24 Q.   But for the existence of these laws and the

15:39:40  25 statements of these state officials and the Attorney

15:39:44 1  General Paxton, would CASN be providing services to people

15:39:47 2  seeking abortions in other states?

15:39:51 3  A.   I can't say that we definitely would be.  We were

15:39:56 4  during the period that S.B. 8 was active, before Dobbs, we

15:39:59 5  were confident that we were able to provide out-of-state

15:40:02 6  abortions, but given the ambiguity in the language of the

15:40:08 7  pre-Roe statutes but, also, just the increased risk of

15:40:12 8  $10,000 minimum from S.B. 8 versus $100,000 minimum from

15:40:19 9  the trigger ban, and where the S.B. 8 civil enforcement

15:40:26 10 risk was that a private citizen would take the initiative

15:40:30 11 to file a lawsuit and see it through to the end; and yes,

15:40:33 12 that would be expensive and we would have to pay the legal

15:40:35 13 costs of that, but it would also still only be a civil

15:40:38 14 penalty versus the civil penalty of $100,000, which was a

15:40:43 15 much higher minimum and the legal fees, and the

15:40:48 16 possibility of that being in combination with a criminal

15:40:51 17 charge, which I believe is a first degree felony, which I

15:40:57 18 think comes with a minimum of five years sentencing, which

15:41:04 19 I would personally and I believe I speak for CASN when I

15:41:09 20 say that we would appreciate some clarity before we take

15:41:11 21 on that risk.

15:41:13 22 Q.   CASN is part of a -- is CASN part of a lawsuit

15:41:18 23 presently challenging the civil enforcement provision of

15:41:22 24 Senate Bill 8?

15:41:23 25 A.   It is, yes.

15:41:23  1   Q.   And it's also now part of a lawsuit challenging the

15:41:27  2   provisions of the Texas trigger ban and the pre-Roe

15:41:33  3   statutes; is that correct?

15:41:34  4   A.   Yes.

15:41:34  5   Q.   And if you obtained the relief that has been

15:41:38  6   requested in this lawsuit, that is, if these laws were

15:41:42  7   strike down, were determined to be invalid at least with

15:41:45  8   respect to the specific purposes of assisting people in

15:41:49  9   obtaining abortions in other states, would CASN then

15:41:53  10  provide those services?

15:41:54  11  A.   We wouldn't be able to immediately, I don't believe.

15:42:02  12  When the leaked Dobbs draft came out, we paused our

15:42:09  13  recruitment for new employees who would be the ones taking

15:42:12  14  on the burden of labor because we didn't want to hire

15:42:16  15  people into such an ambiguous landscape, especially if we

15:42:22  16  didn't know if being associated with us would -- before we

15:42:30  17  bring anybody on with CASN, we want to make sure that we

15:42:32  18  understand the risk that they would be taking on.

15:42:35  19          Historically, that has been much clearer, but

15:42:39  20  right now, in the current context, like we need a much

15:42:44  21  firmer understanding before we endorse a new position or

15:42:48  22  an action that could potentially implicate somebody else

15:42:51  23  even if we don't believe that what we're doing is illegal.

15:42:54  24  We're not trying to create an opportunity for somebody's

15:42:59  25  life to be negatively impacted by doing what we understand

15:43:01 1   and what they believe to be the right thing.

15:43:06 2   Q.   In light of the statements and in light of these

15:43:12 3   laws, are you scared?

15:43:13 4   A.   Oh, absolutely.

15:43:15 5   Q.   Are others at CASN scared?

15:43:18 6   A.   I think so.  Several of us have been -- have done

15:43:23 7   work in criminal areas.  My previous job was at a juvenile

15:43:28 8   justice organization working on post-adjudication cases

15:43:33 9   where a lot of the people who had been charged were

15:43:35 10  charged under the law of parties for things that they

15:43:39 11  didn't realize would be affecting the rest of their lives.

15:43:43 12  And I'm not trying to be in front of a parole board in 40

15:43:47 13  years because somebody -- because they communicated

15:43:54 14  something that I believe to be within my First Amendment

15:43:56 15  right.

15:44:01 16  Q.   I have no further questions for this witness.

15:44:06 17                CROSS-EXAMINATION

15:44:09 18  BY MR. OLSON:

15:44:09 19  Q.   Good afternoon, Ms. Schilling.

15:44:16 20  A.   Good afternoon.

15:44:22 21  Q.   What part of the pre-Roe statute do you think is

15:44:24 22  ambiguous?

15:44:26 23  A.   The definition of furnishing the means.

15:44:29 24  Q.   Are you aware of whether or not there are cases in

15:44:32 25  Texas that define that term?

| | | |
|---|---|---|
| 15:44:35 | 1 | A.   I am not aware of that. |
| 15:44:37 | 2 | Q.   Do you know whether or not there are cases in Texas |
| 15:44:39 | 3 | saying that that term is not unconstitutionally vague or |
| 15:44:43 | 4 | ambiguous? |
| 15:44:45 | 5 | A.   No, I'm not. |
| 15:44:51 | 6 | Q.   You characterized Exhibit 3 and Exhibit 27, which |
| 15:44:54 | 7 | were the two advisories the Attorney General published as |
| 15:44:58 | 8 | encouraging prosecutors to bring suits, correct? |
| 15:45:04 | 9 | A.   If it's on the record and you believe so, then that |
| 15:45:08 | 10 | sounds appropriate. |
| 15:45:09 | 11 | Q.   That's because he doesn't have the power to bring |
| 15:45:12 | 12 | prosecutions himself, correct? |
| 15:45:14 | 13 | A.   That's correct. |
| 15:45:14 | 14 | Q.   Only the district and county attorneys have the power |
| 15:45:17 | 15 | to bring prosecutions. |
| 15:45:19 | 16 | A.   Yes. |
| 15:45:19 | 17 | Q.   Have any district or county attorneys threatened CASN |
| 15:45:25 | 18 | with prosecution? |
| 15:45:27 | 19 | A.   No, but I don't see why they would right now. |
| 15:45:30 | 20 | Q.   And that's because as a matter of fact, they have |
| 15:45:32 | 21 | agreed that they are not going to prosecute as long as |
| 15:45:35 | 22 | this case remains pending, correct? |
| 15:45:37 | 23 | A.   It is my understanding that several district |
| 15:45:43 | 24 | attorneys have agreed to that who were named that they |
| 15:45:46 | 25 | would follow the law as is interpreted in this case. |

| | | |
|---|---|---|
| 15:45:51 | 1 | That's my understanding. |
| 15:45:52 | 2 | Q.   In fact, Kim Ogg, who's the Harris County DA in |
| 15:45:57 | 3 | Houston where CASN is headquartered, announced even before |
| 15:45:58 | 4 | this lawsuit that she had no intention of prosecuting |
| 15:46:00 | 5 | anyone under any of the criminal prohibitions against |
| 15:46:05 | 6 | abortion in Texas. |
| 15:46:06 | 7 | A.   That's correct, but that's only partially relevant to |
| 15:46:09 | 8 | our work.  If you remember from my statement earlier, CASN |
| 15:46:14 | 9 | covers people who are from the Houston area but, also, |
| 15:46:18 | 10 | people who would otherwise be coming to Houston, which had |
| 15:46:21 | 11 | a large concentration of active clinics before S.B. 8 and |
| 15:46:27 | 12 | the Dobbs decision went into effect and, also, surrounding |
| 15:46:30 | 13 | counties.  It's not exclusive to Harris County. |
| 15:46:33 | 14 | Q.   But the Fort Bend County District Attorney's Office |
| 15:46:37 | 15 | also had made that announcement, assessment? |
| 15:46:38 | 16 | A.   Yes.  It's also not exclusive to -- |
| 15:46:40 | 17 | Q.   And Dallas District Attorney, which is also where |
| 15:46:41 | 18 | CASN does some work? |
| 15:46:44 | 19 | A.   Our like mailing address was in Dallas County, but |
| 15:46:47 | 20 | our service area is in the greater Houston area. |
| 15:46:53 | 21 | Q.   Which district attorneys did you fear were going to |
| 15:46:55 | 22 | prosecute you? |
| 15:46:57 | 23 | A.   There are, is it, 254 counties in Texas; is that |
| 15:47:02 | 24 | correct? |
| 15:47:02 | 25 | Q.   There are 254 counties.  There are fewer district |

15:47:06   1   attorneys than that.  But I would like to know on that

15:47:08   2   list, which ones threatened they were going to prosecute

15:47:11   3   CASN?

15:47:13   4   A.  We didn't have specific people in mind.  Part of the

15:47:20   5   ambiguity of the law to us is that we don't know if the

15:47:23   6   jurisdiction would be where somebody lives, where we were

15:47:26   7   at the time when we assisted them where the abortion took

15:47:28   8   place.

15:47:29   9   Q.  That's talking about S.B. 8, right, that has the

15:47:31  10   special venue provision?

15:47:33  11   A.  Yes.  And that was relatively safer for operations

15:47:35  12   for us --

15:47:35  13   Q.  But that's being challenged in another --

15:47:36  14          THE COURT:  Mr. Olson, if you can not cut her

15:47:40  15   off.  Let her complete her answer before you ask the next

15:47:43  16   question.

15:47:43  17          MR. OLSON:  Yes, your Honor.  I'm trying to get

15:47:45  18   us in under time, your Honor.

15:47:46  19          THE COURT:  I understand but not by cutting the

15:47:48  20   witness off.

15:47:49  21          MR. OLSON:  Indeed.

15:47:50  22   A.  Yes.  We applied the same logic while we were making

15:47:53  23   the decision to pause operations for now, though, because

15:47:56  24   we stopped operations the day that the Dobbs decision came

15:48:02  25   out.  We are waiting for further clarity, but we decided

| 15:48:06 | 1 | to take the most risk-averse path that we could under the |
| 15:48:12 | 2 | consideration that we don't know how the Attorney General |
| 15:48:16 | 3 | plans to apply this law. |
| 15:48:18 | 4 | Q.   (BY MR. OLSON) But the Attorney General, in fact, |
| 15:48:20 | 5 | can't prosecute you. |
| 15:48:22 | 6 | A.   No, but he's encouraged other people to do so. |
| 15:48:24 | 7 | Q.   But he, himself, can't prosecute you. |
| 15:48:26 | 8 | A.   No.  Only the civil enforcement mechanism to my |
| 15:48:29 | 9 | knowledge. |
| 15:48:29 | 10 | Q.   And the civil enforcement mechanism applies only to |
| 15:48:33 | 11 | people who perform, induce, or attempt an abortion, |
| 15:48:37 | 12 | correct? |
| 15:48:38 | 13 | A.   That is unclear to me. |
| 15:48:39 | 14 | Q.   Why is that unclear to you? |
| 15:48:43 | 15 | A.   Because of the way that legislators and prosecutors |
| 15:48:58 | 16 | could incorporate all of these things together.  I believe |
| 15:49:01 | 17 | your colleague has talked to Rosann about do you think |
| 15:49:06 | 18 | that this is murder in one place or another.  If I'm |
| 15:49:10 | 19 | assisting somebody in getting to an abortion, are you |
| 15:49:12 | 20 | going to prosecute that as murder? |
| 15:49:13 | 21 | Q.   Indeed.  But I'm not asking about prosecutions |
| 15:49:19 | 22 | because the prosecutors aren't going to prosecute you and |
| 15:49:25 | 23 | Ken Paxton doesn't have the authority to prosecute you. |
| 15:49:27 | 24 | The civil enforcement authority applies only to people who |
| 15:49:31 | 25 | perform, induce, or attempt abortions, correct? |

| | | |
|---|---|---|
| 15:49:34 | 1 | A.   To my knowledge, yes. |
| 15:49:36 | 2 | Q.   Does CASN perform, induce, or attempt abortions? |
| 15:49:42 | 3 | A.   We are not physicians, no. |
| 15:49:54 | 4 | Q.   And you're aware that Briscoe Cain is not a |
| 15:49:59 | 5 | prosecutor in the state of Texas. |
| 15:50:00 | 6 | A.   I am aware of this, yes. |
| 15:50:02 | 7 | Q.   And neither are any of the members of the Texas |
| 15:50:06 | 8 | Freedom Caucus. |
| 15:50:07 | 9 | A.   No.  But they do carry significant influence. |
| 15:50:09 | 10 | Q.   So your worry is that they might persuade someone to |
| 15:50:12 | 11 | enforce the law. |
| 15:50:16 | 12 | A.   They passed the law that people are now responsible |
| 15:50:22 | 13 | for enforcing. |
| 15:50:22 | 14 | Q.   Correct. |
| 15:50:23 | 15 | A.   And I believe have expressed their intent to pass new |
| 15:50:29 | 16 | laws prosecuting abortion funds.  Also, I believe the |
| 15:50:31 | 17 | letter that we received from Representative Cain, the |
| 15:50:36 | 18 | cease-and-desist letter alleged that we were performing |
| 15:50:38 | 19 | criminal acts like retrospective allegation.  I don't |
| 15:50:45 | 20 | trust that we are not going to be prosecuted by some party |
| 15:50:49 | 21 | or another who is involved with this. |
| 15:50:50 | 22 | Part of what is so confusing about this is the |
| 15:50:53 | 23 | chaos of who believes they have jurisdiction where and how |
| 15:50:58 | 24 | that is expressed to the general public and to us.  I'm |
| 15:51:02 | 25 | not an attorney.  We don't have a general counsel to |

15:51:05  1   interpret these things for us.  It's incredibly expensive

15:51:08  2   for us to hire legal counsel to interpret these things for

15:51:11  3   us.

15:51:11  4   Q.  But you don't have an understanding of the Texas

15:51:13  5   criminal jurisdiction statute, correct?

15:51:18  6   A.  Not to where I would want to answer questions about

15:51:20  7   it.

15:51:20  8   Q.  Or the portion of the penal code that determines

15:51:23  9   where venue lies for criminal cases.

15:51:25  10  A.  No.

15:51:26  11  Q.  But if someone were to bring a criminal prosecution,

15:51:30  12  presumably they would have to comply with those laws in

15:51:34  13  order to actually prosecute CASN.

15:51:36  14  A.  Presumably.

15:51:39  15  Q.  Are you aware of any special laws that would override

15:51:44  16  the jurisdictional law or the venue law?

15:51:48  17  A.  No.  But I am aware that there are several

15:51:51  18  conflicting abortion laws in Texas right now.

15:51:53  19  Q.  When you say several, you mean the pre-Roe statutes

15:51:57  20  and the Human Life Protection Act?

15:52:03  21  A.  Well, S.B. 8's fetal cardiac activity provision being

15:52:11  22  -- like S.B. 8 is still in --

15:52:13  23  Q.  Whether or not that's been subsumed under the Human

15:52:16  24  Life Protection Act or one of the pre-Roe statutes?

15:52:18  25  A.  Yes.

| | | |
|---|---|---|
| 15:52:19 | 1 | Q.   Correct? |
| 15:52:19 | 2 | A.   I'm waiting for clarity on this.  That's the issue. |
| 15:52:22 | 3 | Q.   Do you believe it's the Attorney General's |
| 15:52:24 | 4 | responsibility to clarify every time someone CC's him on a |
| 15:52:29 | 5 | letter? |
| 15:52:34 | 6 | A.   No.  I would assume he's CC-ed on a lot of letters, |
| 15:52:37 | 7 | but he has expressed explicit interest in pursuing the |
| 15:52:43 | 8 | civil enforcement mechanism in other abortion |
| 15:52:46 | 9 | restrictions. |
| 15:52:47 | 10 | Q.   Has he expressed specific interest in pursuing |
| 15:52:53 | 11 | prosecutions or civil enforcement against organizations |
| 15:52:55 | 12 | that provide transportation for abortions? |
| 15:52:59 | 13 | A.   Not specifically that I know of -- |
| 15:53:03 | 14 | Q.   How about for organizations that provide meal |
| 15:53:05 | 15 | stipends? |
| 15:53:06 | 16 | A.   No.  And that's what's confusing about this. |
| 15:53:09 | 17 | Q.   How about for accommodations? |
| 15:53:11 | 18 | A.   Not to my knowledge. |
| 15:53:13 | 19 | Q.   For paying for childcare assistance for people who |
| 15:53:16 | 20 | are seeking abortions? |
| 15:53:18 | 21 | A.   No. |
| 15:53:19 | 22 | Q.   And those are the things that CASN says in its |
| 15:53:26 | 23 | mission statement are the things that it does for the |
| 15:53:30 | 24 | clientele who approach it to help obtain abortions, |
| 15:53:32 | 25 | correct? |

| | | |
|---|---|---|
| 15:53:33 | 1 | A. That's correct. Again, we still get targeted. |
| 15:53:36 | 2 | Q. Targeted by? |
| 15:53:37 | 3 | A. Representative Cain, specifically. We've been |
| 15:53:40 | 4 | included in the letters from Jonathan Mitchell. |
| 15:53:43 | 5 | Q. So you have not been targeted by anyone who has any |
| 15:53:46 | 6 | enforcement authority for the state of Texas. |
| 15:53:51 | 7 | A. Not specifically to my knowledge. |
| 15:53:52 | 8 | Q. And the only person you've identified who has any |
| 15:53:56 | 9 | enforcement authority for the state of Texas is Attorney |
| 15:53:59 | 10 | General Paxton, correct? |
| 15:54:01 | 11 | A. No. There's also the district attorneys and the |
| 15:54:04 | 12 | criminal liability. |
| 15:54:06 | 13 | Q. But none of the district attorneys have expressed any |
| 15:54:08 | 14 | interest in enforcing the law, correct? |
| 15:54:12 | 15 | A. The district attorneys, to my understanding, have |
| 15:54:16 | 16 | expressed that they will follow the law as is determined. |
| 15:54:21 | 17 | Q. And that's just a statement of a general intention to |
| 15:54:24 | 18 | enforce the law, correct? |
| 15:54:27 | 19 | A. That is my understanding. I'm not an attorney. |
| 15:54:29 | 20 | Q. And Attorney General Paxton's statements are also |
| 15:54:33 | 21 | just statements that he generally intends to enforce the |
| 15:54:36 | 22 | law, correct? Let me be more specific. He doesn't name |
| 15:54:42 | 23 | specific activities that he's targeting for enforcement, |
| 15:54:45 | 24 | correct? |
| 15:54:47 | 25 | A. No, but he seems to have left it open to future |

15:54:51   1   possibilities from our perspective.

15:54:53   2   Q.   So reading between the lines, you believe that he

15:54:58   3   might come after you in the future.

15:55:01   4   A.   I lack assuredness that he won't.

15:55:06   5   Q.   Has anyone with the Attorney General's Office

15:55:11   6   expressed a definite interest in pursuing CASN for civil

15:55:15   7   enforcement?

15:55:15   8   A.   Not to my knowledge.

15:55:30   9   Q.   And one thing I wanted to clarify.  You mentioned in

15:55:35   10  your testimony before that one of the things CASN does is

15:55:39   11  leverage volunteers.  What did you mean by that?

15:55:43   12  A.   That we have people who are enthusiastic about

15:55:48   13  volunteering for us who we've historically trained and

15:55:53   14  they've been the ones who have done -- we started as a

15:55:58   15  volunteer driving organization.  We provided several

15:56:01   16  hundred drives a year.  The COVID pandemic happened and we

15:56:10   17  -- yes.  But that is originally what -- how the

15:56:14   18  organization was intended and how our structure is built.

15:56:16   19  Q.   That means you put volunteers in touch with the folks

15:56:21   20  who contact you to undertake some of these services.

15:56:25   21  A.   Historically, yes.  Not since S.B. 8 went into

15:56:29   22  effect.  That was a risk that we were not willing to

15:56:30   23  incur.

15:56:39   24  Q.   Is CASN a membership organization?

15:56:43   25  A.   What do you mean by that?

15:56:44  1   Q.   Does it have members?  Are there people who pay dues

15:56:47  2   or otherwise sign an affiliation agreement or announce

15:56:51  3   themselves as I'm a member of CASN?

15:56:55  4   A.   We have people who set up regular donations with us,

15:57:01  5   but I believe that is the only way that we would use the

15:57:08  6   word "membership."

15:57:14  7   Q.   And as of right now, it's run by -- CASN is run by

15:57:18  8   its board members.

15:57:19  9   A.   That's correct.

15:57:22  10   Q.   I believe that's all I have, your Honor.  Thank you,

15:57:25  11   ma'am.

15:57:25  12          THE COURT:  Any followup?

15:57:27  13          MR. ATKINS:  Quick re-direct.

15:57:29  14                RE-DIRECT EXAMINATION

15:57:29  15   BY MR. ATKINS:

15:57:58  16   Q.   So speaking with opposing counsel, you just -- you

15:58:03  17   used a phrase.  Actually, I think you may have used it

15:58:05  18   with me, a phrase "law of parties."  Who are the law of

15:58:10  19   parties to your knowledge?

15:58:11  20   A.   It is being implicated in the most extreme aspect of

15:58:21  21   a commission of a crime by being involved in any part of

15:58:24  22   it.  The way that I learned it was from cases involving

15:58:30  23   death.  So my familiarity with it is coming from the

15:58:33  24   capital murder charge perspective, and I'm not sure if

15:58:36  25   it's used to refer to crimes that don't result in death.

15:58:41  1   Q.   Okay.  So if it's possible to violate the --

15:58:54  2        MR. OLSON:  I will stop right here, your Honor,

15:58:55  3   and object as calling for a speculative legal conclusion.

15:58:58  4   She has already said she's insure about what the law of

15:59:01  5   parties encompasses.

15:59:03  6        THE COURT:  I'll sustain the objection.

15:59:05  7        MR. ATKINS:  Understood.

15:59:11  8   Q.   (BY MR. ATKINS) We talked briefly about the interview

15:59:13  9   that I played to Ms. Mariappuran earlier.  I want to play

15:59:18  10  you a part of that right now.  This is Exhibit 63.

15:59:25  11       (Audio and video file played.)

16:01:35  12  Q.   (BY MR. ATKINS) What was the interview you were

16:01:37  13  asking about there?

16:01:39  14  A.   Whether the Attorney General's Office would be

16:01:43  15  pursuing prosecution to corporations assisting people in

16:01:49  16  getting out of state for their abortions.

16:01:51  17  Q.   And what did you understand Attorney General Paxton

16:01:55  18  to be referring to when he talked about penalties of

16:01:57  19  $100,000 or more?

16:02:00  20  A.   That would be the civil enforcement mechanism

16:02:04  21  referenced in the advisories, I believe, 3 and 26, or at

16:02:13  22  least in -- I have three open in front of me.  So a part

16:02:21  23  of the trigger ban's minimum $100,000 civil enforcement

16:02:24  24  mechanism.

16:02:33  25  Q.   To your knowledge, does Disney perform abortions?

| 16:02:41 | 1 | A.   They may have doctors on staff but not to my |
| 16:02:45 | 2 | knowledge, no. |
| 16:02:47 | 3 | Q.   Does Tesla perform abortions? |
| 16:02:51 | 4 | A.   I don't believe so.  No. |
| 16:02:55 | 5 | Q.   Do you understand Attorney General Ken Paxton as |
| 16:03:00 | 6 | looking into -- certainly not certain that civil penalties |
| 16:03:05 | 7 | would not apply to these people? |
| 16:03:10 | 8 | A.   He seems to believe that they would apply to these |
| 16:03:12 | 9 | people. |
| 16:03:14 | 10 | Q.   And you've never heard him clarify otherwise. |
| 16:03:17 | 11 | A.   No, I have not. |
| 16:03:19 | 12 | Q.   To your knowledge, has he ever made a public |
| 16:03:22 | 13 | statement indicating that they've come to some conclusion |
| 16:03:24 | 14 | about this? |
| 16:03:24 | 15 | A.   Not to my knowledge. |
| 16:03:26 | 16 | Q.   And have you seen him give testimony today about |
| 16:03:29 | 17 | that? |
| 16:03:31 | 18 | MR. OLSON:  Objection, your Honor.  That is |
| 16:03:32 | 19 | improper.  She's not -- the witness is not allowed to |
| 16:03:35 | 20 | comment on other witnesses' testimony. |
| 16:03:38 | 21 | THE COURT:  Is that a rule?  I've never heard |
| 16:03:42 | 22 | that one.  You could ask. |
| 16:03:45 | 23 | Q.   (BY MR. ATKINS) Have you seen Attorney General Ken |
| 16:03:48 | 24 | Paxton today give testimony about whether he has come to a |
| 16:03:53 | 25 | conclusion about whether the civil penalty provisions |

16:03:55  1   could be enforced in that way?

16:03:57  2   A.   I have not.  He's not here today to my knowledge.

16:04:05  3   Q.   We'll look at the binders in tab 25.  Have you seen

16:04:37  4   the Exhibit behind tab 25 before?

16:04:44  5   A.   No, I have not.  It is familiar, but I have not seen

16:04:48  6   this article.

16:04:49  7   Q.   What does it appear to be?

16:04:53  8   A.   It appears to be that Attorney General wants -- I

16:04:59  9   can't speak to desire but is ready to assist local DAs in

16:05:05  10  prosecuting abortion providers.  That's the subject line,

16:05:08  11  but it seems pretty straightforward or the title.

16:05:13  12  Q.   And does the article have any other significance to

16:05:18  13  you?  Take a minute to go through it.

16:06:13  14  A.   Okay.  What I got from this is that he expressed

16:06:21  15  specific interest in assisting Dallas County and Tarrant

16:06:29  16  County's District Attorneys and -- I misread that.  He

16:06:47  17  said Dallas area.  The article outlines that Dallas County

16:06:51  18  and Tarrant County's District Attorneys have different

16:06:57  19  stances on whether they will enforce it; but also, that he

16:07:07  20  disagrees with the Biden administration on the federal

16:07:13  21  rules saying that providers or hospitals must provide

16:07:20  22  abortion services if the life of the pregnant person is at

16:07:24  23  risk.

16:07:24  24          THE COURT:  That's fine.  Do you have any

16:07:26  25  specific questions?

| | | |
|---|---|---|
| 16:07:28 | 1 | Q.   (BY MR. ATKINS) Does this article indicate to you |
| 16:07:32 | 2 | that there's -- at least some district attorneys have |
| 16:07:36 | 3 | expressed an interest in enforcing these criminal |
| 16:07:41 | 4 | penalties? |
| 16:07:42 | 5 | A.   Yes, it does. |
| 16:07:43 | 6 | Q.   And does this article indicate with statements from |
| 16:07:49 | 7 | Attorney General Ken Paxton whether Attorney General Ken |
| 16:07:53 | 8 | Paxton stands ready to support them? |
| 16:07:55 | 9 | A.   Fairly unambiguously, yes. |
| 16:07:58 | 10 | Q.   Okay.  Move to admit Plaintiffs' Exhibit 25. |
| 16:08:04 | 11 | MR. OLSON:  We object, your Honor.  It's |
| 16:08:05 | 12 | irrelevant.  It also violates the best evidence rule and |
| 16:08:07 | 13 | that it refers to different advisories and opinions that |
| 16:08:10 | 14 | Ken Paxton has issued without actually including those |
| 16:08:14 | 15 | advisories themselves, which are the best evidence of what |
| 16:08:16 | 16 | Ken Paxton actually said. |
| 16:08:19 | 17 | MR. ATKINS:  This is additionally an example of |
| 16:08:22 | 18 | the public statement or the publicity surrounding this |
| 16:08:26 | 19 | specific issue.  One of the things that we need to |
| 16:08:29 | 20 | demonstrate is the context in which the statements were |
| 16:08:31 | 21 | made, and the coverage of them is part of that context. |
| 16:08:36 | 22 | THE COURT:  I'll overrule the objections and |
| 16:08:39 | 23 | admit them.  Anything else? |
| 16:08:42 | 24 | MR. ATKINS:  No thank you, your Honor. |
| 16:08:45 | 25 | THE COURT:  Okay.  Anything else? |

| | | |
|---|---|---|
| 16:08:46 | 1 | MR. OLSON:  I have one question. |
| 16:08:47 | 2 | THE COURT:  Okay. |
| 16:08:47 | 3 | RE-CROSS EXAMINATION |
| 16:08:47 | 4 | BY MR. OLSON: |
| 16:08:53 | 5 | Q.   I do promise to make better objections, your Honor. |
| 16:08:56 | 6 | I spent too much time in the appellate courtroom and not |
| 16:08:58 | 7 | enough time in the trial courtroom. |
| 16:09:01 | 8 | Ms. Schilling, in that interview that you watched |
| 16:09:04 | 9 | up there, the Attorney General didn't say that he was |
| 16:09:09 | 10 | going after those people.  He said they were taking a look |
| 16:09:14 | 11 | at it, correct? |
| 16:09:15 | 12 | A.   Yes.  That's correct. |
| 16:09:15 | 13 | Q.   Thank you. |
| 16:09:17 | 14 | THE COURT:  Thank you.  You may step down.  Okay. |
| 16:09:19 | 15 | Before we take a break, I want to do a couple of |
| 16:09:22 | 16 | things.  First of all, I want to observe that it appears |
| 16:09:26 | 17 | as though the evidence is beginning to get a little |
| 16:09:29 | 18 | duplicative.  And so, with your -- any further witnesses? |
| 16:09:33 | 19 | I understand perhaps we have the physician plaintiff has |
| 16:09:38 | 20 | something more to contribute.  But unless there's |
| 16:09:42 | 21 | something additionally that needs to be covered, I'll get |
| 16:09:46 | 22 | you to look at that closely over the break. |
| 16:09:47 | 23 | MS. MYERS:  Your Honor, we actually had some |
| 16:09:50 | 24 | discussion with defendants' counsel over the weekend about |
| 16:09:52 | 25 | this.  Dr. Moayedi is intended to be our last live witness |

```
16:09:55   1   subject to our reserving the issue around General Paxton.

16:09:55   2        THE COURT:  Sure.

16:09:59   3        MS. MYERS:  And then, we were going to offer our

16:10:01   4   remaining parties' declarations and those are on the

16:10:05   5   exhibit list, but not present them live.  And I don't know

16:10:08   6   that we have a resolution around whether the state's going

16:10:11   7   to object to the entry of those declarations.  But we

16:10:15   8   would be happy to submit their testimony via declaration.

16:10:18   9        THE COURT:  Okay.  Ms. Hilton.

16:10:20  10        MS. HILTON:  That's fine, your Honor.  We have no

16:10:22  11   objection to admitting declarations for witnesses who are

16:10:24  12   not called.

16:10:24  13        THE COURT:  Okay.  That may streamline things a

16:10:26  14   bit then.

16:10:27  15        Okay.  Very good.  Then why don't we leave it at

16:10:30  16   that now and take a ten-minute break and come back for

16:10:32  17   your witness.  And then, do you anticipate calling any

16:10:36  18   witnesses at this time?

16:10:38  19        MS. HILTON:  No, your Honor.

16:10:39  20        THE COURT:  Okay.  Great.  Let's take a

16:10:40  21   ten-minute break then.  Thank you.

16:10:41  22        (Recess.)

16:20:39  23        MS. MYERS:  Before we call Dr. Moayedi, I was

16:20:41  24   hoping maybe we could just do some cleanup on our exhibit

16:20:43  25   list.  There aren't any objections to some of these, I
```

| | | |
|---|---|---|
| 16:20:46 | 1 | don't think, and so, I was hoping maybe we could |
| 16:20:48 | 2 | short-circuit this and I wouldn't have to go through it |
| 16:20:50 | 3 | with her. |
| 16:20:50 | 4 | THE COURT: That's great. |
| 16:20:51 | 5 | MS. MYERS: So I believe on Plaintiffs' Exhibits |
| 16:20:53 | 6 | 12, 13, 14 and 15, there's been no objection made; is that |
| 16:20:57 | 7 | right? |
| 16:20:58 | 8 | MR. WASSDORF: That is correct. |
| 16:20:59 | 9 | MS. MYERS: We'd move those into evidence. |
| 16:21:01 | 10 | THE COURT: So admitted. |
| 16:21:02 | 11 | MS. MYERS: And then, I believe Exhibit 17, 18, |
| 16:21:05 | 12 | 19 and 20 are the declarations of the -- our parties who |
| 16:21:08 | 13 | were not put on live. And I think Ms. Hilton said that |
| 16:21:15 | 14 | there was no objection to those being entered. |
| 16:21:17 | 15 | MR. WASSDORF: Correct, as long as they're not |
| 16:21:18 | 16 | called. |
| 16:21:19 | 17 | THE COURT: That's correct. |
| 16:21:19 | 18 | MS. MYERS: We would move 17, 18, 19 and 20. |
| 16:21:22 | 19 | THE COURT: So admitted. |
| 16:21:28 | 20 | MS. MYERS: Plaintiffs' Exhibit 33, I don't |
| 16:21:30 | 21 | believe there's an objection to that. |
| 16:21:32 | 22 | MR. WASSDORF: No objection. |
| 16:21:33 | 23 | THE COURT: So admitted. |
| 16:21:34 | 24 | MS. MYERS: And then, with respect to Plaintiffs' |
| 16:21:37 | 25 | Exhibit 43, 44, 45 and 46, I also believe there's no |

16:21:41    1    objection to those exhibits, as well.

16:21:43    2            MR. WASSDORF:  No objection.

16:21:44    3            THE COURT:  So admitted.

16:21:48    4            MS. MYERS:  And then, Exhibit 47 and, I believe,

16:21:53    5    Exhibit 62 have also been no objections to those two

16:21:56    6    exhibits.

16:21:57    7            MR. WASSDORF:  No objection.

16:21:58    8            THE COURT:  So admitted.

16:22:00    9            MS. MYERS:  Thank you.

16:22:00    10            THE COURT:  Okay.  Great.

16:22:04    11            MS. MYERS:  May I proceed, your Honor?

16:22:06    12            THE COURT:  You may.

16:22:07    13            MS. MYERS:  Plaintiffs call Dr. Ghazaleh Moayedi.

16:22:13    14            THE COURT:  All right.  Doctor, can you hear us

16:22:15    15    okay?

16:22:17    16            THE WITNESS:  I can.  Thank you.

16:22:18    17            THE COURT:  You may proceed.  We need to swear

16:22:26    18    her in.  Do you have an idea of how long this witness will

16:22:38    19    take?

16:22:39    20            MS. MYERS:  I'm sincerely hoping I can do it in

16:22:42    21    30 to 45 minutes, your Honor.

16:22:43    22            THE COURT:  We've got a problem that just arose.

16:22:45    23    We've been told that the -- there's going to be

16:22:48    24    maintenance on our system at 5:00 that's going to shut our

16:22:56    25    internet down.  So let's just get started and see what we

| 16:22:59 | 1 | can do. |
| 16:23:00 | 2 | MS. MYERS: Okay. I will try to go as fast as I |
| 16:23:03 | 3 | can. |
| 16:23:03 | 4 | THE COURT: If not, we can come back another day. |
| 16:23:05 | 5 | We can do something that -- everybody will have the |
| 16:23:07 | 6 | opportunity to get everything in the record they need but |
| 16:23:09 | 7 | I just -- |
| 16:23:10 | 8 | MS. MYERS: Thank you, your Honor. |
| 16:23:10 | 9 | THE COURT: So first, before we begin, Doctor, |
| 16:23:13 | 10 | could I get you to raise your right hand to be sworn, |
| 16:23:15 | 11 | please. |
| 16:23:17 | 12 | THE CLERK: You do solemnly swear or affirm that |
| 16:23:17 | 13 | the testimony which you may give in the case now before |
| 16:23:17 | 14 | the Court shall be the truth, the whole truth, and nothing |
| 16:23:24 | 15 | but the truth? |
| 16:23:24 | 16 | THE WITNESS: I do. |
| 16:23:24 | 17 | GHAZALEH MOAYEDI, called by the Plaintiffs via |
| 16:23:26 | 18 | videoconference, duly sworn. |
| 16:23:26 | 19 | DIRECT EXAMINATION |
| 16:23:27 | 20 | BY MS. MYERS: |
| 16:23:27 | 21 | Q. Good afternoon, Dr. Moayedi. |
| 16:23:32 | 22 | Would you please introduce yourself to the Court |
| 16:23:33 | 23 | a little bit? |
| 16:23:35 | 24 | A. Yes. My name is Dr. Ghazaleh Moayedi. I go by Dr. |
| 16:23:40 | 25 | Moayedi. I use she/her pronouns. I'm an OB/GYN and a |

16:23:46  1  complex planning specialist.  I live in Dallas and I'm an

16:23:54  2  abortion provider.

16:23:55  3  Q.   Could you please tell the Court why you are a

16:23:59  4  plaintiff in this lawsuit?

16:24:01  5  A.   Yes.  I am an abortion provider.  Prior to S.B. 8, I

16:24:08  6  provided abortion care in Dallas, Texas and some abortion

16:24:11  7  care in Oklahoma City.  After S.B. 8, I was traveling to

16:24:17  8  Oklahoma City to provide abortion care to Oklahomans,

16:24:22  9  Texans, Louisianans, Arkansans, Kansans that were

16:24:27  10 traveling to Oklahoma to receive abortion care, and since

16:24:31  11 the Dobbs ruling, I have stopped traveling to provide

16:24:36  12 abortion care.

16:24:36  13     So I'm a part of this case so I can resume my job

16:24:39  14 and my duty to my community as an abortion provider and in

16:24:44  15 traveling to other states where abortion is legal and

16:24:49  16 providing abortion care.  I also have a private practice

16:24:51  17 that I started a couple of years ago, and initially, that

16:24:55  18 private practice was going to be a brick-and-mortar clinic

16:24:59  19 in the Dallas area to provide comprehensive reproductive

16:25:03  20 healthcare, including abortion care to my community.

16:25:07  21     Because of S.B. 8, I transitioned that practice

16:25:12  22 to be a telehealth practice where I could provide

16:25:17  23 medication abortion from Texas to other states where

16:25:22  24 abortion is legal and I'm licensed; and also, a practice

16:25:27  25 where I could provide ultrasounds and consultations for

16:25:31 1  people within Dallas and then, travel with them to other

16:25:36 2  states to provide abortion care for them.  And because of

16:25:41 3  the Dobbs ruling, the trigger ban and the pre-Roe

16:25:45 4  statutes, all of that work is on hold.  So I am suing for

16:25:49 5  right to care for my community.

16:25:52 6  Q.  And we'll go into little more discussion about each

16:25:54 7  of those topics.  Before we do that, would you please tell

16:25:57 8  the Court about your medical training, education very

16:26:00 9  briefly.

16:26:02 10 A.  Yes.  I did undergraduate at U.T. Austin.  I double

16:26:05 11 majored in biology and American studies.  I attended

16:26:10 12 medical school at Texas College of Osteopathic Medicine in

16:26:14 13 Fort Worth, Texas.  I did OB/GYN residency at Texas Tech

16:26:19 14 Health Sciences Center in El Paso.  I did a complex family

16:26:24 15 planning fellowship in Hawaii for two years after that.

16:26:30 16 And I also completed a Master of Public Health in Health

16:26:34 17 Policy and Management at University of Hawaii at Manoa.

16:26:39 18 And I am board certified in obstetrics and gynecology.

16:26:43 19 Q.  Are there any areas of medical practice in which you

16:26:46 20 hold a particular specialty?

16:26:48 21 A.  I'm sorry.  I didn't hear that totally.  Can you

16:26:52 22 repeat it?

16:26:53 23 Q.  It was a bad question.  I apologize for that.

16:26:55 24      Are there any areas of medical practice in which

16:26:56 25 you hold a specialty?

16:26:58   1   A.   Yes.   So I am a complex family planning specialist.

16:27:04   2   This year was the first year that a board exam was offered

16:27:07   3   for that subspecialty, and so, I was one of the first

16:27:10   4   people in the country to sit for that exam and I'll get

16:27:14   5   those results in just a few weeks.

16:27:16   6   Q.   And briefly, can you tell us what is complex family

16:27:20   7   planning?

16:27:23   8   A.   Yeah.   So abortion providers in this country don't

16:27:25   9   have to be specialists in complex family planning.

16:27:28   10   Abortion care is -- can be provided by family medicine

16:27:35   11   doctors, OB/GYNs, nurse practitioners, physician

16:27:38   12   assistants.   You don't have to be a physician and you

16:27:40   13   don't have to be a specialist.   But I specialized in

16:27:43   14   what's called complex family planning, which means I am

16:27:46   15   uniquely skilled to take care of patients with complex

16:27:50   16   medical conditions in pregnancy and provide abortion care

16:27:54   17   to them, and that might mean a complex fetal diagnosis, or

16:27:59   18   a complex maternal diagnosis, a life-threatening

16:28:04   19   condition, or a clinically challenging medical

16:28:07   20   presentation.   And I'm also highly skilled and have

16:28:12   21   specialty training in providing contraception care and

16:28:16   22   management, also in complex situations.   So I'm an

16:28:20   23   abortion and birth control specialist.

16:28:22   24   Q.   Are there any other areas of practice in which you

16:28:26   25   routinely practice medicine?

16:28:29  1  A.   Yes.  So I am a general OB/GYN, so I provide what's

16:28:34  2  called generalist OB/GYN care.  I work as a part-time

16:28:39  3  hospitalist providing routine labor and delivery care.  So

16:28:44  4  taking care of people that are birthing or that show up to

16:28:46  5  the emergency room with a gynecologic or obstetric

16:28:50  6  emergency.  I do that on a part-time basis.

16:28:53  7          I also provide telemedicine care for people

16:28:57  8  across the country in menopause, so I provide consultation

16:29:04  9  and hormone replacement therapy for people going through

16:29:12  10  menopause.  I teach extensively across the state and the

16:29:17  11  country.  And I thank you, your Honor, for the opportunity

16:29:20  12  to Zoom in today.  I'm actually here in San Francisco

16:29:23  13  teaching at UCSF, as well.

16:29:27  14  Q.   Could you give me a working definition of what

16:29:30  15  abortion care is generally?

16:29:34  16  A.   Yeah.  So abortion care can mean a lot of things.

16:29:39  17  Abortion can be offered procedurally.  Sometimes that's

16:29:43  18  called a surgical abortion or a D & C or a D & E.  And so,

16:29:47  19  that is a procedure where the pregnancy is removed from

16:29:51  20  the uterus through the vagina using instruments.  Those

16:29:55  21  instruments can be suction devices, or forceps, or

16:29:58  22  combination of the two.  Abortion can be conducted through

16:30:03  23  medications or medication abortion and that is not one

16:30:08  24  thing.  So medication abortion can be through a

16:30:11  25  combination of pills, mifepristone and misoprostol.

16:30:15  1  Medication abortion can be done with misoprostol alone.

16:30:18  2  And technically, medication abortion could be inducing a

16:30:24  3  delivery in the setting of an abortion using drugs that

16:30:28  4  are used commonly on labor and delivery, like Oxytocin or

16:30:32  5  what's known as Pitocin.  Sometimes abortion care is much

16:30:37  6  more technical than that in very highly complex

16:30:40  7  situations, but that is basically the gist of it.

16:30:45  8  Q.   And in your role as a healthcare provider, have you

16:30:48  9  historically provided sort of the gamut of abortion care

16:30:52  10  as you just described it?

16:30:54  11  A.   Yes.  So prior to S.B. 8, probably anywhere from 75

16:31:04  12  to 90 percent of my practice was providing abortion care.

16:31:08  13  Q.   Are you currently providing abortion care to any

16:31:10  14  patients in or out of the state of Texas?

16:31:13  15  A.   No.

16:31:15  16  Q.   When did you stop providing abortion care to

16:31:17  17  patients?

16:31:18  18  A.   I stopped providing abortion care in Texas once S.B.

16:31:23  19  8 went into effect.  I transitioned my practice primarily

16:31:27  20  to Oklahoma City, and by that, I mean not my private

16:31:30  21  practice but I transitioned traveling to established

16:31:33  22  clinics in Oklahoma City.  I stopped traveling to Oklahoma

16:31:38  23  City in March or April of last year, right when Oklahoma

16:31:44  24  passed their abortion ban.

16:31:47  25          My intent was then to hopefully start traveling

16:31:51  1    to Kansas after that where I'm also licensed, but I took a

16:31:56  2    pause during the summer awaiting the Dobbs decision and

16:32:00  3    actually studying for the test that I spoke about earlier.

16:32:04  4    And so, right now, I'm not traveling to provide abortion

16:32:08  5    care at all.

16:32:08  6    Q.   And why are you currently not traveling to provide

16:32:11  7    abortion care?

16:32:13  8    A.   Because I am concerned about being arrested for

16:32:16  9    taking care of Texans in other states.

16:32:24  10   Q.   When you were able to perform abortion care, how much

16:32:27  11   of your practice -- let me back up.  Between the effective

16:32:32  12   date of S.B. 8, which was September 1st, 2021, and the

16:32:38  13   issuance of the Dobbs decision, which was June 24th, 2022,

16:32:42  14   I think you told me you were traveling to provide care to

16:32:45  15   pregnant Texans outside of the state.

16:32:48  16   A.   Yes.

16:32:49  17   Q.   During that time, how much of your practice was

16:32:53  18   providing care to patients outside of Texas?

16:32:58  19   A.   You know, I would say probably, you know, 50 to 75

16:33:03  20   percent at that point still.  I was traveling quite a bit.

16:33:09  21   Physicians, like we can't pick up shifts just like next

16:33:12  22   month.  Often, you have to schedule your work three to six

16:33:17  23   months in advance.  So I was actually scheduled in Dallas

16:33:22  24   from September through December of 2021.  And so, I didn't

16:33:28  25   have an opportunity during that time to necessarily pick

16:33:32  1    up extra shifts in Oklahoma City, although I did where

16:33:35  2    they were available.  But then, I was able to schedule new

16:33:40  3    shifts in Oklahoma City starting in January, and I was

16:33:44  4    traveling two to three times some months, almost every

16:33:50  5    week or every other week, to Oklahoma City and providing

16:33:53  6    care there anywhere from two to four days a week.

16:33:57  7    Q.   When you were traveling to Oklahoma City and

16:34:00  8    providing the care there, do you have a sense of what

16:34:02  9    percentage of your patients were from Texas?

16:34:06  10   A.   Yeah.  So prior to S.B. 8, I was traveling to

16:34:11  11   Oklahoma City because of the COVID shutdowns of abortion

16:34:15  12   care, as well.  And so, at that time, probably only about

16:34:20  13   ten percent of the people I took care of were from the

16:34:23  14   north Texas area, specifically.  But after S.B. 8,

16:34:27  15   anywhere from 70 to sometimes 90 percent of the patients

16:34:33  16   that I saw were from Texas and not specifically north

16:34:36  17   Texas anymore, but the entirety of Texas.  So I was seeing

16:34:41  18   patients from all over Texas.  And yeah, so a huge jump in

16:34:46  19   the number of people from Texas that I was taking care of

16:34:49  20   in Oklahoma.

16:34:52  21   Q.   If you could travel and feel safe doing that, are

16:34:55  22   there opportunities that you know of where you could go

16:34:58  23   and provide care in a state where abortion care is legal?

16:35:02  24   A.   Yes.  So the clinic that I work for in Oklahoma City

16:35:05  25   also has a clinic in Wichita, Kansas.  I am essentially

16:35:12  1  ready and waiting to travel to provide care.  Right now,

16:35:16  2  I'm scheduled.  You know, I didn't schedule for right now,

16:35:19  3  but I'm scheduled to start working back there again in

16:35:22  4  December through next May essentially pending a court

16:35:28  5  decision.

16:35:31  6  Q.   Dr. Moayedi, you mentioned that you are licensed in

16:35:34  7  these other states.  How many state licenses do you

16:35:36  8  currently hold?

16:35:38  9  A.   I have 20 state licenses.

16:35:43  10  Q.   Do you know how many of those states allow legal

16:35:48  11  abortion, care of some kind?

16:35:51  12  A.   Let's see, I think 11 or 112 of them.

16:36:04  13  Q.   I see that you're referencing something on your

16:36:07  14  screen.  For the benefit of everybody in the courtroom,

16:36:10  15  could you just tell us what you're looking at?

16:36:11  16  A.   Yes.  I have a -- just a document that has all my

16:36:14  17  state licenses on it.  I apologize.

16:36:16  18  Q.   It's fine.  It's a lot of them.

16:36:18  19  A.   Yeah.

16:36:20  20  Q.   In those 20 states, I think you mentioned when we

16:36:25  21  were talking earlier about your desire to engage in

16:36:28  22  telemedicine in states where you're licensed, as well.  Do

16:36:31  23  you remember that?

16:36:32  24  A.   Yes.

16:36:33  25  Q.   Do you know of the 20 states in which you're

16:36:36  1   licensed, where you could provide abortion care via

16:36:40  2   telemedicine?

16:36:42  3   A.   Yeah.   About I think about 10 of those.

16:36:47  4   Q.   Are you currently providing telemedicine abortion

16:36:50  5   care to patients in states located where that would be

16:36:54  6   legal?

16:36:54  7   A.   No, I'm not.

16:36:56  8   Q.   Why are you not doing that?

16:36:58  9   A.   Because I am concerned about the legality of

16:37:02  10  providing abortion care while I'm physically in Texas to

16:37:06  11  patients that are in other states, even though for any

16:37:11  12  other healthcare I provide, it's the law applies to the

16:37:15  13  state that the patient is in.   Not the state that the

16:37:17  14  physician is in.

16:37:22  15  Q.   Dr. Moayedi, if I refer to something as the Texas

16:37:26  16  trigger ban, do you know what I mean?

16:37:28  17  A.   Yes.

16:37:29  18  Q.   What is your understanding of what the Texas trigger

16:37:32  19  ban is?

16:37:33  20  A.   The trigger ban was passed last session, although I

16:37:38  21  don't remember if it was in a special session or regular

16:37:40  22  session.   It was a law essentially that if Roe v. Wade

16:37:46  23  fell, that all abortion would become illegal in Texas.

16:37:53  24  Q.   Do you have an understanding about whether the Texas

16:37:56  25  trigger ban applies to you as a provider of abortion care?

Case: 22-50885    Document: 8    Page: 480    Date Filed: 10/05/2022
Case 1:22-cv-00859-RP    Document 83-4    Filed 10/22/22    Page 481 of 561

194

16:38:01   1   A.   Yes, it does apply to me.

16:38:02   2   Q.   What's your understanding of how it applies to you

16:38:05   3   and what it does?

16:38:07   4   A.   My understanding is that it applies to me both

16:38:10   5   through a potential fine and, also, through felony.

16:38:18   6   Q.   What's your understanding of the behavior that would

16:38:21   7   subject you to a potential felony or fine under the Texas

16:38:26   8   trigger ban?

16:38:27   9   A.   From providing abortion care.  From doing my job.

16:38:35  10   Q.   Is it your understanding that the Texas trigger ban

16:38:40  11   would apply to you providing abortion care even if your

16:38:43  12   patient was not located in Texas?

16:38:46  13   A.   I'm actually unclear on that and that is part of why

16:38:50  14   I'm suing today.

16:38:52  15        THE COURT:  Let me interrupt just briefly so

16:38:54  16   you'll know what's happening.  I'm going to ask the clerk

16:38:57  17   if she could close those blinds there.  It looks like

16:39:00  18   we're getting a lot of sun over there for the folks that

16:39:02  19   are sitting back there.  Thank you.

16:39:12  20        THE WITNESS:  I'm sorry, I didn't hear what your

16:39:14  21   Honor was saying.

16:39:14  22   Q.   (BY MS. MYERS) We were just having a sidebar about

16:39:17  23   blinds and sun.

16:39:21  24        Dr. Moayedi, I hope that we have successfully

16:39:24  25   transferred to you an entire set of all of the Plaintiffs'

16:39:28  1   Exhibits and all of Defendants' Exhibits in this case.

16:39:30  2   Can you confirm that you've received the documents that we

16:39:34  3   sent?

16:39:35  4   A.   Yes, I did.  I received, I believe, 56 -- sorry.  I

16:39:42  5   always forget which one's which, Defendants' Exhibits and

16:39:46  6   I believe I received 61 Plaintiffs' Exhibits.

16:39:49  7   Q.   Okay.  Could you please open up Plaintiffs' Exhibit

16:39:52  8   27.

16:39:58  9   A.   Is that one updated post-Roe advisory?

16:40:02 10   Q.   Yes.  That is the -- that's the title of it.  This

16:40:07 11   exhibit is already offered into evidence, so I just have a

16:40:10 12   few questions for you.  First, do you recognize it?

16:40:13 13   A.   Yes, I do.

16:40:14 14   Q.   Have you ever seen it before?

16:40:17 15   A.   I have seen it before.

16:40:19 16   Q.   Do you know when you first saw it?

16:40:22 17   A.   I'm actually not sure when I first saw this outside

16:40:26 18   of preparing for this case, but I did see the document

16:40:31 19   that came before it that was similar.

16:40:33 20   Q.   Okay.  So why don't we go to that document since you

16:40:37 21   know you saw that before.  I believe that is Exhibit --

16:40:39 22   Plaintiffs' Exhibit 3.

16:40:43 23   A.   Which one was that one?

16:40:47 24   Q.   Plaintiffs' Exhibit 3.

16:40:49 25   A.   Three, okay.  Yep.  Okay.

| | | |
|---|---|---|
| 16:40:51 | 1 | Q.   Could you tell me what Plaintiffs' Exhibit 3 is? |
| 16:40:54 | 2 | A.   Okay.  So this was a statement from Attorney General |
| 16:40:58 | 3 | Ken Paxton, I believe, a few days -- I'm not sure where |
| 16:41:02 | 4 | the date is on here, but I think it was released just a |
| 16:41:05 | 5 | few days after the Dobbs ruling and it was where Ken |
| 16:41:13 | 6 | Paxton essentially said that the pre-Roe bans are in |
| 16:41:18 | 7 | effect.  And I can't remember the wording.  I think he was |
| 16:41:22 | 8 | welcoming people to -- yes.  The prosecutors my choose to |
| 16:41:32 | 9 | immediately pursue criminal prosecutions based on |
| 16:41:34 | 10 | violations of the Texas prohibitions predating Roe.  So |
| 16:41:40 | 11 | this was to me a signaling from the Attorney General, |
| 16:41:45 | 12 | inviting prosecutors to, quite frankly, come after me and |
| 16:41:54 | 13 | my colleagues. |
| 16:41:56 | 14 | Q.   I'm going to direct your attention to there's a |
| 16:41:59 | 15 | paragraph that spans the first and second page of Exhibit |
| 16:42:02 | 16 | 3.  So if you scroll down to the bottom of page 1. |
| 16:42:07 | 17 | There's a paragraph that says upon taking effect.  Do you |
| 16:42:10 | 18 | see where I am? |
| 16:42:11 | 19 | A.   Yep. |
| 16:42:14 | 20 | Q.   If you'd flip because I want to talk to you about |
| 16:42:16 | 21 | what's in the middle of that paragraph and it's on the |
| 16:42:18 | 22 | second page.  And we've already had testimony from other |
| 16:42:29 | 23 | folks about some of these statements.  So I'm going to |
| 16:42:33 | 24 | short-circuit this and what I'd like to talk to you about |
| 16:42:35 | 25 | is the last statement of that paragraph where it says, |

16:42:38 1  additionally, state licensing.  Do you see where I am?

16:42:43 2  A.    Yep.

16:42:44 3  Q.    Could you read that for me?

16:42:47 4  A.    Sure.  Additionally, state licensing authorities are

16:42:51 5  required to revoke any applicable licenses or permit of

16:42:56 6  healthcare professional who performs or attempts to

16:42:58 7  perform an abortion in violation of the act.

16:43:03 8  Q.    What is your understanding of that statement or what

16:43:05 9  was your understanding when you read it?

16:43:09 10  A.    That my multiple state licenses were in jeopardy if I

16:43:14 11  continued to provide abortion care out of state without

16:43:17 12  clarification and, frankly, that I could lose my entire

16:43:22 13  career.

16:43:26 14  Q.    How did you feel about that statement when you read

16:43:29 15  it?

16:43:33 16  A.    I don't like to be scared.  I'm an OB/GYN.  I take

16:43:39 17  care of people in the most beautiful moments and I have to

16:43:44 18  be a leader in times of extreme crisis in a medical

16:43:48 19  setting.  But I was extremely scared.  I became very

16:43:53 20  emotional.  I was not born in Texas, but I very much

16:43:59 21  consider myself a Texan.  I'm very proud to live in Texas.

16:44:05 22  I am raising my family here.  My whole family is here, my

16:44:10 23  grandma, all my family members.  And so, I don't think

16:44:15 24  about moving, but this made me very afraid to continue

16:44:19 25  living here.

| | | |
|---|---|---|
| 16:44:28 | 1 | Q.   Are you aware of any statement by General Paxton |
| 16:44:33 | 2 | after the date of the statement in Exhibit 3 where he has |
| 16:44:39 | 3 | offered any clarity about whether your licenses could be |
| 16:44:44 | 4 | at risk for performing abortions in other states? |
| 16:44:50 | 5 | A.   I know that he had a tweet, but I don't know where it |
| 16:44:54 | 6 | came in this -- in the order.  I am not actually sure if |
| 16:45:04 | 7 | -- I don't think that tweet was specifically around |
| 16:45:05 | 8 | licensing, but I do know that he has made other statements |
| 16:45:16 | 9 | around intending to apply these laws or wanting people to |
| 16:45:19 | 10 | prosecute. |
| 16:45:21 | 11 | Q.   Are you aware of any statement where General Paxton |
| 16:45:25 | 12 | has said unequivocally that you are free to travel to |
| 16:45:28 | 13 | another state and provide abortion care where it is legal? |
| 16:45:31 | 14 | A.   No. |
| 16:45:33 | 15 | Q.   Are you aware of any statement where General Paxton |
| 16:45:36 | 16 | has said unequivocally that if you travel to another state |
| 16:45:40 | 17 | and provide abortion care to a pregnant Texan in that |
| 16:45:43 | 18 | state, that you can safely do that without fear of |
| 16:45:47 | 19 | enforcement of the Texas trigger ban? |
| 16:45:48 | 20 | A.   No. |
| 16:45:57 | 21 | Q.   When you were able to provide abortion care, can you |
| 16:46:00 | 22 | talk a little bit about -- without revealing any specific |
| 16:46:05 | 23 | individuality or confidentiality why your patients seek -- |
| 16:46:09 | 24 | were seeking abortion care? |
| 16:46:13 | 25 | A.   Yeah.  I actually don't ask patients as a condition |

16:46:18   1  of their care why they want an abortion.  I trust the

16:46:22   2  people that I care for to make those decisions for

16:46:26   3  themselves, and my role is to offer them skilled,

16:46:32   4  compassionate and nonjudgmental healthcare.  But people do

16:46:35   5  tell me -- and really, there are a million reasons and

16:46:39   6  often they are multifactorial and compounding, so it's not

16:46:43   7  typically just one thing but many things.

16:46:46   8          So what I hear often is really a testament to our

16:46:52   9  state to some extent.  People have lost their jobs because

16:46:56  10  they became pregnant, they don't have health insurance,

16:46:59  11  they were recently evicted.  Maybe they finally got a new

16:47:05  12  job.  People often tell me that they had a traumatic birth

16:47:09  13  experience or nearly died in their last delivery, and so,

16:47:11  14  they are very frightened to be pregnant again.  That they

16:47:14  15  just had another baby but didn't have access to

16:47:17  16  contraception.

16:47:19  17          People tell me quite often that their physicians

16:47:23  18  told them not to get pregnant again because it could be

16:47:26  19  life-threatening for them, but they were not offered

16:47:28  20  contraception or adequate contraception at the time and

16:47:31  21  so, they are worried about dying during this pregnancy.  I

16:47:37  22  talk to, you know, so people that have been kicked out of

16:47:41  23  their homes because they're pregnant.  Their spouse has

16:47:44  24  left them.  They are in abusive relationships.  They are

16:47:49  25  victims of violence.  I have taken care of, you know,

16:47:54  1  young children that are being abused by their parents and

16:47:57  2  that is why they're pregnant.

16:48:00  3          So really, every reason that you could think of,

16:48:03  4  any reason that someone would not want to be pregnant is a

16:48:06  5  reason that someone tells me that they want or are seeking

16:48:09  6  an abortion.

16:48:13  7  Q.   Dr. Moayedi, do you have an understanding of why you

16:48:22  8  can legally provide an abortion in Texas?

16:48:27  9  A.   I mean, yes and no.  I know that the law says in the

16:48:31  10  setting of a medical emergency, but the reality is that

16:48:36  11  that is an extremely vague statement that is endangering

16:48:43  12  pregnant people across our state.

16:48:46  13  Q.   How is it endangering people across the state?

16:48:51  14  A.   So there isn't a medical definition of medical

16:48:56  15  emergency and it is not an objective statement.  It is

16:49:01  16  actually quite subjective, so it depends, really, for the

16:49:05  17  pregnant person what hospital they show up at, what

16:49:09  18  physician they see, who the staff is, and multiple things.

16:49:16  19          So one physician, I could have an interpretation

16:49:19  20  of what a medical emergency is and another physician in

16:49:23  21  another city could have a completely different

16:49:26  22  interpretation, and that's not just my opinion.  I

16:49:30  23  actually work in conducting research across the state.  I

16:49:34  24  have been working on research actually to this very point

16:49:37  25  for the past two or three years, even prior to S.B. 8,

16:49:42    1   documenting the harms of abortion restrictions on people

16:49:45    2   with medical emergencies.

16:49:48    3          This is something that abortion providers in our

16:49:50    4   state know very well that abortion restrictions are

16:49:55    5   nebulous in their exceptions and that there is not a

16:49:58    6   definition of medical emergency.  And so, what we have

16:50:01    7   found through our research and through my personal

16:50:05    8   experience is that a medical emergency is ill-defined and,

16:50:10    9   in fact, people have to be harmed greatly in order for

16:50:14   10   most people to finally agree that it's a medical

16:50:17   11   emergency.

16:50:19   12   Q.   I want to switch topics on you and return to

16:50:22   13   something that's a little dangerous for me because it's

16:50:25   14   science.  Could we talk about a medication abortion care

16:50:28   15   in a little more detail.

16:50:33   16   A.   You want me to talk about medication abortion?

16:50:37   17   Q.   Yes.  And specifically -- I know you told me that

16:50:42   18   there's a range of care that could fall within the general

16:50:47   19   description of medication abortion care.  Do you have an

16:50:52   20   understanding of what the most common form of medication

16:50:56   21   abortion care generally is that people elect?

16:51:01   22   A.   Yeah.  So in the United States, the most common form

16:51:05   23   of medication abortion is a two-drug regimen.  The first

16:51:08   24   drug is called mifepristone.  It is a progesterone

16:51:12   25   antagonist: it blocks the effect of the hormone

16:51:16    1    progesterone.  That pill is taken on day -- on the first

16:51:20    2    day and then, anywhere from immediately to 72 hours later,

16:51:27    3    another set of pills, misoprostol are taken.  Those pills

16:51:32    4    are called PGE2 analogues prostaglandin analogues.  They

16:51:39    5    mimic naturally occurring prostaglandins that cause the

16:51:43    6    uterus to contract and the cervix to open and expel the

16:51:47    7    pregnancy.

16:51:48    8         So there is an FDA label for those two-drug

16:51:52    9    combo.  The FDA label is one pill, the mifepristone first

16:51:57    10   and, then, 24 to 48 hours later, the four pills of

16:52:01    11   misoprostol.  But global research has shown that those

16:52:04    12   pills are actually effective same day or up to 72 hours

16:52:08    13   later.  So again, the routes and timing vary, depending on

16:52:13    14   what state you're in and how the law is written.  But it

16:52:16    15   is a two/drug combo that essentially induces a

16:52:20    16   miscarriage.

16:52:21    17   Q.   Generally speaking, in your historical practice, did

16:52:26    18   your patients have to take all of the second set of the

16:52:30    19   drug regimen in your office?

16:52:34    20   A.   No.  No.  Texas has a law -- or, I mean, it still has

16:52:43    21   the law.  Texas has a law that medication abortion can

16:52:46    22   only be administered per the FDA label, and so, per Texas

16:52:52    23   law, the first pill was taken in the office and the second

16:52:56    24   set of pills were taken 24 no 48 hours later at someone's

16:53:01    25   home.  I generally do not advise patients to take the

16:53:05  1  pills literally at the same time because the second set of

16:53:09  2  pills causes cramping and bleeding, and I want the person

16:53:13  3  to be at home, comfortable, relaxed and in a safe

16:53:17  4  environment if they can be for the second set of pills.

16:53:20  5  Q.   And do you have an understanding of whether Texas law

16:53:26  6  would consider the ingestion of the second set of pills in

16:53:31  7  the boundaries of Texas if you violate the Texas abortion

16:53:35  8  laws?

16:53:39  9  A.   I don't have a sense from the laws that I know in

16:53:43  10  Texas that that would be the case.  No.  And from a

16:53:52  11  medical perspective, the abortion starts with first pills.

16:54:03  12  Q.   Has anyone, are you aware of any statements of folks

16:54:05  13  who express concern that ingesting the second set of pills

16:54:13  14  could violate the abortion laws of Texas?

16:54:16  15  A.   Yeah.  So unfortunately, because of -- honestly, I'm

16:54:22  16  not sure because of which one, the pre-Roe bans or the

16:54:25  17  trigger ban, clinics in states around the country right

16:54:29  18  now are treating Texas patients differently than patients

16:54:34  19  from other states.  And so, there is somewhat of a tiered

16:54:38  20  system happening that if a patient is from a state like

16:54:41  21  Texas, they're being instructed to stay in the state and

16:54:44  22  take the second set of pills there, and if they're not,

16:54:48  23  then they are told that they can go home and take the

16:54:51  24  second set of pills there.

16:54:52  25           So because of the multitude of laws and confusion

16:55:00  1  really around the laws, clinics in different states are

16:55:03  2  interpreting their risk differently and applying it

16:55:07  3  differently to people from Texas.

16:55:10  4  Q.   Are you aware of any statement by the Texas Attorney

16:55:13  5  General that unequivocally clarifies that ingesting the

16:55:17  6  second set of the drugs for a medication abortion within

16:55:21  7  the state of Texas would not be a violation of the Texas

16:55:24  8  abortion laws?

16:55:25  9  A.   I'm not aware of a statement of clarification from

16:55:27  10  the Attorney General.

16:55:46  11  Q.   I want to return back to what your plans were in the

16:55:50  12  period between when S.B. 8 was effective and when Dobbs

16:55:54  13  came down.  Between September 1st, 2021 and June 24th,

16:56:02  14  2022, I think you said that your intention around your

16:56:06  15  practice was to expand your telehealth practice and offer

16:56:11  16  abortion care in the states where you hold a license where

16:56:15  17  telehealth abortion care is legal.

16:56:18  18  A.   Exactly.  So I purchased an electronic medical record

16:56:23  19  to comply with telehealth laws in the states where I'm

16:56:27  20  licensed.  I purchased malpractice insurance to cover

16:56:33  21  telemedicine medication abortion for all the states that

16:56:37  22  I'm licensed in.  And I was working with a legal team that

16:56:43  23  was providing my legal briefings for every single state

16:56:47  24  that I'm licensed in to give me a breakdown of the

16:56:51  25  specific abortion laws, telemedicine abortion laws and

16:56:55  1   miscarriage management laws in each of those states so

16:57:00  2   that I could comply with the law of each state.

16:57:03  3   Q.   And if you had clarity either via an order from this

16:57:07  4   court or from a unequivocal statement from the office of

16:57:12  5   the Attorney General that you could engage in that type of

16:57:16  6   practice of medicine without violating the abortion laws

16:57:19  7   of Texas, would you do that?

16:57:21  8   A.   Yes, I would.

16:57:24  9   Q.   I think you also mentioned -- we talked about this

16:57:27  10  briefly -- that you had intentions to travel to clinics in

16:57:35  11  other states, including in Kansas.  Do you remember that

16:57:37  12  testimony?

16:57:38  13  A.   Yeah.  So I have or had intentions to travel to

16:57:43  14  Kansas to provide abortion care there.  I am currently

16:57:47  15  scheduled, but they know that it is pending clarification.

16:57:53  16  But in addition to that, I was also talking with

16:57:56  17  colleagues in other states that I'm licensed in.  So in

16:57:59  18  Kansas, it's a clinic that is independently owned, a

16:58:03  19  nonprofit where I would come and, you know -- they book

16:58:06  20  the patients and I would come and work for them.  But as

16:58:09  21  part of my private practice, I was also working to develop

16:58:13  22  a system where I could specifically be of service to

16:58:16  23  people in the Dallas/Fort Worth area, see them in Dallas

16:58:21  24  and then, schedule them directly with me but in another

16:58:25  25  state.

16:58:25   1        And so, I had talked to a colleague that is

16:58:27   2   opening a new clinic and they had one or two days where

16:58:33   3   they weren't going to be operating in their clinic.  And

16:58:35   4   so, we were starting discussions about essentially what we

16:58:38   5   call in surgery is block time of my getting block time at

16:58:41   6   her clinic.  So on the days that she wasn't operating that

16:58:44   7   I would come with patients from Dallas and take care of

16:58:47   8   them there.

16:58:47   9   Q.   And just to make sure I'm clear with respect to that

16:58:50   10  part of your plan to practice after S.B. 8 was effective,

16:58:55   11  but before Dobbs came down, the plan was to do the

16:58:59   12  non-abortion care that was necessary to then be able to

16:59:03   13  perform abortion care in a different state and, also,

16:59:07   14  travel with the patients from Texas to the state where it

16:59:11   15  was legal and provide the abortion care there; is that

16:59:13   16  right?

16:59:13   17  A.   Exactly.  Yeah.  So providing -- and ultrasound is

16:59:18   18  not necessary to provide abortion care.  I want to make

16:59:20   19  that clear.  It is not medically necessary.  But certainly

16:59:24   20  if I'm getting with someone on a plane to go to another

16:59:27   21  state, I want to plan for the procedure beforehand so the

16:59:29   22  person knows what to expect.  So it would be an

16:59:32   23  opportunity for people to meet their physician here.

16:59:36   24        One of the, you know, many, many problems with

16:59:43   25  forcing patients to go out of state is that they don't get

16:59:46   1   to be taken care of by their own physician.  And when I

16:59:49   2   was traveling to Oklahoma City, I really can't even

16:59:53   3   express how much it meant for people from Texas to have a

16:59:57   4   Texan taking care of them.  When I would see people from

17:00:00   5   Dallas and be like, oh, yeah where do you live?  Oh, yeah,

17:00:03   6   I live there, too.  Oh, yeah, the -- you know, this is

17:00:06   7   coming up, this is coming up.  Having someone from your

17:00:08   8   community is incredibly meaningful to be able to take care

17:00:12   9   of you.

17:00:12   10          And so, I wanted to create the best that I could

17:00:16   11   that caring and compassionate environment for people that

17:00:19   12   are being forced to travel so that they could meet with me

17:00:22   13   beforehand and that we could travel together and so they

17:00:25   14   would know who would be taking care of them and they would

17:00:28   15   know who was in their community when they came back home.

17:00:30   16   Q.   And you are not currently doing that, right?

17:00:33   17   A.   No.

17:00:34   18   Q.   If you had clarification either from via an order of

17:00:39   19   this court or an unequivocal statement from the office of

17:00:42   20   the Attorney General that you could engage in that

17:00:44   21   behavior without violating the abortion laws of Texas,

17:00:50   22   would you do so?

17:00:51   23   A.   Yes.  I would start doing that.

17:00:54   24   Q.   And then, I want to circle back to the travel to

17:00:57   25   other states without the patients because that's another

17:00:59  1  component of what you mentioned.

17:01:02  2  A.   Yes.

17:01:03  3  Q.   You are not currently traveling to other states to

17:01:06  4  provide abortion care where it's legal; is that right?

17:01:09  5  A.   No, I'm not.

17:01:14  6  Q.   If you could know either from the order of this court

17:01:19  7  or from an unequivocal statement from the Attorney

17:01:24  8  General's Office that you could travel to another state to

17:01:28  9  provide abortion care to a pregnant Texan in that state

17:01:32  10 and return and not violate the abortion laws of Texas,

17:01:36  11 would you do that?

17:01:38  12 A.   I would and I am scheduled to do so and I hope that I

17:01:42  13 will be able to.

17:01:49  14 Q.   I want to shift to a different topic and ask you to

17:01:55  15 describe for the Court other activities that you engage in

17:02:00  16 with respect to reproductive justice that is not the

17:02:03  17 provision of abortion care.

17:02:07  18 A.   Yeah.  So I you know reproductive justice is about

17:02:11  19 the right to have children, the right to not have

17:02:15  20 children, and the right to raise your children in safe and

17:02:18  21 healthy environments.  And so, I care for people through

17:02:22  22 pregnancy.  I, you know, work on labor and delivery and

17:02:27  23 so, I provide medical care for people that are birthing

17:02:31  24 and support birthing people in my community.  I do

17:02:35  25 advocacy to support birthing people, pregnant people and

17:02:39  1  families in my community, so that includes donating to
17:02:43  2  abortion funds.  I think I have and continue to donate to
17:02:48  3  every single fund in this case.  I donate to practical
17:02:53  4  support organizations.  I volunteer my time for
17:02:59  5  organizations like this, too.  I teach, I educate, I spend
17:03:06  6  quite a bit of time, quite literally for free, teaching
17:03:10  7  medical students and residents across the state in
17:03:15  8  non-biased, nonjudgmental healthcare, contraception,
17:03:21  9  abortion care.  And I advocate within the Dallas area for,
17:03:29  10  you know, local policies or initiatives that support and
17:03:34  11  sustain thriving families.
17:03:37  12  Q.  And I'm sorry.  I may have missed saying this.  Do
17:03:40  13  you also serve on a board of directors for a plaintiff in
17:03:43  14  this lawsuit?
17:03:43  15  A.  Yes.  I serve on the board of directors for Texas
17:03:45  16  Equal Access Fund.  And many, many years ago, I served on
17:03:50  17  the board of directors for the Lilith Fund.
17:03:54  18  Q.  Is it okay if I refer to Texas Equal Access Fund as
17:03:58  19  TEA Fund?
17:03:59  20  A.  Yep.
17:03:59  21  Q.  What is TEA Fund's mission?
17:04:03  22  A.  So F Fund's mission is generally to advance
17:04:08  23  reproductive justice in the north Texas area, although we
17:04:13  24  serve people from many more counties than north Texas,
17:04:18  25  specifically, and we primarily do that through abortion

17:04:22  1  funding, although we do have other programming, as well.

17:04:24  2  But our -- really, our bread and butter is funding

17:04:29  3  abortion care for people of north Texas and advocating for

17:04:33  4  abortion rights.

17:04:35  5  Q.   And when you say funding abortion care, practically

17:04:39  6  what does that mean?

17:04:41  7  A.   So prior to S.B. 8, it means that people would call

17:04:44  8  our hotline, they would say I have an appointment at this

17:04:47  9  clinic or that clinic in north Texas or sometimes out of

17:04:51  10  state, very rarely but -- not very but rarely, out of

17:04:56  11  state and then, we send essentially a voucher to the

17:04:59  12  clinic pledging money for that person so that they can

17:05:02  13  have the funds needed to be able to pay for their

17:05:06  14  abortion.

17:05:07  15       After S.B. 8, we were -- we transitioned, you

17:05:12  16  know, to funding a lot of cases out of state, and then,

17:05:17  17  once the Dobbs ruling came down, we stopped funding.

17:05:20  18  Q.   And why did TEA Fund stop funding even abortions

17:05:28  19  outside of the state of Texas?

17:05:31  20  A.   So we were concerned about the legality and we're

17:05:39  21  unclear if we were able to or not.  Our executive director

17:05:42  22  had, in fact, been served already and we were the subject

17:05:48  23  of harassment for continuing to fund prior to the Dobbs

17:05:53  24  ruling.  We are a 501(c)(3) nonprofit, and so, we have to

17:05:59  25  comply with the law so that we can continue to do our work

|  |  |
|---|---|
| 17:06:02 | 1 |

and we needed clarity so that we could continue do have an

organization.

Q.    If TEA Fund received clarity either through an order

of this court or from an unequivocal statement of the

Attorney General's Office, that funding and paying for

abortions that occur outside of the state of Texas would

not subject TEA Fund to potential liability under the

abortion laws of Texas, would TEA Fund resume funding?

A.    I know that I can't speak for our entire

organization, but I know that our board is eager to start

funding abortion care again, and we would have to vote as

an entire board.  But our intention is to fund abortion

care again.

Q.    I know I've asked you this question already once, but

I'm going to ask you again.  Why did you file this

lawsuit?

A.    I filed this lawsuit so I can continue to do my job

in a clear legal fashion.  I'm a physician.  I have to

follow law, not -- I mean, for many reasons, right, I have

to follow the law.  But also I'm licensed in 20 states.

Every single state has different rules on what happens if

you get arrested even if you're not eventually convicted.

So I could lose all of my medical licenses potentially.

Even if I don't lose a medical license, if you're arrested

or convicted of a felony, you can lose your board

17:07:51 1   certification.  You can lose your ability to get

17:07:55 2   malpractice insurance and you can lose your hospital

17:07:58 3   privileges.  So it would completely ruin me as a person

17:08:03 4   who is still heavily in debt to Texas College of

17:08:09 5   Osteopathic Medicine.  So I filed this lawsuit so I could

17:08:12 6   take care of my community and continue to work.

17:08:15 7   Q.   Are you aware that the office of the Attorney General

17:08:18 8   and some of their filings have suggested that the

17:08:21 9   plaintiffs waited too long to file this lawsuit?

17:08:25 10  A.   I did hear that.  Yes.

17:08:27 11  Q.   Why did you file the lawsuit at the time that it was

17:08:31 12  filed?

17:08:34 13  A.   Well, you know, I don't have the kind of money that's

17:08:40 14  needed personally to be able to fund a lawsuit like this

17:08:43 15  one on my own.  And so, I was waiting for how to pay for

17:08:50 16  this lawsuit.  I was working also with the abortion funds

17:08:54 17  on how we would potentially fundraise to pay for this

17:08:58 18  lawsuit.  So it's -- you know, I'm a working physician.

17:09:04 19  This isn't the kind of money that I have.  And also,

17:09:08 20  because of some of the fee shifting from S.B. 8, it's not

17:09:16 21  just like a little bit of money that you have to come up

17:09:18 22  with to be able to file a lawsuit like this.

17:09:22 23          So really, I don't feel like we waited a long

17:09:24 24  time.  I would have loved to have filed this the moment

17:09:28 25  that the Dobbs ruling came down, but it was a financial

| 17:09:32 | 1 | reason that we waited. |
| 17:09:34 | 2 | Q.   I have nothing further, your Honor.  Pass the |
| 17:09:36 | 3 | witness. |
| 17:09:36 | 4 | THE COURT:  Thank you.  And IT has graciously |
| 17:09:40 | 5 | agreed to wait until we're done to cut us off.  So we're |
| 17:09:44 | 6 | good. |
| 17:09:48 | 7 | THE WITNESS:  Thank you. |
| 17:09:49 | 8 | CROSS-EXAMINATION |
| 17:09:49 | 9 | BY MR. OLSON: |
| 17:10:33 | 10 | Q.   Good afternoon, Doctor. |
| 17:10:34 | 11 | A.   Hello. |
| 17:10:36 | 12 | Q.   What are the terms of your engagement agreement with |
| 17:11:15 | 13 | your lawyers? |
| 17:11:15 | 14 | MS. MYERS:  Objection, your Honor.  Relevance. |
| 17:11:16 | 15 | It's also confidential. |
| 17:11:18 | 16 | MR. OLSON:  It goes directly to why they delayed |
| 17:11:20 | 17 | filing the lawsuit, your Honor.  They just asked why it |
| 17:11:22 | 18 | was taking so long to file and they said they needed to |
| 17:11:24 | 19 | gather money to pay lawyers.  So the amount of money that |
| 17:11:26 | 20 | has been gathered to pay the lawyers and the amount of |
| 17:11:29 | 21 | time that it took to gather that money goes directly to |
| 17:11:31 | 22 | that. |
| 17:11:33 | 23 | MS. MYERS:  Your Honor, I believe the terms of |
| 17:11:35 | 24 | engagement with respect to attorney-client relationship is |
| 17:11:41 | 25 | certainly confidential at least.  Again, I don't |

17:11:45  1  understand how it's relevant.  I'm happy to stipulate to

17:11:47  2  the amount of money that the funds have collectively

17:11:51  3  secured in order to be able to not only deal with having

17:11:56  4  to pursue this lawsuit but, more importantly, the

17:12:01  5  potential fee shifting and joint and several liability

17:12:05  6  that's imposed on their lawyers under S.B. 8.

17:12:09  7          THE COURT:  I'm going to sustain the objection,

17:12:11  8  but I'll take that into consideration in determining the

17:12:13  9  weight to give their argument regarding the attorneys'

17:12:18  10  fees.

17:12:18  11          MR. OLSON:  Understood, your Honor.

17:12:24  12  Q.  (BY MR. OLSON) You testified that there is no medical

17:12:50  13  definition of medical emergency, correct?

17:12:52  14  A.  Correct.

17:12:54  15  Q.  Then how did you conduct your research on people with

17:12:58  16  medical emergencies?

17:13:00  17  A.  No.  The research is medically complex pregnancies.

17:13:05  18  Q.  Quoting your own testimony, ma'am.  You said you were

17:13:08  19  working on my research with people with medical

17:13:10  20  emergencies.

17:13:13  21  A.  I must have misspoken.  The research is entitled

17:13:18  22  medically complex pregnancies.

17:13:22  23  Q.  And as a matter of fact, the statute does give a

17:13:25  24  definition of medical emergency, correct?

17:13:28  25  A.  It is a vague definition.

17:13:30   1   Q.   It gives a definition, correct?

17:13:33   2   A.   No.

17:13:35   3   Q.   It does not give a definition.

17:13:38   4   A.   It says medical emergency.

17:13:40   5   Q.   And nowhere in the statute it defines medical

17:13:44   6   emergency?

17:13:48   7   A.   I think there's a little bit more, but it is

17:13:50   8   essentially medical emergency.

17:13:52   9   Q.   And the --

17:13:53   10   A.   The thing about -- I don't think it says -- I don't

17:13:57   11   think it has a timeframe but something about death or loss

17:14:01   12   of an organ.

17:14:03   13   Q.   And as a matter of fact, it furnishes a defense to a

17:14:08   14   physician who acts in good faith, correct?

17:14:12   15   A.   Yes.  A physician who acts in good faith.

17:14:15   16   Q.   Meaning the physician's subjective belief as to

17:14:18   17   whether or not it's a medical emergency.

17:14:19   18          MS. MYERS:  Objection.  Calls for a legal

17:14:21   19   conclusion.

17:14:22   20          THE COURT:  I'll allow to ask the question what

17:14:25   21   her understanding is.

17:14:27   22   Q.   (BY MR. OLSON) Is that your understanding of what

17:14:29   23   good faith is, that you personally believe it's a medical

17:14:31   24   emergency?

17:14:33   25   A.   I don't know what good faith means.

| | | |
|---|---|---|
| 17:14:35 | 1 | Q.   You don't know what good faith means in the context |
| 17:14:38 | 2 | of the statute that sets up good faith as a defense.  Is |
| 17:14:43 | 3 | that my -- |
| 17:14:44 | 4 | A.   I have an understanding of what good faith means in |
| 17:14:47 | 5 | medical school.  I learned what a medical opinion is. |
| 17:14:50 | 6 | Q.   Have you asked your lawyers what the definition of |
| 17:14:52 | 7 | good faith is in the statute? |
| 17:14:54 | 8 | MS. MYERS:  Objection.  Privileged. |
| 17:14:56 | 9 | THE COURT:  Sustained. |
| 17:14:57 | 10 | MR. OLSON:  Your Honor, she has written articles |
| 17:14:59 | 11 | in which she refers to the advice that she has received |
| 17:15:02 | 12 | from her lawyers on interpreting the statute.  One of them |
| 17:15:06 | 13 | is -- oh, shoot, I missed it, writing it down.  Either the |
| 17:15:14 | 14 | Mother Jones article or in an NPR interview that she had. |
| 17:15:18 | 15 | THE COURT:  You can cross-examine her on that, |
| 17:15:20 | 16 | but you can't ask her what the advice was. |
| 17:15:31 | 17 | Q.   (BY MR. OLSON) Let me ask it this way.  Have you ever |
| 17:15:33 | 18 | discussed with anyone the meaning of good faith in the |
| 17:15:36 | 19 | statute? |
| 17:15:37 | 20 | A.   No. |
| 17:15:45 | 21 | Q.   Have you researched yourself the possible meanings of |
| 17:15:49 | 22 | good faith in the statute? |
| 17:15:53 | 23 | A.   No. |
| 17:15:59 | 24 | Q.   Have you looked to determine whether good faith is |
| 17:16:01 | 25 | defined in Texas law as a defense in a criminal |

17:16:06    1   prosecution?

17:16:07    2   A.   No.

17:16:08    3   Q.   The motion for a preliminary injunction states that

17:16:26    4   the language perform, induce, or attempt an abortion is

17:16:33    5   too vague to be understood.  Do you agree with that?

17:16:36    6   A.   Yes.

17:16:37    7   Q.   Why?

17:16:39    8   A.   Because it doesn't give a -- I mean, one of the

17:16:42    9   reasons is that it doesn't give a location.

17:16:45   10   Q.   But the words "perform, induce and attempt"

17:16:48   11   themselves are understandable?

17:16:52   12   A.   "Attempt" is vague.

17:16:59   13   Q.   You don't see "attempt" as modifying "perform" or

17:17:02   14   "induce"?  Do you believe it's a separate third category?

17:17:06   15           MS. MYERS:  Objection, your Honor.  If he's going

17:17:07   16   to ask about specific statutes, could we ask that he show

17:17:10   17   the witness that language?

17:17:12   18           THE COURT:  If you'd like to -- do you have the

17:17:14   19   ability to show it to her?  You can read it to her.

17:17:29   20           MS. MYERS:  I believe he may have actually just

17:17:31   21   admitted these statutes into evidence, as well.

17:17:35   22           MR. WASSDORF:  It's Plaintiffs' Exhibit 14.

17:17:37   23   Q.   (BY MR. OLSON) Ma'am, could you turn to Plaintiffs'

17:17:41   24   Exhibit 14.

17:17:47   25   A.   The trigger ban text?

17:17:49   1   Q.   The text of the Human Life Protection Act, yes.

17:18:03   2   Subsection (2)(a), a person may not knowingly perform,

17:18:08   3   induce, or attempt an abortion.  What's your understanding

17:18:13   4   of that sentence?

17:18:16   5   A.   I mean, it's a pretty vague sentence.  I know what

17:18:20   6   performing an abortion is.  I'm not totally sure what

17:18:25   7   inducing an abortion is, but I'm pretty sure.  I don't

17:18:27   8   know what attempting an abortion is.

17:18:32   9   Q.   As a matter of fact, you're sure enough about what

17:18:35   10   induce an abortion means that you posted on Twitter that

17:18:37   11   you induced more abortions during your time in San

17:18:41   12   Francisco than you did during your entire time in El Paso,

17:18:44   13   correct?

17:18:47   14   A.   I'm not sure if I used the word "induced."

17:19:25   15   Q.   Ma'am, I'm not certain how we can do this because

17:19:28   16   you're not here for me to hand this to you, but do you

17:19:31   17   recall during a Ask About Abortion -- I don't know if

17:19:34   18   you'd call it a chat or a tweet storm at the end of last

17:19:39   19   month.

17:19:41   20   A.   Okay.

17:19:43   21   Q.   Stating that in one month at U.S.C.F., I provided

17:19:46   22   more induced abortion care than I did my entire OB/GYN

17:19:51   23   residency in El Paso?

17:19:52   24   A.   Okay.  That's actually a -- you're misunderstanding

17:19:58   25   that terminology there.

17:19:58  1   Q.   Oh.

17:19:59  2   A.   Induced abortion care is different than inducing in

17:20:03  3   this setting.

17:20:03  4   Q.   How so?

17:20:05  5   A.   An induction is the delivery through medications, so

17:20:11  6   it's an obstetric term.  It's different than this legal

17:20:15  7   term.  An induced abortion is different than a procedural

17:20:19  8   abortion in a medical sense.

17:20:22  9   Q.   So you don't believe that induce an abortion means an

17:20:25  10  induced abortion?

17:20:29  11  A.   That tweet is about induction abortion.  It's not

17:20:32  12  about what this law is saying.  I mean, it's about

17:20:36  13  abortion but it is -- that word is a different use of the

17:20:39  14  word induced.  You're misunderstanding the meaning.

17:20:43  15  Q.   And I'm misunderstanding the meaning?

17:20:46  16          MS. MYERS:  Objection.  Argumentative.

17:20:50  17          MR. OLSON:  That's fair enough, your Honor.

17:20:52  18  A.   The word has multiple meanings.  That's a different

17:20:54  19  meaning of the word "induce."  I induce labor, I induce an

17:20:59  20  abortion, it's actually a process that is different than

17:21:03  21  what this law is about.

17:21:08  22  Q.   (BY MR. OLSON) You believe it's different than what

17:21:11  23  this law is about.

17:21:12  24  A.   I believe it's different than what this law is about.

17:21:15  25  Sure.  I could be wrong.

| | | |
|---|---|---|
| 17:21:31 | 1 | Q. Can you define an ectopic pregnancy? |
| 17:21:35 | 2 | A. Yeah. So a medical definition for an ectopic |
| 17:21:39 | 3 | pregnancy is actually different than the state definition. |
| 17:21:42 | 4 | But an ectopic pregnancy is a pregnancy that grows in an |
| 17:21:45 | 5 | abnormal location. So it can grow in the fallopian tube, |
| 17:21:50 | 6 | in the egg, in a C-section scar, in the cervix, on the |
| 17:21:55 | 7 | liver, in the abdominal cavity, in the cornua of the |
| 17:22:00 | 8 | uterus, in the myometrium. |
| 17:22:02 | 9 | Q. And how is that different than the state's |
| 17:22:04 | 10 | definition? |
| 17:22:04 | 11 | A. Do you have the state's definition there? |
| 17:22:07 | 12 | Q. I have many definitions here, but I'm asking you how |
| 17:22:09 | 13 | it's different so you can explain it to me. |
| 17:22:12 | 14 | A. The state doesn't recognize the multiple places that |
| 17:22:16 | 15 | ectopic pregnancies can grow. |
| 17:22:17 | 16 | Q. And where does the state not recognize that? Which |
| 17:22:20 | 17 | of the statutes is that? |
| 17:22:22 | 18 | A. They have a statute -- I don't know which one it is |
| 17:22:25 | 19 | -- that defines ectopic pregnancy. |
| 17:22:30 | 20 | Q. Is that the Human Life Protection Act? |
| 17:22:32 | 21 | A. No. Prior to that. |
| 17:22:36 | 22 | Q. Is it S.B. 8? |
| 17:22:39 | 23 | A. No. It's in an older code in the Health and Human |
| 17:22:43 | 24 | Services Code. There's a definition. |
| 17:22:50 | 25 | Q. But as a matter of fact, that term does not itself |

| 17:22:53 | 1 | appear in the Human Life Protection Act, correct? |
| 17:22:57 | 2 | A.   I'm not sure.  I don't have it right in front -- is |
| 17:23:00 | 3 | that this trigger ban? |
| 17:23:01 | 4 | Q.   Plaintiffs' Exhibit 14, yes, the Human Life |
| 17:23:05 | 5 | Protection Act.  I understand you want to refer to it as a |
| 17:23:07 | 6 | trigger ban, but that's not actually its title. |
| 17:23:10 | 7 | A.   It doesn't say Human Life Protection Act at the top. |
| 17:23:13 | 8 | But I don't see ectopic pregnancy in this but -- yeah. |
| 17:23:30 | 9 | It's not in this, specifically, no. |
| 17:23:33 | 10 | Q.   In fact, it says that an abortion is legal if the |
| 17:23:39 | 11 | pregnant woman has a life-threatening physical condition |
| 17:23:43 | 12 | aggregated by, caused by, or arising from a pregnancy that |
| 17:23:47 | 13 | places the female at risk of death or poses a serious risk |
| 17:23:50 | 14 | of substantial impairment of a major bodily function, |
| 17:23:54 | 15 | correct? |
| 17:23:54 | 16 | A.   Could you tell me where that is? |
| 17:23:56 | 17 | Q.   Sure.  That is in subsection (2) -- I'm sorry, |
| 17:24:00 | 18 | section (2) and then subsection (b)(2). |
| 17:24:08 | 19 | A.   Yep. |
| 17:24:08 | 20 | Q.   And that would include an ectopic pregnancy, correct? |
| 17:24:12 | 21 | A.   It doesn't say ectopic pregnancy there. |
| 17:24:14 | 22 | Q.   An ectopic pregnancy places a woman at risk of death |
| 17:24:20 | 23 | or poses a serious risk of substantial impairment of one |
| 17:24:22 | 24 | of her major bodily functions unless an abortion is |
| 17:24:25 | 25 | performed? |

| | | |
|---|---|---|
| 17:24:25 | 1 | A.   Yes. |
| 17:24:32 | 2 | Q.   What's a sham physician? |
| 17:24:34 | 3 | A.   A sham physician? |
| 17:24:36 | 4 | Q.   Yeah. |
| 17:24:38 | 5 | A.   Are you referring to something that I said? |
| 17:24:40 | 6 | Q.   In a Mother Jones article you wrote that was |
| 17:24:43 | 7 | published -- I'm sorry.  It's not what you wrote.  It's a |
| 17:24:46 | 8 | Mother Jones article you were interviewed on June 25 of |
| 17:24:50 | 9 | this year, you complained about sham physicians in the -- |
| 17:24:53 | 10 | A.   Could you remind me of the context? |
| 17:24:55 | 11 | Q.   Yes.  You complained that sham physicians in the |
| 17:24:59 | 12 | Texas legislature were writing statutes about abortion. |
| 17:25:03 | 13 | A.   Right.  So people that were making laws about |
| 17:25:05 | 14 | medicine, talking about medicine and essentially |
| 17:25:08 | 15 | practicing medicine without a medical degree. |
| 17:25:11 | 16 | Q.   So they were practicing medicine by passing laws. |
| 17:25:14 | 17 | A.   They were practicing medicine by telling doctors what |
| 17:25:18 | 18 | to do. |
| 17:25:18 | 19 | Q.   So only doctors should be allowed to pass laws |
| 17:25:22 | 20 | regulating medical practice? |
| 17:25:23 | 21 | MS. MYERS:  Objection.  Argumentative and |
| 17:25:25 | 22 | relevance. |
| 17:25:25 | 23 | THE COURT:  I'll allow the question.  Want to |
| 17:25:31 | 24 | re-ask it. |
| 17:25:32 | 25 | Q.   (BY MR. OLSON) Should only doctors because permitted |

17:25:34   1   to pass laws governing medical practice?

17:25:42   2   A.   In Texas, no one can tell a doctor how to practice

17:25:46   3   medicine.

17:25:50   4   Q.   According to what?

17:25:53   5   A.   I don't know what that law is called but there is

17:25:55   6   a --

17:25:55   7   Q.   As a matter of fact, that law you're referring to is

17:25:57   8   about prohibiting the corporate practice of medicine,

17:25:59   9   meaning that an employer cannot tell the physician how to

17:26:02   10  practice medicine, correct?

17:26:04   11  A.   Exactly.

17:26:05   12  Q.   That doesn't mean that the legislature has no power

17:26:08   13  to pass laws governing the practice of medicine in a

17:26:12   14  state.

17:26:14   15  A.   Sure.

17:26:14   16  Q.   So these people were not actually falsely holding

17:26:18   17  themselves out as physicians.  They disagreed with you

17:26:20   18  about the propriety of abortion law and passed a statute

17:26:23   19  to that effect.

17:26:26   20  A.   Well, these legislators actually make laws that

17:26:31   21  define medical terms without any medical experience, so

17:26:34   22  they are acting as sham physicians.

17:26:36   23  Q.   They're not actually holding themselves out as

17:26:38   24  physicians, correct?

17:26:42   25  A.   Some of them are physicians.

17:26:44  1   Q.   Some of them are physicians, are those the ones

17:26:47  2   you're complaining about?

17:26:49  3   A.   Not specifically.

17:26:54  4   Q.   Are you complaining about the one who looks like

17:26:57  5   three children stacked under a coat?

17:27:03  6   A.   I was complaining about all of them.

17:27:07  7   Q.   You were not complaining about the one who looks like

17:27:11  8   three kids stacked under a coat when referring to sham

17:27:14  9   physicians?  Was that a separate complaint that you made

17:27:16  10  when you were interviewed on the Daily Show a couple of

17:27:19  11  months ago?

17:27:20  12  A.   He is included.

17:27:25  13  Q.   And you are scared of letters that organizations have

17:27:35  14  received that are being written by a person who resembles

17:27:39  15  three kids under a coat.

17:27:42  16  A.   Yes.

17:27:47  17  Q.   But you realize that Representative Cain does not

17:27:50  18  actually have any power to prosecute you, correct?

17:27:55  19  A.   Is Representative Cain a lawyer?

17:27:58  20  Q.   Do you realize that he has no power to prosecute you?

17:28:01  21  A.   Is he a lawyer?

17:28:03  22  Q.   Do you understand that only district and county

17:28:06  23  attorneys in Texas have the power the prosecute someone

17:28:08  24  for a criminal offense?

17:28:22  25  A.   I'm -- you know, I'm not sure, actually.

17:28:25  1  Q.   Assume for me that that's correct, you're aware that

17:28:28  2  Representative Cain is not a district or county attorney.

17:28:32  3  A.   Yes.

17:28:33  4  Q.   Are you aware that none of the members of the Texas

17:28:37  5  House Freedom Caucus are district or county attorneys?

17:28:42  6  A.   I heard that today, but I was not aware.

17:28:43  7  Q.   And Attorney General Paxton is not a district or

17:28:46  8  county attorney.

17:28:51  9  A.   No.  He's a lead attorney of the state.

17:28:54  10  Q.   But he has no power to bring the criminal prosecution

17:28:56  11  against you or against Texas Equal Access Fund, correct?

17:29:03  12  A.   He has the power to bring civil suits against me.

17:29:09  13  Q.   I look forward to talking about that with you.  But

17:29:12  14  right now, I would like to know, you understand he doesn't

17:29:14  15  have the power to bring a criminal prosecution against

17:29:16  16  you, correct?

17:29:17  17  A.   Yes.

17:29:26  18  Q.   Do you have any understanding of the

17:29:46  19  extraterritoriality doctrine?

17:29:53  20  A.   Not deeply but through this process, I have learned a

17:29:58  21  little bit.

17:29:58  22  Q.   And what is your understanding of the Texas statutes

17:30:03  23  governing the criminal jurisdiction of Texas courts under

17:30:06  24  the Texas Penal Code?

17:30:08  25  A.   That there have been some cases where Texas has had

| | | |
|---|---|---|
| 17:30:13 | 1 | extraterritorial reach. |
| 17:30:16 | 2 | Q.   But you, yourself, have not worked through how those |
| 17:30:21 | 3 | -- how the extraterritoriality presumption and how the |
| 17:30:27 | 4 | penal code would cause the Human Life Protection Act |
| 17:30:35 | 5 | defense to work in your case, correct? |
| 17:30:37 | 6 | A.   I'm not a lawyer. |
| 17:30:48 | 7 | Q.   And you, yourself, have continued to donate money to |
| 17:30:51 | 8 | abortion funds, correct? |
| 17:30:53 | 9 | A.   Yes. |
| 17:30:55 | 10 | Q.   As a matter of fact, you posted on Twitter not too |
| 17:30:58 | 11 | long ago that you had from Texas donated money to a fund |
| 17:31:04 | 12 | that was designed to bring young woman to the United |
| 17:31:08 | 13 | States for an abortion, correct? |
| 17:31:11 | 14 | A.   I didn't hear that part.  Say that again. |
| 17:31:13 | 15 | Q.   You donated money to a fund that was going to bring a |
| 17:31:19 | 16 | young woman from Iran to the United States for an |
| 17:31:21 | 17 | abortion, correct? |
| 17:31:22 | 18 | A.   I did not end up donating.  They didn't need anymore |
| 17:31:26 | 19 | money. |
| 17:31:26 | 20 | Q.   But it was your intention to donate? |
| 17:31:29 | 21 | A.   Yes. |
| 17:31:29 | 22 | Q.   And you would have donated had they not -- I suppose |
| 17:31:34 | 23 | not a cap.  I'm sure they would have taken more.  But had |
| 17:31:38 | 24 | they not hit a level they were aiming for, you would have |
| 17:31:41 | 25 | donated? |

17:31:41 1   A.   Yes.

17:31:43 2   Q.   From a bank account situated in Texas?

17:31:48 3   A.   That's where my bank accounts are.

17:32:14 4   Q.   I'm sorry.  I can't read my own handwriting here.

17:32:19 5   Was your plan during the interim between S.B. 8 and the

17:32:25 6   Dobbs decision to take patients from DFW to Kansas or to

17:32:29 7   Oklahoma?

17:32:30 8   A.   I wasn't planning on taking patients to Kansas or

17:32:34 9   Oklahoma.

17:32:34 10   Q.   Oh, I'm sorry.  What was the plan?

17:32:37 11   A.   I was traveling in the interim to Oklahoma and

17:32:42 12   providing abortion care to Oklahoma City.

17:32:44 13   Q.   I thought I understood from your testimony that your

17:32:49 14   plan for the practice you were setting up was that you

17:32:53 15   were going to do telemedicine and that you were going to

17:32:57 16   share space with another doctor who had surgical blocks

17:33:02 17   that she was going to use, and then, you would use the

17:33:05 18   open blocks to bring up patients with you from the DFW

17:33:11 19   area to either Oklahoma or Kansas.

17:33:15 20   A.   Not to Oklahoma or Kansas, to different states but

17:33:18 21   not those two states.

17:33:19 22   Q.   Just to different -- just different states in general

17:33:22 23   where this other doctor had surgical blocks.

17:33:25 24   A.   Exactly.

17:33:26 25   Q.   Okay.  Do you remember what states those were?

| | | |
|---|---|---|
| 17:33:32 | 1 | A.   Yeah.  I was hoping to travel to Maryland and |
| 17:33:36 | 2 | potentially to Nevada. |
| 17:34:03 | 3 | Q.   About how many abortions would you say you've |
| 17:34:06 | 4 | performed during your time since you began practicing in |
| 17:34:09 | 5 | Texas? |
| 17:34:16 | 6 | A.   Probably somewhere between 5,000 to 10,000. |
| 17:34:27 | 7 | Q.   And to be clear, that's abortions you've performed |
| 17:34:32 | 8 | anywhere during the time that you, yourself, have been |
| 17:34:36 | 9 | sort of headquartered in Texas. |
| 17:34:39 | 10 | A.   Some of that might have been while I was in Hawaii, |
| 17:34:42 | 11 | as well.  But yeah, it's most of that was while I was |
| 17:34:48 | 12 | headquartered in Texas. |
| 17:35:05 | 13 | Q.   How many abortions have you performed since the S.B. |
| 17:35:11 | 14 | 8 statute came into effect? |
| 17:35:15 | 15 | A.   I'm not sure. |
| 17:35:19 | 16 | Q.   More than a thousand?  Less than a thousand? |
| 17:35:29 | 17 | A.   Maybe somewhere around there.  I'm not sure. |
| 17:35:34 | 18 | Q.   And how many since the Dobbs decision came down? |
| 17:35:37 | 19 | A.   None. |
| 17:35:46 | 20 | Q.   But during the time since the Dobbs decision came |
| 17:35:49 | 21 | down, you have continued to advocate for -- |
| 17:35:55 | 22 | A.   Yes. |
| 17:35:55 | 23 | Q.   -- abortion funds. |
| 17:35:56 | 24 | A.   Yes.  I advocate for my community. |
| 17:36:00 | 25 | Q.   Now, what do you mean when you say your community? |

| 17:36:06 | 1 | A. I mean my community in the sense of people in the DFW |
| 17:36:13 | 2 | area, I mean in the sense of my neighbors, I mean in the |
| 17:36:17 | 3 | sense of women, I mean in the sense of women of color, I |
| 17:36:21 | 4 | mean in the sense of immigrants. I'm a member of multiple |
| 17:36:25 | 5 | communities and I advocate for them. |
| 17:36:26 | 6 | Q. And one of the ways you advocate for them is by |
| 17:36:29 | 7 | advocating for abortion? |
| 17:36:32 | 8 | A. Advocating for abortion? |
| 17:36:34 | 9 | Q. Yes. |
| 17:36:34 | 10 | A. Yes. |
| 17:36:35 | 11 | Q. And advocating for abortion funds? |
| 17:36:39 | 12 | A. Yes. |
| 17:36:39 | 13 | Q. And how have you curtailed that advocacy since the |
| 17:36:45 | 14 | Dobbs decision came down? |
| 17:36:49 | 15 | A. I don't understand your question. |
| 17:36:50 | 16 | Q. Have you curtailed your advocacy since the Dobbs |
| 17:36:54 | 17 | decision came down? Are there things you have stopped |
| 17:37:00 | 18 | advocating since Dobbs came down? |
| 17:37:02 | 19 | A. I'm not providing abortion care. |
| 17:37:19 | 20 | Q. I'm talking about -- let me clarify. I'm not talking |
| 17:37:24 | 21 | about actions you have done that -- I'm talking about |
| 17:37:31 | 22 | advocacy, raising awareness, sending out mailers -- |
| 17:37:36 | 23 | A. I have continued to do that. |
| 17:37:38 | 24 | Q. You have continued to do that? |
| 17:37:39 | 25 | A. Yes. |

| | | |
|---|---|---|
| 17:37:39 | 1 | Q.   And that has not slackened since the Dobbs decision? |
| 17:37:45 | 2 | A.   I mean, I did take some time off to study for an |
| 17:37:48 | 3 | exam, but no, not because of the Dobbs decision. |
| 17:37:52 | 4 | Q.   Okay.  That was going to be my followup, so thank you |
| 17:37:57 | 5 | for preempting me on that. |
| 17:38:13 | 6 |        Do you recall a -- I don't know if you call it |
| 17:38:16 | 7 | post or an article that you wrote for the website Clue on |
| 17:38:19 | 8 | July 20th? |
| 17:38:21 | 9 | A.   Yes.  Which one?  But yes. |
| 17:38:25 | 10 | Q.   This was the one that was titled What to Do If You |
| 17:38:27 | 11 | Need an Abortion. |
| 17:38:28 | 12 | A.   Yes. |
| 17:38:29 | 13 | Q.   And in that post, you included links to abortion |
| 17:38:38 | 14 | funds.  I don't believe you actually included the one to |
| 17:38:42 | 15 | TEA Fund, but it was to funds like that, correct? |
| 17:38:45 | 16 | A.   I believe it was to the National Network of Abortion |
| 17:38:48 | 17 | Funds website. |
| 17:38:48 | 18 | Q.   And you also included information about how people |
| 17:38:53 | 19 | who saw the post could get in contact with abortionists, |
| 17:38:58 | 20 | correct? |
| 17:38:59 | 21 | A.   I'm sorry? |
| 17:39:01 | 22 | Q.   Links to where people could find a list of physicians |
| 17:39:05 | 23 | who would perform abortions, correct? |
| 17:39:07 | 24 | A.   Yes.  I believe so. |
| 17:39:09 | 25 | Q.   And July 20th, that was after the Dobbs decision came |

17:39:15  1  down, correct?

17:39:16  2  A.   I actually don't know when I wrote that article.  The

17:39:20  3  way that it works is that I will write an article.  That

17:39:25  4  was part of a -- actually, a long form.  I'm a science

17:39:28  5  writer for that app, so it was a long-form article, and

17:39:33  6  then, I write it and then they have a peer-review process.

17:39:37  7  And so, I don't know exactly when I wrote it, if it was

17:39:41  8  before or after Dobbs.  But then, it takes a while for

17:39:44  9  them to end up publishing it and they broke it up into two

17:39:48  10  different articles.

17:39:49  11  Q.   But nevertheless, you haven't contacted them to ask

17:39:52  12  them to take that article down, have you?

17:39:55  13  A.   No.

17:40:03  14  Q.   And the TEA Fund has continued fundraising even after

17:40:09  15  the Dobbs decision came down and the Attorney General's

17:40:14  16  advisories, Plaintiffs' Exhibit 3 and Plaintiffs' Exhibit

17:40:18  17  27 came out, correct?

17:40:20  18  A.   Yes.

17:40:23  19  Q.   And a couple of examples of that are, for instance,

17:40:29  20  Defendants' Exhibit 3.  That's a Twitter post where TEA

17:40:39  21  Fund is asking for donations to help build a future where

17:40:45  22  Texans can access the abortion care they need, correct?

17:40:49  23  A.   Yeah.  This one is specifically around our path

17:40:54  24  support program.

17:40:55  25  Q.   But you have several of those kinds of posts,

17:41:00  1  correct?

17:41:02  2  A.   This isn't my post.

17:41:04  3  Q.   This is TEA Fund's -- sorry, you, the TEA Fund have

17:41:10  4  several of these kinds of posts, correct?

17:41:13  5  A.   TEA Fund has several of these posts and I'm a board

17:41:16  6  member with TEA Fund, but I don't run the social media for

17:41:20  7  TEA Fund.

17:41:21  8  Q.   But you are aware the TEA Fund is still raising money

17:41:25  9  for these purposes?

17:41:25  10  A.   We are still raising money.

17:41:28  11  Q.   And in fact, that same day that Plaintiffs' Exhibit 3

17:41:34  12  got posted, on September 22, earlier that morning, TEA

17:41:41  13  Fund had posted that generous donors have offered to match

17:41:45  14  donations all day today.  Every donation to our NTX giving

17:41:50  15  day 2022 campaign will be doubled, correct?

17:41:56  16  A.   I don't remember seeing that tweet but -- other than

17:41:59  17  in these exhibits, but yes, we were fundraising through

17:42:02  18  north Texas giving day.  That's one of our annual

17:42:05  19  fundraisers.

17:42:06  20  Q.   And were all of the donations you received that date

17:42:10  21  doubled?

17:42:11  22  A.   I am not sure.

17:42:20  23  Q.   Had somebody contacted TEA Fund before that and

17:42:24  24  stated that whoever the person or entity was, it would

17:42:28  25  double all the donations it received that day?

17:42:32   1   A.   I'm a board member.  I'm not involved in those sorts

17:42:36   2   of operations.

17:42:40   3   Q.   So that sort of thing would not have been discussed

17:42:43   4   at the board level for TEA Fund?

17:42:44   5   A.   No.

17:42:49   6   Q.   But TEA Fund also continues to post job openings,

17:42:56   7   correct?

17:42:59   8   A.   Yes.  We have employees.

17:43:01   9   Q.   But it continues to post job openings looking to hire

17:43:04  10   more people, correct?

17:43:06  11   A.   Yes.  We have a couple job openings.

17:43:09  12   Q.   And one of those, for instance, if you look at

17:43:13  13   Defendants' Exhibit 8 is for a communications and

17:43:18  14   development associate, correct?

17:43:23  15   A.   Yes.

17:43:24  16   Q.   And that position is going to be responsible for

17:43:30  17   copyrighting -- I'm going to summarize it very briefly as

17:43:35  18   essentially handling media and publicity hits and

17:43:40  19   fundraising particularly from institutional donors.

17:43:49  20   A.   So they have communications responsibilities and

17:43:52  21   development responsibilities.

17:43:55  22   Q.   Would you agree with my general summary of what

17:43:59  23   they're doing?

17:44:02  24   A.   Sure.

17:44:05  25   Q.   If you could turn for me to Defendants' Exhibit 11.

| | | |
|---|---|---|
| 17:44:21 | 1 | What kind of information goes out on the TEA Fund e-mail |
| 17:44:27 | 2 | list? |
| 17:44:33 | 3 | A.   We get like events that are happening, media clips |
| 17:44:37 | 4 | from board members and staff, affiliate and partner |
| 17:44:43 | 5 | organization, updates, stuff like that. |
| 17:44:49 | 6 | Q.   Is that advocacy events that you're inviting people |
| 17:44:55 | 7 | to participate in? |
| 17:44:56 | 8 | A.   Yeah.  If we have an event, we invite people to come. |
| 17:45:00 | 9 | Or if our partners are having an event, we invite them to |
| 17:45:03 | 10 | participate. |
| 17:45:04 | 11 | Q.   And what would some examples of your partners be? |
| 17:45:09 | 12 | A.   Reproductive justice-type work.  So it could be other |
| 17:45:14 | 13 | abortion funds.  It could be, I believe, like doula |
| 17:45:20 | 14 | training.  So that's -- pride events. |
| 17:45:30 | 15 | Q.   And TEA Fund is inviting people to receive this |
| 17:45:32 | 16 | information from TEA Fund so they can participate |
| 17:45:38 | 17 | themselves, correct? |
| 17:45:42 | 18 | A.   They're inviting people to join our e-mail list to |
| 17:45:44 | 19 | hear news from us. |
| 17:45:46 | 20 | Q.   Part of the news you're giving out is information |
| 17:45:49 | 21 | about how they can also advocate? |
| 17:45:52 | 22 | A.   Yeah. |
| 17:45:57 | 23 | Q.   Could you turn for me to Defendants' Exhibit 13. |
| 17:46:11 | 24 | A.   Okay. |
| 17:46:12 | 25 | Q.   Do you typically hire at TEA Fund program associates |

| | | |
|---|---|---|
| 17:46:18 | 1 | who love talking to people about abortion? |
| 17:46:23 | 2 | A.   Who love talking to people about abortion? |
| 17:46:25 | 3 | Q.   Sure.  Hat is -- |
| 17:46:26 | 4 | A.   The organization loves talking to people about |
| 17:46:30 | 5 | abortion. |
| 17:46:30 | 6 | Q.   And it loves talking to people about the benefits of |
| 17:46:35 | 7 | abortion, correct? |
| 17:46:37 | 8 | A.   We love talking to people about abortion. |
| 17:46:42 | 9 | Q.   Including ways to obtain abortions? |
| 17:46:45 | 10 | A.   Including what? |
| 17:46:46 | 11 | Q.   Ways to obtain abortions? |
| 17:46:54 | 12 | A.   I'm not really sure how to answer that. |
| 17:46:57 | 13 | Q.   Including places a person could go to get an |
| 17:47:00 | 14 | abortion. |
| 17:47:02 | 15 | A.   Well, right now, we are not necessarily, I believe, |
| 17:47:07 | 16 | referring people directly to places to get an abortion, |
| 17:47:11 | 17 | but prior to Dobbs decision, we would help people figure |
| 17:47:17 | 18 | out where to get an abortion. |
| 17:47:29 | 19 | Q.   If you could turn for me to Defendants' Exhibit 19. |
| 17:47:34 | 20 | What's an ABOBO chat? |
| 17:47:37 | 21 | A.   ABOBO means abortion. |
| 17:47:43 | 22 | Q.   Okay.  What's an ABOBO chat? |
| 17:47:46 | 23 | A.   It's talking about abortion.  So it looks -- |
| 17:47:55 | 24 | Q.   Is there a series of things that TEA Fund does?  Is |
| 17:47:58 | 25 | there a series of programs?  Is this a web page on the |

17:48:04  1   website?  What is it?

17:48:06  2   A.   This looks like an IG Live.  It says we're discussing

17:48:12  3   Reddit posts about abortion.  So Reddit is a website where

17:48:16  4   people post their own stories and IG Live is when you go

17:48:20  5   live on Instagram.  And so, this is an ABOBO chat where we

17:48:25  6   talk about people who post about abortion stuff on Reddit,

17:48:30  7   but we talk about it on Instagram Live.

17:48:33  8   Q.   Who typically participates in that for TEA Fund?

17:48:37  9   A.   Staff, board members, whoever's available.  Usually a

17:48:45  10  few people.  It's lighthearted and an opportunity to

17:48:49  11  engage our community in a discussion on abortion.

17:48:52  12  Q.   And in doing that, it certainly looks from this post

17:48:58  13  like at least part of what happens is at least an informal

17:49:03  14  counseling and moral support, correct?

17:49:05  15  A.   No.  We're not counseling anyone.

17:49:08  16  Q.   That's why I said it's an informal counseling.  Maybe

17:49:11  17  commiserate would be a better term?

17:49:19  18  A.   It's talking about abortion.

17:49:22  19  Q.   It's talking in this instance in particular, I had an

17:49:25  20  abortion and now I'm worried about my fiance because he's

17:49:29  21  been acting differently, correct?

17:49:30  22  A.   Right.  That's someone's Reddit post.

17:49:32  23  Q.   What types of responses would you expect to come from

17:49:35  24  TEA Fund in an ABOBO chat that concerned a topic like

17:49:40  25  that?

17:49:40   1   A.   So the way that Reddit works is like someone will

17:49:44   2   post something that might or might not be controversial

17:49:50   3   and then, in Reddit, people will give opinions.  And so,

17:49:53   4   this would be kind of the same thing that different --

17:49:58   5   whoever's on the IG Live would kind of give their opinion

17:50:01   6   on what they think.  So not necessarily TEA Fund's

17:50:04   7   opinion, but what does each person think about this Reddit

17:50:12   8   post.

17:50:12   9   Q.   Is this the sort of thing where the Redditers who

17:50:15   10   posted would be invited to?

17:50:17   11   A.   No.

17:50:18   12   Q.   It would not be.

17:50:20   13   A.   No.  The Reddit post might have happened months

17:50:26   14   before.

17:50:30   15   Q.   But the discussion would be among people who wanted

17:50:31   16   to talk about this poster who had had an abortion and is

17:50:36   17   now worried about her fiance acting differently.

17:50:42   18   A.   Right.  So the people in the IG Live would

17:50:45   19   essentially give their opinions about whatever the OP,

17:50:50   20   original poster, put kind of in a similar way that people

17:50:55   21   in Reddit would give their opinions to.

17:50:57   22   Q.   And that would involve sharing their opinions on it?

17:51:03   23   A.   Right.  Each person would say what they think.

17:51:06   24   Q.   And in something like that, would someone typically

17:51:08   25   share their personal experience?

| | | |
|---|---|---|
| 17:51:12 | 1 | A.   They might share their personal experience. |
| 17:51:25 | 2 | Q.   I don't want to spend too much time on these, but I |
| 17:51:46 | 3 | would like to go through them very quickly so you can |
| 17:51:51 | 4 | confirm a couple of things for us.  Could you turn to |
| 17:51:54 | 5 | Defendants' Exhibit 38, please? |
| 17:52:05 | 6 | A.   Is this the friends with benefits post? |
| 17:52:07 | 7 | Q.   That is correct. |
| 17:52:08 | 8 | A.   Okay. |
| 17:52:09 | 9 | Q.   Is this a -- this was a fundraiser for TEA Fund and a |
| 17:52:15 | 10 | couple of other funds, correct? |
| 17:52:19 | 11 | A.   Yes. |
| 17:52:19 | 12 | Q.   Did this go -- did this go forward on September 4th? |
| 17:52:24 | 13 | A.   I'm not sure.  I think it did.  I didn't go to it. |
| 17:52:32 | 14 | Q.   At the TEA Fund board meetings, would the |
| 17:52:35 | 15 | cancellation of a fundraiser typically have been something |
| 17:52:37 | 16 | that staff would bring up so that the board would be aware |
| 17:52:42 | 17 | of it? |
| 17:52:42 | 18 | A.   Would cancellation of what? |
| 17:52:44 | 19 | Q.   A cancellation of a fundraiser, is that something |
| 17:52:48 | 20 | that staff typically would bring up at a board meeting so |
| 17:52:50 | 21 | the board would be aware of it? |
| 17:52:51 | 22 | A.   They might, yeah.  The staff doesn't attend the board |
| 17:52:54 | 23 | meeting other than our executive director, but they submit |
| 17:52:57 | 24 | reports.  So it might be something in a staff report. |
| 17:53:01 | 25 | Q.   Is that the sort of thing that the executive director |

17:53:04  1  would report on to the board is which fundraiser had gone

17:53:08  2  on and how successful they were?

17:53:10  3  A.   Probably not in detail.  We trust our executive

17:53:14  4  director to do her job.  But this was September 4th and

17:53:18  5  it's September 27th right now.

17:53:20  6  Q.   That leads me to my next question.  Have y'all had a

17:53:24  7  board meeting since this fundraiser would have occurred?

17:53:27  8  A.   No.

17:53:28  9  Q.   Fair enough.  And then, Defendants' 16 and 17, those

17:53:37  10 are just two different Instagram posts advertising the

17:53:41  11 same benefit, correct?

17:53:45  12 A.   Looks like it.

17:53:51  13 Q.   Then in Exhibit 18, is this an advertisement for a

17:54:00  14 different fundraiser?

17:54:17  15 A.   Yeah.  I'm actually not sure what this is.  It looks

17:54:20  16 like it's a show or an event held by someone else for us.

17:54:28  17 Q.   And part of what was at that event was a free

17:54:31  18 community workshop on do-it-yourself menstrual tracking

17:54:35  19 and abortion care, correct?

17:54:38  20 A.   That's what it says.

17:54:42  21 Q.   Does staff at the TEA Fund typically look at these

17:54:45  22 sorts of third-party promotions before they go out to make

17:54:49  23 sure they're accurate?

17:54:52  24 A.   I'm not sure.

17:54:53  25 Q.   Is that the sort of thing that this North Texas

17:54:59 1  Direct Action Alliance would have recruited from TEA Fund

17:55:05 2  or confirmed with TEA Fund before advertising it?

17:55:11 3  A.  Yes.  You know, I'm not sure about the details of

17:55:15 4  this event, but it looks like we promoted it.

17:55:33 5          THE COURT:  Counsel, it's getting late in the

17:55:35 6  day.  If you could pick up the pace a little bit.

17:55:38 7          MR. OLSON:  It is, your Honor.  I'm trying to

17:55:40 8  page through these to make sure if I didn't miss any more

17:55:44 9  of them.

17:55:45 10         THE COURT:  It's okay if you did.  Sorry.

17:55:54 11         MR. OLSON:  I think the only thing I could say to

17:55:59 12 that is touche, your Honor.

17:56:02 13 Q.  (BY MR. OLSON) Ma'am, have you had any communications

17:56:04 14 with the office of the Attorney General besides testifying

17:56:11 15 in lawsuits where the Attorney General has been a party or

17:56:14 16 represented the state?

17:56:16 17 A.  No.  I don't have communication with the Attorney

17:56:19 18 General.

17:56:19 19 Q.  Have you received any notices or letters from the

17:56:23 20 office of the Attorney General?

17:56:25 21 A.  No.

17:56:26 22 Q.  You haven't received any civil investigative demands

17:56:29 23 from the office of the Attorney General?

17:56:34 24 A.  Not that I'm aware of.  No.

17:56:44 25 Q.  In your direct testimony, you went over a lot of

17:56:47  1  different statements you had reviewed, advisories and the

17:56:50  2  like, from Attorney General Paxton that you stated put you

17:56:56  3  in fear that you might be prosecuted, lose your license

17:57:02  4  and board certifications.  In any of those statements, did

17:57:06  5  he indicate that he was going to -- I don't want to say

17:57:14  6  prosecute because that's a criminal term.  Did he indicate

17:57:17  7  that he was going to pursue civil penalties against people

17:57:21  8  for crossing states lines to perform abortions?

17:57:28  9  A.   No.  He didn't actually directly say that.  He was

17:57:32  10  vague in what he said.

17:57:33  11  Q.   In fact, he didn't even indirectly say it, did he?

17:57:36  12  A.   He didn't even what?

17:57:37  13  Q.   He didn't say it even indirectly, did he?

17:57:42  14  A.   I believe he said that he was going to look into

17:57:44  15  doing whatever he could.  Seems like indirectly.

17:57:52  16  Q.   Well, he says he's looking into it, correct?

17:57:57  17  A.   I don't think that was all he said.

17:58:00  18  Q.   The gist of it was that he was looking into it and

17:58:03  19  that no decisions had been made, correct?

17:58:06  20       MS. MYERS:  Objection.  She can't testify to --

17:58:06  21  A.   He said that he would bring civil charges --

17:58:10  22       MS. MYERS:  -- the Attorney General's mental

17:58:11  23  state.

17:58:11  24       THE COURT:  She can testify about what he said,

17:58:14  25  what she heard.  It's in evidence.  We know what he said.

| | | |
|---|---|---|
| 17:58:21 | 1 | MR. OLSON: All right. Fair enough, your Honor. |
| 17:58:26 | 2 | Q. (BY MR. OLSON) Is Attorney General Paxton a white |
| 17:58:31 | 3 | supremacist? |
| 17:58:31 | 4 | A. Is he a licensed pharmacist? You said is the |
| 17:58:38 | 5 | Attorney General -- |
| 17:58:39 | 6 | Q. Another good question and we are willing to |
| 17:58:41 | 7 | stipulate, your Honor, that he's not. No. Is he a white |
| 17:58:44 | 8 | supremacist? |
| 17:58:46 | 9 | A. Oh, a white supremacist. |
| 17:58:48 | 10 | Q. Yes. |
| 17:58:49 | 11 | A. He certainly aligns with neo Nazi groups. |
| 17:58:53 | 12 | Q. Such as? |
| 17:58:58 | 13 | A. Many. I don't have their specific names. |
| 17:59:01 | 14 | Q. But you believe he is a political adjunct to a |
| 17:59:06 | 15 | violent hate group, correct? |
| 17:59:08 | 16 | A. Yes. |
| 17:59:12 | 17 | Q. And as a matter of fact, you put that in writing. |
| 17:59:17 | 18 | A. I'm sure I did. |
| 17:59:21 | 19 | Q. I shouldn't say you put it in writing. The reporter |
| 17:59:25 | 20 | for Jezebel put it in writing after you said it to her, |
| 17:59:29 | 21 | correct, in Defendants' Exhibit 47? |
| 17:59:32 | 22 | A. Yes. Antiabortion extremists are aligned with white |
| 17:59:38 | 23 | supremacists and neo Nazi groups. |
| 17:59:42 | 24 | Q. Of the five to 10,000 abortions you performed, how |
| 17:59:52 | 25 | many of those were on people you clarify as women of |

| | |
|---|---|
| 17:59:56 | 1 |  color?
| 17:59:56 | 2 |  A.   How many of them are what?
| 17:59:58 | 3 |  Q.   How many of those abortions you performed, either
| 18:00:02 | 4 |  percentage-wise or raw numbers, were on people you would
| 18:00:05 | 5 |  characterize as women of color?
| 18:00:07 | 6 |  A.   I don't know what percentage, but maybe half, if not
| 18:00:26 | 7 |  a little bit more.
| 18:00:29 | 8 |  Q.   So somewhere around 2,500 to 5,000 children of color
| 18:00:38 | 9 |  were not born as a result of your work, correct?
| 18:00:41 | 10 |  MS. MYERS:   Objection.
| 18:00:44 | 11 |  A.   I reject the premise of your question.
| 18:00:47 | 12 |  Q.   (BY MR. OLSON) Presuming that each of those
| 18:00:49 | 13 |  pregnancies had gone successfully to term, 2,500 to 5,000
| 18:00:53 | 14 |  children of color were not born because of your work,
| 18:00:56 | 15 |  correct?
| 18:00:58 | 16 |  MS. MYERS:   Objection.  It calls for
| 18:01:00 | 17 |  speculation --
| 18:01:00 | 18 |  A.   Your question stipulates that women of color can't
| 18:01:02 | 19 |  make decisions for themselves and it is highly offensive.
| 18:01:06 | 20 |  MS. MYERS:   Dr. Moayedi, hang on a second.  I've
| 18:01:09 | 21 |  lodged an objection.
| 18:01:12 | 22 |  THE COURT:   I think at this point, it's
| 18:01:15 | 23 |  relevance.  Well, I'll sustain the objection.
| 18:01:17 | 24 |  MR. OLSON:   Fair enough, your Honor.  Nothing
| 18:01:25 | 25 |  further, your Honor.

| | | |
|---|---|---|
| 18:01:26 | 1 | THE COURT:  Thank you.  Anything further? |
| 18:01:28 | 2 | MS. MYERS:  Very briefly.  I promise, your Honor. |
| 18:01:31 | 3 | RE-DIRECT EXAMINATION |
| 18:01:50 | 4 | BY MS. MYERS: |
| 18:01:50 | 5 | Q.   Dr. Moayedi, this has not been offered into evidence |
| 18:01:54 | 6 | yet, so I'm going to try to describe to you what I would |
| 18:01:58 | 7 | like to offer and play.  But are you aware of an interview |
| 18:02:03 | 8 | that Attorney General Paxton did on Lou Dobbs podcast on |
| 18:02:09 | 9 | June 29th, 2022? |
| 18:02:12 | 10 | A.   I had not heard it before, but I heard it today.  I |
| 18:02:17 | 11 | think that was what was being played, correct? |
| 18:02:19 | 12 | Q.   No.  This is actually a different -- I believe the |
| 18:02:22 | 13 | other interview was Exhibit 63, which has been admitted. |
| 18:02:28 | 14 | A.   Okay. |
| 18:02:29 | 15 | Q.   And I'm not really quite sure how to do this, your |
| 18:02:32 | 16 | Honor, to determine if Dr. Moayedi can authentic what this |
| 18:02:35 | 17 | is.  Do you have any objection to moving into evidence a |
| 18:02:43 | 18 | statement made by Attorney General Paxton on the Lou Dobbs |
| 18:02:48 | 19 | podcast? |
| 18:02:49 | 20 | MR. OLSON:  Your Honor, our objection would be |
| 18:02:51 | 21 | that it's duplicative and that it was introduced to us |
| 18:02:54 | 22 | after the deadline to identify the exhibit list but as -- |
| 18:02:57 | 23 | we'll stipulate as to its authenticity.  I just believe at |
| 18:03:01 | 24 | this point, it's -- as your Honor has said, it's |
| 18:03:04 | 25 | duplicative.  The facts are sufficient in the evidence. |

| | | |
|---|---|---|
| 18:03:08 | 1 | MS. MYERS: Your Honor, I think if we could admit |
| 18:03:09 | 2 | the video itself, I don't need to question the -- |
| 18:03:11 | 3 | THE COURT: That's fine. |
| 18:03:12 | 4 | MS. MYERS: -- the witness about it. |
| 18:03:13 | 5 | THE COURT: That's fine. Admitted. |
| 18:03:16 | 6 | MS. MYERS: Okay. Nothing further. |
| 18:03:16 | 7 | THE COURT: Anything further? |
| 18:03:18 | 8 | MR. OLSON: Nothing further. |
| 18:03:19 | 9 | THE COURT: All right. Well, thank you. It's |
| 18:03:20 | 10 | late in the day and I'm going to propose a way forward |
| 18:03:24 | 11 | that won't take us much longer into today. But first, Mr. |
| 18:03:29 | 12 | Hilton, you promised me that you'd answer some questions |
| 18:03:33 | 13 | as you, quote, always do. So would you be the one to |
| 18:03:35 | 14 | answer questions at this point? |
| 18:03:37 | 15 | MR. HILTON: Sounds like I signed up for it, your |
| 18:03:39 | 16 | Honor. |
| 18:03:39 | 17 | MS. MYERS: May we just excuse Dr. Moayedi? |
| 18:03:42 | 18 | THE COURT: Yes. In fact, Doctor, you're excused |
| 18:03:44 | 19 | and we're going to actually be cutting off that feed |
| 18:03:46 | 20 | because we need to do some computer updates apparently. |
| 18:03:50 | 21 | So thank you. |
| 18:03:55 | 22 | THE WITNESS: Thank you, your Honor. |
| 18:03:55 | 23 | THE COURT: So I just wanted to ask you some |
| 18:03:57 | 24 | questions so that everybody knows sort of what the |
| 18:03:59 | 25 | landscape is as we go forward for any post-hearing |

| 18:04:02 | 1 | briefing.  And it's things that we've -- kind of been the |
| 18:04:07 | 2 | elephant in the room in some sense, and so, I want to go |
| 18:04:10 | 3 | ahead and have some clarity.  So let me describe four |
| 18:04:13 | 4 | activities. |
| 18:04:15 | 5 | A person in Texas paying for someone from Texas |
| 18:04:19 | 6 | going to out of state to a place where abortion is legal |
| 18:04:23 | 7 | to obtain an abortion.  Providing funding, travel to |
| 18:04:30 | 8 | facilitate that, accompanying them as they do that.  And |
| 18:04:35 | 9 | then, finally, for an abortion care provider either |
| 18:04:39 | 10 | traveling to another state to perform abortions on someone |
| 18:04:44 | 11 | from Texas or providing telemedicine to that effect. |
| 18:04:51 | 12 | Isn't the position of the state of Texas that the |
| 18:04:53 | 13 | Texas Attorney General has legal authority to seek |
| 18:04:57 | 14 | criminal sanctions for any or all of those activities? |
| 18:05:01 | 15 | MR. HILTON:  I think we made it clear throughout |
| 18:05:03 | 16 | the day, your Honor, that we don't.  That will be a |
| 18:05:05 | 17 | district attorney or a county attorney. |
| 18:05:07 | 18 | THE COURT:  Okay.  So the second question then |
| 18:05:09 | 19 | is, what is the position of the state of Texas with regard |
| 18:05:11 | 20 | to the legal authority of the Attorney General to seek |
| 18:05:17 | 21 | civil penalties sanctions under state law? |
| 18:05:22 | 22 | MR. HILTON:  I apologize.  I don't have the -- do |
| 18:05:24 | 23 | we have the language?  I don't have it in front of me, but |
| 18:05:26 | 24 | I'm happy to read it and make sure I understand it.  As a |
| 18:05:30 | 25 | general proposition, the statute is very specific about |

| | | |
|---|---|---|
| 18:05:34 | 1 | when civil penalties may be sought. There has to be a |
| 18:05:38 | 2 | violation of Health and Safety Code, Section 178.002, |
| 18:05:45 | 3 | which is the general prohibition on abortion. And then, a |
| 18:05:49 | 4 | civil penalty, you know a person who violates that section |
| 18:05:55 | 5 | that is a person who knowingly performs, induces or |
| 18:06:00 | 6 | attempts an abortion without an exception applying, that |
| 18:06:04 | 7 | person is subject to a civil penalty of not less than |
| 18:06:07 | 8 | $100,000 for each violation. And it says the Attorney |
| 18:06:11 | 9 | General shall file an action to recover that civil |
| 18:06:13 | 10 | penalty. |
| 18:06:13 | 11 | So only under those circumstances would a person |
| 18:06:16 | 12 | be subject to a civil penalty. |
| 18:06:17 | 13 | THE COURT: Okay. And I've just described four, |
| 18:06:21 | 14 | actually, technically, five activities. What's your |
| 18:06:23 | 15 | position with regard to whether those five activities fall |
| 18:06:26 | 16 | within that statute? |
| 18:06:27 | 17 | MR. HILTON: So your Honor, I tried to write them |
| 18:06:30 | 18 | down, make sure I got them. I think for the most part, |
| 18:06:33 | 19 | your activities that you've laid out do not describe |
| 18:06:37 | 20 | someone knowingly performing, inducing, or attempting an |
| 18:06:42 | 21 | abortion. We've explored that somewhat with the witnesses |
| 18:06:44 | 22 | today about when you know that set of circumstances would |
| 18:06:48 | 23 | be met. You mentioned a doctor providing actual abortion |
| 18:06:53 | 24 | care and so, that would be what is most directly, you |
| 18:06:58 | 25 | know, covered by 178.002. And so, certainly, you know, |

18:07:02  1   those -- that type of scenario could present liability for

18:07:06  2   a civil penalty.

18:07:08  3          As a general matter, our position is that this is

18:07:11  4   not something that is amenable to a broad, you know -- a

18:07:18  5   broad up-or-down decision on the front end that like most

18:07:22  6   criminal statutes, the facts are very important and that

18:07:25  7   the appropriate time to raise a First Amendment defense to

18:07:29  8   something like this or any kind of defense to this kind of

18:07:32  9   statute would be in the context of an individual criminal

18:07:35  10  proceeding.  I think it's also important to remember that

18:07:38  11  this is essentially a First Amendment case or a right to

18:07:42  12  travel case.

18:07:43  13         This particular statute and the civil penalties

18:07:45  14  tied it to is clearly conduct.  Nothing about this statute

18:07:50  15  says anything about speech.  It talks about performing

18:07:54  16  inducing, or attempting to perform or induce an abortion.

18:07:58  17  So we're entirely outside of the First Amendment realm and

18:08:01  18  any, you know, prosecution decision or by extension any

18:08:04  19  civil penalty decision would be a case-by-case basis.  It

18:08:07  20  would depend on the facts and circumstances of the case.

18:08:10  21         THE COURT:  I guess it just occurs to me that the

18:08:13  22  implication, if not the premise, of many of the questions

18:08:16  23  that the state has been asking these plaintiffs has been

18:08:19  24  you have nothing to worry about.  But you stopped short of

18:08:25  25  saying you have nothing to worry about, and that's -- you

18:08:29  1  know, isn't it a fairly fundamental notion that citizens

18:08:33  2  are entitled to fair notice of conduct that the state is

18:08:39  3  going to use to impose criminal and civil light?  Isn't

18:08:43  4  that all they're asking for is clear notice?

18:08:46  5          MR. HILTON:  I think that's a pretty

18:08:49  6  unobjectionable concept and I think that the statutes

18:08:51  7  provide that.  I think to the extent that everyone here is

18:08:54  8  looking to the Attorney General to provide that, you know,

18:09:00  9  that's not necessarily his role.  We have to look to the

18:09:04  10 text of the statutes to the extent that there are policies

18:09:09  11 of the office of the Attorney General that are relevant.

18:09:10  12 Those are all in evidence now that the document is

18:09:15  13 evidence --

18:09:15  14         THE COURT:  Also is at least one and perhaps two

18:09:20  15 occasions where the Attorney General has made a reference

18:09:23  16 to the availability of civil penalties and in context -- I

18:09:30  17 mean, think of it this way.  Think of an activity that is

18:09:33  18 very important to you in your daily life and if the

18:09:36  19 Attorney General of the state of Texas on national news

18:09:39  20 said, we're looking very seriously at whether we can bring

18:09:45  21 the power of the state to penalize you for doing that, and

18:09:52  22 then, when you have people like the plaintiffs in this

18:09:55  23 case stepping up and saying, we don't know whether or not

18:09:59  24 you're talking about us and he goes out of his way, to say

18:10:07  25 the least, not to come and give the citizens of the state

18:10:11  1   of Texas the assurance they're seeking about what is or

18:10:15  2   isn't within his sphere of authority in terms of this

18:10:21  3   sanction, is that an unreasonable ask by these people?

18:10:24  4           MR. HILTON:  It is, your Honor, to ask him

18:10:26  5   personally to come here for a number of different reasons.

18:10:29  6   And I'd also --

18:10:30  7           THE COURT:  You would on his behalf then.

18:10:32  8           MR. HILTON:  Right.  Me on his behalf certainly

18:10:35  9   is a different question.  I guess I'll just start by

18:10:39  10  saying, you know, what your Honor is asking is essentially

18:10:41  11  the chilling theory of injury that they have laid out

18:10:43  12  here, right?  They have to show both a subjective chill.

18:10:46  13  And we would submit that the evidence today shows that

18:10:50  14  they've been subjectively chilled very little, if at all.

18:10:53  15  They're, in fact, engaging in essentially all of the same

18:10:55  16  fundraising and advocacy activities they did before.  And

18:10:59  17  to the extent there is any chill, it is a self-imposed

18:11:03  18  unreasonable chill, you know, that the chill also has to

18:11:06  19  be objectively reasonable.  And if you want to, you know,

18:11:09  20  focus in on the Attorney General's public statements on a

18:11:13  21  couple of interviews and focus only on those and say those

18:11:18  22  are what caused the chill, I think if we look at the text

18:11:21  23  of those, there is no, you know, specific threat of

18:11:24  24  prosecution.  There's a commitment to follow the law.  And

18:11:26  25  I think the case law is quite clear that that, in and of

18:11:29  1  itself, is not sufficient to cause a chilling injury and

18:11:35  2  he said we're looking into it.

18:11:36  3          THE COURT:  Would it be fair to say in context

18:11:38  4  that a listener of his comments would say that he is

18:11:41  5  looking to find a way to use civil sanctions against

18:11:47  6  potentially these plaintiffs?

18:11:49  7          MR. HILTON:  I don't think so.  I don't think he

18:11:51  8  ever mentioned these plaintiffs in particular.  I don't

18:11:53  9  think there was any specific threat directed towards them.

18:11:56  10  And you know, the characterization of whether he's looking

18:11:59  11  for a way to do that or not, you know, the statute's quite

18:12:02  12  clear, he shall bring the action, right?  So to the extent

18:12:05  13  we're talking about any discretion that he may or may not

18:12:08  14  have, the legislature has spoken on that question.

18:12:10  15          THE COURT:  Well, now you know and have

18:12:12  16  telegraphed -- not telegraphed but you have probably very

18:12:16  17  specifically described the circumstances of the plaintiffs

18:12:18  18  in this case.  Has he looked at whether or not he has the

18:12:24  19  ability to use the civil sanctions that we're talking

18:12:29  20  about against the plaintiffs in this case?

18:12:30  21          MR. HILTON:  Whatever the policy of the office of

18:12:33  22  the Attorney General is related to this stuff, your Honor

18:12:35  23  has that before you in evidence.  And I want to highlight

18:12:38  24  one point here because we've been doing this all day and I

18:12:41  25  think it's an important one.

18:12:42  1          We're talking about, you know, he, Ken Paxton,

18:12:45  2    the Attorney General.  It's important for us to remember

18:12:47  3    that who's been sued here is the official capacity

18:12:50  4    Attorney General.  That is the suit against the state and

18:12:52  5    against the entire office.  So obviously the Attorney

18:12:56  6    General's incredibly important member of our office, but

18:12:58  7    when we're talking about the policy of the state, we're

18:13:01  8    talking about state statutes and we're talking about the

18:13:03  9    policy of the office.  You know, that's the evidence that

18:13:06  10   your Honor has before you.  Can it include some statements

18:13:09  11   from the Attorney General?  You know, sure.  We're not

18:13:11  12   disputing that there could be some relevance here.  We

18:13:14  13   don't think they've proved nearly as much as what

18:13:17  14   plaintiffs would suggest.

18:13:18  15          But, you know, the fact of the matter is that

18:13:21  16   that state law is clear about what is criminalized and not

18:13:24  17   criminalized and liable and not liable here.  So, you

18:13:28  18   know, whatever the plaintiffs are doing by bringing in the

18:13:31  19   Attorney General's statements, it doesn't have -- you

18:13:35  20   know, our position would be that the Attorney General

18:13:38  21   statements are not causing any chill here.  It's either

18:13:41  22   their own subjective chill or it's, you know, whatever is

18:13:44  23   happening in state law perhaps that is chilling their

18:13:47  24   conduct.

18:13:48  25          Well, it's the legislature's prerogative to

18:13:50  1   criminalize conduct that they don't want to occur.  And

18:13:52  2   so, if that's chilling the conduct, well, then, that's

18:13:54  3   having a constitutional and intended effect of the

18:13:56  4   legislation.  So I hope that answers your question.  But I

18:13:59  5   want to just make clear here that we are talking about the

18:14:02  6   Attorney General.  Certainly some of that is in evidence.

18:14:05  7   We understand your Honor's rulings in that regard.  But it

18:14:08  8   is not just the Attorney General; it's the office, it's

18:14:10  9   the legislature and it's the entire body of, you know,

18:14:12 10   state regulations, states law, and so forth.

18:14:14 11            THE COURT:  Thank you very much.

18:14:16 12            MR. HILTON:  I've tried to answer your question.

18:14:17 13            THE COURT:  Yes.  And I appreciate that very

18:14:19 14   much.  So here's my thought.  There are two issues

18:14:21 15   remaining.  Number one is whether or not we need to take

18:14:25 16   evidence in some form from the Attorney General.  I want

18:14:29 17   to take that under advisement, given what we've heard

18:14:32 18   today and what is in play at this point.  The second thing

18:14:37 19   is, I want to in lieu of arguments today -- the case has

18:14:43 20   been well briefed before this hearing, and so, rather than

18:14:47 21   entertain additional arguments, what I want to do is --

18:14:50 22   unless you tell me you don't need it is to give you an

18:14:52 23   opportunity to file posttrial briefs and you can just do

18:14:57 24   in memorandum form is fine.

18:15:02 25            To the extent that there is something that has

| 18:15:05 | 1 | come into evidence today that relates to any of your |
| 18:15:08 | 2 | arguments or defenses that -- or that you want to |
| 18:15:12 | 3 | highlight or focus me on, that's always helpful to me |
| 18:15:17 | 4 | because I may have heard it one way and not realize that |
| 18:15:21 | 5 | it has implications for something that is important to |
| 18:15:24 | 6 | you. |
| 18:15:24 | 7 |           And so, I want to give you the opportunity to |
| 18:15:27 | 8 | give me additional briefing in an informal brief just to |
| 18:15:32 | 9 | highlight what we've heard today and what has been |
| 18:15:34 | 10 | admitted into evidence and how it fits with whatever your |
| 18:15:37 | 11 | arguments previously were.  I think that would be helpful, |
| 18:15:39 | 12 | and so, I want to get to this quickly, obviously.  But I |
| 18:15:43 | 13 | want to give you a meaningful opportunity to do that. |
| 18:15:45 | 14 |           So does anybody have an idea of how long you |
| 18:15:47 | 15 | would like to do that?  Understanding you want to. |
| 18:15:53 | 16 |           MS. MYERS:  Your Honor, I think we could probably |
| 18:15:56 | 17 | file supplemental briefing posttrial -- post-hearing |
| 18:16:00 | 18 | briefing within a week if that's appropriate for you. |
| 18:16:02 | 19 |           May I also just raise one issue with respect to |
| 18:16:04 | 20 | the first issue? |
| 18:16:05 | 21 |           THE COURT:  Sure. |
| 18:16:06 | 22 |           MS. MYERS:  We did not obviously move to enter |
| 18:16:09 | 23 | into evidence the other statements by Attorney General |
| 18:16:13 | 24 | Paxton that are on our exhibit list because he was not |
| 18:16:15 | 25 | here today, and my understanding is, there were objections |

| | |
|---|---|
| 18:16:18 | 1 | with respect to authenticity and hearsay.  And so, I just |
| 18:16:22 | 2 | wanted to -- as you're considering that, I wanted to ask |
| 18:16:25 | 3 | again whether the state might be willing to withdraw those |
| 18:16:28 | 4 | objections so that that evidence could come in before you |
| 18:16:31 | 5 | make a decision about whether we need to call General |
| 18:16:34 | 6 | Paxton. |
| 18:16:34 | 7 | THE COURT:  Would you -- how would you like to |
| 18:16:36 | 8 | respond to that first part? |
| 18:16:38 | 9 | MR. WASSDORF:  Your Honor, with respect to the |
| 18:16:42 | 10 | other -- I guess this would be the tweets? |
| 18:16:46 | 11 | MS. MYERS:  Your Honor, I believe it's the tweets |
| 18:16:48 | 12 | and then, also, his campaign page where he's made some |
| 18:16:51 | 13 | statements, as well. |
| 18:16:52 | 14 | MR. WASSDORF:  You know, we don't have any |
| 18:16:56 | 15 | authenticity objections, but I mean, without being able -- |
| 18:17:01 | 16 | without having any witness to discuss the contents, I |
| 18:17:04 | 17 | think it's difficult to establish the premise -- |
| 18:17:06 | 18 | THE COURT:  Well, then we can -- then you're |
| 18:17:08 | 19 | saying we need a witness.  You can't have your cake and |
| 18:17:11 | 20 | eat it, too.  Or eat your cake and have it. |
| 18:17:15 | 21 | MR. WASSDORF:  I don't believe that Senator -- |
| 18:17:17 | 22 | excuse me.  I used to work at the Senate when Senator |
| 18:17:20 | 23 | Paxton was there.  That's why he's always Senator to me. |
| 18:17:22 | 24 | I don't believe that his knowledge is necessary to |
| 18:17:27 | 25 | establish the relevance to specifically the plaintiffs in |

```
18:17:35    1  this case is what I would be getting at.  But if your
18:17:39    2  Honor is inclined, I think we would be willing to allow it
18:17:43    3  into evidence.
18:17:43    4         THE COURT:  I'm not inclined any way.  I'm just
18:17:47    5  asking whether or not you have objection.
18:17:48    6         MR. WASSDORF:  No objection, your Honor.
18:17:52    7         THE COURT:  Okay.  So admitted.  Thank you.
18:17:56    8         Ms. Hilton, or, Mr. Hilton.
18:17:58    9         THE CLERK:  I need the numbers.
18:17:59   10         THE COURT:  Do you have exhibits numbers?
18:18:02   11         MS. MYERS:  I do.  Would you like them right now
18:18:03   12  or could we do it off the record?  I don't know which one
18:18:06   13  is --
18:18:07   14         THE COURT:  Okay.  If you could confer with each
18:18:08   15  other and make sure that you're on the same page.  That's
18:18:08   16  great.
18:18:10   17         Ms. Hilton.
18:18:12   18         MS. HILTON:  Your Honor, could we get -- maybe we
18:18:14   19  could confer about this.  We proposed having a deadline
18:18:17   20  for posttrial briefing in time for the parties to get the
18:18:20   21  transcript.  And perhaps we could also impose some page
18:18:22   22  limits on that or come to some agreement with.
18:18:25   23         THE COURT:  I'm all for page limits.  Yes.  And
18:18:27   24  as my law clerk, you saw him turn around --
18:18:29   25         MS. MYERS:  We'd have to confer on that, as well.
```

| | |
|---|---|
| 18:18:31 | 1 |
| 18:18:33 | 2 |
| 18:18:37 | 3 |
| 18:18:47 | 4 |

THE COURT:  That's great.  Everybody's being very reasonable and I appreciate that.  So confer on timing and page limit and I think that Lily can get a transcript by 7:00.  Yes.

MS. CASTANEDA:  Your Honor, as one of the appellate-oriented lawyers.

THE COURT:  Sure.

MS. CASTANEDA:  It always concerns me when I hear that we're going to take care of exhibit numbers off the record.  Is there a method by which we can transmit the information?  Or I hate to make anybody stay.

MS. MYERS:  I can also be ready to do this in about two minutes if that's easier.

THE COURT:  That's great.  And --

MS. CASTANEDA:  Thank you, your Honor.

THE COURT:  Actually, why don't you just confer and file a joint notice, that's fine.  And if there's a dispute, we can take that up later.  But thank you.

MS. CASTANEDA:  Thank you, your Honor.

MR. HILTON:  And I'd just suggest, it seems like we could file something, anyway, with regard to a briefing schedule and all that and so --

THE COURT:  Exactly.  I don't want reply briefs, though.  One shot from each side is great.  That's all I need.

| 18:19:32 | 1 | MR. HILTON: And do I understand your Honor |

```
18:19:32   1        MR. HILTON:  And do I understand your Honor

18:19:33   2   correctly that you'd like a response to their motion for

18:19:35   3   reconsideration on the motion to quash?

18:19:37   4        THE COURT:  Yes.  If you'd like to file something

18:19:41   5   by close of business tomorrow on that, that's a fairly

18:19:44   6   straightforward issue.

18:19:45   7        MR. HILTON:  Okay.

18:19:45   8        THE COURT:  Okay.  Great.  All right.  Again,

18:19:48   9   it's been a long day.  Thank you very much for your

18:19:50  10   patience -- yes.

18:19:52  11        MS. CASTANEDA:  I guess one more question.  To

18:19:56  12   the extent that the Court determines that General Paxton

18:20:02  13   will not be compelled to testify and also denies the

18:20:07  14   alternative relief that we've requested in our motion to

18:20:09  15   exclude, might we have the opportunity to file essentially

18:20:12  16   an offer of proof to make part of the record what

18:20:16  17   questions we would have asked General Paxton and what

18:20:19  18   testimony we expected to elicit so that, again, we have

18:20:22  19   just a complete record just for purposes of complete

18:20:26  20   record?

18:20:28  21        MR. OLSON:  We don't have any objections to that,

18:20:29  22   your Honor.

18:20:30  23        THE COURT:  Okay.  Great.  That will be great.

18:20:30  24   I'll give you that opportunity.  Thank you.

18:20:32  25        MS. CASTANEDA:  Thank you, your Honor.
```

| 18:20:33 | 1 | MR. OLSON: When you said in the form of a |
| 18:20:36 | 2 | memorandum, your Honor, you mean you don't want the tables |
| 18:20:38 | 3 | of contents and the indices or -- |
| 18:20:42 | 4 | THE COURT: I don't. I just want -- I mean, I'll |
| 18:20:43 | 5 | take whatever you want. |
| 18:20:46 | 6 | MR. OLSON: That's a dangerous -- |
| 18:20:48 | 7 | THE COURT: I just mean that you don't have to -- |
| 18:21:05 | 8 | something fairly straightforward. I was really wanting to |
| 18:21:07 | 9 | not make you go through the motions in the form of filing. |
| 18:21:09 | 10 | Just the substance of what you want to tell me based on |
| 18:21:12 | 11 | what the evidence was today. That's my main concern. |
| 18:21:18 | 12 | Rather, form -- excuse me, substance over form is what I |
| 18:21:20 | 13 | meant. |
| 18:21:21 | 14 | MR. OLSON: Your Honor, I don't know which -- |
| 18:21:23 | 15 | with me and Ms. Castaneda here, I don't know how you |
| 18:21:26 | 16 | thought you were getting out of not seeing more paper. |
| 18:21:29 | 17 | THE COURT: I'm always good with the appellate |
| 18:21:31 | 18 | lawyers. They either -- they keep me out of trouble until |
| 18:21:33 | 19 | they get me in trouble. All right. |
| 18:21:36 | 20 | Anything else? Okay. Thank you all so much and |
| 18:21:39 | 21 | we'll be adjourned. |
| | 22 | (Proceedings concluded.) |
| | 23 | |
| | 24 | |
| | 25 | |

```
1                        *  *  *  *  *  *

2

3   UNITED STATES DISTRICT COURT  )

4   WESTERN DISTRICT OF TEXAS)

5

6      I, LILY I. REZNIK, Certified Realtime Reporter,

7   Registered Merit Reporter, in my capacity as Official

8   Court Reporter of the United States District Court,

9   Western District of Texas, do certify that the foregoing

10  is a correct transcript from the record of proceedings in

11  the above-entitled matter.

12     I certify that the transcript fees and format comply

13  with those prescribed by the Court and Judicial Conference

14  of the United States.

15  WITNESS MY OFFICIAL HAND this the 30th day of September,

16  2022.

17                          Lily Iva Reznik

18                          ~~~~~~~~~~~~~~~~~~~~~~~~
                            LILY I. REZNIK, CRR, RMR
19                          Official Court Reporter
                            United States District Court
20                          Austin Division
                            501 West 5th Street,
21                          Suite 4153
                            Austin, Texas 78701
22                          (512)391-8792
                            SOT Certification No. 4481
23                          Expires: 1-31-23

24

25
```

Case: 22-50859 Document: 6 Page: 547 Date Filed: 10/07/2022

# Exhibit B

| | |
|---|---|
| **From:** | Christopher Hilton <Christopher.Hilton@oag.texas.gov> |
| **Sent:** | Wednesday, October 5, 2022 9:29 PM |
| **To:** | jecklund@thompsoncoburn.com |
| **Cc:** | emyers@thompsoncoburn.com; Amy Hilton; Will Wassdorf; Kirsten Castaneda; Atkins, John P.; Lowell, Allyn J.; Alexandra Albright; Leif Olson; e.magee@allison-bass.com; Leslie.Dippel@traviscountytx.gov |
| **Subject:** | Re: FTC v. Paxton - conference on dates |

Thanks for letting us know. That doesn't change the basis of our motion so we're going to go ahead and file.

Get Outlook for iOS

> Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>
> Wednesday, October 5, 2022 8:47:57 PM
> Christopher Hilton <Christopher.Hilton@oag.texas.gov>
> Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Alexandra Albright <Aalbright@adjtlaw.com>; Leif Olson <Leif.Olson@oag.texas.gov>; e.magee@allison-bass.com <e.magee@allison-bass.com>; Leslie.Dippel@traviscountytx.gov <Leslie.Dippel@traviscountytx.gov>
> Re: FTC v. Paxton - conference on dates

Hey, all—I just looked into this because I was confused, the exhibits we uploaded contained the page on apex, it appears there was a glitch in filing/PACER when it got submitted.

We can confer in the morning—obviously, we don't object to the court considering that page, we didn't realize it hadn't uploaded or made it into the record. Let me know what a good time to discuss next steps would be...I don't know whether you're proposing appellate review based on the missing page or asking the trial court to reconsider with that info.

I have availability between 9-11:30 to discuss.

Thanks—
Jenny

Sent from my iPhone

> On Oct 5, 2022, at 8:13 PM, Christopher Hilton <Christopher.Hilton@oag.texas.gov> wrote:

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

App.546

Ok

Get Outlook for iOS

_____

      Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
     Wednesday, October 5, 2022 7:37:24 PM
   Christopher Hilton <Christopher.Hilton@oag.texas.gov>
  Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Amy Hilton <Amy.Hilton@oag.texas.gov>;
Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Kirsten Castaneda <kcastaneda@adjtlaw.com>; Atkins,
John P. <JAtkins@thompsoncoburn.com>; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Alexandra
Albright <aalbright@adjtlaw.com>; Leif Olson <Leif.Olson@oag.texas.gov>; e.magee@allison-bass.com
<e.magee@allison-bass.com>; Leslie.Dippel@traviscountytx.gov <Leslie.Dippel@traviscountytx.gov>
     Re: FTC v. Paxton - conference on dates

Thank you for the explanation.  We are opposed. Please be sure to include a copy of the entire exchange
around the apex doctrine issue, including where I informed your team that we didn't believe the apex
doctrine applied given the specific issues in this case.

Thanks,

Elizabeth

Sent from my iPhone


> On Oct 5, 2022, at 7:32 PM, Christopher Hilton <christopher.hilton@oag.texas.gov>
> wrote:
>
>
> We will be seeking appellate review based in part on the denial of our sovereign
> immunity defense. We also are going to note that you all omitted from your exhibits and
> your motion the email where we advised you that you had not demonstrated you were
> entitled apex testimony.
>
>
> Get Outlook for iOS
> _____
>      Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
>      Wednesday, October 5, 2022 7:18 PM
>    Christopher Hilton <Christopher.Hilton@oag.texas.gov>
>   Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Amy Hilton
> <Amy.Hilton@oag.texas.gov>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Kirsten
> Castaneda <kcastaneda@adjtlaw.com>; Atkins, John P.
> <JAtkins@thompsoncoburn.com>; Lowell, Allyn J. <ALowell@thompsoncoburn.com>;
> Alexandra Albright <aalbright@adjtlaw.com>; Leif Olson <Leif.Olson@oag.texas.gov>;
> e.magee@allison-bass.com <e.magee@allison-bass.com>;
> Leslie.Dippel@traviscountytx.gov <Leslie.Dippel@traviscountytx.gov>
>      Re: FTC v. Paxton - conference on dates

App.547

Chris - Can you please tell us the basis of the motion to stay?  I think we are likely opposed but it would be helpful to know the basis so we can provide you an informed position.

Thanks,

Elizabeth

Sent from my iPhone

> On Oct 5, 2022, at 7:14 PM, Christopher Hilton <christopher.hilton@oag.texas.gov> wrote:

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

---

We are going to file a motion to stay the court's order. We'll assume you are opposed unless you note otherwise.

Get Outlook for iOS

---

Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>
Wednesday, October 5, 2022 12:43 PM
Christopher Hilton <Christopher.Hilton@oag.texas.gov>; Amy Hilton <Amy.Hilton@oag.texas.gov>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>; Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Kirsten Castaneda <kcastaneda@adjtlaw.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Alexandra Albright <Aalbright@adjtlaw.com>; Leif Olson <Leif.Olson@oag.texas.gov>
e.magee@allison-bass.com <e.magee@allison-bass.com>; leslie.dippel@traviscountytx.gov <leslie.dippel@traviscountytx.gov>
FTC v. Paxton - conference on dates

Counsel:

In light of the Court's Order yesterday, we wanted to touch base on next steps.  We believe the testimony sought is most efficiently obtained in an evidentiary hearing, and I am happy to contact the court for available dates if you agree.

If you'd prefer to present Mr. Paxton by deposition, we are available October 17-21, and October 27-28.  We are happy to take the deposition in the location most convenient to your client, wherever that may be.

App.548

Please let me know which date/mode of testimony you'd prefer so that we can make the appropriate arrangements.  I am available to confer by phone if that is better for you as well.


Thanks—
Jenny


**Jenny Ecklund**


**Thompson Coburn LLP**

# Exhibit C

And we don't believe the apex doctrine applies to this case, especially given the uni ue role General Paxton's own words play in threats to our clients.

est,

Elizabeth

**Elizabeth G. Myers**
emyers@thompsoncoburn.com
P: 972 629 7111
F: 972 629 7171

**Thompson Coburn LLP**
2100 Ross Avenue Suite 3200
Dallas, TX 75201
www.thompsoncoburn.com

**From:** Amy Hilton <Amy.Hilton@oag.texas.gov>
**Sent:** Thursday, September 22, 2022 2:54 PM
**To:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>
**Cc:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Leslie.Dippel@traviscountytx.gov; Christopher Hilton <Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Eric Magee <e.magee@allison-bass.com>; Leif Olson <Leif.Olson@oag.texas.gov>
**Subject:** RE: FTC v. Paxton - conference on motion for leave to appear remotely at PI hearing

<div style="background-color: yellow; text-align: center;">**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**</div>

Hi Elizabeth,

Saturday at 9am works for us. The rest of our team has conflicts on Saturday, so can we plan to confer on Sunday at 9am?

As to the Attorney General, we don't believe there's been a showing that entitles plaintiffs to apex testimony.

Thanks,
Amy

**From:** Myers, Elizabeth G. <EMYERS@thompsoncoburn.com>
**Sent:** Thursday, September 22, 2022 1:39 PM
**To:** Amy Hilton <Amy.Hilton@oag.texas.gov>; Will Wassdorf <Will.Wassdorf@oag.texas.gov>
**Cc:** Ecklund, Jennifer R. <JEcklund@thompsoncoburn.com>; Leslie.Dippel@traviscountytx.gov; Christopher Hilton <Christopher.Hilton@oag.texas.gov>; aalbright@adjtlaw.com; Lowell, Allyn J. <ALowell@thompsoncoburn.com>; Hillier, Sadie <SHillier@thompsoncoburn.com>; Atkins, John P. <JAtkins@thompsoncoburn.com>; Eric Magee <e.magee@allison-bass.com>
**Subject:** RE: FTC v. Paxton - conference on motion for leave to appear remotely at PI hearing

Amy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazaleh Moayedi, DO, MPH, FACOG, | § § § § § § § | |
| Plaintiffs, | § | |
| vs. | § § | CIVIL CAUSE NO. 1:22-cv-859-RP |
| KEN PAXTON, in his Official Capacity as Attorney General; et al., | § § § | |
| Defendants. | § | |

## ORDER

Before the Court is a motion to stay brought by Defendant Ken Paxton ("Paxton"). (Mot. Stay, Dkt. 84). Having considered the motion, response, and any reply, the Court determines that the motion to stay should be denied.

IT IS ORDERED that Paxton's motion to stay, (Dkt. 84), is **DENIED**.


**SIGNED** on _____.


_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

1

App.552

**Exhibit 12:** Attorney General Paxton's Notice of Appeal

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

FUND TEXAS CHOICE, *et al.*,          §
                                      §
          *Plaintiffs,*               §
                                      §
v.                                    §          No. 1-22-CV-859-RP
                                      §
KEN PAXTON, in his official capacity  §
of Attorney General, *et al.*         §
                                      §
          *Defendants.*               §

---

## ATTORNEY GENERAL PAXTON'S NOTICE OF APPEAL

---

Defendant Attorney General Ken Paxton appeals to the United States Court of Appeals for the Fifth Circuit from the trial court's Order signed on October 4, 2022 (Dkt. 83), which de facto denied the sovereign immunity defense raised in Defendant's Motion to Dismiss Plaintiff's Complaint (Dkt. 33). *See Carswell v. Camp*, 37 F.4th 1062, 1066 (5th Cir. 2022); *Tex. v. Caremark, Inc.*, 584 F.3d 655, 658 (5th Cir. 2009).

This appeal "divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). Accordingly, all claims against the Attorney General are stayed by operation of law pending resolution of his appeal. *See Whole Woman's Health v. Jackson*, 13 F.4th 434, 445 (5th Cir. 2021) (per curiam). Unless the Court orders otherwise, the Attorney General understands that this divestiture of jurisdiction vacates the October 11 deadline to "meaningfully confer . . . to agree on the particulars of Paxton's testimony." (Dkt. 83 at 13.)

App.554

Dated October 7, 2022.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN E. COWLES**
Deputy Attorney General for Civil Litigation

**CHRISTOPHER D. HILTON**
Chief, General Litigation Division

*/s/ Amy S. Hilton*

**AMY SNOW HILTON**
Assistant Attorney General
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

**LEIF OLSON**
Special Counsel
Texas Bar No. 24032801
Leif.Olson@oag.texas.gov

**WILLIAM D. WASSDORF**
Assistant Attorney General
Texas Bar No. 24103022
Will.Wassdorf@oag.texas.gov

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**Counsel for Attorney General
Ken Paxton**

## CERTIFICATE OF SERVICE

I certify that on October 7, 2022, this document was served via the Court's ECF system to all counsel of record.

*/s/ Amy S. Hilton*
**AMY SNOW HILTON**